No. 23-16091

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

HOWARD JARVIS TAXPAYERS ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

v.

CITY OF SAN JOSE,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Consolidated Case Nos. 5:22-cv-00501-BLF and 5:22-cv-02365-BLF
Hon. Beth Labson Freeman

**APPELLANTS' EXCERPTS OF RECORD VOLUME 2 OF 4**

Jonathan M. Coupal, SBN 107815
Timothy A. Bittle, SBN 112300
Laura E. Dougherty, SBN 255855
Howard Jarvis Taxpayers Foundation
1201 K Street, Ste. 1030
Sacramento, CA 95814
Telephone: (916) 444-9950

*Attorneys for Appellants*

[This page intentionally left blank]

[This page intentionally left blank]

# UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF** | THE NORTHERN DISTRICT OF CALIFORNIA |

**Form 1. Notice of Appeal from a Judgment or Order of a
United States District Court**

U.S. District Court case number: | 5:22-cv-00501-BLF; 5:22-cv-02365-BLF |

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | 01/25/2022; 04/15/2022 |

Date of judgment or order you are appealing: | 07/28/2023 |

Docket entry number of judgment or order you are appealing: | 109 |

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

National Association for Gun Rights, Inc.; Mark Sikes; Howard Jarvis Taxpayers Association; Silicon Valley Taxpayers Association; Silicon Valley Public Accountability Foundation; Jim Barry; and, George Arrington

Is this a cross-appeal?  ○ Yes    ◉ No

If yes, what is the first appeal case number? | |

Was there a previous appeal in this case?  ○ Yes    ◉ No

If yes, what is the prior appeal case number? | |

Your mailing address (if pro se):

| |

| |

City: | |    State: | |    Zip Code: | |

Prisoner Inmate or A Number (if applicable): | |

**Signature** | |    **Date** | |

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 1**                    Excerpts 031                    *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

National Association for Gun Rights, Inc; Mark Sikes

Name(s) of counsel (if any):

Harmeet K. Dhillon; Michael A. Columbo; Mark P. Meuser; David A. Warrington; Jeremiah D. Graham

Address: 177 Post St. Ste. 700, San Francisco, CA 94108

Telephone number(s): 415-433-1700

Email(s): harmeet@dhillonlaw.com; mcolumbo@dhillonlaw.com; mmeuser@dhillonlaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?    ⦿ Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

City of San Jose; Jennifer Maguire; City of San Jose Council

Name(s) of counsel (if any):

Joseph W. Cotchett; Andrew F. Kirtley; Tamarah P. Prevost

Address: 840 Malcolm Road, Suite 200 Burlingame CA 94010

Telephone number(s): 650-697-6000

Email(s): jcotchett@cpmlegal.com; akirtley@cpmlegal.com; tprevost@cpmlegal.com

*To list additional parties and/or counsel, use next page.*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Howard Jarvis Taxpayers Association; Silicon Valley Taxpayers Association; Silicon Valley Public Accountability Foundation; Jim Barry; and George Arrington

Name(s) of counsel (if any):

Jonathan M. Coupal; Timothy A. Bittle; Laura E. Dougherty

Address: 1201 K Street, Suite 1030, Sacramento, CA 95814

Telephone number(s): 916-444-9950

Email(s): tim@hjta.org

Is counsel registered for Electronic Filing in the 9th Circuit?  ● Yes   ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 6**                    Excerpts 033                    *New 12/01/2018*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NORTHERN DISTRICT OF CALIFORNIA

### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

U.S. District Court case number: 5:22-cv-00501-BLF

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 01/25/2022

Date of judgment or order you are appealing: 07/28/2023

Docket entry number of judgment or order you are appealing: 109

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes ○ No ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

National Association for Gun Rights, Inc.; Mark Sikes; Howard Jarvis Taxpayers Association; Silicon Valley Taxpayers Association; Silicon Valley Public Accountability Foundation; Jim Barry; and, George Arrington

Is this a cross-appeal? ○ Yes ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ○ Yes ◉ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: State: Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** **Date**

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 1** Excerpts 034 *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

National Association for Gun Rights, Inc; Mark Sikes

Name(s) of counsel (if any):

Harmeet K. Dhillon; Michael A. Columbo; Mark P. Meuser; David A. Warrington;

Address: | 177 Post St. Ste. 700, San Francisco, CA 94108

Telephone number(s): | 415-433-1700

Email(s): | harmeet@dhillonlaw.com; mcolumbo@dhillonlaw.com; mmeuser@dhi

Is counsel registered for Electronic Filing in the 9th Circuit?   ● Yes    ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

City of San Jose; Jennifer Maguire; City of San Jose Council

Name(s) of counsel (if any):

Joseph W. Cotchett; Andrew F. Kirtley; Tamarah P. Prevost

Address: | 840 Malcolm Road, Suite 200, Burlingame, CA 94010

Telephone number(s): | 650-697-6000

Email(s): | jcotchett@cpmlegal.com; akirtley@cpmlegal.com; tprevost@cpmlegal.c

*To list additional parties and/or counsel, use next page.*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 6**                    Excerpts 035                    *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

| |
|---|
| Howard Jarvis Taxpayers Association; Silicon Valley Taxpayers Association; Silicon Valley Public Accountability Foundation; Jim Barry; and, George |

Name(s) of counsel (if any):

| |
|---|
| Jonathan M. Coupal; Timothy A. Bittle; Laura E. Dougherty |

Address: 1201 K Street, Suite 1030, Sacramento, CA 95814

Telephone number(s): 916-444-9950

Email(s): tim@hjta.org

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

| |
|---|
| |

Name(s) of counsel (if any):

| |
|---|
| |

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

| |
|---|
| |

Name(s) of counsel (if any):

| |
|---|
| |

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 6**          Excerpts 036          *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

| | |
|---|---|
| Name of U.S. District Court: | Northern District of California |
| U.S. District Court case number: | 5:22-cv-00501-BLF |
| Date case was first filed in U.S. District Court: | 01/25/2022 |
| Date of judgment or order you are appealing: | 07/13/2023 |

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

○ Yes   ◉ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

National Association for Gun Rights, Inc.; Mark Sikes

Is this a cross-appeal?  ○ Yes   ◉ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?   ○ Yes   ◉ No

If Yes, what is the prior appeal case number?

Your mailing address:

177 Post St.

Ste. 700

| City: | San Francisco | State: | CA | Zip Code: | 94108 |
|---|---|---|---|---|---|

Prisoner Inmate or A Number (if applicable):

| **Signature** | | **Date** | |
|---|---|---|---|

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 1**                                                          *Rev. 12/01/2018*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 6. Representation Statement**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List each party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

National Association for Gun Rights, Inc.; Mark Sikes

Name(s) of counsel (if any):

Harmeet K. Dhillon; Michael A. Columbo; Mark P. Meuser; David A. Warrington;

Address: | 177 Post St., Ste. 700, San Francisco, CA 94108

Telephone number(s): | 415-433-1700

Email(s): | harmeet@dhillonlaw.com; MColumbo@dhillonlaw.com; MMeuser@d

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

City of San Jose; Jennifer Maguire; City of San Jose Council

Name(s) of counsel (if any):

Joseph W. Cotchett; Andrew F. Kirtley; Tamarah P. Prevost

Address: | 840 Malcolm Road, Suite 200, Burlingame, CA 94010

Telephone number(s): | 650-697-6000

Email(s): | jcotchett@cpmlegal.com; akirtley@cpmlegal.com; tprevost@cpmlegal.

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?    ○ Yes    ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  MICHAEL A. COLUMBO (SBN: 271283)
   mcolumbo@dhillonlaw.com
3  MARK P. MEUSER (SBN: 231335)
   mmeuser@dhillonlaw.com
4  JEREMIAH D. GRAHAM (SBN: 313206)
   jgraham@dhillonlaw.com
5
   DHILLON LAW GROUP INC.
6  177 Post Street, Suite 700
7  San Francisco, California 94108
   Telephone: (415) 433-1700
8

9  DAVID A. WARRINGTON (*pro hac vice*)
   dwarrington@dhillonlaw.com
10 DHILLON LAW GROUP INC.
   2121 Eisenhower Avenue, Suite 402
11 Alexandria, VA 22314
   Telephone: (571) 400-2121
12

13 *Attorneys for Plaintiffs National Association for Gun Rights, Inc., and
   Mark Sikes*
14

15 JONATHAN M. COUPAL (SBN: 107815)
   TIMOTHY A. BITTLE (SBN: 112300)
16 LAURA E. DOUGHERTY (SBN: 255855)
   Howard Jarvis Taxpayers Foundation
17 1201 K Street, Suite 1030
18 Sacramento, CA 95814
   Telephone: (916) 444-9950
19 Email: tim@hjta.org

20 *Attorneys for Howard Jarvis Taxpayers Association,
   Silicon Valley Public Accountability Foundation,
21 Silicon Valley Taxpayers Association, Inc., George
   Arrington, and James Barry*
22

23

24                    [Case caption follows on next page]

25

26

27

28

`

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES,** an individual, | Case Number: 5:22-cv-00501-BLF |
| And | **PLAINTIFFS' NOTICE OF INTENT NOT TO AMEND COMPLAINT** |
| **HOWARD JARVIS TAXPAYERS ASSN.,** a nonprofit corporation, **SILICON VALLEY TAXPAYERS ASSN.,** a nonprofit corporation, **SILICON VALLEY PUBLIC ACCOUNTABILITY FOUNDATION,** a nonprofit corporation, **JIM BARRY,** an individual, and **GEORGE ARRINGTON,** an individual, | |
| Plaintiffs, | |
| v. | |
| **CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,** | |
| Defendants. | |

TO THE ABOVE-ENTITLED COURT AND TO ALL PARTIES AND THEIR

ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that ALL PLAINTIFFS—National Association for Gun Rights,

Inc., Mark Sikes, Howard Jarvis Taxpayers Association, Silicon Valley Public Accountability

Foundation, Silicon Valley Taxpayers Association, Inc., George Arrington, and James Barry

(hereinafter, the "Plaintiffs")—will not amend the consolidated complaint herein and file this notice to give "the district court an opportunity to… **enter an order dismissing the action, one that is clearly appealable**." *Lopez v. City of Needles, Cal.*, 95 F.3d 20, 22 (9th Cir. 1996) (emphasis added). The Plaintiffs respond with this "formal notice of [their] intent not to amend" so that "the threatened dismissal" will "ripen[] into a final, appealable judgment." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065 (9th Cir. 2004).

Respectfully submitted,

Date: July 27, 2023

DHILLON LAW GROUP INC.

By:   /s/ Michael A. Columbo
      Harmeet K. Dhillon
      Michael A. Columbo
      Mark P. Meuser
      David A. Warrington*
      Jeremiah D. Graham
      *Admitted *pro hac vice*.

*Attorneys for the National Association for Gun Rights and Mark Sikes*

Date: July 27, 2023

HOWARD JARVIS TAXPAYERS FOUNDATION

By:   /s/ Timothy A. Bittle
      Jonathan M. Coupal
      Timothy A. Bittle
      Laura E. Dougherty

*Attorneys for Howard Jarvis Taxpayers Association, Silicon Valley Public Accountability Foundation, Silicon Valley Taxpayers Association, Inc., George Arrington, and James Barry*

**CERTIFICATION**

I hereby certify that on July 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this action. I hereby certify that Timothy A. Bittle reviewed and approved the use of his electronic signature on this document.

By:        /s/ Michael A. Columbo
           Michael A. Columbo

1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  TAMARAH P. PREVOST (SBN 313422)
   tprevost@cpmlegal.com
3  ANDREW F. KIRTLEY (SBN 328023)
   akirtley@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Fax: (650) 697-0577
7

8  *Attorneys for Defendants City of San Jose, et al.*

9
                **UNITED STATES DISTRICT COURT**
10
               **NORTHERN DISTRICT OF CALIFORNIA**
11
                    **SAN JOSE DIVISION**
12

13 | **NATIONAL ASSOCIATION FOR GUN** | Case No. 5:22-cv-00501-BLF
   | **RIGHTS, INC.**, a nonprofit corporation, and |
   | **MARK SIKES**, an individual, |
14 | | **DEFENDANTS' REPLY IN SUPPORT OF**
   | And | **MOTION TO DISMISS PLAINTIFFS'**
15 | | **CONSOLIDATED SECOND AMENDED**
   | **HOWARD JARVIS TAXPAYERS ASSN.**, | **COMPLAINT**
16 | a nonprofit corporation, **SILICON VALLEY** |
   | **TAXPAYERS ASSN.**, a nonprofit corporation, | Date:    June 15, 2023
17 | **SILICON VALLEY PUBLIC** | Time:    9:00 a.m.
   | **ACCOUNTABILITY FOUNDATION,** a | Judge:   Hon. Beth Labson Freeman
18 | nonprofit corporation, **JIM BARRY**, an | Dept.:   San Jose Courthouse, Courtroom 3
   | individual, and **GEORGE ARRINGTON**, an | (5th Floor)
19 | individual, |

20      Plaintiffs,

21         v.

22 **CITY OF SAN JOSE**, a public entity,
23 **JENNIFER MAGUIRE**, in her official capacity
   as City Manager of the City of San Jose,
24 **CITY OF SAN JOSE CITY COUNCIL**, and
   **ALL PERSONS INTERESTED** in the matter of
25 San Jose Ordinance No. 30716, establishing an
   Annual Gun Harm Reduction Fee,
26

27      Defendants.

28

Defendants' Reply ISO Motion to Dismiss Consolidated Second Amended Complaint
Case No. 5:22-cv-00501-BLF

Excerpts 044

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................... 1

II. ARGUMENT ........................................................................................................... 1

    A.  The NAGR Plaintiffs' Claims Challenging the Insurance Requirement Should Be Dismissed With Prejudice. ........................................................................ 1

        1.  The Insurance Requirement Does Not Infringe on Conduct Covered by the Second Amendment's Plain Text. ............................................................ 2

        2.  The Insurance Requirement is Consistent with the Nation's Historical Tradition of Firearm Regulation and Can Be Resolved as a Matter of Law ......... 4

    B.  The HJTA Plaintiffs' Claims Challenging the Fee Requirement under Tax-Related Provisions of the California Constitution Should Also Be Dismissed with Prejudice. ..... 8

        1.  HJTA Plaintiffs' Article XIII C Claim (Claim 6) ................................. 8

        2.  HJTA Plaintiffs' Tax-Delegation Claim (Claim 7) ............................. 9

    C.  Plaintiffs' Remaining Claims Challenging the Fee Requirement Should Be Dismissed Because They Are Still Unripe for Review. ................................... 9

    D.  Even If the Court Finds Any of Plaintiffs' Remaining Claims Ripe, They Should Each Be Dismissed for Failure to State a Claim. ........................................ 12

        1.  The Second Amendment Claims (Claims 1, 3, and 5) ........................ 12

        2.  The Compelled Speech and Association Claims (Claims 2, 3, and 4) ............... 13

III. CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ...................................................................................................4

*Bishop Paiute Tribe v. Inyo County*,
863 F.3d 1144 (9th Cir. 2017) ...................................................................................11

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) ....................................................................................................14

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................................2, 6

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015) ..................................................................................12

*Janus v. AFSCME Council 31*,
138 S. Ct. 2448 (2018) ..............................................................................................14

*Kwong v. Bloomberg*,
723 F.3d 160 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) ........................12

*McDonald v. Chicago*,
561 U.S. 742 (2010) ....................................................................................................6

*Nat'l Fed'n of Indep. Business v. Sebelius*,
567 U.S. 519 (2012) ....................................................................................................3

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ..................................................................................... *passim*

*O'Connell v. Gross*,
2020 WL 1821832 (D. Mass. Apr. 10, 2020) ...........................................................12

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980) ....................................................................................................14

*Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*,
547 U.S. 47 (2006) ....................................................................................................14

*Schmeer v. County of Los Angeles*,
213 Cal. App. 4th 1310 (2013) ...............................................................................8, 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ................................................................................................3, 4

**Statutes**

San Jose Municipal Code

§ 10.32.210.................................................................................................1, 2, 3

§ 10.32.215.........................................................................................................1

§ 10.32.240.......................................................................................................13

§ 10.32.245.........................................................................................................3

**Rules**

Federal Rules of Civil Procedure

Rule 12(b)(1).....................................................................................................15

Rule 12(b)(6)...........................................................................................1, 2, 15

# I.    INTRODUCTION

In their Consolidated Second Amended Complaint ("SAC") (ECF No. 94), Plaintiffs seek to invalidate San Jose's Gun Harm Reduction Ordinance ("Ordinance"), Muni. Code §§ 10.32.200-10.32.250, which requires non-exempt gun owners residing in San Jose to (1) maintain liability insurance covering harm from accidental shootings (the "Insurance requirement"), and (2) pay an annual Gun Harm Reduction Fee ("Fee") to a City-designated nonprofit organization ("Nonprofit") to fund voluntary services for gun owners and their families (the "Fee requirement"). §§ 10.32.210, 10.32.215.[1] The parties agree the Insurance requirement is now fully implemented, but the Fee requirement is not. ¶¶ 40, 42, 45.[2]

Plaintiffs' claims either lack substantive merit (with respect to the Insurance requirement) or should be dismissed as being unripe or otherwise baseless (with respect to the Fee requirement). *See generally* Mot. to Dismiss the SAC ("Motion") (ECF No. 95). Plaintiffs' challenges to the Insurance requirement under the Second Amendment to the U.S. Constitution (parts of Claims 1 and 3), and to the Fee requirement under tax-related provisions of the California Constitution (Claims 6 and 7), should be dismissed with prejudice for failure to state a claim under Rule 12(b)(6). Mot. at 10-16, 22-24, 25:9-20. Plaintiffs' remaining claims challenging the unimplemented Fee requirement under the First and Second Amendments and related state constitutional provisions (Claims 1-5) should be dismissed because they are unripe for review, or otherwise fail to state a claim. Mot. at 16-22.

Nothing in Plaintiffs' Opposition papers warrants a contrary result, as Plaintiffs' arguments either ignore entirely the basis of the City's Motion or the reasoning applied by the Court in an earlier procedural posture. *See* ECF No. 102 ("HJTA Opp'n"); ECF No. 103 ("NAGR Opp'n"). Such reasoning is appropriately applied here to dismiss each of the Plaintiffs' claims in the SAC, most with prejudice.

# II.    ARGUMENT

## A.    The NAGR Plaintiffs' Claims Challenging the Insurance Requirement Should Be Dismissed With Prejudice.

The Ordinance's Insurance requirement provides that non-exempt gun owners must maintain

---

[1] "§" on its own refers to a section of the Ordinance. *See* SAC, Ex. E (copy of the Ordinance).

[2] "¶" on its own refers to a paragraph in the SAC.

liability insurance for firearm accidents. § 10.32.210. The NAGR Plaintiffs bring a facial challenge to this requirement under the Second Amendment to the U.S. Constitution (¶¶ 84-92) (Claim 1), as well as a derivative claim for declaratory relief "to the extent that" the Second Amendment claim "ha[s] not already established a remedy" (¶¶ 100-102) (Claim 3). The HJTA Plaintiffs do not challenge the Insurance requirement. *See* ¶ 102. Whether the NAGR Plaintiffs have alleged a viable legal theory under the Second Amendment turns on the two-part test announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*"): (1) whether Plaintiffs can show "the Second Amendment's plain text covers an individual's conduct" and, if so, (2) whether the government can demonstrate that "the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.* at 2126.[3] Because the NAGR Plaintiffs' challenge to the Insurance requirement fails to state a claim at both steps of the *Bruen* framework, their claims should be dismissed with prejudice under Rule 12(b)(6). *See* Mot. at 10-16, 25.

### 1.   The Insurance Requirement Does Not Infringe on Conduct Covered by the Second Amendment's Plain Text.

As the Court is aware from having already analyzed the Ordinance under *Bruen*, the analysis of Second Amendment challenges begins with the Amendment's "plain text." *Bruen*, 142 S. Ct. at 2126-27, 2129. The relevant text provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II; *see also District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (holding that this text "guarantee[s] the individual right to possess and carry weapons in case of confrontation"). Plaintiffs' obligation at *Bruen*'s first step is to show that "the Second Amendment's plain text covers an *individual's conduct*." 142 S. Ct. at 2126 (emphasis added). The NAGR Plaintiffs have failed to do this in the SAC, for at least three reasons.

*First*, the preliminary finding the Court must make is the defined scope of conduct that Plaintiffs allege is covered by the Second Amendment's plain text. *Bruen*, 142 S.Ct. at 2134. Plaintiffs

---

[3] The NAGR Plaintiffs' strange argument that "*Bruen* adopted a one-step test" (NAGR Opp'n at 3:15) is directly contradicted by Plaintiffs' quotations from *Bruen* (*id.* at 3:15-22; ¶ 86) and the text of *Bruen* itself, as well as this Court's correct prior analysis (MPI Order at 13-14).

define the scope of conduct as "the right to keep and bear arms for self-defense within the home." ¶ 13; NAGR Opp'n at 7. Brady, accepted as *amicus curiae* in this case, defined the conduct at issue as "insuring liability that might arise from a firearm-related accident." ECF No. 99-1, Brady Amicus Curiae Br. ("Brady Br.") at 11:6. The Court previously (preliminarily and in a different procedural posture) defined the course of conduct as "owning or possessing a firearm without firearm liability insurance." ECF No. 72 ("MPI Order") at 15. The definitions advanced by both Brady and the Court are more appropriate and tailored to the facts of the case, and the City's arguments prevail under either of them.

Plaintiffs' contrary contention that the Ordinance threatens the "right to keep and bear arms," period, is inapposite. The Insurance requirement does not imperil ownership, possession, or use of firearms, *see* § 10.32.245 (presently inoperative "impoundment" provision)—which Plaintiffs concede in the SAC. ¶ 51 ("At present, the City has no authority to seize a person's gun for violating the Ordinance."). Rather, it requires them to obtain, from a private third-party insurance company, liability insurance indemnifying them against "losses or damages resulting from any accidental use of the Firearm." § 10.32.210. This does not threaten Plaintiffs' ability to own, possess, use, or otherwise "keep and bear arms." *See Nat'l Fed'n of Indep. Business v. Sebelius*, 567 U.S. 519, 558 (2012) (explaining that a health insurance mandate might be "inherently" related to "health care consumption," but the two are simply "not the same thing," in part because they "involve different transactions, entered into at different times, with different providers"). As Brady notes, the Insurance requirement "is consistent with other government insurance mandates that also raise no serious constitutional concerns even though they make insurance a prerequisite for engaging in constitutionally protected activity." Brady Br. at 11:16-18 (citing mandates that businesses, including gun ranges and gun stores, have workers compensation and liability insurance); MPI Order at 15:26-28 (crediting "the strong arguments offered by [Brady] that the Second Amendment is not implicated by the Insurance Requirement or Fee provisions").

The course of conduct defined by the NAGR Plaintiffs is not "proscribed by [the Insurance requirement]"—or even threatened by it. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *accord* MPI Order at 15 (noting "the Insurance Requirement would not imperil the ownership or

possession of anyone's firearms"). The NAGR Plaintiffs' generic, cookie-cutter arguments that the Insurance requirement, for instance, "impos[es] a burden on gun ownership and possession" and "seeks to regulate the keeping and bearing of arms" are wholly insufficient and untethered to the Ordinance's plain text. NAGR Opp'n at 5:2-6.

*Second*, the Court previously dismissed this claim with leave to amend, due to the NAGR Plaintiffs' failure to define a "proposed course of conduct for the Court to determine whether it is covered by the Second Amendment's plain text." ECF No. 81 ("MTD Order") at 10:7-10 & n.2. Having failed again to adequately do so in the SAC, the NAGR Plaintiffs' claim should be dismissed with prejudice. *See Susan B. Anthony List*, 573 U.S. at 159 (looking to whether "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute"); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (same). It should not be up the Court to articulate this "necessary allegation" for the Plaintiffs. MTD Order at 10:8.

*Third*, the NAGR Plaintiffs' allegations in the SAC also fail to establish they have Article III standing to challenge the Insurance requirement. *See Susan B. Anthony List*, 573 U.S. at 159; *Babbitt*, 442 U.S. at 298. Regardless of whether the Court might be able to infer from the SAC an alleged "course of conduct arguably affected with a constitutional interest, but proscribed by a statute," the NAGR Plaintiffs have certainly failed to "allege[] an **intention to engage in**" in that course of conduct, as required to establish standing. *Susan B. Anthony List*, 573 U.S. 149, 159 (2014) (emphasis added); *Babbitt*, 442 U.S. at 298. All the NAGR Plaintiffs allege is that they are "subject to the Ordinance," not that that they currently lack insurance that satisfies the Insurance requirement and intend to continue owning or possessing firearms without obtaining the required insurance. ¶¶ 13-14; *see also* Mot. at 10:27-28 (noting Plaintiffs' failure to allege they currently lack compliant insurance). Plaintiffs thus lack standing.

### 2. The Insurance Requirement is Consistent with the Nation's Historical Tradition of Firearm Regulation and Can Be Resolved as a Matter of Law.

Even assuming, liberally, that Plaintiffs can satisfy the first prong of *Bruen* by defining a scope of conduct falling within the Second Amendment's plain text, the Ordinance is firmly grounded in this

country's historical tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2149. It is the City's burden to "'demonstrat[e] that [the Insurance Requirement] is consistent with the Nation's historical tradition of firearm regulation,'" and that there are sufficiently "relevantly similar" historical regulations to defeat Plaintiffs' Second Amendment claim. MPI Order at 16:9-13 (quoting *Bruen*, 142 S. Ct. at 2130, 2132); *see also Bruen*, 142 S. Ct. at 2132-33 (government need only "identify a well-established and representative historical analogue, not a historical twin," keeping in mind that "regulatory challenges posed by firearms today are not always the same as those" in 1791 or 1868, and "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated"). The parties' and Brady's briefing on this issue raises four principal arguments.

*First*, on the issue of history, there are numerous "relevantly similar" historical analogues supporting the constitutionality of the Insurance requirement, including strikingly similar surety statutes, as is described further in the City's Motion. *See* Mot. at 14:9-19; *see also* Brady Br. at 14:1-17. As this Court previously found, "the mid-19th century surety statutes … bear striking analogical resemblances to the Insurance Requirement," and further "that surety laws and the Insurance Requirement share substantial overlap as to the 'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" MPI Order at 18:19-21 (quoting *Bruen*, 142 S. Ct. at 2133); *see also id.* at 18:22-20:2 (rejecting Plaintiffs' arguments for distinguishing the surety laws from the Insurance requirement). Moreover, even putting surety laws to the side, "the history of reallocating costs of firearm accidents—from which the Insurance Requirement descends—can be traced back to the early American practice of imposing strict liability for such accidents." MPI Order at 17:20-18:7.

In response, Plaintiffs repeat the same hyperbolic arguments, failing to grapple in depth with the relevant legal issues. *Compare, e.g.*, NAGR Opp'n at 6:17-7:20 (calling the surety laws an "inapt analogy" because the Ordinance is based on the "[i]nherent … assumption that every person is a danger and [] must purchase their right to own a gun"), *with* MPI Order at 17:15, 18:8-21 (finding the surety laws and Insurance requirement "bear striking analogical resemblances" and "substantial overlap" because they have "similar … deterrent purposes" and "achieve their purposes through similar means, namely the threat of financial consequences (either through a peace bond or higher premiums) for individuals deemed to be high-risk (either by a judge or an underwriter)"), *and* Mot. at 13-16.

Similarly, Plaintiffs' allegations that the Insurance requirement has no historical analogues because San Jose's former Mayor referred to it as "novel" and the first of its kind (NAGR Opp'n at 4, 6; ¶¶ 87-88) is irrelevant to the nuanced and searching historical inquiry *Bruen* requires, and is not appropriately focused on the clear text of the Ordinance germane to this case.

**Second**, given *Bruen*'s discussion of the great "variety" of gun regulations permitted under the Second Amendment, *Bruen*, 142 S. Ct. at 2162 (quoting *Heller*, 554 U.S. at 636), even firearms laws that have no clear historical analogues—such as laws requiring fingerprinting, background checks, and firearms training—will often pass constitutional muster because they reflect state and local governments' legitimate and well-established power to uphold peace and good order, including through the regulation of firearms. *See* Mot. at 14-16 (collecting authorities). This is consistent with the wide variety of gun regulations, including wholly contemporary regulations, that *Bruen* blessed as *per se* constitutional. *See Bruen*, 142 S. Ct. at 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring). The Insurance requirement here is analogous to and significantly less burdensome than many of those regulations. *See also* Brady Br. at 17-18 (contending that approximately 93 percent of homeowners already have the required liability insurance through their homeowner's policy). And it is certainly less burdensome than the laws the Supreme Court has historically struck down as violating Second Amendment rights, all of which have either sought to directly prohibit or prevent most or all people from keeping or bearing arms. *See McDonald v. Chicago*, 561 U.S. 742, 750 (2010) (law "banning handgun possession); *Heller*, 554 U.S. at 628, 630, 632 (law requiring a firearm be stored and transported in a way that "makes it impossible" to use it for self-defense); *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) (striking down law that "in effect den[ies] the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens'"); *id.* at 2157 (Alito, J., concurring) (explaining that "all we decide" in "today's decision" is "that a State may not enforce a law … that *effectively prevents* its law-abiding residents from carrying a gun" for self-defense or other lawful purposes). The Insurance requirement here bears no resemblance to such laws.

The NAGR Plaintiffs' response is that, after *Bruen*, Courts may no longer consider the burdens imposed by gun regulations. *See* NAGR Opp'n at 5:13 ("Whether a regulation's burden is small or great, impactful or inconsequential is immaterial."); *id.* at 1:22 (arguing the City's discussions of

comparable burdens "smuggle in the … balancing test the [*Bruen*] Court rejected"); *id.* at 7:21-23 (similar). But the NAGR Plaintiffs' argument is directly contrary to *Bruen* itself. *See Bruen*, 142 S. Ct. at 2128, 2133 (providing that, at step two of *Bruen*, two "central considerations" are "whether modern and historical regulations impose a comparable *burden* on the right of armed self-defense and [] whether that *burden* is comparably justified" (emphases added)); *accord* MPI Order at 15:21-23 (analysis of "the degree to which Plaintiffs' Second Amendment rights have been burdened … occur[s] under the 'historical tradition' prong of the *Bruen* framework"). Plaintiffs thus both pressure this Court to strike down the Ordinance under *Bruen*, while also asking the Court to misapply it.

*Third*, this issue can and should be decided now as a matter of law. Under *Bruen* step two, the Insurance requirement minimally burdens Second Amendment rights and is sufficiently similar to historical firearm regulations that it is constitutional under *Bruen*. No discovery is required to reach this conclusion. While the NAGR Plaintiffs argue that their insurance claim should survive the pleading stage because they allege "enough facts to raise a reasonable expectation that discovery will reveal evidence to support the allegations," NAGR Opp'n at 3:6-7, 4:16-19 & n.1, 8:7-17 (quoting *Starr v. Baca*, 652 F.3d 12012, 1217 (9th Cir. 2011)), they never explain what those facts are likely to be or how they would change the analysis. The claim should be dismissed. The text of the Ordinance is established, and the parties do not dispute either that the Insurance requirement is fully implemented and presently being enforced, or that *Bruen* supplies the governing legal standard to determine its constitutionality under the Second Amendment. Plaintiffs' claims as pled are insufficient to state a claim, even after having been granted leave to amend.

*Fourth*, the City's arguments are supported again by *amicus curiae* Brady, which is a nationally recognized authority on the history and present-day landscape of firearms regulation. *See Brady Br.* Brady argues, among other things, that the Insurance requirement descends from a well-established historical tradition of American governments allocating costs associated with risks, including through insurance mandates, and that the NAGR Plaintiffs' challenge to the Insurance requirement here fails at both steps of the *Bruen* framework. *See id*. As with the City's arguments, the NAGR Plaintiffs ignore many of these arguments, as well.

**B.     The HJTA Plaintiffs' Claims Challenging the Fee Requirement under Tax-Related Provisions of the California Constitution Should Also Be Dismissed with Prejudice.**

While the City's principal argument about Plaintiffs' claims challenging the Fee requirement is lack of ripeness because the Fee is still not implemented (*see infra* § II.C), at least two of Plaintiffs' claims challenging the Fee requirement can and should be dismissed now for failure to state a claim. These claims allege that the Fee requirement violates the California Constitution's prohibitions on imposing a special "tax" without voter approval under article XIII C (Claim 6), and on delegating the power to tax under article XIII (Claim 7). ¶¶ 114-27. The HJTA Plaintiffs have repeatedly conceded that the fate of these claims is tied together, in the sense that both claims fail if the Court rules against them on the threshold issue of whether the Fee is a "tax" under article XIII C of the California Constitution. *See* MTD Order at 23:2-4; HJTA Opp'n at 19:6-8.

The Court previously dismissed the lead claim (Claim 6) with leave to amend on that very threshold issue, noting specific pleading deficiencies under *Iqbal. See* MTD Order at 22:5-26; *see also id.* at 13-15, 22-23 (holding that Plaintiffs' allegations indicate the Fee is not a "tax" under *Schmeer v. County of Los Angeles*, 213 Cal. App. 4th 1310, 1328-29 (2013), because the Fee is not "payable to, or for the benefit of, a local government"). As the City has shown, the HJTA Plaintiffs then re-pled a virtually *identical* version of that claim. *See* Mot. at 23:7-12. Having already been given leave to amend once and squandered it, thereby wasting the parties' and the Court's time, the HJTA Plaintiffs should not be given leave to amend a second time. Both claims should be dismissed with prejudice.

**1.     HJTA Plaintiffs' Article XIII C Claim (Claim 6)**

The Court previously dismissed this claim, in part, because it "contain[ed] very limited factual allegations," "largely legal conclusions couched in the language of article XIII C," and thus "f[ell] short of the federal standard required by *Ashcroft v. Iqbal*." MTD Order at 22. The HJTA Plaintiffs then re-filed the *exact same* claim, except for the addition of a single conclusory sentence stating "The fes [sic] is therefore invalid." *Compare* ¶¶ 114-121, *with HJTA* action, No. 22-cv-02365-BLF, ECF No. 1, Compl. ¶¶ 25-30). The claim is subject to dismissal with prejudice for this reason alone.

It also subject to dismissal because, among other reasons, the Fee is still not a "tax" under Article XIII C and *Schmeer* for all the reasons stated in the Court's prior MTD Order. *See* Mot. at 23-

24 (citing MTD Order at 13-15, 22-23); *see also id.* ¶¶ 57, 109 (Plaintiffs repleading the allegation that the Ordinance requires the Fee be paid directly to the Nonprofit, which the Court previously noted, in its MTD Order at 22, seemed on its own to be fatal to the claim under *Schmeer*).

In response, the HJTA Plaintiffs do not deny that they repled the same allegations as before despite the Court's finding that such allegations were insufficient under *Iqbal*. *See* HJTA Opp'n at 12-18. Instead, they side-step that issue to press three arguments, often convoluted, attempting to distinguish *Schmeer* as follows: (1) the fee in *Schmeer* was paid to a private entity, whereas the Fee here is not currently being paid to anyone because the Nonprofit has not yet been established (*id.* at 12-14); (2) the fact that the services funded by the Fee are intended to reduce gun harm, and thereby benefit the San Jose public, means the Fee is "for the benefit of a local government" and thus a "tax" within the meaning of *Schmeer* (*id.* at 14-15), and (3) the HJTA Plaintiffs "believe" a state Court of Appeal would limit *Schmeer* because *Schmeer* was wrongly decided (*id.* at 15-18). The Court has noted that *Schmeer* was "thorough," "persuasive," and the "touchstone" of the appropriate analysis. The HJTA Plaintiffs haven't suggested a sensical distinction of *Schmeer*, or cited any alternative on-point case that the Court could apply. The claim should be dismissed with prejudice.

### 2. HJTA Plaintiffs' Tax-Delegation Claim (Claim 7)

The HJTA Plaintiffs' seventh claim should likewise be dismissed with prejudice because they "again concede that they have no claim for an unlawful delegation of the power to tax unless this Court first finds that the City's fee is a 'tax'" under their sixth claim. HJTA Opp'n at 19:6-8. For the reasons stated above, and as previously stated by this Court, the HJTA Plaintiffs have again failed to adequately allege the Fee is "tax" within the meaning of the California Constitution despite being given a chance to amend. *See* MTD Order at 22:5-23:4. This claim should also be dismissed with prejudice.

### C. Plaintiffs' Remaining Claims Challenging the Fee Requirement Should Be Dismissed Because They Are Still Unripe for Review.

All Plaintiffs' claims involve facial challenges to the Ordinance's Fee requirement, including federal constitutional challenges under the First and Second Amendments, and closely related state constitutional challenges. ¶¶ 84-127. But this Court has held on two occasions that certain federal and state constitutional challenges were not ripe for review, specifically because: the Fee requirement was

not being enforced, the Nonprofit had not been designated, "the Ordinance does not specify what the Nonprofit's activities will be," and the Court could not tell "whether the Fee would fund *any* kind of speech or expressive activities." MPI Order at 7-10 (concluding that, "[w]ithout a concrete idea of the Nonprofit's actual programs and activities, the Court is left 'entangling [itself] in abstract disagreements'"); MTD Order at 7-9, 18-19, 23.

Since then, the City has been working hard to implement this unique Ordinance, but the only two developments in implementing the Fee requirement to have subsequently occurred—which the Court's prior reasoning indicates could affect the ripeness of the Second Amendment claims (*see infra* § II.D.1) but not the First Amendment claims (*see infra* § II.D.2)—are that the City has at least preliminarily set the Fee amount at $25 and promulgated regulations defining the Ordinance's "financial hardship" exemption. ¶¶ 31, 39; SAC Ex. H, § 4 (financial hardship regulations); *see also* Mot. at 4, 5; ECF No. 85 (Jan. 2023 Status Report). The City has not yet designated or contracted with a Nonprofit, the final Fee amount has not been confirmed by the City Council, the Fee requirement is not yet operational or enforceable, and the non-existent Nonprofit has yet to use Fee revenues to provide services to gun owners and their families (nor has the precise nature of those services yet been articulated). Mot. at 16-20. Thus, the lack of ripeness remains today.

Plaintiffs make various misguided arguments in an effort to avoid this conclusion and to obtain a premature (and, for some claims, impossible) adjudication of their challenges to the Fee requirement. For example, the NAGR Plaintiffs generically argue instead that they face "a credible threat of prosecution" for failure to pay the Fee (obviously not true, since the Fee is not being enforced), and that learning "[t]he name of the nonprofit … [will] not change the constitutionality of the [Fee requirement]" (ignoring the actual ripeness analysis relevant to Plaintiffs' claims, and the Court's stated reasons the lack of ripeness). NAGR Opp'n at 8:24, 9:2-3. Meanwhile, the HJTA Plaintiffs argue that "Plaintiffs' rights should not hang in limbo" due to the City's "delays" in implementing the Fee Requirement (again, ignoring that no one's rights are "in limbo" as the Fee is neither being charged nor enforced), and using outdated facts to argue, incorrectly and without supporting allegations, that the City is somehow engaged in "duplicity" and deriving unspecified "benefit[s] from causing delay" of the Fee requirement's implementation. HJTA Opp'n at 5-6. These arguments are all some combination

of hyperbole, unsupported speculation, or are simply irrelevant. And none of Plaintiffs' arguments identify for the Court how it can rule on speech or association claims without knowing what services the Nonprofit will provide, and without the requirement in question even being enforced.

Constitutional ripeness requires establishing injury-in-fact (of which here, there is none), and prudential ripeness requires considering the fitness of issues for judicial decision, and the hardship to the parties of withholding court consideration. *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153-54 (9th Cir. 2017). Plaintiffs fail to allege injury-in-fact with respect to the Fee requirement for the substantially the same reasons that they fail to allege injury-in-fact to to challenge the Insurance requirement. *See supra* § II.A.1. Specifically, no Plaintiff alleges that they intend to continue owning or possessing firearms but not to comply with the Fee requirement when it comes into effect. ¶¶ 13-21. The NAGR Plaintiffs attempt to rebut this with the bare assertion that they have "establish[ed] … standing" without any explanation or citation to allegations in the complaint. NAGR Opp'n at 10:8; *see also id.* at 9:20-21 (arguing that NAGR Plaintiff Sikes "objects [to the Fee Requirement] by virtue of filing this lawsuit"). Further, there is no prejudice to Plaintiffs whatsoever of withholding judicial review of the Fee requirement claims until it is operationalized and being enforced. Every day that goes by without the Fee being implemented or enforceable is, presumably, a benefit to Plaintiffs, and it is unclear why Plaintiffs are dissatisfied the Fee requirement has not been implemented sooner.

The City has made progress in implementing its novel Ordinance, but the structure and terms of the Fee requirement are unique, have not been done by the City before, and rely upon interest from qualified nonprofit organizations outside of the City's control. There is no "deception" explaining why an RFI rather than an RFP process was used to secure interest from nonprofits as Plaintiffs haphazardly claim. The RFI process is broader, casts a wide net, and seeks more information from potential nonprofit recipients about how those nonprofits might provide services, collect payment, and otherwise operationalize the Ordinance's directives. *See generally* ECF No. 85 (Jan. 2023 Status Update). The Court should also reject Plaintiffs' attempts to conjure up some other form of prejudice, such as by going outside the SAC to falsely assert (without any legal or factual authority) that San Jose gun owners are somehow currently "accumulating debt of $25/year" while the Fee requirement remains

unimplemented. HJTA Opp'n at 14:4-5. The Fee requirement is not retroactive. When implemented, it will start to be enforced, and not before.

Plaintiffs' challenges to the Fee requirement should thus be dismissed for lack of ripeness. Nothing in the SAC or Plaintiffs' Opposition briefs warrant a different result.

**D.  Even If the Court Finds Any of Plaintiffs' Remaining Claims Ripe, They Should Each Be Dismissed for Failure to State a Claim.**

**1.  The Second Amendment Claims (Claims 1, 3, and 5)**

Because the Fee amount has at least been preliminarily set at $25 and the City has implemented regulations defining the Ordinance's "financial hardship" exemption (based on 30% area median income), the Court could determine that the Fee requirement is ripe for adjudication with respect to Plaintiffs' Second Amendment and related state constitutional claims. *See* MPI Order at 12 (ruling that "the promulgation of regulations on these two points" was necessary for the claim to be ripe); SAC Ex. H, § 4-3 (financial hardship regulations). The question for Second Amendment purposes, is whether this $25 Fee with the financial hardship exemption is so "exorbitant [as to] deny ordinary citizens their right to public carry." *Bruen,* 142 S. Ct. at 2138 n.9; *accord* MPI Order at 12. It obviously is not.

"Properly interpreted, the Second Amendment allows a variety of gun regulations," including laws far more intrusive than payment of a $25 Fee (e.g., fingerprinting, background and mental health record checks) so long as they reflect state and local governments legitimate power to uphold peace and good order. *Bruen*, 142 S. Ct. at 2162. The Ordinance's Fee requirement here is significantly less burdensome than the various laws that the *Bruen* Court indicated were *per se* constitutional, and the $25 Fee amount is clearly not exorbitant under any common-sense understanding of the term, or under Second Amendment case law. *See, e.g., Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015) (upholding $48 in gun licensing fees); *Kwong v. Bloomberg*, 723 F.3d 160, 161, 167 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (upholding $340 gun licensing fee); *O'Connell v. Gross*, 2020 WL 1821832 (D. Mass. Apr. 10, 2020) (upholding $300 in fees and mandatory gun safety courses).

In response, Plaintiffs simply ignore the controlling "exorbitant" test for fees under *Bruen*, and instead argue other non-controlling issues. *See, e.g.*, NAGR Opp'n at 7-8 (arguing *Bruen* rejected the

"means-end" scrutiny test for Second Amendment challenges, and discussing case law about administrative fees intended to defray costs directly incurred by governments). The Second Amendment and related declaratory relief challenges to the Fee requirement should thus be dismissed.

The same is true of the HJTA Plaintiffs' state-law "unconstitutional conditions" claim, which necessarily falls with the Second Amendment claim. In a vain attempt to avoid this outcome, the HJTA Plaintiffs directly contradict their own allegation that "[a]t present, the City has no authority to seize a person's gun for violating the Ordinance" (¶ 51) by arguing the opposite. *See* HJTA Opp'n at 11-12 (arguing the City presently *has* the legal authority to seize firearms for violations of the Ordinance); *contra* MTD Order at 20 (finding "there are no means by which a San Jose gun owner may be deprived of his or her firearm" for violating the Ordinance, and calling any contrary view is a "misinterpretation" of the law). Specifically, the HJTA Plaintiffs argue that, despite its own contrary allegations and the City's repeated prior concessions in this litigation that it lacks authority to take possession of firearms for violations of the Ordinance, the City's ability to seize firearms for various violations of criminal law might also apply to the Ordinance. *See* HJTA Opp'n at 11-12. Among other fatal flaws with this argument, the Ordinance does not authorize criminal punishment for violations, but expressly authorizes only civil and administrative remedies such as "administrative citations" and "administrative fines." § 10.32.240. The HTJA Plaintiffs' other argument that the "[t]he City has identified no federal law that would deprive it of the power to enforce its own ordinance" (*id.* at 12:14-15) references an argument that has never been raised in this case, and that is otherwise perplexing and/or irrelevant.

## 2. The Compelled Speech and Association Claims (Claims 2, 3, and 4)

Plaintiffs bring claims facially challenging the Fee requirement on compelled speech and association grounds under the First Amendment (Claims 2 and 3) and an analogous provision of the California Constitution (Claim 4). ¶¶ 93-106. Despite the claims' obvious lack of ripeness, including for reasons set forth in this Court's earlier reasoning (*see supra* II.C), Plaintiffs rehash their prior arguments anyway. *See* HJTA Opp'n at 8-9; NAGR Opp'n at 9. Several of Plaintiffs' arguments are absurd on their face. For example, the HJTA Plaintiffs argue that the $25 Fee necessarily constitutes compelled speech or association because the Nonprofit will have to engage in "communication" to

provide the voluntary services contemplated by the Ordinance. HJTA Opp'n at 9:9-20. This argument seems to assume that all communication is protected by the First Amendment and the California Constitution, which is incorrect. *See City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (recognizing that not every group is engaged in "the sort of 'expressive association' that the First Amendment has been held to protect"); MPI Order at 9:16-27 ("It is also unclear whether the Fee would fund *any* kind of speech or expressive activities," noting for example "a program that may reduce gun harm without involving speech or other expressive activity, such as offering optional firearm safety training to first-time gun owners"). Plaintiffs likewise repeat that *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), categorically forbids "[a]ny compelled payments to a private organization." *See* NAGR Opp'n at 9:16-20; HJTA Opp'n at 9:2-8. This has also already been rejected by this Court. *See* MTD Order at 8:14-16 ("To the extent NAGR Plaintiffs argue that—regardless of the Nonprofit's actual activities—the Supreme Court's decision in *Janus* instructs that a mandatory Fee to *any* nonprofit would violate the First Amendment, this argument is unavailing.").

Ripeness aside, substantively the compelled speech and association claims should be dismissed as meritless, for at least two additional reasons. First, Plaintiffs are not "forced … to support [the Nonprofit's] speech" (¶¶ 95, 105) because whatever expressive speech (if any) the Nonprofit ultimately engages in, Plaintiffs will never lose their ability to "expressly disavow" their connection to that message. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (rejecting shopping center's First Amendment challenge to state law requiring it to allow certain expressive activity on its property); *Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*, 547 U.S. 47, 65 (2006) (rejecting compelled-speech-and-association challenge to federal law conditioning law schools' receipt of federal funds on allowing on campus military recruiters during era of "Don't Ask, Don't Tell" because law did "not sufficiently interfere with any message of the school"). Second, the Ordinance does not violate Plaintiffs' associational rights because they remain free to associate with others and voice disapproval of the Ordinance and the nonprofit. *See Rumsfeld*, 547 U.S. at 69-70 (right to associate not violated "regardless of how repugnant" law schools considered "Don't Ask, Don't Tell" policy to be).

Ultimately, Plaintiffs have not plausibly alleged the Fee requirement will compel them and other San Jose gunowners to engage in expressive speech and association with which they disagree in

violation of the First Amendment or the California Constitution. Plaintiffs' federal and state constitutional claims based on compelled speech and association should be dismissed.

**III.     CONCLUSION**

For the foregoing reasons, the City respectfully requests that the Court dismiss Plaintiffs' SAC under Rules 12(b)(1) and 12(b)(6). Since the SAC's defects with respect to claims challenging the Insurance requirement and tax-related claims challenging the Fee requirement cannot be cured, the City respectfully asks that the dismissal of those claims be without leave to amend. To the extent the Court determines the Second Amendment challenges to the Fee requirement are ripe for review, those claims should also be dismissed with prejudice.

Dated:  March 30, 2023                          Respectfully submitted,

                                                **COTCHETT, PITRE & McCARTHY, LLP**

                                                By: */s/ Tamarah P. Prevost*
                                                      JOSEPH W. COTCHETT
                                                      TAMARAH P. PREVOST
                                                      ANDREW F. KIRTLEY

                                                *Attorneys for Defendants City of San Jose, et al.*

1   JONATHAN M. COUPAL, State Bar No. 107815
    TIMOTHY A. BITTLE, State Bar No. 112300
2   LAURA E. DOUGHERTY, State Bar No. 255855
    Howard Jarvis Taxpayers Foundation
3   1201 K Street, Suite 1030
    Sacramento, CA 95814
4   (916) 444-9950

5   Attorneys for Plaintiffs
    HOWARD JARVIS TAXPAYERS ASSN., et al.
6

7

8                    UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

                        SAN JOSE DIVISION
10

11  NATIONAL ASSN. FOR GUN RIGHTS,          No. 22-cv-00501-BLF
    et al.,
12
                    Plaintiffs
13
           v.
14
    CITY OF SAN JOSE, et al.,
15
                    Defendants
16  ─────────────────────────────────        No. 22-cv-02365-BLF

17  HOWARD JARVIS TAXPAYERS ASSN.,
    et al.,
18                                           **HJTA'S OPPOSITION TO CITY'S MOTION**
                    Plaintiffs               **TO DISMISS PLAINTIFFS' COMPLAINT**
19
           v.
20
    CITY OF SAN JOSE,                        Date:   June 15, 2023
21                                           Time:   9:00 a.m.
                    Defendant                Judge:  Hon. Beth Labson Freeman
22                                           Dept:   San Jose Courtroom 3

23

24

25

26

27

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES. ............................................................................... 3

ARGUMENT. ................................................................................................... 5

    I.    THE CITY'S VERSION OF THE FACTS MUST BE REJECTED
        ON A MOTION TO DISMISS. ............................................................. 5

    II.   PLAINTIFFS' FIRST AMENDMENT SPEECH AND ASSOCIATION
        CLAIMS ARE RIPE FOR REVIEW CONCLUSION. .................................. 5

        A.    Plaintiffs' Rights Should Not Hang In Limbo While The City
               Delays Implementation. ........................................................ 5

        B.    Plaintiffs' First Amendment Claims Are Ripe Enough For
               Facial Review ...................................................................... 8

    III.  AMENDMENTS TO THE COMPLAINT WARRANT DENYING
        THE CITY'S RENEWED MOTION TO DISMISS PLAINTIFFS'
        UNCONSTITUTIONAL CONDITION CLAIM .......................................... 10

    IV.  PLAINTIFFS' UNVOTED TAX CLAIM IS CURRENTLY
        DISTINGUISHABLE FROM *SCHMEER*, AND IS NONETHELESS
        ALLOWED UNDER *SCHMEER*, A CASE THAT SHOULD NOT BE
        EXTENDED BEYOND ITS FACTS. ..................................................... 12

        A.    *The Fee Is Not Currently Being Paid To A Private
               Entity.* ................................................................................ 13

        B.    *Even If A Nonprofit Is Designated, Schmeer, By Its Own
               Terms, Will Not Apply.* ......................................................... 14

        C.    *This Court Should Not Extend Schmeer's Reach To Vastly
               Different Facts.* ................................................................... 15

    V.   IF PLAINTIFFS' CLAIM OF UNLAWFUL DELEGATION IS
        DISMISSED ON RIPENESS GROUNDS, IT SHOULD BE WITH
        LEAVE TO AMEND ....................................................................... 19

CONCLUSION .............................................................................................. 20

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Cal. Chamber of Commerce v. State Air Res. Bd.*
(2017) 10 Cal.App.5th 604. ........................................................................ 16

*Cal. Motor Transp. Co. v. State Bd. of Equal.*
(1947) 31 Cal.2d 217. ................................................................................ 18

*City of Glendale v. Trondsen*
(1956) 300 P.2d 235. .................................................................................. 26

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
657 F.3d 936 (9th Cir. 2011). ...................................................................... 8

*Decker v. Advantage Fund, Ltd.*
362 F.3d 593 (9th Cir. 2004). ...................................................................... 5

*Griffith v. City of Santa Cruz*
(2012) 207 Cal.App.4th 982. ............................................................... 15-16

*Hill RHF Hous. Partners, L.P. v. City of L.A.*
(2021) 12 Cal.5th 458. ............................................................................... 18

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*
499 F.3d 1048 (9th Cir. 2007). .................................................................... 5

*Jacks v. City of Santa Barbara*
(2017) 3 Cal.5th 248. ................................................................................. 18

*Janus v. AFSCME Council 31*
138 S.Ct. 2448 (2018). ................................................................................ 9

*Knox v. City of Orland*
(1992) 4 Cal.4th 132. ................................................................................. 16

*Mills v. Cnty. of Trinity*
(1980) 108 Cal.App.3d 656. ....................................................................... 18

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
No. 22-cv-00501-BLF, 2022 U.S. Dist. LEXIS 138385, at *42
(N.D. Cal. Aug. 3, 2022). ........................................................................... 16

*Prof. Engineers in Cal. Gov. v. Kempton*
(2007) 40 Cal.4th 1016. ............................................................................. 18

*Roberts v. United States Jaycees*
468 U.S. 609 (1984). .................................................................................... 8

*Schmeer v. County of Los Angeles*
(2013) 213 Cal.App.4th 1310. .......................................................... *passim*

3

*United States v. Stevens*
130 S.Ct. 1577, 176 L.Ed. 2d 435 (2010)....................................................... 8


**CONSTITUTIONS**

**California Constitution**
Art. 1, § 1............................................................................................... 10
Art. XI, § 5............................................................................................. 12
Art. XI, § 11........................................................................................... 19
Art. XIII C, § 1....................................................................................... 13
Art. XIII C, § 1(e)..................................................................... 13, 15, 16
Art. XIII C, § 2....................................................................................... 13


**STATUTES**

**San Jose Municipal Code**
§ 1.08.010.............................................................................................. 11
§ 1.08.020.............................................................................................. 11
§ 1.08.025.............................................................................................. 12
§ 10.32.200............................................................................................ 14
§ 10.32.215............................................................................................ 20
§ 10.32.220...................................................................................... 9, 17
§ 10.32.220(C)....................................................................................... 20
§ 10.32.235...................................................................................... 9, 16
§ 10.32.245.................................................................................... 10, 11


**MISCELLANEOUS**

https://sanjose.legistar.com/View.ashx?M=F&ID=10972300&GUID=8729FAF4-9C72-49
E8-B07A-2FEB3A618FBE................................................................................. 6

https://www.sanjoseca.gov/home/showpublisheddocument/87508.......................... 6, 19

4

**ARGUMENT**

**I**
**THE CITY'S VERSION OF THE FACTS**
**MUST BE REJECTED ON A MOTION TO DISMISS**

The City chose not to answer the complaint, but to immediately file this motion to dismiss the complaint. Plaintiffs allegations therefore stand undenied. When the court considers a defendant's motion to dismiss the plaintiffs' complaint, "[a]ll well-pleaded facts in the complaint are accepted as true and construed in the light most favorable to the nonmoving party." (*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007); *Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595 (9th Cir. 2004).)

While plaintiffs and the City agree on many facts regarding the legislative history of the City's ordinance and the procedural history of this case, there are key facts in dispute regarding the impact of the ordinance on the rights of gun owners. In this Opposition brief, when it is relevant, plaintiffs will point out the City's improper description of a different version of the facts. At those junctures, the Court must accept plaintiffs' allegations as true.

**II**
**PLAINTIFFS' FIRST AMENDMENT SPEECH**
**AND ASSOCIATION CLAIMS ARE RIPE FOR REVIEW**

The City has moved to dismiss plaintiffs' second amended complaint on grounds that the facts are not yet ripe for review. (City's Mot. to Dismiss at PDF 23:8.) The City urges this Court to take action consistent with its dismissal of plaintiffs' prior complaint "when the Fee requirement was in virtually the same state of implementation as it is today." (*Id.* at PDF 23:14.)

Plaintiffs urge this Court to deny the City's motion for two reasons: (1) the City is perpetuating the delayed state of implementation and should not benefit from causing delay; and (2) the case is ripe for facial review.

**A.** **_Plaintiffs' Rights Should Not Hang In Limbo While The City Delays Implementation_**

From the beginning, the City's strategy has been to avoid facing the merits of plaintiffs' claims. A June 2, 2022, memo from city staff to the Mayor and City Council states, "pending litigation has caused uncertainty as to when the City will be able to begin implementation of the

5

ordinance. ... The ordinance requires that the fee be collected by a designated nonprofit organization. ... Staff recommends a procurement process open to any interested organizations be used to select the designated nonprofit. *In August 2022, based on an evaluation of the status of litigation, staff will decide whether to initiate a procurement process.* (Staff Memo pp. 2-3 at https://sanjose.legistar.com/View.ashx?M=F&ID=10972300&GUID=8729FAF4-9C72-49E8-B07A-2FEB3A618FBE.)[1]

A July 1, 2022, update from city staff to the Mayor and City Council recites: "On July 1, 2022 the City Manager's Office issued regulations that *suspend implementation* of both the insurance requirement and the Gun Harm Reduction Fee [until] the legal situation has been clarified. ... *Per Council direction, implementation of the Gun Harm Reduction Fee can only begin after the legal challenges have been fully resolved.*" (City's Status Rpt., ECF 25 at PDF 3:12; Staff Memo at https://www.sanjoseca.gov/home/showpublisheddocument/87508.)

The City's suspended Implementation Timeline had called for "issu[ing] a Request for Proposals to procure the designated nonprofit" to occur some time in September 2022. (See Staff Memo, Attachment A, PDF p. 4., at https://www.sanjoseca.gov/home/showpublisheddocument/87508.) The Timeline had projected "December 2022" as the date by which the City Manager would "[f]inalize contract with designated nonprofit." (*Id.* at PDF p. 5.)

Despite halting implementation of the ordinance until "the legal challenges have been fully resolved," the City nonetheless moved to dismiss plaintiffs' complaints as unripe because the ordinance had not yet been implemented. This Court saw through the City's duplicity and refused to cooperate with what it called a "chicken and egg problem." (Transcript of Aug. 4, 2022 hearing, ECF 76, PDF pp. 15:20-16:4; 23:19; 26:12.)

The Court granted the City's motion but with leave to amend the complaint by February 2, 2023, based on the Implementation Timeline showing that the City Manager would issue a Request for Proposals in September, then select a nonprofit from among the proposals received and finalize

---

[1] Unless noted otherwise, all emphasis is added.

1  a contract by the end of December.

2      On January 6, 2023, however, the City filed a Status Report indicating that those deadlines

3  had not been met. Although it represented that the City Manager "has now completed all relevant

4  tasks in the Implementation Timeline, except for the task listed as 'Finalize contract with designated

5  nonprofit' with an estimated completion date of December 2022" (Status Report, ECF 85, at PDF

6  p. 3:6), that representation was untruthful.

7      The City Manager had *not* "issu[ed] a Request for Proposals to procure the designated

8  nonprofit" which, according to the Timeline, was supposed to be done in September. Instead, the

9  City Manager issued something else – a "Request for Information." The Status Report explained

10  the difference: "RFIs are used by the City to solicit information about potential solutions and do not

11  typically result in a contract award, whereas RFPs are used by the City to gather responses and

12  pricing from potential contractors to deliver a specific City defined scope of work, with the purpose

13  of awarding one or more contracts at the end of the RFP process." (ECF 85 at PDF p. 3:25.)

14      The Status Report informed the Court that no qualified organizations responded to the City

15  Manager's Request for Information (*id.* at PDF p. 3:13.) so the City Manager "has decided that the

16  best approach to progress implementation at this point is to ... publish a full Request for Proposals

17  .... Unfortunately, the lack of satisfactory RFI responses and the upcoming RFP process will delay

18  the steps necessary for full implementation." (*Id.* at PDF p. 3:20.) The Status Report offered no

19  date by which these overdue "steps necessary for full implementation" might be completed.

20      Despite the City's delay in designating a nonprofit, it is back in court requesting dismissal

21  of plaintiffs' amended complaint on grounds of unripeness because no nonprofit organization has

22  yet been designated. The City should not benefit from its own delay.

23      The complaint alleges that a $25 Fee is imposed for the current year and will eventually be

24  collected once a nonprofit has been designated. (Cons. 2d Amnd. Complaint at PDF p. 11:15.)

25  The City apparently does not dispute that allegation. (City's Mot. to Dismiss at PDF p. 26:4 ["The

26  primary thing that has changed since the Court previously dismissed claims for lack of ripeness is

27  that the City Council passed in its 2022-2023 schedule of fines and fees a Fee amount of $25"].)

1  Because the ordinance requires that the current Fee be paid eventually once a private nonprofit

2  organization is selected by the City Manager, plaintiffs' First Amendment claims are ripe enough

3  for facial review.  The City's motion should be denied.

4  **B.**   ***Plaintiffs' First Amendment Claims Are Ripe Enough For Facial Review***

5          As the City readily admits, this case presents a facial challenge to the City's Gun Harm

6  Reduction Fee. (City's Mot. to Dismiss at PDF p. 23:10.)  A facial challenge ordinarily alleges that

7  "no set of circumstances exists under which the law would be valid." But in the First Amendment

8  context, it need only allege that "a substantial number of its applications [would be] unconstitu-

9  tional." (City's Mot. to Dismiss at PDF p. 17:2; *Comite de Jornaleros de Redondo Beach v. City of*

10 *Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011); *United States v. Stevens*, 130 S.Ct. 1577,

11 1587, 176 L.Ed. 2d 435 (2010).)

12         Here, plaintiffs' amended complaint alleges that a Fee of $25 has been imposed for fiscal

13 year 2022/2023, that it will eventually be collected, at which point nonpayment will be punished, and

14 that the challenged ordinance requires the Fee to be paid as a compelled donation to a private

15 nonprofit organization that the City Manager will designate. (Cons. 2d Amnd. Complaint at PDF p.

16 11:15.)

17         The City argues that, until the nonprofit is designated, it is unknown "how the Nonprofit will

18 actually behave in delivering voluntary services."   (City's Mot. to Dismiss at PDF p. 25:13.)

19 Regarding plaintiffs' compelled association claim, however, it is irrelevant how the nonprofit will

20 actually behave.  Plaintiffs' complaint alleges a right against being forced by the government to

21 associate with *anyone*.  (Cons. 2d Amnd. Complaint at PDF p. 19:11.)  Americans have a right to

22 choose for themselves which private organizations, if any, they want to associate with or support

23 financially. (*Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).) The complaint therefore

24 adequately pleads a claim for compelled association.

25         For similar reasons, the complaint adequately pleads a claim for compelled speech.  The

26 City argues that, until a nonprofit is actually designated, it is unknown whether plaintiffs will

27 "disagree with their message," or whether the nonprofit will engage in expressive conduct at all.

8

1  (City's Mot. to Dismiss at PDF p. 25:12-24.)

2  Plaintiffs' facial challenge, however, does not rest on the content of the nonprofit's speech.

3  It is irrelevant whether plaintiffs will agree or disagree with its message.  It is enough that the

4  nonprofit will be speaking, and the City of San Jose is ordering gun owners to subsidize that

5  speech. (*Janus v. AFSCME Council 31*, 138 S.Ct. 2448, 2463 (2018).)  Moreover, the designated

6  nonprofit can change from year to year at the discretion of the City Manager.  (SJ Muni. Code §

7  10.32.235.)  Waiting to learn how the first designated nonprofit will "actually behave" provides no

8  guarantee that subsequent nonprofits will behave the same way.

9  The City cannot seriously argue that these nonprofits might not speak at all.  They *have* to

10  speak.  They must provide services to gun owners and others, which "may include, but are not

11  necessarily limited to the following: (1) Suicide prevention services or programs; (2) Violence

12  reduction or gender based violence services or programs; (3) Addiction intervention and substance

13  abuse treatment; (4) Mental health services related to gun violence; or (5) Firearms safety

14  education or training."  (SJ Muni Code § 10.32.220.)  None of these services can be provided

15  without communication.  For example, if a person contacts the nonprofit ready to commit suicide,

16  is it reasonable to believe he will be met with silence? Is it reasonable to believe that a "firearms

17  safety education or training" class could be taught without communication?  While it may be

18  possible that *some* of the nonprofit's activities will involve no speech, for a First Amendment facial

19  challenge, it is sufficient that "a substantial number" of its services will.  (*Comite de Jornaleros*, 657

20  F.3d at 944.)

21  Because, under the ordinance, the nonprofit will be offering voluntary services that involve

22  speaking, and plaintiffs have alleged a right against being forced by the government to subsidize

23  *anyone's* speech (Cons. 2d Amnd. Complaint at PDF p. 19:9), the complaint adequately pleads not

24  only a claim for compelled association, but a claim for compelled speech as well.

25  / / /

26  / / /

27  / / /

III

**AMENDMENTS TO THE COMPLAINT**
**WARRANT DENYING THE CITY'S RENEWED MOTION**
**TO DISMISS PLAINTIFFS' UNCONSTITUTIONAL CONDITION CLAIM**

In its September Order, this Court observed that plaintiffs' complaint as then drafted asserted a constitutional right to keep and bear arms under both the U.S. and California constitutions. The complaint alleged that the City's ordinance unconstitutionally conditioned plaintiffs' exercise of these rights by requiring gun owners to pay a "fee" or else face confiscation of their firearms.

The Court rejected the assertion that California's constitution contains a right to keep arms and ruled, "to the extent HJTA Plaintiffs assert the unconstitutional condition of a California right, amendment would be futile, as the California Supreme Court has expressed that there is no right to bear arms in the California Constitution. Accordingly, this claim is dismissed WITHOUT LEAVE TO AMEND." (Court's Order, ECF 81 at PDF p. 21:11.)

As to plaintiffs' claim that the City's ordinance unconstitutionally conditions their federal right to bear arms, the Court dismissed that claim with leave to amend. The Court explained that, in its view, plaintiffs were "misinterpreting" the ordinance. "[T]he HJTA Complaint's allegation that 'any gun owner who fails to pay the required fee to the designated private organization may be forced to surrender his firearms' is a misinterpretation of the Ordinance. ... The Ordinance expressly states that its impoundment provision may only apply '[to] the extent allowed by law' (Ordinance § 10.32.245), and the City openly admits that there is no state or federal law that would presently permit impoundment." (*Id.* at PDF p. 20:5.) Because the Court's interpretation of the ordinance was based on the City's admission, the Court granted plaintiffs leave to amend their complaint to allege otherwise.

In their consolidated amended complaint, plaintiffs did allege otherwise. First, they deleted the verbiage that previously claimed a right to bear arms implied in "Article I, section 1 of the California Constitution provid[ing] that 'All people ... have inalienable rights' among which are the rights of 'protecting property, and pursuing and obtaining safety.'" (Plaintiffs' Orig. Complaint at

10

Excerpts 072

PDF p. 6:1.)  But then, with respect to whether city police have authority to seize the firearms of gun owners who refuse to pay the fee, plaintiffs added new allegations to their amended complaint:

110.    The City has represented to the District Court that section 10.32.245 does not currently threaten gun owners with confiscation of their firearms because it reads, "*To the extent allowed by law*, the Firearm or Firearms of a person that is not in compliance with this Part may be impounded subject to a due process hearing" and, according to the City, the law does not currently authorize city police to confiscate a firearm with or without a due process hearing.

111.    The Howard Jarvis Plaintiffs believe that representation is incorrect. City police are authorized by law to, and often do, confiscate firearms when carried or used in violation of the law. If a student brings a firearm to school, if someone is carrying a firearm in public without a CCW permit, if someone with a CCW permit is carrying a firearm while intoxicated, if someone purchases a firearm on the street without going through a federally licensed dealer, if someone discharges a firearm in the air on New Year's Eve, and for a host of other reasons, city police are authorized to, and often do, confiscate firearms when carried or used in violation of the law.

112.    The City's Ordinance makes it a violation of the law to own a gun in the City of San Jose unless you timely pay the annual Gun Harm Reduction Fee. San Jose Municipal Code section 1.08.010 provides, "No person shall violate any provision or fail to comply with any of the requirements of this Code or of any other ordinance of the city. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code or of any city ordinance, other than administrative provisions thereof, shall be guilty of a misdemeanor, unless the violation of such provision is designated as an infraction or is a parking violation. The Code provisions for which a violation is an infraction are set forth in Section 1.08.020. The Code provisions for which a violation is a parking violation are set

11

Excerpts 073

forth in Section 1.08.025." Possessing a gun without paying the fee is not an infraction. It is a misdemeanor violation of the law, and city police can confiscate a gun that is kept or carried in violation of the law.

(Cons. 2d Amnd. Complaint at PDF p. 19:18-20:16.)

San Jose is a charter city. Under California's constitution, charter cities "may make *and enforce* all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters .... City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede *all laws* inconsistent therewith." (Cal. Const., art. XI, § 5.) Under this provision of the California Constitution whereby a charter city's charter, with respect to municipal affairs, supersedes state law inconsistent therewith, the burden is on the City to identify some federal law that prohibits the City from seizing firearms when they are possessed in violation of the City's ordinance. So far, the City has only "admitted" that it has no such power, but that could just be strategic posturing to gain an advantage in the litigation. The City has identified no federal law that would deprive it of the power to enforce its own ordinance. In fact, in defending against NAGR's Second Amendment claims, the City has argued vigorously that federal law does not constrain the City's power to regulate local gun ownership.

The new allegations added to plaintiffs' amended complaint are sufficient to state a claim for unconstitutional condition. The City's motion to dismiss this claim should be denied.

**IV**

**PLAINTIFFS' UNVOTED TAX CLAIM IS CURRENTLY DISTINGUISHABLE FROM *SCHMEER*, AND IS NONETHELESS ALLOWED UNDER *SCHMEER*, A CASE THAT SHOULD NOT BE EXTENDED BEYOND ITS FACTS**

The City argues that plaintiffs' unvoted tax claim should be dismissed because it contains essentially the same allegations as their prior complaint, which this Court dismissed because it found a controlling precedent in *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310. Currently, however, and for the foreseeable future, *Schmeer* does not apply to this case because the City is imposing a fee that is not being paid to a private entity. And even if the City someday

12

1  finds a private entity to provide the services described in the ordinance, the fee will still be "for the

2  benefit of" the City of San Jose, which takes it out from under *Schmeer*.

3  **A.**     ***The Fee Is Not Currently Being Paid To A Private Entity***

4          *Schmeer* involved a local ordinance barring grocers from furnishing disposable plastic bags

5  to their customers, and requiring the grocers to charge and keep ten cents for each paper bag

6  requested by a customer.  *Schmeer* held that the bag charge did not impose a "tax" that required

7  voter approval as that term is used in article XIII C, sections 1 and 2 of the California Constitution,

8  because "tax" in our common vernacular refers to compulsory payments made to or for the benefit

9  of the government.  "Accordingly, we conclude that the language 'any levy, charge, or exaction of

10 any kind imposed by a local government' in the first paragraph of  California Constitution, article

11 XIII C, section 1, subdivision (e) is limited to charges payable to, or for the benefit of, a local

12 government."  (*Schmeer*, 213 Cal.App.4th at 1328-29.)

13         The complaint alleges that a $25 Fee is imposed for the current year despite the fact that

14 a nonprofit payee has not yet been designated.  (Cons. 2d Amnd. Complaint at PDF p. 11:15; see

15 also City's Mot. to Dismiss at PDF p. 26:4 ["The primary thing that has changed since the Court

16 previously dismissed claims for lack of ripeness is that the City Council passed in its 2022-2023

17 schedule of fines and fees a Fee amount of $25"].)  Since there is no designated nonprofit, the fee

18 was included in the City's 2022-2023 Budget for its police department.  (City's 8/17/22 Status

19 Report, ECF 25 at PDF p. 4:6 ["the City Council, after a public hearing, voted in June 2022 to

20 approve the City's 'Fee and Charges Report' for the 2022-2023 fiscal year, which included the Fee

21 as part of the City Police Department's annual budget and set a placeholder Fee amount of $25

22 per gun-owning household"].)

23         The lack of a nonprofit payee may or may not be a temporary situation.  The City admits

24 that no qualified organizations responded to the City Manager's Request for Information.  (City's

25 01-06-23 Status Report, ECF 85 at PDF p. 3:13.)  The City Manager "has decided that the best

26 approach to progress implementation at this point is to ... publish a full Request for Proposals ....

27 Unfortunately, the lack of satisfactory RFI responses and the upcoming RFP process will delay the

1  steps necessary for full implementation." (*Id.* at PDF p. 3:20.)  The City has committed to no date

2  by which this RFP process will be commenced or completed, nor offered any guarantee that it will

3  produce a qualified nonprofit willing to sign a contract with the City to provide the services de-

4  scribed in the ordinance.  In the meantime, however, San Jose gun owners are subject to an

5  accumulating debt of $25/year.

6        The City may object to having its fee analyzed under the current state of affairs, but doesn't

7  the City's Motion to Dismiss demand that plaintiffs' complaint be analyzed under the current state

8  of affairs?  The City's motion asks this Court to dismiss plaintiffs' complaint as unripe because, at

9  this snapshot in time, there is no designated nonprofit payee.  What's good for the goose is good

10  for the gander.  At this snapshot in time, when there is no designated nonprofit payee, *Schmeer*

11  does not apply to rescue the City's 2022/2023 fee.  The motion must be denied.

12  **B.**  **_Even If A Nonprofit Is Designated, Schmeer, By Its Own Terms, Will Not Apply_**

13        *Schmeer* held that the term "tax," as defined in article XIII C, section 1(e), "is limited to

14  charges payable to, *or for the benefit of*, a local government."  (*Schmeer*, 213 Cal.App.4th at

15  1328-29.)

16        Plaintiffs' complaint alleges that "the City's Ordinance requires the nonprofit to expend the

17  fee providing services such as suicide prevention, gender based violence prevention, addiction

18  intervention, substance abuse treatment, and mental health counseling for victims of gun violence,

19  which services will be available to the general public, not just gun owners, and which gun owners

20  are not required to, and may not choose to, utilize. Because its revenue will fund public services,

21  not services requested by each payer, the 'fee' is a tax under California law."  (Cons. 2d Amnd.

22  Complaint at PDF p. 11:21.)

23        San Jose Municipal Code section 10.32.200 contains Findings regarding the need for the

24  ordinance, and a declaration of purpose.  It finds, "Conservatively, San Jose taxpayers annually

25  spend approximately $39.7 million ... to respond to gun violence with such public services as

26  emergency police and medical response, victim assistance, incident investigation, acute and

27  long-term health care, and perpetrator adjudication and judicial sanctioning."  It declares, "This Part

14

1    is passed and adopted in the exercise of the police power of the City, and for the protection of the

2    welfare, peace and comfort of the residents of the City of San Jose.  Specifically, it is the intent of

3    this Ordinance to reduce gun harm."

4           Thus, for the purpose of reducing the annual cost incurred by "San Jose taxpayers ... to

5    respond to gun violence with such public services as emergency police and medical response,

6    [etc.]," and "for the protection of the welfare, peace and comfort of the residents of the City of San

7    Jose," the ordinance requires gun owners to pay an annual fee to a nonprofit organization fo fund

8    its provision of services which plaintiffs allege are available to, and for the benefit of, the San Jose

9    general public – which services could have been provided by the City directly had the City been

10   willing to pay for them.

11          This, plaintiffs contend, is a tax requiring voter approval, even under *Schmeer's* narrowed

12   definition of "tax" to mean only "charges payable to, *or for the benefit of*, a local government."

13   (*Schmeer*, 213 Cal.App.4th at 1328-29.)

14   **C.     *This Court Should Not Extend Schmeer's Reach To Vastly Different Facts***

15          The California Constitution defines a "tax" as "*any* levy, charge, or exaction of *any kind*

16   imposed by a local government."  (Cal. Const., art. XIII C, § 1(e).)  The *Schmeer* court admitted

17   that the bag fee was *imposed* by a local government, and that article XIII C "does not explicitly state

18   that the levy, charge or exaction must be *payable* to a local government."  (*Schmeer*, 213

19   Cal.App.4th at 1327.)  Nevertheless, the court ruled that the word tax "in ordinary usage" refers

20   only to payments made to, or for the benefit of, the government.

21          The HJTA plaintiffs believe that, had their case been allowed to remain in state court and

22   progress up to the state courts of appeal, there is a good chance *Schmeer* would not have been

23   extended to facts like those at bar.

24          *Schmeer* cited no precedent for its interpretation of article XIII C, section 1(e).  It also cited

25   no precedent for redefining a constitutionally defined term of art.  In fact, the only precedent at the

26   time acknowledged that the voters who enacted article XIII C, section 1(e) intended a "*broadened*

27   definition of 'tax'," not the one in ordinary usage.  (*Griffith v. City of Santa Cruz* (2012) 207

15

Cal.App.4th 982, 989.)

In the ten years since *Schmeer* was decided, only one court has followed it. This Court. (See *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-00501-BLF, 2022 U.S. Dist. LEXIS 138385, at *42 (N.D. Cal. Aug. 3, 2022).)

As plaintiffs argued before, *Schmeer* can be easily distinguished from the case at bar. *Schmeer* ruled it was not a tax when commercial retailers with no connection to the government were required to collect a ten cent payment for a ten cent product, and only from persons who voluntarily purchased the product. Here, however, there is a connection to the government. The City will hand-pick the nonprofit organization it finds most qualified to provide services to the public that are specified in the ordinance and which the City itself could provide, it will enter into contract with that nonprofit, and will audit the nonprofit's use of the fee revenue. (SJ Muni. Code § 10.32.235.) Unlike *Schmeer*, the fee is compulsory; gun owners must pay it whether or not they request or receive any service that the nonprofit offers. As the City admits, use of the services is "voluntary" even though payment of the fee is not. (City's Mot. to Dismiss at PDF p. 8:25.)

Applying any test other than the *Schmeer* private payee test, this would be a tax. It passes the only test expressly contained in article XIII C, section 1(e) where "tax" is defined as "*any* levy, charge, or exaction of *any* kind imposed by a local government." Unlike the bag charge in *Schmeer*, the City's fee also passes the test of "compulsory" and "not in return for a benefit." "[G]enerally speaking, a tax has two hallmarks: (1) it is compulsory, and (2) it does not grant any special benefit to the payor." (*Cal. Chamber of Commerce v. State Air Res. Bd.* (2017) 10 Cal.App.5th 604, 610.) "Indeed, nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied." (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 135.) And again unlike the bag charge in *Schmeer*, the City's gun fee even passes the test of raising revenue to pay for public services. "A 'tax,' in the general sense of the word, includes every charge upon persons or property, imposed by *or under the authority of* the Legislature, for public purposes." (*City of Glendale v. Trondsen* (1956) 300 P.2d 235, 239 [citations omitted].)

1   Although the City repeatedly argues that the nonprofit will provide services only to "gun

2   owners and their families." (City's Motion at PDF 8:8, 8:25, 30:18.), the complaint alleges that the

3   nonprofit is authorized to, and logically must, offer services to unrelated members of a gun owner's

4   household, unrelated intimate friends, and even the general public. (Cons. 2d Amnd. Complaint

5   at PDF 14:11, 11:20.) This Court must accept the complaint's version of the facts, not only

6   because this is a motion to dismiss, but also because only plaintiffs' version is supported by the

7   actual text of the ordinance. To be qualified for selection as the Designated Nonprofit Organiza-

8   tion, an organization must "provid[e] services to residents of the City that own or possess a Firearm

9   in the City *or* to members of their household, *or* to those with whom they have a close familial or

10  intimate relationship." (SJ Muni Code § 10.32.220.) Unrelated members of one's household, such

11  as roommates, and unrelated people with whom one has an intimate relationship, such as

12  sweethearts and close friends, are members of the public, not family, despite the City's repeated

13  misrepresentation otherwise.

14      Moreover, services that the nonprofit is expected to provide will logically reach outside the

15  payer's inner circle. They "include, but are not necessarily limited to the following: (1) Suicide

16  prevention services or programs; (2) Violence reduction or gender based violence services or

17  programs; (3) Addiction intervention and substance abuse treatment; (4) Mental health services

18  related to gun violence; or (5) Firearms safety education or training." (*Id.*) It is far-fetched for the

19  City to suggest that the nonprofit will hang up the phone when a non-gun owner calls ready to end

20  his life by jumping or overdosing. It is far-fetched to suggest that the nonprofit is going to counsel

21  victims of gun violence only if they currently possess a gun of their own. Logically, these services

22  will be available to the general public.

23      The City's fee therefore is: (1) imposed by the City; (2) compulsory; (3) not in return for a

24  benefit received; (4) to pay for public services. *Schmeer*'s analysis considered none of these

25  traditional tests. It looked only at the broad definition of "tax" contained in California's Constitution,

26  article XIII C, section 1(e), which defines a tax as "any levy, charge, or exaction of any kind

27  imposed by a local government" *unless it fits one of seven exceptions*. The *Schmeer* court did not

17

find that the bag charge fit any one of the seven exceptions. Instead, it made up an eighth exception: "paid to a private entity." This broke several rules of constitutional construction. "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Prof. Engineers in Cal. Gov. v. Kempton* (2007) 40 Cal.4th 1016, 1037.) Where there is ambiguity, "construction is to favor the taxpayer rather than the government." (*Cal. Motor Transp. Co. v. State Bd. of Equal.* (1947) 31 Cal.2d 217, 223-24.) "Initiative measures as well as other general constitutional provisions should be interpreted liberally to give full effect to the framers' objective." (*Mills v. Cnty. of Trinity* (1980) 108 Cal.App.3d 656, 660.) Here, the "framers' objective" is contained in the Liberal Construction Clause of the statewide initiative that added article XIII C to the constitution, and the Findings and Declarations of the subsequent initiative that amended it: "its provisions 'shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent'" (*Hill RHF Hous. Partners, L.P. v. City of L.A.* (2021) 12 Cal.5th 458, 475) "so that neither the Legislature nor local governments can circumvent these restrictions on increasing taxes by simply defining new or expanded taxes as 'fees'" (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 263).

Thus, the *Schmeer* court was barred from adding to or rewriting article XIII C, required to construe it to favor taxpayers rather than the government, and bound to adopt a liberal interpretation that gives full effect to the framers' objective of enhancing taxpayer consent and preventing local governments from circumventing voter approval by labeling exactions as "fees." Instead it took the opposite approach. For these reasons, rather than expand *Schmeer*, which no California court has done, this Court should either distinguish *Schmeer* based on its vastly different facts, or find that the fee at bar may constitute a tax even under *Schmeer* because it is "for the benefit of" the City of San Jose.

/ / /

/ / /

/ / /

**V**

## IF PLAINTIFFS' CLAIM OF UNLAWFUL DELEGATION
## IS DISMISSED ON RIPENESS GROUNDS,
## IT SHOULD BE WITH LEAVE TO AMEND

The City urges this Court to dismiss plaintiffs' unlawful delegation claim again, as it did before, for the same reasons and based on the same concessions that applied then.

First, plaintiffs again concede that they have no claim for an unlawful delegation of the power to tax unless this Court first finds that the City's fee is a "tax" as that term was broadly defined by the voters in the California Constitution.

Second, plaintiffs also concede that they have no claim under California Constitution article XI, section 11, because that provision applies to the State Legislature, not the City. Plaintiffs meant to scrub that from the consolidated amended complaint and apologize that somehow it was inadvertently left in.

When this Court partly granted the City's first motions to dismiss last September, it dismissed plaintiffs' unlawful delegation claim (with leave to amend) solely on ripeness grounds. The Court opined, "Here, because section 31 includes the specific language of 'surrendered or suspended by grant or contract,' the absence of any grant or contract would significantly hamper the Court's ability to evaluate whether the power to tax has been 'surrendered or suspended.' ... Because there is no current grant or contract that the Court can evaluate to determine if the City has 'surrendered or suspended' its power to tax, the Court finds that HJTA Plaintiffs' fourth claim for unconstitutional delegation is not ripe for adjudication. Accordingly, the Court will GRANT the City's motion to dismiss this claim with LEAVE TO AMEND." (Court's Order, ECF 81 at PDF p. 23:17.)

If the City ever finds a qualified nonprofit willing to collect the fee and provide the services described in the ordinance, that nonprofit and the City will enter into a contract. (See Staff Memo, Attachment A, PDF p. 5 at https://www.sanjoseca.gov/home/showpublisheddocument/87508 [setting December 2022 as the date by which the City Manager would "[f]inalize contract with designated nonprofit"].) Should that day ever come, plaintiffs' allegations that the nonprofit will

19

1  collect the fee and appropriate and spend its revenue, will materialize. Under the terms of the

2  Ordinance, the City cannot be the one collecting the fee.  Rather, gun owners "shall pay an Annual

3  Gun Harm Reduction Fee to the Designated Nonprofit Organization each year."  (S.J. Muni. Code

4  § 10.32.215.)  Nor will the City appropriate or spend the revenue from the fee.  San Jose Municipal

5  Code section 10.32.220(C) provides, "the City shall not specifically direct how the monies from the

6  Gun Harm Reduction Fee are expended."  Rather, "[t]he Designated Nonprofit Organization shall

7  spend every dollar generated from the Gun Harm Reduction Fee."

8  　　　If plaintiffs' unlawful delegation claim is unripe, then, it is through no fault of their own.  And

9  if the City ever signs a contract with a nonprofit, the claim will become ripe at that time.  Therefore,

10  if the Court again dismisses the claim as unripe, it should again be with leave to amend.

11  　　　　　　　　　　　　　　　　**CONCLUSION**

12  　　　For the reasons above, the City's motion to dismiss plaintiffs' consolidated amended

13  complaint should be denied, but to the extent it is granted based on unripeness, it should be with

14  leave to amend if and when the City designates a nonprofit to collect the fee.

15  DATED: March 16, 2023.　　　　　　　　　Respectfully submitted,

16

17  　　　　　　　　　　　　　　　　JONATHAN M. COUPAL
　　　　　　　　　　　　　　　　TIMOTHY A. BITTLE
　　　　　　　　　　　　　　　　LAURA E. DOUGHERTY

18

19  　　　　　　　　　　　　　　　　_Tim Bittle_

20  　　　　　　　　　　　　　　　　TIMOTHY A. BITTLE
　　　　　　　　　　　　　　　　Attorneys for Plaintiffs
　　　　　　　　　　　　　　　　HOWARD JARVIS TAXPAYERS ASSN.,et al.

21

22

23

24

25

26

27

*NAGR v. San Jose*, No. 22-cv-00501-BLF / *HJTA v. San Jose*, No. 22-cv-02365-BLF – HJTA Ps' Opp. to Motion to Dismiss

Excerpts 082

1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  TAMARAH P. PREVOST (SBN 313422)
   tprevost@cpmlegal.com
3  ANDREW F. KIRTLEY (SBN 328023)
   akirtley@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Fax: (650) 697-0577
7

8  *Attorneys for Defendants City of San Jose, et al.*

9                **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11                   **SAN JOSE DIVISION**

12

13 **NATIONAL ASSOCIATION FOR GUN**          Case No. 5:22-cv-00501-BLF
   **RIGHTS, INC.**, a nonprofit corporation, and
14 **MARK SIKES**, an individual,             **DEFENDANTS' MOTION TO DISMISS**
                                              **PLAINTIFFS' CONSOLIDATED SECOND**
15                  And                       **AMENDED COMPLAINT UNDER**
                                              **FEDERAL RULES 12(b)(1) AND 12(b)(6)**
16 **HOWARD JARVIS TAXPAYERS ASSN.**,
   a nonprofit corporation, **SILICON VALLEY**
17 **TAXPAYERS ASSN.**, a nonprofit corporation,   Date:   June 15, 2023
   **SILICON VALLEY PUBLIC**                  Time:   9:00 a.m.
18 **ACCOUNTABILITY FOUNDATION,** a         Judge:  Hon. Beth Labson Freeman
   nonprofit corporation, **JIM BARRY**, an    Dept.:  San Jose Courthouse, Courtroom 3
19 individual, and **GEORGE ARRINGTON**, an           (5th Floor)
   individual,
20
                    Plaintiffs,
21
            v.
22
   **CITY OF SAN JOSE**, a public entity,
23 **JENNIFER MAGUIRE**, in her official capacity
   as City Manager of the City of San Jose,
24 **CITY OF SAN JOSE CITY COUNCIL**, and
   **ALL PERSONS INTERESTED** in the matter of
25 San Jose Ordinance No. 30716, establishing an
   Annual Gun Harm Reduction Fee,
26
                    Defendants.
27

28

---

Defendants' Motion to Dismiss Plaintiffs' Consolidated Second Amended Complaint
Case No. 5:22-cv-00501-BLF

1

**NOTICE OF MOTION AND MOTION**

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

3

      **PLEASE TAKE NOTICE** that on June 15, 2023, at 9:00 a.m., or as soon thereafter as the

4

matter may be heard, in the courtroom of the Honorable Beth Labson Freeman, United States District

5

Judge of the Northern District of California, located at 280 South First Street, San Jose, California

6

95113, Defendants City of San Jose, Jennifer Maguire (in her official capacity as City Manager), and

7

the City of San Jose City Council (collectively, the "City" or "Defendants") will and hereby do move

8

this Court to dismiss Plaintiffs' Consolidated Second Amended Complaint (ECF No. 94) in its entirety

9

under Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack ripeness and standing, and under Rule

10

12(b)(6) for failure to state a claim upon which relief can be granted.

11

      This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of

12

Points and Authorities; the accompanying declaration of Tamarah P. Prevost and all exhibits thereto;

13

the Proposed Order; the anticipated reply brief; and any other papers Defendants may file in support of

14

the Motion, as well as all judicially noticeable facts, the files and records in this action, and such other

15

evidence and argument as may be provided to the Court at or before the hearing.

16

17

Dated:  February 16, 2023

          **COTCHETT, PITRE & McCARTHY, LLP**

18

          By:   */s/ Tamarah P. Prevost*

19

               Joseph W. Cotchett
               Tamarah P. Prevost
               Andrew F. Kirtley

20

21

          *Attorneys for Defendants City of San Jose, et al.*

22

23

24

25

26

27

28

Excerpts 084

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES TO BE DECIDED ...................................................... 1

II.    INTRODUCTION .................................................................................................... 1

III.   BACKGROUND AND PROCEDURAL HISTORY ............................................... 3

    A.    The Ordinance ............................................................................................... 3

        1.    Enactment ......................................................................................... 3

        2.    Findings and Purposes ...................................................................... 3

        3.    Requirements and Implementation ................................................... 4

            a.    The Insurance Requirement ................................................... 4

            b.    The Fee Requirement ............................................................. 5

            c.    Compliance and Enforcement ................................................ 6

    B.    Procedural History ........................................................................................ 7

        1.    The NAGR Plaintiffs ....................................................................... 7

        2.    The HJTA Plaintiffs ......................................................................... 7

        3.    Plaintiffs' Claims in the SAC ........................................................... 8

IV.   LEGAL STANDARDS ............................................................................................ 8

    A.    Rule 12(b)(1) ................................................................................................. 8

    B.    Rule 12(b)(6) ................................................................................................. 9

    C.    Facial Challenges to Laws .......................................................................... 10

V.    ARGUMENT ......................................................................................................... 10

    A.    The NAGR Plaintiffs' Second Amendment Claim Challenging the
        Insurance Requirement Should Be Dismissed. .......................................... 10

        1.    The Insurance Requirement Does Not Infringe on Conduct that
            Falls Within the Plain Text of the Second Amendment. ................ 11

        2.    The Insurance Requirement Is Consistent with the Nation's
            Historical Tradition of Firearm Regulation. .................................. 13

    B.    Plaintiffs' Claims Challenging the Fee Requirement Should Also Be
        Dismissed. ................................................................................................... 16

        1.    Claims challenging the Fee requirement are still unripe for review. ........... 16

2. The Fee Requirement Does Not Violate the Right to Keep and Bear Arms. ....................................................................................... 20

    a. Plaintiffs' Second Amendment Claim (Claim 1) .......................... 20

    b. The HJTA Plaintiffs' Unconstitutional Conditions Claim (Claim 5) 21

3. Plaintiffs Fail to State a Derivative Declaratory Relief Claim (Claim 3). ....................................................................................... 22

4. The Fee is not a "tax" under the California Constitution (Claims 6 and 7). ........................................................................................... 22

    a. HJTA Plaintiffs' Article XIII C Claim (Claim 6) .......................... 23

    b. HJTA Plaintiffs' tax-delegation claim (Claim 7) .......................... 24

C. Plaintiffs' Claims Should Be Dismissed Without Leave to Amend. ...................... 25

VI. CONCLUSION ..................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967).................................................................................................16

*Americans for Prosperity Found. v. Bonta,*
    141 S.Ct. 2373 (2021)...........................................................................................10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................................9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................9

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
    598 F.3d 1115 (9th Cir. 2010)..............................................................................17

*Cramer v. Brown,*
    2012 WL 13059699 (C.D. Cal. Sept. 12, 2012)....................................................16

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015).............................................................................21

*Jackson v. City and County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014)................................................................................10

*Kokkonen v. Guardian,*
    511 U.S. 375, 377 (1994).....................................................................................8, 9

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013), *cert. denied,* 134 S.Ct. 2696 (2014) ....................21

*Nat'l Park Hosp. Assn. v. Dep't. of Interior,*
    538 U.S. 803 (2003).............................................................................................17

*O'Connell v. Gross,*
    No. CV 19-11654-FDS, 2020 WL 1821832 (D. Mass. Apr. 10, 2020)................21

*Parks Sch. of Bus. v. Symington,*
    51 F.3d 1480 (9th Cir. 1995).................................................................................9

*Reno v. Catholic Soc. Servs., Inc.,*
    509 U.S. 43 (1993)................................................................................................9

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004)........................................................................................9

*Scott v. Pasadena Unified Sch. Dist.*,
  306 F.3d 646 (9th Cir. 2002)........................................................................................17

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001)........................................................................................9

*Thomas v. Anchorage Equal Rights Comm'n*,
  220 F.3d 1134 (9th Cir. 2000) (en banc)......................................................................9

*Toilet Goods Ass'n, Inc. v. Gardner*,
  387 U.S. 158 (1967).....................................................................................................16

*United States v. Power Co.*,
  2008 WL 2626989 (D. Nev. June 26, 2008)..................................................................20

*Vieux v. Easy Bay Reg'l Park Dist.*,
  906 F.3d 1330 (9th Cir. 1990)......................................................................................17

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008).....................................................................................................10

**Rules**

Federal Rules of Civil Procedure:

  Rule 12(b)(1)...........................................................................................................8, 9, 25

  Rule 12(b)(6)...............................................................................................................9, 25

**Ordinances**

§§ 10.32.215, 10.32.235(A), 10.32.240(B)........................................................................3

§ 10.32.200(A) ...................................................................................................................3

§ 10.32.200(B)(10)-(13).....................................................................................................3

§ 10.32.200(B)(11)..............................................................................................................3

§ 10.32.200(B)(4)-(10)........................................................................................................4

§ 10.32.255(A)-(C)..............................................................................................................4

§ 10.32.210(A), (C)..............................................................................................................4

§ 10.32.220(B)(11)-(12)......................................................................................................4

§ 10.32.235(A)(1)................................................................................................................4

§§ 10.32.215, 10.32.220(A) ........................................................................................... 5

§ 10.32.200(B)(13) ...................................................................................................... 5

§ 10.32.220(A)(1)-(5) .................................................................................................. 5

§ 10.32.205(B) .............................................................................................................. 5

§ 10.32.200(B)-(C) ....................................................................................................... 5

§ 10.32.215 .................................................................................................................... 5

§ 10.32.235(A)(2) ......................................................................................................... 5

§ 10.32.230(A)-(B) ....................................................................................................... 6

§ 10.32.240(A) .............................................................................................................. 6

§ 10.32.245 .................................................................................................................... 6

## I.  STATEMENT OF ISSUES TO BE DECIDED

In their Consolidated Second Amended Complaint ("SAC") (ECF No. 94), Plaintiffs bring facial challenges seeking to invalidate and enjoin enforcement of two requirements under San Jose's 2022 Gun Harm Reduction Ordinance ("Ordinance") (San Jose Muni. Code §§ 10.32.200-10.32.250): (1) that non-exempt gun owners residing in San Jose have liability insurance covering harm to persons or property from accidental shootings (the "Insurance requirement"), and (2) that they pay an annual Gun Harm Reduction Fee ("Fee") to a City-designated nonprofit organization ("Nonprofit") to fund voluntary services for gun owners and their families (the "Fee requirement"). §§ 10.32.210, 10.32.215.[1] The Insurance requirement is currently fully implemented, but the Fee requirement is not. This Motion to Dismiss the SAC ("Motion") presents the following issues:

1.  Whether, under Rule 12(b)(6), Plaintiffs' claims facially challenging the Ordinance's Insurance requirement under the Second Amendment should be dismissed with prejudice for failure to state a claim?

2.  Whether Plaintiffs' claims facially challenging the Ordinance's Fee requirement should be dismissed without prejudice because they are still unripe for review?

3.  Whether, under Rule 12(b)(6), Plaintiffs' claims facially challenging the Ordinance's Fee requirement should be dismissed with prejudice for failure to state claim?

## II.  INTRODUCTION

The Ordinance derives from the legitimate authority of Defendants City of San Jose, San Jose City Council, and San Jose City Manager Jennifer Maguire (collectively, the "City" or "Defendants") to enact and implement legislation aimed at reducing gun harm in San Jose, while fully respecting gun owners' First and Second Amendment rights. The Ordinance imposes two modest requirements on San Jose gun owners who do not qualify for one of its three exemptions: (1) to have liability insurance for accidental or negligent harm caused by firearms (the "Insurance requirement"), and (2) to pay an annual Fee (currently set at $25) to the City-designated Nonprofit to fund voluntary services for gun owners and their families aimed at preventing gun harm (the "Fee requirement"). §§ 10.32.210, 10.32.215,

---

[1] "§" on its own refers to a section of the Ordinance. *See* Consol. SAC, Ex. E (copy of Ordinance).

10.32.225. The Ordinance was discussed and voted on by the City Council in January and February 2022, which led to the commencement of these now-consolidated actions.

When the parties briefed the last round of (pre-consolidation) motions to dismiss, both the Fee and Insurance requirements were far from fully implemented, causing the Court to dismiss (mostly with leave to amend) the federal constitutional claims for lack of ripeness, and most of Plaintiffs' claims under the California Constitution for failure to state claim under Rule 12(b)(6). The consolidated Plaintiffs filed their SAC on February 2, 2023. As the City noted in recent Status Report, however, only the Insurance requirement has been fully implemented and is fully ripe, rendering many of Plaintiffs' claims challenging the Fee requirement still unripe at this juncture.

Defendants now move under Rules 12(b)(1) and 12(b)(6) to dismiss the SAC for three reasons.

*First*, the SAC's claims challenging the Insurance requirement under the Second Amendment (and a derivative declaratory relief claim) are now ripe for review, but they fail to state a claim upon which relief may be granted for two reasons: because Plaintiffs have failed to show that the Second Amendment's plain text covers conduct required by the Ordinance, and because the City can amply demonstrate that the Insurance requirement is consistent with this Nation's historical tradition of firearms regulation, akin to regulations the *Bruen* court blessed as constitutional. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*").

*Second*, Plaintiffs' claims challenging the Fee requirement should be dismissed for lack of prudential ripeness. As provided in the City's January 6, 2023 Status Report, implementation of the Fee requirement encountered a significant unanticipated delay when the City received no acceptable responses from entities willing to serve as the Nonprofit under the Ordinance. ECF No. 85. Because the Fee requirement is still not fully implemented, Plaintiffs' claims that relate to, *inter alia*, designation of the attendant non-profit entity, remain unripe for review on First Amendment and related orunds. *See* ECF No. 72 at 7-13 ("August 2022 Order") (this Court holding that Plaintiffs' First and Second Amendment claims challenging the Fee requirement were unripe for review, because it was not fully implemented); ECF No. 81 at 7-10, 18-19, 23 ("September 2022 Order") (reiterating that holding).

*Third*, even if Plaintiffs' claims challenging the Fee were ripe for review (they are not), they should be dismissed for failure to statute a claim under Rule 12(b)(6). Nearly all the claims re-pled in

the SAC (except for the Second Amendment claim, which is appropriately re-pled under *Bruen*) are substantively the same as those set forth in Plaintiffs' prior complaints, and dismissed with leave by the Court in its September 2022 Order. Plaintiffs were given the opportunity to address the deficiencies raises by the Court, but they failed to do so. Their claims should be dismissed with prejudice.

## III.    BACKGROUND AND PROCEDURAL HISTORY

### A.    The Ordinance

#### 1.    Enactment

In June 2021, the City's mayor and City Council directed the drafting of a gun safety ordinance designed to mitigate gun harm in San Jose. ¶ 26; *see also* ECF No. 36-1 (Decl. of Tamarah P. Prevost ISO MTD NAGR FAC) ¶ 2 & Ex. 1. On January 25, 2022, after exchanging numerous memoranda, the City Council met, heard a first reading, and voted on the draft Ordinance. ¶¶ 27-29 & Exs. B, D, E; *see also* ECF No. 36-1 ¶¶ 3-10 & Exs. 2-9. On February 8, 2022, the City Council took a second vote and enacted the Ordinance. ¶ 38. The Ordinance omits certain key aspects of the Fee and Insurance requirements, and expressly directs the City Council and City Manager to implement those requirements. *See, e.g.*, §§ 10.32.215, 10.32.235(A), 10.32.240(B). Some of the City's implementation efforts to date are set forth in the SAC, and they are more fully summarized in the three previous Status Reports filed by the City. *See* ECF No. 78 (Aug. 17, 2022); ECF No. 82 (Oct. 25, 2022); ECF No. 85 (Jan 6, 2023). As of the date of this Motion, the Insurance requirement has been fully implemented, but the Fee requirement has not. Decl. of Tamarah P. Prevost ISO MTD SAC ¶ 6 (Feb. 16, 2023) ("Prevost Decl.") (confirming that the City's most recent Status Report, at ECF No. 85, remains accurate today).

#### 2.    Findings and Purposes

The Ordinance's basic purpose is to "reduce gun harm" "for the protection of the welfare, peace, and comfort of the residents of the City of San Jose." § 10.32.200(A). To "reduce the number of gun incidents," the Ordinance seeks to provide voluntary "[p]rograms and services to gun owners and their households" (e.g., gun-safety training), and to require gunowners to obtain liability insurance to compensate victims of accidental shootings. § 10.32.200(B)(10)-(13); *see also* § 10.32.200(B)(11) (finding that liability insurance mandates were part of "a comprehensive public health approach to car safety" that helped reduce car crash fatalities by 80%). The Ordinance is informed by public health

research and data, such as findings that more than a third of all gun injuries are from unintentional shootings, that gunowners and those who live with them are at significantly higher risk of gun-induced suicide and homicide, and that gun-related deaths and serious bodily injury costs San Jose residents $442 million per year. § 10.32.200(B)(4)-(10).

### 3. Requirements and Implementation

The Ordinance applies to all City residents who own a gun, except for (1) peace officers, (2) state concealed weapon license holders, and (3) those for whom complying with the Ordinance would be a "financial hardship." §§ 10.32.210, 10.32.215 10.32.255. In October 2022, the City Manager's Office promulgated regulations ("CMO Regulations") that flesh out these exceptions, such as by providing that the "financial hardship" exception applies when a gun owner's "household income is at or below the Extremely Low Income threshold [i.e., 30% of Area Median Income based on household size] for Santa Clara County." ¶ 39 & Ex. H, § 4. Gun owners subject to the Ordinance must comply with three main requirements: (a) the Insurance requirement, (b) the Fee requirement, and (c) a documentation requirement showing their compliance with the Ordinance.

### a. The Insurance Requirement

The Ordinance requires non-exempt gun owners to obtain "a homeowner's, renter's or gun liability insurance Policy … covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury or property damage." § 10.32.210(A), (C). The purpose of the liability insurance requirement is to ensure victims of accidental shootings have access to compensation, and to leverage private insurance market forces as a means of "encouraging safer behavior." § 10.32.220(B)(11)-(12). The Ordinance authorizes the City Manager to promulgate regulations on "[p]rocesses related to the implementation of the liability insurance requirement, and forms necessary thereto." § 10.32.235(A)(1). In October 2022, the City Manager promulgated those regulations and published the Attestation Form that non-exempt gun owners must use to certify their compliance with the Insurance requirement. ¶ 39 & Ex. H. The Insurance requirement is fully implemented and took effect on January 1, 2023. ¶¶ 40, 45 (citing SAC Ex. H, § 2.1; ECF No. 85).

### b. The Fee Requirement

The Ordinance requires non-exempt gun owners to pay an annual Fee to make available voluntary programming and services to San Jose gun owners, as well as "members of their household" and "those with whom they have a close familiar or intimate relationship." §§ 10.32.215, 10.32.220(A). The purpose of these voluntary services is to "encourage safer behavior" related to gun ownership and use. § 10.32.200(B)(13). The services aim to reduce gun-related harms, including but not limited to services related to suicide prevention, reduction of gender-based and other violence, addiction intervention, substance abuse treatment, mental health services, and firearms safety education and training. § 10.32.220(A). The Ordinance requires that the services be provided by a City-designated Nonprofit. § 10.32.205(B). While the City may not "specifically direct" how the Nonprofit spends the Fee revenue, the Ordinance is clear that "[n]o portion of the monies … shall be used for litigation, political advocacy, or lobbying activities." § 10.32.200(B)-(C).

The Ordinance did not set the Fee amount but left that for later decision by the City Council. § 10.32.215. In June 2023, the City Council passed a $25 Fee amount per gun-owning household when it passed the City's schedule of fees and charges for its 2022/2023 Fiscal Year. ¶ 31; ECF No. 78 at 2. The City Council could revise this amount at a future, unscheduled vote authorizing the CMO to begin enforcing the Fee requirement. ECF No. 78 at 2-3. That vote cannot occur until the City has completed other necessary implementation steps (e.g., designating and contracting with a Nonprofit). *Id.* These prerequisite steps to a final Council vote were expected to occur by December 2022 but have been delayed because the CMO did not receive an acceptable response from any nonprofit entity interested in serving as the Nonprofit under the Ordinance. ECF No. 85. The CMO is currently executing a further process for attracting bids from nonprofits interested in serving in that role, but everything hinges on developments outside the City's control—i.e., an acceptable organization being willing to serve as the Nonprofit. *See id.*

The Ordinance also authorizes the City Manager to promulgate regulations concerning the "[d]esignation of the [Nonprofit], any processes and procedures related to the payment of the [F]ee, and any additional guidelines or auditing of the use of the monies from the [F]ee," and also to set the date when payment of the Fee is due each year. §§ 10.32.215, 10.32.235(A)(2). The CMO regulations issued

in October 2022 did not contain any of these regulations, but rather provided that "a payment date will be established in an amended version of these regulations to be issued in the future," and noted that payment of the Fee is "not required … until a payment date is set through the amended regulations." ¶ 42 (quoting SAC Ex. H, § 2.2). As of the filing of this Motion, there have been no other amended regulations issued by the City Manager's Office, and no material action towards this end after the most recent Status Report in January 2023. *See* Prevost Decl. ¶ 6.

### c. Compliance and Enforcement

Much in the same way car owners must document their compliance with liability insurance and annual fee requirements, the Ordinance requires non-exempt gun owners to complete a City "attestation form" providing information about their gun liability insurance and to keep that form and "proof of payment of the [Fee]" "with the[ir] Firearms where they are being stored or transported." § 10.32.230. Gunowners must also produce the form and proof of payment "when lawfully requested to do so by a peace officer." *Id.* In October 2022, the City published the referenced "attestation form" as part of the CMO Regulations. *See* SAC Ex. H.

Violations of the Ordinance are punishable by an administrative citation and fine, subject to due process protections. § 10.32.240. Similar to the Fee, the Ordinance does not set the amount of fines but leaves that to future action by the City Council. *Id.* In October 2022, the City Council set escalating fine amounts for first, second, and third or subsequent violations of the Ordinance ($250, $500, and $1000, respectively), which are proportional to the violation type and severity with amounts set for other municipal code violations. ECF No. 82 at 3-4; *accord* ¶ 41. The Ordinance also authorizes the "impound[ment]" of firearms "subject to a due process hearing," but only "to the extent allowed by law." § 10.32.245. As Plaintiffs admit, there is currently no lawful basis to impound firearms under state or federal law, meaning that this provision will not take effect unless and until, for example, the State passes a law permitting municipalities to impound firearms. ¶ 51 (admitting that "[a]t present, the City has no authority to seize a person's gun for violating the Ordinance").

The Ordinance also contains a severability clause. § 3.

### B. Procedural History

#### 1. The NAGR Plaintiffs

Plaintiffs National Association for Gun Rights, Inc., and Mark Sikes (collectively, the "NAGR Plaintiffs") filed their original complaint in January 2022. ECF No. 1. The following month, they filed a First Amended Complaint ("FAC") challenging the Insurance and the Fee requirements under the First and Second Amendment, the California Constitution, and the San Jose City Charter. ECF No. 19.

In March 2022, they moved for a preliminary injunction under all their claims. *See* ECF Nos. 25, 28, 32. The following month, the City moved to dismiss the FAC. *See* ECF Nos. 36, 46, 50. In June 2022 (after both motions were briefed), the U.S. Supreme Court announced a new test for analyzing Second Amendment claims in *Bruen*. 142 S. Ct. 2111. This led to supplemental briefing from the parties and amicus briefing from Brady before the motion hearings. *See* ECF Nos. 64-65, 66-1, 69-70. In its August 2022 Order, the Court denied the motion for preliminary injunction for lack of ripeness (as the First and Second Amendment challenge to the Fee requirement) and failure to show a likelihood of success on the merits. ECF No. 72. In its September 2022 Order, the Court also largely granted the City's motion to dismiss for lack of ripeness and failure to state a claim, dismissing most claims with leave to amend. ECF No. 81 at 7-17, 24.

In the SAC, the NAGR Plaintiffs drop all their state law claims and bring only federal claims under the First and Second Amendments, and a derivative Declaratory Judgment Act claim. ¶¶ 84-102.

#### 2. The HJTA Plaintiffs

The HJTA Plaintiffs comprise three nonprofit corporations and two individuals. ¶¶ 16-20. In March 2022, they filed their Complaint in state court to invalidate only the Fee requirement and a related compliance requirement as (1) a violation of federal and state constitutional rights against compelled speech and association, (2) an "unconstitutional condition" of the exercise of Second Amendment rights and similar state constitutional rights, (3) an unlawful special "tax" under Cal. Const., art. XIII C, and (4) an unconstitutional delegation of the power to tax under Cal. Const., art. XI and XIII. ECF No. 81 at 5. In April 2022, the City removed the HJTA Complaint to this Court, and moved to the dismiss the Complaint under Rules 12(b)(1) and 12(b)(6). *Id.* The Court related the case with the *NAGR* action and consolidated the two cases for all purposes. ECF Nos. 41, 80. In September

2022 Order, the Court granted the City's motion to dismiss for lack of prudential ripeness and failure to state a claim. ECF No. 81 at 18-24.

In the SAC, the HJTA Plaintiffs re-bring all their claims that were dismissed with leave to amend, and add a declaratory relief claim in connection with their First Amendment claim. ¶¶ 93-127.

### 3. Plaintiffs' Claims in the SAC

When the parties briefed the last motions to dismiss, both the Fee and Insurance requirements were far from fully implemented, resulting in the Court's September 2022, dismissing many of Plaintiffs' respective claims for lack of prudential ripeness. ECF No. 81. (Sept. 30, 2022).

On February 2, 2023, Plaintiffs timely filed their Consolidated SAC, which re-alleges claims that were dismissed with leave to amend (omitting claims under the San Jose City Charter). For the Court's convenience, the following table lists Plaintiffs' claims as they are numbered in the SAC and provides, for each claim, the Ordinance requirement challenged and the Plaintiffs bringing the claim.

| | Claim for Relief (SAC ¶¶ 84-127) | Requirement Challenged | | Plaintiffs Bringing | |
|---|---|---|---|---|---|
| 1 | U.S. Constitution, Second Amendment | Fee | Insurance | NAGR | |
| 2 | U.S. Constitution, First Amendment (compelled speech and association) | Fee | | NAGR | HJTA |
| 3 | Declaratory Judgment, 28 U.S.C. §§ 2201–02 (derivative of Claims 1 and 2) | Fee | Insurance | NAGR | HJTA |
| 4 | Cal. Constitution, art. I (§§ 2-3) (compelled speech and association) | Fee | | | HJTA |
| 5 | Cal. Unconstitutional Conditions Doctrine (based on Second Amendment rights) | Fee | | | HJTA |
| 6 | Cal. Constitution, art. XIII C (§§ 1-2) (special tax lacking voter approval) | Fee | | | HJTA |
| 7 | Cal. Constitution, arts. XIII (§ 31) and XI (§ 11) (delegation of power to tax) | Fee | | | HJTA |

## IV. LEGAL STANDARDS

### A. Rule 12(b)(1)

The plaintiff bears the burden of establishing the Court has jurisdiction. *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).[2] The Court's proper role is "to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution," which means it lacks jurisdiction "to issue advisory opinions [] or to declare rights in hypothetical cases." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* Ripeness "is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Facial attacks are based on the argument that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* To the extent the Court deems any part of the City's argument to represent a factual attack disputing the truth of Plaintiffs' allegations relevant to federal jurisdiction, it "need not presume the truthfulness of the plaintiff's allegations" and "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*

**B.** **Rule 12(b)(6)**

Defendants are entitled to dismissal under Rule 12(b)(6) if, accepting Plaintiffs' allegations as true, the complaint fails to state a claim. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). The Court should not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Plaintiffs' "obligation to provide the 'grounds' of [their] 'entitle[ment] to relief' requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders naked assertions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

---

[2] Unless otherwise noted, internal citations, alterations, and quotations are omitted.

### C. Facial Challenges to Laws

To bring a successful facial challenge to a law, the plaintiff must "establish no set of circumstances exists under which the law would be valid or show that the law lacks a plainly legitimate sweep," or (in the First Amendment context) that "a substantial number of its applications are unconstitutional, judged in relation to the [law]'s plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). Because facial challenges "often rest on speculation," *Jackson v. City and County of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014) ("*Jackson*"), they are "disfavored" for "several reasons." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 455 (2008). Among other things, "they raise the risk of premature interpretations of statutes on the basis of factually barebones records," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 450-51.

## V. ARGUMENT

### A. The NAGR Plaintiffs' Second Amendment Claim Challenging the Insurance Requirement Should Be Dismissed.

The NAGR Plaintiffs bring a facial challenge to the Insurance requirement under the Second Amendment to the U.S. Constitution. *See* ¶¶ 84-102. The allegations by the NAGR Plaintiffs are either vague speculation or plainly inaccurate.

First, the NAGR Plaintiffs allege the Ordinance does not specify "minimum insurance coverage thresholds or premiums" or state how much it "will cost" them to obtain the required liability insurance, but rather leaves the setting of policy premiums to the state's highly regulated insurance market. ¶¶ 53-55. They also complain that "[t]he Ordinance does nothing to ensure that insurance companies will provide" the required liability insurance, and thus it "empower[s]" insurers "to prohibit persons from exercising their Second Amendment rights"—Plaintiffs don't say how, nor do they name any insurers engaged in the supposed concerted action of collectively removing the required insurance from the market. ¶ 56; *cf.* Cal. Dept. of Ins., *2021 California Property and Casualty Market Share Report* (Apr. 30, 2022), *available at* shorturl.at/gCX18 (listing 228 licensed property and casualty insurers in California). They also do not allege how they might be burdened, *i.e.*, whether for example their own homeowners' insurance policy does not already cover what is required by the Ordinance, or if

not, what the precise burden would be if they tried to comply. Second, and more problematically, the NAGR Plaintiffs accuse the Ordinance of "burden[ing] the right to "keep and bear arms in the home," and because the Ordinance is "novel" it cannot be located in the nation's historical traditions under *Bruen*. ¶¶ 87, 88. Based on such allegations and speculation, the NAGR Plaintiffs claim the Insurance requirement violates their Second Amendment rights. ¶¶ 82, 84-92. Each of these assertions are false under the appropriate legal framework.

Under *Bruen*, Second Amendment challenges turn on a two-part test: (1) whether the challenger can show "the Second Amendment's plain text covers an individual's conduct" and, if so, (2) whether the government can demonstrate that "the regulation is consistent with this Nation's historical tradition of firearms regulation." 142 S. Ct. at 2126. Plaintiffs fail to state a Second Amendment claim at both steps, and the claim should be dismissed with prejudice.

### 1. The Insurance Requirement Does Not Infringe on Conduct that Falls Within the Plain Text of the Second Amendment.

The Ordinance requires that gun owners carry liability insurance for firearm accidents. The conduct regulated by the Ordinance is entirely outside of the scope of the Second Amendment.

Analysis of Second Amendment challenges begins with the Amendment's "plain text," which requires looking at "the Second Amendment's text, as informed by history." *Id.* at 2126-27, 2129. The relevant Second Amendment text provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II; *see also District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (holding that this text "guarantee[s] the individual right to possess and carry weapons in case of confrontation").[3]

At step one, *Bruen* requires a plaintiff to show that "the Second Amendment's plain text covers an *individual's conduct*." 142 S. Ct. at 2126 (emphasis added). Thus, the NAGR Plaintiffs must clearly

_____

[3] While pre-*Bruen*, law found a law "infringe[s]" on the Second Amendment right to "keep and bear Arms" when it amounts to total bans on possession, *McDonald v. Chicago*, 561 U.S. 742, 750 (2010), or requires a firearm be stored and transported in a way that "makes it impossible" to use it for self-defense. *Heller*, 554 U.S. at 628, 630, 632. The Ordinance's Insurance requirement bears no resemblance to such laws.

1   articulate and allege a proposed course of conduct, protected by the Second Amendment, that they

2   claim is burdened by the Ordinance. Plaintiffs were well-aware of this requirement before filing the

3   SAC, but failed to properly allege it. *See, e.g.*, ECF No. 81 at 10 (citing *Bruen*, 142 S. Ct. at 2134-36,

4   and noting "the NAGR FAC does not define a *proposed course of conduct* for the Court to determine

5   whether it is covered by the Second Amendment's plain text."); *see also id.* at 10 n.2. The Second

6   Amendment claim (¶¶ 84-92) should be dismissed on this ground alone.

7           Construing the SAC in Plaintiffs' favor, the closest the NAGR Plaintiffs come to pleading the

8   required course of conduct is to allege the protected conduct at issue is "choosing to keep and bear arms

9   in the home." *See* ¶ 87 ("The Ordinance's insurance and/or fee requirements imposes a cost on

10  Plaintiffs … merely for choosing to keep and bear arms in the home," and thus "places a burden on

11  conduct central to the plain text of the Second Amendment."). But this allegation fails to state a claim

12  because "choosing to keep and bear arms in the home" is not a course of conduct that is affected by the

13  Insurance requirement, which merely requires gun owners to obtain liability insurance for accidental

14  shootings, assuming that such coverage is not already part of their existing homeowner's or renter's

15  policy. Moreover, the Ordinance does not condition firearm ownership on complying with the

16  Insurance requirement, because non-compliance is only punishable by an administrative citation and

17  fine. § 10.32.240; *see also* ¶ 51 (conceding that "the City has no authority to seize a person's gun for

18  violating the Ordinance" under the Ordinance's impoundment provision); *accord* ECF No. 72 at 15

19  ("The Court recognizes that, because the impoundment provision is not operable under current law, the

20  Insurance Requirement would not imperil the ownership or possession of anyone's firearms.").

21          While liability insurance covering firearm accidents is certainly *related to* firearms, the Second

22  Amendment's text does not cover all topics related to firearms in any way, but only the specific rights

23  "to keep and bear" arms. The plain text must be followed. Indeed, the Supreme Court has made this

24  very distinction in decisions upholding other insurance mandates. *See, e.g.*, *National Federation of*

25  *Independent Business v. Sebelius*, 567 U.S. 519, 558 (2012) (wherein the Court explained that a

26  mandate to purchase health insurance might be "inherently" related to "health care consumption," but

27  the two were simply "not the same thing," in part because they "involve different transactions, entered

28  into at different times, with different providers"). The insurance mandate at issue in this case is simply

not within the plain text of the Second Amendment. Holding insurance for an activity is not the same as participating in that activity.

Moreover, the Insurance requirement bears no resemblance to the laws that the Supreme Court has historically struck down as violating Second Amendment rights, all of which have either sought to directly ban, prohibit, or prevent most or all people from keeping or bearing arms. *See Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., and Roberts, C.J., concurring) (explaining that the Court struck down New York's licensing regime because its features—namely, "the unchanneled discretion for licensing officials and the special-need requirement—*in effect deny* the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens'"); *id.* at 2157 (Alito, J., concurring) (explaining that "all we decide" in "today's decision" is "that a State may not enforce a law … that *effectively prevents* its law-abiding residents from carrying a gun" for self-defense or other lawful purposes). Even laws struck down under pre-*Bruen* legal frameworks were far more burdensome than the Ordinance here. *See, e.g.*, *McDonald*, 561 U.S. at 750 (striking down law "banning handgun possession"); *Heller*, 554 U.S. at 628, 630, 632 (striking down law that "totally bans handgun possession in the home" and requires firearms be stored and transported in a way that "makes it impossible" to use them for self-defense).

Instead of regulating the purchase, sale, storage, or use of firearms in any way, the Insurance requirement merely requires that non-exempt gun owners to obtain liability insurance for firearm accidents (if such coverage is not already included in their existing policies). Because the Insurance requirement does not "infringe[]" on the NAGR Plaintiffs' rights to keep and bear arms, their Second Amendment claim must be dismissed.

## 2. The Insurance Requirement Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Since the Insurance requirement does not infringe Second Amendment rights (*Bruen* step 1), the Court need not go any further. However, the Insurance requirement is also consistent with the nation's historical traditional of firearm regulation (*Bruen* step 2) because, as *Bruen* itself explains, states have long had the right to regulate the *manner* in which firearm rights were exercised. 142 S. Ct. at 2147.

Numerous historical analogues support the Insurance requirement's constitutionality is that they are "relevantly similar" as mandated by *Bruen*. *Id.* at 2132. Determining if historical analogues are "relevantly similar" requires comparing "how and why the regulations burden a law-abiding citizen's

right to armed self-defense." *Id.* at 2133. To meet its burden, the government need only "identify a well-established and representative historical analogue, not a historical twin," and even if "not a dead ringer for historical precursors," a law still may "pass constitutional muster." *Id.* After all, "[t]he regulatory challenges posed by firearms today are not always the same as those" in 1791 or 1868, and "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. Accordingly, Plaintiffs' self-serving and conclusory allegations, that because the Ordinance is "novel" and "unique," it is not historically supported under *Bruen*, lacks the necessary nuance under this legal framework. *See, e.g.*, ¶ 88.

As one apt example, *Bruen* itself reviewed surety laws from the 1800s, which are applicable to the Insurance requirement. *See* Cornell, *supra*, *The Long Arc of Arms Regulation*, 55 U.C. Davis L. Rev. at 2570-71 (2022) ("[T]he imposition of a peace bond was the primary mechanism for the enforcement of the peace in the early republic …. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace."). While *Bruen* ultimately found these laws did not save the specific New York law at issue, *Bruen*'s reasoning is directly applicable here: because such laws are "intended merely for prevention" and "not meant as any degree of punishment," any burden associated with these surety laws was "too insignificant" to bear on the constitutionality analysis. *Bruen*, 2022 WL 2251305, at *27 (citing 4 Blackstone, *Commentaries*, at 249). *See* ECF No. 72 at 16-20 (citing *Bruen*, 2142 S. Ct. at 2148-51); *see* ECF No. 72 at 16-20.

And countless other historic regulations and laws can be analogized to the Insurance requirement, the purpose of which is to prevent and mitigate harm to persons and property from firearms. Numerous laws from the 1700s prioritized public safety, welfare, or the "public good," including preventing harm from firearms, regulating the possession, storage, and transport of gunpowder, and those conditioning the keeping and bearing of guns on the gunowner taking an oath of loyalty to the state. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 74 Fordham L. Rev. 487, 506-08, 510-12 (2004). The 1800s saw laws limiting the carrying of concealed weapons and prohibiting firing guns in certain circumstances, including within town limits. *See id.* at 513-15. The Insurance requirement here is far less burdensome.

Indeed, one way to understand the Ordinance's constitutionality is to understand what it does *not* do. In explaining its reasoning, *Bruen* cited numerous antebellum decisions from State high courts upholding state laws banning concealed carry—but not banning public carry altogether—including *State v. Reid*, 1 Ala. 612 (1840), which held that an Alabama concealed carry prohibition was permissible under a state constitution that "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne," and *Nunn v. State*, 1 Ga. 243, 251 (1846), which upheld a Georgia law prohibiting the secret "wearing" or "carrying" of pistols. *Bruen*, 142 S. Ct. at 2145-47; *see also Bruen*, Br. for Amici Curiae Profs. of History and Law in Support of Respondents 19-20 & n.13, *available at* https://tinyurl.com/y5ek8mph (brief by 17 preeminent historians noting numerous state statutes and constitutional provisions prescribing gun regulations); Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328–1928*, 55 U.C. Davis L. Rev. 2545, 2591 (2022) (Reconstruction era state constitutions "expressly recognized broad police power authority to regulate arms"). A key takeaway from these authorities is that a government's police power can be used to pass regulations related to the keeping and bearing of firearms, so long as they do not function as a total or *de facto* prohibition on keeping and bearing arms for self-defense.

"Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 142 S. Ct. at 2162 (citing *Heller*, 554 U.S. at 636). Even firearms laws that have no clear historical analogues from the Founding or Reconstructions eras—such as laws requiring fingerprinting, background checks, mental health records checks, and training in firearms handling—will often pass constitutional muster because they reflect state and local governments legitimate power to uphold peace and good order. *Id.* The Ordinance's Insurance requirement is analogous to and significantly less burdensome than requirements that the *Bruen* Court indicated were *per se* constitutional.

The City's police power to enact the Ordinance is consistent with centuries of jurisprudence upholding regulations affecting individual constitutional rights, such as freedom of speech (e.g., time, place, and manner restrictions) and property rights. *See, e.g.*, *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022) (rejecting constitutional takings, exaction, and unreasonable seizure challenges to ordinance requiring landlord to pay tenant a relocation fee); *FCC v. Fla. Power Corp.*, 480 U.S. 245,

252 (1987) (noting the wide constitutionality of "statutes regulating [] economic relations" under the Fifth Amendment). Guns are property, as are the persons and property that the Insurance requirement seeks to protect, and even constitutionally protected property rights have long been subject to governmental regulations. The Insurance requirement here is no different.

In sum, even if the Ordinance is found to "infringe" on Second Amendment rights in some way (it does not), it minimally burdens those rights and is sufficiently similar to historical firearm regulations that it is constitutional under *Bruen*.

### B. Plaintiffs' Claims Challenging the Fee Requirement Should Also Be Dismissed.

#### 1. Claims challenging the Fee requirement are still unripe for review.

All Plaintiffs' claims involve facial challenges to the Ordinance's Fee requirement. ¶¶ 84-127; *see supra* at 8 (table). Plaintiffs generally attack the Fee requirement under two basic sets of claims: because the Fee requirement forces them to "associate with a private group" (¶ 96), or that the Fee is a "tax." These and other related claims against the Fee requirement are meritless, as set forth below.

This Court previously held on two occasions, when the Fee requirement was in virtually the same state of implementation as it is today, that certain federal and state constitutional challenges were not ripe for review. ECF Nos. 72, 81. The same is true today. The City has not designated a Nonprofit. *See* ECF No. 85. Accordingly, many of the same claims challenging the Fee requirement that have previously been dismissed on ripeness grounds and that were re-pled in the SAC (i.e., at least Claims 1, 2, and 4) should again be dismissed for lack of ripeness.

Ripeness doctrine looks primarily at two considerations: "the hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The "basic rationale" of ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements," *id.* at 148, and to ensure that challenges to laws are "test[ed] … in a concrete situation." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 165 (1967). Pre-enforcement challenges are not ripe if it is likely that the law will change before it goes into effect. *See, e.g.*, *Cramer v. Brown*, 2012 WL 13059699, at *3 (C.D. Cal. Sept. 12, 2012) (finding pre-enforcement claim justiciable, in part, because there was "no reason to think the law will change"). Another common reason that issues "may not be ripe for review

[is] if further factual development would significantly advance [the court's] ability to deal with the legal issues presented." *Nat'l Park Hosp. Ass'n v. Dep't. of Interior*, 538 U.S. 803, 812 (2003); *see also Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122-23 (9th Cir. 2010) (case not ripe if it "involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all"); *Vieux v. Easy Bay Reg'l Park Dist.*, 906 F.3d 1330, 1344 (9th Cir. 1990) (federal courts may not issue advisory opinions based on a "hypothetical state of facts").

"The prudential considerations of ripeness are amplified when constitutional considerations are concerned." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002). Indeed, "[t]he Supreme Court has neatly instructed that the jurisdiction of federal courts to hear constitutional challenges should be exercised only when the underlying constitutional issues [are tendered] in clean-cut and concrete form." *Id.* (quoting *Rescue Army v. Municipal Court*, 332 U.S. 549, 584 (1947)).

Here, Plaintiffs' claims facially challenging the Fee requirement on compelled speech and association grounds remain unripe for review for the same reasons that this Court expressed in its prior orders from August and September 2022. *See* ECF Nos. 72, 81. Plaintiffs re-pled these claims in the SAC as Claims 1, 2, and 4, but the same ripeness concerns previously articulated by the Court continue to exist today. In August 2022, this Court held that the NAGR Plaintiffs' First and Second Amendment challenges to the Fee requirement were unripe for review because the Nonprofit had not been designated, "the Ordinance does not specify what the Nonprofit's activities will be," and the Court could not tell "whether the Fee would fund *any* kind of speech or expressive activities." ECF No. 72 at 7-10. Ultimately, the Court concluded: "Without a concrete idea of the Nonprofit's actual programs and activities, the Court is left 'entangling [itself] in abstract disagreements.'" *Id.* at 10 (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)). A month and a half later, the Court reached the same conclusion and dismissed both sets of Plaintiffs' federal constitutional challenges to the Fee Requirement as unripe. ECF No. 81 at 7-9, 18-19, 23.

As the City noted in its most recent Status Report, the City attempted to handle the Nonprofit designation process through an RFI process but did not receive any satisfactory responses, even after republishing the RFI. ECF No. 85 at 2. As a result, the City has decided to issue an RFP, which process has not yet begun. *Id.*; Prevost Decl. ¶ 6. Unfortunately, the lack of satisfactory RFI responses and the

upcoming RFP process will delay the steps necessary for full implementation of the Fee requirement, which requires designating and contracting with the Nonprofit, all of which must happen before the City Council votes on whether to approve the CMO's authority to begin requiring payment of the Fee. ECF No. 85 at 2-3; *see also* ¶ 58 (alleging "[t]he destination of the [Fee] money is to a still undetermined nonprofit"). At a time when the City is grappling with and developing ways to fully implement the Ordinance's terms, is not an appropriate time for the Court to try to evaluate whether those terms, when fully implemented in the future, will be constitutional. While courts have rejected ripeness arguments in pre-enforcement challenges precisely because the legislature "ha[d] no power to amend the statute before its effective date" and there was "no reason to think the law will change," *Cramer,* 2012 WL 13059699, at *3, the opposite is true here, which aptly demonstrates one reason why these claims remain unripe for review.

Additionally, Plaintiffs' renewed allegations about the conditions under which the Ordinance is to be implemented rest on self-serving speculation rather than any actual knowledge (e.g., how the Nonprofit will actually behave in delivering voluntary services). For example, Plaintiffs allege that the Fee requirement violates the compelled speech and association doctrines because the undetermined Nonprofit's activities "*may* include advocating about the dangers of gun ownership, and other services with little to no connection to the payer's ownership of a gun," and that the whole situation "is an invitation to corruption and waste." ¶ 62. Plaintiffs likewise claim that the Fee requirement violates their asserted rights under the First Amendment and highly similar state constitutional provisions (Cal. Const., art. I, §§ 2-3) "to not be forced by the government to support someone else's speech, particularly when you disagree with their message," and "the right to not be forced by the government to associate with or support … a group with which you would not voluntarily assemble." ¶ 95 (First Amendment claim); ¶ 105 (identical allegation underpinning analogous state constitutional claim). These claims and allegations are clearly based on speculation. *See Young v. Hawaii*, 992 F.3d 765, 828 (9th Cir. 2021) (en banc) (claims not ripe if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all"); *United States v. Gila Valley Irrigation Dist.*, 31 F.3d 1428, 1436 (9th Cir. 1994) (claims not ripe when based on "speculation" regarding future

regulatory decisions); *see also* § 10.32.220(B) (expressly prohibiting the Nonprofit from spending any "portion of the monies from the [Fee]" on "litigation, political advocacy, or lobbying activities").[4]

However, because the Fee amount has at least been preliminarily set, the Fee requirement can be evaluated under the Second Amendment framework. The primary thing that has changed since the Court previously dismissed claims for lack of ripeness is that the City Council passed in its 2022-2023 schedule of fines and fees a Fee amount of $25, pursuant to its customary budget process. It is true that after the CMO designates and contracts with a Nonprofit and then asks the City Council to vote on whether to approve the CMO's authority to begin enforcing the Fee requirement, the City Council could set a different amount. ECF No. 85 at 3 (citing ECF No. 78 at 3); *accord* ¶ 57 (conceding that the current $25 Fee amount "is subject to change"). However, the Court could find, now, that the Fee is not "exorbitant" and therefore passes constitutional muster under *Bruen*. *See* 142 S. Ct. at 2138 n.9.

As this Court has itself noted (ECF No. 72 at 12), *Bruen* discussed with approval fee payments so long as they are not so "exorbitant [so as to] deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. Based on this, this Court stated in its September 2022 Order:

> In and of itself, a fee that is merely associated with owning a firearm—and for which the failure to pay does not result in that ownership being revoked, Opp. 3—would not necessarily be inconsistent with the "historical tradition of firearm regulation." Indeed, the Supreme Court in *Bruen* expressly contemplated regulations that may permissibly include fee payments, so long as the fees were not so "exorbitant [so as to] deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. Here, the Court cannot assess whether such a Fee would be so "exorbitant" as to infringe upon Plaintiffs' rights without additional information on the Fee amount or the as-yet-to-be-determined "criteria by which a person can claim a financial hardship exemption." Ordinance § 10.32.235(A)(4). Absent the promulgation of regulations on these two points, the Court would be left to issue an impermissible advisory opinion on the Ordinance's constitutionality under the Second Amendment.

ECF No. 72 at 12. The "financial hardship" criteria have been set in the CMO Regulations (SAC Ex. H, § 4-3), and the Fee amount has been set at $25 but is potentially still subject to change by the City Council. Thus, the Court could find that Second Amendment challenge to the Fee requirement remains

---

[4] These claims are also subject to dismissal under Rule 12(b)(6), which provides that such speculative and conclusory allegations need not be credited. *See Twombly*, 550 U.S. at 555.

unripe for review, or it could go ahead and decide the issue under *Bruen* based on the action taken by the City Council to vote it into the City's budget. If in the future, the City Council materially increases the Fee amount, Plaintiffs could seek leave to amend their Complaint to re-bring the claim at that time.

As for the compelled speech and association claims, it is "premature" to ask a federal court "to issue a binding interpretation of a local ordinance based on what might happen in the future without first giving the City … the opportunity to interpret its own ordinance." *United States v. Power Co.*, 2008 WL 2626989, at *4 (D. Nev. June 26, 2008). Moreover, important *regulations* bearing on the Fee requirement have not yet been promulgated. *See* ¶ 42 & SAC Ex. H, § 2.2 (CMO regulations state that amended regulations will be issued regarding implementation of the Fee requirement). At minimum, the SAC's challenges to the Fee requirement based on compelled speech and association (Claims 2 and 4) should be dismissed for lack of ripeness, for the same reasons as stated in the Court's August and September 2022 Orders. *See* ECF Nos. 72, 81. The Court can, however, and should, deem the amount of the Fee constitutional under *Bruen*.

### 2. The Fee Requirement Does Not Violate the Right to Keep and Bear Arms.

#### a. Plaintiffs' Second Amendment Claim (Claim 1)

The *Bruen* analysis of the Insurance requirement, *supra*, applies equally to the Fee requirement. It is obvious that an annual $25 Fee with a financial hardship exemption (based on 30% area median income) passes constitutional muster under *Bruen*. Such a nominal Fee is far from being so "exorbitant [so as to] deny ordinary citizens their right" to keep and bear arms. *Bruen*, 142 S. Ct. at 2138 n.9. As this Court noted in August 2022: "In and of itself, a fee that is merely associated with owning a firearm—and for which the failure to pay does not result in that ownership being revoked—would not necessarily be inconsistent with the 'historical tradition of firearm regulation,'" especially given that *Bruen* "expressly contemplated regulations that may permissibly include fee payments" so long as they are not "exorbitant." ECF No. 72 at 12.

"Properly interpreted, the Second Amendment allows a variety of gun regulations," including laws far more intrusive than payment of a $25 Fee (e.g., fingerprinting, mental health records checks) so long as they reflect state and local governments legitimate power to uphold peace and good order. *Bruen*, 142 S. Ct. at 2162. The Ordinance's Fee requirement here is significantly less burdensome than

the various laws that the *Bruen* Court indicated were *per se* constitutional, and the $25 Fee amount is clearly not exorbitant under any common-sense understanding of the term, or Second Amendment case law. *See, e.g., Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015) (upholding $48 in gun licensing fees); *Kwong v. Bloomberg*, 723 F.3d 160, 161, 167 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (upholding $340 gun licensing fee); *O'Connell v. Gross*, 2020 WL 1821832 (D. Mass. Apr. 10, 2020) (upholding $300 in fees and mandatory gun safety courses).

The Second Amendment challenge to the Fee requirement should be dismissed with prejudice.

**b. The HJTA Plaintiffs' Unconstitutional Conditions Claim (Claim 5)**

The HJTA Plaintiffs bring a related claim, alleging the Fee has unlawfully "placed a condition on the continued exercise" of their rights to keep and bear arms under the Second Amendment and the California Constitution. ¶¶ 108-109. In its September 2022 Order, the Court dismissed *with prejudice* the aspect of this claim based on the California Constitution, yet the HJTA Plaintiffs' have improperly re-pled the claim in the SAC. ECF No. 81 at 21:11-15. This aspect of the claim should be stricken or (again) dismissed, as the Court sees fit.

As for the aspect of the claim of based on Second Amendment rights, the Court dismissed it with leave to amend because "[t]he Ordinance as drafted does not 'condition' the exercise of Second Amendment rights because there are no means by which a San Jose gun owner may be deprived of his or her firearm." ECF No. 81 at 20 (rejecting, as a "misinterpretation of the Ordinance," the HJTA Plaintiffs' allegations that a gun owner could be "forced to surrender his firearms" if he fails to pay the Fee). The Court noted that the HJTA Plaintiffs failed to provide "any authority that the unconstitutional conditions doctrine can apply in the Second Amendment context where possession is not at risk," and held that their Fifth Amendment takings case law was inapposite. *Id.*

The HJTA Plaintiffs' allegations in the SAC for this claim remain largely the same as in their prior complaint, with one exception: the HJTA Plaintiffs have added the vague and unsupported allegation that because the police may confiscate firearms involved in some violations of the law (e.g., "[i]f a student brings a firearm to school," "if someone purchases a firearm on the street without going through a federally licensed dealer," "if someone discharges a firearm in the air on New Year's Eve"), and because a violation of the Ordinance is also a violation of the law, then it must be possible (the

HJTA Plaintiffs claim) that police officers might also confiscate guns for violations of the Ordinance. ¶¶ 111-12. This is a stretch. Such vague and speculative allegations about what the law *might be* or how different combinations of law and conduct *could* apply are insufficient to state claim under Rule 12(b)(6). Moreover, it is axiomatic that more specific provisions of law control over more general ones. *See, e.g.*, Cal. Code Civ. Proc. § 1859. Thus, the Ordinance's provision that firearms may be "impounded" for violations of the law only if authorized by some other law (i.e., state or federal law, as interpreted by the City) controls over HTJA's unsupported supposition that the City might begin using a highly general provision of the Municipal Code (§ 1.08.010) to override the Ordinance's impoundment provision. The claim should again be dismissed, this time with prejudice, for failure to state a claim upon which relief may be granted.

### 3. Plaintiffs Fail to State a Derivative Declaratory Relief Claim (Claim 3).

Plaintiffs make a claim for declaratory relief under 28 U.S.C. §§ 2201-02 "to the extent that each of the claims above [i.e., their First and Second Amendment Claims] have not already established a remedy," in which case Plaintiffs allege "are entitled to declaratory relief holding that the Ordinance violates Plaintiffs' individual rights under the Constitution of the United States and is otherwise invalid." ¶ 101. This claim is derivative of Plaintiffs' First and Second Amendment claims, and it should likewise be dismissed for failure to state a claim under Rule 12(b)(6) for the same reasons.

### 4. The Fee is not a "tax" under the California Constitution (Claims 6 and 7).

The HJTA Plaintiffs' final two claims for relief allege that the Fee requirement violates the California Constitution's prohibitions on imposing a special "tax" without voter approval (Cal. Const., art. XIII C), and on delegating the power to tax (Cal. Const., arts. XI, XIII). ¶¶ 114-27. It has already been established in this case that both claims require the HJTA Plaintiffs to show that the Fee is a "tax" under Article XIII C. ECF No. 81 at 23:2-4. But, as this Court has previously held, the Fee is not a "tax" under *Schmeer v. County of Los Angeles*, 213 Cal. App. 4th 1310 (2013), because the Fee is not "payable to, or for the benefit of, a local government." *Id.* at 13-15, 22-23 (quoting *Schmeer*, 213 Cal. App. 4th at 1328-29); *see also id.* at 14 (calling *Schmeer* "thorough," "persuasive," and the "touchstone" of the Court's analysis, and rejecting Plaintiffs' "attempt to distinguish *Schmeer* on its facts"). But the Court gave Plaintiffs leave to amend these claims, and the HJTA Plaintiffs decided to

re-bring the same claims in the SAC (the NAGR Plaintiffs opted not to do so). The re-pled claims, however, are *identical* to the HJTA Plaintiffs' old claims. Compare SAC ¶¶ 114-27, with HJTA Complaint ¶¶ 24-37 (*HJTA* action, No. 22-cv-02365-BLF, ECF No. 1). For the same substantive reasons articulated in the City's prior motions, these claims should now be dismissed with prejudice.

### a. HJTA Plaintiffs' Article XIII C Claim (Claim 6)

Just as before, Plaintiffs again fail to state a claim under Article XIII C for at least three reasons.

First, the Court previously dismissed this claim because it "contain[ed] very limited factual allegations," "largely legal conclusions couched in the language of article XIII C," and thus "f[ell] short of the federal standard required by *Ashcroft v. Iqbal*." ECF No. 81 at 22 (citing prior HJTA Complaint ¶¶ 25-30). The HJTA Plaintiffs then re-filed the *exact same* claim (i.e., the language is identical except the addition of a conclusory sentence at the end stating "The fes [sic] is therefore invalid."). The claim is subject to dismissal with prejudice for this reason alone.

Second, the Fee is still not a "tax" under Article XIII C, which is defined as "any levy, charge, or exaction of any kind imposed by a local government." Cal. Const., Art. XIII C, § 1(e). A charge is a "tax" under this definition only if it is "payable to, or for the benefit of, a local government." *Schmeer*, 213 Cal. App. 4th at 1328-29. Here, the Fee is not a "tax" because it is not paid or remitted to the local government, but rather "shall" be paid directly to the Nonprofit to fund voluntary services for the benefit of gun owners and their families. § 10.32.215. This Court previously held that *Schmeer* is fatal to Plaintiffs' claims, and that remains true today. *See also* ECF No. 81 at 22 (noting that Plaintiffs' allegation that the Ordinance requires the Fee be paid directly to the Nonprofit, seemed to be, on its own, fatal to the claim); *cf.* ¶¶ 57, 109.

Third, even if the Fee were a "tax," it would fall under the "specific benefits exception." *See* Cal. Const., Art. XIII C, § 1(e)(1). Under that exception, taxes are not subject to Article XIII C if they are "imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege." *Id.*; *see, e.g.*, *S. Cal. Edison Co. v. Pub. Util. Comm'n*, 227 Cal. App. 4th 172, 200 (2014) (finding this exception applied to a public utility fee "designed to benefit … ratepayers"). That exception applies here, where the Fee is paid only by San

Jose gun owners for the sole purpose of providing gun-safety and other programming and services to San Jose gunowners, "members of their household," and "those with whom they have a close familial or intimate relationship." § 10.32.220(A).

### b. HJTA Plaintiffs' tax-delegation claim (Claim 7)

The HJTA Plaintiffs' final claim is for unlawful delegation of the power to tax under Cal. Const., art. XIII (§ 31), and art. XI (§ 11). ¶¶ 122-27. This claim fails for three reasons.

First, while the Court previously dismissed this claim as unripe, ECF No. 81 at 23, it should now be dismissed with prejudice along with the Article XIII C claim because the HJTA Plaintiffs failed to plausibly allege the Fee is a "tax" despite being given a chance to amend. The HJTA Plaintiffs have previously *conceded* that failure to show the Fee is a "tax" under Article XIII C is fatal to this claim. ECF No. 81 at 23:2-4. Thus, this claim should also be dismissed with prejudice.

Second, as the HJTA Plaintiffs have likewise already *conceded* in this litigation, the Ordinance also does not violate Article XI § 11 because that provision only applies to the *state* Legislature, not municipal governments. *See HJTA* Action, No. 22-cv-02365, ECF No. 16 at 18 n.3 (HJTA Plaintiffs conceding this point and "withdraw[ing]" the allegation); Cal. Const., Art. XI, § 11(a) ("*The Legislature* may not delegate to a private person or body power to …."); *County of Riverside v. Superior Court*, 30 Cal.4th 278, 284 (2003). Thus, Article XI § 11 does not apply to the City.

Third, Article XIII § 31 does not apply because the Ordinance does not "surrender[] or suspend[]" the City's power to tax "by grant or contract." Cal. Const., Art. XIII, § 31. The Ordinance itself is clearly not a "grant" or a "contract," and the SAC does not plausibly allege the existence of any such grant or contract. Nor has there been any surrender or suspension of the City's power to tax because "the controlling consideration" under Section 31 is "whether a disputed contract amounts to a local entity's 'surrender'… of its control of a [taxing] power or municipal function," which "turns on whether this crucial control element has been lost." *Russell City Energy Co., LLC v. City of Hayward*, 14 Cal. App. 5th 54, 64 (2017). Here, no such control has been lost because the imposition of the Fee and the Fee amount are both controlled entirely by the City Council. § 10.32.215. The Nonprofit's only power is to receive and spend Fee monies under its limited mandate in the Ordinance. § 10.32.220.

**C.  Plaintiffs' Claims Should Be Dismissed Without Leave to Amend.**

In deciding whether to grant leave to amend, the Court must consider five factors set forth by the US. Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). A strong showing with respect to any one of the other factors may warrant denial of leave to amend. *Id.*

Here, the third and fifth *Foman* factors warrant denial of leave to amend at least with respect to the NAGR Plaintiffs' claims challenging the Insurance requirement (Claims 1 and 3), and also with respect to the certain of Plaintiffs' claims challenging the Fee requirement, including under California constitution provisions concerning taxation (Claims 6 and 7). All those claims can be resolved at this stage of the case as a matter of law. With respect to the latter two claims, the Court previously pointed out deficiencies with these claims and granted leave to amend, but the HJTA Plaintiffs' version of those claims in the SAC are virtually unchanged.

## VI.  CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court dismiss Plaintiffs' SAC under Rules 12(b)(1) and 12(b)(6). Since the Complaint's defects with respect to claims challenging the Insurance requirement and certain claims challenging the Fee requirement cannot be cured, the City respectfully requests that the dismissal of those claims be without leave to amend.

Dated:  February 16, 2023

Respectfully submitted,

**COTCHETT, PITRE & McCARTHY, LLP**

By: */s/ Tamarah P. Prevost*
JOSEPH W. COTCHETT
TAMARAH P. PREVOST
ANDREW F. KIRTLEY

*Attorneys for Defendants City of San Jose, et al.*

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Defendants City of San Jose, et al.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.**, a nonprofit corporation, and **MARK SIKES**, an individual,<br><br>And<br><br>**HOWARD JARVIS TAXPAYERS ASSN.**, a nonprofit corporation, **SILICON VALLEY TAXPAYERS ASSN.**, a nonprofit corporation, **SILICON VALLEY PUBLIC ACCOUNTABILITY FOUNDATION,** a nonprofit corporation, **JIM BARRY**, an individual, and **GEORGE ARRINGTON**, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE**, a public entity, **JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, **CITY OF SAN JOSE CITY COUNCIL**, and **ALL PERSONS INTERESTED** in the matter of San Jose Ordinance No. 30716, establishing an Annual Gun Harm Reduction Fee,<br><br>Defendants. | Case No. 5:22-cv-00501-BLF<br><br>**DECLARATION OF TAMARAH P. PREVOST IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECOND AMENDED COMPLAINT**<br><br>Date: June 15, 2023<br>Time: 9:00 a.m.<br>Judge: Hon. Beth Labson Freeman<br>Courtroom: San Jose Courthouse, Courtroom 3 (5th Floor) |

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Declaration of Tamarah P. Prevost ISO Defendants' Motion to Dismiss Plaintiffs' Consolidated SAC
Case No. 5:22-cv-00501-BLF

Excerpts 115

I, **Tamarah P. Prevost**, declare as follows:

1.     I am an attorney duly licensed to practice law in the State of California and admitted to practice in this Court. I am a partner with the law firm of Cotchett, Pitre & McCarthy, LLP ("CPM") and counsel for Defendants City of San Jose, et al. ("City" of "San Jose") in this action. The matters described herein are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.     The activities undertaken by the City to implement the Ordinance are publicly available. *See, e.g.*, *City Manager Regulations For The Reduction of Gun Harm Ordinance* (October 21, 2022), *available at* https://www.sjpd.org/home/showpublisheddocument/732 /638018715451770000 ("CMO Regulations"); *Memorandum from Sarah Zárate to San Jose Mayor and City Council Re: Gun Harm Reduction Ordinance Update* (July 1, 2022), *available at* https://www.sanjoseca.gov/home/showpublisheddocument/87508 ("July Memorandum"). The City has also been and remains committed to providing Plaintiffs and the Court with Status Reports to provide timely and complete information about the City's efforts to implement the Ordinance.

3.     Each of the three Status Reports that the City has filed in this action have been drafted and filed after detailed consultation between myself and several City staff, including the City Manager's Office. *See* ECF No. 78 (Aug. 17, 2022); ECF No. 82 (Oct. 25, 2022); ECF No. 85 (Jan 6, 2023).

4.     In the City's most recent Status Report, filed on January 6, 2023 (the "January 2023 Status Report"), the City provided an update of the progress it has made in implementing both the Fee and Insurance requirements under the Ordinance.

5.     As was set forth in the January 2023 Status Report, the Ordinance's Insurance requirement has been fully implemented.

6.     As for the Ordinance's Fee requirement, I have conferred with the City Manager's Office as recently as the day of this filing. The January 2023 Status Report is still the most up-to-date recitation of the City's efforts to implement the Fee requirement. There are no additional material developments that have occurred regarding implementation of the Fee requirement

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Declaration of Tamarah P. Prevost ISO Defendants' Motion to Dismiss Plaintiffs' Consolidated SAC
Case No. 5:22-cv-00501-BLF    Excerpts 116    1

1    between when the January 2023 Status Report was filed (January 6, 2023) and the date of this

2    filing (February 16, 2023).

3          7.    The City remains committed to filing additional status reports in the future on an

4    ongoing basis to ensure the Court and the Plaintiffs in this action are notified as the City completes

5    any future implementation activities related to the Ordinance.

6

7          I declare under penalty of perjury under the laws of California and the United States that

8    the foregoing is true and correct. Executed this 16th day of February 2023 at Burlingame,

9    California.

10

11                            */s/ Tamarah P. Prevost*
                                 TAMARAH P. PREVOST

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Declaration of Tamarah P. Prevost ISO Defendants' Motion to Dismiss Plaintiffs' Consolidated SAC
Case No. 5:22-cv-00501-BLF    Excerpts 117    2

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE*
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admitted *Pro Hac Vice*

*Attorneys for the National Association for Gun Rights,
Inc. and Mark Sikes*

JONATHAN M. COUPAL (SBN: 107815)
TIMOTHY A. BITTLE (SBN: 112300)
LAURA E. DOUGHERTY (SBN: 255855)
Howard Jarvis Taxpayers Foundation
1201 K Street, Suite 1030
Sacramento, CA 95814
Telephone: (916) 444-9950
Email: tim@hjta.org

*Attorneys for Howard Jarvis Taxpayers Association,
Silicon Valley Public Accountability Foundation, Silcon
Valley Taxpayers Association, Inc., George Arrington,
and James Barry*



**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES,** an individual,<br><br>     Plaintiffs,<br><br>     And<br><br>**HOWARD JARVIS TAXPAYERS ASSN.,** a nonprofit corporation**, SILICON VALLEY TAXPAYERS ASSN.,** a nonprofit corporation, **SILICON VALLEY PUBLIC ACCOUNTABILITY FOUNDATION,** a nonprofit corporation, **JIM BARRY**, an individual, and **GEORGE ARRINGTON**, an individual,<br><br>     Plaintiffs,<br><br>     v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, the **CITY OF SAN JOSE CITY COUNCIL, and ALL PERSONS INTERESTED in the matter of San Jose Ordinance No. 30716, establishing an Annual Gun Harm Reduction Fee,**<br><br>     Defendants. | **Case Number: 5:22-cv-00501-BLF**<br>**Case Number: 5:22-cv-02365-BLF**<br><br>**CONSOLIDATED SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, INVALIDATION OF §§ 10.32.215 AND 10.32.230(B) OF CHAPTER 10.32 OF TITLE 10 OF THE SAN JOSE MUNICIPAL CODE, AND NOMINAL DAMAGES**<br><br>**Judge: Hon. Beth Labson Freeman** |



Plaintiffs by and through the undersigned counsel, hereby bring this consolidated action for injunctive relief, a declaratory judgment, invalidation of the fee provisions, and nominal damages as a result of the City of San Jose's unconstitutional and unlawful ordinance, specifically Part 6 of Chapter 10.32 of Title 10 of the San Jose Municipal Code (the "Ordinance").

In support of these requests, Plaintiffs state as follows:

**INTRODUCTION**

1.     The Second Amendment provides an "unqualified command": "the right of the people to keep and bear Arms, shall not be infringed." *See New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1981); U.S. Const., Amend. 2.

2.     "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).

3.     The Second Amendment (incorporated through the Fourteenth Amendment) "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  This right is particularly acute at home, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Thus, the conduct at issue in this case falls within the plain text of the Second Amendment and is "presumptively protect[ed]" by the Constitution.  *Bruen*, 142 S.Ct. at 2130.

4.     The City of San Jose's insurance mandate is utterly inconsistent with "the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S.Ct. at 2130.  To the contrary, as the City's Mayor highlighted in his own press release, the City of San Jose is "the *first* city in the United States to enact an ordinance to require gun owners to purchase liability insurance."  *San Jose Mayor Statement on Historic Passage of First in the Nation Gun Violence Reduction Ordinance* (Jan. 25, 2022) ("Liccardo Press Release") (attached as Exhibit A) (emphasis added)

---

Consolidated Second Amended Complaint

5:22-cv-00501-BLF

5.      The City of San Jose's fee requirement is nothing more than an attempt to impose costs on ordinary American citizens for no reason other than their decision to exercise their basic constitutional rights.

6.      The City of San Jose's ordinance thus flagrantly fails the test set forth in *Bruen* for assessing burdens on the exercise of the right to bear arms guaranteed by the Second Amendment to the Constitution of the United States just as surely as if the City had required individuals to have "defamation insurance" or to pay a "speech tax" before speaking in the town square or publishing a newspaper.

7.      To preserve the safety and core rights under the Constitution of the law-abiding citizens of the City of San Jose, as well as their rights under the California Constitution and the City Charter, this Court must invalidate and prevent Defendants from enforcing the unconstitutional and unlawful Ordinance.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the Second and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C § 1983. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief and other relief, including preliminary and permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1) because Defendants are officials of the City of San Jose, which is within the geographical boundaries of the Northern District of California. Defendants are also residents of this State within the meaning of 28 U.S.C. § 1391(c).

10.     The Court has personal jurisdiction over the Defendants because the City of San Jose is within the State of California.

11.     The California Superior Court for the County of Santa Clara has jurisdiction over the *in rem* reverse validation action against all persons filed in that court pursuant to California Code of Civil Procedure sections 860 *et seq.* by Plaintiffs Howard Jarvis Taxpayers Association, *et al.*, which defendant City of San Jose removed to this Court.

**INTRADISTRICT ASSIGNMENT**

12.     This action is properly assigned to the San Jose Division, pursuant to Civil L.R. 3-2(e). A substantial part of the events giving rise to the claims occurred in Santa Clara County, California.

**PARTIES**

13.      Plaintiff National Association of Gun Rights ("NAGR") is a non-stock, nonprofit corporation incorporated under the laws of the Commonwealth of Virginia and has its principal place of business in Loveland, Colorado. NAGR is a grassroots organization whose mission is to defend the right to keep and bear arms under the Second Amendment and advance the constitutional right by educating the American people and urging them to action in public policy.  NAGR has members who would be subject to the Ordinance within the City of San Jose.

14.     Plaintiff Mark Sikes resides in San Jose, California. Sikes legally owns a gun, is not a peace officer, does not have a concealed carry permit, and does not meet the qualifications of CAL. GOV. CODE § 68632 (a) and (b) and, therefore, would be subject to the Ordinance if it were to go into effect.

15.     Plaintiffs NAGR and Mark Sikes are referred to collectively herein as "NAGR Plaintiffs."

16.     Plaintiff Howard Jarvis Taxpayers Association ("HJTA") is a nonprofit public benefit corporation, comprised of over 200,000 California members, organized and existing under the laws of California for the purpose, among others, of engaging in civil litigation on behalf of its members and all California taxpayers to ensure constitutionality in taxation. HJTA has members who reside in the City of San Jose, who legally own firearms, and who are subject to the Annual Gun Harm Reduction Fee that is the subject of this action.

17.     Plaintiff Silicon Valley Taxpayers Association, Inc. ("SVTA") is a nonprofit public benefit corporation, comprised of members who reside in Santa Clara County, organized and existing under the laws of California for the purpose of advocating the reduction of taxes and acting on behalf of its members to achieve its tax reduction goals. SVTA has members who reside in the City of San Jose, who legally own firearms, and who are subject to the Annual Gun Harm Reduction Fee that is the subject of this action.

3

18.     Plaintiff Silicon Valley Public Accountability Foundation ("SVPAF") is a nonprofit public benefit corporation, comprised of members who reside in Santa Clara County, organized and existing under the laws of California for the purpose of monitoring the policies and political actions of public officials in Santa Clara County to keep voters informed and residents represented in local decision-making. SVPAF has members who reside in the City of San Jose, who legally own firearms, and who are subject to the Annual Gun Harm Reduction Fee that is the subject of this action.

19.     Plaintiff Jim Barry is a resident of San Jose who legally owns a firearm and is subject to the Annual Gun Harm Reduction Fee that is the subject of this action.

20.     Plaintiff George Arrington is a resident of San Jose who legally owns a firearm and is subject to the Annual Gun Harm Reduction Fee that is the subject of this action.

21.     Plaintiffs HVTA, SVTA, SVPAF, Jim Barry and George Arrington are collectively referred to herein as "Howard Jarvis Plaintiffs."

22.     Defendant City of San Jose is a municipal corporation within the County of Santa Clara, California.[1]

23.     Defendant Jennifer Maguire ("Maguire") is the current and active City Manager for the City of San Jose. San Jose's Charter states that the City Manager is the "Chief Administrative Officer and head of the administrative branch of the City government." San Jose City Charter §§ 502, 701. "The City Manager shall be responsible for the faithful execution of all laws, provisions of this Charter, and acts of the Council which are subject to enforcement by the City Manager or by the officers who are under the City Manager's direction and supervision." *Id.*, § 701(d). Additionally, the City Manager is directly identified with enforcement authority throughout the Ordinance. Ordinance §§ 10.32.205, 210, 215, 235, & 250.

24.     Defendant San Jose City Council (the "City Council") is vested with authority under Article IV of the City of San Jose's City Charter (Ex. A). The Ordinance vests the City Council with authority to "set forth the schedule of fees and charges established by resolution of the City Council" and to "set forth…the schedule of fines" for those who violate the ordinance. *Id.*, § 10.32.215;

---

[1] *See City of San Jose City Charter, as amended* (Feb. 2021),
https://www.sanjoseca.gov/home/showpublisheddocument/13907/638058439112030000

Consolidated Second Amended Complaint                    5:22-cv-00501-BLF

10.32.250; 10.32.240.

25.     Defendants All Persons Interested in the matter of San Jose Ordinance No. 30716, establishing an Annual Gun Harm Reduction Fee will be bound by any validation judgment issued in this case pursuant to California Code of Civil Procedure section 870.  Jurisdiction by the California court over All Persons was obtained by published summons pursuant to Code of Civil Procedure sections 861 and 862.

## STATEMENT OF FACTS

### Enactment of the Ordinance

26.     On June 29, 2021, the City Council directed San Jose City Attorney Nora Frimann "to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage." Frimann Mem. re Gun Harm Reduction Ord. at 1 (Jan. 14, 202, 1 ("City Attorney Mem.") (a true and correct copy is attached as Exhibit B). Plaintiff NAGR immediately sent the City a cease and desist letter warning that the proposed ordinance was unconstitutional. *Ltr. from H. Dhillon and D. Warrington to San Jose City Council*, (July 14, 2021) (a true and correct copy is attached as Exhibit C).

27.     On January 14, 2022, in advance of the City Council's January 25 meeting, the City Attorney issued a memorandum in compliance with the City Council's directions that recommended the Council "[c]onsider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs." City Attorney Mem. at 1. Under a section addressing penalties for noncompliance, the City Attorney stated that "[f]ailure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine." *Id*. at 2.

28.     On January 21, 2022, Mayor Liccardo, Vice Mayor Jones, Councilmember Cohen, and Councilmember Carrasco issued "Directions" to the City Council, including to "[a]pprove the proposed ordinance," with certain modifications. *Mayor's Mem. to City Council* at 2 (Jan. 21, 2022) (a

5

Consolidated Second Amended Complaint                                          5:22-cv-00501-BLF

true and correct copy is attached as Exhibit D). The Mayor's Memorandum also noted that "Members of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations, with subsequent restoration of ownership as required by constitutional due process." *Id.* at 4 (emphasis added).

29.    On January 25, 2022, the City Council approved the ordinance through two votes regarding various changes. *Tuesday, January 25, 2022 City Council Meeting Synopsis* at 13 (a true and correct copy is attached as Exhibit E).

30.    The Ordinance requires any San Jose resident who owns a firearm to "obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy ... specifically covering losses or damages resulting from any accidental use of the Firearm." (San Jose Muni. Code § 10.32.210(A).).

31.    The Ordinance also requires San Jose gun owners to pay an "Annual Gun Harm Reduction Fee" to a "Designated Nonprofit Organization" that the City Manager will designate from time to time. The amount of the annual fee "will be set forth in the schedule of fees and charges established by resolution of the City Council." (Muni. Code § 10.32.215.) In the 2022/2023 schedule of fees, the Gun Harm Reduction Fee is set at $25 per year.

32.    "Designated Nonprofit Organization" is defined in the Ordinance as "an entity that qualifies as a nonprofit corporation under the federal internal revenue code and is designated pursuant to the City Manager's authority under Section 10.32.235," provided that "[n]o City official or employee shall sit on the board of directors of the Designated Nonprofit Organization." (Muni. Code § 10.32.205(B).) Section 10.32.235, in subdivision (A)(2), delegates authority to the City Manager for "[d]esignation of the nonprofit organization that will receive the Gun Harm Reduction Fee."

33.    The Ordinance provides basic guidelines for expenditure of the fee by the nonprofit organization. It says, "expenditures may include, but are not necessarily limited to the following: (1) Suicide prevention services or programs; (2) Violence reduction or gender based violence services or programs; (3) Addiction intervention and substance abuse treatment; (4) Mental health services related to gun violence; or (5) Firearms safety education or training." (Muni. Code § 10.32.220(A).).

34.    The Ordinance further states, "The Designated Nonprofit Organization shall spend

every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San Jose, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San Jose firearm owner or her family will incur through her possession of firearms." (Muni. Code § 10.32.220(C).). Except for these basic guidelines, the Ordinance provides that "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended." (Muni. Code § 10.32.220(C).)

35.     A gun owner's failure to pay the required fee to the designated private organization is punishable by a fine (Muni. Code § 10.32.240(A)) and confiscation of the owner's firearms (Muni. Code § 10.32.245).

36.     The Mayor immediately issued a press release the night of the vote, in which he boasted that "Tonight San José became *the first city in the United States* to enact an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm." Liccardo Press (emphasis added).

37.     Within 24 hours, articles were published about San Jose enacting an unprecedented regulation of gun ownership, including in the San Francisco Chronicle and the Los Angeles Times. *See* Lauren Hernández, *Gun Owners In San Jose Must Buy Liability Insurance Under Newly Passed First-In-The-Nation Law,* SAN FRANCISCO CHRONICLE (Jan. 26, 2022) https://www.sfchronicle.com/bayarea/article/Gun-owners-in-San-Jose-must-buy-liability-16804951.php  (a true and correct copy is attached as Exhibit F) ("The San Jose City Council adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability insurance for their firearms, city officials said.  The ordinance – which city officials said marks *the first such law for a city, state, or other jurisdiction in the country* . . . ." (emphasis added)); Olga R. Rodriguez and Juliet Williams, *San Jose Approves First Law In U.S. Requiring Gun Owners To Have Insurance*, LOS ANGELES TIMES (Jan. 25, 2022), https://www.latimes.com/california/story/2022-01-25/san-jose-gun-liability-insurance (a true and correct copy is attached as Exhibit G) ("The city of San Jose voted Tuesday night to require gun owners to carry liability insurance *in what's believed to be the first*

*measure of its kind in the United States.* The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights." (emphasis added)).

38. On February 8, 2022, the City Council voted a second time to approve the Ordinance.

39. On October 21, 2022, City Manager Regulations for the Ordinance went into effect (attached as Exhibit H ).

40. Section 2.1 of the City Manager Regulations provides "Firearm owners residing in San Jose who are required by SJMC section 10.32.210 to obtain liability insurance shall obtain such insurance by January 1, 2023."

41. Fines for violations of the Ordinance begin at $250 for a first offense and increase to $500 for a second offense and $1000 for a third offense within a year.

42. Section 2.2 of the Regulations state "[t]his version of the City Manager Regulations for the Reduction of Gun Harm Ordinance does not set a payment date; a payment date will be established in an amended version of these regulations to be issued in the future. Individuals covered by the Gun Harm Reduction Fee are not required to pay the fee until a payment date is set through the amended regulations.

43. With respect to the purported Gun Harm Reduction Fee, the City provided to the District Court an Implementation Timeline. Per the Timeline, "issu[ing] a Request for Proposals to procure the designated nonprofit" would not occur until September 2022. The Timeline projected "December 2022" as the date by which the City Manager would "finalize contract with designated nonprofit."

44. The District Court granted the City's motion to dismiss plaintiffs' claims as unripe, with leave to amend the complaint by February 2, 2023, based on the Timeline showing that the City Manager would issue a Request for Proposals in September, then select a nonprofit from among the proposals received and finalize a contract by the end of December.

45. On January 6, 2023, the City filed a Status Report in which it represented that the City Manager "has now completed all relevant tasks in the Implementation Timeline, except for the task listed as 'Finalize contract with designated nonprofit' with an estimated completion date of December

Consolidated Second Amended Complaint                                    5:22-cv-00501-BLF

2022." (01/06/23 Status Report, ECF #85 at 3:6).

46. Yet the City Manager had not "issu[ed] a Request for Proposals to procure the designated nonprofit" which, according to the Timeline, was supposed to be done in September. Instead, the City Manager issued something else – a "Request for Information." The Status Report explained the difference: "RFIs are used by the City to solicit information about potential solutions and *do not typically result in a contract award*, whereas RFPs are used by the City to gather responses and pricing from potential contractors to deliver a specific City defined scope of work, with the purpose of awarding one or more contracts at the end of the RFP process." (ECF #85 at 3:25.).

47. The Status Report informed the Court that no qualified organizations responded to the City Manager's Request for Information (*id.* at 3:13.) so the City Manager "has decided that the best approach to progress implementation at this point is to ... publish a full Request for Proposals .... Unfortunately, the lack of satisfactory RFI responses and the upcoming RFP process will delay the steps necessary for full implementation." (*Id.* at 3:20.) The Status Report offered no date by which these overdue "steps necessary for full implementation" might be completed.

48. Despite the City's delay in designating a nonprofit, and its equivocation on the ultimate amount of the fee, this controversy is ripe because a fee of $25 has been imposed for the 2022/2023 fiscal year and, although the City is not currently enforcing proof of payment (because there is no nonprofit to accept payment), the City has *not* waived the fee. The the 2022/2023 fee apparently will be due and payable once a nonprofit has been designated.

49. This controversy is ripe because, regardless of the ultimate identity of the nonprofit organization, the City's Ordinance requires the nonprofit to expend the fee providing services such as suicide prevention, gender based violence prevention, addiction intervention and substance abuse treatment, and mental health counseling for victims of gun violence, which services will be available to the general public, not just gun owners, and which gun owners are not required to, and may not choose to, utilize. Because its revenue will fund public services, not services requested by each payer, the "fee" is a tax under California law.

**The Burdens of the Ordinance**

50. The Ordinance will require an estimated 50,000-55,000 gun-owning San Jose Citizens,

Consolidated Second Amended Complaint                                        5:22-cv-00501-BLF

minus a few exceptions, to obtain an insurance policy and pay annual fees simply to exercise the same constitutional right to own a gun that existed prior to this ordinance. *Liccardo Mem. re Gun Harm Reduction Ord*. (Jan., 19, 2022) (a true and accurate copy is attached as Exhibit I).

51. The Ordinance states that "[t]o the extent allowed by law, the Firearm or Firearms of a person that [*sic*] is not in compliance with [the Ordinance] may be impounded subject to a due process hearing." Ordinance § 10.32.245. Further, "[a]ny violation" of the Ordinance is "punishable by an administrative citation," "fines for violations," and "all other civil and administrative remedies available to the City." *Id*., § 10.32.240; *see also* City Attorney Mem. at 2 ("Failure to comply [with the Ordinance] shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine."). At present, the City has no authority to seize a person's gun for violating the Ordinance, but "[m]embers of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations . . ." Mayor's Mem. to City Council, Jan. 21, 2022.

52. The Ordinance targets guns in the home. It does not apply to people who have a license to carry a concealed weapon. *Id*., § 10.32.225. Additionally, absent a concealed carry permit, there is no other way to carry a firearm in San Jose. *See* CAL. PENAL CODE §§ 25850, 26150, 26155, 26350, 26400.

### *Insurance Requirement*

53. The Ordinance conditions the constitutional right to own a gun on the payment of an unstated amount for insurance. It states that "A person who resides in the City of San Jose and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy…specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury, or property damage." Ordinance § 10.32.210.A.

54. This requirement does not contain any information about minimum insurance coverage thresholds or premiums. Thus, the City of San Jose has conditioned the constitutional right of its law-abiding citizens to own a gun on an unstated, unregulated price to be set by an industry of for-profit private sector corporations.

Consolidated Second Amended Complaint                    5:22-cv-00501-BLF

55.     Moreover, the City's findings did not include any evidence that there will always be insurance policies "specifically covering losses or damages resulting from any accidental use of" firearms, or what any such policy will cost. *See* Ordinance § 10.32.200.B.10 ("[i]njuries from unintentional shootings . . . are *generally* insurable" (emphasis added)).

56.     The Ordinance does nothing to ensure that insurance companies will provide policies "specifically covering" losses arising from accidental firearm use for any and every citizen who is subject to the Ordinance, which means the City's insurance mandate would establish a precondition to gun ownership that empowers for-profit insurance companies (with or without government pressure) to prohibit persons from exercising their Second Amendment rights.

### *Fee Requirement*

57.     The second primary component of the Ordinance is the imposition of a "fee" for owning a gun. The Ordinance states that "A person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year." Ordinance § 10.32.215. No fee amount is specified, nor is there criteria for how to calculate the fee. *Id*. Rather, Defendant City Council reserved the right for itself to determine the fee amount at a later date. *Id*. This fee is currently set at an amount of $25, but is subject to change. Memorandum from Sarah Zarate to San Jose Mayor and City Council Re: Gun Harm Reduction Ordinance Update (July 1, 2022), available at sanjoseca.gov/home/showpublished document/87508.

58.     The destination of the money is to a still undetermined nonprofit. That determination is delegated to Defendant Maguire. *Id*., §§ 10.32.205.B; 10.32.220; *see also* City Manager Regulations at § 2-2 ("This version of the City Manager Regulations for the Reduction of Gun Harm Ordinance does not set a payment date; a payment date will be established by an amended version of these regulations to be issued in the future.").

59.     The nonprofit fee in the Ordinance is not to defray the City's administrative costs. Rather, "all monies…shall be expended by the Designated Nonprofit Organization…." *Id*., § 10.32.220.A.

60.     The only selection criteria for the Designated Nonprofit Organization is that it

Consolidated Second Amended Complaint                                    5:22-cv-00501-BLF

"provid[e] services to residents of the City that own or possess a Firearm in the City or to members of their household, or to those with whom they have a close familial or intimate relationship." These services "include, but are not necessarily limited to" suicide prevention services or programs, violence reduction or gender based violence services or programs, mental health services related to gun violence, firearms safety education or training, or addiction intervention and substance abuse treatment. *Id.*, § 10.32.220.A (emphasis added).

61.    "[T]he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended" by the nonprofit. Id., § 10.32.220.C.

62.    The fee thus functions to compel gun owners to give their money to a government approved nonprofit to spend on vaguely specified and/or unspecified programs at the nonprofit's discretion, none of which are services that the City is obligated to perform. While the nonprofit must make these services available to "residents of the City that own or possess a Firearm," it must also make those services available to non-gun owning "members of their household," and is nowhere precluded from making those services available to the general public. Indeed, the nature of many of the services listed in the Ordinance (suicide prevention, gender based violence prevention, addiction intervention and substance abuse treatment, mental health counseling for victims of gun violence, and gun safety "education") covers a much wider population than just gun owners. This compelled donation by gun owners to one City favored nonprofit to provide public "education," which may include advocating about the dangers of gun ownership, and other services with little to no connection to the payer's owernship of a gun and little or no municipal oversight is not only obnoxious to the Constitution, it is an invitation to corruption and waste.

63.    By its plain terms, this fee and insurance requirement do not compensate the City to cover reasonable costs of governmental activity, because they are not for government activity. Further, the manner in which those costs are allocated to gun owners do not bear a fair or reasonable relationship to the gun owner's burdens on, or benefits received from, the City's governmental activity.

64.    Indeed, the Ordinance also authorizes a separate fee just to recoup the costs associated

Consolidated Second Amended Complaint                                    5:22-cv-00501-BLF

in administering the Ordinance. *Id*. § 10.32.250.

65.    Accordingly, as discussed further below, the "Annual Gun Harm Reduction Fee"—unconnected to the cost of City services and for unspecified programs outside of the City's control—and the mandatory insurance requirement backed by the threat of fines are nothing more than costs that the City is imposing on the exercise of a constitutional right.

## The Second Amendment

66.    The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

67.    "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).

68.    Consistent with this protection, in *Bruen* the Supreme Court held "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

69.    "As [the Supreme Court] explained in *Heller*, the 'texual elements' of the Second Amendment's operative clause . . . 'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S.Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). Thus, in *Heller* and *McDonald*, the Supreme Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary law-abiding citizen to possesses a handgun in the home for self-defense." *Bruen*, 142 S.Ct. at 2122.

70.    "[T]he need for armed self-defense is perhaps 'most acute' in the home," *Bruen*, 142 S.Ct. at 2135 (quoting *Heller*, 544 U.S. at 628) but also extends to "a right to 'bear' arms in public for self-defence." *Id*.

71.    Thus, NAGR Plaintiffs assert that the Ordinance burdens an activity that falls within the plain text of the Second Amendment: the right to keep and bear arms in the home for self-defense and the right to bear arms in public for self-defense, including when transporting firearms from one location to another.

Consolidated Second Amended Complaint                                     5:22-cv-00501-BLF

72.     As the Supreme Court has noted, "*Heller* and *McDonald* expressly rejected the application of any 'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'"  *Bruen*, 142 S.Ct. at 2129 (quoting *Heller*, 554 U.S. at 634) (other citations omitted).  Thus, "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 544 U.S. at 635).

73.     Accordingly, government may not justify regulations that infringe upon the Second Amendment by reference to some "important interest" or balancing test; "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside of the Second Amendment's 'unqualified command.'"  *Bruen*, 142 S.Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

74.     The problem of gun violence in densely populated communities is not new.  Adopting an insurance requirement and/or fee for all gun owners is a solution "that the Founders themselves could have adopted to confront that problem,"  *Bruen*, 142 S.Ct. at 2131, but in fact did not adopt.

75.     To the contrary, the City and its leaders have emphasized the novelty of the City's insurance and fee requirements.

76.     Local governments, including the City of San Jose, are bound by the Second Amendment because of the Fourteenth Amendment. *See Bruen*, 142 S.Ct. 2137 ("Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment."); *McDonald*, 561 U.S. at 790; *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

77.     Second Amendment rights are not subject to a free floating balancing test or judged against the "important interests" identified by the government.

78.     The Ordinance cites a number of statistics about gun violence, but provides no examples of how it is consistent with this Nation's historical tradition of firearms ownership.  To the contrary, the Mayor and other sources, apparently relying on city officials, have emphasized the unique, "first of its kind" nature of the insurance requirement.

79.     Although the Supreme Court in *Bruen* noted that there were past laws that required individuals "reasonably accused of intending to injure another or breach the peace" or "threatening to do harm" to obtain a bond in order to carry a gun *in public*, *see Bruen* at 2120, 2148, there is no historical tradition of requiring <u>every</u> gun owner to purchase insurance for the mere ownership of guns, even if the guns stay locked within the home and are never carried in public.

80.     Moreover, while state actors may collect a fee to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed," *Cox v. New Hampshire*, 312 U.S. 569 (1941), they "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).  In the Second Amendment context, at least one Court of Appeals has stated "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2nd Cir. 2013).

81.     Neither the insurance premium nor the fee to be paid to the City's chosen nonprofit are designed to defray the City's administrative costs.  Instead, they impose a charge simply for the enjoyment of a right guaranteed by the federal constitution.

82.     In sum, the NAGR Plaintiffs assert that the insurance requirement in the Ordinance violates the Second Amendment, as incorporated by the Fourteenth Amendment, by placing a burden on the right to keep and bear arms that is inconsistent with this Nation's history and tradition of firearms regulation.

83.     Accordingly, the Plaintiffs request that this court issue preliminary and permanent injunctions preventing Defendants from enforcing the insurance mandate, fee requirement, and their associated enforcement provisions of Ordinance pursuant to 42 U.S.C. § 1983, declare the insurance mandate, fee provisions, and associated enforcement provisions of the Ordinance unconstitutional under the Constitution of the United States,  issue nominal damages, and order any other relief this Court deems necessary and proper.

**FIRST CLAIM FOR RELIEF (NAGR PLAINTIFFS ONLY)**
**Violation of the Second and Fourteenth Amendments (42 U.S.C. § 1983)**
*The Ordinance requiring owners of guns to purchase insurance and pay a fee*
*violates the Second and Fourteenth Amendments to the United States Constitution.*

84.     NAGR Plaintiffs incorporate by reference and re-allege each of the Paragraphs set forth above.

85.     The Second Amendment of the United States Constitution guarantees "the right of the people to keep and bear arms" and that right "shall not be infringed." U.S. CONST., amend. II.

86.     In a Second Amendment inquiry, a Court asks whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. If so, "government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.*

87.     The Ordinance's insurance and/or fee requirements imposes a cost on Plaintiffs and all gun owners merely for choosing to keep and bear arms in the home. Thus, the Ordinance places a burden on conduct central to the plain text of the Second Amendment.

88.     The City has not (and cannot) demonstrated that the Ordinance is consistent with this Nation's historical tradition of firearms regulation. To the contrary, the City has emphasized the new and unique nature of the insurance and fee provisions.

89.     Thus, the insurance and fee provisions of the Ordinance violate the Second and Fourteenth Amendments to the Constitution of the United States.

90.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Ordinance.

91.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to preliminary and permanent injunctive relief invalidating and restraining enforcement of the Ordinance as well as declaratory relief.

92.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

Consolidated Second Amended Complaint                                    5:22-cv-00501-BLF

U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF (ALL PLAINTIFFS)
### Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)
*The Ordinance requiring owners to pay a fee to a nonprofit organization to exercise their constitutional rights violates the First and Fourteenth Amendments to the United States Constitution.*

93.     Plaintiffs repeat the allegations above as though fully set forth herein.

94.     The First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, "Congress shall make no law … abridging the freedom of speech ... or the right of the people peaceably to assemble."

95.     Freedom of speech includes the right to not speak and the right to not be forced by the government to support someone else's speech, particularly when you disagree with their message. The right to peaceably assemble includes the right to associate with others around a common cause and the right to not be forced by the government to associate with or support someone else's organization, particularly a group with which you would not voluntarily assemble.

96.     By requiring San Jose gun owners to pay an Annual Gun Harm Reduction Fee to a private nonprofit organization that the City Manager will designate, the Ordinance forces San Jose gun owners to associate with or support that private group and to fund their message, in violation of the gun owners' rights of free speech and association under the United States Constitution.

97.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the fee provisions of the Ordinance.

98.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to preliminary and permanent injunctive relief invalidating and restraining enforcement of the Ordinance as well as declaratory relief.

99.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

Consolidated Second Amended Complaint                          5:22-cv-00501-BLF

**THIRD CLAIM FOR RELIEF (ALL PLAINTIFFS AS DESCRIBED BELOW)**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202**
***Plaintiffs are entitled to declaratory relief.***

100.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth above.

101.    To the extent that each of the claims above have not already established a remedy, Plaintiffs are entitled to declaratory relief holding that the Ordinance violates Plaintiffs' individual rights under the Constitution of the United States and is otherwise invalid, are entitled to preliminary and permanent injunctions preventing the enforcement of the Ordinance, nominal damages, and further relief that this Court deems necessary or proper.

102.    NAGR Plaintiffs are entitled to declaratory relief with respect to both the insurance mandate and the fee.  Based on their claims above, Howard Jarvis Plaintiffs are entitled to declaratory relief based on the First Amendment with respect to the fee provision of the Ordinance.

**FOURTH CLAIM FOR RELIEF (HOWARD JARVIS PLAINTIFFS ONLY)**
**Violation of California Rights of Speech and Association**

103.    Except as specified above, the Howard Jarvis Plaintiffs repeat the allegations contained in the Paragraphs above as though fully set forth herein.

104.    Article I, sections 2 and 3 of the California Constitution provide, "A law may not restrain or abridge liberty of speech," and "The people have the right to ... assemble freely to consult for the common good."

105.    Liberty of speech includes the right to not speak and the right to not be forced by the government to support someone else's speech, particularly when you disagree with their message. The right to assemble freely includes the right to associate with others around a common cause and the right to not be forced by the government to associate with or support someone else's organization, particularly a group with which you would not voluntarily assemble.

18

106.     By requiring San Jose gun owners to pay an Annual Gun Harm Reduction Fee to a private nonprofit organization that the City Manager will designate, the Ordinance forces San Jose gun owners to associate with or support that private group and to fund their message, in violation of the gun owners' rights of free speech and association under the California Constitution.

### FIFTH CLAIM FOR RELIEF (HOWARD JARVIS PLAINTIFFS ONLY)
### Violation of Doctrine of Unconstitutional Conditions

107.     Except as set forth above, the Howard Jarvis Plaintiffs repeat the allegations contained in the Paragraphs above as though fully set forth herein.

108.     The Second Amendment of the United States Constitution provides, "the right of the people to keep and bear arms, shall not be infringed."

109.     Howard Jarvis Plaintiffs gun owners wish to continue exercising their rights under the United States and California constitutions to protect their property and personal safety by keeping and bearing arms. However, the Ordinance has placed a condition on the continued exercise of those rights: any gun owner who fails to pay the required fee to the designated private organization may be forced to surrender his firearms to the City. (Muni. Code § 10.32.245.)

110.     The City has represented to the District Court that section 10.32.245 does not currently threaten gun owners with confiscation of their firearms because it reads, "*To the extent allowed by law*, the Firearm or Firearms of a person that is not in compliance with this Part may be impounded subject to a due process hearing" and, according to the City, the law does not currently authorize city police to confiscate a firearm with or without a due process hearing.

111.     The Howard Jarvis Plaintiffs believe that representation is incorrect. City police are authorized by law to, and often do, confiscate firearms when carried or used in violation of the law. If a student brings a firearm to school, if someone is carrying a firearm in public without a CCW permit, if someone with a CCW permit is carrying a firearm while intoxicated, if someone purchases a firearm

Consolidated Second Amended Complaint                                      5:22-cv-00501-BLF

on the street without going through a federally licensed dealer, if someone discharges a firearm in the air on New Year's Eve, and for a host of other reasons, city police are authorized to, and often do, confiscate firearms when carried or used in violation of the law.

112.    The City's Ordinance makes it a violation of the law to own a gun in the City of San Jose unless you timely pay the annual Gun Harm Reduction Fee. San Jose Municipal Code section 1.08.010 provides, "No person shall violate any provision or fail to comply with any of the requirements of this Code or of any other ordinance of the city. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code or of any city ordinance, other than administrative provisions thereof, shall be guilty of a misdemeanor, unless the violation of such provision is designated as an infraction or is a parking violation. The Code provisions for which a violation is an infraction are set forth in Section 1.08.020. The Code provisions for which a violation is a parking violation are set forth in Section 1.08.025." Possessing a gun without paying the fee is not an infraction. It is a misdemeanor violation of the law, and city police can confiscate a gun that is kept or carried in violation of the law.

113.    Howard Jarvis Plaintiffs gun owners' right to keep a gun in their home for protection is "inalienable." It is not a right granted by the City of San Jose that can be withheld or revoked by the City if gun owners do not comply with conditions contrived by the City. Under the doctrine of unconstitutional conditions, the City can no more charge a fee to own a gun than it could charge a fee to own a Bible.

### SIXTH CLAIM FOR RELIEF (HOWARD JARVIS PLAINTIFFS ONLY)
### Special Tax Lacking Voter Approval

114.    Except as set forth above, the Howard Jarvis Plaintiffs repeat the allegations contained in the Paragraphs above as though fully set forth herein.

115.    The Annual Gun Harm Reduction Fee is imposed by the City of San Jose.

Consolidated Second Amended Complaint                    5:22-cv-00501-BLF

116.  The Annual Gun Harm Reduction Fee is a compulsory exaction.

117.  Article XIII C, section 1(e) of the California Constitution defines a "tax" as "any levy, charge, or exaction of any kind imposed by a local government" unless it fits one of seven limited exceptions.

118.  Although labeled a "fee" by the City, the Annual Gun Harm Reduction Fee does not qualify for any exception from the definition of a "tax" enumerated in article XIII C, section 1(e). Therefore it is a tax.

119.  Taxes are either "general taxes" or "special taxes." A "special tax" is "any tax imposed for specific purposes." (Cal. Const., art. XIII C, § 1(d).) The Annual Gun Harm Reduction Fee is imposed ostensibly for the purpose of reducing gun harm. Therefore, it is a special tax.

120.  Article XIII C, section 2(d) of the California Constitution provides, "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."

121.  The Annual Gun Harm Reduction Fee was not submitted to the electorate or approved by a two-thirds vote. The fes is therefore invalid.

**SEVENTH CLAIM FOR RELIEF**
**Unconstitutional Delegation of Power to Tax**

122.  Except as set forth above, the Howard Jarvis Plaintiffs repeat the allegations contained in the Paragraphs above as though fully set forth herein.

123.  Only the government possesses the power to tax.

124.  The power to tax includes the power to collect taxes and appropriate tax revenues.

125.  Under the Ordinance, the Annual Gun Harm Reduction Fee will be collected by the private nonprofit organization that the City Manager will designate. That revenue will not be remitted to the City, but will be appropriated by the private organization. San Jose Municipal Code section 10.32.220(C) states, "The Designated Nonprofit Organization shall spend every dollar generated from

the Gun Harm Reduction Fee," and "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended."

126.    Under article XIII, section 31 of the California Constitution, the power to tax may not be granted to a private entity. It provides, "The power to tax may not be surrendered or suspended by grant or contract." Similarly, article XI, section 11 prohibits the delegation of local powers to private entities. It prohibits "delegat[ing] to a private person or body power to make, control, appropriate, supervise, or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or assessments, or perform municipal functions."

127.    The Ordinance unconstitutionally delegates some of the City's power to tax and appropriate tax revenues to a private organization, not answerable to the voters, that the City Manager will designate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray, on behalf of themselves and their members where applicable, for the following:

A.    Preliminary and permanent injunctions enjoining Defendants and all successors in office from enforcing the insurance mandate, fee requirement, and related enforcement provisions in the Ordinance;

B.    A declaratory judgment that the insurance mandate, fee requirement, and related enforcement provisions in the Ordinance violate the First, Second, and Fourteenth Amendments of the United States Constitution;

C.    An Order invalidating sections 10.32.215 and 10.32.230(B) of chapter 10.32 of title 10 of the San Jose Municipal Code;

D.    Nominal damages;

E.    Costs and attorneys' fees, including those authorized by 42 U.S.C. § 1988; and

F.    Any other relief as this Court, in its discretion, deems just and appropriate.

Consolidated Second Amended Complaint                                    5:22-cv-00501-BLF

Dated: February 2, 2023

DHILLON LAW GROUP INC.

By: _/s/ David A. Warrington_____
Harmeet K. Dhillon
Michael A. Columbo
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
(415) 433-1700

David A. Warrington*
Curtis M. Schube*
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(571) 400-2121

*Admitted *pro hac vice*

*Attorneys for NAGR Plaintiffs*

JONATHAN M. COUPAL (SBN: 107815)
TIMOTHY A. BITTLE (SBN: 112300)
LAURA E. DOUGHERTY (SBN: 255855)
Howard Jarvis Taxpayers Foundation
1201 K Street, Suite 1030
Sacramento, CA 95814
Telephone: (916) 444-9950
Email: tim@hjta.org

*Attorneys for Howard Jarvis Plaintiffs*

# EXHIBIT A

CONTENT ARCHIVE

## ARCHIVE OF MAYOR LICCARDO'S WRITING

To view a complete archive of Mayor Liccardo's first-person writing and opinion pieces, please visit his medium blog.

## MAYOR LICCARDO PHOTO ARCHIVE

To access this archive of photos featuring Mayor Liccardo -- including updated headshots -- please visit this photostream on Flikr.

## MAYOR LICCARDO VIDEO ARCHIVE

For a complete archive of Mayor Liccardo's videos of special events -- like the annual State of the City events -- please visit the Mayor's Youtube channel.

## PRESS ROOM

## SAN JOSÉ MAYOR STATEMENT ON HISTORIC PASSING OF FIRST IN THE NATION GUN VIOLENCE REDUCTION ORDINANCE

**Post Date:**            01/25/2022 10:50 PM

**FOR IMMEDIATE RELEASE**

January 25, 2022

**Media Contact:**

Rachel Davis, Communications Director/Press Secretary, Office of Mayor Sam Liccardo,
 rachel.davis@sanjoseca.gov

SAN JOSÉ, CA - Today, San José City Council voted to become the first city, state, or jurisdiction in the nation to adopt a law requiring gun owners to have insurance coverage for their firearms, and use fees paid by gun owners to invest in evidence-based initiatives to reduce gun harm.  He released the following statement:

 **"Tonight San José became the first city in the United States to enact an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm.   Thank you to my council colleagues who continue to show their commitment to reducing  gun violence and its devastation in our community.  I am deeply grateful also to our advocacy and legal partners with Cotchett, Pitre & McCarthy, LLP,  EveryTown, Moms Demand Action, SAFE, the Gifford Law Alliance and many**

Excerpts 144

others who work tirelessly to help us craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community.  I look forward to supporting the efforts of others to replicate these initiatives across the nation."

**Statements of Support:**

**Shannon Watts, Founder, Moms Demand Action**

"Following unthinkable tragedies from gun violence, San José has taken action that will save lives. Our grassroots volunteers have been proud to work hand-in-hand with the mayor, city council, and community partners to help get this innovative package of gun safety laws crafted and across the finish line."

**Rachel Michelson, Volunteer Leader with the California Chapter, Moms Demand Action, San José**

"Once again, San José has taken initiative to be a leader in the gun violence prevention movement. This ordinance is an innovative approach to address the costs of gun violence and incentivize safer practices that can help prevent firearm deaths and injuries. Other cities should follow San José's lead and prioritize safer cities."

**Ewan Barker Plummer, Volunteer Leader, Students Demand Action, Bay Area**

"This vote is a victory for gun safety. Thanks to the tireless advocacy of volunteers and commitment to gun safety from San José leaders San José is leading the charge against gun violence. We all want a safer San José, a safer California, and a safer nation. With this approach, we can move closer to that goal."

*Return to full list >>*



Excerpts 145

# EXHIBIT B



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:** HONORABLE MAYOR
AND CITY COUNCIL

**FROM:** Nora Frimann
City Attorney

**SUBJECT: GUN HARM REDUCTION
ORDINANCE**

**DATE:** January 14, 2022

---

## RECOMMENDATION

Consider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs.

## BACKGROUND

On June 29, 2021, the City Council directed the City Attorney to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

Council directed that the ordinance include the following provisions:

- Compliance:
  - The gun owner shall sign and complete an insurance attestation, describing the specific policy number and issuer, and sign the attestation under penalty of perjury. Acceptable insurance coverage may include any homeowner's or renter's policy that provides for a minimum coverage amount.
  - The attestation document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
- Exemptions and waivers:
  - A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.
  - An exemption from these requirements for sworn law enforcement.
  - An exemption from these requirements for holders of a concealed carry weapon (CCW) permit.

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject:  Gun Harm Reduction Ordinance**
Page 2

- Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine.

## ANALYSIS

The proposed ordinance includes provisions that are in accordance with the direction from Council.  The proposed ordinance authorizes an annual gun harm reduction fee to be paid by gun owners to a designated nonprofit organization that will, in turn, use the fees collected to provide certain services, as specified in the ordinance, to residents of the City who own or possess a gun or to members of their household.  The proposed ordinance also authorizes the City Manager to charge and collect any and all City cost recovery fees associated with fulfilling the policies of the ordinance relating to the reduction of gun harm, including any associated third-party costs.

The recitals within the draft ordinance contain the data and other information that supports the proposed ordinance.

The effective date of the proposed ordinance will be six months from the date of adoption.  This is to allow for time for the City Manager's Office to potentially do outreach, develop regulations, and work through any other issues related to the implementation of the proposed ordinance.

## CONCLUSION

If approved, the proposed ordinance will require, with certain exceptions, that San José residents who own firearms: (a) obtain and maintain liability insurance; (b) pay an annual gun harm reduction fee to a designated nonprofit organization that will use the fee proceeds to provide gun harm reduction services to residents of the City who own or possess a gun or to members of their household; and (c) pay any City cost recovery fees associated with program implementation, including any associated third-party costs.

## CLIMATE SMART SAN JOSE

The recommendation in this memo has no effect on Climate Smart San José energy, water, or mobility goals.

## COORDINATION

This memorandum has been coordinated with the City Manager's Office.

1889106

Excerpts 148

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject: Gun Harm Reduction Ordinance**
Page 3

## CEQA

Not a Project, File No. PP17-008, General Procedure & Policy Making resulting in no changes to the physical environment.

/s/
NORA FRIMANN
City Attorney

For questions please contact Nora Frimann, City Attorney, at (408) 535-1900.

1889106

EXHIBIT "B"

# EXHIBIT C



DAVID A. WARRINGTON
DWarrington@DhillonLaw.com

HARMEET DHILLON
Harmeet@DhillonLaw.com

July 14, 2021

**VIA ELECTRONIC AND CERTIFIED MAIL**

San Jose City Council
200 E. Santa Clara St.
San Jose, CA 95113

Mayor Sam Liccardo
mayoremail@sanjoseca.gov

Vice Mayor Charles Jones
District1@sanjoseca.gov

Sergio Jimenez, City Council Dist. 2
District2@sanjoseca.gov

Raul Peralez, City Council Dist. 3
District3@sanjoseca.gov

David Cohen, City Council Dist. 4
District4@sanjoseca.gov

Magdalena Carrasco, City Council Dist. 5
District5@sanjoseca.gov

Devora Davis, City Council Dist. 6
district6@sanjoseca.gov

Maya Esparza, City Council Dist. 7
District7@sanjoseca.gov

Sylvia Arenas, City Council Dist. 8
district8@sanjoseca.gov

Pam Foley, City Council Dist. 9
District9@sanjoseca.gov

Matt Mahan, City Council Dist. 10
District10@sanjoseca.gov

> **Re:** **Ordinance Shifting the Public Burden of Criminal Behavior to Gun Owners**
> **Your File NO - 21-1579**

Dear Mayor and City Council,

This Firm represents the National Foundation for Gun Rights. It has come to our attention that on June 29, 2021, you voted unanimously to have the City Attorney research and draft an ordinance that would impose a mandatory fee on gun owners and require them to buy gun liability insurance. Given that the city's own press release regarding the proposed ordinance, concedes that "criminals won't obey these mandates," the City of San Jose is seeking to impose a tax on a select group of law abiding citizens simply for exercising their right to keep and bear arms.

**DHILLON LAW GROUP INC.**
**A CALIFORNIA PROFESSIONAL CORPORATION**
**177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)**

The right to keep and bear arms of the citizens of the United States, which includes the City of San Jose, is protected by the Second Amendment to the United States Constitution, that states in pertinent part that, "the right of the people to keep and bear Arms shall not be infringed." The proposed ordinance would be an unconstitutional infringement on that right and we are prepared to litigate to protect the Second Amendment rights of the citizens of San Jose should the City Council enact such an ordinance.

The law on this issue is clear.

The City of San Jose is prohibited from enacting laws that infringe upon the Second Amendment rights of its citizens. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790 (2010) (holding that the Second Amendment right is protected against infringement by the individual states through the Fourteenth Amendment); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (holding that the Second Amendment right is "fundamental and is incorporated against state and municipalities" like the City of San Jose).

Further, courts have found that the right to keep and bear arms "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). It also protects the right "to acquire and maintain proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The Second Amendment protects the implicit right to train with weapons. *District of Columbia v. Heller*, 665 U.S. 570, 617-618 (2008). It also protects the implicit right to possess ammunition. *United States v. Miller*, 307 U.S. 174, 180 (1939).

What you propose to do strikes at the very core of this fundamental right and seeks to punish (though registration[1] and taxation) citizens of your city who have committed no crime or offense. This type of government overreach was rejected by our Founders and the Bill of Rights was adopted in direct response to then recent examples of such conduct by the British.

First-hand experience with the British Parliament's 1765 enactment of the Stamp Act led to the protections for the freedoms of Speech and Press found in the First Amendment. Like the tax you propose here, the Stamp Act imposed a direct tax on printed material, resulting in a selective tax imposed on those who desired to read the news or communicate with others via printed material.

Indeed, many of the Bill of Rights' protections that citizens of the United States enjoy are a direct result of the abuses by the British Parliament and Crown in the years leading up to the Declaration of Independence, to wit: the 1774 Massachusetts Government Act – First Amendment Right to Assemble; 1774 The Quartering Act – Third Amendment; and 1774 Administration of

---

[1] In order to implement your proposed taxation scheme, there is no doubt that a gun registration scheme will accompany it.

**DHILLON LAW GROUP INC.**
**A CALIFORNIA PROFESSIONAL CORPORATION**
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

Excerpts 153

Justice Act – Sixth and Seventh Amendment Right to a Jury Trial. Americans enjoy the protections of the Second Amendment today because the British attempted to confiscate the guns and ammunition of the colonist on April 19, 1775, in Concord Massachusetts.

Unfortunately, the City Council of the City of San Jose is not the first government entity that has forgotten the lessons of the Founding and attempted to use a selective tax against a fundamental constitutional right.

In 1936, the United States Supreme Court stopped the State of Louisiana from imposing a selective tax on newspapers with circulation of more than 20,000 copies per week. The Court found that this selective tax "might result in destroying both advertising and circulation." *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936). The Court held that the Louisiana law was "bad because … it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean* at 250. The Louisiana tax penalized certain publishers from being able to fully exercise their constitutional rights.

More recently, in 1983, the Supreme Court dealt with a case where the state tax scheme of Minnesota "singled out the press for special treatment." *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 582 (1983). The Court held that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star* at 585.

There is no "special characteristic" of the law abiding gun owner that would justify imposition of a special tax, therefore, as in *Minneapolis Star*, it is easily understood that the goal of the proposed ordinance is to suppress and discourage the exercise of the right to keep and bear arms and that goal is "presumptively unconstitutional." *See id*.

Simply put, a discriminatory tax that singles out citizens exercising their constitutional rights is unconstitutional.

Please be advised that should you pass the proposed ordinance and blatantly violate the constitutional rights of the residents of San Jose, my clients have authorized our firm to file a lawsuit against the City to protect the constitutional rights of their members. This lawsuit will be brought pursuant to 42 U.S.C. §1983 for the deprivation of constitutional rights. As such, once we prevail in protecting the residents of San Jose's constitutional rights, our firm will then seek our reasonable attorney fees under 42 U.S.C. §1988(b).

We thereby strongly encourage you to reconsider moving forward with the proposed ordinance.

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

July 14, 2021
Page 4 of 4

Regards,

David A. Warrington          Harmeet K. Dhillon

*Counsel for the National Foundation for Gun Rights*

Cc: National Foundation for Gun Rights

**DHILLON LAW GROUP INC.**
A CALIFORNIA PROFESSIONAL CORPORATION
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

Excerpts 155

# EXHIBIT D

![City of San Jose logo]

CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:** HONORABLE CITY COUNCIL

**FROM:** Mayor Liccardo,
Vice Mayor Jones,
Councilmember Cohen
Councilmember Carrasco

**SUBJECT: SEE BELOW**

**DATE:** 01/21/2022

Approved _____                Date 01/21/2022

---

## DIRECTION:

1. Establish that the gun harm reduction fee in the initial year shall amount to $25 per gun-owning household—or an approximate amount close to $25 that assists with the rounding of the final fee—plus that amount strictly reflecting only the administrative cost incurred by:
   a. The Designated Non-profit Organization,
   b. The State of California for its use of the Department of Justice's Automated Firearm System and/or California Firearms Application Reporting System to communicate legal obligations and available services to gun-owning residents in San Jose, and
   c. The City, if any.

2. Determine that until or unless the Council determines otherwise,
   a. The City shall not be engaged in the collection of fees, the transmittal of information through the Department of Justice Database, nor the accounting nor distribution of the funds.
   b. After the initial implementation of the ordinance, the City's role will remain largely limited to setting the fee, engaging in contractual arrangements with the State of California and other entities necessary for the implementation of the ordinance, and enforcement.
   c. All administrative tasks shall be the responsibility of the Designated Nonprofit Organization, and all administrative costs shall be borne by that organization, and recovered by a portion of the fee revenue.

d.  No fees shall be collected nor required of any gun owner until the City Attorney has determined that there is resolution of pending facial legal challenges to the ordinance for any claim which is not *res judicata,* that is, for any claim that is not precluded by a prior final judgment.

3.  Approve the proposed ordinance, with modifications in the following sections:
    a.  Expenditure of Gun Harm Reduction Fee, Section 10.32.220
        - Insert the following italicized language into A. to read, "All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City or to members of their household, *or to those with whom they have a close familial or intimate relationship."*
        - Insert within the itemized list under A., "Addiction intervention and substance abuse treatment"
        - Revise provisions under C. to read: "C.  *The Designated Nonprofit Organization shall spend every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms.   Otherwise, t*he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended*"*
    b.  Exceptions, Section 10.32.225
        - Insert the following italicized language into B. to read, "Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, *for as long as these statutes are legally enforceable."*
    c.  Compliance, Section 10.32.230
        - Delete the following stricken language and insert the italicized language into A. to read, "Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported. ~~There is no requirement to submit the attestation form to the City. However, each~~ *Each* person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes.  *Each person shall present the form when lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm."*
    d.  Purpose and Findings, 10.32.200
        Among the findings listed in B., add:

- "Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José.
- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.
- Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries."

## DISCUSSION:

When our current pandemic passes, an epidemic of gun violence will continue to take its grim toll throughout our nation.  In response, we propose that the City of San Jose become the first city—or U.S. jurisdiction—to use liability insurance and a fee-supported non-profit organization to reduce gun violence and harm.   We consider the merits for each of these two elements.

### Insurance

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses.  More importantly, insurance can also incentivize safer gun ownership.  Risk-adjusted premiums can—and in some cases, do—reduce the risk of gun harm, by encouraging firearm owners to take gun-safety courses, use gun safes, install child-safe trigger locks, or utilize chamber-load indicators.  Unintentional shootings–often involving children–annually claim the lives of 500 Americans and injure another 26,000.   We should apply the lessons of the insurance industry's impact on auto safety: reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by 80% over the past five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk, because we live in a nation in which 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home, resulting in too many child victims.   As in other contexts, an insurance requirement can help make our community safer.

### Fees and Investment in Evidence-Based Prevention

Second, we propose the payment of a modest fee to support evidence-based community-led initiatives to reduce the harm of gun violence in our community, such as through domestic violence and suicide prevention efforts, gun-safety classes, mental health services, and addiction intervention.

Why should the funding nonprofit focus these services for occupants of gun-owning households?  Because that's where the greatest risk is.  Epidemiological studies show that even a properly stored firearm in the home doubles occupants' risk of becoming a victim of homicide and triples the likelihood of suicide.  A more recent Stanford study concluded that male handgun owners may be eight times more likely to commit suicide by gun than other men, and gun-

owning women are 35 times more likely to do so than their gender peers.  Prioritizing those investments for residents living with guns in the home will provide the most direct path for reducing gun harm.

Some gun owners will express the view that the 2nd Amendment renders any imposition of a gun-related fee unconstitutional.  While the Second Amendment protects the rights of citizens to own guns, it doesn't require the public to subsidize gun ownership.  Every day, our taxpaying residents bear the financial burden for police officers, ambulances, and trauma surgeons to respond to gun violence.  These direct costs of gun violence to San Jose taxpayers-- to say nothing of the human and financial toll to victims' families—exceeds $39 million annually, and $1.4 billion for all Californians.  Using fees to fund initiatives to reduce gun violence reduces the financial burdens of gun use on all of us.

Moreover, courts have long upheld the imposition of taxes on the purchase of guns and ammunition ever since Congress imposed the federal gun tax in 1919.  This history affirms the consistent position of courts to allow the imposition of modest fees on the exercise of constitutional rights, such as IRS filing fees on the formation of nonprofit advocacy organizations (1st Amendment), taxes on newspapers (1st Amendment), and court filing fees (7th Amendment), the cost of counsel for defendants of financial means (6th Amendment), or on filing to become a candidate for elected office (1st and 14th Amendments).   The constitutional question is whether a modest fee substantially burdens the exercise of that right.  Given that we provide an explicit exemption for those unable to pay, it imposes no such burden.

We are grateful for the many community leaders and experts—such as NextDoor Solutions to Domestic Violence CEO Esther Peralez-Dieckman, Health Trust CEO Michele Lew, Gardner Healthcare CEO Reymundo Espinoza, Stanford University Medical Center Epidemiologist Dr. Julie Parsonnet, National Rifle Association San Jose Chapter President Dave Truslow, Community Health Partnership CEO Dolores Alvarado and Deputy Director Cathryn Hyde, and Brady United Director Shikha Hamilton, and Moms Demand Action California Chapter representative Rachel Michelson, and SAFE Legislative Affairs Director Dr. Susie MacLean MD, who have stepped up to advise or participate in the creation of a nonprofit organization that will identify high-impact violence reduction programs for investment.

**Compliance**

The ordinance will impose fines and other administrative sanctions on violators. Of course, criminals won't obey insurance or fee mandates. Yet, given the legally frail status of concealed-carry regulations before the current U.S. Supreme Court, we will likely see many more guns out on the street—and in bars, nightclubs, and other contexts that will increase our peril.  Law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns in America.  Members of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations, with subsequent restoration of ownership as required by constitutional due process. Giving the police the ability to distinguish the scofflaws from law-abiding gun owners could provide a lawful basis for forfeiture of the gun in a context—where an officer responds to a bar brawl or domestic violence allegation—where even temporarily extracting a gun from a combustible situation could dramatically reduce the risk of deadly violence.

**Thanks**

Our gratitude goes to City Attorney Nora Frimann, Terra Chaffee, and the rest of her team for their extensive research and work in fashioning this ordinance, and to Christina Guimera and Paul Pereira in the Mayor's office for their mighty efforts to bring forward this initiative, and to convene partners to help.

In addition to those community leaders mentioned above, we also thank the many supporters, advocates, thought partners, and active partners of this initiative, including Rachel Michelson, Yvonne Murray, Maria Ines Ortega Barrera, and all of the volunteers and staff at Mom's Demand Action, Everytown, Brady United, and many of our Project Hope community leaders. We also thank local leaders who have stepped up to offer critical help, including District Attorney Jeff Rosen, Assemblymember Phil Ting and his lead expert on staff, Mark Chekal-Bain, Senator Josh Becker, California Attorney General Rob Bonta and his team, and Golden State Warriors Coach Steve Kerr.

We are deeply appreciative of the philanthropic support of the policy and research work necessary for the crafting of this initiative by the Heising-Simons Foundation—particularly Deanna Gomby and Holly Kreider—and by SV Angel CEO Ron Conway. We also appreciate the willingness of the Silicon Valley Community Foundation to serve as a fiscal agent for these funds.

Finally, we offer our very deep gratitude to the *pro bono* efforts of our legal team, led by Joe Cotchett and Tamarah Prevost of Cotchett, Pitre & McCarthy, LLP. We have had great support, advice, research, and legal assistance provided by Allison Anderman and Esther Sanchez-Gomez at the Giffords Law Center to Prevent Gun Violence; Tanya Schardt and Steve Lindley at Brady United; UC Berkeley School of Law Dean Erwin Chemerinsky; Stanford Law Professor and Economist John J. Donohue III; Michael Redding, John Marsh, and team at the California Attorney General's office, and Keker, Van Nest & Peters LLP.

*The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*

# EXHIBIT E

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

## ORDINANCE NO. 30716

**AN ORDINANCE OF THE CITY OF SAN JOSE ADDING PART 6 TO CHAPTER 10.32 OF TITLE 10 OF THE SAN JOSE MUNICIPAL CODE TO REDUCE GUN HARM BY REQUIRING GUN OWNERS TO OBTAIN AND MAINTAIN LIABILITY INSURANCE AND ESTABLISHMENT OF ANNUAL GUN HARM REDUCTION FEE**

**WHEREAS,** the Constitution of the United States of America affords certain protections to the ownership of firearms; and

**WHEREAS,** the United States Supreme Court has recognized that the Constitutional protections related to firearms ownership are not unlimited, and can be subject to certain types of governmental regulations; and

**WHEREAS,** a city's police power includes the power to regulate firearms and many courts throughout the nation have upheld local regulations related to the ownership or possession of firearms; and

**WHEREAS,** firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

**WHEREAS,** each year more than 23,000 United States residents die by firearm suicide, 14,000 die by firearm homicide, and nearly 500 die from unintentional firearm injuries; and

**WHEREAS,** in California, between 2005 and 2015, nearly 4,000 children and teenagers were killed or injured with firearms, and 533 children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** the Santa Clara County Public Health Department issued a report on firearm injuries in April 2018. In 2016, 11% of injury deaths were due to firearms injuries. During the period 2007-2016, there were an average of 46 deaths per year due to self-inflicted/suicide from firearms injuries, and an average of 28 deaths per year due to assault/homicide from firearms injuries. Self-inflicted/suicide accounted for the highest percentage of deaths (59%) from firearms injuries, with assault/homicide accounting for 36% of deaths from firearm injuries; and

**WHEREAS,** the April 2018 Santa Clara County Public Health Department report on firearm injuries reported that during the period from 2010-2014, there were an annual average of 28 emergency department visits and 12 hospitalizations due to unintentional firearms injuries. During 2010-2014, 31% of emergency department visits and 16% of hospitalizations from firearms injuries were due to unintentional shootings; and

**WHEREAS,** research published in the American Journal of Epidemiology in 2004 found that regardless of storage practice, type of gun, or number of firearms in the home, having a gun in the home was associated with an increased risk of firearm homicide and firearm suicide in the home; and

**WHEREAS,** a 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

**WHEREAS,** a study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight times greater likelihood for firearm suicide among men, and 35 times greater likelihood of firearm suicide among women; and

**WHEREAS,** according to the American Academy of Pediatrics, in homes with guns, suicide rates in children and adolescents and the likelihood of accidental death by shooting are each four times higher than in homes without guns; and

ORD. NO. 30716

**WHEREAS,** in the past decade, 40% of the suicides committed by children and teens involved guns, and 90% of these suicides were with guns that the victims accessed at their own homes or from a relative's home; and

**WHEREAS,** 58% of shooting deaths in children and teens are homicides, and the risk of homicide is three times higher when there are guns in the home; and

**WHEREAS**, a June 2014 report published by Everytown for Gun Safety and Moms Demand Action which analyzed publicly reported gun deaths nation-wide over a one-year period from December 15, 2012 to December 12, 2013, showed that at least 100 children were killed in unintentional shootings, amounting to nearly two each week; and

**WHEREAS,** according to research published in Social Science and Medicine in 2007 based on data over a three-year study period from 2001 to 2003, states with higher rates of household firearm ownership had higher rates of firearm homicide but not of non-firearm homicide, and this relationship held across gender, age, income and multiple other variables; and

**WHEREAS,** a study in the Journal of Urban Health conducted in 2015 estimated there are as many as 4.6 million children in the United States living in homes with loaded unsecured guns; and

**WHEREAS,** injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

**WHEREAS,** in some instances, gun owners have been successfully sued for harm resulting from the use of the owner's firearm by themselves or a third party; and

ORD. NO. 30716

**WHEREAS,** auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly 80% from 1967 to 2017; and

**WHEREAS,** similarly, insurance-based mechanisms can encourage firearm owners to take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators, and according to 2018 research published in The Actuary there is evidence that some actuaries and insurance companies are recognizing firearm-related risk through their product offerings, pricing and underwriting decisions; and

**WHEREAS**, pursuant to the provisions and requirements of the California Environmental Quality Act of 1970, together with related State CEQA Guidelines and Title 21 of the San José Municipal Code (collectively, "CEQA"), the Director of Planning, Building and Code Enforcement has determined that the provisions of this Ordinance do not constitute a project, under File No. PP17-008 (General Procedure & Policy Making resulting in no changes to the physical environment); and

**WHEREAS**, the City Council of the City of San José is the decision-making body for this Ordinance; and

**WHEREAS**, this Council has reviewed and considered the "not a project" determination under CEQA prior to taking any approval actions on this Ordinance;

**NOW, THEREFORE,** BE IT ORDAINED BY THE COUNCIL OF THE CITY OF SAN JOSE:

**SECTION 1.** Chapter 10.32 of Title 10 of the San José Municipal Code is hereby amended by adding a Part to be numbered, entitled and to read as follows:

4

Excerpts 166

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**Part 6**

**REDUCTION OF GUN HARM – LIABILITY INSURANCE REQUIREMENT AND GUN HARM REDUCTION FEE**

**10.32.200  Purpose and Findings**

A.    This Part is passed and adopted in the exercise of the police power of the City, and for the protection of the welfare, peace and comfort of the residents of the City of San José.  Specifically, it is the intent of this Ordinance to reduce gun harm.

B.    Findings:

1.    Firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

2.    Each year more than twenty-three thousand (23,000) United States residents die by firearm suicide, fourteen thousand (14,000) die by firearm homicide, and nearly five hundred (500) die from unintentional firearm injuries; and

3.    In California, between 2005 and 2015, nearly four thousand (4,000) children and teenagers were killed or injured with firearms, and five hundred thirty-three (533) children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

4.    During 2010-2014 in Santa Clara County, thirty-one percent (31%) of emergency department visits and sixteen percent (16%) of

hospitalizations from firearms injuries were due to unintentional shootings; and

5.      A 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

6.      A study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight (8) times greater likelihood for firearm suicide among men, and thirty-five (35) times greater likelihood of firearm suicide among women; and

7.      Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José; and

8.      Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning; and

9.      Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries; and

10.     Injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

Excerpts 168

11. Auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly eighty percent (80%) from 1967 to 2017; and

12. Liability insurance can reduce the number of gun incidents by encouraging safer behavior and it can also provide coverage for losses and damages related to gun incidents; and

13. Programs and services to gun owners and their households can also encourage safer behavior, and provide education and resources to those residents.

## 10.32.205  Definitions

As used in this Part, the following terms have the following meaning:

A. "Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion.  Firearm does not include antique firearms as defined by 18 U.S.C. Section 921(a).

B. "Designated Nonprofit Organization" means an entity that qualifies as a nonprofit corporation under the federal internal revenue code and is designated pursuant to the City Manager's authority under Section 10.32.235. No City official or employee shall sit on the board of directors of the Designated Nonprofit Organization.

## 10.32.210  Liability Insurance Required

A.    **Insurance required.**  A person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury or property damage.

B.    For purposes of this Section, a person shall be deemed to be the owner of a Firearm if such Firearm is lost or stolen until such loss or theft is reported to the police department or sheriff which has jurisdiction in which such Firearm owner resides.

C.    Any person who owns a Firearm on the effective date of this Section shall obtain the insurance required by this Section within thirty (30) days of the effective date of this Ordinance, or by a later date certain established in the regulations promulgated by City Manager pursuant to Section 10.32.235.

**10.32.215  Annual Gun Harm Reduction Fee**

A person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year.  The date by which payment shall be made annually shall be established in the regulations promulgated by City Manager pursuant to Section 10.32.235. The annual fee will be set forth in the schedule of fees and charges established by resolution of the City Council.

NVF:TLC:KML
2/3/2022                                                        ORD. NO. 30716

## 10.32.220  Expenditure of Gun Harm Reduction Fee

A.     All monies from the Gun Harm Reduction Fee shall be expended by the
       Designated Nonprofit Organization on providing services to residents of the City
       that own or possess a Firearm in the City, to members of their household, or to
       those with whom they have a close familial or intimate relationship.  Such
       expenditures may include, but are not necessarily limited to the following:

       1.      Suicide prevention services or programs;

       2.      Violence reduction or gender based violence services or programs;

       3.      Addiction intervention and substance abuse treatment;

       4.      Mental health services related to gun violence; or

       5.      Firearms safety education or training.

B.     No portion of the monies from the Gun Harm Reduction Fee shall be used for
       litigation, political advocacy, or lobbying activities.

C.     The Designated Nonprofit Organization shall spend every dollar generated from
       the Gun Harm Reduction Fee, minus administrative expenses, exclusively for
       programs and initiatives designed to (a) reduce the risk or likelihood of harm
       from the use of firearms in the City of San José, and (b) mitigate the risk of
       physical harm or financial, civil, or criminal liability that a San José firearm
       owner or her family will incur through her possession of firearms. Otherwise, the
       City shall not specifically direct how the monies from the Gun Harm Reduction
       Fee are expended.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

D.   The designated non-profit shall provide a biannual report to an appropriate council committee and the report may also be provided to the City Council, as directed by the council committee.

## 10.32.225  Exceptions

The provisions of this Part shall not apply to any of the following:

A.   Those persons designated as peace officers pursuant to Chapter 4.5 of Title 3 of Part 2 of the California Penal Code (§830 et seq.), including sworn peace officers, active reserve peace officers and retired peace officers.

B.   Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, for as long as these statutes are legally enforceable.

C.   Those persons for which compliance with this Part would create a financial hardship.

## 10.32.230  Compliance

A.   Insurance requirement.  Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported.  Each person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes.  Each person shall present the form when

lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm.

B.     Fee provisions.  Each person shall affix proof of payment of the annual Gun Harm Reduction Fee to the attestation form and keep it with the Firearm or Firearms where they are being stored or transported.

## 10.32.235  Authority of the City Manager

A.     The City Manager is authorized to promulgate all regulations necessary to implement the requirements and fulfill the policies of this Part relating to the reduction of gun harm, including, but not limited, to the following subjects:

1.     Processes and procedures related to the implementation of the liability insurance requirement, and forms necessary thereto.

2.     Designation of the nonprofit organization that will receive the Gun Harm Reduction Fee, any processes and procedures related to the payment of the fee, and any additional guidelines or auditing of the use of the monies from the fee.

3.     Designation of any third-party agency and/or organization that will aid in the implementation of the noticing of the requirements of this Part or any other administrative tasks related to the requirements of this Part.

4.     The criteria by which a person can claim a financial hardship exemption from this Part pursuant to Section 10.32.225.C.

B.     Regulations shall be published on the City's website.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

C.    Regulations promulgated by the City Manager shall have the same force and effect of law.  Unless a later date is specified in a regulation, a regulation shall become effective upon date of publication.

## 10.32.240  Enforcement

A.    Any violation of this Part shall be punishable by an administrative citation in accordance with the procedures set forth in Chapter 1.15 of Title 1 of this Code relating to the issuance of administrative citations, imposing of administrative fines, right to appeal, and the right to an administrative hearing.

B.    The amounts of the fines for violations imposed pursuant to this Part shall be set forth in the schedule of fines established by resolution of the City Council.

C.    A violation of this Part is also enforceable through all other civil and administrative remedies available to the City.

## 10.32.245  Impoundment

To the extent allowed by law, the Firearm or Firearms of a person that is not in compliance with this Part may be impounded subject to a due process hearing.

## 10.32.250  Fees and Charges

The City Manager is hereby authorized to charge and collect any and all cost recovery fees associated with fulfilling the policies of this Part relating to the reduction of gun harm, including any associated third-party costs.  All fees shall be as set forth in the schedule of fees and charges established by resolution of the City Council.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**SECTION 2.**  This Ordinance shall become effective at the expiration of one hundred eighty (180) days after its adoption.

**SECTION 3.**  Consistent with Section 1.04.160 of the San José Municipal Code, should any provision of this Ordinance or its application to any person or circumstance be determined by a court of competent jurisdiction to be unlawful, unenforceable or otherwise void, that determination shall have no effect on any other provision of this Ordinance or the application of this Ordinance to any other person or circumstance and, to that end, the provisions hereof are severable.

**SECTION 4.**  The City Council of the City of San José takes action on this Ordinance based upon the totality of the administrative record including the facts stated above, the facts stated in the memorandums to the City Council for the January 25, 2022 City Council Meeting, as well as any oral or written testimony at the January 25, 2022 City Council meeting.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**PASSED FOR PUBLICATION** of title this 25th day of January, 2022, by the following bifurcated vote:

Including Insurance Requirements; Excluding Sections 10.32.215, 10.32.220, and 10.32.230(b)

| | |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, FOLEY, JONES, JIMENEZ, MAHAN, PERALEZ, LICCARDO. |
| NOES: | DAVIS. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

**PASSED FOR PUBLICATION** of title this 25th day of January, 2022, by the following bifurcated vote:

Excluding Insurance Requirements; Sections 10.32.215, 10.32.220, and 10.32.230(b) only:

| | |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, JONES, JIMENEZ, PERALEZ, LICCARDO. |
| NOES: | DAVIS, FOLEY, MAHAN. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

SAM LICCARDO
Mayor

ATTEST:

TONI J. TABER, CMC
City Clerk

# Exhibit F

BAY AREA

# Gun owners in San Jose must buy liability insurance under newly passed first-in-the-nation law

Lauren Hernández

Jan. 25, 2022Updated: Jan. 26, 2022 6:03 p.m.



This file photograph shows San Jose Mayor Sam Liccardo on Tuesday, March 24, 2015, in San Jose, Calif.
Santiago Mejia/The Chronicle

The San Jose City Council adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability insurance for their firearms, city officials said.

The ordinance — which city officials said marks the first such law for a city, state or other jurisdiction in the country — also calls for gun owners to pay fees that will be invested "into evidence-based initiatives to reduce gun violence and gun harm," San Jose Mayor Sam Liccardo said in a statement on Tuesday night.

According to the ordinance, "A person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or

damages resulting from any negligent or accidental use of the Firearm, including but not limited to death, injury or property damage."

Residents who do not comply could have their firearms confiscated under the new law, which takes effect in six months.

The ordinance notes that each year 23,000 people in the U.S. die by firearm suicide, 14,000 die by firearm homicide and another 500 die from unintentional gun injuries.



Liccardo thanked the council and advocacy groups including Moms Demand Action, SAFE, the Gifford Law Alliance and others for their commitment to "reducing gun violence and devastation in our community."

Liccardo said these groups helped "craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community." He said that he will support other jurisdictions who choose to launch similar ordinances across the United States.

Shannon Watts, the founder of Moms Demand Action, said in a statement that the ordinance will "save lives."

Ewan Barker Plummer, volunteer leader with the Bay Area chapter of Students Demand Action said the vote was "a victory for gun safety."

"We all want a safer San Jose, a safer California, and a safer nation," Barker Plummer said. "With this approach, we can move closer to that goal."

*Lauren Hernández is a San Francisco Chronicle staff writer.*
*Email: lauren.hernandez@sfchronicle.com Twitter: @ByLHernandez*

Written By
Lauren Hernández
Reach Lauren on
Lauren Hernández joined The San Francisco Chronicle in 2018. She covers breaking news, crime and general news. Previously, she was a breaking news reporter for the USA TODAY Network's Statesman Journal in Salem, Oregon. She studied journalism at San Jose State University. She is a member of the National Association of Hispanic Journalists. Hernández has bylines in the Silicon Valley Business Journal and The Desert Sun. Her journalism has received awards in California and Oregon.

EXHIBIT "G"

# Exhibit G

# Los Angeles Times

# San Jose approves first law in U.S. requiring gun owners to have insurance



San Jose Mayor Sam Liccardo speaks during a news conference in May 2021 after nine people died in a shooting in his city. (Associated Press)

BY OLGA R. RODRIGUEZ AND JULIET WILLIAMS
ASSOCIATED PRESS

JAN. 25, 2022 **UPDATED** 11:08 PM PT

The city of San Jose voted Tuesday night to require gun owners to carry liability insurance in what's believed to be the first measure of its kind in the United States.

The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights.

The council also voted to require thousands of gun owners in the city to pay a small fee, which would be used for firearm safety education and services such as domestic violence prevention and mental health services.

The proposal seeks to reduce gun violence in the San Francisco Bay Area city.

# Exhibit H



# CITY MANAGER REGULATIONS
## FOR
## THE GUN HARM REDUCTION ORDINANCE

**Issued by the City Manager**

*Sarah zárate*

Sarah Zarate
Director of Administration, Policy, and Intergovernmental Relations
Office of the City Manager

**EFFECTIVE: October 21, 2022**

San José Police Department
Permits Unit
(408) 277-4452
https://www.sjpd.org/records/documents-policies/gun-harm-reduction-ordinance

CITY MANAGER REGULATIONS FOR
GUN HARM REDUCTION ORDINANCE
**EFFECTIVE**: October 21, 2022
Page **2** of 6

# PART I - GENERAL PROVISIONS

## SECTION 1-1. PURPOSE AND AUTHORITY

The Gun Harm Reduction Ordinance, set forth in Title 10, Chapter 10.32, Part 6 of the San José Municipal Code ("SJMC" or "Code"), provides that individuals who own or possess firearms and reside in the City of San José ("City") must maintain liability insurance covering losses or damages resulting from any accidental use of their firearm and pay an annual gun harm reduction fee. These regulations implement the provisions of SJMC Chapter 10.32, Part 6 and are issued by the City Manager under the authorization granted pursuant to SJMC Section 10.32.235. These regulations are not intended to be exhaustive and can be amended at any time by the City Manager. These regulations shall be referred to as the "City Manager Regulations for the Gun Harm Reduction Ordinance."

## SECTION 1-2. DEFINITIONS AND CONSTRUCTION

The definitions set forth in SJMC Chapter 10.32 Part 6, and herein, shall govern the application and interpretation of these regulations. Any reference to federal, state or local statutes and ordinances includes any regulations promulgated thereunder and is deemed to include any successor or amended version of the referenced statute, ordinance or regulatory provision.

# PART II – IMPLEMENTATION TIMELINE

## SECTION 2-1. LIABILITY INSURANCE REQUIREMENT OPERATIVE DATE

Firearm owners residing in San José who are required by SJMC section 10.32.210 to obtain liability insurance shall obtain such insurance by January 1, 2023.

## SECTION 2-2. ANNUAL GUN HARM REDUCTION FEE PAYMENT DATE

SJMC section 10.32.215 provides that the date by which payment of the Gun Harm Reduction Fee shall be made annually will be set by regulations promulgated by the City Manager. This version of the City Manager Regulations for the Reduction of Gun Harm Ordinance does not set a payment date; a payment date will be established in an amended version of these regulations to be issued in the future. Individuals covered by the Gun Harm Reduction Fee are not required to pay the fee until a payment date is set through the amended regulations.

# PART III – INSURANCE REQUIREMENT ATTESTATION FORM

## SECTION 3-1. INSURANCE REQUIREMENT ATTESTATION FORM ESTABLISHED

Individuals subject to the insurance requirement must demonstrate compliance with the requirement by completing and executing an Attestation Form. The form included with these regulations as Exhibit A shall be used for this purpose. The attestation form shall be kept with the subject individual's firearm(s) where they are being stored or transported.

San José Police Department
Permits Unit
(408) 277-4452
https://www.sjpd.org/records/documents-policies/gun-harm-reduction-ordinance

CITY MANAGER REGULATIONS FOR
GUN HARM REDUCTION ORDINANCE
**EFFECTIVE**: October 21, 2022
Page 3 of 6

## PART IV – EXEMPTIONS

## SECTION 4-1. PEACE OFFICER EXEMPTION

SJMC section 10.32.225 provides that those persons designated as peace officers pursuant to Chapter 4.5 of Title 3 of Part 2 of the California Penal Code (§830 et seq.), including sworn peace officers, active reserve peace officers and retired peace officers are exempted from the Gun Harm Reduction Ordinance. In any instance where they would otherwise be required to present the attestation form to demonstrate compliance with the ordinance, a person claiming the peace officer exemption must instead present a valid identification card, issued by a law enforcement agency, that indicates that the person claiming the exemption is a peace officer. If an individual claiming this exemption cannot present a valid identification card as described above, then they are not covered by the exemption and are subject to the requirements of the ordinance.

## SECTION 4-2. CONCEALED WEAPON LICENSE EXEMPTION

SJMC section 10.32.225 provides that those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155 are exempted from the Gun Harm Reduction Ordinance. In any instance where they would otherwise be required to present the attestation form to demonstrate compliance with the ordinance, any person claiming the concealed weapon license exemption must instead present their license to carry a concealed weapon. If an individual claiming this exemption cannot present their license, then they are not covered by the exemption and are subject to the requirements of the ordinance.

## SECTION 4-3. FINANCIAL HARDSHIP EXEMPTION

SJMC section 10.32.225 provides that those persons for which compliance with the Gun Harm Reduction Ordinance would create a financial hardship are exempted from the ordinance. SJMC section 10.32.235 provides that the criteria by which a person can claim a financial hardship exemption shall be defined through regulations issued by the City Manager.

An individual qualifies for financial hardship if their household income is at or below the Extremely Low Income threshold for Santa Clara County, adjusted for household size, according to the Area Median Income (AMI) calculations released annually by the California Department of Housing and Community Development (HCD). (The Extremely Low Income threshold is set at 30% of AMI.) HCD does not calculate the Extremely Low Income threshold for households of nine individuals or larger. For these households, the financial hardship standard shall be calculated by taking the difference between the threshold for households of eight individuals and households of seven individuals, multiplying the difference by the number of individuals in the household in excess of eight, and adding the product to the Extremely Low Income threshold for a household of eight individuals.

To claim the financial hardship exemption, individuals must state their gross household income and the size of their household on the Attestation Form to show that they meet the hardship threshold, and sign the form under penalty of perjury. They must also attach a copy of their

San José Police Department
Permits Unit
(408) 277-4452
https://www.sjpd.org/records/documents-policies/gun-harm-reduction-ordinance

CITY MANAGER REGULATIONS FOR
GUN HARM REDUCTION ORDINANCE
**EFFECTIVE**: October 21, 2022
Page **4** of **6**

current Federal Income Tax Return (form 1040) to the Attestation Form. The Social Security number on the form 1040 should be redacted.

## PART V – ENFORCEMENT

## SECTION 5-1. ADMINISTRATIVE CITATIONS

Gun owners in San José found to be in violation of the Gun Harm Reduction Ordinance and who cannot show proof that they qualify for an exemption from the ordinance, as specified in Part IV of these regulations, will be subject to an administrative citation and associated fine, as specified in SJMC section 10.32.240.

# Exhibit A



## Gun Liability Insurance Attestation Form

| Section 1: Description |
|---|

To be compliant with the Gun Harm Reduction Ordinance, gun owners and those in possession of guns must have a current homeowner's, renter's or gun liability insurance policy for their firearm(s) and ensure that the policy covers losses or damages resulting from accidental use of the firearm, including but not limited to death, injury, or property damage. Exemptions are listed below.

**Gun owners and those in possession of guns in the City of San José must complete the below insurance attestation form by January 1, 2023. The form must be accurately completed and kept with the firearm(s) at all times. It does not need to be submitted to the City.**

Non-compliance may result in fines. For more information about San José's Gun Harm Reduction Ordinance, and City Manager issued regulations, go to: https://www.sjpd.org/records/documents-policies/gun-harm-reduction-ordinance

Description of exemptions:

A. Those persons designated as peace officers pursuant to Chapter 4.5 of Title 3 of Part 2 of the California Penal Code (§830 et seq.), including sworn peace officers, active reserve peace officers and retired peace officers. *(Need to provide proof of eligibility for the exemption - show ID from issuing agency upon request; police to verify employment upon contact)*

B. Those persons who have a license to carry a concealed weapon pursuant to California Penal Code § 26150 or § 26155, for as long as these statutes are legally enforceable. *(Need to provide proof of eligibility for the exemption – show CCW license upon request)*

C. Those persons for which compliance with this Part would create a financial hardship. (See back side of form)

| Section 2: Exemptions |
|---|

I claim the following exemption because: (Please select one)

☐A. I am designated as a peace officer pursuant to Chapter 4.5 of Title 3 of Part 2 of the California Penal Code (§830 et seq.), including sworn peace officers, active reserve peace officers and retired peace officers. *(I will show ID from issuing agency upon request)*

☐B. I have a license to carry a concealed weapon pursuant to California Penal Code § 26150 or § 26155, for as long as these statutes are legally enforceable. *(I will show CCW license upon request)*

☐C. This requirement would create a financial hardship. (*I attached proof of income*)

| Section 3: Insurance Coverage |
|---|

Name of firearm owner: Click or tap here to enter text.

Name of Insurance Company (issuing the policy): Click or tap here to enter text.
Address of Insurance Company: Click or tap here to enter text.
Phone: Click or tap here to enter text.

| Insurance Policy Number: Click or tap here to enter text. | Effective Date: | Expiration Date: |
|---|---|---|

| Section 4: Acknowledgment |
|---|

I do, hereby attest that this information is true and I will provide proof of compliance (sign the form under penalty of perjury and keep form with firearms where they are stored or transported).

| Signature | Date |
|---|---|
| | |

## Section 5: Financial Hardship Exemption Worksheet

An individual qualifies for financial hardship if their household income is at or below the extremely low-income threshold for Santa Clara County, adjusted for household size, according to the Area Median Income (AMI) calculations released annually by the California Department of Housing and Community Development (HCD).  (The extremely low- income threshold is set at 30% of AMI.)

**To claim the financial hardship exemption, complete the required information below, including stating your household size and gross household income.**

| Number of persons in my household: Click or tap here to enter text. | Gross household income: Click or tap here to enter text. |
|---|---|

To qualify for a financial hardship exemption your gross household income cannot exceed 30% of AMI adjusted for your household size. Please review the information in the table below to determine if you qualify.

If your income is at or below the allowed limit, you may claim a Financial Hardship Exemption in Section 2 of this form. You must provide proof of financial hardship and attach a copy of your current Federal Income Tax Return (form 1040) to this Attestation Form. **The Social Security number on the form 1040 should be redacted.**

| Household Size | Area Median Income (AMI) 30% |
|---|---|
| 1 Person | [insert] |
| 2 Person | [insert] |
| 3 Person | [insert] |
| 4 Person | [insert] |
| 5 Person | [insert] |
| 6 Person | [insert] |
| 7 Person | [insert] |
| 8 Person | [insert] |
| 9 Person household and larger | For every additional person over 8, add [insert] to the income threshold for 8 person households |

# Exhibit I

1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  TAMARAH P. PREVOST (SBN 313422)
   tprevost@cpmlegal.com
3  ANDREW F. KIRTLEY (SBN 328023)
   akirtley@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Fax: (650) 697-0577
7
   *Attorneys for Defendants*
8

9                **UNITED STATES DISTRICT COURT**

10        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                     **SAN JOSE DIVISION**

12  | **NATIONAL ASSOCIATION FOR GUN** | Case No. 5:22-cv-00501-BLF |
    **RIGHTS, INC.**, a non-profit corporation, and
13  **MARK SIKES**, an individual,          **DEFENDANTS' STATUS REPORT ON**
                                            **IMPLEMENTATION OF THE GUN HARM**
14               Plaintiffs,                 **REDUCTION ORDINANCE**

15        v.                                Judge:    Hon. Beth L. Freeman

16  **CITY OF SAN JOSE**, a public entity,
    **JENNIFER MAGUIRE**, in her official capacity
17  as City Manager of the City of San Jose, and the
    **CITY OF SAN JOSE CITY COUNCIL**,
18
                 Defendants.
19

20  **HOWARD JARVIS TAXPAYERS**          Case No. 5:22-cv-02365-BLF
    **ASSOCIATION**, Silicon Valley Taxpayers
21  Association, Silicon Valley Public Accountability
    Foundation, James Barry, and George Arrington,
22
                 Plaintiffs,
23
          v.
24
    **CITY OF SAN JOSE**, and all persons interested
25  in the matter of San Jose Ordinance No. 30716,
    establishing an Annual Gun Harm Reduction Fee,
26
                 Defendants.
27

28

Defendants' Status Report on Implementation of the Gun Harm Reduction Ordinance
Case Nos. 5:22-cv-00501-BLF, 5:22-cv-02365-BLF
Exhibit 19

Defendants City of San Jose, City Manager Jennifer Maguire, and the San Jose City Council (collectively, the "City") provide the following Status Report concerning the City's ongoing efforts to implement the San Jose Gun Harm Reduction Ordinance ("Ordinance") at issue in the above-captioned consolidated cases, referred to herein as the "*NAGR* Action" (Case No. 22-cv-00501-BLF) and the "*HJTA* Action" (Case No. 22-cv-02365-BLF).[1]

## Summary of the City's Prior Status Reports

Since the San Jose City Council approved the Ordinance in February 2022, the City has been diligently working through the various administrative and legislative tasks necessary to implement the Ordinance, including the City Manager's Office ("CMO") promulgating regulations and the City Council passing resolutions as contemplated by the Ordinance's express terms. The City has previously filed two Status Reports providing updates about these efforts.

The first Status Report, filed on August 17, 2022, referred the Court to a July 2022 memorandum ("July Memorandum") that sets forth the City's "Implementation Timeline," which lists the major tasks necessary to implement the Ordinance and their estimated completion dates. ECF 78 (citing *Mem. from Sarah Zárate to San Jose Mayor and City Council Re: Gun Harm Reduction Ordinance Update* at 3-5 (July 1, 2022), *available at* https://www.sanjoseca.gov/home/showpublisheddocument/87508).

The second Status Report, filed on October 25, 2022 ("October Status Report"), reported that the City had completed three milestones set forth in the Implementation Timeline: (1) the City Manager's Office ("CMO") published revised regulations providing details and criteria necessary to implement the Ordinance's liability insurance mandate and exemptions (*cf.* Ordinance § 10.32.235(A)(1), (4)); (2) the City Council passed a resolution setting the amounts of administrative fines for violations of the Ordinance (*cf. id.* § 10.32.240(B)); and (3) the CMO initiated a Request for Information ("RFI") process to determine the best path to competitively designate a nonprofit organization with which the City will contract to provide services and programs to be funded by the Ordinance's Gun Harm Reduction Fee

---

[1] All ECF citations herein are to the earlier-filed *NAGR* Action, as the docket in the later-filed *HJTA* Action was ordered closed by the Court as an administrative component of consolidation. *See* ECF 80, at 2:19-20 (Sept. 30, 2022) (Order Consolidating Related Cases).

("Fee") (*cf. id.* § 10.32.235(A)(2)). ECF 82. In short, the City reported that implementation of the Ordinance was proceeding according to the schedule set forth in the Implementation Timeline, with the City having completed all tasks with estimated completion dates through October 2022, and thus focusing its efforts on the remaining tasks with estimated completion dates of November 2022 or later.

### New Updates on the City's Implementation of the Ordinance

With respect to the Ordinance's Fee requirement, the CMO has now completed all relevant tasks in the Implementation Timeline, except for the task listed as "Finalize contract with designated nonprofit" with an estimated completion date of December 2022. As stated in the October Status Report, the CMO initiated an RFI process for soliciting interest and information from nonprofit organizations regarding using the Fee's funds to provide the programs and services contemplated by the Ordinance. In doing so, the CMO followed its customary process of publishing the RFI to a third-party platform (biddingo.com) used by the City to inform the public about procurement and contracting opportunities, which in turn pushed the RFI to thousands of companies and organizations. When the published deadline for responding to the RFI expired, the CMO had received no responses. So it reissued the RFI with a new response deadline, which resulted in a response from a single entity. The CMO reviewed that entity's response but deemed it inadequate to move forward because of numerous deficiencies, including that the responding entity: was not then a properly-designated nonprofit organization, failed to provide a clear timeline for obtaining nonprofit status, failed to explain the operational processes it would use to achieve its stated goals, and failed to fully respond to all RFI items.

The CMO has decided that the best approach to progress implementation at this point is to do additional outreach and publish a full Request for Proposals ("RFP") to the biddingo.com platform to elicit responsive proposals from qualified nonprofit organizations.[2] Unfortunately, the lack of satisfactory RFI responses and the upcoming RFP process will delay the steps necessary for full

---

[2] The difference between an RFI and RFP at the City is as follows. RFIs are used by the City to solicit information about potential solutions and do not typically result in a contract award, whereas RFPs are used by the City to gather responses and pricing from potential contractors to deliver a specific City-defined scope of work, with the purpose of awarding one or more contracts at the end of the RFP process.

---

Defendants' Status Report on Implementation of the Gun Harm Reduction Ordinance
Case Nos. 5:22-cv-00501-BLF, 5:22-cv-02365-BLF

1   implementation and enforcement of the Fee requirement. *See e.g.*, ECF 78 at 3:1-8 (the August Status

2   Report, describing some of these steps: "the CMO, after it has completed all necessary prerequisites to

3   enforcing the Fee (i.e., after the nonprofit organization has been designated and the City has secured a

4   contract with the nonprofit), will have to re-appear before the City Council and ask it to vote on and

5   approve the CMO's authority to begin requiring payment of the Fee," at which time "the City Council

6   may choose the keep the Fee at the current $25 placeholder amount, or it may set another amount").

7           With respect to the Ordinance's liability insurance mandate, that requirement took effect as

8   scheduled on January 1, 2023. Among other work set forth in the Implementation Timeline and

9   elsewhere related to finalizing this aspect of the Ordinance, the City has engaged in significant outreach

10  to gun owners in multiple languages to inform them about the insurance mandate.

11          Finally, after the October Status Report, elections for various City offices were held in

12  November 2022, resulting in some changes to the City's political leadership. Among those were a

13  transition in administrations from that of former Mayor Sam Liccardo to current Mayor Matt Mahan,

14  who took office on January 1, 2023, and changes in the composition of the City Council.

15                              *       *       *

16          When there is a further material development in the City's Ordinance implementation efforts,

17  including its efforts to contract a nonprofit organization, the City will promptly update the Court

18  by filing a further Status Report.

19

20  Dated:  January 6, 2023                     Respectfully submitted,

21                                              **COTCHETT, PITRE & McCARTHY, LLP**

22                                              By:   */s/ Tamarah P. Prevost*

23                                                    Joseph W. Cotchett
                                                      Tamarah P. Prevost
24                                                    Andrew F. Kirtley

25                                              *Attorneys for Defendants City of San Jose, et al.*

26

27

28

---

Defendants' Status Report on Implementation of the Gun Harm Reduction Ordinance
Case Nos. 5:22-cv-00501-BLF, 5:22-cv-02365-BLF                                              3

COUNCIL AGENDA: 1/25/22

FILE: 22-045



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

# Memorandum

**TO: HONORABLE CITY COUNCIL**          **FROM: MAYOR LICCARDO**

**SUBJECT: GUN HARM REDUCTION ORDINANCE   DATE: JANUARY 19, 2022**

Approved                                         Date 1/19/22

## DISCUSSION

A more substantive memorandum—with specific recommendations—will follow, but it is important for the entire City Council to have access to all of the data available to us in evaluating this proposed ordinance. When we initially proposed the imposition of a fee paid by gun owners in San Jose, it became apparent that under Proposition 26, it would be helpful to establish the legal baseline and ceiling for that fee, by identifying the cost burden to San Jose taxpayers of gun-inflicted injuries and death in San Jose. Doing so requires rigorous study of demographics and cost data from healthcare and other service providers, public agencies, and other sources.

Accordingly, we sought to identify a qualified consultant, and multiple references recommended the Pacific Institute on Research and Evaluation (PIRE), an independent, nonprofit organization, headed by health economist Dr. Ted Miller, Ph.D. Dr. Miller and his team–consisting of David Swedler, Ph.D and Bruce Lawrence, Ph.D, gathered data, conducted research, and prepared the attached document, reflecting their calculations. Dr. Miller summarized their preliminary findings in a June report, and the attached provides a fuller description of PIRE's assumptions, methods, and findings. Among those findings:

- On average, 206 people suffered death or serious injury from gunshots each year in the City of San José between 2012 and 2018.

- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with publicly-funded services such as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.

Excerpts 197

Case 5:22-cv-00501-BLF Document 194-10 Filed 02/02/24 Page 3 of 3385

- When private financial costs to individuals and families are included in the calculation, San José residents incur an annual burden of $442 million per year.

This report was peer-reviewed by economist Dr. John J Donohue III, JD, PhD, a law professor at Stanford Law School, and epidemiologist Julie Parsonnet, MD, a health policy expert at Stanford University School of Medicine. My thanks for their commitment of time.

This work was funded by a grant from the Silicon Valley Community Foundation using philanthropic funds that originated from two donors. My deep gratitude to Director Holly Kreider and CEO Deanna Gomby at the Heising-Simons Foundation, and to SV Angel founder Ron Conway for their generous support. I also thank Gina Dalma and Nicole Taylor of the SVCF for their support of our efforts. None of these funders or supporters have reviewed the report, so it may or may not reflect their views.

Excerpts 198

```
 1

 2                  IN THE UNITED STATES DISTRICT COURT

 3                FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4                           SAN JOSE DIVISION

 5

    NATIONAL ASSOCIATION FOR GUN    )   CV-22-00501-BLF
 6  RIGHTS, INC. ET AL,             )
                                    )   SAN JOSE, CALIFORNIA
 7              PLAINTIFF,          )
                                    )   AUGUST 4, 2022
 8           VS.                    )
                                    )   PAGES 1-30
 9  CITY OF SAN JOSE, ET AL,        )
                                    )
10              DEFENDANT.          )
                                    )
11  _____

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE BETH LABSON FREEMAN
13                  UNITED STATES DISTRICT JUDGE

14
                       A P P E A R A N C E S
15

16    FOR THE PLAINTIFF:      BY:  MICHAEL A COLUMBO
                              DHILLON LAW GROUP, INC.
17                            POLITICAL LAW
                              177 POST STREET, SUITE 700
18                            SAN FRANCISCO, CA 94108

19    FOR THE DEFENDANT:      BY:  TAMARAH PREVOST
                                   MELISSA MONTENEGRO
20                                 ANDREW KIRTLEY
                              COTCHETT PITRE MCCARTHY
21                            840 MALCOLM ROAD
                              BURLINGAME, CA 94010

22

23    OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                    CERTIFICATE NUMBER 13185
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1              SAN JOSE, CALIFORNIA           AUGUST 4, 2022

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 9:02 A.M.)

 4              THE CLERK:  CALLING CASE 22-0501.  NATIONAL

 5     ASSOCIATION FOR GUN RIGHTS, ET AL. VERSUS THE CITY OF SAN JOSE,

 6     ET AL.

 7              COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND

 8     IF WE COULD BEGIN WITH PLAINTIFF AND THEN MOVE TO DEFENDANT.

 9              MR. COLUMBO:  GOOD MORNING, YOUR HONOR.

10     MICHAEL COLUMBO ON BEHALF OF THE NATIONAL ASSOCIATION FOR

11     GUN RIGHTS AND MARK SIKES, THE PLAINTIFF.

12              THE COURT:  GOOD MORNING.

13              MS. PREVOST:  GOOD MORNING, YOUR HONOR.

14     TAMARAH PREVOST, COTCHETT PITRE MCCARTHY, FOR THE CITY OF

15     SAN JOSE, DEFENDANTS.

16              THE COURT:  GOOD MORNING.

17              MR. KIRTLEY:  GOOD MORNING, YOUR HONOR.

18     ANDREW KIRTLEY ALSO OF COTCHETT PITRE MCCARTHY.

19              THE COURT:  GOOD MORNING.

20              MS. MONTENEGRO:  GOOD MORNING, YOUR HONOR.

21     MELISSA MONTENEGRO, ALSO OF COTCHETT PITRE MCCARTHY, FOR

22     DEFENDANT CITY OF SAN JOSE.

23              THE COURT:  GOOD MORNING.

24              ALL RIGHT.  WELL, I IMAGINE THERE'S NOT MUCH SURPRISE

25     TODAY BECAUSE YOU'VE HAD AT LEAST A SHORT AMOUNT OF TIME TO
```

1    REVIEW MY ORDER DENYING THE MOTION FOR PRELIMINARY INJUNCTION.

2    THAT'S NOT TO SAY THE CASE DOESN'T GO FORWARD.

3        AND MR. COLUMBO, I DON'T THINK YOU HAD ANY REAL DOUBT

4    ABOUT THAT, BUT I WANTED -- WHAT I WOULD LIKE TO DO IS TO WALK

5    THROUGH MY TENTATIVE RULING ON EACH OF THE CLAIMS, AND THEN WE

6    CAN TURN BACK TO ARGUMENT ON IT.  BUT THAT MAY HELP.  AND IT

7    MAY SHORT CIRCUIT SOME OF IT.

8        THE FIRST CLAIM IS UNDER THE SECOND AMENDMENT, AND OF

9    COURSE YOU BRIEFED -- YOU PLED THIS CLAIM, MR. COLUMBO UNDER, A

10   DIFFERENT SET OF LAWS THAT CONTROLLED.  THIS IS NOW OUT OF

11   DATE, IT'S ALMOST INCOMPREHENSIBLE UNDER BRUEN, TO NO FAULT OF

12   YOURS.  AND SO QUITE FRANKLY, I THINK YOU OUGHT TO JUST AMEND

13   THE FIRST CAUSE OF ACTION, BECAUSE IT JUST ISN'T WORTH OUR TIME

14   DISCUSSING WHETHER THERE'S INTERMEDIATE OR STRICT SCRUTINY AND

15   HOW THE BALANCING GOES.

16       I WILL CIRCLE BACK TO THE FEE ISSUE AFTER I TALK ABOUT THE

17   SECOND CLAIM WHICH IS UNDER THE FIRST AMENDMENT, THAT ONLY

18   PERTAINS TO THE FEE.

19       AS I INDICATED IN MY DENIAL OF THE MOTION FOR PRELIMINARY

20   INJUNCTION, I DON'T BELIEVE THAT THE FEE CLAIM IS RIPE.  I

21   BELIEVE THAT ON A MOTION TO DISMISS, THAT WOULD CAUSE ME TO

22   ACTUALLY DISMISS THIS CLAIM WITHOUT PREJUDICE TO BEING

23   RE-FILED.

24       I WANT TO BE -- AND THEREFORE ONCE, OR IF EVER THE FEE IS

25   FULLY ENACTED AND HAS A START DATE, YOU CAN MAKE A MOTION FOR

```
1    LEAVE TO AMEND TO BRING IT BACK.

2         SO I WOULD -- CIRCLING BACK TO CLAIM ONE, WHICH YOUR

3    SECOND AMENDMENT CLAIM DEALS WITH BOTH THE FEE AND THE

4    INSURANCE, I CAN'T EVALUATE THE FEE UNDER THE SECOND AMENDMENT

5    EITHER BECAUSE I DON'T KNOW WHETHER IT'S A MODEST TO DE MINIMUS

6    AMOUNT OR AN EXORBITANT FEE OR SOMEWHERE IN BETWEEN, AND SO I

7    THINK IT'S JUST NOT RIPE.

8         ON CLAIM THREE, UNDER THE CALIFORNIA CONSTITUTION ON FIELD

9    PREEMPTION, I'M INCLINED TO GRANT THAT MOTION TO DISMISS ON

10   THAT CLAIM WITHOUT LEAVE TO AMEND.  AND I THINK THAT'S FULLY

11   DISCUSSED IN THE PRELIMINARY INJUNCTION ORDER.

12        ON THE FOURTH CLAIM UNDER THE CALIFORNIA CONSTITUTION ON

13   THE TAXATION ISSUE, I DO THINK ON THIS IT'S RIPE, AND THINGS

14   WILL DEVELOP AS THE CASE GOES ON.

15        SO I'M NOT EXACTLY SURE WHAT I'M GOING TO DO HERE, I

16   ACTUALLY THINK THAT I MAY GRANT THE MOTION TO DISMISS IN REGARD

17   TO THE INSURANCE AND DENY THE MOTION TO DISMISS IN REGARD TO

18   THE FEE.  SO I WANT TO HEAR SOME ARGUMENT ON THAT.

19        ON CLAIM FIVE IN REGARD TO THE CHARTER VIOLATION, THAT

20   PERTAINS TO THE FEE, I'M INCLINED TO DENY THE MOTION TO

21   DISMISS.  I DO NEED A MORE DEVELOPED RECORD, AND THAT WILL

22   OCCUR THROUGHOUT THE MONTHS OR YEARS OF DISCOVERY AND

23   DEVELOPMENT OF THE CASE.

24        AND ON THE DECLARATORY RELIEF CLAIM, I THINK THERE'S A LOT

25   OF OVERLAP.  I'M NOT INCLINED TO DISMISS IT AT THAT POINT.  I
```

1    THINK THAT THAT MAY BECOME MORE OBVIOUS IN THE FUTURE.  I THINK

2    IT'S SOMEWHAT INSIGNIFICANT, IF IT'S DUPLICATIVE, WE GET RID OF

3    IT LATER, IF IT'S NOT DUPLICATIVE, THEN I THINK MR. COLUMBO

4    WILL HAVE THE OPPORTUNITY TO DEVELOP THAT A LITTLE FURTHER.

5         SO THAT'S MY TENTATIVE.  YOU CAN SEE THERE ARE A FEW

6    THINGS THAT I'M UNDECIDED ON, AND ON ALL OF IT, YOU ARE WELCOME

7    TO CHANGE MY MIND, AND THAT'S WHY WE HAVE HEARINGS.

8         SO MS. PREVOST, THIS IS YOUR MOTION, I'M GOING TO LET YOU

9    START.

10            MS. PREVOST:  THANK YOU, YOUR HONOR.

11        I APPRECIATE THE COURT'S COMMENTS, THAT WAS HELPFUL IN

12    FRAMING THE ISSUES.

13        THERE ARE QUITE A FEW ISSUES IN THIS CASE, AS THE COURT

14    KNOWS, AND WE AGREE GENERALLY THAT A LOT OF THEM AREN'T RIPE.

15    AND THAT ALSO DOVETAILS INTO ONE THE BASIS FOR OUR MOTION,

16    WHICH IS THAT THIS IS NOT AN APPROPRIATE FACIAL CHALLENGE,

17    BECAUSE IF ANYTHING, WHAT THE PLAINTIFFS ARE SEEKING HERE IS

18    RELIEF ON AN -- ON AS-APPLIED ARGUMENTS.

19        AND SO OUR VIEW, GENERALLY, IS THAT THERE ARE CERTAIN

20    LEGAL CLAIMS THAT CAN BE DECIDED ON THE COMPLAINT, ON THE

21    PAPERS, AS THE COURT ALLUDED TO IN YOUR COMMENTS JUST NOW.  AND

22    THEN OTHERS THAT ARE INAPPROPRIATE FOR A FACIAL CHALLENGE

23    BECAUSE THEY NEED TO BE FACTUALLY DEVELOPED, OR THE SPECIFIC

24    HARM TO THE PLAINTIFFS AS THE ORDINANCE IS FULLY DEVELOPED,

25    NEEDS TO BE ARTICULATED OR IN A FUTURE COMPLAINT OR AMENDMENT

1    OF SOME KIND.

2         AND THAT CERTAINLY IS TRUE ABOUT THE FEE.  IT ALSO, I

3    THINK IS TRUE ABOUT PORTIONS OF THE CITY CHARTER ARGUMENT,

4    CLAIM, RATHER.

5         I WILL START WITH, PERHAPS, THE STATE CONSTITUTIONAL

6    ARGUMENT, PROPOSITION 26 TAX ARGUMENT, AS THAT WAS I THINK THE

7    FIRST ISSUE THAT THE COURT SOUGHT SOME COMMENT ON.

8              THE COURT:  YES.

9              MS. PREVOST:  AND SO OUR VIEW HAS NOT CHANGED IN THE

10   TWO HEARINGS OR ONE AND A HALF HEARINGS WE'VE HAD SO FAR ON

11   THIS, AND THAT IS REALLY THIS FEE, THE FEE PORTION AT LEAST, IS

12   NOT A TAX BECAUSE NO PORTION OF THE FEE IS PASSING THROUGH

13   GOVERNMENT HANDS.

14        AND THE ORDINANCE IS VERY CLEAR THAT THE MONEY THAT IS

15   COLLECTED FROM THE FEE WILL GO DIRECTLY TO FUND THE PROGRAMS OF

16   THE NONPROFIT THAT ARE IDENTIFIED IN THE ORDINANCE AND

17   EFFECTUATE THE PURPOSES THAT THE NONPROFIT SEEKS TO ACCOMPLISH.

18             THE COURT:  SO MR. COLUMBO MAKES AN ARGUMENT THAT I

19   THOUGHT WAS STRONG, THAT YOU JUST CAN'T GET AROUND THE TAXING

20   REQUIREMENT BY SIMPLY DIRECTING WHERE THE MONEY IS TO BE SPENT

21   TO KEEP IT OUT OF THE CITY COFFERS.

22        I'M INCLINED TO LET THIS BE DEVELOPED AND FOR ME TO SEE

23   EXACTLY WHAT THAT NONPROFIT IS.  I BECOME A LITTLE CONCERNED

24   WHEN IT'S POSSIBLE THAT THE CITY, ITSELF, WILL GIVE BIRTH TO

25   THE NONPROFIT AS OPPOSED TO RECEIVING GRANT -- RECEIVING

1    PROPOSALS FROM EXISTING NONPROFITS, AND TO THE EXTENT THAT THE

2    NONPROFIT REALLY IS THE CITY IN NONPROFIT CLOTHING, I WOULD BE

3    CONCERNED THAT THAT WOULD NOT BE A WAY OUT.

4         SO THAT ARGUMENT WOULD CAUSE, THAT MR. COLUMBO MADE, WOULD

5    CAUSE ME TO HAVE A MORE DEVELOPED RECORD AND TO SEE WHAT THE

6    REGULATIONS ACTUALLY ARE, TO SEE WHAT THE NONPROFIT IS.  I

7    THINK I NEED TO KNOW WHAT IT IS, NOT JUST IT'S SOMETHING THAT'S

8    CALLED NONPROFIT.

9              MS. PREVOST:  SURE, THAT'S FAIR.

10        AND YOU KNOW, TWO RESPONSES TO THAT.  THE FIRST IS YOU ARE

11   CORRECT, THE NONPROFIT HAS NOT BEEN FULLY -- THE NONPROFIT

12   REGULATIONS HAVE NOT BEEN FLESHED OUT, MEANING THE NONPROFIT IS

13   NOT IDENTIFIED, THAT IS STILL AN ONGOING PROCESS AT THE CITY.

14   SO THAT IS CORRECT.

15        BUT THIS ARGUMENT ON OUR MOTION WAS ALSO PLED IN THE

16   ALTERNATIVE, MEANING THAT THE SCHMEER CASE, THAT I THINK WE ARE

17   IMPLICITLY DISCUSSING RIGHT NOW, IS ONE SORT OF BASIS BY WHICH

18   WE -- THAT WE DO BELIEVE ORDINANCE STANDS WITH PROPOSITION 26

19   MEANING, WHICH SCHMEER SAYS, IS THAT, YOU KNOW, WHEN THE MONEY

20   DOESN'T GO DIRECTLY TO THE GOVERNMENT, THEN IT WON'T FALL UNDER

21   PROPOSITION 26 AS MANDATES.

22        BUT THERE'S ALSO A SPECIFIC BENEFIT EXCEPTION WHICH WE

23   ALSO DISCUSS A LITTLE BIT IN THE PAPERS, AND OUR MOTION REALLY

24   BRINGS THOSE TWO ARGUMENTS IN THE ALTERNATIVE.  AND THE

25   ORDINANCE SECTION 1032.220, IS CLEAR THAT THE FEE GOES TO GUN

1    OWNERS, THEIR FAMILIES, CITY RESIDENTS, WHO ARE GUN OWNERS AND

2    THEIR FAMILIES, RIGHT, AND SO THAT IS ANOTHER BASIS.

3            BUT I UNDERSTAND THE COURT'S COMMENTS ABOUT THE LACK OF

4    DEVELOPMENT, FACTUAL DEVELOPMENT ON THIS ISSUE.

5                THE COURT:  I THINK THE SCHMEER CASE PROBABLY APPLIES

6    VERY NEATLY TO THE INSURANCE ASPECT.  AND IT MAY BE THAT I NOT

7    GRANT THE MOTION TO DISMISS AS TO INSURANCE, BUT -- UNDER

8    SCHMEER, AND DENY IT AS TO THE FEE, AND THEN WE WOULD GO

9    FORWARD.

10           SO THAT'S -- THAT'S WHERE I -- THAT MAY BE THE PROPER

11   DIVISION HERE.

12               MS. PREVOST:  CERTAINLY, YOUR HONOR.

13           WELL, LET ME TRY AND ADDRESS THE OTHER ISSUES YOU RAISED

14   EARLIER, IF THAT MAKES SENSE.

15               THE COURT:  PLEASE, YES.

16               MS. PREVOST:  SO THE CITY CHARTER, SIMILARLY, I

17   UNDERSTAND THE COURT'S, I WOULDN'T CALL IT CONCERN, COMMENTS

18   ABOUT THE LESS THAN CLEAR NATURE OF THE CITY MANAGER'S FUNCTION

19   IN TERMS OF THE DELEGATION OF AUTHORITY BETWEEN THE CITY

20   COUNSEL AND THE CITY MANAGER'S OFFICE.

21           THERE ARE SEPARATE GROUNDS, THOUGH, THAT THE PLAINTIFFS

22   BRING THIS CLAIM, THE CITY CHARTER CLAIM UNDER.  THERE'S

23   SECTION 1211 OF THE CITY CHARTER THAT MAY MOVE UNDER,

24   SECTION 1207, AND SECTION 701.

25           AND ON THE FIRST TWO -- ESSENTIALLY WHAT I'M TRYING TO

1    SUMMARIZE, WHAT THE PLAINTIFFS CLAIM ARE, BUT THERE'S THREE

2    BASIC ARGUMENTS, RIGHT.  THE FIRST IS THE CLAIM WITH RESPECT TO

3    THE MONEY PAID INTO THE CITY TREASURY, AND THAT THE MONEY WILL

4    BE -- REVENUES AND RECEIPTS WILL GO INTO THE GENERAL FUND.  AND

5    THAT, I THINK, IS AN ISSUE THAT CAN BE RESOLVED ON THE

6    COMPLAINT ON THE PLEADINGS.

7         SIMILARLY, WITH SECTION 1207, DELEGATING TO THE CITY

8    COUNSEL AUTHORITY TO APPROPRIATE MONIES FOR OPERATION OF

9    DEPARTMENTS WITHIN THE CITY.  NONE OF THIS MONEY, THE FEE, THE

10   MONEY FROM THE NONPROFIT FEE OR THE MONEY THAT WILL BE PAID BY

11   GUN OWNERS TO THEIR INSURANCE COMPANIES, IS GOING INTO THE

12   CITY'S GENERAL FUND OR FOR CITY SPENDING OR SHOULD BE

13   CONSIDERED REVENUE.  IT JUST ISN'T REVENUE.

14        SO I THINK THAT THOSE TWO ASPECTS OF THIS CAUSE OF ACTION

15   CAN BE DECIDED BY THE COURT ON THE PAPERS.

16        SECTION 701, AND I UNDERSTAND FROM THE COURT'S ORDER

17   YESTERDAY THAT THERE MAY BE SOME ADDITIONAL FACT DEVELOPMENT

18   THAT NEEDS TO OCCUR THERE, BUT AGAIN, THE ORDINANCE IS CLEAR IN

19   TERMS OF HOW IT INTERACTS WITH THE CITY AND WHAT IT EXPECTS THE

20   CITY MANAGER TO DO.  THE CITY CHARTER IS CERTAINLY VERY CLEAR.

21   AND SO THAT WOULD BE OUR REQUEST IS THAT THE COURT REVIEW THIS

22   CLAIM IN SEPARATE PARTS.

23        THE COURT:  SO I GUESS MY CONCERN, AND I'M NOT

24   INCLINED TO HAVE THE PLAINTIFFS AMEND ON THIS, BUT AS TO

25   SECTIONS 1211 AND 1207, I STILL THINK I NEED TO SEE EXACTLY

1    WHAT THE ORDINANCE IS DOING SO THAT I CAN DETERMINE WHETHER THE

2    LANGUAGE IS MERELY A RUSE TO GET AROUND THE CITY MONEY TO THE

3    CITY TREASURY AS MR. COLUMBO MAY CLAIM THAT IT IS, OR THAT IT

4    IS TRULY A PROPER PROVISIONAL REQUIREMENT THAT DOES NOT INVOKE

5    THE SECTIONS OF THE CHARTER.

6         I THINK I NEED A FACTUAL RECORD ON THIS, I DON'T THINK

7    IT'S A LEGAL ISSUE.

8         MS. PREVOST:  I AGREE.  THAT IS WHY OUR VIEW IS THAT

9    THIS IS AN IMPROPER FACIAL CHALLENGE, THAT THE APPROPRIATE WAY

10   TO CHALLENGE THE CITY CHARTER, UNDER THESE CIRCUMSTANCES, IS TO

11   BRING IT AS AN AS-APPLIED CHALLENGE.

12        THE COURT:  WELL, IT MAY BE AN AS-APPLIED CHALLENGE.

13   I'M ACTUALLY SAYING IT COULD BE A FACIAL CHALLENGE ONCE THE

14   REGULATIONS ARE WORKED OUT AND ONCE THE CITY ACTUALLY DEVELOPS

15   THE FEE AND FIND FINE STRUCTURE, WHICH WE DON'T EVEN KNOW ABOUT

16   YET.

17        SO I CERTAINLY UNDERSTAND THAT THERE'S A WHOLE OTHER BODY

18   OF CLAIMS THAT THE PLAINTIFF MAY BRING ON AS-APPLIED, BUT IT

19   HASN'T BEEN APPLIED YET, SO THEY CAN'T BRING THOSE YET.  THAT'S

20   NOT MY CONCERN AT THIS STAGE.

21        MS. PREVOST:  SURE.  I UNDERSTAND, YOUR HONOR.  THAT

22   MAKES SENSE.

23        THE COURT:  OKAY.

24        AND ON THE DEC RELIEF, I THINK REALLY, I MEAN, I THINK

25   THERE'S NOT -- I APPRECIATE YOUR ARGUMENT, I THINK YOU RAISE

1    CORRECT POINTS, I JUST THINK I'M NOT GOING TO SPLIT THE HAIRS

2    ON THAT RIGHT NOW.

3              MS. PREVOST:  I AGREE, YOUR HONOR.

4         IF PLAINTIFFS ARE GOING TO BE AMENDING THEIR COMPLAINT,

5    THAT MAKES SENSE.

6              THE COURT:  ALL RIGHT.  THANK YOU.

7         MR. COLUMBO, LET ME TURN TO YOU FOR YOUR COMMENTS.

8              MR. COLUMBO:  THANK YOU, YOUR HONOR.

9         WHEN YOU FINISHED YOUR TENTATIVE RULING, I THOUGHT MAYBE I

10   WOULD GET OUT OF HERE QUICKLY, BUT I THINK WE'VE ACTUALLY GOT A

11   FEW THINGS TO ADDRESS.

12        ONE THING THAT, IN LISTENING TO THE CITY'S ARGUMENTS, I

13   THINK THERE'S GOING TO BE A THEME THAT HAS JUST DEVELOPED

14   THROUGHOUT OUR RESPONSE TODAY, AND THAT IS, THIS THING THAT WE

15   ARE CALLING A FEE, THE GUN HARM REDUCTION FEE, CALLING IT THAT

16   IS MISLEADING AND CONFUSING WHEN, IN THE SAME CONVERSATION, WE

17   ARE ALSO LOOKING BACK TO PRECEDENT, THAT ADJUDICATES THE

18   CONSTITUTIONALITY OR LEGALITY OF CITY FEES.

19        WHEN THE COURTS HAVE EVALUATED CITY FEES, THEY ARE VERY

20   MUCH TALKING ABOUT MONEY PAID TO A CITY DIRECTLY FOR ITS

21   ADMINISTRATIVE COSTS IN DIRECTING SOME GOVERNMENT ACTIVITY OR

22   FUNCTION.  THAT'S NOT WHAT THIS ORDINANCE DOES.  IT IS A

23   COMPELLED DONATION TO A NONPROFIT.

24        SO TO THE EXTENT THAT WE ARE RELYING ON PAST CASES THAT

25   ADDRESS THE LEGALITY OF THINGS CALLED FEES, THAT'S NOT REALLY

1    WHAT WE ARE TALKING ABOUT HERE, THIS IS A MANDATORY DONATION

2    WHICH IS EXPLORED IN OUR FIRST AMENDMENT ARGUMENTS.

3              THE COURT:  WHICH I'M GOING TO PUT ON THE SHELF FOR A

4    WHILE.

5              MR. COLUMBO:  SO ONE THING I ALSO WANT TO NOTE IS IN

6    THE COURT'S ORDER YESTERDAY DENYING THE MOTION FOR PRELIMINARY

7    INJUNCTION, AND GRANTED THAT WAS IN A DIFFERENT CONTEXT, IT WAS

8    TO DECIDE THE PROBABILITY OF SUCCESS OF THE MERITS IN THE

9    FUTURE; HOWEVER, IN THE COURT'S DISCUSSION, I BELIEVE THE CITY

10   CHARTER PROVISIONS, THE COURT HAD TO MAKE A DECISION AS TO

11   WHETHER THIS NONPROFIT ENTITY, BASED ON THE INFORMATION WE HAVE

12   SO FAR, WAS A CITY ENTITY OR WHETHER IT WAS CONDUCTING A CITY

13   ACTIVITY.

14        AND FOR THE PURPOSE OF YESTERDAY'S RULING, THE COURT CAME

15   DOWN ON THE SIDE OF THIS MANDATORY DONATION NOT GOING -- SORRY,

16   GOING TO AN ENTITY THAT IS NOT THE CITY ENTITY THAT IS NOT

17   PERFORMING A CITY ACTIVITY.

18        AND THAT'S A CHOICE TO MAKE, BECAUSE HAVING MADE THAT

19   CHOICE, IT INFLUENCES BOTH THE FIRST AND SECOND AMENDMENT

20   ANALYSIS, IN TERMS OF WHAT WE ARE EVEN TALKING ABOUT.

21        HAD THE COURT GONE THE OTHER WAY AND DETERMINED THAT THE

22   MANDATORY DONATION WAS IN FACT TO A CITY ENTITY TO PAY FOR A

23   CITY ACTIVITY, THAT WOULD LEAD TO, I THINK, DIFFERENT RESULTS,

24   OR A LEAST A DIFFERENT ANALYSIS IN THE FIRST AND SECOND

25   AMENDMENT.

1    SO I ONLY PREFACE THAT BECAUSE I THINK THE DISTINCTION

2    BETWEEN CITY ENTITY OR CITY ACTIVITY OR PRIVATE INDEPENDENT

3    NONPROFIT, ACTUALLY BECOMES QUITE A LYNCHPIN FOR THE REST OF

4    THE ANALYSIS.

5         THE COURT:  SO MR. COLUMBO, I AGREE, AND I ACTUALLY

6    STRUGGLED WITH THAT IN DEVELOPING MY ORDER ON THE CHARTER.

7         I DECIDED AT THIS EARLY STAGE TO EVALUATE THE FEE AND WHAT

8    I THOUGHT THE CITY INTENDED IT TO BE.  THAT MAY TURN OUT TO BE

9    INCORRECT, AS I SAY, I CREDITED YOUR ARGUMENT HERE ABOUT THE --

10   AND YOUR ARGUMENT MAY NOT ULTIMATELY PAN OUT, BUT I DO THINK

11   IT'S AN IMPORTANT ISSUE, I AGREE WITH YOU COMPLETELY.

12        BUT WHAT I NOTED IN EVALUATING WHAT THE FEE IS, WHERE IT

13   GOES AND HOW IT'S SPENT, IS THAT I ACTUALLY THINK IN DEVELOPING

14   THIS PART OF THE ORDINANCE, THE CITY WAS TRYING TO THREAD A

15   VERY FINE NEEDLE, BECAUSE THEY MAY FIND THEMSELVES, IF THEY GET

16   THEMSELVES THROUGH ONE PLACE, THEY MAY END UP IN ANOTHER.

17        SO IT'S OUT OF THE FRYING PAN, INTO THE FIRE, IF I'M GOING

18   TO KEEP USING ANALOGIES.  AND SO YOU ALMOST ARE IN A WAIT AND

19   SEE WHERE THEY END UP, AND WE ALL ARE IN A WAIT AND SEE.

20        AND I CAME VERY CLOSE TO SAYING, THE FEE ISSUE UNDER THE

21   CHARTER WASN'T RIPE, AND ULTIMATELY I DIDN'T MAKE THAT

22   DETERMINATION IN THE PRELIMINARY INJUNCTION, I -- I STILL

23   STRUGGLE WITH IT, BECAUSE I'M NOT SURE WHAT WE CAN DO ON THE

24   FEE ISSUE UNDER THE CHARTER.  AND IT MAY BE THE WISER THING TO

25   SIMPLY SAY, IT'S NOT RIPE, BECAUSE I CAN'T EVALUATE YOUR

1    IMPORTANT ARGUMENT UNTIL I KNOW WHAT THE FEE IS.

2          MR. COLUMBO:  YES, YOUR HONOR.

3          THE COURT:  SO IF THOSE ARE YOUR OPTIONS,

4    MR. COLUMBO, WOULD IT BE LESS BAD FOR YOU TO -- FOR ME TO SAY

5    THAT THE CHARTER ISSUE FOR THE FEE IS SIMPLY NOT RIPE AND JUST

6    TAKE IT OFF THE TABLE FOR NOW?

7          MR. COLUMBO:  WELL, PART OF MY CONCERN HERE IS THAT,

8    ALTHOUGH WE DID HAVE A RATHER SUBSTANTIVE DECISION, QUASI

9    SUBSTANTIVE DECISION ALREADY, WE ARE STILL AT THE MOTION TO

10   DISMISS STAGE.

11         THE COURT:  SURE.

12         MR. COLUMBO:  AND WE ARE STILL EVALUATING IT UNDER

13   THE STANDARD PARADIGM OF A 12(B)(6).

14         THE COURT:  SURE.

15         MR. COLUMBO:  SO, IN OUR VIEW, THERE ARE MATERIAL

16   FACTUAL QUESTIONS.  THE NATURE OF THE CLAIM HAS BEEN FRAMED

17   ADEQUATELY FOR THE COURT AND THE DEFENDANT.  AND IN THAT SENSE,

18   THE 12(B)(6), AS TO THAT QUESTION, SHOULD BE DENIED BECAUSE

19   DISCOVERY MAY SHED LIGHT ON THE EXTENT TO WHICH DECISIONS,

20   PERHAPS, HAVE BEEN MADE, IF NOT PUBLISHED, BUT I CAN ADDRESS

21   THAT IN A MORE STRUCTURED WAY IN A MOMENT, IF YOU WILL ALLOW ME

22   TO RUN THROUGH THE CITY --

23         THE COURT:  SURE, OKAY.

24         MR. COLUMBO:  SO AS NOTED IN OUR PLEADINGS, THE CITY

25   ANNOUNCED THAT IT WOULD BE ENACTING THIS ORDINANCE, AND IT

1        ENACTED THE ORDINANCE SIX MONTHS AGO, STATING THAT IT WOULD

2        TAKE EFFECT THREE DAYS FROM, NOW AFTER THE CITY MANAGER

3        PREPARED TO IMPLEMENT IT.

4            THE COURT IS PROPOSING HOLDING THAT THE MANDATORY

5        NONPROFIT DONATION IS NOT SUBJECT TO REVIEW BECAUSE IT'S

6        UNRIPE, BUT THIS IS BASED ON THE FACT THAT THE CITY MANAGER HAS

7        NOT IMPLEMENTED THE ORDINANCE.

8                THE COURT:  WELL, THE CITY COUNCIL HASN'T SET THE FEE

9         EITHER.  REMEMBER THE COUNCIL HAS A ROLE HERE AS WELL.

10                MR. COLUMBO:  YES.

11                THE COURT:  THE MANAGER DOESN'T SET THE FEE.

12                MR. COLUMBO:  RIGHT.  BUT THERE ARE OTHER ASPECTS

13         THAT WE HAVE BEEN DISCUSSING TODAY THAT ARE FULLY WITHIN THE

14         CITY MANAGER'S CONTROL.

15                THE COURT:  YES, I AGREE.

16                MR. COLUMBO:  EXAMPLES INCLUDE, THE HARDSHIP

17         EXCEPTION OR ANNOUNCING THE NONPROFIT WILL RECEIVE THE C OR

18         EXPLAINS THE MEANS AND EXTENT TO WHICH SHE WILL SUPERVISE THE

19         NONPROFIT.

20            IRONICALLY, THE MANAGER'S EXPLANATION FOR NOT CARRYING OUT

21         THESE DUTIES IS THAT WE HAVE THIS PENDING CASE.

22                THE COURT:  WELL, THAT DISTURBED ME WHEN I SAW THAT,

23         BECAUSE ULTIMATELY IF THAT'S THE CITY'S POSITION, THEN THEY

24         AREN'T GOING TO BE ABLE TO ENFORCE THE FEE, WHICH IS YOUR

25         ULTIMATE GOAL.

1    I THINK WE MAY HAVE TOUCHED ON THAT BEFORE, THAT THIS IS

2    NOT A CHICKEN AND EGG PROBLEM, AND THE COURT ISN'T DOING

3    ANYTHING.  THE CITY IS AN INDEPENDENT ACTOR, AND IF IT'S GOING

4    TO WAIT FOR THE COURT, IT HAS NO GUN PROTECTION ORDINANCE.

5    AND AS FAR AS YOUR CLIENTS ARE CONCERNED, NEVER IS TOO

6    SOON FOR THIS TO GO INTO EFFECT.

7    MR. COLUMBO:  YES.

8    SO OUR CONCERN IS THAT, LIKE, FLICKING A LIGHT SWITCH, ONE

9    CITY OFFICIAL HAS NOW DECLARED THE ORDINANCE IS OFF, BUT IF AND

10   WHEN THE COURT DISMISSES THE CASE FOR ANY OTHER REASON, WE CAN

11   FLICK THAT SWITCH BACK ON.

12   AND WE DON'T FEEL THE COURT'S JURISDICTION IS AT THE MERCY

13   OF THE MANAGER FOR THE FOLLOWING REASONS:

14   FIRST, BASED ON WHAT WE KNOW ALREADY, THE ORDINANCE WILL

15   CONDITION LAWFUL GUN OWNERSHIP ON THE MAKING OF A DONATION TO

16   AN INDEPENDENT NONPROFIT.  ACCORDING TO THE REASONING IN THE

17   ORDER YESTERDAY, IT IS NOT A CITY ENTITY, AND IT IS NOT

18   CARRYING OUT A CITY ACTIVITY.

19   THESE ARE THE ESSENTIAL FACTS FOR OUR FEDERAL

20   CONSTITUTIONAL VIOLATIONS COMPELLING GUN OWNERS TO MAKE

21   DONATIONS TO, AND THEREFORE ASSOCIATE WITH AND SUBSIDIZE AN

22   INDEPENDENT NON-GOVERNMENTAL, PRIVATE NONPROFIT ORGANIZATION

23   NOT CONDUCTING CITY ACTIVITIES, WOULD VIOLATE THE FIRST

24   AMENDMENT NO MATTER WHAT THE ORGANIZATION ULTIMATELY

25   COMMUNICATES.

1        THE FIRST AMENDMENT DOESN'T STOP WITH POLITICAL SPEECH,

2   AND SO THE CITY'S PROMISE TO INSTRUCT THE NONPROFIT TO AVOID

3   SOME POLITICAL SPEECH IS NOT DISPOSITIVE.  THE FIRST AMENDMENT

4   ALSO PROTECTS AGAINST FORCED ASSOCIATION.

5        THEREFORE, WE THINK THERE ARE NO MATERIAL, FACTUAL,

6   UNKNOWN -- SORRY, THERE ARE NO MATERIAL UNKNOWN FACTS AS TO THE

7   FIRST AMENDMENT CLAIM.  FOOTNOTE TWO IN THE COURT'S ORDER

8   YESTERDAY PROVIDED SOUND ADVICE TO THE CITY, WHICH WE THINK IS

9   ONLY POSSIBLE BECAUSE WE HAVE ENOUGH INFORMATION FOR THAT CLAIM

10  TO BE RIPE.

11          THE COURT:  WELL, I JUST WANT TO BE CLEAR THAT THAT

12   FOOTNOTE IS PICKING UP ON YOUR ARGUMENTS AND NOT MY DECISION,

13   AND I THINK I WORDED IT THAT WAY.

14       AGAIN, I ALWAYS DO TRY TO CREDIT EITHER COUNSEL WITH

15   IMPORTANT POINTS THAT HAVE BEEN RAISED, AND I HAVE CREDITED YOU

16   NOW TWICE.  BUT IT DOESN'T MEAN THAT YOU WILL ULTIMATELY

17   PREVAIL, I JUST THINK THAT THE CITY, AND I THINK MS. PREVOST

18   WAS VERY CANDID LAST WEEK IN ACKNOWLEDGING THAT THIS -- WHAT IS

19   DEVELOPED IN THIS LAWSUIT INFORMS THE CITY IN THEIR

20   DECISIONMAKING AS THEY GO FORWARD.

21       AND I APPRECIATE THAT, AND I THINK THAT THAT IS WHERE THE

22   LAWSUIT AND THE CITY FUNCTIONS DO HAVE A SYMBIOTIC

23   RELATIONSHIP.

24       MR. COLUMBO, I JUST THINK THAT YOU HAVE -- I HAVE TO

25   OPERATE AT SUCH SAY HIGH LEVEL OF ABSTRACTION UNDER THE FIRST

```
1    AMENDMENT CLAIM FOR THE FEE, BASED ON WHAT IS WRITTEN SO FAR,

2    TO MAKE SUCH BROAD STATEMENTS UNDER THE CONSTITUTION THAT

3    THERE'S NEVER ANY FEE TO ANY ORGANIZATION, I'M JUST -- I JUST

4    DON'T THINK I CAN BE FLOATING OUT THERE.  IF IT WAS ANOTHER

5    AMENDMENT TO THE CONSTITUTION AND I WAS MAKING THOSE BROAD

6    STATEMENTS, YOU WOULD CALL ME AN ACTIVIST JUDGE.

7              MR. COLUMBO:  NOT ME.

8              THE COURT:  RIGHT.  SO I'M NOT -- I JUST DON'T THINK

9    THAT WE CAN DO THAT.

10        I ALSO THINK THAT WITH THE LAWSUIT GOING FORWARD AND

11   DISMISSING ONLY THE FIRST AMENDMENT CLAIM AND MAYBE THE CHARTER

12   CLAIM, YOU CAN ALWAYS, IN AN INSTANT, UPON THE CITY'S ENACTMENT

13   OF THESE OPEN ISSUES, BRING BACK THE CLAIM, A MOTION FOR LEAVE

14   TO AMEND CLAIM AND A TRO ON THOSE ISSUES.

15        AND SO I DON'T THINK I AM IMPERILING YOUR CLIENT'S

16   ULTIMATE RIGHTS, I'M NOT MAKING THEM VIOLATE THE LAW BEFORE

17   THEY CAN SEEK TO HAVE IT THROWN OUT, WHICH I THINK YOU'VE

18   RAISED THAT POINT AS WELL.  I JUST DON'T THINK THAT'S ON THE

19   TABLE.

20             MR. COLUMBO:  IT SOUNDS LIKE OUR ONLY POINT OF

21   DISAGREEMENT THEN, PERHAPS, IS ON THE SWEEP OF JANUS, IN WHICH

22   OUR VIEW, IF UNION DONATIONS TO, FOR COLLECTIVE BARGAINING, ARE

23   IMPERMISSIBLE UNDER THE FIRST AMENDMENT, THEN DONATIONS TO AN

24   INDEPENDENT NONPROFIT, FOR WHATEVER IT DOES, ARE AS WELL.

25             THE COURT:  BUT IN JANUS, AND FOR THE COURT REPORTER,
```

```
 1    J-A-N-U-S, IN JANUS WE KNEW THE UNION, WE KNEW WHAT IT WAS, WE

 2    KNEW WHAT THE CONTRACT WAS, WE KNEW WHAT THE COLLECTIVE

 3    BARGAINING ACTIVITIES OF THE UNION WERE, IT WAS ALL FLESHED

 4    OUT.  AS OPPOSED TO, IF THERE WAS EVER A UNION THAT MIGHT COME

 5    IN, AND WE WILL SEE WHAT IT LOOKS LIKE, AND MAYBE IT WILL JUST

 6    HOLD THE COMPANY CHRISTMAS PARTY, WHO KNOWS.

 7         SO I DON'T THINK JANUS TAKES US THERE EITHER.

 8              MR. COLUMBO:  SO JUST LOOKING AT SOME OF THE OTHER

 9    ISSUES THAT HAVE BEEN RAISED, AND I WILL JUST SAY COLLOQUIALLY,

10    TO THE EXTENT THAT ANY OF THESE ISSUES TURN UPON FACTS THAT CAN

11    BE DEVELOPED IN DISCOVERY, WE WOULD SUGGEST THAT A 12(B)(6) IS

12    NOT WARRANTED GLOBALLY.

13         FOR THE SECOND AMENDMENT CLAIM, BRUEN OBVIOUSLY CHANGED

14    THE ANALYSIS.  THE COURT HAS INVITED PLAINTIFFS TO AMEND THE

15    COMPLAINT TO REFLECT THAT.

16              THE COURT:  YES.

17              MR. COLUMBO:  AS DISCUSSED IN OUR SUPPLEMENTAL BRIEF,

18    THE COURT HAS OUR REASONING THERE.

19              THE COURT:  YOU MADE IT IN YOUR PLEADING.

20              MR. COLUMBO:  I WON'T REPEAT IT AT THIS TIME.

21              THE COURT:  YOU KNOW, I REALLY SEE THIS AS AN

22    OPPORTUNITY FOR YOU TO PUT YOUR PLEADING IN THE RIGHT POSTURE.

23         SO I'M JUST NOT GOING TO -- I SEE NO REASON TO EVALUATE

24    MS. PREVOST'S CLAIMS UNDER THE NOW DEFUNCT TWO-PART TEST,

25    INTERMEDIATE AND STRICT SCRUTINY, AND JUST FIND THAT CLAIM ONE
```

 1    SIMPLY DOES NOT TRACK THE CURRENT STANDARD UNDER THE SECOND

 2    AMENDMENT, AND HAVE YOU AMEND THAT.

 3         I THINK IT'S AN OPPORTUNITY FOR YOU, FRANKLY, NOT A

 4    PUNISHMENT.

 5              MR. COLUMBO:  AS TO THE INSURANCE REQUIREMENT, WE

 6    FEEL THERE IS HISTORICAL SUPPORT FOR THE INSURANCE REQUIREMENT.

 7         THE COURT, AND I THINK WE FLESHED THAT ARGUMENT OUT AS

 8    WELL IN OUR -- ON OUR SUBMISSIONS TO DATE.  HERE, WE DO FEEL

 9    THERE ARE DISTINCTIONS WE HAVE EXPLAINED BETWEEN THE

10    ORDINANCE --

11              THE COURT:  YOU DON'T BEAR THE BURDEN ON THAT.

12         I MEAN, WHEN YOU PLEAD IT, YOU DON'T HAVE TO PLEAD THE

13    HISTORICAL TRADITION, IT'S NOT YOUR BURDEN.

14         I MEAN, YOU CAN -- YOU CAN PLEAD WHATEVER YOU WANT, BUT

15    ULTIMATELY, IT IS -- YOUR BURDEN IS TO SHOW THAT THE CONDUCT IN

16    QUESTION COMES UNDER THE PROTECTION OF THE SECOND AMENDMENT.

17    YOU THEN HAVE THE PROTECTION OF A PRESUMPTION THAT THEN SHIFTS

18    THE BURDEN.

19         AND SO IT'S SUCH A DIFFERENT ANALYSIS.  SO I THINK WE

20    SHOULD JUST MOVE ON FROM THAT.

21         BEFORE WE WRAP UP, I JUST WANT TO REVISIT THE ISSUE ON THE

22    CHARTER, MR. COLUMBO, BECAUSE I'M REALLY STRUGGLING.  IF I

23    LEAVE THE CHARTER PROVISION IN, I STILL DON'T EVEN KNOW WHAT WE

24    ARE GOING TO DO UNTIL WE UNDERSTAND THE NATURE OF THE FEE AND

25    THE NATURE OF ITS EXPENDITURE BY THE NONPROFIT, THE NATURE OF

1    THE CONTROL EXERTED OVER THE EXPENDITURES BY THE CITY MANAGER.

2         AND THAT'S NOT SOMETHING YOU ARE GOING TO LEARN IN

3    DISCOVERY, IT DOESN'T ACTUALLY EXIST.  AND ON AN INTERROGATORY

4    TODAY, AND MS. PREVOST WAS SAYING YOU GOT NOTHING.

5         MR. COLUMBO:  I DO THINK THAT IS A FACTUAL QUESTION.

6    WHERE WE WOULD --

7         THE COURT:  WILL BE.  BUT THE GROUND HASN'T STOPPED

8    SHAKING, IS ALL I'M SAYING.

9         MR. COLUMBO:  RIGHT.

10        THE CITY CHARTER STATES THAT A FUND TO BE KNOWN AS A

11   GENERAL FUND IS CREATED AS A MEDIUM OF CONTROLLED ACCOUNTING

12   FOR ALL CITY ACTIVITIES EXCEPT THOSE WHICH REQUIRE SPECIAL

13   FUNDS.  IF THE WORK OF THE NONPROFIT UNDER THE DICTATE OF THE

14   ORDINANCE AS ENFORCED THROUGH THE SUPERVISION OF THE CITY

15   MANAGER IS A CITY ACTIVITY, THEN HAVING FUNDING FOR THAT CITY

16   ACTIVITY BYPASSED THE GENERAL FUND WOULD VIOLATE THE CHARTER'S

17   REQUIREMENT.

18        THE COURT:  BUT I CAN'T EVALUATE THAT YET BECAUSE I

19   DON'T KNOW WHAT THE ENACTING LEGISLATION SAYS.

20        MR. COLUMBO:  I DON'T KNOW THAT WE ARE GOING TO GET

21   MORE LEGISLATION ON THAT ISSUE, THAT SOUNDS LIKE THAT IS A

22   FACTUAL QUESTION THAT CAN BE DEVELOPED IN DISCOVERY THROUGH THE

23   CITY MANAGER.

24        THE COURT:  OKAY.

25        MR. COLUMBO:  THE CITY DOES HAVE SOME THINGS THAT IT

1    MAY TAKE UP AGAIN, BUT IN TERMS OF THE ORDINANCE ITSELF ON ITS

2    FOUR CORNERS, THE BALL IS IN THE CITY MANAGER'S COURT.  AND THE

3    EXTENT TO WHICH THOSE DECISIONS HAVE BEEN MADE OR ARE ON HOLD,

4    THEY JUST HAVEN'T STARTED THINKING ABOUT IT YET.  I THINK THAT

5    IS A FACTUAL QUESTION THAT SHOULD BE EXPLORED.

6         THE COURT:  I GUESS I DON'T DISAGREE THAT IT

7    ULTIMATELY IS A FACTUAL QUESTION, AND I THINK THIS CLAIM NEEDS

8    TO GO FORWARD AT THE RIGHT TIME, I JUST DON'T KNOW HOW IT CAN

9    GO FORWARD NOW.

10        SO THAT'S WHAT I NEED TO THINK ABOUT.  I NEED TO THINK

11   ABOUT WHETHER I SHOULD PUT THIS ISSUE ON THE FEE UNDER THE

12   CHARTER ARGUMENT AND THE ISSUE UNDER THE FIRST AMENDMENT TO

13   JUST DETERMINE THAT THOSE ARE NOT RIPE AT THIS POINT.

14        I WAS MORE INCLINED TO LET THE CHARTER ISSUE GO FORWARD, I

15   JUST SEE ALL THE PROBLEMS.

16        MR. COLUMBO:  ON THE TAX ARGUMENT, I WILL JUST TAKE A

17   BRIEF STAB.

18        THE COURT:  SURE.

19        MR. COLUMBO:  IN SCHMEER, THE CITY IMPOSED

20   REGULATIONS ON GROCERY STORES REQUIRING THEM TO PROVIDE USABLE

21   BAGS.  THE CITY SAID THE STORES COULD CHARGE CUSTOMERS A FEW

22   CENTS FOR A BAG IN ORDER TO FUND COMPLIANCE WITH THE CITY'S

23   MANDATE IMPOSED ON THEM.  IT DID NOT SAY THAT CITIZENS, OR EVEN

24   ALL STORE CUSTOMERS, MUST DONATE THEIR MONEY TO THE GROCERY

25   STORES, MUCH LESS CONDITION THEIR EXERCISE OF A CONSTITUTIONAL

 1    RIGHT ON MAKING SUCH A DONATION TO A PRIVATE ENTITY.

 2         SCHMEER'S HOLDING WAS THAT A TAX INCLUDED THE CHARGE FOR

 3    THE BENEFIT OF A LOCAL GOVERNMENT.  HERE, THE DONATION GOES TO

 4    A NONPROFIT WHO IS EITHER UNDER CONTRACT OR GRANT OR PART OF

 5    THE CITY, WHAT HAVE YOU, TO FUND A GOVERNMENT PROGRAM UNDER

 6    CREATED BY THE ORDINANCE UNDER THE SUPERVISION, TO SOME EXTENT,

 7    OF THE CITY MANAGER TO FULFILL THE CITY'S GOALS.

 8         UNLIKE IN SCHMEER, THE NONPROFIT IS NOT AUTHORIZED TO

 9    CHARGE THE PUBLIC TO COMPLICATE IT FOR A COST OF COMPLIANCE

10    WITH THE CITY MANDATE.  YOU KNOW, THEREFORE, WE THINK THIS

11    SITUATION TAKES US OUT FROM UNDER SCHMEER.

12         THE COURT:  OKAY.

13         MR. COLUMBO:  AND THE LOOPHOLE AND INCENTIVES THIS

14    WOULD CREATE ARE CONCERNING.  AND TO THE EXTENT THERE ARE

15    FACTUAL QUESTIONS, THEN THE MOTION TO DISMISS SHOULD BE DENIED.

16         THE COURT:  SO OF COURSE, MR. COLUMBO, IF I FIND A

17    CLAIM ISN'T RIPE, I'M NOT RULING AGAINST YOU, WE ARE JUST

18    PUTTING IT -- WE ARE JUST WAITING UNTIL THE CITY DOES ITS JOB.

19    AND IF THEY NEVER ENACT A FEE AMOUNT, A PENALTY AMOUNT AND

20    DESIGNATE A NONPROFIT, THEN YOU WIN.  SO THAT'S NOT A BAD

21    OUTCOME FOR YOU.

22         MR. COLUMBO:  RIGHT.

23         THE COURT:  SO, YOU KNOW, I'M VERY PRACTICAL ABOUT

24    THE WAY I LOOK AT THINGS, BUT I THINK THAT THAT'S REALLY THE

25    WAY I NEED TO ANALYZE IT.

1    SO I APPRECIATE YOUR ARGUMENTS, AND I ACTUALLY THINK WHEN

2    THE CITY FINISHES ITS WORK, THAT YOUR ARGUMENTS UNDER THE

3    CHARTER WILL REQUIRE FACTUAL DEVELOPMENT.  YOU ARE RIGHT.

4    AND IT'S GOING TO BE AN INTERESTING ISSUE AS TO HOW THE

5    STRUCTURE THE CITY ENACTS INTERACTS WITH ITS OBLIGATIONS UNDER

6    ITS CHARTER.

7    OKAY.  MS. PREVOST, LET ME RETURN TO YOU FOR FINAL

8    COMMENTS.

9    MS. PREVOST:  THANK YOU, YOUR HONOR.  I APPRECIATE

10   IT.  I WILL TRY AND KEEP THIS BRIEF.

11   THE CHARACTERIZATION OF THE FEE AS A COMPELLED DONATION IS

12   OBVIOUSLY A FIRST AMENDMENT ARGUMENT.  AND WHETHER CLEARLY

13   THERE ARE WAYS OF LABELING THE FEE ON BOTH SIDES, RIGHT, TO

14   EFFECTUATE ADVOCACY AND FRAME IT IN A WAY THAT'S FAVORABLE TO

15   EITHER SIDE.

16   BUT THE LAW IS WHAT IT IS, AND WHEN IT COMES TO WHETHER

17   THE FEE IS A TAX, OR AS THE PLAINTIFFS CALL IT, A DONATION, I

18   MEAN, THE SIMPLE FACT REMAINS THAT THIS MONEY DOES NOT RAISE

19   REVENUE FOR THE CITY, PERIOD.

20   AND WE CAN -- WE BELABORED SCHMEER AND THE PROP 26

21   ANALYSIS, SO I DON'T WANT TO WASTE THE COURT'S TIME, BUT I

22   THINK WHAT IS IMPORTANT TO UNDERSTAND AND A POINT THAT I THINK

23   NEEDS TO BE MADE, IS THE CITY IS THREADING A NEEDLE, AS THE

24   COURT RECOGNIZES, AND GUN VIOLENCE IS AN EXTREMELY COMPLEX

25   PROBLEM, AND THIS IS CREATIVE LEGISLATION DESIGNED WITH A LOT

1    OF THOUGHT THAT'S WELL-INFORMED THAT, YOU KNOW, TAKES ON THE

2    BENEFIT OF FEEDBACK FROM MULTIPLE DIFFERENT STAKEHOLDERS.  AND

3    THE IDEA THAT THE CITY MANAGER'S OFFICE IS DELAYING

4    INTENTIONALLY, FIRST OF ALL, I'M NOT CLEAR ON HOW THAT IS

5    DETRIMENTAL TO PLAINTIFFS, BECAUSE IT'S DELAYING --

6              THE COURT:  I AGREE.

7              MS. PREVOST:  THE VIOLATION OF THEIR CONSTITUTIONAL

8    RIGHTS.

9         BUT PUTTING THAT ASIDE, I CAN ASSURE YOU THAT THE CITY IS

10   WORKING EXTREMELY HARD.  AND THE COMMENTS IN THE PUBLIC

11   MEMORANDUM, THAT I BELIEVE THE PLAINTIFFS ARE REFERRING TO,

12   ABOUT WAITING FOR LEGISLATION OR WAITING FOR LITIGATION TO END,

13   IT IS NOT THE CASE AT ALL, IN ANY MANNER, THAT THE CITY IS

14   WAITING FOR THIS CASE TO END BEFORE IT MOVES.  I JUST WANT TO

15   MAKE THAT ABSOLUTELY CLEAR.

16             THE COURT:  OKAY.

17             MS. PREVOST:  THE CITY IS WORKING VERY HARD TO

18   DEVELOP REGULATIONS THAT ARE CONSTITUTIONAL AND EFFECTIVE AND

19   DEAL WITH THIS VERY COMPLEX PROBLEM.  SO I WANTED TO MAKE THAT

20   CLEAR.

21        IN TERMS, JUST BRIEFLY, I DON'T BELIEVE THAT THE FIRST

22   AMENDMENT IS SQUARELY ON THE TABLE AS PART OF THIS ARGUMENT

23   BECAUSE OF HOW UNRIPE WE BELIEVE IT IS, BUT YOU KNOW, OUR VIEW

24   IS THAT WHERE THE NONPROFIT FEE SITS IN BETWEEN THE TWO ENDS OF

25   THE SPECTRUM OF UNDER KELLER, RIGHT, WHETHER IT'S GERMANE TO

1    THE CITY'S GOALS OR IDEOLOGICAL IN NATURE, WHERE THE NONPROFIT

2    FEE SITS IN TERMS OF THE PROGRAMS THAT IT FUNDS AND THIS

3    POSSIBLE ASSOCIATION, THAT IT COULD BE ADHERED TO, THAT IS AN

4    UNDERDEVELOPED QUESTION AT THIS POINT, AND NOT CLEAR, AS THE

5    COURT POINTED OUT IN ITS ORDER YESTERDAY.

6         SO I THINK THE COURT IS CORRECT THAT THAT IS -- THAT ISSUE

7    IS NOT FACTUALLY DEVELOPED OR RIPE YET.  BUT NONETHELESS, WE

8    BELIEVE THAT KELLER IS -- PROVIDES THE CITY WITH THE SUPPORT

9    FOR WHAT IT ULTIMATELY WILL ENACT.

10         THE COURT:  OKAY.  ALL RIGHT.

11         LET ME FINISH UP WITH JUST SOME MORE HOUSEKEEPING THINGS.

12         FIRST OF ALL, I WAS SURPRISED IN THE SUPPLEMENTAL BRIEFS,

13    WHICH OF COURSE ONLY CAME ABOUT BECAUSE I ASKED FOR THEM, TO

14    LEARN THAT THE CITY HAD POSTPONED ENACTMENT OF THE ORDINANCE.

15         I DON'T WANT TO BE SURPRISED AGAIN, SO MS. PREVOST, I WILL

16    ASK THAT SHOULD THERE BE ANY PROMULGATION OF CITY MANAGER

17    REGULATIONS OR ANY MODIFICATION OF THE ORDINANCE BY THE CITY

18    COUNCIL, THAT YOU INFORM THE COURT AND PROVIDE ME A COPY OF IT

19    WITHIN TEN DAYS OF THAT ENACTMENT.

20         MS. PREVOST:  YES, YOUR HONOR.

21         THE COURT:  I WOULD JUST APPRECIATE THAT, IT HELPS

22    ME.

23         I ALSO HAVE PENDING A MOTION, MY OWN SUA SPONTE MOTION TO

24    CONSOLIDATE THE THREE CASES, THE HOWARD JARVIS CASE AND THE

25    GLASS CASE WITH THIS ONE.

```
 1          LET ME JUST TELL YOU MY THINKING ON IT.  I CERTAINLY

 2     WANTED TO HONOR THIS PLAINTIFF'S RIGHT TO HAVE ITS PRELIMINARY

 3     INJUNCTION HEARD AND DECIDED BEFORE I LOOKED AT THE

 4     CONSOLIDATION.  I AM INCLINED TO CONSOLIDATE THE CASES, BUT

 5     ALLOW THREE SEPARATE COMPLAINTS TO GO FORWARD, AND THEN I WILL

 6     CONSOLIDATE BRIEFING ON ISSUES FOR EFFICIENCY.

 7          BUT IN LOOKING AT THE DIFFERENT MISSION STATEMENTS, AS I

 8     IMAGINE THEM, THAT I CAN SEE THROUGH THE PLEADINGS OF THE THREE

 9     DIFFERENT PLAINTIFFS, I'M NOT SURE IT WOULD BE A HAPPY MARRIAGE

10     TO MAKE THEM SHARE A SINGLE PLEADING, AND I DON'T WANT TO BOG

11     THOSE PLAINTIFFS DOWN WITH HAVING TO DO THAT.  BUT I'M NOT

12     GOING TO HEAR THREE SEPARATELY BRIEFED MOTIONS ON THE SECOND

13     AMENDMENT AND THE FIRST AMENDMENT.  THESE ISSUES ARE COMPLETELY

14     OVERLAPPING, AND SO I WILL BE DEVELOPING THAT.

15          SO IN TERMS OF -- AND I HAVE TWO OTHER MOTIONS TO DISMISS

16     COMING UP, I WILL LET THE OTHER PARTIES KNOW MY THINKING.  IN

17     TERMS OF THIS MOTION TO DISMISS AND THE OTHER TWO THAT ARE

18     COMING UP, I WILL ULTIMATELY ISSUE A SINGLE ORDER COVERING ALL

19     OF THEM, AND IF I HAVEN'T -- AND I WILL PROBABLY ISSUE THE

20     CONSOLIDATION ORDER IN ADVANCE SO THAT ALL THE FILING WILL BE

21     DONE IN ONE CASE.  AND IT'S PROBABLY THIS ONE, MR. COLUMBO,

22     BECAUSE YOU WERE THE FIRST TO FILE.

23          BUT I WILL ALLOW THE SEPARATE PLEADINGS, JUST TO GIVE EACH

24     OF THE PLAINTIFF GROUPS THE OPPORTUNITY TO KEEP THEIR OWN

25     IDENTITY.
```

1    I'M GOING TO HAVE YOUR DEADLINE TO AMEND TO BE A CERTAIN

2    NUMBER OF DAYS AFTER THE ISSUANCE OF THIS FINAL ORDER, WHICH

3    WILL COVER ALL THREE.

4         AND SO MR. COLUMBO, WITH ALL OF THAT IN MIND, FROM THE

5    TIME I ISSUE MY ORDER, HOW MUCH TIME WOULD YOU LIKE FOR YOUR

6    AMENDMENT?  I DON'T SEE A REASON TO RUSH THIS AT THIS POINT.

7              MR. COLUMBO:  I THINK WE CAN DO THAT IN 14 DAYS.

8              THE COURT:  OH, THAT'S MODEST.  YES, THAT'S FINE.

9              MR. COLUMBO:  I THINK WE HAVE ALREADY BRIEFED IT.

10             THE COURT:  I KNOW YOU HAVE.  I KNOW.  EXACTLY.

11        OKAY.  SO THAT TIME PERIOD WON'T START TO RUN UNTIL YOU

12   GET A WRITTEN ORDER, SO THAT GIVES YOU A LOT OF LEAD TIME AS

13   WELL.

14        I KNOW IT'S BETTER TO WAIT TO DRAFT IT UNTIL YOU ACTUALLY

15   SEE WHAT MY RULING IS, AS OPPOSED TO VAGARIES.  IT WILL BE A

16   FAIRLY HIGH LEVEL ORDER, BECAUSE AGAIN, YOU'VE ALREADY BRIEFED

17   IT, I'VE ALREADY READ IT, I'VE ALREADY WRITTEN ABOUT IT, I

18   THINK WE HAVE HAD A FULSOME DISCUSSION HERE ON THE RECORD, AND

19   I'M GOING TO GO THROUGH CLAIM-BY-CLAIM, MUCH THE WAY I DID

20   HERE.

21             MR. COLUMBO:  I'M SORRY, YOUR HONOR, ON REFLECTION,

22   WOULD THE COURT MIND IF WE ASK FOR 30 DAYS TO ABSORB THE THREE

23   CASES?

24             THE COURT:  I DON'T MIND AT ALL, AND I THINK THAT'S

25   REASONABLE.  I ALWAYS ASK AND LAWYERS ARE ALWAYS MODEST.  SO

1    THAT'S FINE.

2         OKAY.  I THINK THAT TAKES CARE OF EVERYTHING.  AND WE WILL

3    JUST PROCEED.  SO THANK YOU ALL FOR THE ARGUMENT TODAY AND THE

4    BRIEFING, IT WAS QUITE GOOD.

5         ALL RIGHT.  THANK YOU ALL.

6         (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____
     SUMMER A. FISHER, CSR, CRR
25   CERTIFICATE NUMBER 13185          DATED: 8/16/22

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE (admitted *pro hac vice*)
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admission *pro hac vice* pending

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case Number: 5:22-cv-00501-BLF<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: July 21, 2022<br>Hearing Time: 9:00 a.m.<br>Location: Courtroom 3, 5th Floor<br>Robert F. Peckham Federal Building<br>280 South First Street, San Jose, CA<br><br>Judge: Honorable Beth Labson Freeman |



**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 21, 2022, at 9:00 a.m. or as soon thereafter this matter may be heard before the Honorable Beth Labson Freeman, in Courtroom 3 of the above-entitled Court, located at the Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, Room 2112, San Jose, California, 95113.

Plaintiffs National Association for Gun Rights, Inc. ("NAGR") and Mark Sikes ("Sikes"), pursuant to Fed. R. Civ. P. 65, will and hereby do move this Court for the issuance of a preliminary injunction prohibiting Defendants from enforcing Part 6 of Chapter 10.32 of Title 10 (§§10.32.200-10.32.250) of the City of San Jose's local ordinances.

The grant of a preliminary injunction is warranted because: (i) to allow the Ordinance to go into effect would deprive Plaintiffs, as well as all citizens of San Jose, of their First, Second, Fifth, and Fourteenth Amendment rights under the United States Constitution, articles XI and XIIIC of the California Constitution, and the San Jose Charter, (ii) the denial of such relief would irreparably harm Plaintiffs, (iii) providing said relief would not harm Defendants; and (iv) the public interest favors upholding the United States and California Constitutions and the San Jose City Charter, and (v) Plaintiffs are likely to succeed on the merits.

In support of this Motion, Plaintiffs respectfully refer this Court to this Motion, the Memorandum of Points and Authorities in Support of the Motion for Preliminary Injunction, the attached exhibits, the pleadings on record, and the arguments of counsel.

//
//
//
//
//
//
//
//
//

1



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 230

1                                                 Respectfully submitted,

2    Date: March 8, 2022              DHILLON LAW GROUP INC.

3

4                              By:    /s/ Harmeet K. Dhillon

                                       Harmeet K. Dhillon

5                                         Michael A. Columbo

                                         Mark P. Meuser

6                                         DHILLON LAW GROUP INC.

7                                         177 Post Street, Suite 700

                                         San Francisco, California 94108

8                                         (415) 433-1700

9                                         David A. Warrington*

                                         Curtis M. Schube (admitted *pro hac vice*)

10                                      DHILLON LAW GROUP INC.

                                       2121 Eisenhower Avenue, Suite 402

11                                      Alexandria, VA 22314

12                                      (571) 400-2121

13                                         *Admission *pro hac vice* pending

14                                         Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Plaintiffs' Notice of Motion and Motion for                              Case No.22-cv-00501-BLF
Preliminary Injunction

## TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................................1

RELEVANT FACTUAL BACKGROUND ............................................................................2

   The Ordinance ........................................................................................................... 4

   The Purpose and Justifications of the Ordinance ..................................................... 4

ARGUMENT ........................................................................................................................9

  I. PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF. ..............9

    A. There Is a Strong Likelihood Plaintiffs' Will Succeed in Proving Their Claims on Multiple Grounds. ........................................................................................9

      1. The Ordinance violates the Second Amendment of the United States Constitution. ..................................................................................................9

          *a. The Ordinance Burdens The Right to Keep Arms* ...................................... 11

          *b.The Court Should Apply Strict Scrutiny* ...................................................... 11

          *c.The Ordinance Even Fails Intermediate Scrutiny* ........................................ 13

          *d. Alternatively, the Ordinance is Unconstitutional Because It Burdens the Second Amendment Right to Keep and Bear Arms* ...............................13

      2. The Ordinance Violates Plaintiffs' Free Speech and Association Rights........15

      3. The Ordinance Violates article XI, § 7 of the California Constitution. ............18

      4. The Orders Violate Article XIII C, Section 1 of the California Constitution..19

      5. The Ordinance Violates the San Jose's City Charter's Reservation of Budget and Appropriation Powers to the City Council and Administrative Powers to the City Manager.....................................................................................20

      6. The Ordinance Violates the San Jose City Charter's Requirement that City Receipts Be Deposited into City Accounts ....................................................21

    B. Plaintiffs Face Imminent Irreparable Harm Absent Immediate Injunctive Relief.21

    C. The Balance of Hardships Tips Decidedly in Plaintiffs' Favor. ...........................22

    D. Injunctive Relief Is In The Public Interest ..........................................................22

  II. THE COURT SHOULD DISPENSE WITH ANY BOND REQUIREMENT ...............23



1

CONCLUSION...........................................................................................................23

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 233

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*All for Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011). .......................................................... 8

*Americans for Prosperity Foundation v. Harris*,
 182 F. Supp. 3d 1049 (C.D. Cal. 2016). .......................................... 21

*Bauer v. Becerra*,
 858 F.3d 1216 (9th Cir. 2017) .......................................................... 14

*Bible Club v. Placentia-Yorba Linda School Dist.*,
 573 F. Supp. 2d 1291 (C.D. Cal. 2008). .......................................... 22

*College Republicans at San Francisco State University v. Reed*,
 523 F. Supp. 2d 1005 (N.D. Cal. 2007) ............................................ 20

*Community House, Inc. v. City of Boise*,
 490 F.3d 1041 (9th Cir. 2007) .......................................................... 21

*Cox v. New Hampshire*,
 312 U.S. 569 (1941) ................................................................... 13, 14

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) .............................................................. passim

*Doctor John's, Inc. v. Sioux City*,
 305 F. Supp. 2d 1022 (N.D. Iowa 2004) .......................................... 22

*Doe v. Harris*,
 772 F.3d 563  (9th Cir.2014) ..................................................... 21, 22

*Duncan v. Becerra*,
 265 F.Supp.3d 1106 (S.D. Cal. 2017) ......................................... 21, 22

*Elrod v. Burns*,
 427 U.S. 347 (1976) .......................................................................... 20

*Ezell v. City of Chicago*,
 651 F.3d 684 (7th Cir. 2011) .......................................... 10, 11, 20

iii



*Fiscal v. City and County of San Francisco,*

   158 Cal.App.4th 895 (Cal. Ct. App. 2008) ................................................................... 17

*Janus v. AFSCME, Council 31,*

   138 S.Ct. 2448 (2018) .............................................................................................. 15, 16

*Jorgensen v. Cassiday,*

   320 F.3d 906 (9th Cir. 2003). ......................................................................................... 22

*Keller v. State Bar of California,*

   496 U.S. 1 (1990) ............................................................................................................ 15

*Knox v. SEIU,*

   567 U.S. 298 (2012) ........................................................................................................ 15

*Kwong v. Bloomberg,*

   723 F.3d 160 (2nd Cir. 2013) ......................................................................................... 14

*McDonald v. City of Chicago, Ill.,*

   561 U.S. 742 (2010) .......................................................................................................... 9

*Minneapolis Star and Tribune Co. v. Minnesota Comm'r. of Rev.,*

   460 U.S. 575 (1983) ........................................................................................................ 10

*Murdock v. Com. of Pennsylvania,*

   319 U.S. 105, 112 (1943) ................................................................................. 1, 9, 13, 14

*Nordyke v. King,*

   681 F.3d 1041 (9th Cir. 2012) .......................................................................................... 9

*Pimentel v. Dreyfus,*

   670 F.3d 1096 (9th Cir. 2012) .......................................................................................... 8

*Regan v. Taxation with Representation of Wash.,*

   461 U.S. 540 (1983) ........................................................................................................ 16

*S.O.C., Inc. v. Cnty. of Clark,*

   152 F.3d 1136 (9th Cir. 1998). ....................................................................................... 20

*Sammartano v. First Jud. Dist. Ct.,*

   303 F.3d 959 (9th Cir. 2002). .............................................................................. 20, 21, 22

iv



Excerpts 235

*Stormans, Inc. v. Selecky*,

   586 F.3d 1109 (9th Cir. 2009). ................................................................. 21

*United States v. Chester*,

   628 F.3d 673 (4th Cir. 2010) ..................................................................... 11

*United States v. Chovan*,

   735 F.3d 1127 (9th Cir. 2013) ...................................................... 9, 10, 11, 12

*United States v. Masciandaro*,

   638 F.3d 458 (4th Cir. 2011) ....................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.*,

   555 U.S. 7 (2008)........................................................................................ 8

*Wooley v. Maynard*,

   430 U.S. 705 (1977)................................................................................... 16

**STATUTES**

42 U.S.C. § 1983 ............................................................................................ 8

Cal. Penal Code § 12026 ............................................................................... 17

Cal. Penal Code § 23500 ............................................................................... 17

Cal. Penal Code § 23520 ............................................................................... 17

Cal. Penal Code § 25225 ............................................................................... 17

Cal. Penal Code § 25850 ................................................................................. 4

Cal. Penal Code § 26150 ................................................................................. 4

Cal. Penal Code § 26155 ................................................................................. 4

Cal. Penal Code § 26350 ................................................................................. 4

Cal. Penal Code § 26400 ................................................................................. 4

Cal. Penal Code § 28070 ............................................................................... 17

Cal. Penal Code § 29010 ............................................................................... 17

Cal. Penal Code § 29184 ............................................................................... 17

Cal. Penal Code § 29610 ............................................................................... 17



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 236

Cal. Penal Code § 30165 ........................................................................................... 17

Cal. Penal Code § 30900 ........................................................................................... 17

Cal. Penal Code § 34370 ........................................................................................... 17


Title 10 of the San José Municipal Code:

§ 10.32.200 ......................................................................................................... 12

§ 10.32.200.A ........................................................................................................ 4

§ 10.32.200.B.2 ..................................................................................................... 4

§ 10.32.200.B.4 ..................................................................................................... 4

§ 10.32.200.B.7 ..................................................................................................... 4

§ 10.32.200.B.8 ................................................................................................. 5, 13

§ 10.32.200.B.9 ................................................................................................. 5, 13

§ 10.32.200.B.12 .................................................................................................... 5

§ 10.32.205 ............................................................................................................ 7

§ 10.32.210 ............................................................................................................ 4

§ 10.32.210.A ........................................................................................................ 6

§ 10.32.215 .................................................................................................... passim

§ 10.32.220 ...................................................................................................... 7, 14

§ 10.32.220.A ........................................................................................................ 7

§ 10.32.220.C .................................................................................................... 7, 19

§10.32.225 ...................................................................................................... 4, 10

§ 10.32.230.A ........................................................................................................ 6

§ 10.32.240 ..................................................................................................... 4, 6, 8

§10.32.245 ...................................................................................................... 4, 6, 8

§10.32.250 ..................................................................................................... 4, 8, 14

San Jose City Charter:

§ 400 ................................................................................................................. 19

§ 1204 ............................................................................................................... 19



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 237

§ 1206 .......................................................................................................................... 19

§ 1211 .......................................................................................................................... 20

**RULES**

Fed. R. Civ. P. 65(c) .................................................................................................... 22

**CONSTITUTIONAL AUTHORITIES:**

California Consitution:

    Article XI, section 7 ........................................................................................ 17, 18

    Article XIII C, §2(b) ............................................................................................. 18

    Article XIII C, §1 .................................................................................................. 18

    Article XIII C, §1(e) ............................................................................................. 18

    Article XIII C, §2(d) ............................................................................................. 18

United States Consititution:

    amend. I ..................................................................................................... passim

    amend. II ..................................................................................................... passim

    amend. XIV ……………………………………………………………………..1

**OTHER AUTHORITIES**

A Bill for Establishing Religious Freedom, in 2 papers of Thomas Jefferson 545 (J. Boyd ed. 1950)

.................................................................................................................................. 15l

Lauren Hernández, *Gun Owners In San Jose Must Buy Liability Insurance Under Newly Passed First-In-The-Nation Law,* SAN FRANCISCO CHRONICLE, Jan. 25, 2022 (updated Jan. 26, 2022) …… 3

Liccardo Press Release, Jan. 19, 2022 ............................................................ 4, 5, 6, 13

Liccardo Press Release, Jan. 25, 2022 ...................................................................... 2, 3

Olga R. Rodriguez and Juliet Williams, *San Jose Approves First Law In U.S. Requiring Gun Owners To Have Insurance*, LOS ANGELES TIMES, Jan. 25, 2022 .................................................. 3



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 238

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

"The power to tax the exercise of a privilege is the power to control or suppress its enjoyment."

*Murdock v. Pennsylvania*, 319 U.S. 105, 112, 63 S. Ct. 870, 874, 87 L. Ed. 1292 (1943).

The Supreme Court has made it clear that laws designed to burden the exercise of the fundamental right to own a gun and keep it in one's own home is unconstitutional. Just as taxing the press for the right to circulate its content is unconstitutional, so too is an annual tax on the right to own a gun. Yet, the City of San Jose ("City") has taken the unprecedented step of requiring virtually all gun owners who reside in the City to pay annual fees just for their right to own a gun and to pay for special insurance, or risk forfeiture of their guns.

The amount of the fees and the cost of the insurance are not defined by this new law and are subject to the whims of the San Jose City Council and private insurance companies—who may not even offer the policy that the City demands to avoid nullification of a person's Second Amendment rights. To make matters worse, one of the fees comprises a compulsory donation to a government-chosen nonprofit, forcing gun owners to associate with a group against their will and to fund educational programs targeting themselves that they didn't ask for and may not want, need, or agree with.

This new law does not just violate the United States Constitution. It also violates the California Constitution and the City's own Charter. The California Constitution prevents local governments from enacting laws when state law already occupies the field and California already has extensive gun regulations thoroughly occupying this field. Additionally, the insurance requirement and the Gun Harm Reduction Fee are taxes within the meaning of the law and the City failed, as required by the California Constitution, to submit them to the electorate for approval. Finally, by forcing gun owners to pay the City's Gun Harm Reduction Fee directly to a third party nonprofit to spend as it chooses outside of the control of the City Council, the City's new gun ordinance violates provisions of its own Charter by unlawfully delegating the City Council's budgetary and appropriation powers and by not depositing all of the Ordinance's

Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 239

proceeds into the City's general fund.

Accordingly, this Court should immediately issue a preliminary injunction to prevent the City from enforcing the unconstitutional and unlawful Ordinance.

## RELEVANT FACTUAL BACKGROUND

On June 29, 2021, the City Council directed San Jose City Attorney Nora Frimann "to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage." Frimann Mem. re Gun Harm Reduction Ord., Jan. 14, 2022, ("City Attorney Mem.") (attached hereto as Exhibit A). Plaintiff National Association for Gun Rights immediately sent the City a cease and desist letter warning that the proposed ordinance was unconstitutional. *See* Ltr. From D. Warrington and H. Dhillon to San Jose City Council, July 14, 2021 (attached hereto as Exhibit B).

On January 14, 2022, in advance of the City Council's January 25 meeting, the San Jose City Attorney issued a memorandum in compliance with the City Council's directions that recommended the Council "[c]onsider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs." City Attorney Mem. at 1(Ex. A). Under a section addressing penalties for noncompliance, the City Attorney stated that "[f]ailure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine." *Id.* at 2.

In an op-ed published on January 19, 2021, in the Los Angeles Times, San Jose Mayor Sam Liccardo wrote "[l]ast June our City Council unanimously approved my proposals that will mitigate gun harm in our community — and a final vote on Jan. 25 should turn them into law." Mayor Sam Liccardo, *Op-Ed: My City's New Gun Control Laws Will Help More Than Waiting On Congress To Do Something*, Los Angeles Times, Jan. 19, 2022), https://www.latimes.com/opinion/story/2022-01-19/op-ed-new-gun-control-laws-help-congress (attached as Exhibit C).

//

Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 240

On January 21, 2022, Mayor Liccardo, Vice Mayor Jones, Councilmember Cohen, and Councilmember Carrasco issued "Directions" to the City Council, including to "[a]pprove the proposed ordinance," with certain modifications. Mayor's Mem. to City Council, Jan. 21, 2022, 2 (attached as Exhibit D). The Mayor's Memorandum also noted that "Members of the California legislature are exploring bills to have law enforcement agencies *seize guns as a sanction for violations of local gun regulations*, with subsequent restoration of ownership as required by constitutional due process." *Id.* at 4 (emphasis added).

Following the City Council's January 25, 2022, meeting, the Mayor immediately issued a press release the night of the vote, in which he boasted that "Tonight San José became the first city in the United States to *enact* an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm." Liccardo Press Release, Jan. 25, 2022 (emphasis added) (attached as Exhibit E).

Within 24 hours, articles were published about San Jose enacting an unprecedented regulation of gun ownership, including the San Francisco Chronicle and the Los Angeles Times. *See* Lauren Hernández, *Gun Owners In San Jose Must Buy Liability Insurance Under Newly Passed First-In-The-Nation Law,* SAN FRANCISCO CHRONICLE, Jan. 25, 2022 (updated Jan. 26, 2022), https://www.sfchronicle.com/bayarea/article/Gun-owners-in-San-Jose-must-buy-liability-16804951.php ("The San Jose City Council adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability insurance for their firearms, city officials said.")(attached as Exhibit F); Olga R. Rodriguez and Juliet Williams, *San Jose Approves First Law In U.S. Requiring Gun Owners To Have Insurance*, LOS ANGELES TIMES, Jan. 25, 2022, https://www.latimes.com/california/story/2022-01-25/san-jose-gun-liability-insurance (attached as Exhibit G)("The city of San Jose voted Tuesday night to require gun owners to carry liability insurance in what's believed to be the first measure of its kind in the United States. The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights.").

The Ordinance was placed on the consent calendar for the City Council's February 8, 2022,

meeting, during which a majority of the City Council voted again to approve the Ordinance. Def.'s Mem. Supp. Mot. Dismiss 3.

### The Ordinance

The Ordinance will take effect on August 8, 2022, one hundred eighty days from the date of its adoption on February 8, 2022, Ord., Sec. 2, and will be codified as Chapter 10.32 of Title 10 of the San Jose Municipal Code, Ordinance section 1-2. Ordinance (attached as Exhibit H). It will require 50,000-55,000 San Jose residents, minus a few exceptions, to keep proof with their guns that they have an insurance policy for gun accident liability and have paid an annual Gun Harm Reduction Fee to a nonprofit chosen by the City Manager. *Id.*, §§ 10.32.210, 10.32.215, 10.32.250; Liccardo Mem. Re Gun Harm Reduction Ord., Jan. 19, 2022 (attached as Exhibit I). The penalties for noncompliance include "impoundment" (seizure) of a person's guns and the payment of fines. Ordinance §§ 10.32.240, 10.32.245.

This Ordinance targets gun ownership in the home because it does not apply to those who have a license to carry a concealed weapon. Ordinance §10.32.225. (Without a concealed carry permit, there is virtually no other way San Jose residents can exercise their Second Amendment rights outside of the home. *See* CAL. PENAL CODE §§ 25850, 26150, 26155, 26350, 26400.)

### The Purpose and Justifications of the Ordinance

The City's vague purpose for the Ordinance is "to reduce gun harm." Ordinance § 10.32.200.A. The Ordinance cites overall state and national injury data for homicide, suicide, and accidents, and statistics on the total number of youth injured in California in certain years. Ordinance § 10.32.200.B.2. As to "gun harm" in San Jose, specifically, the Ordinance notes that in *Santa Clara County*, in which San Jose is located, "sixteen (16%) of hospitalizations from firearms injuries were due to unintentional shootings." Ordinance § 10.32.200.B.4. The nonprofit organization helping the City enact and justify the Ordinance, Pacific Institute for Research and Evaluation (PIRE), concluded in its own analysis that an average of "206 people suffer death or serious bodily injury from gunshots each year" in San Jose, though the Ordinance does not specify how many were typically due to accidents or suicide, or intentional violence. *See* Ordinance § 10.32.200.B.7.

The Ordinance contains an estimation that "San Jose taxpayers annually spend approximately

$39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term care, and perpetrator adjudication and judicial sanctioning." Ordinance § 10.32.200.B.8. This estimation also does not differentiate between the costs arising due to intentional violence, suicide, and accidents.

The Ordinance boldly claims that "including private costs to individuals and families…San Jose residents incur an annual financial burden of $442 million per year." *Id*., § 10.32.200.B.9. However, more than $328,355,500 or 74% of these alleged costs are for the impact of guns on "quality of life," which includes the "value of pain, suffering, and lost quality of life." Liccardo Jan. 19, 2022, Memo., 4 (Ex. I). The next highest figure within the asserted $442 million calculation is "lost work," accounting for $78,272,000 or nearly 18% of the total. *Id*. In other words, 92% of the $442 million in "costs" claimed in the Ordinance comprises artificially calculated "quality of life" and "lost work" due to all causes of firearm deaths and injuries.

Accordingly, the costs used to calculate the total financial burden on San Jose, which the Ordinance aims to fully or partially recoup from all gun owners, does not correct for the overwhelming costs imposed by the perpetrators of violent criminal conduct that the Ordinance does not target, and 92% of the highest dollar figure the Ordinance cites for support does not comprise actual expenses incurred by the City. And yet, the Ordinance uses these sham figures to justify:

(A) imposing a collective financial burden on all gun owners (except those with a permit to carry their guns) through the Gun Harm Reduction Fee;

(B) compelling gun owners to pay the Gun Harm Reduction Fee directly to a City-chosen nonprofit, a forced donation, allegedly for programs to re-educate gun owners about the dangers of guns *and other purposes*; and

(C) requiring all gun owners to buy insurance to cover the costs to victims of the accidental use of guns (but not all crime victims).

As to compelling purchase of insurance, the Ordinance provides no studies or statistics establishing that gun liability insurance will reduce gun violence. Instead, the Ordinance includes only the conclusory statement that "Liability insurance can reduce the number of gun incidents by



encouraging safer behavior….” Ordinance § 10.32.200.B.12.

Thus, every citizen of San Jose will be forced to pay a fee and buy insurance to exercise their fundamental Constitutional right to home and self-defense by owning a gun based on the direct and societal costs primarily caused by criminals using guns illegally. Liccardo Jan. 19, 2022, Memo. 1 (Ex. I) (noting that “Assaults and homicides are most common” and “Unintentional gunshot wounds tend to be less serious.”). Specifically, according to PIRE, the alleged costs to the City of homicide and assault are $7,067,303 out of $7,940,358 (or 89%) of the total costs, *id.* at 2, and PIRE also attributed the majority of its artificially calculated societal costs of guns to “Homicide/Assault/Legal Intervention.” *Id.* at 5 ($253,828,000 out of $441,699,000).

### a. The Insurance Mandate

The insurance mandate requires that “A person who resides in the City of San Jose and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner’s, renter’s or gun liability insurance policy…specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to, death, injury, or property damage.” Ordinance § 10.32.210.A. The Ordinance does not include any information about minimum insurance coverage thresholds or premiums. *See generally* Ordinance. Thus, the insurance requirement lacks certainty as to the cost of insurance, what has to be covered, and minimum coverage thresholds. This guesswork will allow private for-profit corporations to dictate the government mandated cost of owning a gun. Additionally, based on the insurance companies’ economic interests, they may choose not to insure a person who nonetheless has a Constitutional right to keep and bear arms.

To comply with the Ordinance, gun owners must present a “City-designated attestation form” signed under penalty of perjury identifying their insurance policy to any police officer who “knows or *has reason to believe*” they possess a firearm. Ordinance § 10.32.230.A (emphasis added). Failure to comply with the Ordinance authorizes seizure (“impoundment”) of the person’s gun and fines. Ordinance §§ 10.32.240; 10.32.245.

### b. Gun Harm Reduction Fee

The first of two fees the Ordinance imposes requires that “A person who resides in the City



1  and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the

2  Designated Nonprofit Organization each year." Ordinance § 10.32.215. The fee amount is not

3  specified in the Ordinance, which neither contains any criteria to determine what the fee will be nor

4  any limits on how high it can be set. *See id*. Rather, the City Council reserved the right for itself to

5  determine this amount at an unspecified later date. *Id*.

6      The Ordinance requires gun owners to pay this fee directly to a nonprofit chosen by the City

7  Manager, Defendant Jennifer Maguire ("Maguire"). *Id*., §§ 10.32.205; 10.32.220. No part of the

8  City's fee actually goes to the City. Further, "all monies…shall be expended by the Designated

9  Nonprofit Organization." *Id*., § 10.32.220.A. Additionally, once the money is in the nonprofit's

10  coffers, "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are

11  expended." *Id*., §10.32.220.C. Accordingly, without City oversight or even knowledge of the fees

12  being paid to the nonprofit, and with the City prohibiting itself from controlling how the funds are

13  being spent, the potential for waste, fraud, and abuse is staggering.  As discussed below, it is also

14  illegal.

15      The Ordinance provides scant information about the Designated Nonprofit Organization,

16  other than the fact that it will have a contract with the City. In recent public comments, Mayor

17  Liccardo has claimed that, in addition to funding this nonprofit, the City will also be creating it and

18  choosing its members—but this is not stated anywhere in the Ordinance. Mary Harris, *San Jose's*

19  *New Gun Law Is the First of Its Kind*, Slate.com (Feb. 3, 2022), https://slate.com/news-and-

20  politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html (attached as Exhibit

21  J)("We're forming a 501(c)(3) foundation, which is going to receive the dollars, and the board,

22  which will be comprised of a host of folks, . . .").

23      The only criteria for the City's contract with the nonprofit as to how the funds are ultimately

24  spent is that the nonprofit's services are to "include, but are not necessarily limited to" suicide

25  prevention services or programs, violence reduction or domestic violence services or programs,

26  addiction intervention and substance abuse treatment, mental health services related to gun violence,

27  and firearms safety education or training. *Id*., § 10.32.220.A. "All monies from the Gun Harm

28  Reduction Fee shall be expended by the Designated Nonprofit Organization" to provide the services

7

Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

and programs listed above exclusively to "residents of the city that own or possess a Firearm in the City, to members of their household, or to those with whom they have a close familial or intimate relationship." *Id.*

The fee thus functions as a way to compel gun owners to give their money to a government approved nonprofit, that will inevitably hold the City's anti-gun biases, to spend on unspecified programs targeting gun owners at the nonprofit's sole discretion with little to no City oversight. The program forces gun owners to subsidize an organization that is hostile to gun ownership, to be used for their own re-education. But although the Gun Harm Reduction Fee must be exclusively spent on programs to re-educate gun owners, members of their household, or to those with whom they have a close familial or intimate relationship, *id.*, the Ordinance in fact does not include *any* requirement for gun owners or anyone else to attend the nonprofit's programs.

Despite justifying the Ordinance on the grounds that gun injuries are allegedly costing the City hundreds of millions of dollars, the Gun Harm Reduction Fee does not compensate the city for any of those alleged losses. The Ordinance authorizes the City Manager to collect *another* undetermined fee to administer the Ordinance, that is, to "charge and collect any and all cost recovery fees associated with fulfilling the policies of this Part relating to the reduction of gun harm, including any associated third-party costs." Ordinance § 10.32.250.

Any gun owner who does not pay the Gun Harm Reduction Fee could be issued an as yet undetermined fine, Ordinance § 10.32.240 (it "shall be set forth in the schedule of fines established by resolution of the City Council") and may have their gun "impounded." *Id.* at §10.32.245. In a recent interview, the Mayor disclosed how the Ordinance could allow the police new opportunities to confiscate guns.

> Encountering people with guns, out on the street, in bars and nightclubs—you can imagine a host of different venues where a police officer would really like to have the ability to remove a gun from a potentially combustible situation. For example, there's a bar brawl and they're patting down everybody and someone's got a gun. "Have you paid your fee? You have insurance?" "No." OK, well, there's an opportunity for us to remove the gun.

*San Jose's New Gun Law Is the First of Its Kind*, *Supra*. (Ex. J).



Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

Case No.22-cv-00501-BLF

\*     \*     \*     \*

The insurance requirement and both of the fees in the Ordinance are unknown costs imposed on gun owners that are designed to deter gun ownership. These unknown costs are subject to the whims of the City Council and insurance companies and bear a significant risk of making gun ownership cost prohibitive. The unknown extent of the costs further, whatever they may be now or in the future, chills the exercise of Second Amendment rights.

Plaintiffs therefore seek a preliminary injunction to prevent the City from enforcing the Ordinance, which it will do should this Court not take action prior to August 8, 2022.

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008); *see Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (applying *Winter* to claim under 42 U.S.C. § 1983); *All for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

**I.     PLAINTIFFS ARE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.**

**A.  There Is a Strong Likelihood Plaintiffs' Will Succeed in Proving Their Claims on Multiple Grounds.**

**1.  The Ordinance violates the Second Amendment of the United States Constitution.**

Defendants' Ordinance violates the Second Amendment to the U.S. Constitution, which prohibits the government from infringing "the right of the people to keep and bear Arms." U.S. Const., amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Even in the face of "the problem of handgun violence in this country…the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* at 636. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*,



561 U.S. 742, 778 (2010). "The upshot of [*Heller* and *McDonald*] is that there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home." *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011). Local governments, including the City of San Jose, are bound by the Second Amendment. *McDonald*, 561 U.S. at 790; *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

In Second Amendment challenges, the Ninth Circuit, along with other circuits have "looked to the First Amendment as a guide." *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). In *Murdock v. Pennsylvania*, the Supreme Court considered a payment for a license to solicit or deliver orders for goods, as applied to the evangelizing activity of Jehovah's Witnesses. 319 U.S. 105, 106 (1943). The court thus examined the constitutionality of a requirement to, as it called it, "pay a license *tax* as a condition to the pursuit of their activities" that were protected by the First Amendment. *Murdock*, 319 U.S. at 110 (emphasis added).

Similarly, the Ordinance's requirement that gun owners pay a Gun Harm Reduction Fee and purchase insurance comprise taxes as a condition for the ownership of a gun, a constitutional right. "This tax is not a charge for the enjoyment of a privilege or benefit *bestowed by the state*," but rather "[t]he privilege in question *exists apart from state authority*" because "[i]t is guaranteed [to] the people by the federal constitution." *Murdock*, 319 U.S. *at* 115 (emphasis added).

Under the California Constitution, too, the Gun Harm Reduction Fee and the Insurance Mandate are deemed taxes. A "'tax' means any levy, charge, or exaction of any kind imposed by a local government," with the exception of seven kinds of charges not relevant here. Cal. Const. Art. X III C §1 (e).

Courts have historically rejected taxing First Amendment rights and therefore Second Amendment rights cannot be taxed. "A tax that burdens rights protected by the [Constitution] cannot stand unless the burden is necessary to achieve an overriding government interest." *Minneapolis Star and Tribune Co. v. Minnesota Comm'r. of Rev.*, 460 U.S. 575, 582 (1983). Taxing the press's circulation of content "suggests that the goal of the regulation is not unrelated to the suppression of expression." *Id.* at 585. The same is true for the taxation of guns. It is a thinly veiled attempt at suppressing the exercise of the right to keep and bear arms by making it more costly and

burdensome to own a gun—in addition to compelling the subsidization of anti-gun education programs.

Courts evaluate Second Amendment challenges by using a two-step inquiry. First, a court asks "whether the challenged law burdens conduct protected by the Second Amendment." *Chovan*, 735 F.3d at 1136. This step evaluates "a textual and historical inquiry into original meaning." *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) (citing *Heller*, 554 U.S. at 634-35; *see also Chovan*, 735 F.3d at 1137). This first step has a low bar. Even a prohibition on "domestic violence misdemeanants" from possessing firearms satisfied the first step of the test. *Chovan*, 735 F.3d at 1137.

### a. The Ordinance Burdens the Right to Keep and Bear Arms

Regulations on guns in the home fall squarely into the Second Amendment's protections. Indeed, it is at home "where the need for defense of self, family, and property is most acute." *Heller,* 554 U.S. at 628. The Ordinance's primary, if not sole, aim is at guns possessed within the home, as evidenced by it only applying to citizens who cannot carry a weapon outside the home. Ordinance §10.32.225.

Further, Mayor Liccardo's January 21, 2022, Memo states that the insurance mandate will encourage "use of gun safes [and] install child-safe trigger locks," which address storage in the home, and noted that "4.6 million children live in a *household* where a gun is kept and unlocked and loaded, and 72% of gun injuries occur *at home*." Pg. 3 (Ex. D) (emphasis added). Additionally, in justifying the fee, the Memo states that "a properly stored firearm *in the home* doubles occupants' risk of becoming a victim…[and] prioritizing those investments for residents living with guns *in the home* will provide the most direct path for reducing gun harm." *Id*. at 4. (emphasis added).

The Ordinance thus directly regulates firearms *in the home*, where the need is "most acute." Consequently, the Ordinance burdens protected Second Amendment rights.

### b. If Applying a Level of Scrutiny, the Court Should Apply Strict Scrutiny

The second step of the traditional test is for the court to "apply an appropriate level of scrutiny." *Id*. "Given *Heller*'s focus on 'core' Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First



1  Amendment as a guide in developing a standard of review for the Second Amendment." *United*
2  *States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010). Thus, like the First Amendment, some burdens
3  receive strict scrutiny, such as content based speech restrictions, while others receive intermediate
4  scrutiny, such as time, place and manner restrictions. *Id*. The level of scrutiny "should depend on (1)
5  'how close the law comes to the core of the Second Amendment right, and (2) 'the severity of the
6  law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell*, 651 F.3d 703).

7  Strict scrutiny should apply because this law strikes at the very core of the Second
8  Amendment. It specifically targets guns in the home, "where the need for defense of self, family, and
9  property is most acute," *Heller*, 554 U.S. at 628, and threatens the impoundment of guns—the
10 complete denial of Second Amendment rights—for noncompliance with its arbitrary insurance and
11 annual fee requirements.

12 The Ordinance will severely burden a gun owner's ability to exercise his right to own a gun
13 for home or self-defense by imposing uncertain costs just to exercise a constitutional right. Even if
14 the fees are initially a low sum, the Ordinance does not cap or otherwise provide a limiting principle
15 for the total amount the Council may impose as a cost for owning a gun, and the cost of insurance
16 will be at the mercy of private insurers. This unbridled discretion that the City Council has given
17 itself, along with the discretion left to a private, for-profit, industry, can, and likely will, severely
18 burden or chill the residents of San Jose's Second Amendment rights. It also gives the City the
19 ability to strategically play possum in this litigation, proffering the Ordinance imposes a lower
20 financial burden and citing economic hardship exceptions, despite the Ordinance not limiting the
21 costs they can impose tomorrow.

22 For example, if the essential purpose and mechanism of the Ordinance are ratified by the
23 Court, regardless of the amount of the City's fees and the cost of the mandatory insurance and the
24 actual direct costs to the city, there would be nothing to prevent the City from attempting to shift the
25 full brunt of its bogus claim of $442 million in societal costs in San Jose onto the estimated 55,000
26 gun owners, for a per-owner charge of $8,036.36 per person—in addition to whatever insurance
27 companies may charge, if they cover the liabilities the City mandates they cover.

28 //

1    Accordingly, strict scrutiny is the appropriate level of scrutiny if the Court applies any level

2  of scrutiny.

3              *c.  The Ordinance Even Fails Intermediate Scrutiny*

4    This Ordinance does not satisfy the lower standard of an intermediate scrutiny analysis, let

5  alone the strict scrutiny standard. Intermediate scrutiny requires "1) the government's stated

6  objective to be significant, substantial, or important; and 2) a reasonable fit between the challenged

7  regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

8    While neither the Supreme Court nor the Ninth Circuit have found reducing gun violence to

9  be a compelling government interest, the Ninth Circuit has stated that it is important. *Chovan*, 735

10  F.3d at 1139. Nevertheless, the Ordinance's provisions are not a reasonable fit, much less narrowly

11  tailored, to its claimed purposes. The City makes no findings, other than conclusory self-serving

12  statements, that special gun accident insurance or compulsory donations to anti-gun nonprofits will

13  reduce gun violence or other injuries, particularly gun violence by those who lawfully possess

14  firearms to be kept in the home, much less the root cause of most costs cited in the Ordinance:

15  criminals who use guns to commit intentional acts of violence. *See generally* Ordinance § 10.32.200.

16    That the Ordinance does not in fact limit how the chosen nonprofit would spend the City's

17  Gun Harm Reduction Fee, and specifically forbids the City from directing the spending of its own

18  fee, renders speculative any argument that payment of the fee furthers the Ordinance's aims. And, so

19  far, there is no requirement that any particular gun owner (or their household members and close

20  personal associates) subject to the Ordinance must actually receive the services for which the City's

21  fee is paying the nonprofit to provide.

22    Additionally, the Ordinance embodies a second government purpose of shifting the claimed

23  collective costs of gun injuries caused by some onto nearly all gun owners. *See* Ordinance

24  § 10.32.200.B.8, 9. The extrajudicial exaction of payments from a whole class of persons (those

25  exercising their Second Amendment rights) to pay City or societal costs arising from the actions of a

26  few individuals (violent criminals, including perpetrators of domestic gun violence, and careless gun

27  owners) smacks of collective punishment. It is neither a reasonable fit with a significant, substantial,

28



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

1   or important government interest, nor narrowly tailored to a compelling interest—indeed it is an

2   illegitimate government practice.

3          Further, the city's costs related to police, fire, judicial expenses form a substantial part of the

4   City's costs—but none of the Ordinance's measures will compensate the city for these claimed

5   municipal losses. They are also *normal* government costs, shared by all, that have historically been

6   financed through general tax revenue, not taxes imposed selectively on particular citizens or

7   communities.

8          The other private costs related to loss of work and quality of life are purely manufactured and

9   arbitrary abstract concepts that will only be impacted by the Ordinance in equally arbitrary, abstract,

10  speculative, and attenuated ways. The City's own hired research firm concluded that $253,828,000

11  of the $411,699,000 in total costs it calculated came from "Homicide/Assault/Legal Intervention"

12  alone. Liccardo Jan. 19 Memo 5 (Ex. I). Thus, roughly 57% of the costs incurred by the City, by its

13  own calculation, comes from crime alone, which neither insurance nor the fee will ever reimburse.

14  Indeed, the City's research states that its "primary costs" are for "fire department and police

15  response." The Gun Harm Reduction Fee going to the nonprofit is supposed to be for educational

16  programs, not to compensate San Jose for its losses and there is no indication in the Ordinance that

17  the City expects to claim any funds from the gun owners' insurance policies.

18

19         Finally, the government cannot impose fees on guns for purposes other than administrative

20  costs. The government "may not impose a charge for the enjoyment of a right granted by the federal

21  constitution." *Murdock*, 319 U.S. at 113. It may collect a fee to "meet the expense incident to the

22  administration of the act and to the maintenance of public order in the matter licensed." *Cox v. New*

23  *Hampshire*, 312 U.S. 569 (1941). "[I]mposing fees on the exercise of constitutional rights is

24  permissible when the fees are designed to defray (and do not exceed) the administrative costs of

25  regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2nd Cir. 2013). The

26  Ninth Circuit has adopted this *Murdock/Cox* fee-jurisprudence for the Second Amendment. *Bauer v.*

27  *Becerra*, 858 F.3d 1216 (9th Cir. 2017). Here, the Gun Harm Reduction Fee goes directly to a

28  nonprofit for the purposes of reeducating gun owners. Ordinance §§ 10.32.215, 10.32.220. The



Plaintiffs' Notice of Motion and Motion for          Case No.22-cv-00501-BLF
Preliminary Injunction

administrative costs of the Ordinance, if any, are actually covered by an entirely separate fee authorized by the Ordinance. *Id*. at § 10.32.250.

### d. Alternatively, the Ordinance is Unconstitutional Because It Burdens the Second Amendment Right to Keep and Bear Arms

The majority opinion in *Heller* noted that "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." 554 U.S. at 634. This was in response to Justice Breyer's dissent, which claimed that a law restricting guns was constitutional after weighing its burden on Second Amendment rights against handgun violence, urban geography, and history. *Id*. But the majority stated that "The very enumeration of the right takes out of the hands of government —even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. Indeed, as Justice Kavanagh noted, while on the D.C. Circuit, "The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered." *Heller v. District of Columbia*, 670 F.3d 1244, 1273 (D.C. Cir. 2011)(Kavanagh, B., dissenting) (quoting Tr. Of Oral Arg. at 44, *Heller*, 554 U.S. 570 (No. 07-290)) ("[T]hese various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored,' none of them appear in the Constitution…these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up."). Thus, a balancing tests that weighs a government interest against a constitutional right under a strict scrutiny or intermediate scrutiny analysis is inappropriate under *Heller*.

The Ordinance is therefore unconstitutional based on the mere fact that its insurance requirement and fees burden Plaintiffs' ability to exercise their Second Amendment rights.

### 2. The Ordinance Violates Plaintiffs' Free Speech and Association Rights.

To continue to exercise their Second Amendment rights, the Ordinance unconstitutionally forces gun owners to associate with and subsidize the speech of others with whom they may disagree.

"[M]andatory associations are permissible only when they serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Knox*

Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

1  *v. SEIU*, 567 U.S. 298, 310 (2012). "Compelling a person to subsidize the speech of other private

2  speakers raises similar First Amendment concerns." *Janus v. AFSCME, Council 31*, 138 S.Ct. 2448,

3  2464 (2018)(citing *Knox*, 567 U.S. at 309). "As Jefferson famously put it, 'to compel a man to

4  furnish contributions of money for the propagation of opinions which he disbelieves and abor[s] is

5  sinful and tyrannical." *Id*. (quoting A Bill for Establishing Religious Freedom, in 2 papers of

6  Thomas Jefferson 545 (J. Boyd ed. 1950)). "Because the compelled subsidization of private speech

7  seriously impinges on First Amendment rights, it cannot be casually allowed." *Id*. Thus, in *Janus*,

8  the Supreme Court concluded that a law that requires government agencies to extract "agency fees"

9  from "nonconsenting employees," violates the First Amendment. *Id*. at 2486.

10      The operation of the Ordinance is strikingly similar to the imposition of mandatory union

11  "agency fees" on public sector employees, addressed by the Supreme Court in *Janus*. In *Janus*, an

12  employee, whether or not he/she wanted to associate with the union, was required to pay an "agency

13  fee" to the union. *Janus*, 138 S.Ct. at 2460. Here, whether a gun owner wants to associate with or

14  donate to the nonprofit or not, he/she must pay the Gun Harm Reduction Fee directly to the City's

15  chosen nonprofit. Ordinance § 10.32.215. In *Janus*, no form of employee consent was required by

16  the state's statute. *Janus*, 138 S.Ct. at 2486. Likewise, the Ordinance does not have any consent

17  provision. *See generally* Ordinance. Such a procedure "violates the First Amendment." *Janus*, 138

18  S.Ct. at 2486.

19      In another illustrative case, the Supreme Court held that the California Bar could use

20  members' dues to "fund activities germane" to the "State's interest in regulating the legal

21  profession" but it could not use members' dues to "fund activities of an ideological nature which

22  falls outside of those areas of activity." *Keller v. State Bar of California*, 496 U.S. 1, 13 (1990). So

23  likewise, the City of San Jose cannot force gun owners to pay fees to a nonprofit for whatever

24  purposes they desire, particularly to discourage exercising the right to keep and bear arms.

25  It is a well-established principle that:

26      [T]he right of freedom of thought protected by the First Amendment against state
27      action includes both the right to speak freely and the right to refrain from speaking at
        all. A system which secures the right to proselytize religious, political, and
28      ideological causes must also guarantee the concomitant right to decline to foster such

concepts. The right to speak and the right to refrain from speaking are complementary
components of the broader concept of individual freedom of mind.

*Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citations and internal quotations

omitted).

In recent comments, Mayor Liccardo has likened the compulsory payment of the Gun Harm

Reduction Fee to forced membership in a club. After describing the nonprofit's activities the gun

owner's payment of the annual fee to the nonprofit would fund, a reporter asked the mayor if "it's

almost like joining a club," to which the Mayor responded:

> Yeah, and look, I don't pretend to believe these are overwhelmingly folks who are
> willing to want to do this. I recognize that this is by government fiat, and many would
> prefer not to pay the fee.

Mary Harris, *San Jose's New Gun Law Is the First of Its Kind*, Slate.com, https://slate.com/news-

and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html.

Here, the forced association and subsidization of speech is more severe even than in *Janus*.

In *Janus*, the employees' union fees were a condition of employment. While conditioning

employment on forgoing constitutional rights is significant, here, the Ordinance conditions a

constitutional right on forgoing other constitutional rights.

Indeed, "government may not deny a benefit to a person because he exercises a constitutional

right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983). Here, the

Ordinance denies citizens a benefit (freedom of speech and association) by forcing them to associate

with and subsidize a nonprofit that will communicate messages which gun owners will not agree

with solely because the citizens exercise their constitutional right to own a gun. The Gun Harm

Reduction Fee therefore violates the First Amendment.

As stated above, in *Heller*, Justice Roberts noted that interest-balancing tests for the First

Amendment are "baggage." Tr. of Oral Arg. At 44, *Heller*, 554 U.S. 570 (No. 07-290). Currently,

the Supreme Court has not assigned a test for compelled subsidization of speech. *See Janus*, 138

S.Ct. at 2465 ("[W]e again find it unnecessary to decide the issue of strict scrutiny because the

Illinois scheme cannot survive under even the more permissive standard…."). The Court did say,

however, that "minimal scrutiny is foreign to our free-speech jurisprudence." *Id*. As Justices Scalia and Roberts have noted in *Heller*, the Constitution does not prescribe a balancing test, so there should not be one. However, if such a test is administered, for the reasons stated above, this Ordinance cannot pass even intermediate scrutiny; therefore, the Ordinance should be enjoined for violating the First Amendment.

### 3. The Ordinance Violates article XI, § 7 of the California Constitution.

Article XI, section 7 of the California Constitution states that "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." This provision prohibits a local law that "duplicates, contradicts, or *enters an area fully occupied by general law*, either expressly or by legislative implication." *Fiscal v. City and County of San Francisco* 158 Cal.App.4th 895, 903 (Cal. Ct. App. 2008)(quotation omitted)(emphasis added).

The State of California has voluminous statutes comprehensively regulating firearm ownership in California. *See generally* Cal. Penal Code §§ 23500-34370. This includes firearm safety, CAL. PENAL CODE §§ 23500-23520, the appearance of firearms, *id*., §§ 23800-24790, storage of firearms, *id*., §§ 25000-25225, how to handle lost or stolen firearms, *id*., §§ 25250-25225, carrying firearms, *id*., §§ 25300-26406, the sale, lease, or transfer of firearms, *id*., §§ 26500-28490, the registration and assignment of firearms, *id*., §§ 28010-28024, how to transfer firearms between private persons, *id*., §§ 28050-28070, recordkeeping, background checks, and fees related to transfer, *id*., §§ 28100-28490, the manufacture of firearms, *id*., §§ 29010-29184, who may not possess a firearm, *id*., §§ 29610-30165, rules pertaining to "firearm equipment," *id*., §§ 30150-30165, and, in some cases, firearm registration, *id*., §§ 30900-30965. This is but a sample of all of the separate statutes regulating firearms in California.

California courts have already determined that "the Legislature intended to occupy the field of residential handgun possession to the exclusion of local government entities." *Fiscal*, 158 Cal.App.4th at 909 (citing Cal. Penal Code § 12026).[1] Thus, the Ordinance, insofar as it intends to

---

[1] The specific mandates in the state laws cited in *Fiscal* have since been transferred into other statutes with no substantive change.



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Excerpts 256

1  impose gun storage and safety requirements, plainly encroaches upon a field already occupied by

2  state law, and thus violates Article XI, section 7.

3  **4. The Ordinance Violates Article XIII C, Section 1 of the California Constitution.**

4  The California Constitution requires that "No local government may impose, extend, or

5  increase any *general tax* unless and until that tax is submitted to the electorate and approved by a

6  majority vote." Article XIII C, §2(b) (emphasis added). It also requires that "No local government

7  may impose, extend, or increase any *special tax* unless and until that tax is submitted to the

8  electorate and approved by a two-thirds vote." Article XIII C, §2(d) (emphasis added). A "tax" is

9  "any levy, charge, or exaction of any kind imposed by a local government," with exceptions that do

10  not apply here. Article XIII C, §1(e). The Gun Harm Reduction Fee and the insurance requirement

11  (backed by the threat of a fine payable to the City) are levies, charges or exactions imposed by the

12  City of San Jose and thus each constitutes a "tax" within the meaning of the California Constitution.

13  *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-566 (2012) (a law describing a payment

14  as a "penalty" for not complying with an insurance requirement does not determine whether the

15  payment is a tax for constitutional purposes).

16  If the City disputes that the Gun Harm Reduction Fee or insurance requirement is a tax, "the

17  [City] bears the burden of proving by a preponderance of the evidence that a levy, charge, or other

18  exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the

19  governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or

20  reasonable relationship to the payor's burdens on, or benefits received from, the governmental

21  activity." Article XIII C, §1.

22  The City cannot meet this burden. The amount of the Gun Harm Reduction Fee and the

23  required insurance payments (including penalties for noncompliance) are "more than necessary to

24  cover the reasonable costs of the governmental activity" because neither is for government activity.

25  Additionally, as to both the Gun Harm Reduction Fee and the mandatory insurance, "the manner in

26  which those costs are allocated to" gun owners do not "bear a fair or reasonable relationship to the

27  payor's burdens on, or benefits received from" the City's "governmental activity." Article XIII C,

28  §1. Every gun owner would be compelled by the Ordinance to pay an arbitrary amount for the Gun

19



Plaintiffs' Notice of Motion and Motion for
Preliminary Injunction

Case No.22-cv-00501-BLF

Harm Reduction Fee and pay the city a fine if they do not have an insurance policy specifically covering them for owning a gun. The Ordinance does not establish, or claim, that each gun owner will receive a benefit in return for the fee paid having a value commensurate with the amount they paid. For the same reasons stated in the Second Amendment analysis regarding reasonable fit, neither the insurance requirement nor the Gun Harm Reduction Fee bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, a governmental activity.

The Ordinance's required payments, whether general or special taxes, were never voted upon by the citizens of San Jose. Compl. First Am. Compl. ¶ 72. Accordingly, they violate the California Constitution.

> **5. The Ordinance Violates the San Jose's City Charter's Reservation of Budget and Appropriation Powers to the City Council and Administrative Powers to the City Manager.**

The Ordinance violates the San Jose City Charter by commanding gun owners to directly pay the City's Gun Harm Reduction Fee to one nonprofit to be used for program activity that was not directed by the City Council or managed by the City Manager.

The San Jose City Charter vests in the City Council "[a]ll powers of the City and the determination of all matters of policy." San Jose City Charter § 400. With regard to the expenditure of City funds, only the City Council has the power to establish a budget. *Id.* §§ 1204, 1206. The Council also has the sole power to appropriate the expenditure of City funds. *Id.*, § 1207. The City Manager, by contrast, is the "Chief Administrative Officer and head of the administrative branch of the City government." *Id.,* § 502; *see also id.,* § 701.

The Ordinance, by prohibiting the City Council from using its budgeting and appropriating powers to direct how the receipts from the City's Gun Harm Reduction fee are expended by the chosen nonprofit, Ordinance § 10.32.220.C, violates the San Jose City Charter's reservation of budgeting and appropriation power to the City Council. The Ordinance also violates the City Charter's delegation of executive functions to the "administrative" branch of the City Government under the leadership and control of the City Manager because the Ordinance says "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended" other than a

vague direction to "reduce the risk" of harm from using firearms and "mitigate the risk" of harm or liability from possessing firearms. *Id.*

### 6. The Ordinance Violates the San Jose City Charter's Requirement that City Receipts Be Deposited into City Accounts.

The San Jose City Charter states that "[a]ll revenues and receipts which are not required by [the] Charter, State law or ordinances to be placed in special funds shall be credited to the [City's] General Fund." *Id.*, § 1211.  The General Fund is "a medium of control and accounting for all City activities excepting activities for which special funds are established and maintained." *Id.*

The Ordinance requires gun owners to pay the City-required, City-determined fee directly to a nonprofit organization, *id.*, § 10.32.215, thereby diverting a City fee to a nonprofit rather than the City's General Fund or a special fund.  This violates the City Charter's requirement that all City revenues and receipts be deposited into City accounts.  The loss of this essential means of City "control and accounting," in combination with the Ordinance's prohibition against City control of the nonprofit's use of the funds and the vague statements about what the nonprofits should use the funds for, is an open invitation to corruption, waste, fraud, and abuse.

### B. Plaintiffs Face Imminent Irreparable Harm Absent Immediate Injunctive Relief.

For a statute that violates the Second Amendment, the "remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory." *Ezell*, 651 F.3d at 698. (emphasis in original). A city ordinance that violates the Second Amendment "stands as a fixed harm to every [citizen's] Second Amendment right." *Id.* "Irreparable harm is presumed" and cannot be remedied by damages. *Id.* at 699.

Additionally, "where the First Amendment is implicated, the Supreme Court has made clear that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *College Republicans at San Francisco State University v. Reed*, 523 F. Supp. 2d 1005, 1011 (N.D. Cal. 2007) (*citing Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973-74 (9th Cir. 2002), *in turn citing Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998) (holding that a civil liberties organization that had demonstrated probable success on

1   the merits of its First Amendment overbreadth claim had thereby also demonstrated irreparable

2   harm). "In other words, the requirement that a party who is seeking a preliminary injunction show

3   'irreparable injury' is deemed fully satisfied if the party shows that, without the injunction, First

4   Amendment freedoms would be lost, even for a short period." *Reed*, 523 F. Supp. 2d at 1011.

5   "Unlike a monetary injury, violations of the First Amendment 'cannot be adequately remedied

6   through damages.'" *Americans for Prosperity Foundation v. Harris*, 182 F. Supp. 3d 1049, 1058

7   (C.D. Cal. 2016) (*citing Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)).

8           Without an injunction preventing Defendants from enforcing the Ordinance, Plaintiffs will

9   suffer irreparable harm in the form of deprivation of fundamental freedoms secured by the First,

10  Second and Fourteenth Amendment to the U.S. Constitution and the California Constitution.

11  Plaintiffs' irreparable injuries cannot adequately be compensated by damages or any other remedy

12  available at law. Thus, irreparable injury is clearly shown, necessitating the relief Plaintiffs seek in

13  this Motion.

14          **C.      The Balance of Hardships Tips Decidedly in Plaintiffs' Favor.**

15          "[S]erious First Amendment questions compel[] a finding that there exists the potential for

16  irreparable injury, or that a the very least the balance of hardships tips sharply in [the plaintiffs']

17  favor." *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quoting

18  *Sammartano*, 303 F.3d at 973). Similarly, when there is a threat of sanctions for failure to act on a

19  law that restricts Second Amendment rights, even if the government endures hardship, the balance

20  favors the plaintiffs. *See Duncan v. Becerra*, 265 F.Supp.3d 1106, 1136 (S.D. Cal. 2017).

21          Here, if the Ordinance goes into effect and is enforced, tens of thousands of San Jose citizens

22  will risk seizure of their guns and the payment of fines if they do not forgo their fundamental rights

23  to keep arms and to free speech and association, as well as rights under the California constitution to

24  vote on tax increases, and rights under the City Charter to have City fees deposited into City

25  accounts. The balance of hardships sharply tips in favor of Plaintiffs.

26          **D.      Injunctive Relief Is in The Public Interest**

27          "As the Ninth Circuit has consistently recognized, there is a significant public interest in

28  upholding First Amendment principles." *Americans for Prosperity Foundation*, 182 F. Supp. 3d at



Plaintiffs' Notice of Motion and Motion for                                      Case No.22-cv-00501-BLF
Preliminary Injunction

Excerpts 260

1059 (internal citations omitted); *see also Doe v. Harris*, 772 F.3d 563, 683 (9th Cir.2014);

*Sammartano*, 303 F.3d at 974. Similarly, "the public interest favors the exercise of Second

Amendment rights by law-abiding responsible citizens." *Duncan*, 265 F.Supp.3d 1106.

As discussed above, Plaintiffs' core constitutional rights to own guns to defend one's home and self will remain in jeopardy so long as Defendants remain free to enforce their Ordinance. Likewise, Plaintiffs' right to free speech and association will be jeopardized by forcing them to subsidize and associate with a nonprofit. Holding the City Council to account for the constraints on its power in the California constitution and the City Charter are also in the public interest. Accordingly, issuance of injunctive relief is proper, and the Court should grant this Motion.

## II.  THE COURT SHOULD DISPENSE WITH ANY BOND REQUIREMENT

Rule 65(c) of the Federal Rules of Civil Procedure provides that a preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, the Court has discretion as to whether any security is required and, if so, the amount thereof. *See, e.g., Jorgensen v. Cassidy*, 320 F.3d 906, 919 (9th Cir. 2003).

Plaintiffs request that the Court waive any bond requirement, because enjoining Defendants from unconstitutionally enforcing the Ordinance will not financially affect Defendants, who do not have a financial stake in enforcing the Ordinance. A bond would, however, be burdensome on already burdened Plaintiffs under these circumstances. *See, e.g., Bible Club v. Placentia-Yorba Linda School Dist.*, 573 F. Supp. 2d 1291, fn. 6 (C.D. Cal. 2008) (waiving requirement of student group to post a bond where case involved "the probable violation of [the club's] First Amendment rights" and minimal damages to the District of issuing injunction)(citing *Doctor John's, Inc. v. Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004) ("requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay.")).

//

//

23



# CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction to restrain and enjoin Defendants, as well as their agents, employees, and successors in office, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any provision of the Ordinance.


Respectfully submitted,

Date: March 8, 2022                    DHILLON LAW GROUP INC.

By:    /s/ Harmeet K. Dhillon
       Harmeet K. Dhillon
       Michael A. Columbo
       Mark P. Meuser
       DHILLON LAW GROUP INC.
       177 Post Street, Suite 700
       San Francisco, California 94108
       (415) 433-1700

       David A. Warrington*
       Curtis M. Schube (admitted *pro hac vice)*
       DHILLON LAW GROUP INC.
       2121 Eisenhower Avenue, Suite 402
       Alexandria, VA 22314
       (571) 400-2121

       *Admission *pro hac vice* pending

       Attorneys for Plaintiffs

24



**CERTIFICATE OF SERVICE**

I, Harmeet K. Dhillon, hereby certify that on March 8, 2022, I electronically filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

Dated: March 8, 2022

By: /s/Harmeet K. Dhillon
Harmeet K. Dhillon



Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

Case No.22-cv-00501-BLF

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE (admitted *pro hac vice*)
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314

*Admission *pro hac vice* pending

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a non-profit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE,** in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case Number: 5:22-cv-00501-BLF<br><br>**DECLARATION OF DAVID WARRINGTON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: July 21, 2022<br>Hearing Time: 9:00 a.m.<br>Location: Courtroom 3, 5th Floor<br>Robert F. Peckham Federal Building<br>280 South First Street, San Jose, CA<br><br>Judge: Honorable Beth Labson Freeman |



Declaration of Warrington In Support Of Plaintiffs' Motion for
Preliminary Injunction                    Case No.: 5:22-cv-00501-BLF

I, David A. Warrington, declare and state as follows:

1. I am over the age of 18, and an attorney at law, admitted to practice in the District of Columbia and state of Virginia and in good standing.

2. I am counsel to the National Foundation for Gun Rights and Mark Sikes, Plaintiffs in the instant action.

3. On July 14, 2021, I signed and submitted the attached cease-and-desist letter to the City of San Jose after it voted to direct City staff to draft an ordinance to impose fees on gun owners and compel them to donate to a nonprofit organization selected by the City.

4. A true and accurate copy of the July 14, 2021, letter is marked as Exhibit "B" to Plaintiffs' Motion for Preliminary Injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Alexandria, Virginia, on this 8th day of March, 2022.

By: _/s/ David A. Warrington_____
David A. Warrington

---

1

Declaration of Warrington In Support Of Plaintiffs' Motion for
Preliminary Injunction     Case No.: 5:22-cv-00501-BLF

1  Joseph W. Cotchett (SBN 36324)
   jcotchett@cpmlegal.com
2  Tamarah P. Prevost (SBN 313422)
   tprevost@cpmlegal.com
3  Andrew F. Kirtley (SBN 328023)
   akirtley@cpmlegal.com
4  Melissa Montenegro (SBN 329099)
   mmontenegro@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
6  San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
7  Burlingame, CA 94010
   Telephone: (650) 697-6000
8  Facsimile: (650) 697-0577
9

10 *Attorneys for Defendant City of San Jose*

11                    **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

13                          **SAN JOSE DIVISION**

14

15 **Howard Jarvis Taxpayers Association**;    Case No. 5:22-cv-02365-BLF
   Silicon Valley Taxpayers Association; Silicon
16 Valley Public Accountability Foundation; James   **DEFENDANT CITY OF SAN JOSE'S**
   Barry; and George Arrington,                     **NOTICE OF MOTION AND MOTION TO**
17                                                  **DISMISS PLAINTIFFS' COMPLAINT**
                      Plaintiffs,                   **UNDER RULES 12(b)(1) AND 12(b)(6);**
18                                                  **MEMORANDUM OF POINTS AND**
             v.                                     **AUTHORITIES**
19
20 **City of San Jose**, and all persons interested in the
   matter of San Jose Ordinance No. 30716,         Date:        TBD
21 establishing an Annual Gun Harm Reduction Fee,   Time:        9:00 a.m.
                                                    Courtroom:   Via Zoom
22                    Defendants.                   Judge:       Hon. Beth Labson Freeman
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on August 4, 2022, or on a date and time to be set by the Court[1], in the courtroom of the Honorable Beth Labson Freeman, United States District Judge of the Northern District of California, located at 280 South 1st Street, San Jose, California 95113, Defendant City of San Jose ("City") will and hereby does move this Court to dismiss the Complaint in this matter in its entirety under Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). Plaintiffs Howard Jarvis Tax Association, Silicon Valley Taxpayers Association, Silicon Valley Public Accountability Foundation, James Barry, and George Arrington (collectively, "Plaintiffs") filed the Complaint in Santa Clara County Superior Court on March 7, 2022, and the City timely removed the case to the Northern District of California on April 15, 2022 (*see* ECF 1).

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declarations of Tamarah P. Prevost and Sarah Zarate and the exhibits thereto; the Proposed Order; the anticipated reply brief; the files and records in this action; and all other papers, pleadings, documents, arguments of counsel, and other materials provided to the Court at the hearing or before the motion is submitted for decision; and any other evidence and argument the Court may consider.

/ / /

---

[1] Pursuant to the Court's protocols, counsel for Defendant contacted the Clerk for this Court to reserve a hearing date for this Motion, but as of the time of this filing had not yet received one. Decl. of Tamarah P. Prevost ¶ 15. As such, in filing this Motion, Defendant selected August 4, 2022 in the ECF System, believing this may be convenient for the Court because it is the hearing date for Defendants' motion to dismiss plaintiffs' complaint in the recently related case captioned *National Association for Gun Rights, Inc., et al. v. City of San Jose, et al.,* Case No. 5:22-cv-00501-BLF, also pending before this Court. *Id.* Defendant awaits further notice from the Court if this date or time is not convenient or preferable and appreciates in advance the Court's time and assistance with this matter.

1

2     Dated: April 22, 2022

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**COTCHETT, PITRE & McCARTHY, LLP**

By:    _/s/ Tamarah P. Prevost_____
          Joseph W. Cotchett
          Tamarah P. Prevost
          Andrew F. Kirtley
          Melissa Montenegro

*Attorneys for Defendant City of San Jose*

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES TO BE DECIDED ..................................................... 1

II.    INTRODUCTION ............................................................................................... 2

III.   FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

     A.    History of Ordinance and Procedural Posture ........................................ 3

     B.    Summary of the Ordinance .................................................................... 4

         1.    Annual Gun Harm Reduction Fee (§ 10.32.215) ...................... 5

         2.    Proof of Payment of the Fee (§ 10.32.230(B)) ......................... 5

IV.   LEGAL STANDARDS ....................................................................................... 6

     A.    Rule 12(b)(1) ....................................................................................... 6

     B.    Rule 12(b)(6) ....................................................................................... 7

     C.    Facial Constitutional Challenges .......................................................... 7

V.    ARGUMENT ..................................................................................................... 8

     A.    The Complaint Should Be Dismissed Under Rule 12(b)(1). ................. 8

         1.    None of Plaintiffs' Claims are Ripe for Review ........................ 8

         2.    Plaintiffs Also Lack Article III Standing. ............................... 10

         3.    Plaintiffs Do Not State a Proper Facial Constitutional Challenge. ...................... 11

     B.    The Court Should Dismiss the Complaint under Rule 12(b)(6) Because Each of Plaintiffs' Claims Fails .................................................................... 11

         1.    Plaintiffs Fail to State First Amendment or California Constitutional Claims Based on Compelled Speech or Association ...................... 11

         2.    Plaintiffs Fail to State Second Amendment and Related California Constitutional Claims .................................................................... 13

             a.    Under the Second Amendment, the Appropriate Level of Scrutiny Is Intermediate Scrutiny. ........................................... 13

             b.    The Ordinance Easily Survives Intermediate Scrutiny. ........... 15

             c.    Plaintiffs' Related State Law Claim Fails Because There Is No "Inalienable" Right to Bear Arms under the California Constitution. ...... 17

     C.    Plaintiffs Fail to State a Claim that the Ordinance Is an Unconstitutional Delegation of the Power the Tax. ........................................................................... 19

D.     The Complaint Should Be Dismissed Without Leave to Amend. ....................................20

VI.    CONCLUSION ..........................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)...........................................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................7

*Bauer v. Becerra*,
  858 F.3d 1216 (9th Cir. 2017).............................................................14, 15, 17

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*,
  529 U.S. 217 (2000).........................................................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................7, 10, 11

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000) (Stevens, J., dissenting) ...............................................13

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010).............................................................................9

*City of Renton v. Playtime Theaters, Inc.*,
  475 U.S. 41 (1986)...........................................................................................16

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...........................................................................................10

*County of Riverside v. Superior Court*,
  30 Cal.4th 278 (2003) .....................................................................................20

*Cramer v. Brown*,
  2012 WL 13059699 (C.D. Cal. Sept. 12, 2012).................................................8

*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015).............................................................................15

*Gilbert v. Chase Home Fin., LLC*,
  2013 WL 2318890 (E.D. Cal. May 28, 2013)...................................................10

*Gonzales v. Carhart*,
  550 U.S. 124 (2007).....................................................................................7, 11

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011).................................................................13, 14

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) ...................................................................14

*Jackson v. City and County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014)..............................................7, 13, 14, 16

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) .......................................................................16

*Kasler v. Lockyer,*
    23 Cal.4th 472 (2000) ...............................................................................17

*Keller v. State Bar of California,*
    496 U.S. 1 (1990) ......................................................................................12

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ....................................................................................6

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013)................................................................14, 15

*Leadsinger, Inc. v. BMG Music Pub.,*
    512 F.3d 522 (9th Cir. 2008).....................................................................20

*Lopez v. Turnage,*
    2021 WL 5142070 (N.D. Cal. Oct. 15, 2021)..........................................20

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization,*
    858 F.2d 1376 (9th Cir. 1988)...................................................................20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ....................................................................................9

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) (en banc)..................................................11

*O'Connell v. Gross,*
    No. CV 19-11654-FDS, 2020 WL 1821832 (D. Mass. Apr. 10, 2020)...........15

*Parks Sch. of Bus. v. Symington,*
    51 F.3d 1480 (9th Cir. 1995).......................................................................7

*People v. Camperlingo,*
    69 Cal.App. 466 (1924) .............................................................................17

*People v. Evans,*
    40 Cal.App.3d 582 (1974)..........................................................................17

*People v. King,*
    22 Cal.3d 12 (1978) ...................................................................................17

*Portland Police Ass'n v. City of Portland*,
    658 F.2d 1272 (9th Cir. 1981) ................................................21

*R.J. Reynolds Tobacco Co. v. Shewry*,
    423 F.3d 906 (9th Cir. 2005) .................................................12

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ................................................................7

*Rizzo v. Goode*,
    423 U.S. 362 (1976) .............................................................20

*Russell City Energy Co., LLC v. City of Hayward*,
    14 Cal.App.5th 54 (2017) ....................................................19

*S. Cal. Edison Co. v. Pub. Util. Comm'n*,
    227 Cal.App.4th 172 (2014) ................................................19

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ...............................................7

*Schmeer v. County of Los Angeles*,
    213 Cal.App.4th 1310 (2013) ..............................................18

*Scholl v. Mnuchin*,
    489 F. Supp. 3d 1008 (N.D. Cal. 2020) .................................8

*Scott v. Pasadena Unified Sch. Dist.*,
    306 F.3d 646 (9th Cir. 2002) .................................................9

*Sierra Club v. United States Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.C. Cir. 2013) .......................................9

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) .................................................7

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ...............................................15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .............................................................10

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) ...............................6

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158 (1967) ..............................................................8

*Torcivia v. Suffolk Cty., New York*,
    17 F.4th 342 (2d Cir. 2021) .................................................15

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997) ..................................................................................................15, 16

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013) ....................................................................................13, 15

*United States v. Gila Valley Irr. Dist.,*
31 F.3d 1428 (9th Cir. 1994) ............................................................................................10

*United States v. Power Co., Inc.,*
2008 WL 2626989 (D. Nev. June 26, 2008) ....................................................................10

*Vieux v. Easy Bay Reg'l Park Dist.,*
906 F.3d 1330 (9th Cir. 1990) ............................................................................................9

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ..........................................................................................................14

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ......................................................................................................8, 13

*Westlands Water Distrib. Dist. v. Nat. Res. Defense Council,*
276 F. Supp. 2d 1046 (E.D. Cal. 2003) ............................................................................21

*Young v. Hawai'i,*
992 F.3d 765 (9th Cir. 2021) (en banc) ............................................................................14

**Constitutions**

United States Constitution ................................................................................ *passim*

California Constitution
Art. I, § 2(a) ................................................................................................................11, 12
Art. XI, § 11(a) ..................................................................................................................20
Art. XIII C ..........................................................................................................................18
Art. XIII C, § 1(e) ..............................................................................................................18
Art. XIII C, § 1(e)(1) ....................................................................................................18, 19
Art. XIII, § 31 ....................................................................................................................19

**Rules**

Federal Rules of Civil Procedure
Rule 12(b)(1) ......................................................................................................6, 7, 8, 21
Rule 12(b)(6) ........................................................................................................3, 7, 11, 21
Rule 15(a) ..........................................................................................................................20

Excerpts 274

**Ordinances**

San Jose Municipal Code Title 10

§ 10.32.200(A) ........................................................................................4
§ 10.32.200(B) ....................................................................................5, 15
§ 10.32.200(B)(4) ...................................................................................4
§ 10.32.200(B)(6) .................................................................................16
§ 10.32.200(B)(10) .................................................................................4
§ 10.32.200(B)(11) .................................................................................4
§ 10.32.200(B)(13) .................................................................................5
§ 10.32.205 ..............................................................................................5
§ 10.32.210 ..............................................................................................4
§ 10.32.215 .....................................................................................*passim*
§ 10.32.220 ......................................................................................14, 20
§ 10.32.220(A) ..................................................................................5, 19
§ 10.32.220(B) ..................................................................................9, 11
§ 10.32.225(C) .......................................................................................17
§ 10.32.230(A) ....................................................................................4, 6
§ 10.32.230(B) ................................................................................4, 5, 6
§ 10.32.235(A) ....................................................................................3, 8
§ 10.32.235(A)(2) ..................................................................................5
§ 10.32.235(A)(4) .....................................................................4. 10, 17
§ 10.32.240(A) ........................................................................................6
§ 10.32.240(B) ................................................................................3, 6, 8
§ 10.32.245 ..............................................................................................6
§ 10.32.255 ..............................................................................................4

**Other Authorities**

6 Wright & Miller, FED. PRAC. & PROC. § 1473 (3d ed. 2021) ..........................20

U.S. Centers for Disease Control and Prevention, *Firearm Violence Prevention*,
     *available at* https://www.cdc.gov/violenceprevention/firearms/fastfact.html
     (accessed Apr. 22, 2022) ......................................................................15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF ISSUES TO BE DECIDED

Under Civ. L. R. 7-4(a)(3), the City sets forth the following statement of issues to be decided:

1.    Whether Plaintiffs' claims, all of which challenge the lawfulness of a 2022 San Jose ordinance provision requiring non-exempt San Jose gunowners to pay an annual Gun Harm Reduction Fee in an unspecified amount that still needs to be determined through future action by the San Jose City Council, should be dismissed under Rule 12(b)(1) because they are not ripe for review?

2.    Whether Plaintiffs' Complaint should be dismissed under Rule 12(b)(6) as to all four causes of action for failure to state a claim on which relief may be granted?

## II.     INTRODUCTION

The San Jose Ordinance ("Ordinance") at issue in this action springs from the legitimate authority of Defendant City of San Jose ("City" or "San Jose") to enact legislation aimed at reducing gun deaths and injuries and compensating victims of accidental shootings. The City believes that smart, innovative policies informed by public health experts and gunowners alike can reduce firearm-related deaths and injuries, while fully respecting lawful gunowners' Second Amendment rights to keep and bear arms for self-defense. State and local governments must be afforded discretion to address the complex challenge of reducing the ever-increasing numbers of gun-related deaths and injuries.

The Ordinance requires non-exempted San Jose gunowners to obtain liability insurance for gun accidents and to pay a reasonable annual Gun Harm Reduction Fee ("Fee"), which a nonprofit organization will use to provide gunowners and their families with voluntary programming and services related to gun safety, mental health, and domestic violence. Notwithstanding the Ordinance's modest scope, Plaintiffs Howard Jarvis Tax Association, Silicon Valley Taxpayers Association, Silicon Valley Public Accountability Foundation, James Barry, and George Arrington (collectively, "Plaintiffs") seek to strike it down under various federal and state constitutional provisions, all of which are based on the same handful of flawed legal theories. The Complaint is legally defective and should be dismissed without leave to amend on two grounds.

First, Plaintiffs' claims fail under Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of standing and ripeness, because key components of the Ordinance, which bear directly on the validity of Plaintiffs' claims, have not yet been decided by the City. For example, Plaintiffs' Complaint is premised on the speculation about the nature of the nonprofit organization referenced in the Ordinance, which the City Manager has not yet designated. Similarly, the Complaint rests on the theory that the annual Fee infringes on the right to keep and bear arms—even though the amount of the Fee has not yet been set, and even though the criteria for the Ordinance's "financial hardship" exemption have not yet been established. Plaintiffs' abstract objections to these and other aspects of the law rest on speculation, contingent future events, and hypotheticals that would require this Court to issue an advisory opinion about an ordinance that is still incomplete and unfinished.

Second, under Rule 12(b)(6), all four of Plaintiffs' claims under the First and Second Amendment to the U.S. Constitution and the California Constitution are legally defective under binding precedent or otherwise collapse under scrutiny. Because there are no facts Plaintiffs could allege to cure those defects, all four claims should be dismissed without leave to amend.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    History of Ordinance and Procedural Posture

In June 2021, the City's Mayor and City Council directed the City Attorney to draft a gun safety ordinance designed to mitigate gun harms for the Council's consideration. *See* Decl. of Tamarah Prevost ("Prevost Decl.") ¶ 2, Ex. 1. Six months and seven detailed memoranda later, the Council, at its January 25, 2022 meeting, heard a first reading of the draft ordinance, directed that certain amendments be drafted, that it be published, and voted to re-consider the Ordinance at a later date. *Id.* ¶¶ 3-9, Exs. 2-8. On February 8, 2022, the City enacted the Ordinance. *Id.* ¶ 16, Ex. 15 (copy of the Ordinance). The Ordinance expressly leaves key aspects of the law unspecified and dependent on future action by the City Council and City Manager (§§ 10.32.215, 10.32.235(A), 10.32.240(B)) and the City Council and City Manager 180 days to take those actions before the Ordinance becomes effective on August 7, 2022. § 2.[1]

On March 7, 2022, Plaintiffs commenced this action in Santa Clara County Superior Court (Case No. 22CV395596) by filing their "Complaint to Invalidate §§ 10.32.215 and 10.32.230(B) of Chapter 10.32 of the Title 10 of the San Jose Municipal Code" ("Complaint") against the City and "all persons interested in the" Ordinance. *See* Compl., ECF 1, Ex. A. On March 24, the Superior Court issued an order approving publication of the summons. On April 15, the City timely removed the action to this Court. *See* ECF 1. Shortly thereafter, the Court entered an order relating this action to the earlier-filed action *National Association for Gun Rights, Inc., et al. v. City of San Jose, et al.*, Case No. 5:22-cv-00501-BLF ("*NAGR*" Action), as well as an Order to Show Cause why the two actions should not be consolidated. ECF 5-6. Both actions are pre-enforcement to the validity of the Ordinance under the First, Second, and Fourteenth Amendments to the U.S. Constitution, and various provisions of the California Constitution.

---

[1] "§_" on its own refers to a section of the Ordinance. *See* Prevost Decl., Ex. 13 (copy of the Ordinance).

### B.    Summary of the Ordinance

The Ordinance's basic purpose is to "reduce gun harm" "for the protection of the welfare, peace, and comfort of the residents of the City of San Jose." § 10.32.200(A). To "reduce the number of gun incidents," the Ordinance seeks to provide voluntary gun safety and other "[p]rograms and services to gun owners and their households" and to require gunowners to obtain liability insurance to compensate victims of accidental shootings, which is partly informed by an analogue to the success of car insurance mandates in helping reduce vehicle collision fatalities and injuries. § 10.32.200(B)(10)-(13); *see also* § 10.32.200(B)(11) (finding risk-based automobile liability insurance mandates were part of "a comprehensive public health approach to car safety" that helped reduce U.S. motor vehicle collision fatalities by 80%). The Ordinance is informed by public health research and data, such as findings that more than a third of all gun injuries are from unintentional shootings, that gunowners and those who live with them are at significantly higher risk of gun suicide and homicide than the rest of the population, and that gun-related deaths or serious bodily injuries cost San Jose residents $442 million per year. § 10.32.200(B)(4)-(10).

The Ordinance applies to all City residents who own a gun, with three exceptions: (1) peace officers, (2) those with a state concealed weapon license, and (3) those for whom compliance with the Ordinance would create a "financial hardship." § 10.32.255(A)-(C). With respect to the latter, the Ordinance authorizes the City Manager to "promulgate [] regulations" on "[t]he criteria by which a person can claim a financial hardship exemption" (§ 10.32.235(A)(4)), but the City Manager has not yet done so. *See* Decl. of Sarah Zarate, City Manager's Office ("CMO Decl.") ¶¶ 4-8.

For all non-exempt City resident gunowners, the Ordinance imposes three main requirements: (1) to obtain liability insurance "specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury or property damage" (§ 10.32.210), (2) to pay an annual Fee (§ 10.32.215), and (3) to self-certify compliance with the insurance requirement and to have proof that they have paid the Fee (e.g., a receipt) (§ 10.32.230(A)-(B)). Whereas the plaintiffs in the related *NAGR* Action challenge the legality of all three requirements, Plaintiffs here expressly do *not*

1    challenge the liability insurance requirement. ¶ 10.[2] Instead, they challenge only the legality of the annual

2    Fee requirement under § 10.32.215 and the related obligation to keep a receipt or other proof they have

3    paid the Fee under § 10.32.230(B). *See* ¶ 11; *see also id.*, Prayer for Relief (seeking "an Order

4    invalidating sections 10.32.215 and 10.32.230(B)" of the Ordinance). Those two provisions are

5    summarized below.

6            **1.     Annual Gun Harm Reduction Fee (§ 10.32.215)**

7        The Ordinance requires San Jose gunowners to pay an annual Fee to make available voluntary

8    programming and services to gunowner residents, "to members of their household, or to those with whom

9    they have a close familiar or intimate relationship" (§§10.32.215, 10.32.220(A)) with the goal of

10   "encourag[ing] safer behavior" related to gun ownership and use (§ 10.32.200(B)(13)). The programs

11   and services will focus on suicide prevention, violence reduction and gender-based violence, addiction

12   intervention and substance abuse treatment, mental health services related to gun violence, and firearms

13   safety education or training. § 10.32.220(A)(1)-(5). These programs and services will be provided to

14   qualifying City residents by a nonprofit organization that will be, but has not yet been, designated by the

15   City Manager. § 10.32.205(B); CMO Decl. ¶ 6. While the City may not "specifically direct" how the

16   nonprofit spends monies from the Fee, the Ordinance is clear that "[n]o portion of the monies … shall be

17   used for litigation, political advocacy, or lobbying activities." § 10.32.200(B)-(C).

18        The Ordinance does not set the amount of the Fee but leaves that to be "established by [separate]

19   resolution of the City Council." § 10.32.215. To date, no such resolution has been passed. CMO Decl.

20   ¶¶ 7-8. The Ordinance also authorizes the City Manager to "promulgate [] regulations" concerning the

21   "[d]esignation of the nonprofit organization that will receive the [Fee], any processes and procedures

22   related to the payment of the fee, and any additional guidelines or auditing of the use of the monies from

23   the fee" (§ 10.32.235(A)(2)), as well as the annual due date for payment of the Fee (§ 10.32.215). The

24   City Manager has not yet promulgated these regulations. CMO Decl. ¶¶ 7-8.

25            **2.     Proof of Payment of the Fee (§ 10.32.230(B))**

26        Similar to the way car owners must have documentation in their car showing they have obtained

27

---

28   [2] "¶" on its own refers to paragraphs in Plaintiffs' Complaint, a copy of which is at ECF 1, Ex. A.

required auto liability insurance and paid annual DMV fees, the Ordinance requires gunowners to complete a form attesting they have the required insurance and to "affix proof of payment of the annual [Fee] to the [] form and keep it with the Firearm or Firearms where they are being stored or transported," and to produce the form and proof of payment "when lawfully requested to do so by a peace officer." § 10.32.230(A)-(B). Plaintiffs do not challenge the requirement of completing a form attesting to having the required insurance but seek to invalidate only the requirement to keep proof of payment of the annual Fee under Section 10.32.230(B). *See* ¶¶ 10-11; *id.*, Prayer for Relief.

Violations of the Ordinance are punishable by an administrative citation and fine, subject to due process protections. § 10.32.240(A). Similar to the Fee, the Ordinance does not set the amount of the administrative fine but leaves that to be "established by [separate] resolution of the City Council." § 10.32.240(B). To date, no such resolution has been passed. CMO Decl. ¶¶ 7-8. Contrary to Plaintiffs' allegations that the Ordinance authorizes the "confiscation" of firearms of those who fail or refuse to comply with the Ordinance (¶ 16), the Ordinance only authorizes "impoundment" of firearms and only "to the extent allowed by law" (§ 10.32.245). There is currently no lawful basis to impound firearms under state or federal law, meaning this particular provision will not take effect until, for example, the passage of a state law permitting municipalities to impound firearms. The Ordinance also contains a severability clause. § 3.

## IV.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

The plaintiff bears the burden of establishing the Court has jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).[3] The Court's proper role is "to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution," which means it lacks jurisdiction "to issue advisory opinions []or to declare rights in hypothetical cases." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* Ripeness "is drawn from both Article III limitations on judicial

---

[3] Unless otherwise noted herein, internal citations, quotation marks, and alterations are omitted.

power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "A Rule 12(b)(1) jurisdictional attack may be facial or factual," *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The City primarily makes a facial attack, that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* To the extent the Court deems any part of the City's argument to represent a factual attack disputing the truth of Plaintiffs' allegations purporting to establish federal jurisdiction, the court "need not presume the truthfulness of the plaintiff's allegations" and "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*

### B.   Rule 12(b)(6)

Defendants are entitled to dismissal under Rule 12(b)(6) if, accepting Plaintiffs' allegations as true, the complaint fails to state a claim. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). The Court should not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Plaintiffs' "obligation to provide the 'grounds' of [their] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### C.   Facial Constitutional Challenges

In adjudicating facial challenges to laws, courts may not "resolve questions of constitutionality with respect to each potential situation that might develop" in litigation, especially when the moving party does not demonstrate that the law "would be unconstitutional in a large fraction of relevant cases." *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007). Because facial challenges "often rest on speculation" (*Jackson v. City and County of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014) ("*Jackson*")), "they raise the risk of premature interpretations of statutes on the basis of factually barebones records," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people

from being implemented in a manner inconsistent with the Constitution" (*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)). A facial challenge must show that there is "no set of circumstances exists under which the [law] would be valid, i.e., that the law is unconstitutional in all of its applications," or at least that it lacks a "plainly legitimate sweep." *Id.* at 449.

## V. ARGUMENT

### A. The Complaint Should Be Dismissed Under Rule 12(b)(1).

#### 1. None of Plaintiffs' Claims are Ripe for Review

The Ordinance was enacted in February 2022, but it expressly provides a 180-day period before it becomes effective on August 7, 2022. § 2. During this time, the Council needs to pass resolutions setting the amount of the Fee and any administrative fine for noncompliance (§§ 10.32.215, 10.32.240(B)), and the City Manager needs to promulgate key regulations, such as those establishing the criteria for the financial hardship exemption and designating the nonprofit organization (§ 10.32.235(A)). *See generally* CMO Decl. Since the Ordinance is not yet effective, and since none of the required resolutions or regulations have yet been passed or promulgated, Plaintiffs' claims are not ripe for review and, thus, subject to dismissal under Rule 12(b)(1). *See Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1024-27 (N.D. Cal. 2020).

Ripeness doctrine looks primarily at two considerations: "the hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The "basic rationale" of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" (*id.* at 148), and to ensure that challenges to laws are "test[ed] … in a concrete situation" (*Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 165 (1967)). Pre-enforcement challenges to laws are not ripe if it is likely that the law will change before it goes into effect. *See, e.g.*, *Cramer v. Brown*, 2012 WL 13059699, at *3 (C.D. Cal. Sept. 12, 2012) (finding pre-enforcement claim justiciable, in part, because the legislature "ha[d] no power to amend the statute before its effective date" and there was "no reason to think the law will change"). Additionally, an issue "may not be ripe for review if further factual development would significantly advance [the court's] ability to deal with the legal issues presented."

1    *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *see also Chandler v. State Farm*

2    *Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122-23 (9th Cir. 2010) (case not ripe if it "involves uncertain or

3    contingent future events that may not occur as anticipated, or indeed may not occur at all"); *Vieux v. Easy*

4    *Bay Reg'l Park Dist.*, 906 F.3d 1330, 1344 (9th Cir. 1990) (federal courts may not issue advisory opinions

5    based on a "hypothetical state of facts").

6          "The prudential considerations of ripeness are amplified when constitutional considerations are

7    concerned." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) ("*Scott*"). Indeed,

8    "[t]he Supreme Court has neatly instructed that the jurisdiction of federal courts to hear constitutional

9    challenges should be exercised only when the underlying constitutional issues [are tendered] in clean-

10   cut and concrete form." *Id.* (quoting *Rescue Army v. Mun. Ct. of Los Angeles*, 332 U.S. 549, 584 (1947)).

11         Here, Plaintiffs' claims are not ripe because material aspects of the Ordinance provision that

12   Plaintiffs challenge have not yet been established (e.g., the non-profit itself), and because some aspects

13   of Plaintiffs' claims require further factual development (e.g., how the nonprofit behaves in providing

14   voluntary programming and services). Plaintiffs claim the Fee requirement violates their First

15   Amendment "right to not speak and the right to not be forced by the government to support someone

16   else's [i.e., the nonprofit's] speech, particularly when you disagree with their message." ¶ 18 (brackets

17   added). This claim is clearly based on speculation. *See Sierra Club v. United States Army Corps of*

18   *Eng'rs*, 990 F. Supp. 2d 9, 31-32 (D.C. Cir. 2013) (grounds for preliminary injunction not ripe where the

19   complained-of conduct "has not yet occurred and is still in the process of being addressed"). Plaintiffs'

20   allegations also ignore that the nonprofit is prohibited from engaging in policy activity or advocacy.

21   § 10.32.220(B) (expressly prohibiting nonprofit from spending any "portion of the monies from the

22   [Fee]" on "litigation, political advocacy, or lobbying activities").

23         Similarly, Plaintiffs' Second Amendment challenge is based on allegations that the Fee places an

24   unconstitutional burden on the keeping and bearing of arms (*see* ¶¶ 22-23), despite the fact that the

25   amount of the Fee has not yet been determined so any such burden cannot even be ascertained. This claim

26   turns on the *extent* to which the Ordinance burdens non-exempt San Jose gunowners' Second

27   Amendment rights. It is "premature" to ask a federal court "to issue a binding interpretation of a local

28

Excerpts 284

ordinance based on what might happen in the future without first giving the City … the opportunity to interpret its own ordinance." *United States v. Power Co., Inc.*, 2008 WL 2626989, at *4 (D. Nev. June 26, 2008). Here, the City has not even finished the required legislative action. *See* § 10.32.215 (requiring the Fee amount be "established by [future] resolution of the City Council"); CMO Decl. ¶¶ 7-8 (no such resolution has been passed).

Moreover, important *regulations* bearing on the Fee have not yet been promulgated. *See, e.g.*, §§ 10.32.215, 10.32.235(A)(4) (authorizing City Manager to "promulgate [] regulations" concerning the "[d]esignation of the nonprofit organization … any processes and procedures related to the payment of the fee, and any additional guidelines or auditing of the use of the monies from the fee," as well as "[t]he financial hardship exemption"); CMO Decl. ¶¶ 4-8; *cf. United States v. Gila Valley Irr. Dist.*, 31 F.3d 1428, 1436 (9th Cir. 1994) (claims unripe when based on "mere speculation"). The allegations do not satisfy Plaintiffs' burden. *Twombly*, 550 U.S. at 555.

**2. Plaintiffs Also Lack Article III Standing.**

The foregoing argument also makes clear that Plaintiffs lack Article III standing to seek relief based on a "conjectural and hypothetical" future harm. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs have not alleged, as necessary, that any threatened injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("allegations of *possible* future injury are not sufficient" (emphasis in original)). Instead, Plaintiffs' own allegations demonstrate their lack of standing, such as their allegations implying that they might disagree with the views expressed by a yet-to-be-determined nonprofit and "may" be forced to surrender their firearms if they decline to pay the yet-to-be-determined Fee. *See, e.g.*, ¶¶ 18-19, 22. Such speculative fears that Plaintiffs (and, given this is a facial challenge, a large fraction of all persons subject to the Ordinance) might someday suffer such purported injuries fall well short of establishing the requisite Article III injury. *See, e.g.*, *Gilbert v. Chase Home Fin., LLC*, 2013 WL 2318890, at *11 (E.D. Cal. May 28, 2013) ("The prospect of [plaintiff] someday losing the property is speculative, and does not represent a concrete injury" because "there is no indication that the foreclosure process has either begun or concluded").

### 3. Plaintiffs Do Not State a Proper Facial Constitutional Challenge.

Even if Plaintiffs' claims were somehow ripe and they had standing, their facial challenge still fails because they allege no facts establishing that the Fee would be unconstitutional in a "large fraction" of cases—nor could they, since the amount of the Fee has not even been determined. *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007). Assuming the Council and City Manager establish constitutionally reasonable fees, fines, and regulations, the Ordinance's sweep is plainly legitimate because it furthers the City's legitimate efforts to reduce the harm caused by gun-related accidents and imposes only de minimus or marginal burdens on the constitutional right to obtain and keep a firearm in the home for self-defense, for reasons more fully explained below. *Cf. Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 840 (2013) (rejecting facial challenge to ordinance that regulated gun shows "only minimally and only on county property," without even requiring empirical support justifying the regulation). Plaintiffs' Complaint is subject to dismissal for this reason alone.

### B. The Court Should Dismiss the Complaint under Rule 12(b)(6) Because Each of Plaintiffs' Claims Fails

#### 1. Plaintiffs Fail to State First Amendment or California Constitutional Claims Based on Compelled Speech or Association.

Plaintiffs' first cause of action, for compelled speech and association claims under the First Amendment and an analogous provision of the California Constitution (Cal. Const., Art. I, § 2(a)) are based largely on speculation that Plaintiffs and a large fraction of San Jose gunowners will "disagree with the [] message" of a yet-to-be-designated nonprofit with unknown leadership. ¶ 18. This is precisely the kind of speculative and conclusory allegation that need not be credited under Rule 12(b)(6), as Plaintiffs allege no facts to make plausible their fear that they and a large fraction of San Jose gunowners will disagree with the yet-to-be-designated nonprofit. *See Twombly*, 550 U.S. at 555. These claims should be dismissed as pure speculation, especially since the Ordinance expressly prohibits the nonprofit from engaging in political advocacy. *See id.*; § 10.32.220(B) (providing no portion of the Fee may be used "for litigation, political activity, or lobbying activities").

To the extent Plaintiffs allege the First Amendment bars a law from requiring them to pay *any* amount of money that ends up in the hands of a government-selected entity that expresses *any* view with

1  which they disagree, such an argument is contrary to binding precedent. *See, e.g., Bd. of Regents of the*

2  *Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000) ("It is inevitable that government will adopt

3  and pursue programs and policies within its constitutional powers but which nevertheless are contrary to

4  the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule,

5  may support valid programs and policies by taxes or other exactions binding on protesting parties."); *R.J.*

6  *Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 917 (9th Cir. 2005). As the U.S. Supreme Court has

7  aptly noted: "If every citizen were to have a right to insist that no one paid by public funds express a

8  view with which he disagreed, debate over issues of great concern to the public would be limited to those

9  in the private sector, and the role of government as we know it radically transformed." *Keller v. State*

10  *Bar of California*, 496 U.S. 1, 12-13 (1990). Yet, that is precisely the non-existent "right" on which

11  Plaintiffs appear to base their First Amendment claim.

12        Plaintiffs' related claims under the California Constitution's free speech and association

13  provisions fare no better, for much the same reason. *See* Cal. Const., Art. I, § 2(a) ("Every person may

14  freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of

15  this right. A law may not restrain or abridge liberty of speech or press."); *id.*, § 3(a) ("The people have

16  the right to ... assemble freely to consult for the common good."). Here, Plaintiffs vaguely allege that the

17  Fee requirement violates this provision because it "forces San Jose gun owners to associate with or

18  support private group [i.e., the yet-to-be-determined nonprofit] and to fund their message." ¶ 19 (brackets

19  added). Although Plaintiffs fail to specify what the nonprofit's "message" might be or what might be

20  objectionable about it, Plaintiffs appear to fear that the nonprofit will express unspecified anti-gun views

21  in providing entirely voluntary services and programming to gunowners and their families. Given the

22  conclusory and unsupported nature of Plaintiffs' allegations, such a vague and speculative fear fails to

23  plausibly allege a violation of the California Constitution's guarantees of free speech and association.

24        Ultimately, Plaintiffs have not plausibly alleged the Fee requirement will compel them and a large

25  fraction of San Jose gunowners to engage in speech and association with which they do not agree in

26  violation of the First Amendment and related state constitutional guarantees. This is especially so in view

27  of federalism-based concerns that federal courts should not invalidate state laws on the grounds that they

28

violate the right of association based only on "factual assumptions." *Wash. State Grange*, 552 U.S. at 457; *accord Cal. Democratic Party v. Jones*, 530 U.S. 567, 600 (2000) (Stevens, J., dissenting) ("[A]n empirically debatable assumption … is too thin a reed to support a credible First Amendment distinction" with respect to burdens on association). Plaintiffs' First Amendment and related state law claims should be dismissed.

> ### 2. Plaintiffs Fail to State Second Amendment and Related California Constitutional Claims.

As their second cause of action, Plaintiffs contend the Ordinance's Fee requirement impermissibly burdens their and other San Jose gunowners' Second Amendment rights. ¶¶ 20-22. The Ninth Circuit adjudicates Second Amendment challenges using a two-step test, which "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). For purposes of this Motion, the City concedes the Fee requirement imposes some minimal or slight burden, and so proceed to the second step of the test. *See e.g., Heller*, 554 U.S. at 625; *Jackson*, 746 F.3d at 959.

> #### a. Under the Second Amendment, the Appropriate Level of Scrutiny Is Intermediate Scrutiny.

To determine the appropriate level of scrutiny, Courts look to two factors. First, Courts assess how close the law comes to the core of the Second Amendment right, which is the right to keep firearms in the home for purposes of self-defense. *Heller*, 554 U.S. at 629; *Jackson*, 746 F.3d at 963. Unless the challenged law "implicates the core of the Second Amendment right and severely burdens that right," courts in the Ninth Circuit generally apply intermediate scrutiny. *Young*, F.3d 765 at 784; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*") ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."). Here, intermediate scrutiny applies because the Fee requirement does not "impos[e] restrictions on the use of handguns within the home" or otherwise come close to regulating

the core Second Amendment right of keeping firearms in the home for self-defense. *Jackson*, 746 F.3d at 963. As relevant here, the Ordinance merely requires resident gunowners to pay a reasonable Fee to fund services aimed at reducing well-established harms that result from guns being present in the home. §§ 10.32.215, 10.32.220.

The second factor of the scrutiny evaluation requires the Court to assess the "severity of the law's burden" on the core Second Amendment right. *Jackson*, 746 F.3d at 963. A law that "severely burdens that right receives strict scrutiny," but in all "other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny." *Young v. Hawai'i*, 992 F.3d 765, 784 (9th Cir. 2021) (en banc). Laws that regulate only the "manner in which persons may exercise their Second Amendment rights" are obviously less burdensome than those which ban firearm possession completely. *Jackson*, 746 F.3d at 961 (citing *Chovan*, 735 F.3d at 1138). Similarly, "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not. *Jackson*, 746 F.3d at 961; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that laws placing "reasonable restrictions on the time, place, or manner of protected speech" and that "leave open alternative channels" for communication pose less burden to a First Amendment right and are reviewed under intermediate scrutiny).

Here, the burden identified by Plaintiffs that the Ordinance imposes (related to the Fee) is minimal: it neither regulates the use of firearms, how or where they are stored, nor any other factors evaluated by courts as directly affecting residents' ability to keep and bear arms for self-defense. *See e.g.*, *Heller*, 554 U.S. at 629. Instead, it merely requires gunowners to pay a reasonable annual Fee and keep proof that they have paid the fee with their firearm when it is being stored or transported. §§ 10.32.215, 10.32.230(B). The Ordinance neither seeks to ban guns nor threatens to seize them. Indeed, the Ninth Circuit (in line with the other Circuits) has long applied intermediate scrutiny to uphold similar laws. *See, e.g., Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) (upholding DOJ's use of gun sale fee for enforcement efforts targeting illegal firearm possession after point of sale under intermediate scrutiny); *Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015) ("*Heller III*") (upholding $48 in gun licensing fees under intermediate scrutiny); *Kwong v. Bloomberg*, 723 F.3d 160, 161, 167 (2d

Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (upholding $340 gun licensing fee under intermediate scrutiny); *O'Connell v. Gross*, No. CV 19-11654-FDS, 2020 WL 1821832 (D. Mass. Apr. 10, 2020) (upholding law requiring mandatory safety courses and $300 in fees under intermediate scrutiny). Intermediate scrutiny is therefore appropriate.

### b. The Ordinance Easily Survives Intermediate Scrutiny.

To withstand intermediate scrutiny, the City need only show (1) that their stated objective is significant, substantial, or important; and (2) a reasonable fit between the Ordinance and that objective. *Chovan*, 735 F.3d at 1139.

First, the City's objective of promoting public safety and addressing gun injuries is an "important" government interest. *Chovan*, 735 F.3d at 1139; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (it is "self-evident" that government's interest in promoting public safety and reducing violent crime are substantial and important government interests"); *Stimmel v. Sessions*, 879 F.3d 198, 201 (6th Cir. 2018) (referring to "government's compelling interest of preventing gun violence"); *Torcivia v. Suffolk Cty., New York*, 17 F.4th 342, 359 (2d Cir. 2021) (finding a "substantial governmental interest in preventing suicide and domestic violence"). The Ordinance's other stated purpose of reducing the social and financial costs caused by guns (§ 10.32.200(B)) is also an important interest. *See, e.g., Bauer*, 858 F.3d at 1226; *Kwong*, 723 F.3d at 168 (city permitted to recover costs as part of scheme "designed to promote public safety and prevent gun violence"). There can be no serious doubt that gun violence is a major public health crisis. *See* U.S. Centers for Disease Control and Prevention, *Firearm Violence Prevention*, *available at* https://www.cdc.gov/violenceprevention/firearms/fastfact.html (accessed Apr. 22, 2022) ("Firearm injuries are a serious public health problem."). Thus, the Ordinance clearly meets the first prong under intermediate scrutiny.

Second, there is a reasonable fit between the challenged regulation and the City's objective. *See Chovan*, 735 F.3d at 1139. When assessing the reasonableness of fit under immediate scrutiny, courts must give "substantial deference to the predictive judgments" of the legislature on public policy questions that fall outside the courts' competence. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*"). This is because "the legislature is far better equipped than the judiciary to make sensitive

public policy judgments (within constitutional limits)" on complex empirical questions like "the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) ("*Turner I*")). This Court's "sole obligation" is simply "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 181. That standard is easily met here.

The City's reasonable legislative judgments are entitled to deference. The City relied on several studies and findings to form its reasonable judgment that an insurance mandate combined with voluntary gun-safety and other programming and services for gunowners and their household members will deter, prevent, or reduce accidental gun harm. *See e.g.*, Prevost Decl. ¶ 12, Ex. 11 (*The New England Journal of Medicine*, "Handgun Ownership and Suicide in California," cited in Ordinance findings at § 10.32.200(B)(6)). The City also evaluated and reviewed materials concerning financial and other harms arising from gun violence. *See, e.g.*, *id.* ¶ 13, Ex. 12 (The Educational Fund to Stop Gun Violence, "Unintentional Shootings"); *id.* ¶ 8, Ex. 7 (compendium of materials provided to City Council in advance its January 25, 2022 meeting).

The multitude of studies reviewed by the City Council supports its view that the Ordinance's annual Fee requirement and related education programming and services will positively improve public health, safety, and well-being. Indeed, a city is allowed "a reasonable opportunity to experiment with solutions to admittedly serious problems," such as harm caused by firearms. *Jackson*, 746 F.3d at 966 (citing *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 52 (1986)). The Ordinance findings and legislative record more than sufficiently support the reasonableness of the fit between City's important interests in deterring gun-related deaths and injuries and the imposition of a reasonable annual Fee to fund programs aimed at advancing those exact interests. *See City of Renton*, 475 U.S. at 51-52; *Jackson*, 746 F.3d at 969. Additionally, it is widely known that the Mayor has publicly proposed a mere $25 fee in a Memorandum provided for Council's review. *See* Prevost Decl. ¶ 5, Ex. 4. Yet the Complaint contains no non-conclusory allegations as to why such a minimal Fee would be an unconstitutional burden on Second Amendment rights, especially when binding Ninth Circuit law is directly to the

1   contrary. *See Bauer*, 858 F.3d at 1225 (upholding constitutionality of California law imposing $19 fee

2   on all gun sales). Nor do Plaintiffs' claims account for the Ordinance's "financial hardship" exemption,

3   which would exempt from the Ordinance's requirements any person who meets its yet-to-be-promulgated

4   criteria. §§ 10.32.225(C), 10.32.235(A)(4).

5        In sum, intermediate scrutiny applies, and the Ordinance clearly passes muster under that tier of

6   scrutiny. Plaintiffs fail to state a claim under the Second Amendment.

7           **c.**    **Plaintiffs' Related State Law Claim Fails Because There Is No**

8                 **"Inalienable" Right to Bear Arms under the California Constitution.**

9        Because the California Constitution has no provision expressly guaranteeing a right to keep or

10  bear arms, Plaintiffs rely on the state constitution's general guarantee of certain "inalienable rights,"

11  including "the rights of 'protecting property, and pursuing and obtaining safety." ¶ 21 (quoting Cal.

12  Const., Art. I, § 1). Plaintiffs further allege that, because these rights are "inalienable," they cannot "be

13  withheld or revoked by the City if gun owners do not comply with the conditions [i.e., payment of the

14  annual Fee and keeping proof of payment with their firearm when it is being stored or transported]

15  contrived by the City." ¶ 23.

16       Plaintiffs' attempt to shoehorn a right to keep and bear arms into the California Constitution is

17  directly contrary to California law. "If plaintiffs are implying that a right to bear arms is one of the rights

18  recognized in the California Constitution's declaration of rights, they are simply wrong." *Kasler v.*

19  *Lockyer*, 23 Cal.4th 472, 481 (2000) (citing to *In Re Ramirez*, 193 Cal. 633, 651 (1924) ["The constitution

20  of this state contains no provision on the subject."]); *see also People v. Camperlingo*, 69 Cal.App. 466,

21  473 (1924) ("the right of a citizen to bear arms is not acquired from any constitutional provision.").

22  Moreover, under California law, "[i]t has long been established that regulation of firearms is a proper

23  police function." *People v. Evans*, 40 Cal.App.3d 582, 586-87 (1974), *disapproved of on other grounds*

24  *by People v. King*, 22 Cal.3d 12 (1978). Plaintiffs' claim should be dismissed.

25  / / /

26  / / /

27  / / /

28

3.      **Plaintiffs Fail to State a Claim that the Ordinance Imposes a Tax in Violation of the California Constitution.**

Plaintiffs third cause of action argues that the Ordinance's annual Fee requirements is a "tax" that may not be imposed without voter approval under Article XIII C of the California Constitution, as amended by Proposition 26 ("Proposition 26"). *See* ¶¶ 26-31. Proposition 26 defines a "tax" as "any levy, charge, or exaction of any kind imposed by a local government," subject to seven specific exceptions. Cal. Const., Art. XIII C, § 1(e); *see also Schmeer v. County of Los Angeles*, 213 Cal.App.4th 1310, 1329 (2013), *as modified* (Mar. 11, 2013) ("*Schmeer*") (interpreting Proposition 26's definition of a "tax" as "limited to charges payable to, or for the benefit of, a local government"). Plaintiffs fail to state a claim for two reasons.

First, the Ordinance's annual Fee is not a "tax" under Proposition 26 because it is not paid or remitted to the local government, but rather paid directly to and used by the private nonprofit organization to provide gun-safety and other programming and services. § 10.32.215 (providing gunowners "shall pay" the Fee "to the to the Designated Nonprofit Organization"); *see Schmeer*, 213 Cal.App.4th 1310 (2013) (legally mandated charge paid to and retained by retail stores is not a "tax" for purposes of Proposition 26). In *Schmeer*, Los Angeles County enacted an ordinance that prohibited retail stores from providing disposable plastic carryout bags to customers. *Id.* at 1314. The stores could provide paper carryout bags but were required to charge customers ten cents per bag. *Id.* Critically, the proceeds of the paper bag sales were retained by the store to be used for prescribed purposes, including to cover the actual costs of the paper bags. *Id.* The *Schmeer* plaintiffs sued on the same theory advanced by Plaintiffs here: that the bag charge is a tax subject to Proposition 26. The court disagreed, ruling that because the proceeds of the bag charge are retained by the retail store and not remitted to the county, "the voter approval requirements of article XIII C, section 2 therefore are inapplicable." *Id.* at 1326, 1329-30. *Schmeer* is fatal to Plaintiffs' claim.

Second, Plaintiffs' claim also fails because, even if the Fee were a "tax," it would fall under Proposition 26's "specific benefits exception." *See* Cal. Const., Art. XIII C, § 1(e)(1). Under that exception, fees are not subject to Proposition 26 if they are "imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not

1    exceed the reasonable costs to the local government of conferring the benefit or granting the privilege."

2    *Id.*; *see, e.g.*, *S. Cal. Edison Co. v. Pub. Util. Comm'n*, 227 Cal.App.4th 172, 200 (2014) (finding this

3    exception applied to a public utility fee "designed to benefit … ratepayers"). That exception clearly

4    applies here, where the Fee is paid only by San Jose gunowners for the sole purpose of providing gun-

5    safety and other programming and services to San Jose gunowners, "members of their household, or []

6    those with whom they have a close familial or intimate relationship." § 10.32.220(A).

7         In sum, the Fee is not a tax under Proposition 26, and Plaintiffs' claim should be dismissed.

8    **C.    Plaintiffs Fail to State a Claim that the Ordinance Is an Unconstitutional Delegation
9           of the Power the Tax.**

10        Plaintiffs allege in their fourth claim that the Fee requirement violates two California

11   Constitutional provisions (1) providing that "[t]he power to tax may not be surrendered or suspended by

12   grant or contract" (Cal. Const., Art. XIII, § 31), and (2) prohibiting "delegat[ing] to a private person or

13   body power to [] control, appropriate, supervise, or interfere with county or municipal corporation []

14   money, or property, or to levy taxes or assessments …." (*id.*, Art. XI, § 11). ¶¶ 36-37. Plaintiffs vaguely

15   claim that the Ordinance violates these provisions by "unconstitutionally delegat[ing] some of the City's

16   power to tax and appropriate tax revenues" to a nonprofit organization. ¶ 37. These claims also fail.

17        First, the Fee is not a "tax" under Article XIII of the Constitution for the reasons argued above,

18   and therefore does not implicate Section 31 of that same Article. But even if that were not the case,

19   Section 31 still would not apply because the Ordinance does not "surrender[] or suspend[]" the City's

20   power to tax "by grant or contract." Cal. Const., Art. XIII, § 31. The Ordinance itself is clearly not a

21   "grant" or a "contract," and Plaintiffs' Complaint does not plausibly allege the existence of any such

22   grant or contract. *Cf.* ¶ 37 (vaguely alleging "[t]he Ordinance" itself somehow violates Section 31);

23   ¶ 8 (speculating, without any factual support, that "defendant City may have already entered into a

24   contract with a designated nonprofit organization"). Nor has there been any surrender or suspension of

25   the City's power to tax because "the controlling consideration" under Section 31 is "whether a disputed

26   contract amounts to a local entity's 'surrender'… of its control of a [taxing] power or municipal

27   function," which "turns on whether this crucial control element has been lost." *Russell City Energy Co.,*

28

1  *LLC v. City of Hayward*, 14 Cal.App.5th 54, 64 (2017). Here, no such control has been lost because the

2  imposition of the Fee and the Fee amount are both controlled entirely by the City Council, per the express

3  terms of the Ordinance. § 10.32.215. The nonprofit organization's only power is to receive and spend

4  Fee monies in accordance with its limited mandate under the Ordinance. § 10.32.220.

5      Second, the Ordinance also does not violate Article XI, Section 11(a), because that provision only

6  applies to the *state* Legislature, not municipal governments. *See* Cal. Const., Art. XI, § 11(a) ("*The*

7  *Legislature* may not delegate to a private person or body power to make, control, appropriate, supervise,

8  or interfere with county or municipal corporation improvements, money, or property, or to levy taxes or

9  assessment, or perform municipal functions") (emphasis added)); *see* also *County of Riverside v.*

10  *Superior Court*, 30 Cal.4th 278, 284 (2003), *quoting Adams v. Wolff*, 84 Cal.App.2d 435, 442 (1948)

11  (Section 11(a) "is a restraint on the state Legislature's right to interfere with municipal affairs and in no

12  way regulates what may be done by a municipal corporation by charter provision"). Plaintiffs' claim thus

13  fails because Section 11(a) does not apply to the City.

14      **D.    The Complaint Should Be Dismissed Without Leave to Amend.**

15      The City respectfully requests the Complaint be dismissed without leave to amend, in light of

16  futility and serious federalism concerns. The Ninth Circuit's permissive standards for granting leave to

17  amend do not apply here. Rule 15(a) only allows parties to amend pleadings to "assert matters that were

18  overlooked or were unknown *at the time the party interposed the original complaint*." 6 Wright & Miller,

19  FED. PRAC. & PROC. § 1473 (3d ed. 2021). "If jurisdiction is lacking at the outset [of a litigation], the

20  district court has no power to do anything with the case except dismiss." *Morongo Band of Mission*

21  *Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988), *cert. denied*, 488 U.S.

22  1006 (1989); *Lopez v. Turnage*, 2021 WL 5142070, at *1 (N.D. Cal. Oct. 15, 2021). Moreover, the

23  Ordinance is what it is. The legal defects described in this Motion cannot be cured by adding different

24  factual allegations to the Complaint. "Any amendment would be futile." *Leadsinger, Inc. v. BMG Music*

25  *Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

26      A practice of allowing plaintiffs to sue legislators before a bill is effective so that the plaintiffs

27  could amend or supplement their pleadings when the bill becomes effective is inappropriate. *Rizzo v.*

28

*Goode*, 423 U.S. 362, 380 (1976); *Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1275 n.3 (9th Cir. 1981) (citing "federalism concerns" as reason for declining to exercise jurisdiction in litigation involving municipal police department policies); *Westlands Water Distrib. Dist. v. Nat. Res. Defense Council*, 276 F. Supp. 2d 1046, 1051 (E.D. Cal. 2003). The Court should dismiss the Complaint without leave to amend.

## VI.    CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court dismiss Plaintiffs' Complaint under Rules 12(b)(1) and 12(b)(6). Since the Complaint's defects cannot be cured, the City requests that the dismissal be without leave to amend.

Respectfully submitted,

Dated:  April 22, 2022                          **COTCHETT, PITRE & McCARTHY, LLP**

By:   */s/ Tamarah P. Prevost*
       Joseph W. Cotchett
       Tamarah P. Prevost
       Andrew F. Kirtley
       Melissa Montenegro

*Attorneys for Defendant City of San Jose*

Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Tamarah P. Prevost (SBN 313422)
tprevost@cpmlegal.com
Andrew F. Kirtley (SBN 328023)
akirtley@cpmlegal.com
Melissa Montenegro (SBN 329099)
mmontenegro@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Defendant City of San Jose*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **Howard Jarvis Taxpayers Association**; Silicon Valley Taxpayers Association; Silicon Valley Public Accountability Foundation; James Barry; and George Arrington,<br><br>Plaintiffs,<br><br>v.<br><br>**City of San Jose**, and all persons interested in the matter of San Jose Ordinance No. 30716, establishing an Annual Gun Harm Reduction Fee,<br><br>Defendants. | Case No. 5:22-cv-02365-BLF<br><br>**DECLARATION OF TAMARAH P. PREVOST IN SUPPORT OF DEFENDANT CITY OF SAN JOSE'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date: TBD<br>Time: 9:00 a.m.<br>Courtroom: Via Zoom Webinar<br>Judge: Hon. Beth Labson Freeman |

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

Declaration of Tamarah P. Prevost ISO Defendant City of San Jose's Motion to Dismiss Plaintiffs' Complaint; Case No. 5:22-cv-02365-BLF

Excerpts 297

1    I, Tamarah P. Prevost, declare as follows:

2         1.     I am an attorney duly licensed to practice law in the State of California and admitted to practice in this Court. I am a partner with the law firm of Cotchett, Pitre & McCarthy, LLP ("CPM") and counsel for Defendant City of San Jose ("City" of "San Jose") in this action, as well as the earlier-filed related action *National Association for Gun Rights, Inc., et al. v. City of San Jose, et al.*, Case No. 5:22-cv-00501-BLF ("*NAGR*"). The matters described herein are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

        2.     Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of a Memorandum from the San Jose Mayor, Vice Mayor, and City Councilmembers Carrasco, Cohen, and Peralez to the San Jose City Council, dated June 16, 2021.

        3.     Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of a Memorandum from the San Jose City Attorney Nora Frimann to the San Jose City Council, dated January 14, 2022.

        4.     Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of a Memorandum from the San Jose Mayor to the San Jose City Council, dated January 19, 2022.

        5.     Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of a Memorandum from the San Jose Mayor, Vice Mayor, and City Councilmembers Jones, Cohen, and Carrasco to the San Jose City Council, dated January 21, 2022.

        6.     Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of a Memorandum from City Councilmember Davis to the San Jose City Council, dated January 21, 2022.

        7.     Attached hereto as **<u>Exhibit 6</u>** is a true and correct copy of a Memorandum from City Councilmember Peralez to the San Jose City Council, dated January 21, 2022.

        8.     Attached hereto as **<u>Exhibit 7</u>** is a true and correct copy of the "Supplemental Memorandum" from San Jose City Attorney Nora Frimann to the San Jose City Council, dated January 21, 2022, which contains hyperlinks to fourteen documents. For the Court's convenience, those fourteen documents are attached to Exhibit 7 as a compendium. The Supplemental Memorandum states: "The attached list provides the citations for the various research and data sources used in the recitals of the proposed ordinance that is being considered at the City Council's January 25, 2022 meeting. It may be useful in Council's deliberations on the matter."

Excerpts 298

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

9. Attached hereto as **Exhibit 8** is a true and correct copy of the "Replacement/ Supplemental Memorandum" from the San Jose Mayor to the San Jose City Council, dated January 24, 2022.

10. Attached hereto as **Exhibit 9** is a true and correct copy of the San Jose City Council Agenda, dated January 25, 2022.

11. Attached hereto as **Exhibit 10** is a true and correct copy of a report prepared by the Pacific Institute for Research and Evaluation, titled "Incidence and Cost of Firearm Injuries in San Jose, CA," dated January 19, 2022.

12. Attached hereto as **Exhibit 11** is a true and correct copy of an article published in *The New England Journal of Medicine*, titled "Handgun Ownership and Suicide in California," dated June 4, 2020.

13. Attached hereto as **Exhibit 12** is a true and correct copy of an article by the Educational Fund to Stop Gun Violence, titled "Unintentional Shootings."

14. Attached hereto as **Exhibit 13** is a true and correct copy of the City of San Jose Ordinance at issue in this action, as enacted on February 8, 2022.

15. On April 21, 2022, Melissa Montenegro, an attorney from Defendant's counsel's office, emailed Judge Freeman's Courtroom Deputy Clerk, Tiffany Salinas-Harwell, requesting a hearing date for Defendant City of San Jose's Motion to Dismiss Plaintiffs' Complaint. As of the time of filing the instant Motion, Defendant's counsel did not receive a response. Since the ECF filing system requires selection of a date, Defendant's counsel self-selected the hearing date of August 4, 2022, which is the hearing date for Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint in the recently related case captioned *National Association for Gun Rights, Inc., et al. v. City of San Jose, et al.*, Case No. 5:22-cv-00501-BLF.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct. Executed this 22nd day of April 2022 at Burlingame, California.

*/s/ Tamarah P. Prevost*
TAMARAH P. PREVOST

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Declaration of Tamarah P. Prevost ISO Defendant City of San Jose's Motion to Dismiss Plaintiffs' Complaint; Case No. 5:22-cv-02365-BLF

Excerpts 299

# Exhibit 1



# *Memorandum*

**TO:** HONORABLE CITY COUNCIL

**FROM:** Mayor Liccardo
Vice Mayor Jones
Councilmember Carrasco
Councilmember Peralez
Councilmember Cohen

**SUBJECT:** SEE BELOW

**DATE:** June 16, 2021

APPROVED:

Date: 06/10/21

---

**SUBJECT: Reducing Gun Harm, and the Public Burdens of Gun Violence**

## RECOMMENDATION

1. **Reducing Gun Harm, and the Public Burdens of Gun Violence**: Direct the City Attorney to return to Council in September with an ordinance for Council approval that would require every gun owner residing in the City of San José—with exceptions delimited below—to obtain and maintain a City-issued document evincing (i) payment of an annual fee, and (ii) attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

   a. Compliance:
      1) The gun owner shall sign and complete the insurance attestation, describing her specific policy number and issuer, and sign it under penalty of perjury. Acceptable coverage may include any homeowner's or renter's policy providing a minimum coverage amount.
      2) The document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
   b. Exemptions and waivers:
      1) A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.

Excerpts 301

Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**
Page 2

      2) An exemption from these requirements will exist for sworn law enforcement.
      3) An exemption from these requirements will exist for holders of a concealed carry weapon (CCW) permits, if the City Attorney deems it necessary to do so to avoid conflicts with state preemption over CCW regulation.

  c. Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine. Subsequent failure to yield firearms upon the lawful demand of a law enforcement official under this ordinance would constitute a misdemeanor.

  d. Legal issues:
      1) To minimize financial risk against the City, the City Manager is directed to retain fee revenue in a segregated account until the conclusion of active litigation seeking to overturn the ordinance.
      2) The City Attorney shall evaluate the legal feasibility of applying these requirements upon all persons possessing a firearm in the City of San Jose, whether they reside here or not.
      3) The City Attorney shall evaluate the constitutionality of permanent seizure of the firearm as a consequence of noncompliance.

  e. Fee Calculation and Revenue:
      1) Pursuant to state law, fee revenue may only be utilized to fund city services provided specifically to respond to gun harm, including police officer response, fire/emergency medical response, and any City assistance to victims and their families.
      2) Return in September with the final report from the Pacific Institute for Research and Evaluation (PIRE) detailing the financial burden carried by City taxpayers for the use of firearms in the City, pursuant to Proposition 26. Calculate a fee substantially below each gun owner's pro-rata share of that cost, to ensure clear legal satisfaction of Proposition 26's dictates. As Proposition 26 allows, the fee should provide full cost recovery for the City's cost of processing the fee application.
      3) Should the County of Santa Clara indicate a willingness to participate in and enforce a fee mandate, fee revenue would be shared with the County to fund such services as emergency room treatment, victim assistance, jail, criminal prosecution, and mental health services within the constraints of Prop 26.

  f. Ghost Guns: ensure that the definition of "firearm" under the ordinance includes unfinished frames and receivers commonly sold as do-it-yourself guns and/or assembled after downloading and 3D printing.

2. **Gun Violence Restraining Orders (GVRO):** Direct the City Manager to return to Council in the Fall to identify ways to increase access and use of GVRO's, including:

  a. Better inform residents in multiple languages about accessing GVROs, such as by:
      • requiring protocols in our gang prevention outreach by employees of PRNS and affiliated non-profits to clients and family members;
      • reviewing and revising SJPD protocols and training about proactively informing reporting parties of domestic violence about the availability of GVRO's (rather than doing so only upon their affirmative disclosure of the existence of a firearm in the home);

Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**

- publicly displaying information in our police lobbies, on our city website, and other prominent locations;
- Communicating to key HR/risk officers among employers and school districts; and
- participating in a convening of stakeholders by the District Attorney's Office to explore other options for enhancing public awareness.

b.   Update training protocols for officers regarding recent changes in state law that enable police officers to complete DVRO's on behalf of residents afraid or otherwise constrained from doing so.

c.   Return to Council during the time for identifying City-sponsored legislation, and add for Council consideration a bill that would strengthen the effectiveness of GVRO's, including (a) broadening authority to search the subject's residence to ensure compliance; (b) enhancing sanction for violating a GVRO from a misdemeanor to a wobbler/felony; (c) enabling District Attorneys' offices to submit GVRO's on behalf of concerned witnesses and victims.

3.   **Assault Weapons Ban:** Direct the City Attorney to file an amicus curia or to join other cities and counties throughout the state in jointly filing to appeal the June 4, 2021, District Court decision in *Miller v. Bonta* that overturned California's three-decade ban on assault weapons.

4.   **Ghost Guns:** Direct the City Attorney to craft a prohibition on the possession, assembly, and manufacturing of any untraceable gun lacking a serial number, in collaboration with partner organizations such as Brady United and Gifford Law Center, to cover gaps in California state prohibitions, most of which do not take effect until July 2022.

5.   **Straw Purchasing and Suicide Prevention:** Direct the City Attorney to bring to Council this June the final ordinance of the measures upon which Council had already voted in 2019, to regulate gun sale transactions to counter "straw purchasing"—such as by videotaping transactions and training gun store staff—and to post suicide prevention information prominently at the point of sale. Gun store staff training should include vigilance for circumstances of the purchase of guns by domestic violence victims for their disqualified abusers.

6.   **Ammunition Checks:** If pending federal litigation overturns the 2016 California mandate for background checks on all ammunition purchasers, return to Council to consider several options, including (a) assessing the legality of an SJPD-issued permit for ammunition purchases, and (b) evaluate whether to mandate fingerprinting on all ammunition purchases within the City of San José, modeled on the successful efforts of sixteen other cities.

7.   **"Looking out for One Another":** Convene with County leaders to discuss how we can create a public campaign to encourage appropriate notification to mental health or law enforcement authorities of implied or explicit threats of violence, planning or preparatory steps to commit violence, or apparent fascination with prior acts of violence.

RULES AND OPEN GOVERNMENT
Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**
Page 4

8. **Gun Buy-Back programs:** Direct the City Manager to return to Council to discuss how the City could more frequently host gun buy-backs and strengthen partnerships for buy-back programs with Santa Clara County and other public, private, and non-profit organizations.

9. **Leveraging Federal Information for Early Intervention**: Direct the City Manager to work with the Santa Clara County District Attorney to enhance communication between the San José Police Department and other local law enforcement with key Federal agencies—specifically the Special Agents in Charge (SAC) for local Federal Bureau of Investigations, Bureau of Alcohol, Tobacco, and Firearms, DEA, DHS, and U.S. Customs and Border Control—to improve protocols that will enable local law enforcement access to critical information about high-risk individuals in San José. Report back to Council the findings from such efforts.


<u>**Discussion**</u>

Let's begin by putting aside the obvious: none of these proposals will magically prevent all horrific mass shootings like those that took the lives of our community members on May 26, 2021, or July 28, 2019, or four other occasions in the past three years. A vaccine may control a single virus, but in a nation burdened with more than 300 million guns, <u>no panacea exists to halt our nation's epidemic of mass shootings</u>.


Yet beyond these mass shootings remain an even more horrific reality, the frequency of which has sadly desensitized us: daily gun violence. During the thirteen days that friends and family grieved the devastating loss of their nine loved ones at the VTA rail yard, San José has suffered eight more episodes of gun violence. Every year, too many San José families endure the devastating pain of dozens of gun killings and many more emergency room admissions for gunshot injuries.
We can take action to save lives. To do so, we must not focus our efforts on mass shootings, but rather on the more routine—and more deadly—gun harm that we see weekly in emergency rooms throughout our City. Firearm use leaves our nation with approximately 40,000 annual deaths, 71,000 annual non-fatal injuries, and too many grieving loved ones.
Since no city or state in the United States has yet implemented an insurance or fee mandate, these proposals will attract naysayers. In the current political climate, even modest harm-reduction approaches draw intense opposition. The gun lobby has beaten back similar proposals introduced in California, Massachusetts, New York, and Congress, where a bill currently exists. Yet, as we consider our nation's deadly daily toll of gun victims, future generations will reserve their criticism for those who chose to do nothing.

It has become axiomatic to say that America suffers from an "epidemic" of gun violence, and it's long past time for us to treat gun violence as a public health problem. <u>A public health approach focuses our efforts on multiple and other varied interventions that can reduce risk factors and the ultimate harm of gun violence.</u> As with other epidemics in which public health approaches have been applied, such as smoking and automobile-related deaths, we must use many different interventions, including market-based solutions, behavioral insights, regulation, and education. Implementation of these varied approaches has reduced <u>per-mile auto fatalities by 80% in five</u>

Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**
Page 5

decades, saving an estimated 3.5 million lives. We must identify interventions, monitor results, and scale the impact of best practices for other cities and states. While the powerful gun lobby halts progress in Congress and state legislatures, cities have become laboratories of civic innovation, from which others can learn, adopt, and adapt.

**Insurance and Fee Mandates**
The insurance and fee mandates will accomplish several important goals:

- **Compensate the public for the cost of gun harm:** Direct costs of gun violence to California taxpayers for gunshot-related medical treatment, police response, ambulance transport, and the like exceeded $1.4 billion in 2018. While the Second Amendment protects the rights of citizens to own guns, it has never mandated that the public subsidize gun owners' exercise of that right.

- **Incentivize safer behavior:** Insurance-based mechanisms can encourage firearm owners to take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators. Insurers have long used risk-adjusted premiums to reward good driving and incentivize the use of airbags and other safety features, reducing per-mile auto fatalities by 80% in five decades. We need a similar approach to address gun accident risk, because 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home.  Nearly 500 Americans also die from preventable, unintentional shootings every year—including many children.

- **Provide care to injured victims:** Injuries from unintentional shootings—which are generally insurable—comprise more than a third of all gun-related injuries. An insurance mandate will ensure proper medical care and rehabilitation for many of the 26,000 injured victims of unintentional shootings annually, including more than 7,000 children.

- **Take guns away from criminals:** This ordinance can provide a straightforward, constitutionally compliant mechanism for the temporary or permanent seizure of guns from individuals who have no intention of being law-abiding. Where an owner lacks the City-issued document, police could temporarily or permanently seize an identified gun immediately on-site, such as after responding to a domestic violence call, more immediately and effectively than a GVRO.

- **Fund critical public services:** Pursuant to Proposition 26, fees must support the provision of public services, such as medical treatment, emergency response, and police, in response to gun violence.  Fines—for non-compliance—could compensate victims, and fund violence prevention, mental health care for trauma, or gun buy-backs.

- **Broaden impact:** With a successful effort, other cities could adopt similar ordinances, and—particularly with statewide adoption—enable greater impact, while engaging the insurance industry more broadly in incentivizing safer behavior.

To be sure, critics will assert that criminals won't pay a fee, and won't get insurance. That's precisely the point; they may not get driver's licenses either, nor update their registration, but the failure to do so provides a basis for a lawful seizure.

**Ghost Guns**
SJPD has reported a rapid rise in the possession and use of unserialized firearms seized from criminals, matching reports nationally. State law contains gaps, the most significant of which lies in its delayed application--another year away. San Francisco, San Mateo County, and other communities have taken action to ban the assembly, manufacture, and possession of these untraceable weapons, and non-profit partners have offered Constitutionally-compliant language for a proposed ordinance in San Jose. We should move forward quickly.

**Gun Violence Restraining Orders**
Many employers, family members, and educators become aware when a gun-owning individual poses a risk of harming themselves or others, but often feel helpless to do much about it. Identifying those high-risk individuals, and separating them from their guns—even temporarily—can make everyone safer. This appears particularly true within the home, where family members see the signs of mental distress most clearly; in one study, 54% of mass shootings involved domestic or family violence, and in 42% of those incidents, the shooter showed clear signs of intent to others. In another survey of survivors living in 67 California domestic violence shelters, 38% of respondents reported a gun in the household, of whom 2/3 reported that the abuser had used the gun to threaten or scare them.

Gun Violence Restraining Orders provide family members, neighbors, coworkers, and others who fear violent conduct by a gun owner a means to seek court-mandated seizure of those guns for 21 days, and with a permanent order, up to five years. While the rate of obtaining GVRO's has increased substantially in Santa Clara County in recent years—from four in 2017 to 122 in 2019, with much credit to the outreach of the Crime Strategies Unit at the District Attorney's Office and the combined work of the San José Police Department and City Attorney's Office—it remains an underutilized tool that can markedly reduce the risk of gun harm. Education is key—and not merely for community members, but also for police officers, employers, non-profit providers, schools, and many others.

From conversations with police officers and prosecutors, there appears to be a consensus that GVRO's could use more teeth, for example, by authorizing searches to verify full compliance, and enabling felony conviction for egregious violations. It also appears that the complexity of the multi-form GVRO application seems too daunting for many community members needing help, and requires that they provide information well beyond their likely knowledge, e.g., to describe all of the guns owned by the person, and whether there are "no less restrictive alternatives." Some recent changes in the law—for example, enabling police officers to submit GVRO's on behalf of potential victims—will help, but it's far from clear whether most SJPD officers even know of the new law, and how they can use this tool. The recommendations above include what we can accomplish as a City, but also suggested legislative reforms from local experts for making DVRO's more effective statewide.

**Straw Purchasing and Suicide Prevention**

Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**
Page 7

Previously, Council approved direction to draft an ordinance requiring gun stores to conduct video and audio recording of all firearm and ammunition transactions, and training staff to detect straw purchases. We further required that all gun stores display County-approved suicide prevention materials at the point of sale. We understand that the ordinance appears near completion, and we urge its implementation this month.

While additional sensible restrictions on gun sales—particularly federal action that would meaningfully enforce eligibility restrictions, ban semiautomatic assault weapons with large ammunition clips, and the like—appear long overdue, their impact seems modest given the ubiquity of gun ownership and access. Gun sales amount to the shoreline to a much larger sea—the ocean of 300 million guns currently in circulation—we focus our attention on that larger source of risk.

**Regulating Ammunition Purchases**
Regulation of ammunition sales can reduce gun harm, but California's statewide ammunition database and background checks have come under scrutiny and legal challenge. If the Ninth Circuit invalidates the California law, we'll need to look for alternatives locally. The direction calls for staff to return to Council to discuss options, including a City-issued permit. Another promising alternative involves fingerprinting at the point of sale, which cities like Sacramento have used effectively to identify 156 persons illegally possessing guns, resulting in dozens of arrests and gun seizures in one year (2008) alone.  Sixteen other communities in California have enacted similar ordinances.

**Looking Out for Each Other**
Among the best practices in cities globally are community-based efforts to reduce gun violence through vigilance—engaging community members to spot the signs of emotional and mental distress in coworkers, students, and family members that will result in preventative outreach by mental health and public safety officials. With new funding available from the State of California—and likely, federal dollars—the County will have opportunities to expand mental health services, and a collaboration with the City and the community could "crowd-source" early intervention. New York offers one example of an effective community outreach program, Cure Violence in the City of New York, utilizing community-based "outreach workers" and "violence interrupters" in neighborhoods most vulnerable to gun violence. In an area of East New York, Brooklyn, gun injuries fell 50 percent following the implementation of this program.  Similarly, Berlin offers a compelling model focused on schools.

**Collaboration of Partners**
Our sincere thanks go to many partners who have helped to support this work—including Ron Conway and the Heising-Simons Foundation—and to the many partners who have helped to shape, inform, and provide feedback on these proposals, including the Santa Clara County Office of the District Attorney, The Gifford Law Center, local advocates with Moms Demand Action, the Office of the City Attorney, the San José Police Department, the Santa Clara County Public Health Department, the Santa Clara County Counsel's Office, Everytown for Gun Safety, Brady United, and attorneys at the offices of Keker Van Nest and Cotchett, Pitre who have graciously offered their guidance *pro bono*.

RULES AND OPEN GOVERNMENT
Subject: **Reducing Gun Harm, and the Public Burdens of Gun Violence**
Page 8

**Conclusion**

Plenty of criticism will emerge for these solutions. I encourage critics to come up with better ones—let's have a discussion of the best ideas, but above all, let's move forward. We don't have the luxury of remaining mired in discussing and posturing—our community demands action.

*BROWN ACT: The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*

# Exhibit 2



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:** HONORABLE MAYOR
AND CITY COUNCIL

**FROM:** Nora Frimann
City Attorney

**SUBJECT: GUN HARM REDUCTION
ORDINANCE**

**DATE:** January 14, 2022

---

## RECOMMENDATION

Consider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs.

## BACKGROUND

On June 29, 2021, the City Council directed the City Attorney to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

Council directed that the ordinance include the following provisions:

- Compliance:
  - The gun owner shall sign and complete an insurance attestation, describing the specific policy number and issuer, and sign the attestation under penalty of perjury. Acceptable insurance coverage may include any homeowner's or renter's policy that provides for a minimum coverage amount.
  - The attestation document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
- Exemptions and waivers:
  - A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.
  - An exemption from these requirements for sworn law enforcement.
  - An exemption from these requirements for holders of a concealed carry weapon (CCW) permit.

- Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine.

## ANALYSIS

The proposed ordinance includes provisions that are in accordance with the direction from Council.  The proposed ordinance authorizes an annual gun harm reduction fee to be paid by gun owners to a designated nonprofit organization that will, in turn, use the fees collected to provide certain services, as specified in the ordinance, to residents of the City who own or possess a gun or to members of their household.  The proposed ordinance also authorizes the City Manager to charge and collect any and all City cost recovery fees associated with fulfilling the policies of the ordinance relating to the reduction of gun harm, including any associated third-party costs.

The recitals within the draft ordinance contain the data and other information that supports the proposed ordinance.

The effective date of the proposed ordinance will be six months from the date of adoption.  This is to allow for time for the City Manager's Office to potentially do outreach, develop regulations, and work through any other issues related to the implementation of the proposed ordinance.

## CONCLUSION

If approved, the proposed ordinance will require, with certain exceptions, that San José residents who own firearms: (a) obtain and maintain liability insurance; (b) pay an annual gun harm reduction fee to a designated nonprofit organization that will use the fee proceeds to provide gun harm reduction services to residents of the City who own or possess a gun or to members of their household; and (c) pay any City cost recovery fees associated with program implementation, including any associated third-party costs.

## CLIMATE SMART SAN JOSE

The recommendation in this memo has no effect on Climate Smart San José energy, water, or mobility goals.

## COORDINATION

This memorandum has been coordinated with the City Manager's Office.

1889106

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject:  Gun Harm Reduction Ordinance**
Page 3

## CEQA

Not a Project, File No. PP17-008, General Procedure & Policy Making resulting in no changes to the physical environment.

/s/
NORA FRIMANN
City Attorney

For questions please contact Nora Frimann, City Attorney, at (408) 535-1900.

1889106