No. 23-16091

---

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

HOWARD JARVIS TAXPAYERS ASSOCIATION, et al.,

*Plaintiffs-Appellants*,

v.

CITY OF SAN JOSE, et al.

*Defendant-Appellee*.

---

On Appeal from the United States District Court, Northern District of California
Consolidated Case Nos. 5:22-cv-00501-BLF and 5:22-cv-02365-BLF
(Hon. Beth Labson Freeman)

---

**APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 OF 2**

---

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Defendant-Appellee.*

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE*
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admission *Pro Hac Vice* forthcoming

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE,** in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case Number: 5:22-cv-00501-BLF<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND NOMINAL DAMAGES**<br><br>Judge: Hon. Beth Labson Freeman |



First Amended Complaint                                      No: 5:22-cv-00501-BLF

1    *"That the power to tax involves the power to destroy; that the power to destroy may defeat and*
2    *render useless the power to create…."* Justice John Marshall, *M'Culloch v. Maryland*, 17 U.S. 316,
3    431 (1819). *"A tax that burdens rights protected by the [Constitution] cannot stand unless the burden*
4    *is necessary to achieve an overriding governmental interest."* Justice Sandra Day O'Connor,
5    *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 582 (1983).

6        Plaintiffs National Association for Gun Rights, Inc. ("NAGR"), and Mark Sikes ("Sikes"), by
7    and through the undersigned counsel, hereby bring this action for injunctive relief, a declaratory
8    judgment, and nominal damages as a result of the City of San Jose's unconstitutional and unlawful
9    ordinance, specifically Part 6 of Chapter 10.32 of Title 10 of the San Jose Municipal Code (the
10    "Ordinance"). In support of these requests, Plaintiffs state as follows:

11    <div align="center">**INTRODUCTION**</div>

12        1.    The Second Amendment "guarantee[s] the individual right to possess and carry
13    weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and the
14    government "may not impose a charge for the enjoyment of a right granted by the federal
15    constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). And yet, the City of San Jose has
16    taken the unprecedented step of requiring virtually all gun owners within its city limits to pay
17    unspecified sums of money to private insurance companies and an unspecified fee to an unidentified
18    government-chosen nonprofit simply to exercise their constitutional right to own a gun, as well as an
19    unspecified fee to the City for the costs of administering the unlawful Ordinance. Just as a tax on the
20    fundamental right for the press to circulate its content "suggests that the goal of the regulation is not
21    unrelated to suppression of expression," *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of*
22    *Rev.*, 460 U.S. 575, 586 (1983), San Jose's imposition of a tax, fee, or other arbitrary cost on gun
23    ownership is intended to suppress gun ownership without furthering any government interest. In fact,
24    the stated penalties for nonpayment of the insurance and fees include seizure of the citizen's gun. The
25    Ordinance is, therefore, patently unconstitutional.

26        2.    Moreover, it is at home "where the need for defense of self, family, and property is
27    most acute." *Heller*, 554 U.S. at 628. Because California and the City of San Jose have already made
28    it exceedingly difficult to lawfully carry a weapon outside the home, and the Ordinance only affects

---

<div align="center">1</div>

First Amended Complaint                                             5:22-cv-00501-BLF

owners of lawfully owned guns, the Ordinance's true impact is solely on guns kept in the home by law-abiding citizens. If left intact, the City of San Jose's Ordinance would strike at the very core of the fundamental constitutional right to keep and bear arms and defend one's home.

3.    While threatening the seizure of firearms for failure to fund the city's chosen nonprofits in violation of the Second Amendment, the Ordinance does *nothing* to deter the scourge of unlawful ownership and use of guns by criminals or to recoup from them compensation for the extensive injuries and costs they cause. According to the City's own statistics in support of the Ordinance, "Injuries from unintentional shootings" nationally only comprise about a third of all gun-related injuries, Ordinance §10.32.200.B.10, and in the period from 2010 to 2014, only "thirty-one percent (31%) of emergency department visits and sixteen percent (16%) of hospitalizations from firearms injuries were due to unintentional shootings." *Id*. at §10.32.200.B.4. Consequently, this Ordinance—largely directed as it is at gun safety and liability protection for *unintentional* acts—does virtually *nothing* to impose its costs on the primary source of gun violence and its associated harms in San Jose: criminals committing intentional acts of violence with guns.

4.    Further, the Ordinance calculates the cost to San Jose "per-firearm owning household" based on all of the costs ($39.7M) arising from responses to "gun violence," including "incident investigation," "perpetrator adjudication" and "judicial sanctioning"—i.e., responses to intentional criminal activity. *Id*. at §10.32.200.B.8. And yet, the Ordinance does not impose these costs on criminals but rather on lawfully gun-owning households. The Ordinance seeks to impose financial pressure ("incentivizing" or "encouraging" in the words of the Ordinance at sections 10.32.200.B.11-12) on gun owners.  But the Ordinance applies its pressure to lawful gun owners exercising their constitutional right to keep arms in the home for self-defense against the violent criminals who are actually causing the harm and costs the Ordinance claims it is trying to reduce.

5.    By compelling gun owners to directly pay and therefore subsidize the advocacy of an unnamed government-chosen nonprofit for the purpose of preaching the harms of gun ownership back at them, as appears to be the intent and function of the Gun Harm Reduction Fee, the Ordinance also violates the First Amendment rights of gun owners.

//

2

First Amended Complaint                                                5:22-cv-00501-BLF

6.      Additionally, the Ordinance violates Article XIII C of the California Constitution because the Gun Harm Reduction Fee and penalty-backed insurance mandate constitute taxes within the meaning of the California Constitution which were not approved by the voters. Finally, the Ordinance violates the San Jose City Charter because, by commanding gun owners to directly pay one nonprofit for unspecified programs not controlled by the City Council, it unlawfully deprives the City Council of its budget and appropriations powers and the City Manager of their powers as the City's chief administrative officer, and violates a Charter requirement that City funds only be deposited into City accounts.

7.      To preserve the safety and core rights under the Constitution of the law-abiding citizens of the City of San Jose, as well as their rights under the California Constitution and the City Charter, this Court must prevent Defendants from enforcing the unconstitutional and unlawful Ordinance.

**JURISDICTION AND VENUE**

8.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the First, Second, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C § 1983. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief and other relief, including preliminary and permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

9.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the state law claims regarding the City of San Jose's lack of authority to pass the Ordinance because the federal claims and this state claim are so related that they form part of the same case or controversy.

10.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1) because Defendants are officials of the City of San Jose, which is within the geographical boundaries of the Northern District of California. Defendants are also residents of this State within the meaning of 28 U.S.C. § 1391(c).

11.      The Court has personal jurisdiction over the Defendants because the City of San Jose is within the State of California.

//

---

3

First Amended Complaint                                                    5:22-cv-00501-BLF

**INTRADISTRICT ASSIGNMENT**

12.     This action is properly assigned to the San Jose Division, pursuant to Civil L.R. 3-2(e). A substantial part of the events giving rise to the claims occurred in Santa Clara County, California.

**PARTIES**

13.     Plaintiff NAGR is a non-stock, nonprofit corporation incorporated under the laws of the Commonwealth of Virginia and has its principal place of business in Loveland, Colorado. NAGR is a grassroots organization whose mission is to defend the right to keep and bear arms under the Second Amendment and advance the constitutional right by educating the American people and urging them to action in public policy.  NAGR has members who would be subject to the Ordinance within the City of San Jose.

14.     Plaintiff Mark Sikes resides in San Jose, California. Sikes legally owns a gun, is not a peace officer, does not have a concealed carry permit, and does not meet the qualifications of CAL. GOV. CODE § 68632 (a) and (b) and, therefore, would be subject to the Ordinance if it were to go into effect.

15.     Defendant City of San Jose is a municipal corporation within the County of Santa Clara, California. A true and correct copy of the City of San Jose's City Charter is attached as Exhibit "A."

16.     Defendant Jennifer Maguire ("Maguire") is the current and active City Manager for the City of San Jose. San Jose's Charter states that the City Manager is the "Chief Administrative Officer and head of the administrative branch of the City government." San Jose City Charter §§ 502, 701. "The City Manager shall be responsible for the faithful execution of all laws, provisions of this Charter, and acts of the Council which are subject to enforcement by the City Manager or by the officers who are under the City Manager's direction and supervision." *Id.*, § 701(d). Additionally, the City Manager is directly identified with enforcement authority throughout the Ordinance. Ordinance §§ 10.32.205, 210, 215, 235, & 250.

17.     Defendant San Jose City Council (the "City Council") is vested with authority under Article IV of the City of San Jose's City Charter (Ex. A). The Ordinance vests the City Council with authority to "set forth the schedule of fees and charges established by resolution of the City Council"

First Amended Complaint                                                            5:22-cv-00501-BLF

1  and to "set forth…the schedule of fines" for those who violate the ordinance. *Id.,* § 10.32.215;

2  10.32.250; 10.32.240.

3  <div align="center">**STATEMENT OF FACTS**</div>

4  <div align="center">**Enactment of the Ordinance**</div>

5      18.    On June 29, 2021, the City Council directed San Jose City Attorney Nora Frimann "to

6  return to Council with an ordinance for Council consideration that would require every gun owner

7  residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued

8  document evincing payment of an annual fee, and attestation of insurance coverage for unintentional

9  firearm-related death, injury, or property damage." Frimann Mem. re Gun Harm Reduction Ord., Jan.

10  14, 2022, 1 ("City Attorney Mem.") (a true and correct copy is attached as Exhibit "B"). Plaintiff

11  National Association for Gun Rights immediately sent the City a cease and desist letter warning that

12  the proposed ordinance was unconstitutional. Ltr. from H. Dhillon and D. Warrington to San Jose City

13  Council, July 14, 2021 (a true and correct copy is attached as Exhibit "C").

14      19.    On January 14, 2022, in advance of the City Council's January 25 meeting, the City

15  Attorney issued a memorandum in compliance with the City Council's directions that recommended

16  the Council "[c]onsider approving an ordinance amending Title 10 of the San José Municipal Code to

17  add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain

18  liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs." City Attorney

19  Mem. at 1 (Ex. B). Under a section addressing penalties for noncompliance, the City Attorney stated

20  that "[f]ailure to comply shall constitute a civil violation subjecting the owner to the temporary or

21  permanent seizure of the gun, and under specified circumstances, a fine." *Id*. at 2.

22      The City Attorney concluded:

23      If *approved*, the proposed ordinance will require, with certain exceptions, that San José

24      residents who own firearms: (a) obtain and maintain liability insurance; (b) pay an annual gun

25      harm reduction fee to a designated nonprofit organization that will use the fee proceeds to

26      provide gun harm reduction services to residents of the City who own or possess a gun or to

27      members of their household; and (c) pay any City cost recovery fees associated with program

28      implementation, including any associated third-party costs.

<div align="center">5</div>

First Amended Complaint                                5:22-cv-00501-BLF

1   *Id.* at 2 (emphasis added).

2        20.    In an op-ed published on January 19 in the Los Angeles Times, San Jose Mayor Sam

3   Liccardo wrote "[l]ast June our City Council unanimously approved my proposals that will mitigate

4   gun harm in our community — and *a final vote* on Jan. 25 should turn them into law." Mayor Sam

5   Liccardo, *Op-Ed*: *My City's New Gun Control Laws Will Help More Than Waiting On Congress To*

6   *Do Something*, LOS ANGELES TIMES, Jan. 19, 2022, https://www.latimes.com/opinion/story/2022-01-

7   19/op-ed-new-gun-control-laws-help-congress (emphasis added)(a true and correct copy is attached as

8   Exhibit "D").

9        21.    On January 21, 2022, Mayor Liccardo, Vice Mayor Jones, Councilmember Cohen, and

10  Councilmember Carrasco issued "Directions" to the City Council, including to "[a]pprove the

11  proposed ordinance," with certain modifications. Mayor's Mem. to City Council, Jan. 21, 2022, 2 (a

12  true and correct copy is attached as Exhibit "E"). The Mayor's Memorandum also noted that

13  "Members of the California legislature are exploring bills to have law enforcement agencies seize

14  guns *as a sanction for violations of local gun regulations*, with subsequent restoration of ownership as

15  required by constitutional due process." *Id.* at 4 (emphasis added).

16       22.    The Agenda for the City Council's January 25, 2022, meeting further stated that the

17  recommendation before the Council was to "[c]onsider approving" the Ordinance.  Agenda for Jan.

18  25, 2022 City Council Meeting (a true and correct copy is attached as Exhibit "F"). The City's

19  Synopsis for what occurred at its January 25, 2022, City Council Meeting also states that the action

20  before the Council was to "[c]onsider approving" the Ordinance and the Synopsis records that the

21  Ordinance was indeed "approved" through two votes regarding various changes.  Tuesday, January

22  25, 2022 City Council Meeting Synopsis at 13 (a true and correct copy is attached as Exhibit "G").

23       23.    The Mayor immediately issued a press release the night of the vote, in which he

24  boasted that "Tonight San José *became* the first city in the United States *to enact* an ordinance to

25  require gun owners to purchase liability insurance, and to invest funds generated from fees paid by

26  gun owners into evidence-based initiatives to reduce gun violence and gun harm." Liccardo Press

27  Release, Jan. 25, 2022 (emphasis added) (a true and correct copy is attached as Exhibit "H").

28       24.    Within 24 hours, articles were published about San Jose enacting an unprecedented

---

6

First Amended Complaint                                        5:22-cv-00501-BLF

1    regulation of gun ownership, including in the San Francisco Chronicle and the Los Angeles Times.

2    *See* Lauren Hernández, *Gun Owners In San Jose Must Buy Liability Insurance Under Newly Passed*

3    *First-In-The-Nation Law,* SAN FRANCISCO CHRONICLE, Jan. 25, 2022 (updated Jan. 26, 2022)

4    https://www.sfchronicle.com/bayarea/article/Gun-owners-in-San-Jose-must-buy-liability-

5    16804951.php  (a true and correct copy is attached as Exhibit "I") ("The San Jose City Council

6    adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability

7    insurance for their firearms, city officials said."); Olga R. Rodriguez and Juliet Williams, *San Jose*

8    *Approves First Law In U.S. Requiring Gun Owners To Have Insurance*, LOS ANGELES TIMES, Jan. 25,

9    2022, https://www.latimes.com/california/story/2022-01-25/san-jose-gun-liability-insurance (a true

10   and correct copy is attached as Exhibit "J") ("The city of San Jose voted Tuesday night to require gun

11   owners to carry liability insurance in what's believed to be the first measure of its kind in the United

12   States. The San Jose City Council overwhelmingly approved the measure despite opposition from

13   some gun owners who said it would violate their 2nd Amendment rights.").

14       25.    Consistent with the Mayor's pre- and post-meeting statements, and the interpretations

15   of reputable journalists reporting on the Council's action, Plaintiffs considered the City Council's vote

16   to potentially constitute the "final approval" or enactment of the Ordinance and immediately filed suit

17   to protect their rights and those of the citizens of San Jose.

18       26.    The City's new position, first taken in this litigation, is that contrary to the Mayor's and

19   City Council's pronouncements before and after the January 25, 2022, City Council meeting, the City

20   Council did not actually "enact" or provide the "final approval" for the Ordinance on January 25

21   because it would have violated the City Charter for them to do so. The City now states the ordinance

22   could only have ever been truly enacted at the City Council's February 8, 2022, meeting on its

23   "second reading," (Mem. Supp. Mot. Dismiss 3), notwithstanding the Mayor's statements to the

24   contrary before and after the January 25 Council meeting. The Ordinance was placed on the Council's

25   consent calendar for its February 8, 2022, meeting and on that day the Council voted a second time to

26   approve the Ordinance.

27       27.    In any event, regardless of whether the Mayor's statements about the enactment of

28   the Ordinance or the City's published records about its approval were incorrect or misleading, a

7

First Amended Complaint                                                      5:22-cv-00501-BLF

1   true and correct copy of the now-indisputably enacted Ordinance, as shown on the City's website,

2   is attached as Exhibit "K."

3                                    **The Burdens of the Ordinance**

4        28.    The Ordinance will require an estimated 50,000-55,000 gun-owning San Jose Citizens,

5   minus a few exceptions, to obtain an insurance policy and pay annual fees simply to exercise the

6   same constitutional right to own a gun that existed prior to this ordinance. Liccardo Mem. re Gun

7   Harm Reduction Ord., Jan., 19, 2022 (a true and accurate copy is attached as Exhibit "L").

8        29.    The Ordinance states that "[t]o the extent allowed by law, the Firearm or Firearms of a

9   person that [*sic*] is not in compliance with [the Ordinance] may be impounded subject to a due

10  process hearing."  Ordinance § 10.32.245.  Further, "[a]ny violation" of the Ordinance is "punishable

11  by an administrative citation," "fines for violations," and "all other civil and administrative remedies

12  available to the City." *Id*., § 10.32.240; *see also* Mayor's Mem. to City Council, Jan. 21, 2022 (Ex. E)

13  ("Members of the California legislature are exploring bills to have law enforcement agencies seize

14  guns as a sanction for violations of local gun regulations . . ."); City Attorney Frimann Memo. at 2

15  (Ex. B)("Failure to comply [with the Ordinance] shall constitute a civil violation subjecting the owner

16  to the temporary or permanent seizure of the gun, and under specified circumstances, a fine.").

17       30.    The Ordinance targets guns in the home. It does not apply to people who have a license

18  to carry a concealed weapon. *Id*., § 10.32.225. Additionally, absent a concealed carry permit, there is

19  no other way to carry a firearm in San Jose. *See* CAL. PENAL CODE §§ 25850, 26150, 26155, 26350,

20  26400. The Ordinance thus would charge all law-abiding owners of guns for home and self-defense to

21  pay for the harms caused by criminals who use unregistered guns to commit acts of violence.

22  Ordinance § 10.32.200.B.8 (identifying costs the Ordinance seeks to recoup to include those arising

23  from homicides and all firearm-related injuries).

24                                    *Insurance Requirement*

25       31.    The Ordinance conditions the constitutional right to own a gun on the payment of an

26  unstated amount for insurance.  It states that "A person who resides in the City of San Jose and owns

27  or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a

28  homeowner's, renter's or gun liability insurance policy…specifically covering losses or damages

---

8

First Amended Complaint                                              5:22-cv-00501-BLF

1    resulting from any accidental use of the Firearm, including but not limited to death, injury, or property

2    damage." Ordinance § 10.32.210.A.

3         32.    This requirement does not contain any information about minimum insurance coverage

4    thresholds or premiums. Thus, the City of San Jose has conditioned the constitutional right of its law-

5    abiding citizens to own a gun on an unstated, unregulated price to be set by an industry of for-profit

6    private sector corporations.

7         33.    Moreover, the City's findings did not include any evidence that there are available

8    insurance policies "specifically covering losses or damages resulting from any accidental use of"

9    firearms, or what any such policy will cost. *See* Ordinance § 10.32.200.B.10 ("[i]njuries from

10   unintentional shootings . . . are *generally* insurable" (emphasis added)).

11        34.    The Ordinance does nothing to ensure that insurance companies will provide policies

12   "specifically covering" losses arising from accidental firearm use for any and every citizen who is

13   subject to the Ordinance, which means the City's insurance mandate would establish a precondition to

14   gun ownership that empowers for-profit insurance companies (with or without government pressure)

15   to prohibit persons from exercising their Second Amendment rights.

16        35.    Further, the Ordinance does not indicate there is any way for taxpayers to file claims

17   against insurers to recover the city's expenses. *See id.* §10.32.210 (stating only that policies must

18   cover "death, injury, or property damage").

19                                     *Fee Requirement*

20        36.    The second primary component of the Ordinance is the creation of a "fee" for owning a

21   gun. The Ordinance states that "A person who resides in the City and owns or possesses a Firearm in

22   the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each

23   year." Ordinance § 10.32.215. No fee amount is specified, nor is there criteria for how to calculate the

24   fee. *Id*. Rather, Defendant City Council reserved the right for itself to determine the fee amount at a

25   later date. *Id*.

26        37.    The destination of the money is to an undetermined nonprofit. That determination is

27   delegated to Defendant Maguire. *Id.*, §§ 10.32.205.B; 10.32.220.

28        38.    The nonprofit fee in the Ordinance is not to defray the City's administrative costs.

---

9

First Amended Complaint                                          5:22-cv-00501-BLF

1   Rather, "all monies…shall be expended by the Designated Nonprofit Organization…." *Id.*,

2   § 10.32.220.A.

3   39.   The only selection criteria for the Designated Nonprofit Organization is that it

4   "provid[e] services to residents of the City that own or possess a Firearm in the City or to members of

5   their household, or to those with whom they have a close familial or intimate relationship." These

6   services "include, *but are not necessarily limited to*" suicide prevention services or programs, violence

7   reduction or gender based violence services or programs, mental health services related to gun

8   violence, firearms safety education or training, or addiction intervention and substance abuse

9   treatment. *Id.*, § 10.32.220.A (emphasis added).

10   40.   "[T]he City shall not specifically direct how the monies from the Gun Harm Reduction

11   Fee are expended" by the nonprofit. *Id.*, § 10.32.220.C.

12   41.   The fee thus functions to compel gun owners to give their money to a government-

13   approved nonprofit to spend on unspecified programs at the nonprofit's discretion, none of which are

14   services that the City is obligated to perform. This compelled donation by gun owners to one City-

15   favored nonprofit to advocate about the dangers of gun ownership with little to no municipal oversight

16   is not only obnoxious to the Constitution, it is an invitation to corruption and waste.

17   42.   By its plain terms, this fee and insurance requirement do not compensate the City to

18   cover reasonable costs of governmental activity, because they are not for government activity. Further,

19   the manner in which those costs are allocated to gun owners do not bear a fair or reasonable

20   relationship to the gun owner's burdens on, or benefits received from, the City's governmental

21   activity.

22   43.   Indeed, the Ordinance also authorizes a separate fee just to recoup the costs associated

23   in administering the Ordinance. *Id.* § 10.32.250.

24   44.   Accordingly, as discussed further below, the "Annual Gun Harm Reduction Fee"—

25   unconnected to the cost of City services and for unspecified programs outside of the City's control—

26   and the mandatory insurance requirement backed by the threat of fines and seizure are nothing more

27   than exactions, or *taxes* within the meaning of the California Constitution, that the City is imposing on

28   the exercise of a constitutional right.

First Amended Complaint                                    5:22-cv-00501-BLF

**The Second Amendment**

45.     The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

46.     "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).

47.     Even in the face of "the problem of handgun violence in this country,…the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

48.     "The upshot of [*Heller* and *McDonald*] is that there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home." *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011).

49.     Local governments, including the City of San Jose, are bound by the Second Amendment. *McDonald*, 561 U.S. at 790; *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

50.     Imposing an insurance mandate and fees (or taxes) on gun owners in the City of San Jose burdens Plaintiff NAGR's members and Plaintiff Sikes by creating an indefinite cost on their ability to exercise their basic and fundamental right to possess a gun. "A tax that burdens rights protected by the [Constitution] cannot stand unless the burden is necessary to achieve an overriding governmental interest." *Minneapolis Star and Tribune*, 460 U.S. at 582.

51.     Both the insurance mandate and the fees created by the Ordinance are costs subject to the whims of the City Council and private insurance companies and, thus, bear a significant risk of making gun ownership far more expensive, if not cost prohibitive. As a form of fixed tax disconnected from a person's income or the monetary value of a person's firearms, it is an especially regressive one.

52.     The Ordinance cites a number of statistics about gun violence, but provides no studies or statistics that gun liability insurance will reduce gun violence. Rather, it in conclusory fashion states that "Liability insurance can reduce the number of gun incidents by encouraging safer

behavior….." Ordinance § 10.32.200.B.12.  It is not apparent how liability insurance will meaningfully add to the extant incentives for safe behavior, such as the fear of potentially killing another human being (intentionally or by accident), being prosecuted, or being sued.

53.     The Ordinance does not include any studies or statistics showing that the yet-to-be-determined nonprofit will accomplish the stated aim of reducing gun violence. Rather, in conclusory fashion, it states that "Programs and services to gun owners and their households can also encourage safer behavior, and provide education and resources to those residents." *Id.*, § 10.32.200.B.13.

54.     The Ordinance cites a figure that "San Jose taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term care, and perpetrator adjudication and judicial sanctioning." It cites figure of $442 million in gun-related costs if the calculation includes "private costs to individuals and families." *Id.*, § 10.32.200.B.8-.9. But the Ordinance does not distinguish how much of these costs are due to intentional violent criminal conduct that the Ordinance will hardly address as opposed to the types of unintentional conduct it is largely focused on.

55.     Despite the per-household fee being based on the City's assessment of the overall cost of guns to San Jose, the fee will not reimburse the City, taxpayers, or private individuals because the fee will be distributed entirely to a nonprofit. Likewise, the insurance will not reimburse the City, taxpayers, or private individuals for any intentional gun violence committed by criminals and most costs incurred by the City/taxpayers, such as ambulance, police, and judicial costs, would not be the type of costs covered by an insurance carrier.

56.     Therefore, neither the insurance mandate nor the nonprofit fee fit any stated, or unstated, government objective.

57.     Additionally, governments "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113.

58.     The only exception is to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Applied to the Second Amendment, "imposing fees on the exercise of constitutional rights is

1    permissible when the fees are designed to defray (and do not exceed) the administrative costs of

2    regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2nd Cir. 2013).

3          59.     Neither the insurance premium nor the fee to be paid to the City's chosen nonprofit are

4    designed to defray the City's administrative costs and, therefore, they are unconstitutional.

5                                            **The First Amendment**

6          60.     The First Amendment, applied to the states through the Fourteenth Amendment,

7    protects the freedom of speech, including both the right to speak freely and the right to refrain from

8    speaking at all, and to avoid associating with others for expressive purposes. The First Amendment

9    thus prohibits government officials from forcing individuals to support views that they find

10   objectionable.

11         61.     Thomas Jefferson famously said that "to compel a man to furnish contributions of

12   money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

13   *Janus v. AFSCME*, 138 S.Ct. 2448, 2464 (2018) (quoting *A Bill for Establishing Religious Freedom*,

14   in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950)).

15         62.     The Ordinance directs gun owners to subsidize one unidentified nonprofit by paying

16   the city's fee directly to that organization. Ordinance § 10.32.215. The Ordinance even prohibits the

17   city from directing how the nonprofit would use the funds. *Id.* at § 10.32.220.C. The one thing that is

18   clear is that the organization will likely be dedicated to exclusively preaching the negative risks of

19   gun ownership, and the Ordinance does not prohibit the nonprofit from using the City's fee revenues

20   for other messages and programs.

21         63.     The Defendants may not force Plaintiffs to pay fees to nonprofits when those fees are

22   going to be used to fund activities of ideological or political nature with which Plaintiffs disagree, *see*

23   *Keller v. State Bar of California*, 496 U.S. 1, 13 (1990), or in fact are left unstated.

24         64.     The Ordinance therefore unconstitutionally compels Plaintiffs to subsidize speech and

25   associate against their will and this Court should therefore preliminarily and permanently enjoin

26   Defendant from enforcing the Ordinance and award Plaintiffs nominal damages.

27                                    **California Constitution-Preemption**

28         65.     Article XI, section 7 of the California Constitution states that "A county or city may

---

                                                    13

First Amended Complaint                                          5:22-cv-00501-BLF

1  make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not
2  in conflict with general laws."

3      66.    Article XI, section 7 of the California Constitution preempts any local law that
4  "duplicates, contradicts, or *enters an area fully occupied by general law*, either expressly or by
5  legislative implication." *Fiscal v. City and County of San Francisco* 158 Cal.App.4th 895, 903 (Cal.
6  Ct. App. 2008)(quotation omitted)(emphasis added).

7      67.    "[T]he Legislature intended to occupy the field of residential handgun possession to the
8  exclusion of local government entities." *Id*. at 909.

9      68.    Gun regulation is already fully occupied by the state of California. Indeed, California
10  already comprehensively regulates firearms, including firearm safety, CAL. PENAL CODE §§ 23500-
11  23520, the appearance of firearms, *id*., §§ 23800-24790, storage of firearms, *id*., §§ 25000-25225,
12  how to handle lost or stolen firearms, *id*., §§ 25250-25225, carrying firearms, *id*., §§ 25300-26406, the
13  sale, lease, or transfer of firearms, *id*., §§ 26500-28490, the registration and assignment of firearms,
14  *id*., §§ 28010-28024, how to transfer firearms between private persons, *id*., §§ 28050-28070,
15  recordkeeping, background checks, and fees related to transfer, *id*., §§ 28100-28490, the manufacture
16  of firearms, *id*., §§ 29010-29184, who may not possess a firearm, *id*., §§ 29610-30165, rules
17  pertaining to "firearm equipment," *id*., §§ 30150-30165, and, in some cases, firearm registration, *id*.,
18  §§ 30900-30965. This is but a sample of all of the separate statutes regulating firearms in California.
19  *See generally* CAL. PENAL CODE §§ 23500-34370.

20      69.    Thus, the City of San Jose's Ordinance violates the California Constitution because it
21  is preempted by California state law.

22                  **California's Local Tax Requirements**

23      70.    All taxes imposed by local governments in California must be approved by voters of
24  the local government. CAL. CONST. art. XIII C. A "tax" in California, with exceptions that do not
25  apply here, is defined as "any levy, charge, or *exaction of any kind* imposed by a local government."
26  Article XIII C, § 1(e) (emphasis added).

27      71.    The Ordinance's insurance mandate and Gun Harm Reduction Fee do not pay for City
28  services and do not correspond to any benefit received from City services by those who pay for them.

First Amended Complaint                                5:22-cv-00501-BLF

72.     The insurance mandate and the Gun Harm Reduction fee are thus taxes which were not submitted to the electorate for approval and, therefore, violate the California Constitution.

**The San Jose City Charter**

73.     The San Jose City Charter vests in the City Council "[a]ll powers of the City and the determination of all matters of policy." San Jose City Charter § 400. These powers include the exclusive authority to impose taxes.  *Id.*, § 602(c).  With regard to the expenditure of City funds, only the City Council has the power to establish a budget. *Id.* §§ 1204, 1206.  The Council also has the sole power to appropriate the expenditure of City funds. *Id.*, § 1207.

74.     The City Manager is the "Chief Administrative Officer and head of the administrative branch of the City government." *Id.*, §§ 502; 701.

75.     "All revenues and receipts which are not required by [the] Charter, State law or ordinances to be placed in special funds shall be credited to the [City's] General Fund." *Id.*, § 1211. The General Fund is "a medium of control and accounting for all City activities excepting activities for which special funds are established and maintained." *Id.*

76.     The Ordinance, by prohibiting the City from directing how "monies from the Gun Harm Reduction fee are expended" by the chosen nonprofit, Ordinance § 10.32.220.C, violates the San Jose City Charter's reservation of budgeting and appropriation power to the City Council.

77.     The Ordinance also violates the City Charter's delegation of executive functions to the "administrative" branch of the City Government under the leadership and control of the City Manager because the Ordinance says "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended" other than vague directions to the nonprofit to "reduce the risk" of harm from using firearms, "mitigate the risk" of harm or liability from possessing firearms, and to spend the City's funds in ways including, *but not limited to*, various services. *Id.,* § 10.32.220.A, C.

78.     The Ordinance, by requiring gun owners to pay the City-required, City-determined fee directly to a nonprofit organization, *id.*, § 10.32.215, thereby diverts a City fee to a nonprofit rather than the City's General Fund, and thus violates the City Charter's requirement that all City revenues and receipts be deposited into City accounts as an essential means of City "control and accounting." This too is an invitation to corruption, waste, and fraud.

79.     The Ordinance also violates California Government Code § 43400 that requires all "money received from licenses, street poll taxes, fines, penalties, and forfeitures shall be paid into the general fund."

\*          \*          \*          \*

80.     In sum, the Ordinance violates the Second Amendment by infringing upon the right to keep and bear arms, violates the First Amendment by forcing gun owners to associate with and pay a donation subsidizing the virtually unrestricted speech of a private non-governmental nonprofit organization, violates article XI, §7 of the California Constitution because state law thoroughly occupies and preempts the field of gun regulation, violates article XIII C of the California Constitution by failing to submit a local tax to the voters for approval, violates the San Jose City Charter's budget,  appropriations, and separation of powers provisions, and violates controls on the handling of city receipts under the City Charter.

81.     Accordingly, Plaintiffs request that this court issue preliminary and permanent injunctions preventing Defendants from enforcing the Ordinance in its entirety pursuant to 42 U.S.C. § 1983, declare the Ordinance unconstitutional in its entirety under both the United States and California Constitutions, declare that the Ordinance violates the San Jose City Charter and the California Government Code, issue nominal damages, and order any other relief this Court deems necessary and proper.

**FIRST CLAIM FOR RELIEF**
**Violation of the Second and Fourteenth Amendments (42 U.S.C. § 1983)**
*The Ordinance requiring owners of guns to purchase insurance and pay annual fees*
*violates the Second and Fourteenth Amendments to the United States Constitution.*

82.     Plaintiffs incorporate by reference and re-allege each of the Paragraphs set forth above.

83.     The Second Amendment of the United States Constitution guarantees "the right of the people to keep and bear arms" and that right "shall not be infringed." U.S. CONST., amend. II.

84.     In a Second Amendment inquiry, a Court asks "whether the challenged law burdens conduct protected by the Second Amendment[.]" *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).

85.     Government "may not impose a charge for the enjoyment of a right granted by the

First Amended Complaint                                                                    5:22-cv-00501-BLF

1   federal constitution." *Murdock*, 319 U.S. at 113. For example, in 1973 the Minnesota legislature

2   passed a use tax on paper and ink. The Supreme Court struck down this special use tax because it

3   singled out the press for special treatment and the Court found that a "tax that burdens rights

4   protected by the [Constitution] cannot stand unless the burden is necessary to achieve an overriding

5   governmental interest." *Minneapolis Star and Tribune Co.*, 460 U.S. at 581.

6       86.     This is particularly true because the exercise of a constitutional right cannot be

7   conditioned upon a fee unless it is to defray an administrative expense. *Cox*, 312 U.S. at 577; *Kwong*,

8   723 F.3d at 165.

9       87.     The Ninth Circuit has adopted the *Murdock/Cox* standards for Second Amendment fee

10  cases. *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017).

11                      ***The Ordinance Violates the Second Amendment***

12      88.     Both the Ordinance's Gun Harm Reduction Fee and insurance mandate impose costs

13  on gun owners in the City of San Jose just for exercising their Second Amendment rights.

14      89.     If the City has the power to impose these arbitrary burdens on gun ownership, there

15  would be no limiting principle to the amount of the fees and costs the City could mandate and

16  nothing to prevent the City from extinguishing the Second Amendment within its borders entirely.

17      90.     Though the Ordinance threatens the confiscation of guns and an unspecified fine for

18  noncompliance with its insurance and Gun Harm Reduction Fee, it does not specify a sum certain or

19  articulate standards that will determine the cost of the insurance requirement or either fee that the

20  Ordinance creates. Therefore, the as yet unknown financial burden of the Ordinance's insurance

21  requirement will be left to the whims of for-profit insurance companies without a clear standard for

22  what their policies must cover.  The City's fees, too, are left unstated and deferred to future,

23  unscheduled determinations of the City Council in an exercise of unfettered discretion. Any

24  statement by the City now regarding a minimal cost or burden rings hollow because there are no

25  constraints on the City's authority to increase the costs and burdens tomorrow.

26      91.     The City's dictate that the right to gun ownership will depend on citizens having an

27  unspecified insurance policy and payment of as-yet undetermined fee to a third party who has yet to

28  be chosen to fund unspecified programs beyond the City's control will chill and infringe upon on

---

First Amended Complaint                                          5:22-cv-00501-BLF

1    those citizens' Second Amendment rights.

2        92.    It is plausible, if not probable, that the Ordinance will discourage gun ownership, if not

3    make it cost prohibitive, for at least some San Jose residents, particularly in light of the view of gun

4    ownership reflected in the Ordinance's findings.

5        93.    Where, as here, taxes and fees are not anchored to value or income, they are also

6    inherently regressive; their burden on citizens' rights will be inversely proportional to those citizens'

7    ability to pay the taxes and fees.

8        94.    At the very least, any such a cost "infringe[s]" upon the constitutional right to keep and

9    bear arms.

10            ***The Ordinance Does Not Serve Its Claimed Purpose or Any Other Valid Purpose***

11        95.    The Ordinance's "Purpose and Findings" recites facts about homicide, suicide,

12    accidental injury and death, hospitalizations, probabilities of incidents as they correlate to gun

13    ownership, and statistics from automobile insurance. Ordinance § 10.32.200.B. Accordingly, the City

14    of San Jose appears to claim a stated objective of reducing gun violence.

15        96.    However, requiring gun owners to purchase an insurance policy and pay an annual fee

16    to an unnamed nonprofit are not a reasonable fit to the asserted objective of reducing gun violence

17    insofar as the violence to be reduced is committed by persons who do not register their guns and use

18    their guns to commit crimes, or the injuries are inflicted by persons other than the guns' owners.

19        97.    The City makes no findings, other than conclusory statements, that insurance or

20    funding nonprofits will impact gun violence, particularly gun violence by those who lawfully possess

21    and register their firearms to be kept in the home as opposed to others who possess guns either

22    unlawfully or outside the home. *See generally id.*, § 10.32.200.B. That the Ordinance does not in fact

23    control how the chosen nonprofit would spend the City's fees, and specifically forbids the City from

24    directing the spending of its own funds, further undermines the contention that payment of the fee

25    would achieve the Ordinance's aims.

26        98.    The Ordinance cites a figure that "San Jose taxpayers annually spend approximately

27    $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with

28    such public services as emergency police and medical response, victim assistance, incident

18

First Amended Complaint                                        5:22-cv-00501-BLF

1  investigation, acute and long-term care, and perpetrator adjudication and judicial sanctioning."

2  Ordinance § 10.32.200.B.8. It includes a sum of $442 million if the calculation includes "private costs

3  to individuals and families." *Id*., § 10.32.200.B.9.  But more than $328,355,500 (or 74%) of these

4  alleged costs are for the impact of guns on "quality of life" and a further $78,272,000 (or 18%) of the

5  asserted $442 million is for "lost work." Liccardo Mem. re Gun Harm Reduction Ord., Jan., 19, 2022

6  (Ex. L).

7  99.     However, the Gun Harm Reduction Fee will not reimburse the City, taxpayers, or

8  private individuals because the fee will be distributed entirely to a nonprofit. Likewise, the insurance

9  will not likely reimburse the City, taxpayers or private individuals for any intentional gun violence

10  committed by gun owners or injuries inflicted by uninsured persons or premises and, even if the gun

11  owner is insured, costs incurred by the City/taxpayers, such as ambulance, police, and judicial costs,

12  would not be reimbursed by an insurance carrier. Thus, the insurance and fee requirements do not fit

13  the government interest in reimbursing the costs incurred by the City/taxpayers or most private

14  individuals or their families who are injured through criminal gun violence (the majority of gun

15  injuries).

16  100.    To the extent that Defendants will assert a separate government interest, said

17  government interest would not be significant, substantial, or important.

18  101.    To the extent that Defendant will assert a separate government interest, requiring gun

19  owners to pay insurance and an annual fee to an unnamed nonprofit does not constitute a reasonable

20  fit for any other government interest.

21  102.    Neither the insurance requirement nor the fee requirement is historically or

22  presumptively lawful, in that, the Ordinance is a first-of-its-kind regulation of firearms.

23                              *       *       *       *

24  103.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

25  to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

26  Ordinance.

27  104.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled preliminary and

28  permanent injunctive relief invalidating and restraining enforcement of the Ordinance as well as

19

First Amended Complaint                                                5:22-cv-00501-BLF

1    declaratory relief.

2        105.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

3    rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

4    U.S.C. § 1988.

5                                    **SECOND CLAIM FOR RELIEF**

6                    **Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)**
     *The payment of a fee to a nonprofit violates the free speech rights of gun owners by*
7    *compelling them to subsidize private speech on matters of substantial public concern.*

8        106.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

9    above.

10       107.    The First Amendment protects Plaintiffs' freedom of speech which includes both the

11   right to speak freely and the right to refrain from speaking at all.

12       108.    The First Amendment protects the right of Plaintiffs to eschew association for

13   expressive purposes.

14       109.    The First Amendment prohibits government officials from forcing individuals to

15   support views that they find objectionable.

16       110.    Thomas Jefferson famously said that "to compel a man to furnish contributions of

17   money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

18   *Janus*, 138 S.Ct. at 2464 (quoting *A Bill for Establishing Religious Freedom*, in 2 Papers of Thomas

19   Jefferson 545 (J. Boyd ed. 1950)).

20       111.    In *Janus*, the Supreme Court examined the case of compelled subsidization of private

21   speech. The Court never determined if the courts are to use strict scrutiny or exacting scrutiny

22   because in *Janus* the Court concluded that the "Illinois scheme cannot survive under even the more

23   permissive standard." *Id.* at 2465.

24       112.    Furthermore, the Defendants may not require Plaintiffs to pay fees to nonprofits when

25   those fees are going to be used to fund activities of ideological or political nature, such as endorsing

26   gun control. *See Keller*, 496 U.S. at 13.

27       113.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

28   to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

---

                                                    20

First Amended Complaint                                                     5:22-cv-00501-BLF

1    Ordinance.

2        114.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled preliminary and

3    permanent injunctive relief invalidating and restraining enforcement of the Ordinance, as well as

4    declaratory relief.

5        115.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

6    rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

7    U.S.C. § 1988.

8
                         **THIRD CLAIM FOR RELIEF**
9              **Violation of article XI, §7 of the California Constitution-Field Preemption**
                 *The Ordinance occupies a field already occupied by California law.*
10

11       116.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

12   above.

13       117.    Article XI, section 7 of the California Constitution states that "A county or city may

14   make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not

15   in conflict with general laws."

16       118.    The State of California has voluminous statutes comprehensively regulating firearm

17   ownership in California. *See generally* CAL. PENAL CODE §§ 23500-34370. California courts have

18   already determined that "the Legislature intended to occupy the field of residential handgun

19   possession to the exclusion of local government entities." *Fiscal*, 158 Cal.App.4th at 909 (citing Cal.

20   Penal Code § 12026).[1]

21       119.    Accordingly, because the state legislature has already occupied the field of regulating

22   residential handgun possession, as well as all conceivable fields of gun possession, local governments

23   are excluded from further regulation of guns, particularly guns in the home.

24       120.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

25   to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

26   Ordinance.

27

28   _____
     [1] The state laws cited in *Fiscal* have since been repealed.  However, they have been continued into other statutes with no
     substantive change.

                                    21
     First Amended Complaint                                          5:22-cv-00501-BLF

121.     Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

**FOURTH CLAIM FOR RELIEF**

**Violation of article XIII C, §1 of the California Constitution-Local Tax Elections**
***The Ordinance imposes new taxes, but was not submitted to the electorate for vote.***

122.     Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth above.

123.     The California Constitution requires that "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote." Article XIII C, §2(b).

124.     It also requires that "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." Article XIII C, §2(d).

125.     A "tax" is "any levy, charge, or exaction of any kind imposed by a local government," with exceptions that do not apply here. Article XIII C, §1(e).

126.     Thus, both of the fees in the Ordinance and the insurance requirement constitute a "tax."

127.     The Ordinance, whether it is a general or a special tax, was never submitted to the electorate for a vote.

128.     We note that, if the City disputes that the Ordinance is a tax, "the [City] bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." Article XIII C, §1.

129.     The City cannot meet this burden because the fees imposed are a levy, charge, or exaction imposed by the city that does not meet any exception, and the amount of the fees are "more

22

First Amended Complaint                                                     5:22-cv-00501-BLF

than necessary to cover the reasonable costs of the governmental activity" because they are not for government activity, and "the manner in which those costs are allocated to" gun owners do not "bear a fair or reasonable relationship to the payor's burdens on, or benefits received from" the City's "governmental activity." Article XIII C, §1.

130.   As stated previously, the insurance requirement and the fee allocated to a nonprofit do not cover "costs of a governmental activity" as the insurance is allocated to for-profit corporations and the fee is allocated to an unnamed nonprofit rather than the City.

131.   Neither the insurance requirement nor the nonprofit fees bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, a governmental activity.

132.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Ordinance.

133.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

**FIFTH CLAIM FOR RELIEF**
**San Jose City Charter, Art. IV, §§ 400, 502, 602, 701, 1204, 1206, 1207, 1211**
***The Ordinance Violates the Separation of Powers Within the City of San Jose's Government, its Budget and Appropriations Procedures, and Controls on the City's Receipts.***

134.   Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth above.

135.   The San Jose City Charter ("Charter") establishes the powers of the City of San Jose's government. San Jose City Charter § 200 (Ex. A).

136.   The Charter divides the legislative power of the City's government from its executive power.  "All powers of the City and the determination of all matters of policy shall be vested in the Council, subject to the provisions of this Charter and the Constitution of the State of California." *Id.*, § 400.

137.   The Charter grants the City Council the power to impose taxes by ordinance.  *Id.*, §

---

23

First Amended Complaint                                    5:22-cv-00501-BLF

1  602(c).

2      138.   Only the City Council has the power to establish a budget. *Id.* §§ 1204, 1206.  The

3  Council also has the sole power to appropriate the expenditure of City funds. *Id*., § 1207.

4      139.   The City Manager is the "Chief Administrative Officer and head of the administrative

5  branch of the City government." *Id.*, § 502; *see also id.,* § 701.

6      140.   Finally, "[a]ll revenues and receipts which are not required by [the] Charter, State law

7  or ordinances to be placed in special funds shall be credited to the [City's] General Fund." *Id*., § 1211.

8  The General Fund is "a medium of control and accounting for all City activities excepting activities

9  for which special funds are established and maintained." *Id.* CAL. GOV'T. CODE § 43400 also requires

10  monies received "from licenses, street poll taxes, fines, penalties, and forfeitures" to be put into the

11  general fund.

12      141.   Here, the Ordinance states that "[t]he City shall not specifically direct how the monies

13  from the Gun Harm Reduction Fee are expended" by its chosen nonprofit.  Ordinance, § 10.32.220.C.

14      142.   The Ordinance, by prohibiting the City from directing how "monies from the Gun

15  Harm Reduction Fee are expended" violates the San Jose City Charter's reservation of budgeting and

16  appropriation power to the City Council.

17      143.   The Ordinance also violates the City Charter's delegation of executive functions to the

18  "administrative" branch of the City Government under the leadership and control of the City Manager

19  because the Ordinance says "the City shall not specifically direct how the monies from the Gun Harm

20  Reduction Fee are expended" other than a vague directions to the nonprofit to "reduce the risk" of

21  harm from using firearms, "mitigate the risk" of harm or liability from possessing firearms, and to

22  spend the city's funds in ways including, *but not limited to*, various services. *Id.,* § 10.32.220.A, C.

23      144.   The Ordinance states that gun owners must pay the City-required, City-determined fee

24  directly to a nonprofit organization. *Id.*, § 10.32.215. By diverting the payment of the City's

25  mandatory fee directly to a nonprofit rather than the City's General Fund, the Ordinance violates the

26  City Charter's requirement that all City revenues and receipts be deposited into City accounts as an

27  essential means of City "control and accounting."

28      145.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

First Amended Complaint                                        5:22-cv-00501-BLF

1   to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

2   Ordinance.

3          146.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate

4   their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs

5   pursuant to California Code of Civil Procedure Section 1021.5.

6                            **SIXTH CLAIM FOR RELIEF**
                        **Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202**
7                        *Plaintiffs are entitled to declaratory relief.*

8          147.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

9   above.

10         148.    To the extent that each of the claims above have not already established a remedy,

11  Plaintiffs are entitled to declaratory relief holding that the Ordinance violates Plaintiffs' individual

12  rights under the United States and California constitutions and San Jose's City Charter, and is

13  otherwise invalid, are entitled to preliminary and permanent injunctions preventing the enforcement of

14  the Ordinance, nominal damages, and further relief that this Court deems necessary or proper.

15                                    **PRAYER FOR RELIEF**

16         WHEREFORE, Plaintiffs pray, on behalf of themselves and all of NAGR's members, for the

17  following:

18         A.     Preliminary and permanent injunctions enjoining Defendants and all successors in

19                office from enforcing the Ordinance, including those authorized by 42 U.S.C. § 1983

20                and Cal. Civil Code §52.1;

21         B.     A declaratory judgment that the Ordinance violates the First, Second, and Fourteenth

22                Amendments of the United States Constitution and article XI, section 7 and article XIII

23                C of the California Constitution, San Jose's City Charter, and granting the necessary

24                and proper relief this Court deems appropriate, including relief authorized by 28 U.S.C.

25                §§ 2201, 2202;

26         C.     Nominal damages;

27         D.     Costs and attorneys' fees, including those authorized by 42 U.S.C. § 1988 and

28                California Code of Civil Procedure Section 1021.5; and

---

25

First Amended Complaint                                          5:22-cv-00501-BLF

1    E.    Any other relief as this Court, in its discretion, deems just and appropriate.

2

3    Dated: February 14, 2022                    DHILLON LAW GROUP INC.

4

5                                               By: _/s/ Harmeet K. Dhillon_____

6                                               Harmeet K. Dhillon
                                                Michael A. Columbo
7                                               Mark P. Meuser
                                                DHILLON LAW GROUP INC.
8                                               177 Post Street, Suite 700
                                                San Francisco, California 94108
9                                               (415) 433-1700

10

11                                              David A. Warrington*
                                                Curtis M. Schube*
12                                              DHILLON LAW GROUP INC.
                                                2121 Eisenhower Avenue, Suite 402
13                                              Alexandria, VA 22314
                                                (571) 400-2121
14

15                                              *Admission *pro hac vice* forthcoming

16                                              *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

---

26

First Amended Complaint                                          5:22-cv-00501-BLF





City of San José

# CITY CHARTER

Adopted in 1965 and
as Amended by Voters through November 2020

Updated February 2021

# TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---|---|---|

I ..................Incorporation and Succession ....................................................... 1

II ...............Powers of the City ............................................................................. 1

III ...............Form of Government ......................................................................... 3

IV ...............The Council ....................................................................................... 3

V ................The Mayor ...................................................................................... 13

VI...............Legislation ..................................................................................... 15

VII...............City Manager ................................................................................. 18

VIII ............Administrative Organization ......................................................... 20

IX ...............Officers and Employees................................................................. 32

X ................Boards and Commissions ............................................................... 34

XI...............Civil Service System ..................................................................... 40

XII..............Fiscal Administration .................................................................... 48

XIII ............Franchises ...................................................................................... 62

XIV .............School System ............................................................................... 63

XV .............Retirement...................................................................................... 64

XV-A .........Retirement...................................................................................... 69

XVI............Elections ........................................................................................ 76

XVII...........General Provisions......................................................................... 81

XVIII .........Transitional Provisions ................................................................. 84

XIX .............An Act to Limit Urban Sprawl and the Fiscal and
Environmental Effects of Specified Development
in Outlying Areas.......................................................................... 86

Legislative History ........................................................................................  i

# ARTICLE I
# INCORPORATION AND SUCCESSION

**SECTION 100.  Name.**

The City of San José, in the County of Santa Clara, State of California, shall continue to be a municipal corporation under its present name of "City of San José."

**SECTION 101.  Boundaries.**

The boundaries of the City of San José shall continue as now established until changed in the manner authorized by law.

**SECTION 102.  Succession, Rights, Powers and Liabilities.**

The City of San José shall remain vested with and shall continue to own, have, possess, control and enjoy all property, rights of property and rights of action of every nature and description (including but not limited to all pueblo lands and pueblo rights) owned, had, possessed, controlled or enjoyed by it at the time this Charter takes effect, and is hereby declared to be the successor of the same.  It shall be subject to all debts, obligations and liabilities which exist against the municipality at the time this Charter takes effect.

# ARTICLE II
# POWERS OF THE CITY

**SECTION 200.  General Powers.**

The City of San José shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter and in the Constitution of the State of California.  The City shall also have all other rights, powers and privileges which are not prohibited by, or in conflict with, the State Constitution or the Charter and which it would be proper to specifically set forth in this Charter even though such are not herein set forth.  It shall also have the power to exercise and all rights, powers and privileges heretofore or hereafter established, granted or prescribed by any law of the State, by this Charter or by other lawful authority, or which a municipal corporation might or could exercise under the Constitution and laws of the State of California.

The enumeration or specification in this Charter of any particular power shall not be held to be exclusive of or any limitation upon the generality of the foregoing provisions.

**SECTION 201.  Special Powers.**

The City shall have the following special power:  To acquire any property outside the City limits by eminent domain, or otherwise, for municipal purposes.

**SECTION 202.  Procedures.**

The City shall have the power to act and may act pursuant to any procedure established by any law of the State, unless a different procedure is established by this Charter or by ordinance.

**SECTION 203.  Continuity of Government in Event of Disaster.**

In order to provide for continuity of City government during any emergency resulting from war, enemy-caused calamity or other disasters of whatever nature, and in order to otherwise handle any such emergency, the Council is hereby empowered, anything elsewhere in this Charter to the contrary notwithstanding, to:

(a)   Provide for the appointment or designation of persons to exercise the powers and discharge the duties of any City offices, whether elective or appointive, during any such emergency, in the event the regularly elected or appointed incumbents of said offices are killed, missing, disabled or for some other cause unable or unavailable to perform the functions and duties of their respective offices, until said incumbent officers perform or resume performance of their functions and duties or until, where an actual vacancy exists, a successor is elected or appointed, pursuant to other provisions of this Charter, to fill such vacancy;

(b)   Provide for the preservation of essential records needed to protect the rights of individuals and to conduct emergency operations;

(c)   Provide for the establishment of emergency locations for City government so that the City could continue to operate;

(d)   Provide for the formulation of plans to use all personnel, facilities and equipment of government for emergency actions;

(e)   Do such other things as may be authorized by the laws of the State of California for such purposes.

**SECTION 204.  City Government - Ethics.**

The citizens of San José expect and must receive the highest standard of ethics from all those in the public service.  City officers and employees must be independent, impartial and responsible in the performance of their duties and accountable to the members of the public.
*Added at election November 6, 1990*

**2 |** P a g e                                                          Updated 2/2021

**SER-283**

# ARTICLE III
# FORM OF GOVERNMENT

**SECTION 300.  Form of Government.**

The municipal government established by this Charter shall be known as the "Council-Manager" form of government.

# ARTICLE IV
# THE COUNCIL

**SECTION 400.  Powers Vested in Council.**

All powers of the City and the determination of all matters of policy shall be vested in the Council, subject to the provisions of this Charter and the Constitution of the State of California.

**SECTION 401.  Composition of Council.**

The composition of the Council shall be as follows:

   (a)   NUMBER OF MEMBERS.   The Council shall consist of eleven (11) members, one of whom shall be the Mayor, each of whom shall have the right to vote on all matters coming before the Council.

   (b)   DISTRICTS.   Except as otherwise provided elsewhere in this Charter and excepting the Mayor who shall be elected at a Regular Municipal Election from the City at large, each member of the Council shall be elected at a Regular Municipal Election by one of ten (10) Districts designated by number within the City.   The term "by Districts" shall mean the election of eligible persons, as defined in Section 404, to the office of member of the Council by the voters of each District alone.

*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

**SECTION 402.  Mayor and Council Member Term Limits.**

The regular term of office of each member of the Council shall be four (4) years.  The Mayor and Council members shall be subject to the following term limits:

   (a)   MAYOR.  No person who has been elected to the office of Mayor for two (2) successive four-year terms shall be eligible to run for election to the office of Mayor, nor to serve as such, for any additional successive term; but the above

shall not disqualify any person from running for election to the office of Mayor, nor from further service as Mayor, for any term or terms which are not successive; nor for any parts of terms which are not successive.

(b)   COUNCIL MEMBER.  No person who has been elected to the City Council as a Council member in any Council District in the City for two (2) successive four-year terms, after the effective date of this Section, shall be eligible to run for election as a member of the Council in any Council District, nor appointed to serve as a Council member for any additional successive term.  Any person appointed or elected to the City Council as a City Council member to fill an unexpired term of two years or less in length shall be eligible to serve two successive four-year terms upon the expiration of the unexpired term for which that person was appointed or elected.  Any person appointed or elected to the City Council as a City Council member to fill an unexpired term of more than two years in length shall only be eligible to serve one successive four-year term.  The above shall not disqualify any person from running for election to the Office of Mayor or for any term or terms which are not successive.  The effective date of this Section shall be January 1, 1991.

*Amended at election June 2, 1970*
*Amended at election November 7, 1978*
*Amended at election November 6, 1990*
*Amended at election November 8, 1994*

## SECTION 403.  Elections by Districts.

For the purpose of electing members of the Council, excepting the Mayor, the City shall be divided into ten (10) numbered Districts as nearly equal in population as practicable.  The boundaries of the ten Districts shall be established initially by reference to that certain map of the City of San José, entitled "Election Districts of the City of San José", filed and displayed in the office of the City Clerk, and drafted according to data contained in the official census of the City as taken in 1975 and certified by the City Clerk.  Thereafter the boundaries of such Districts shall be subject to alteration and change under the provisions of this Section.

Following the taking of each federal decennial census, commencing with the 1980 federal decennial census, the Council shall, by ordinance, redistrict the City into ten (10) numbered Districts.  If time permits, such ordinance shall be enacted no earlier than three (3) months and no later than eight (8) months following receipt by the City Clerk of data containing an enumeration of population by blocks derived from such census.  In no event shall such ordinance be enacted later than October 31 in the year following the decennial census.  Notwithstanding the foregoing the Council may enact an ordinance to adjust the deadline to enact the redistricting ordinance if the results of the federal decennial census are not delivered to the states by April 1 in the year following such census.

The redistricting ordinance shall be adopted according to the provisions of Article VI, Section 604 of this Charter and shall become effective at the expiration of thirty (30) days after adoption of the ordinance; provided, however, that if the redistricting ordinance

becomes effective on or after the first day on which nomination papers may be filed for an election to the office of member of the Council, excepting the Mayor, then the ordinance shall not apply, or be deemed to apply, to that election or to the person elected to the office of member at such election.

By no later than February 1 in the year following the decennial census, the Council shall appoint an Advisory Commission whose purpose shall be to study and make appropriate recommendations with respect to such redistricting.  This Advisory Commission shall consist of one (1) member from each District, who shall be appointed by the Council member from that District, and a Chairperson chosen from the City at large, who shall be appointed by the Mayor.  The membership of the Commission shall be representative of the ethnic make-up of the City at large, to the extent practicable.

The Advisory Commission shall conduct at least three public hearings, at various locations in the City, concerning its recommendations regarding District boundaries, and shall submit its report and recommendations to the Council within the time prescribed by the Council. If the Council fails to prescribe a time, the Advisory Commission shall submit its report and recommendations to the Council within one hundred twenty (120 days following its appointment.

The Council shall duly consider the report and recommendations of the Advisory Commission and in adopting any redistricting ordinance.  However, the Council is required to adopt an ordinance within the period of time required under this Section even if the Advisory Commission fails to provide recommendations or reports as specified in this Section.

Except as provided hereinabove, such Districts shall be used for all elections of members of the Council, including their recall, and for filling any vacancy in the office of member of the Council, subsequent to the effective date of such ordinance and until new Districts are established.

Any territory which is annexed to or consolidated with the City but not included within a District shall, prior to or concurrently with completion of the proceedings therefor, be added to an adjacent District or Districts by the Council by ordinance, which shall become effective at the expiration of thirty (30) days after adoption and shall apply to all elections held on and after its effective date.

Any ordinance adopted by the Council and establishing, changing, or altering the boundaries of any District shall describe the new boundaries by reference to a map on file in the office of the City Clerk and/or by a metes-and-bounds description.

In any redistricting, the Council shall make the Districts as nearly equal in population as may be practicable, and may, in establishing the boundaries of the Districts, give consideration to (a) natural boundaries, street lines and/or City boundaries; (b) geography; (c) cohesiveness, contiguity, integrity and compactness of territory; and (d) community of interests within each District.

Updated 2/2021

Upon any redistricting pursuant to the provisions of this Charter, each incumbent member of the Council will continue, during the remainder of the member's term, to hold office and to represent the District by which the member was elected prior to such redistricting, notwithstanding any provision of Section 404 requiring a member to be a resident of the District represented by such member.

*Amended at election June 2, 1970*
*Amended at election November 7, 1978*
*Amended at election November 6, 1990*
*Amended at election June 7, 1994*
*Amended at election November 3, 2020*


**SECTION 404.  Eligibility.**

A person shall not be eligible to take office as a member of the Council, including Mayor, unless the person satisfies all of the following conditions:

(a)     The person must have been a citizen of the United States for at least one year immediately preceding the commencement of the term for which the person is elected or the date upon which the person is appointed.

(b)     The person must have been a resident of the City of San José and, excepting the Mayor, of the District represented by the person as member, for at least thirty (30) days immediately preceding the last day specified by law for the filing of nomination papers with the City Clerk for such office or, if appointed, preceding the date of the person's appointment to fill a vacancy.

(c)     If elected to office at a Regular Municipal Election, the person must have been a registered elector of the City of San José on the last day specified by law for the filing of nomination papers with the City Clerk for such office.

(d)     If appointed to such office, the person must have been a registered elector of the City of San José at the time of the person's appointment.

A person shall not be eligible to be a candidate at any election for any Council office, if the person would not be eligible under the above provisions of this Section to take office if elected.  Any determination as to whether a person has met the eligibility requirements shall be made at the time the nomination papers are filed and at the time of taking office.

The incumbent must, at all times, during the term of office continue being:

(a)     a citizen of the United States;

(b)     a resident of the City of San José and, except as provided in Section 403, of the District which he or she represents;

(c)     and a registered elector of the City.

*Amended at election June 2, 1970*
*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

### SECTION 405.  Judge of Qualifications.

The Council shall be the judge of the election and qualification of its members, including the Mayor, and of any other elective officer, and of the grounds for forfeiture or loss of their respective offices, and for that purpose shall have the power to subpoena witnesses, administer oaths and require the production of evidence.  A member, or the Mayor, or the holder of any other elective office, charged with conduct constituting grounds for forfeiture or loss of his or her office shall be given, if he or she so demands, an opportunity to be heard in his or her own defense at a public hearing after reasonable notice to such members.
*Amended at election June 7, 1994*

### SECTION 406.  Holding Other Office.

Except as authorized by this Charter, no member of the Council shall hold any other City office or City employment, other than Mayor, during the term for which he or she was elected to the Council; provided and excepting, however, that a member of the Council may become a member of any advisory, administrative or governing body of any special purpose district, entity, organization or committee when such is authorized by State law or where the offices are not incompatible.
*Amended at election June 7, 1994*

### SECTION 407.  The Council; Salary.

Each member of the Council, including the Mayor, shall be paid a salary for his or her services as a member of the Council, which shall be established in accordance with the provisions hereinafter set forth in this Section.  No salary shall be established for any member of the Council, including the Mayor, except as provided in this Section.

(a)     Between March 1st and April 30th commencing in 2019, and every five (5) years thereafter, the Salary Setting Commission shall set the amount of base salary which it deems appropriate for the members of the Council, including the Mayor, commencing July 1 of that year.  The amount set for each member of the Council shall be the same, except that the amount set for the Mayor may exceed that of the other members of the Council.  The base salary shall be in an amount which takes into account the full time nature of the office and which is commensurate with salaries then being paid for other public or private positions having similar full time duties, responsibilities and obligations.

No determination of base salary amounts shall be made except upon the affirmative vote of three (3) members of the Commission.  Failure of the Commission to make a determination of salary amounts in any year within the time prescribed shall be deemed to mean that no change to the base salary be made.

(b)     The Salary Setting Commission's determination of the Mayor and Council base salaries, together with the reasons therefor, shall be made in writing and submitted to the City Manager no later than May 1, so that funds can be budgeted and appropriated for that purpose.  Before it submits any such determination to the City Manager, the Commission shall conduct at least one public hearing on the matter.  When such a determination has been submitted to the City Manager, it shall not thereafter be amended by the Commission.

(c)     Commencing July 1, 2020, and annually thereafter in years in which there are no base salaries set by the Salary Setting Commission under Section 407(a), in order to provide a cost of living adjustment, the base salaries of the Council and Mayor shall increase by a percentage equal to the percentage increase of the preceding calendar year's annual average of the Consumer Price Index-Urban (CPI-U), or successor index, for San Francisco-Oakland-Hayward, as determined by the United States Department of Labor, Bureau of Labor Statistics. In no event shall the CPI-U salary increase exceed 5% per year.

(d)     The Council may, at any time, by ordinance, reduce the salaries of the members of the Council, including the Mayor.  In any salary reducing ordinance adopted hereunder, the salaries for each member of the Council shall be the same, except that the salary of the Mayor may exceed that of the other members of the Council.

(e)     For each member of the Council, except the Mayor, a sum, as established by the Salary Setting Commission, shall be deducted from the salary of such member for each regular meeting of the Council, other than regular adjourned meetings, which he or she fails to attend in each such calendar month; provided, however, that such deduction shall not be made for his or her failure to attend any meeting during which he or she is away on authorized City business, or from which he or she is absent because of his or her own illness or the illness or death of a close family member.  No deduction shall be made from the Salary of the Mayor because of his or her failure to attend any Council meeting.

*Amended at election June 7, 1966*
*Amended at election June 5, 1973*
*Amended at election November 4, 1980*
*Amended at election November 4, 1986*
*Amended at election November 6, 2018*

**SECTION 408.  Reimbursement.**

The members of the Council and the Mayor shall receive reimbursement, if and to the extent such is authorized by the Council, for expenses incurred in the performance of their duties or functions of office.

**SECTION 409.  When Office Becomes Vacant.**

The office of a member of the Council or of the Mayor becomes vacant on the happening of any of the following events before the expiration of such officer's term:

(a)     The death of the incumbent;

(b)     Insanity of the incumbent, when determined by a final judgment or final order of a court of competent jurisdiction;

(c)     Resignation of the incumbent;

(d)     The incumbent ceases to satisfy any requirements for retention of his or her office which are set forth elsewhere in this Charter;

(e)     Removal of the incumbent from office;

(f)     Absence of the incumbent from the State of California for more than sixty (60) days, unless either upon business of the City or with the consent of the Council.  In the case of illness or other urgent necessity, and upon a proper showing thereof, the time limited for absence from the State shall be extended by the Council;

(g)     The incumbent ceases to discharge the duties of his or her office for a period of three (3) consecutive months except when prevented by sickness or when absent from the State with permission required by this Charter;

(h)     The incumbent being convicted of a felony or of any offense involving a violation of his or her official duties;

(i)     The refusal or neglect of the incumbent to file his or her official oath or bond, if such is required by law, within the time prescribed by law;

(j)     The decision of a competent tribunal declaring void the incumbent's election or appointment;

(k)     The making of an order vacating the incumbent's office or declaring his or her office vacant when he or she fails to furnish an additional or supplemental bond if such is required of him or her by law;

(l)     The commitment of the incumbent to a hospital or sanitarium, by a court of competent jurisdiction, as a drug addict, dipsomaniac, inebriate, or stimulant addict; but in such event the office shall not be deemed vacant until the order of commitment has become final;

(m)    The incumbent's absence from five (5) consecutive regular meetings of the Council, unless excused by written resolution of the Council.  No such excuse shall operate retroactively.   No resolution shall excuse an incumbent's absence from more than five (5) consecutive regular meetings immediately following the date of adoption of such resolution although additional resolutions may be adopted excusing an incumbent's absence from not more than five (5) additional regular meetings immediately following the date of each such resolution.  For purposes of this subsection, regular meetings from which an incumbent has been absent shall not be deemed consecutive if separated by one or more regular meetings at which such incumbent has been present or his or her absence from which has been excused by the Council. Also, for purposes of this subsection, "regular meetings" shall not be deemed to mean or include "regular adjourned meetings", "special meetings", or any committee meetings.

*Amended at election June 2, 1970*
*Amended at election June 7, 1994*

## SECTION 410.  Filling of Vacancies.

If, for any reason, a vacancy, as defined by Charter Section 409, occurs in the office of Mayor or Council member, the Council shall either fill the vacancy by appointment by a majority of its remaining members, or call an election for the purpose of filling such vacancy.

(a)     APPOINTMENT.  If the vacancy is filled by appointment, the appointment shall be effective until the end of the unexpired term of office or January 1st following the next Regular Municipal Election after the appointment, which ever first occurs.

(b)     ELECTION.  If the vacancy is to be filled by election, the election will be for the entire unexpired term of the office.  The election will either be conducted at a Regular Municipal Election, a General Election or at a Special Municipal Election, as determined by the Council.  The election will be conducted in accordance with Section 1600.

(c)     INTERIM APPOINTMENT.  If a vacant office is to be filled by election, the Council may make an interim appointment to fill the office until a candidate has been duly elected and the results of the election have been officially certified.  A person who is appointed during the interim period shall meet the eligibility requirements to hold office under Section 404 of this Charter.

(d)     ADVANCE REPLACEMENT.   When a vacancy is, for any reason, anticipated in advance of its actual occurrence, the Council may initiate the appointment or election process in anticipation of the vacancy.  The member who will be vacating the position may participate in the process.

(e)     NO REMAINING MEMBERS.  If the offices of all of the Council members and also of the Mayor should become vacant and no member of the Council remains to fill any vacancies, the City Clerk shall call and conduct a Special Municipal Election, as soon as reasonably possible, to fill such offices for the remainder of the unexpired terms.

(f)     ELECTION DATES.  All dates for elections to fill vacancies shall be set by resolution.

(g)     ELECTION IN 1994.  The election held on November 8, 1994 to fill a vacancy effective January 1, 1995 in Council District 7 shall be deemed to be an election
pursuant to this Section.  The person so elected shall serve for the full term of that office.

*Amended at election June 6, 1967*
*Amended at election June 6, 1972*
*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

## SECTION 411.  The Council; Interference With Administrative Matters.

Neither the Council nor any of its members nor the Mayor shall interfere with the execution by the City Manager of his or her powers and duties, nor in any manner dictate the appointment or removal of any City officers or employees whom the City Manager is empowered to appoint except as expressly provided in Section 411.1.  However, the Council may express its views and fully and freely discuss with the City Manager anything pertaining to the appointment and removal of such officers and employees.

Except for the purpose of inquiries and investigations under Section 416, the Council, its members and the Mayor shall deal with City officers and employees who are subject to the direction and supervision of the City Manager, City Attorney, City Auditor, Independent Police Auditor or City Clerk, solely through the City Manager, City Attorney, City Auditor, Independent Police Auditor or City Clerk, respectively, and neither the Council nor its members nor the Mayor shall give orders to any subordinate officer or employee, either publicly or privately.

*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

**SECTION 411.1  Department Heads; Policy Objectives; Consent to Hire.**

(a)     The Council shall adopt a written Statement of Policy for each City Department which is under the administration of the City Manager.  Said Statement of Policy shall set forth the broad goals, objectives and aspirations to be accomplished by that Department.

(b)     When the position of head of each Department becomes vacant, the Council shall review and, if necessary, amend the previously approved Statement of Policy.  The Council also shall adopt a set of questions which are intended to elicit responses from each prospective appointee concerning the goals, objectives and aspirations in the Statement of Policy.

For purposes of this section, the term "department" shall mean any department specified in Charter Section 807 as well as any department created by ordinance pursuant to Charter Section 800.

Prior to appointing any Department head, the City Manager shall submit to the Council, for its review, the responses to the Council's questions submitted by the proposed appointee, and shall seek the Council's advice and consent.  The appointment shall be made only if the Council, by the affirmative vote of a majority of its members, advises the City Manager that it concurs with the proposed appointment.  This section shall not apply to the appointment of any "acting" department head to serve in an interim capacity.
*Added at election November 4, 1986*

**SECTION 412.  Meetings of the Council.**

The Council shall provide, by ordinance or resolution, not inconsistent with other provisions of this Section, for the time, place, and manner of holding its meetings.  Copies of such ordinances or resolutions shall be kept on file in the office of the City Clerk where they shall be available for public inspection.  To the extent that they are not inconsistent with other sections of this Charter, the provisions of Chapter 9 of Part I of Division 2 of Title 5 of the Government Code, as they now exist or may hereafter be amended, insofar as they relate to the right of the public to attend meetings of the Council, the adjournment of regular or adjourned regular meetings, the calling of special meetings and the holding of executive sessions, shall govern meetings of the Council.  No business shall be considered at any special meeting other than such as is specified in the notice of such meeting.

**SECTION 413.  Citizen Participation.**

Within the established rules for the conduct of its official proceedings, no person shall be denied the right personally, or through authorized representatives, to present grievances or offer suggestions for the betterment of municipal affairs at any regular meeting of the Council.

**SECTION 414.  Quorum.**

Except as otherwise specifically provided elsewhere in this Charter, a majority of the entire membership of the Council shall be necessary to constitute a quorum to do business, but a lesser number may adjourn from time to time.

**SECTION 415.  Rules and Procedure.**

The Council shall establish rules for the conduct of its proceedings, and to preserve order at its meetings.  It shall cause a record of its meetings to be maintained and this record shall be open to public inspection.

**SECTION 416.  Investigations.**

The Council may make investigations into the affairs of the City and the conduct of any City department, office, or agency, and for this purpose may subpoena witnesses, administer oaths, take testimony, and require the production of evidence.  Disobedience of any subpoena or the refusal to testify upon other than constitutional grounds shall be punishable by contempt proceedings.

# ARTICLE V
# THE MAYOR

**SECTION 500.  Mayor.**

There shall be a Mayor of the City of San José, elected at large, who shall be the eleventh member of the Council.  Except as otherwise provided elsewhere in the Charter, the Mayor shall be elected by a majority of the votes cast citywide at a Regular Municipal Election, for a term of four (4) years from and after the first day of January following the year of the election.

The office of each member of the Council, including the office of the member who is Mayor, is a separate office to be separately filled.  Any incumbent member of the Council may run for the seat of Mayor, and the Mayor may run for the seat of Mayor or for any other seat on the Council for which the Mayor is otherwise eligible; however, no member of the Council shall hold more than one seat, and no person may be a candidate for more than one seat.
*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

**SECTION 501.  Political Position.**

It is the intent of this Article that the Mayor shall be the political leader within the community by providing guidance and leadership to the Council, by expressing and explaining to the community the City's policies and programs and by assisting the Council in

the informed, vigorous and effective exercise of its powers.  Political leadership shall be concerned with the general development of the community and the general level of City services and activity programs.

**SECTION 502.  The Mayor; Powers and Duties.**

The Mayor shall have the following powers and duties:

(a)     The Mayor shall have the power to make recommendations to the Council on matters of policy and program which require Council decision.

(b)     Not less than annually, the Mayor shall address the citizens of the City concerning the current status of City affairs and articulating the policy plans which the Mayor proposes for the City during the ensuing year.

(c)     In addition, the Mayor, at other times during the year, may inform the citizens concerning any matters of policy or program which the Mayor believes are for the welfare of the community.

(d)     If the Mayor recommends any increases in the City budget, the Mayor shall recommend the method of financing such expenditures.  If the Mayor proposes the curtailment of any service, the Mayor shall provide specific recommendations and the reasons for the proposal.

(e)     The Mayor shall preside at meetings of the Council and shall have a vote as a member of the Council.  The Mayor shall have no veto powers;

(f)     The Mayor shall have authority to preserve order at all Council meetings, to remove or cause the removal of any person from any meeting of the Council for disorderly conduct, to enforce the rules of the Council and to determine the order of business under the rules of the Council;

(g)     The Mayor shall have the power to direct and supervise the Public Information Office of the City.

(h)     The Mayor shall exercise such other powers and perform such other duties as may be prescribed by the Council, provided the same are not inconsistent with this Charter.

Nothing in this Section shall be construed in any way as an infringement or limitation on the powers and duties of the City Manager as Chief Administrative Officer and head of the administrative branch of the City government as prescribed in other sections of this Charter. Except as otherwise provided in this Charter, the Mayor shall possess only such authority over the City Manager and the administrative branch as he or she possesses as one member of the Council.
*Amended at election November 4, 1986*

### SECTION 503.  Vice-Mayor.

At the second meeting of the Council following the end of each even-numbered year within which a Regular Municipal Election is required to be held, the Council shall elect one of its members as Vice-Mayor who, until a person is appointed to succeed him or her, or until his or her office otherwise becomes vacant, shall serve as Vice-Mayor during the temporary absence or inability of the Mayor to discharge the duties of his or her office.

In case of the temporary absence or disability of both the Mayor and Vice-Mayor, the Council shall elect one of its members to act as Mayor Pro Tempore.
*Amended at election June 6, 1972*
*Amended at election June 7, 1994*
*Amended at election November 8, 1994*

### SECTION 504.  Vacancy.

The office of Mayor shall become and be deemed vacant immediately upon the incumbent's ceasing to be a member of the Council.

# ARTICLE VI
# LEGISLATION

### SECTION 600.  Council Action; Method.

The Council shall act only by ordinance, by resolution or by motion made, seconded and adopted.  The vote on all ordinances, resolutions and motions shall be by "ayes" and "noes." The individual vote of each member of the Council shall be entered in the minutes of the Council, except that where a vote is unanimous, it may be so recorded.  Upon request of any member, a roll-call vote shall be taken and recorded on any vote.  Whenever a roll-call vote of the Council is in order, the City Clerk shall call the names of members in alphabetical order except that the name of the presiding officer shall be called last.  All members present shall be required to vote unless disqualified from doing so by law.  All written ordinances and resolutions shall be signed by the Mayor and attested by the City Clerk.

**SECTION 601.  Council Action, Vote Required.**

Except as otherwise provided elsewhere in this Charter, no ordinance, resolution or motion shall be passed, adopted, or become effective unless it receives the affirmative vote of at least either (a) four (4) members of the Council, if the vote is taken on or before December 31, 1980; or (b) six (6) members of the Council, if the vote is taken on or after January 1, 1981. *Amended at election November 7, 1978*

**SECTION 602.  Ordinances, When Required.**

The following acts of the Council shall be by ordinance:

(a)     Those acts required by specific provision of this Charter to be by ordinance;

(b)     Each act the violation of which will constitute a misdemeanor punishable by a fine or other penalty;

(c)     Each act imposing a new or additional tax, other than the annual property tax;

(d)     Each act granting a franchise.

**SECTION 603.  Ordinances, Requisites of.**

Every proposed ordinance shall be introduced in writing.  The enacting clause shall be "Be it Ordained by the Council of the City of San José".  Each ordinance shall contain a title which shall state in general terms the subject or subjects contained in the ordinance.  No section of any ordinance or of any code shall be amended unless the whole section to be amended is set forth as amended.

**SECTION 604.  Ordinances, Procedure for Adoption.**

Except as otherwise provided elsewhere in this Charter, and with the exception of ordinances which take effect immediately upon adoption, hereinafter referred to in this Article, no ordinance shall be adopted unless (a) it is first passed for publication of title, (b) the title of the ordinance is published as hereinafter provided in this Section, and (c) at least six (6) days have elapsed between the date it was passed for publication of title and the date it is adopted.

The title of an ordinance shall be deemed to have been "published", as said term is hereinabove used in this Section if such title is printed in a newspaper of general circulation in the City no later than the third day immediately preceding the date of its adoption.  No part of any ordinance, or proposed ordinance, other than its title, need be published.

Ordinances which take effect immediately upon adoption, hereinafter referred to in this Article, may be adopted without compliance with the above provisions of this Section. *Amended at election June 2, 1970*

---

**SECTION 605.  Ordinances; Effective Date.**

Except as otherwise provided in this Charter, each adopted ordinance shall become effective at the expiration of thirty (30) days after adoption or at any later date specified therein.

The following ordinances shall take effect immediately upon adoption:

      (a)      An ordinance calling for or otherwise relating to an election;

      (b)      An ordinance declaring the amount of money necessary to be raised by taxation, or fixing a rate of ad valorem taxation or levying the annual tax on property;

      (c)      An ordinance providing for a tax levy or appropriation for the usual current expenses of the City;

      (d)      An ordinance adopted as and declared by the Council to be an urgency measure necessary for the immediate preservation of the public peace, health or safety, containing a statement of the facts constituting such urgency, if adopted by the affirmative vote of at least five (5) members of the Council if the vote occurs on or before December 31, 1980 or by not less than eight (8) members of the Council if the vote occurs on or after January 1, 1981;

      (e)      An ordinance relating to a bond issue;

      (f)      An ordinance adopted pursuant to a State law by virtue of which such ordinance shall be effective immediately.

Nothing contained in this Section shall be deemed to require an ordinance when an ordinance is not otherwise required.
*Amended at election November 7, 1978*

**SECTION 606.  Codification.**

To the extent that it has not already so done, the Council shall cause to be codified all general ordinances in force, and cause the same to be printed in book, pamphlet or loose-leaf form for the use of the City, its officers and the public.

**SECTION 607.  Code of Ethics.**

The Mayor and City Council shall adopt and maintain a Code of Ethics to provide guidance to City officers and employees in their conduct while discharging their public responsibilities.  This Code of Ethics shall include, but not be limited to, ordinances relating to the following areas of regulation:

(a)   Limitations on and requirements for reporting of campaign contributions and post-election contributions to candidates for elected City Offices.

(b)   Reporting and registration requirements for local government lobbyists who act to influence any governmental action of the City of San José.

(c)   Limitations on the acceptance of gifts by City officers and employees including elected officers and members of Boards and Commissions.

(d)   Limitations on the acceptance of honoraria by City officers including elected officials, Council appointees and members of Boards and Commissions.

(e)   Regulations regarding disqualification of former City officers and employees in matters connected with former City duties or official responsibilities.

The Mayor, on a biennial basis beginning in 1993, shall conduct a review of the City's Code of Ethics including any ordinances relating to ethic standards. The Mayor shall make any recommendation for amendments or changes to the Code of Ethics and its implementing ordinances to the City Council.

No amendments or changes shall be adopted which in any way lessen the ethical standard in regulations except by a two-thirds vote of the City Council.
*Added at election November 6, 1990*

**SECTION 608.**

*Repealed at election June 2, 1970*

**SECTION 609.  Violation and Penalty.**

The Council may make the violation of its ordinances a misdemeanor for which a violator may be prosecuted in the name of the People of the State of California and may prescribe punishment for each violation by a fine in an amount not to exceed that set by State law or by imprisonment not to exceed six (6) months, or by both fine and imprisonment.  Such violations may also be redressed by civil actions.
*Amended at election November 6, 1984*

# ARTICLE VII
# CITY MANAGER

**SECTION 700.  Appointment, Term and Compensation.**

There shall be a City Manager.  The Mayor shall nominate one or more candidates for Council consideration for appointment to the position of City Manager.  The City Manager

shall be appointed by the Council for an indefinite term.   The Council shall fix the compensation of the City Manager.
*Amended at election November 4, 1986*

## SECTION 701.  City Manager; Powers and Duties.

The City Manager shall be the chief administrative officer of the City.  He or she shall be responsible to the Council for the administration of City affairs placed in his or her charge by or under this Charter.   Without limiting the foregoing general grant of powers, responsibilities and duties, the City Manager shall have the following powers and duties:

(a)   Subject to the Civil Service provisions of this Charter and of any Civil Service Rules adopted pursuant thereto, and except as otherwise provided elsewhere in this Charter, the City Manager shall appoint all officers and employees of the City; and, when he or she deems it necessary for the good of the service, the City Manager may, subject to the above-mentioned limitations, suspend without pay, demote, discharge, remove or discipline any City officer or employee who under this Charter is appointed by the City Manager;

(b)   Except as otherwise provided elsewhere by this Charter, the City Manager shall direct and supervise the administration of all departments, offices and agencies of the City;

(c)   The City Manager shall have the right to attend all meetings of the Council, other than closed executive sessions where the City Manager or another Council appointee is the subject of discussion, and to take part in its discussions, but not to vote.  The City Manager shall attend all regular and special meetings of the Council unless prevented by illness or physical incapacity or unless his or her absence has been authorized by the Council;

(d)   The City Manager shall be responsible for the faithful execution of all laws, provisions of this Charter, and acts of the Council which are subject to enforcement by the City Manager or by officers who are under the City Manager's direction and supervision;

(e)   The City Manager shall prepare and submit the annual budget to the Council in accordance with the provisions of Section 1204.

(f)   The City Manager shall submit a complete report on the finances and administrative activities of the City as of the end of the preceding fiscal year to the Council at a public meeting to be held within three (3) calendar months following the close of each preceding fiscal year.  The annual report, which shall be personally certified by the City Manager to be accurate and complete shall contain a statement indicating:

(1)    Whether the revenues budgeted for the preceding fiscal year were actually received, and an explanation concerning any material differences between the total revenues budgeted and the revenues actually received;

(2)    The extent to which expenditures budgeted were actually incurred, and an explanation for any material variance between budgeted expenditures and actual expenditures;

(3)    The amount of the financial reserves of the city;

(4)    All other information which, in the opinion of the City Manager, is necessary to provide an accurate and complete picture of the fiscal status and condition of the city.

The report shall be in a form which is susceptible to confirmation by audit.  It shall be made available to the public in the Office of the City Clerk.

(g)    The City Manager shall make such other reports as the Council from time to time may request concerning the operations of City departments, offices and agencies subject to his or her direction and supervision; shall keep the Council fully advised as to the financial condition and future needs of the City; and make such recommendations to the Council concerning the affairs of the City as he or she deems desirable or as requested by Council.

(h)    The City Manager shall exercise such other powers, and shall perform such other duties, as are specified in this Charter or may be authorized or required by the Council.

*Amended at election November 4, 1986*

## SECTION 702.  Removal by Council.

The Council may remove the City Manager from office at any time.

## SECTION 703.  Removal by People.

The City Manager may be removed from office by the People of the City pursuant and subject to the provisions of Section 1604 of this Charter.

## SECTION 704.  Acting City Manager.

The City Manager may appoint, subject to approval of the Council, or if he or she fails to do so the Council may appoint, an officer of the City as Acting City Manager to exercise and perform the powers and duties of the City Manager during the temporary absence or disability of the City Manager.

*Amended at election June 7, 1994*

# ARTICLE VIII
# ADMINISTRATIVE ORGANIZATION

**SECTION 800.  Administrative Organization; General Provisions.**

Subject to the limitations hereinafter specified in this section, the Council shall have the following powers and duties:

(a)     The Council, in its discretion, may at any time establish such City offices, departments and agencies, in addition to those established by this Charter, as it may desire; and shall prescribe the respective functions, powers and duties of such additional offices, departments and agencies.  The Council shall also prescribe the respective functions, powers and duties of those departments which are established by Section 807 of this Charter.  The Council may at any time add to, take away, reduce or otherwise change the respective functions, powers and duties of any of the above mentioned offices, departments and agencies.  The Council may at any time abolish or discontinue any office, department or agency other than those established by this Charter.  The Council may also, at any time, prescribe additional functions, powers or duties for those offices and departments specified in Sections 803 to 807, inclusive, and may at any time take away, reduce or otherwise change all or any of such additional functions, powers or duties;

(b)     Subject to the limitations hereinafter specified in subsection (c) of this Section, the Council may:

(1)     Contract with any "public agency" for the exercise or performance by a "public agency" for or on behalf of the City, of any of the powers, duties or functions of any office, department or agency of the City established by or pursuant to the provisions of this article;

(2)     Contract with any "public agency" for the exercise or performance by the City, for or on behalf of any "public agency" of any of the powers, duties or functions of any "public agency";

(3)     Contract with any "public agency" for the joint exercise or performance by such "public agency" and the City, for or on behalf of any "public agency" and/or the City, of any of the powers, duties or functions of any office, department or agency of the City established by or pursuant to the provisions of this article and/or of any of the powers, duties or functions of any "public agency";

(4)     Contract with any "private agency" for the exercise or performance by a "private agency" or jointly by a "private agency" and the City for or

on behalf of the City, of any of the powers, duties or functions of any office, department or agency established by or pursuant to the provisions of this article;

(5)    Contract with any "public agency" for the purchase or acquisition by a "public agency" by the City, or jointly by both, for or on behalf of the City, a "public agency" or both, of any real or personal property, or for the construction or making by a "public agency," by the City, or jointly by both, for or on behalf of the City, a "public agency" or both, of any public works project or public improvement.

Each such contract, excepting contracts for specific improvements or projects, and also excepting contracts for specific studies or reports to be completed within five years, shall be terminable by the City at any time following the expiration of one (1) year from and after the date of such contract or at any time following the expiration of such shorter period of time as may be specified in the contract.

In case of and during the term of any such contract, any provisions of this Charter, or of any ordinance, resolution or other City regulation, providing for the exercise or performance of said powers, duties or functions by a City office, department or agency established by or pursuant to the provisions of this article, or specifying a procedure for or otherwise controlling or regulating the manner in which such powers, duties or functions may be exercised or performed by any City office, department or agency established by or pursuant to this article, shall be deemed suspended to the extent that they are inconsistent with the performance or exercise by a "public agency" or "private agency" of any of such powers, duties or functions pursuant to or as provided by such contract.  Also, the provisions of Section 1217 of this Charter, and of any City ordinance, resolution or other regulation relating to the matters mentioned in said Section 1217, shall not apply to any acquisitions or purchases of property, nor to any public works projects or improvements, made, constructed or done by a "public agency" for or on behalf of the City pursuant to any contract above mentioned in sub-paragraph (5) of this sub-section (b), provided that the "public agency," in doing such things for or on behalf of the City, complies with such procedural requirements as would be applicable to it if it were to do such things for or on behalf of itself.

As used in this sub-paragraph (b), "public agency" means the United States of America, the State of California, any division, department, office, agency or political or administrative subdivision of the United States or of the State of California, or any county, municipal corporation (other than the City of San José), district, authority or other governmental body or organization; and, as used in this sub-section (b), "private agency" means any private corporation, firm, association, organization or person.

---

(c)     Anything hereinabove in this section to the contrary notwithstanding, unless authorized by other sections of this Charter, no power, duty or function assigned by this Charter to the office of City Clerk, City Attorney, City Auditor, Independent Police Auditor or to the Finance Department, shall be discontinued or assigned or transferred to any other office, department or agency of the City nor to any "public agency" or "private agency" as said terms are hereinabove defined; excepting, however, that the Council may provide for the furnishing or performance of special services by another office, department or agency or by a "public agency" or a "private agency" to assist the office of City Clerk, City Attorney, City Auditor, Independent Police Auditor or the Department of Finance in the exercise or performance by them of those powers, duties and functions which are assigned to them by this Charter if and when such assistance or service is requested or recommended by the head of such office or department.

*Amended at election June 7, 1966*
*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

### SECTION 801.  Direction by City Manager.

Except as otherwise provided elsewhere in this Charter, all offices, departments and agencies established by or pursuant to the provisions of this Article shall be administered by an officer appointed by and subject to the direction and supervision of the City Manager.

### SECTION 802.  Organization, Conduct and Operation of Departments.

By action not inconsistent with other provisions of this Charter, the Council shall provide for the organization, conduct and operation of the several offices, departments and agencies of the City.

### SECTION 803.  Office of City Attorney.

The office of City Attorney is hereby established.  The City Attorney shall be an attorney at law, and shall be licensed to practice law in the State of California.  In addition, he or she shall have had at least five (5) years of experience in the practice of law prior to his or her appointment.  Except as otherwise provided in this Charter, the City Attorney shall have the following powers and duties:

(a)     Represent and appear for the City, its Council, boards and commissions, in any or all legal actions or proceedings in which they or any of them are concerned or are a part;

(b)     Upon request of an officer or employee or former officer or employee of the City, defend such officer or employee or former officer or employee in any action or proceeding brought against him or her, in his or her official or

individual capacity or both, on account of an act or omission in the scope of his or her employment as an officer or employee of the City, whenever the City is required by the general laws of the State of California to provide such defense or whenever the Council elects to provide such defense even though not required to so do; provided and excepting, however, that the City Attorney may refuse to provide such defense whenever, in his or her opinion, his or her providing such defense would conflict with his or her other duties or responsibilities, in which event the City, if required by the general laws of the State to provide such defense or if it elects to provide such defense though not required by the general laws to do so, shall provide other legal counsel for such purpose;

(c)     Advise the Council and all City boards, commissions and officers in all matters of law pertaining to their offices or their powers and duties;

(d)     Perform other legal services required by the Council.

The Council may retain or employ, by contract or otherwise, other attorneys to take charge of any litigation or legal matter or to assist the City Attorney therein, or may purchase insurance which requires the insurer to provide for the defense of the City and/or of its officers and employees in connection with any matter covered by such insurance.

Except as may be otherwise provided by the Council, the City Attorney shall be under the direction and supervision of the Council.
*Amended at election June 7, 1994*

### SECTION 803.1.  City Attorney; Power of Appointment.

Subject to the Civil Service provisions of this Charter and of any Civil Service Rules adopted pursuant thereto, the City Attorney shall appoint all officers and employees, exclusive of clerical, employed in the Office of the City Attorney, and when he or she deems it necessary for the good of the service, he or she may, subject to the above-mentioned limitations, suspend without pay, demote, discharge, remove or discipline any such officer or employee whom he or she is empowered to appoint.  Neither the Council nor any of its members nor the Mayor shall in any manner dictate the appointment or removal of any such officer or employee whom the City Attorney is empowered to appoint, but the Council may express its views and fully and freely discuss with the City Attorney anything pertaining to the appointment and removal of such officers and employees.
*Added at election November 4, 1980*
*Amended at election June 7, 1994*

### SECTION 804.  Office of City Clerk.

The office of City Clerk is hereby established.  The City Clerk shall have the following powers and duties:

(a)     Attend all regular and special meetings of the Council, unless prevented by illness or physical incapacity or unless his or her absence has been authorized by the Council; and keep an accurate record of the proceedings of the Council;

(b)     Keep a record of all ordinances of the City, and of all written resolutions adopted by the Council, in such manner that the information contained therein will be readily accessible to the public.  To each ordinance contained in such record he or she shall annex or attach his or her certificate stating (1) that it is the original copy of such ordinance or, if the ordinance contained in his or her record is not the original copy, that it is a true and correct copy of the ordinance, and (2) if the ordinance was one required by law to be published, that it has been published pursuant to law;

(c)     Keep all other records of Council proceedings and of his or her office in such manner that the information contained therein will be readily accessible to the public until such time as any of them are destroyed in accordance with State law;

(d)     Be custodian of the seal of the City;

(e)     Administer oaths or affirmations and take affidavits and depositions in connection with or pertaining to City affairs or business; and certify copies of official records of his or her office;

(f)     Have charge of all City elections;

(g)     Be responsible for the publication of all official advertising of the City; and

(h)     Perform such other duties consistent with this Charter as may be required of him or her by the Council.

Except as may be otherwise provided by the Council, the City Clerk shall be under the direction and supervision of the Council.
*Amended at election June 7, 1994*

## SECTION 805.  Office of the City Auditor.

The office of City Auditor is hereby established.  The City Auditor shall be appointed by the Council.  Each such appointment shall be made as soon as such can reasonably be done after the expiration of the latest incumbent's term of office.  Each such appointment shall be for a term ending four (4) years from and after the date of expiration of the immediately preceding term; provided, that if a vacancy should occur in such office before the expiration of the former incumbent's terms, the Council shall appoint a successor to serve only for the remainder of said former incumbent's term.

The office of City Auditor shall become vacant upon the happening before the expiration of his term of any of the events set forth in subsections (a), (b), (c), (d), (e), (h), (i), (j), (k) and (l) of Section 409 of this Charter.  The Council, by resolution adopted by not less than ten (10) of its members may remove an incumbent from the office of City Auditor, before the expiration of his or her term, for misconduct, inefficiency, incompetence, inability or failure to perform the duties of such office or negligence in the performance of such duties, provided it first states in writing the reasons for such removal and gives the incumbent an opportunity to be heard before the Council in his or her own defense; otherwise, the Council may not remove an incumbent from such office before the expiration of his or her term.

The City Auditor shall have the following powers and duties:

(a)   Conduct or cause to be conducted annual post audits of all the fiscal transactions and accounts kept by or for the City.  Such audits shall include but not be limited to the examination and analysis of fiscal procedures and the examination, checking and verification of accounts and expenditures.  The audits shall be conducted in accordance with generally accepted auditing standards and accordingly shall include tests of the accounting records and other auditing procedures as may be considered necessary under the circumstances.  The audits shall include the issuance of suitable reports of examination so the Council and the public will be informed as to the adequacy of the financial statements of the City.

(b)   Conduct performance audits, as assigned by Council.  A "performance audit" means a post audit which determines with regard to the purpose, functions and duties of the audited agency all of the following:

(1)   Whether the audited department, office or agency, is managing or utilizing its resources, including public funds, personnel, property, equipment and space in an economical and efficient manner.

(2)   Causes of inefficiencies or uneconomical practices, including inadequacies in management information systems, internal and administrative procedures, organizational structure, use of resources, allocation of personnel, purchasing policies and equipment.

(3)   Whether the desired results are being achieved.

(4)   Whether objectives established by the Council or other authorizing body are being met.

(c)   Conduct special audits and investigations, as assigned by Council.  "Special audits" and "investigations" mean assignments of limited scope, intended to determine:

(1)   The accuracy of information provided to the Council.

(2)    The costs and consequences of recommendations made to the Council.

(3)    Other information concerning the performance of City Departments, Offices or Agencies as requested by the Council.

(d)    The City Auditor shall have access to, and authority to examine any and all documents including but not limited to books, accounts, internal memoranda, writings and tapes, reports, vouchers, correspondence files and other records, bank accounts, money and other property of any City department, office or agency, whether created by the Charter or otherwise, with the exception of the office of any elected official.

It is the duty of any officer, employee or agent of the City having control of such records to permit access to, and examination thereof, upon the request of the City Auditor or his or her authorized representative.  It is also the duty of any such officer, employee or agent to fully cooperate with, and to make full disclosure of all pertinent information.

(e)    Prepare and submit to the Council, in each calendar month, a written report of the City Auditor's activities and findings in the immediately preceding calendar month, together with any recommendations to improve the administration of the City;

(f)    Perform other auditing functions, consistent with other provisions of this Charter, and prepare and submit such other reports, as may be assigned by the Council.

*Amended at election November 7, 1978*
*Amended at election November 4, 1986*

## SECTION 805.1.  City Auditor; Power of Appointment.

(a)    The City Auditor may appoint and prescribe the duties of the professional and technical employees employed in the Office of the City Auditor.  Such appointed professional and technical employees shall serve in unclassified positions at the pleasure of the City Auditor.  The Council shall determine whether a particular employee is a "professional" or "technical" employee who may be appointed by the City Auditor pursuant to these Subsections.

(b)    In addition, subject to the Civil Service provisions of this Charter and of any Civil Service Rules adopted pursuant thereto, the City Auditor shall appoint all clerical employees employed in the Office of the City Auditor, and when the City Auditor deems it necessary for the good of the service he or she may, subject to the above-mentioned limitations, suspend without pay, demote, discharge, remove or discipline any such employee whom he or she is empowered to appoint.

(c)    Neither the Council nor any of its members nor the Mayor shall in any manner dictate the appointment or removal of any such officer or employee whom the City Auditor is empowered to appoint, but the Council may express its views and fully and freely discuss with the City Auditor anything pertaining to the appointment and removal of such officers and employees.

*Added at election November 4, 1980*
*Amended at election November 4, 1986*

## SECTION 805.2.  City Auditor Performance Audit.

The Council shall contract with an independent audit firm, which has no other contracts with the City, to conduct a performance audit of the City Auditor's office at least every two years. The report of the performance audit shall be available to the public.
*Added at election November 4, 1986*

## SECTION 806.  Finance Department.

A Finance Department is hereby established.  A Director of Finance shall be the head of such department.  The functions of such department and the powers and duties of the Director of Finance shall be as follows:

(a)    Regularly, at least once each month, and at the end of each fiscal year, prepare and submit to the City Manager a monthly statement indicating the financial condition of the City;

(b)    Except as otherwise provided in Article XII of this Charter, receive or collect all monies or revenues due the City; maintain custody of all public funds and securities belonging to or under the control of the City, and deposit and invest funds in accordance with principles of sound treasury management and in accordance with the applicable laws or ordinances;

(c)    Maintain a general accounting system for the City; and supervise and control disbursements and expenditures to assure that unexhausted and unencumbered appropriations exist therefor or that payment has been otherwise legally authorized, and that money is available therefor in the City Treasury with which to make payment;

(d)    Verify cash receipts, the distribution of revenues to the appropriate funds, and certify as to the legality and correctness of all bills, invoices, payrolls, demands and charges against the City, and sign warrants or checks in payment of such claims;

(e)    Unless and except as may be otherwise provided by the Council, procure materials, supplies and general services for the City, and prepare and maintain

a current inventory of all materials and supplies and an inventory of general assets belonging to the City;

(f)    Unless and except as may be otherwise provided by the Council, provide general services to other departments of the City as may be determined appropriate;

(g)    Perform such other functions, consistent with this Charter, as may be required by the Council.

Subject to the direction and supervision of the City Manager, the Director of Finance shall be responsible for the conduct of all of the functions of the Finance Department and, except as otherwise provided elsewhere in this Charter, shall have for such purpose the duties and powers imposed by the general laws of the State of California upon City Treasurers, City Assessors and City Tax Collectors.

**SECTION 807.  Administrative Organization; Other Departments.**

(a)    The following Charter departments are hereby established:  A Police Department, a Fire Department, a Public Works Department, a Parks and Recreation Department, a Personnel Department, a Planning Department, an Airport Department and a Library Department.

(b)    Additional departments may be created by Council from time to time pursuant to Section 800.

(c)    Each department shall have such functions, powers and duties as Council may from time to time prescribe.

*Amended at election November 4, 1986*

**SECTION 808.  Public Information Office.**

A Public Information Office is hereby established.

This office shall be administered by a Public Information Officer appointed by the Mayor. The Public Information Officer shall be under the direction and supervision of the Mayor.

The functions and duties of this office shall be to gather and disseminate to the public and to the news media, in a timely manner, accurate and complete information concerning the policies of the Council and other information regarding the City and the general region in which it is located, and to perform such other duties as may be assigned by the Council.

*Added at election November 4, 1986*

**SECTION 809.  Office of the Independent Police Auditor**

The Office of the Independent Police Auditor is hereby established.  The Independent Police Auditor shall be appointed by the Council.  Each such appointment shall be made as soon as such can reasonably be done after the expiration of the latest incumbent's term of office. Each such appointment shall be for a term ending four (4) years from and after the date of expiration of the immediately preceding term; provided, that if a vacancy should occur in such office before the expiration of the former incumbent's terms, the Council shall appoint a successor to serve only for the remainder of said former incumbent's term.

The office of Independent Police Auditor shall become vacant upon the happening before the expiration of his or her term of any of the events set forth in subsections (a), (b), (c), (d), (e), (h), (i), (j), (k) and (l) of Section 409 of this Charter.  The Council, by resolution adopted by not less than ten (10) of its members may remove an incumbent from the office of the Independent Police Auditor, before the expiration of his or her term, for misconduct, inefficiency, incompetence, inability or failure to perform the duties of such office or negligence in the performance of such duties, provided it first states in writing the reasons for such removal and gives the incumbent an opportunity to be heard before the Council in his or her own defense; otherwise, the Council may not remove an incumbent from such office before the expiration of his or her term.

The Independent Police Auditor shall have the following powers and duties:

(a)   Review Police Department investigations of complaints initiated by members of the public and administrative investigations initiated bv the Police Department against police officers to determine if the investigation was complete, thorough, objective and fair.

(b)   Make recommendations with regard to Police Department policies and procedures based on the Independent Police Auditor's review of investigations of complaints against police officers.

(c)   Make recommendations with regard to Police Department policies and procedures.

(1)   For the purposes of making recommendations in accordance with this subsection (c), the Independent Police Auditor shall have access to and authority to examine reports and records that are not exempt from disclosure and available for public inspection under the law for officer involved shootings and uses offeree resulting in death or great bodily injury, regardless of whether a complaint has been made. The Police Department shall make these reports and records available to the Independent Police Auditor without redaction, but the Police Department may withhold such reports and records from the Independent Police Auditor until any criminal or administrative investigation involving the police officer or police officers specifically

involved in the incident is complete. For the purpose of this subsection (c)(1), "great bodily injury" means a serious impairment of physical condition, including, but not limited to. the following: loss of consciousness, concussion, bone fracture. protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement.

(2)   In addition to the records and reports described in subsection (c)(1), the Independent Police Auditor shall have access to and authority to examine redacted records and reports of the Police Department, including, but not limited to, use of force statistics, police reports, and body worn camera footage, for the purposes of making recommendations in accordance with this subsection (c), subject to the following limitations:

   i.     Records and reports sought by the Independent Police Auditor must be directly related to a topic that is the subject of a complaint or administrative investigation; and

   ii.    Records and reports sought by the Independent Police Auditor must be directly related to a topic that is part of a work plan submitted to the Council bv the Independent Police Auditor and approved by the Council; and

   iii.   In addition to any other redactions authorized under State law, the Police Department shall redact police officer names and personally identifiable information of police officers in any record and report provided to the Independent Police Auditor under this subsection (c)(2); and

   iv.    Any recommendation from the Independent Police Auditor that is based on the records and reports that were examined bv the Independent Police Auditor under this subsection (c)(2) shall be reviewed bv the City Manager, Chief of Police, City Attorney, and the Council, if appropriate, in accordance with the closed session provisions of California Government Code section 54950 et seg., before disclosure.

(d)     Conduct public outreach to educate the community on the role of the Independent Police Auditor and to assist the community with the process and procedures for investigation of complaints against police officers.

(e)     Contract with any entity consistent with the powers and duties under this Charter and subject to any limitation imposed by Council.

(f)     Perform such other duties consistent with this Charter as may be required of him or her by the Council subject to any requirement to meet and confer with the recognized employee organization for police officers, including the exhaustion of applicable impasse resolution procedures.

*Added at election November 5, 1996*
*Amended at election November 3, 2020*

### SECTION 809.1.  Independent Police Auditor; Power of Appointment.

(a)     The Independent Police Auditor may appoint and prescribe the duties of the professional and technical employees employed in the Office of the Independent Police Auditor.  Such appointed professional and technical employees shall serve in unclassified positions at the pleasure of the Independent Police Auditor.  The Council shall determine whether a particular employee is a "professional" or "technical" employee who may be appointed by the Independent Police Auditor pursuant to these Subsections.

(b)     In addition, subject to the Civil Service provisions of this Charter and of any Civil Service Rules adopted pursuant thereto, the Independent Police Auditor shall appoint all clerical employees employed in the Office of the Independent Police Auditor, and when the Independent Police Auditor deems it necessary for the good of the service he or she may, subject to the above-mentioned limitations, suspend without pay, demote, discharge, remove or discipline any such employee whom he or she is empowered to appoint.

(c)     Neither the Council nor any of its members nor the Mayor shall in any manner dictate the appointment or removal of any such officer or employee whom the Independent Police Auditor is empowered to appoint, but the Council may express its views and fully and freely discuss with the Independent Police Auditor anything pertaining to the appointment and removal of such officers and employees.

*Added at election November 5, 1996*

**SECTION 810.  Retirement Board or Boards.**

(a)      The City Council by ordinance shall establish one or more retirement boards to administer the retirement plans established pursuant to Article XV of this Charter.

(b)      The term of membership, qualifications of the members and the size of each retirement board shall be prescribed by ordinance. The members of any retirement board shall be appointed and removed in a manner prescribed by ordinance with a majority of the members appointed by the City Council. The City Council shall appoint and remove the members of any retirement board in a manner prescribed by ordinance. The members of each retirement board shall be paid a monthly stipend determined pursuant to the provisions of Section 1001.1 of this Charter.

(c)      Each retirement board shall administer the retirement plan or plans that the retirement board has been designated to administer in accordance with the fiduciary duties and obligations established by law, the City Charter, and as further prescribed by ordinance.

(d)      Each retirement board shall annually adopt a budget approved by the City Council covering the entire aggregate expense of administration of the retirement plan or plans that the retirement board has been designated to administer for the ensuing fiscal year, using the same fiscal year as the City pursuant to Section 1200 of this Charter.

(e)      Each retirement board may retain or employ, by contract, attorneys to assist the retirement board on matters reasonably necessary to carry out their fiduciary duties in the administration of the retirement plan or plans that the retirement board has been designated to administer.

(f)      Each retirement board shall comply with all open and public meeting requirements established by state law and applicable Council action.

*Added at election November 4, 2014*

**SECTION 810.1.  Retirement Board; Power of Appointment.**

(a)      The retirement board or boards may appoint and prescribe the duties of the chief executive officer and the chief investment officer or such equivalent positions of the Office of Retirement Services to assist in the administration of the plan or plans.  Such appointed officers shall serve in unclassified positions at the pleasure of the appointing retirement board; if more than one board then the boards shall jointly appoint the chief executive officer and the chief investment officer.

(b)     The chief executive officer or the officer holding an equivalent position of the Office of Retirement Services may appoint and prescribe the duties of the professional and technical employees and clerical employees employed in the Office of Retirement Services.

(c)     In addition, when the chief executive officer or the officer holding an equivalent position deems it necessary for the good of the service he or she may suspend without pay, demote, discharge, remove or discipline any such employee in the Office of Retirement Services subject to any applicable Civil Service provisions of the Charter and any Civil Service Rules adopted thereto.

(d)     Neither the Council nor any of its members nor the Mayor shall in any manner dictate the appointment or removal of any such officer or employee whom the retirement board or boards is empowered to appoint or the chief executive officer is empowered to appoint, but the Council may express its views and fully and freely discuss with the retirement board or boards anything pertaining to the appointment and removal of such officers and employees.

(e)     Compensation set for chief executive officer, chief investment officer, or their equivalent and the investment professional staff shall be set in accordance with Charter Section 902 and the board or boards shall consider compensation of equivalent positions in comparable United States Public Pension Plans in recommending the total compensation for the positions of chief executive officer, chief investment officer or their equivalent and the investment professional staff.

*Added at election November 4, 2014*

# ARTICLE IX
# OFFICERS AND EMPLOYEES

## SECTION 900.  Officers and Employees; Enumeration.

The officers of the City shall consist of the Mayor, members of the Council, the City Manager, the City Attorney, the City Clerk, the City Auditor, the Independent Police Auditor, the directors or heads of the various City offices or departments, the members of various boards and commissions and such other officers as may be provided for by this Charter or by action of the Council.

*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

## SECTION 901.  Officers and Employees; Appointment and Removal.

The City Manager, the City Attorney, and the City Clerk shall be appointed and may at any time be removed by the Council.  Except as otherwise provided by this Charter, all other

officers, department heads and employees of the City, except members of boards and commissions, shall be appointed by the City Manager and, except as otherwise provided elsewhere in this Charter, shall serve at his or her pleasure.

The Council shall appoint, and may at any time remove, an Acting City Manager, an Acting City Attorney, Acting City Clerk, Acting City Auditor and Acting Independent Police Auditor to perform the functions and duties of the respective offices in the case of absence or disability.

The Mayor and each member of the Council shall appoint any assistants to serve in his or her office.

The City Manager shall, subject to the provisions of Section 411.1, appoint a person to act as the head of a department or office, other than the office of City Clerk, City Attorney, City Auditor, Independent Police Auditor and Public Information Officer in the case of absence or disability of the head of such department or office.
*Amended at election November 7, 1978*
*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

## SECTION 902.  Compensation.

The compensation of all City appointive officers and employees, except as otherwise provided in this Charter, shall be fixed by the Council.  All officers and employees shall be entitled to be reimbursed for actual and necessary expenses incurred while performing official business of the City when said expenses have been authorized or approved by the proper authority.

## SECTION 903.  Oath of Office.

Each officer of the City, before entering upon the duties of his office, shall take the oath of office as provided for in the Constitution of this State and shall file the same with the City Clerk.

## SECTION 904.  Administering Oaths.

Each department head and his or her deputies shall have the power to administer oaths and affirmations in connection with any official business pertaining to his or her department.
*Amended at election June 7, 1994*

## SECTION 905.  Official Bonds.

The Council shall fix the nature, amount and terms of the official bonds of all officials or employees who are required by the Council to qualify for such bonds; provided, however, that all officers and employees having custody or control of public funds shall be required to

be bonded.  All bonds shall be executed by a responsible corporate surety, shall be approved as to form by the City Attorney and shall be filed with the City Clerk.  Premiums on official bonds shall be paid by the City.

### SECTION 906.  Prohibited Interests.

The provisions of Article 4, Chapter 1, Division 4, Title 1 of the Government Code of the State of California as the same now exist or may hereafter be amended, relating to prohibitions applicable to specified officers, shall apply in the City.

### SECTION 907.  Nepotism.

The Council shall not appoint to a salaried position under the City government any person who, at the time of his appointment, is related by blood or marriage, within the second degree, to any member of such Council; nor shall the City Manager or any other appointing authority appoint to any salaried position under City government any person who, at the time of his appointment, is related by blood or marriage, within the second degree, to such appointing authority.

### SECTION 908.  Discrimination.

Except as otherwise provided by the general laws of this State heretofore or hereafter enacted, no person employed by the City or seeking employment therewith shall be employed, refused employment, promoted, demoted, disciplined or discharged or in any way favored or discriminated against because of political opinion or affiliations, or membership in a lawful employees association, or because of race, color or creed.

# ARTICLE X
# BOARDS AND COMMISSIONS

### SECTION 1000.  Planning Commission.

There shall be, and there is hereby established, a Planning Commission to consist of eleven (11) members appointed by the Council with one member appointed from each Council District and one member appointed as an "at-large" member. It shall be deemed to be a continuation of the Planning Commission established by and pursuant to this Section as it read immediately prior to the effective date of this Section as it now reads.

A person shall not be eligible to take or hold office as a member of the Planning Commission unless he or she satisfies all of the following conditions:

(a)     He or she must have been a citizen of the United States for at least one year immediately preceding the commencement of the four-year term or lesser

period of time for which he or she is appointed, and he or she must be a citizen of the United States during his or her incumbency;

(b)    He or she must have been a resident of the City of San José for at least one year immediately preceding the commencement of the four-year term or lesser period of time for which he or she is appointed, and he or she must be a resident of the City of San José during his or her incumbency;

(c)    He or she must have been a registered elector of the City of San José at the time of his or her appointment and thereafter to and including the date of commencement of the four-year term or lesser period of time for which he or she is appointed.

The City Manager, the City Attorney and such other officers as the Council may designate, or their representatives, may meet with the Planning Commission and may participate in its discussions but shall not have a vote.

Those persons who immediately prior to the effective date of this Section (as it now reads) were members of the Planning Commission established by and pursuant to this Section as it read immediately prior to the effective date of this Section (as it now reads) shall continue to be members of this Planning Commission and, subject to other provisions of this Charter, shall hold such offices until the expiration of the terms for which they were appointed, to wit: the three members appointed for terms expiring on June 30, 2022, shall continue in office until the end of June 30, 2022, and the four members appointed for terms expiring on June 30, 2024, shall continue in office until the end of June 30, 2024. The Council shall appoint an eighth and ninth member for a term expiring on June 30, 2022, and a tenth and eleventh member shall be appointed fora term expiring on June 30, 2024. Thereafter, the Council shall appoint commissioners for four-year terms commencing on the first day of July of each even-numbered year to fill the offices of those members whose terms expire as of the end of the 30th day of June of such year.

The office of a member shall become vacant if during his or her term of office he or she ceases to be a resident of the City of San José or ceases to be a citizen of the United States. Also, the office of a member shall become vacant upon the happening before the expiration of his or her term of any of the events set forth in subsections (a), (b), (c), (e), (g), (h), (i), (j), (k), and (l) of Section 409 of this Charter, or upon such member's absence from five (5) consecutive regular meetings other than adjourned regular meetings, of the Commission, unless excused by resolution of Council.  Also, the Council may remove a member from office at any time for misconduct, inefficiency or willful neglect in the performance of the duties of his or her office providing it first states in writing the reasons for such removal and gives such member an opportunity to be heard before the Council in his or her own defense. If a vacancy occurs before the expiration of a member's term, appointed to represent a specific Council District, the Council shall appoint a qualified person from the same Council District to fill such vacancy for the remainder of the unexpired term of such member.

The Planning Commission shall have the following powers and duties:

(a)     Make recommendations to the Council respecting the adoption, amendment, or repeal of master, general, comprehensive, precise or specific plans for future physical development of the City or any part thereof, and periodically review the same;

(b)     Make recommendations to the Council respecting the adoption, amendment or repeal of land use and development regulations, including but not limited to zoning and subdivision regulations;

(c)     Make recommendations to the Council respecting the adoption, amendment or repeal of plans or programs for the redevelopment, rehabilitation or renewal of any areas of the City;

(d)     Make recommendations to the Council respecting capital improvement programs; and

(e)     Exercise such other powers and perform such other functions and duties as may be expressly given to it by other provisions of this Charter, or exercise such other powers or perform such other functions as may be prescribed by the Council not inconsistent with the provisions of this Charter.

*Amended at election June 6, 1966*
*Amended at election June 2, 1970*
*Amended at election June 7, 1988*
*Amended at election June 7, 1994*
*Amended at election November 3, 2020*


**SECTION 1001.  Civil Service Commission.**

There shall be, and there is hereby established, a Civil Service Commission.  The following provisions shall be applicable thereto:

(a)     MEMBERSHIP.   The Civil Service Commission shall consist of five (5) members appointed by the Council for terms of four (4) years.  Members must be qualified electors of the City at all times during their terms of office; not more than four (4) shall be of the same sex; and one (1) shall be an attorney-at-law, licensed to practice law in the State of California, who shall have practiced law in said State for at least five (5) years.

(b)     TERMS OF OFFICE.   The term of office for persons appointed after November 1, 1998 shall be four (4) years.

The person who is appointed to fill the one (1) office of the member whose term expires on December 1, 2001, and each person who is thereafter appointed to fill such one (1) office whenever it becomes vacant, regardless of

whether it becomes vacant during or at the end of an incumbent's term of office, shall be appointed by the Council from a list of three (3) persons to be nominated in each case by all full-time officers and employees in the Civil Service of the City (other than members of the Council and members of boards and commissions) at elections to be held for such purpose. Only full-time officers and employees shall be eligible to vote at such elections, and no officer or employee shall be permitted to vote for more than one person at any one election. The names of three (3) persons receiving the highest number of votes at any such election shall be referred to the Council, and the Council, without consideration of the number of votes received by each, shall appoint to such office the one of the three whom it believes is best qualified for such office. Said nomination elections shall be conducted by the City Clerk in accordance with an election procedure prepared by the City Clerk and approved by the Council.

(c)     VACANCIES. The City Council shall adopt an ordinance setting forth rules relating to vacancies before expiration of a term of office and removal of a member from office.

(d)     OATH AND DECLARATION.   The members of the Civil Service Commission, in addition to the oath of office required by law, shall make under oath and file in the office of the City Clerk the following declaration:  "I am opposed to appointment to public service as a reward for political activity and will execute and perform the powers and duties of the office of Civil Service Commissioner in the spirit of this declaration."

(e)     SECRETARY. The Council shall provide the Commission with a secretary satisfactory to the Commission; provided, however, that the head of any personnel department of the City shall not hold any secretarial, executive or administrative position under the direct jurisdiction of the Civil Service Commission.

(f)     POWERS AND DUTIES. The Civil Service Commission shall have the following powers and duties:

(1)     To recommend to the Council the adoption, amendment or repeal of Civil Service Rules relating to the matters specified in Section 1102 of Article XI of this Charter;

(2)     To make any investigation which it may consider desirable concerning the administration of personnel in the Classified Service;

(3)     To make recommendations to the Council, the City Manager or to any other appointive power on matters relating to the administration of personnel in the Classified Service;

(4)    To exercise and perform such other powers and duties as are expressly given to it by other provisions of this Charter; and to exercise such other powers and perform such other functions and duties as may be prescribed by the Council not inconsistent with the provisions of this Charter.

*Amended at election June 7, 1988*
*Amended at election June 7, 1994*
*Amended at election November 3, 1998*

## SECTION 1001.1.  Salary Setting Commission.

There shall be, and there is hereby established, a Salary Setting Commission.  The following provisions shall be applicable thereto:

(a)    MEMBERSHIP.  The Salary Setting Commission shall consist of five (5) members appointed by the Civil Service Commission.  Members must be qualified electors of the City at all times during their term of office.

(b)    TERMS OF OFFICE.  Except as provided herein below, the regular term of office of each member of the Salary Setting Commission shall be four (4) years.  The initial members of the Salary Setting Commission shall be appointed by the Civil Service Commission during the month of January, 1981.  Two (2) of the members so appointed shall be appointed for a term expiring on December 31, 1982; and three (3) of the members so appointed shall be appointed for a term expiring on December 31, 1984.  Commencing in December of 1982, the Civil Service Commission shall, during the month of December of each even-numbered year, make appointments to fill the offices of the members whose terms are expiring at the end of such even-numbered year.  Such appointments shall be for regular terms of four (4) years commencing on the first day of January of the following odd-numbered year and expiring on the 31st day of December of the second even-numbered year thereafter.

(c)    VACANCIES.  The office of a member shall become vacant upon the happening before the expiration of his or her term of any of the events set forth in subsections (a), (b), (c), (d), (e), (h), (i), (j), (k), and (l) of Section 409 of this Charter.  Also, the Civil Service Commission may remove a member from office at any time for misconduct, inefficiency or willful neglect in the performance of the duties of his or her office providing it first states in writing the reasons for such removal and gives such member an opportunity to be heard before the Civil Service Commission in his or her own defense.  If a vacancy occurs before the expiration of a member's term, the Civil Service Commission shall appoint a qualified person to fill such vacancy for the remainder of the unexpired term of such member.

(d)     POWERS AND DUTIES.
The Salary Setting Commission shall perform the following duties:

(1)     Commencing in 2019, and every five (5) years thereafter, the Salary Setting Commission shall set the base salaries for members of the Council, including the Mayor, as provided in Section 407 of this Charter.

(2)     The Salary Setting Commission shall biennially make recommendations regarding the monthly stipend for any non-City employee member of the retirement board or boards which administer the retirement plan or plans established pursuant to Article XV of this Charter and designated by the Council to receive a stipend. The stipend set by the Council will be in accordance with the process established through ordinance.

*Added at election November 4, 1980*
*Amended at election June 7, 1994*
*Amended at election November 4, 2014*
*Amended at election November 6, 2018*

## SECTION 1002.  Other Boards and Commissions.

In addition to those specific boards and commissions which are established by other provisions of this Article, the Council may create such other boards and commissions as in its judgment are required, and may grant them such functions, powers and duties as are consistent with the provisions of this Charter.  In addition, the Council may create such temporary committees as it may deem advisable to render counsel and advice to the Council, the City Manager or any board or commission on any specified matter within the jurisdiction of such authorities.  All boards, commissions and committees created by the Council shall be subject to such direction and supervision, if any, as the Council may specify, and the members thereof shall be appointed by the Council, or by the Mayor if such is authorized by the Council, for such terms as the Council may deem advisable.

## SECTION 1003.  Reimbursement for Expenses.

Members of boards, commissions and committees shall receive reimbursement, if and to the extent such is authorized by the Council, for expenses incurred in the performance of their duties or functions of office.

# ARTICLE XI
# CIVIL SERVICE SYSTEM

### SECTION 1100.  Merit Principle.

All appointments and promotions to positions in the Classified Service shall be made on the basis of merit and fitness, demonstrated by examination and other evidence of competence, in accordance with Civil Service Rules adopted in the manner provided in this Charter.

### SECTION 1101.  Civil Service System; Classified and Unclassified Service.

The Civil Service of the City shall be divided into the Classified Service and the Unclassified Service, as follows:

(a)  The Unclassified Service shall comprise and include all of the following officers and employees:

(1)  The Mayor and the members of the Council and their assistants;

(2)  All members of boards and commissions, and if so desired by the Civil Service Commission, the Secretary of the Civil Service Commission;

(3)  The City Manager and all his or her assistants, deputies, and secretaries, the head of each department, assistant directors of departments, deputy directors of departments, (excluding the police department) and the City Clerk and one assistant.

(4)  Temporary Employment

a.  Persons temporarily employed to make or conduct a special inquiry, investigation, examination or installation, or to render professional, scientific or technical services of an occasional or exceptional character; provided that no person employed in the Unclassified Service pursuant to this subsection for any purpose shall continue in such employment pursuant to this subsection for a period in excess of six (6) months for each special inquiry, investigation, examination, installation or particular service unless an extension is approved by the Civil Service Commission;

b.  Persons temporarily employed to fill positions for a period of time not to exceed two (2) years, where there exists a need to perform duties of a temporary nature or where duties may be required on an intermittent basis.

(5)    Persons employed in the event of an emergency to perform services required because of and during such emergency for a period of time not to exceed six (6) months unless an extension is approved by the Civil Service Commission;

(6)    Persons employed to temporarily fill positions in the classified service when no eligible lists for such positions exist, until such time as eligible lists are created and persons can be hired there from to fill such positions;

(7)    Volunteer members of the police, fire or civil defense departments or of any police, fire or civil defense force or organization.

(8)    The Public Information Officer, and all persons employed in the Public Information Office, exclusive of clerical employees.

(9)    The City Auditor and the professional and technical employees in the Office of the City Auditor.

(10)    The City Attorney and all attorneys and supervisors in the Office of the City Attorney;

(11)    The Independent Police Auditor and the professional and technical employees in the Office of the Independent Police Auditor.

(12)    The chief executive officer, chief investment officer, or their equivalent and the investment professional staff, as set forth by ordinance, in the Office of Retirement Services and who shall not be member of the City's defined benefit pension or retiree healthcare retirement plans. This section shall not apply to any incumbent filling those positions on the date that the conversion was approved by election.

(b)    The Classified Service shall consist of all persons employed in positions in the City Civil Service which are not in the Unclassified Service;

(c)    Nothing herein shall be construed as precluding the appointing authority from filling any position in the manner in which positions in the Classified Service are filled.

(d)    Whenever previously classified positions are placed in the unclassified service in this Charter, the unclassified status shall not apply to those incumbents filling those classified positions on the date that the conversion was approved by election.

*Amended at election November 4, 1986*
*Amended at election November 3, 1992*

*Amended at election June 7, 1994*
*Amended at election November 5, 1996*
*Amended at election November 4, 2014*

### SECTION 1102.  Civil Service Rules; Contents.

The Council shall adopt Civil Service Rules for the Classified Service relating to the following matters:  Creation of positions; applications for employment; examinations; eligibility and qualifications; duration of eligible lists; certification of eligible lists; appointments; promotions; demotions; transfers; resignations; layoffs; temporary reductions due to retrenchment or completion of work; performance ratings; factors and weights to be considered in efficiency rating; filling of positions; classification of positions; specifications for positions; separation from service; dismissals; suspensions; disciplinary action; such other things, consistent with this Charter, as the Council may deem proper and necessary.

### SECTION 1103.  Civil Service Rules; Manner of Adoption.

Civil Service Rules for the Classified Service shall be adopted, and may from time to time be repealed or amended, by ordinance of the Council.  Upon adoption, Civil Service Rules shall have the force and effect of law.

The Council may adopt, repeal or amend any Civil Service Rule for the Classified Service, provided it first receives from the Civil Service Commission a report or recommendation with respect to the proposed new Rule, if a new Rule is proposed to be adopted, or with respect to the proposed repeal or amendment of an existing Rule if an existing Rule is proposed to be repealed or amended; provided, however, that if the Civil Service Commission refuses or fails to submit to the Council a report or recommendation on any proposed new Rule, or proposed repeal or amendment of any existing Rule, within ninety (90) days from and after the date the Council requests such a report or recommendation, the Council may adopt such new Rule or repeal or amend such existing Rule, without first receiving a report or recommendation thereon from the Civil Service Commission.

### SECTION 1104.  Disciplinary Action.

*Repealed at election November 3, 1998*

### SECTION 1105.  Appointments from Classified Service to Unclassified Service.

In the event an officer or employee of the City who heretofore held or now holds a position in the Classified Service was thereafter or is hereafter appointed to a position in the Unclassified Service, and should subsequently be removed or resign from the Unclassified Service, he or she shall have the right, if he or she has not been guilty of infamous, disgraceful or dishonest conduct, to be employed forthwith in a position consonant with his or her former classification in the Classified Service without loss of any rights or privileges and upon the same terms and conditions as if he or she had remained in said classification.
*Amended at election June 7, 1994*

**SECTION 1106.  Employees of Consolidated Cities.**

Except as otherwise required by such laws of the State of California as are applicable to charter cities, all officers and employees of any city (hereinafter called "consolidated city") hereafter consolidated with the City of San José, who were full-time officers or employees of such consolidated city upon the date of election held in such consolidated city for such consolidation, when such officers or employees would be included in the classified service of the City of San José, shall from the effective date of such consolidation be deemed to have their names upon eligible lists for respective types of positions held by them, and to be qualified for appointment to such respective positions.
*Amended at election June 3, 1969*

**SECTION 1107.  Employees of Annexed Agencies.**

In the event of the annexation of all or a portion of the area of any governmental agency to the City, it shall be discretionary with the Council as to whether all or any of the officers or employees of such agency shall be entitled to have their names placed upon eligible lists for respective types of positions held by them and to be qualified for appointment to such respective positions.

**SECTION 1108.  Mandatory Separation from Service.**

Any member of the Police or Fire Department of the City who is also a member of any Police and Fire Department retirement plan or system of the City must be separated from any position in the Police or Fire Department of the City upon his or her attaining the age of seventy (70) years, such separation to be effective no later than the last day of the calendar month within which he or she attains such age.  Subject to the provisions of other sections of this Charter, the Council may at any time provide for mandatory separation of officers or employees, other than persons holding elective offices, from specified positions in the Civil Service at an earlier age if and when the Council deems such to be for the good of the Civil Service.
*Amended at election November 2, 1982*
*Amended at election June 5, 1984*
*Amended at election June 7, 1994*

**SECTION 1109.  Exclusions and Exceptions.**

The provisions of this Article shall not be deemed to apply to, nor in any way limit the Council in, the Council's exercise of any of the powers granted to it by the provisions of sub-section (b) of Section 800, or by the provisions of Section 803, of the Charter.  All transfers or consolidations of functions, and all contracts, resulting from the exercise by the Council of such powers shall be deemed exempt from the Civil Service provisions of this Charter, and all persons employed or whose services are contracted for, pursuant to any such transfer, consolidation or contract shall be deemed, for Civil Service purposes, to be independent contractors and not officers or employees within the Civil Service of the City, regardless of

the extent, if any, of any supervision or control which may be exercised over such persons or their activities by any officer or employee of the City.  Also, the Council may at any time, or from time to time, authorize or direct the execution of contracts between the City and any public or private body, entity, firm, organization, association or person, for the conduct or making of any special study, inquiry, investigation or examination, or for the preparing or doing of any special or particular services or work, for or on behalf of the City or any office, department or agency thereof, unless such is prohibited by the provisions of any other Article of this Charter, without complying with the provisions of this Article; and all persons with whom such contracts are made shall be deemed, for Civil Service purposes, to be independent contractors and not officers or employees within the Civil Service of the City, regardless of the extent, if any, of any supervision or control which may be exercised over such persons or their activities by any officer or employee of the City.  In addition, the appointment by the Council of any person to any office, pursuant to authority granted to the Council by this Charter, shall not be subject to the Civil Service provisions of this Charter.

### SECTION 1110.  Exceptions:  War or National Emergency.

Notwithstanding any other provisions of this Charter to the contrary, in time of war or national emergency the Council may provide for the emergency employment of any person to fill any office or position in the City.  Such person shall not be subject to the requirements, regulations and qualifications of the personnel, merit or civil service system adopted by the City.  An emergency appointee shall not acquire civil service or other permanent status because of the emergency appointment.  The Council may, however, provide that an emergency appointee selected from an eligible list who is otherwise eligible for permanent appointment may acquire such rights as are expressly provided for under Civil Service Rules.

### SECTION 1111.   Compulsory Arbitration for Fire and Police Department Employee Disputes.

(a)    It is hereby declared to be the policy of the City of San José that strikes by firefighting and peace officers are unlawful in the state of California and not in the public interest and should be prohibited, and that a method should be adopted for peacefully and equitably resolving disputes that might otherwise lead to such strikes.

If any firefighter or peace officer employed by the City of San José willfully engages in a strike against the City, said employee shall be dismissed from his or her employment and may not be reinstated or returned to City employment except as a new employee.  No officer, board, council or commission shall have the power to grant amnesty to any employee charged with engaging in a strike against the City.

(b)    The City, through its duly authorized representatives, shall negotiate in good faith with the recognized fire and police department employee organizations on all matters relating to the wages, hours, and other terms and conditions of City employment, including the establishment of procedures for the resolution

of grievances submitted by either employee organization over the interpretation or application of any negotiated agreement including a provision for binding arbitration of those grievances. Unless and until agreement is reached through negotiations between the City and the recognized employee organization for the fire or police department or a determination is made through the arbitration procedure hereinafter provided, no existing benefit or condition of employment for the members of the fire department or police department bargaining unit shall be eliminated or changed.

(c)     All disputes or controversies pertaining to wages, hours, or terms and conditions of employment which remain unresolved after good faith negotiations between the City and either the fire or police department employee organization shall be submitted to a three-member Board of Arbitrators upon the declaration of an impasse by the City or by the recognized employee organization involved in the dispute. All issues concerning the scope of the arbitration Board's authority, jurisdiction or powers shall, upon the request of either party, be resolved by petition to the Superior Court.

(d)     Representatives designated by the City and representatives of the recognized employee organization involved in the dispute, controversy or grievance shall each select one arbitrator to the Board of Arbitrators within three (3) days after either party has notified the other, in writing, that it desires to proceed to arbitration. The third member of the Arbitration Board shall be selected by agreement between the two arbitrators selected by the City and the employee organization, and shall serve as the neutral arbitrator and Chairman of the Board. In the event that the arbitrators selected by the City and the employee organization cannot agree upon the selection of the third arbitrator within ten (10) days from the date that either party has notified the other that it has declared an impasse, then either party may request the Superior Court of the County of Santa Clara to appoint an arbitrator who shall be a retired judge of the Superior Court.

Any arbitration convened pursuant to this section shall be conducted in conformance with, subject to, and governed by Title 9 of Part 3 of the California Code of Civil Procedure to the extent that such procedures do not conflict with this Charter Section. Unless otherwise mandated by state or federal law, all arbitration hearings shall be open to the public and all documents submitted in arbitration shall be public records. Notwithstanding any other provision of this Charter to the contrary, the authority, jurisdiction and powers of the Board of Arbitrators are limited by the provisions of this Section.

(e)     At the conclusion of the arbitration hearings, the Arbitration Board shall direct each of the parties to submit, within such time limit as the Board may

establish, a last offer of settlement on each of the issues in dispute. The Arbitration Board shall decide each issue by majority vote by selecting whichever last offer of settlement on that issue it finds by the preponderance of the evidence submitted to the Arbitration Board satisfies section (f) below, is in the best interest and promotes the welfare of the public, and most nearly conforms with those factors traditionally taken into consideration in the determination of wages, hours, and other terms and conditions of public and private employment, including, but not limited to, changes in the average consumer price index for goods and services, the wages, hours, and other terms and conditions of employment of other employees performing similar services.

(f)     In all arbitration proceedings conducted pursuant to this section, the primary factors in decisions regarding compensation shall be the City's financial condition and, in addition, its ability to pay for employee compensation from on-going revenues without reducing City services. No arbitration award may be issued unless a majority of the Arbitration Board determines, based upon a fair and thorough review of the City's financial condition and a cost analysis of the parties' last offers, that the City can meet the cost of the award from on-going revenues without reducing City services. The arbitrators shall also consider and give substantial weight to the rate of increase or decrease of compensation approved by the City Council for other bargaining units.

"Compensation" shall mean all costs to the City, whether new or ongoing, for salary paid and benefits provided to employees, including but not limited to wages, special pay, premium pay, incentive pay, pension, retiree medical coverage, employee medical and dental coverage, other insurance provided by the City, vacation, holidays, and other paid time off.

(g)     Additionally, the Board of Arbitrators shall not render a decision, or issue an award, that:

(1)     increases the projected cost of compensation for the bargaining units at a rate that exceeds the rate of increase in revenues from the sales tax, property tax, utility tax and telephone tax averaged over the prior five fiscal years; or

(2)     retroactively increases or decreases compensation, including, but not limited to, enhancements to pension and retiree health benefit for service already rendered, but excluding base wages; or

(3)     creates a new or additional unfunded liability for which the City would be obligated to pay; or

(4)     deprives or interferes with the discretion of the Police Chief or Fire Chief to make managerial, operational or staffing decisions, rules,

orders and policies in the interest of the effective and efficient provision of police and fire services to the public.

(h)    Compliance with the provisions of this Section shall be mandatory and enforceable pursuant to section 1085 of the Code of Civil Procedure; failure to comply with these provisions shall also constitute an act in excess of jurisdiction.

(i)    After reaching a decision, the Arbitration Board shall mail or otherwise deliver a true copy of its decision to the parties.  The decision of the Arbitration Board shall not be publicly disclosed and shall not be binding until ten (10) days after it is delivered to the parties.  During that ten-day period the parties may meet privately, attempt to resolve their differences, and by mutual agreement amend or modify any of the decisions of the Arbitration Board.  At the conclusion of the ten-day period, which may be extended by mutual agreement between the parties, the decision of the Arbitration Board together with any amendments or modifications agreed to by the parties shall be publicly disclosed and shall be binding upon the parties.  The City and the recognized employee organization shall take whatever action is necessary to carry out and effectuate the award.

(j)    The expenses of any arbitration convened pursuant to this section, including the fee for the services of the Chairman of the Arbitration Board, shall be borne equally by the parties. All other expenses which the parties may incur individually are to be borne by the party incurring such expenses.

(k)    This Section shall be effective immediately upon passage by the voters, and shall apply to any arbitration in which hearings commence after November 2, 2010.

(l)    The voters declare that the provisions of this Section are not severable, and none would have been enacted without the others.  Should any portion of this Section 1111 be enjoined or declared invalid, all provisions shall be deemed invalid and inoperative and there shall be no compulsory arbitration for fire and police department employee disputes.

*Added at election November 4, 1980*
*Amended at election November 2, 2010*

# ARTICLE XII
# FISCAL ADMINISTRATION

### SECTION 1200.  Fiscal Year.

Unless otherwise provided by ordinance, the fiscal year of the City shall begin on the first day of July of each year and end on the 30th day of June of the following year.

**SECTION 1201.  Use of County Tax System.**

Unless otherwise provided by or pursuant to ordinance adopted or approved by the qualified electors of the City, the Council shall continue to use for the purpose of municipal ad valorem property taxation the Santa Clara County system of property assessment and property tax collection as said system is now provided by law or may hereafter be amended and insofar as such provision is not in conflict with this Charter.

Should there arise any reason whatsoever that prevents the City from using said County system for said purpose or if the use of the County system should be discontinued by or pursuant to ordinance adopted or approved by the qualified electors of the City, the Council shall provide a system for the assessment of property and the collection of property taxes in the City.

**SECTION 1202.  Submission of Capital Improvement Program; Contents.**

At least thirty (30) days prior to the beginning of each fiscal year, or at such earlier time as the Council may specify, the City Manager shall prepare and shall submit to the Council a capital improvement program for the five (5) fiscal years immediately following the fiscal year within which such program is submitted to Council.  On or before the day that he or she submits such program to the Council, the City Manager shall also file a copy of the program with the Planning Commission of the City.  Such capital program shall include:

    (a)    A clear summary of its contents;

    (b)    A list of all capital improvements which are proposed to be undertaken during the five fiscal years immediately following the fiscal year within which such program is submitted to the Council with appropriate supporting information as to the necessity of such improvements;

    (c)    Cost estimates, method of financing and recommended time schedules for each such improvement; and

    (d)    Such other information as the City Manager may deem desirable.

*Amended at election November 6, 1990*
*Amended at election June 7, 1994*
*Amended at election November 7, 2000*

**SECTION 1203.  Action on Capital Program.**

Upon receipt of the copy of the capital improvement program prepared by the City Manager, the Planning Commission shall consider the program and, at least ten (10) days prior to the time fixed by Council for a public hearing on the capital program, shall submit to the Council a written report setting forth its findings and recommendations respecting such program.  The Planning Commission, in its report may recommend such additions, deletions or other

amendments as it deems desirable.  If it should recommend any capital improvements different from or additional to those proposed by the City Manager, it shall set forth, in its report, the estimated cost thereof and the manner in which it proposes that the same shall be financed.

The Council shall fix a time and place for a public hearing on the capital program as submitted by the City Manager and upon such amendments or changes, if any, as shall have been submitted as aforesaid by the Planning Commission at least ten (10) days prior to the time fixed by Council for a public hearing on the capital program.  The Council shall cause a notice of such public hearing to be published not less than ten (10) days prior to said hearing by at least one insertion in a newspaper of general circulation in the City.  Copies of the capital program as submitted by the City Manager, and copies of such report as may have been submitted by the Commission, shall be filed and available for inspection by the public in the office of the City Clerk for at least ten (10) days prior to said public hearing.  The notice of such public hearing shall state the time and place of hearing and the times and place when and where copies of the capital program as submitted by the City Manager and the report of the Planning Commission will be available for inspection by the public.  At the time and place so advertised or at any time or place to which such public hearing shall from time to time be adjourned, the Council shall hold a public hearing on the capital program as submitted by the City Manager, and on the written report of the Planning Commission, at which interested persons desiring to be heard shall be given reasonable opportunity to be heard.

Upon conclusion of such hearing, the Council shall adopt such a capital program, for the five (5) fiscal years covered by the City Manager's proposed capital program with such amendments as it may deem desirable.  Upon its adoption and until adoption of a new budget and a new five (5) year capital program, such capital program, as adopted by the Council, shall serve as a general guide to the Council and to the City administration in the planning and scheduling of capital improvements.  From time to time, however, the Council may authorize such departures therefrom as it may deem necessary or desirable.
*Amended at election November 6, 1990*
*Amended at election November 7, 2000*

## SECTION 1204.   Fiscal Administration; Submission of Budget and Budget Message.

(a)     Each Council Appointee shall submit to the Mayor and the Council annually the budget request, for the ensuing fiscal year, of each City department, office or agency under his or her administration.

(b)     The Mayor shall deliver a budget message which shall include:

--A statement of the fiscal priorities which the City should adopt for the ensuing year.

--Which Departments, Offices or Agencies the Mayor proposes to be expanded or to receive reduced budgeted allocations.

--Specific recommendations concerning any proposed additions to or deletions from the budget.

(c)     The Mayor shall deliver the Mayor's budget message during a meeting of the Council to be held following the receipt of the budget request from the City Manager.

(d)     The Council shall hold a public hearing to consider the Mayor's budget message and to make any revisions or changes in it which the Council deems advisable.

The Council shall fix a time and place for the public hearing, and shall give notice in the manner specified in Section 1206.

Upon close of the public hearing, the Council shall approve the Mayor's budget message as presented, or as revised, by the affirmative vote of a majority of its members.

(e)     None of the recommendations included within the Mayor's budget message, or as amended and approved by the Council, shall be implemented or carried out in any manner which violates the requirement for a balanced budget contained in Section 1205.

(f)     At least thirty (30) days prior to the beginning of each fiscal year, or at such earlier time as the Council may specify, the City Manager shall submit to the Council a budget for the ensuing fiscal year, together with an accompanying report.

In addition to complying with the requirements of Section 1205, the budget shall contain the City Manager's financial plan for the activities of the City proposed for the ensuing fiscal year which reflects accurately the recommendations and priorities specified in the budget message as adopted by the Council.

The report of the City Manager accompanying the budget shall specify the budget allocations which implement each component included within the budget message as adopted by the Council.

*Amended at election November 4, 1986*

## SECTION 1205.  Budget, Contents.

The budget shall provide a complete financial plan of all City funds and activities for the ensuing fiscal year and, except as required by law or this Charter, shall be in such form as the

Council may require or, in the absence of Council requirements, in such form as the City Manager deems desirable.  It shall begin with a clear general summary of its contents; shall show in detail all estimated income, including the amount proposed to be raised by property taxation, estimated unencumbered balances of funds to be carried over from the preceding year, estimated unencumbered available reserves, and all proposed expenditures, including debt service, for the ensuing year.  The total of proposed expenditures shall not exceed the total of estimated income, estimated unencumbered balances of funds to be carried over from the preceding year and unencumbered available reserves.

**SECTION 1206.  Council Action on Budget.**

Upon receipt of the proposed budget from the City Manager, the Council shall proceed to consider the same and may make such revisions and changes as it may deem advisable; but it shall not adopt such budget, either as proposed by the Manager or as revised or changed by the Council, until after it shall have held a public hearing in accordance with the following provisions of this Section.

The Council shall fix a time and place for a public hearing on the budget, and shall cause a notice of such public hearing to be published not less than ten (10) days prior to said hearing by at least one insertion in a newspaper of general circulation within the City.  Copies of the proposed budget as submitted by the City Manager shall be filed and available for inspection by the public in the office of the City Clerk for at least ten (10) days prior to said hearing.  Statements, or copies, of such revisions or changes as the Council shall have made in the proposed budget prior to said public hearing shall be available for public inspection at the public hearing.  The notice of said public hearing shall state the time and place of public hearing and the times and place where copies of the budget as submitted by the City Manager will be available for public inspection, and shall further state that statements, or copies, of such revisions or changes as the Council shall have made in the proposed budget before the public hearing will be available for public inspection at the time and place of said public hearing.

At the time and place advertised for said public hearing or at any time or place to which said public hearing shall from time to time be adjourned, the Council shall hold a public hearing on the proposed budget, and upon such revisions or changes as may have been made by the Council, at which interested persons desiring to be heard shall be given reasonable opportunity to be heard.  Upon conclusion of such public hearing, the Council may adopt the proposed budget with such amendments, if any, as it may deem desirable.  Such amendments may add or increase programs or amounts or may delete or decrease any programs or amounts except expenditures required by law or for debt service, provided that no amendment to the budget shall increase proposed expenditures to an amount greater than the total estimated income plus unencumbered available reserves and estimated unencumbered balances of funds carried over from the preceding fiscal year.

**SECTION 1207.  Appropriations.**

After adoption of the budget and on or prior to the beginning of the budget year, the Council, by ordinance, shall appropriate monies for the operation of each of the offices, departments and agencies of the City during the budget year and for other purposes or objects named in the budget. Appropriations may be made for various classes or categories of expenditures, if the Council deems such to be desirable, without separately appropriating specific amounts of money for each of the items of expenditure within any class or category.  Each department, officer or agency to or for which an appropriation has thus been made shall be deemed authorized to use the money so appropriated, subject to the supervision and direction of the City Manager and subject to such other restrictions as are elsewhere set forth in this Charter or are imposed by the Council, for the classes or categories of expenditures specified in the appropriation ordinance, provided its expenditures are within the bounds of appropriation.  Appropriations for bond interest, bond redemption, fixed charges and other classes or categories of expenditures not appropriated to a specific department, office or agency shall be subject to the administration of and expenditure by the City Manager for the respective classes or categories of expenditures for which such appropriations are made.

Appropriation ordinances adopted pursuant to the provisions of this Section need not be first passed for publication, nor be published, and shall be effective immediately upon adoption.

In the event the Council should fail to adopt such ordinance within the prescribed time, the several amounts proposed as expenditures in the budget adopted by the Council, or if the Council has not yet adopted a budget, the several amounts proposed as expenditures in the budget as prepared and submitted by the City Manager to the Council, for the classes or categories of expenditures therein mentioned, so far as they relate to operation and maintenance expenditures, shall be deemed appropriated for such classes or categories of expenditures until the Council adopts said appropriation ordinance for the current budget year.

**SECTION 1208.  Appropriations; Changes.**

Appropriations may be amended, revised or supplemented as follows:

(a)     SUPPLEMENTAL APPROPRIATIONS.  If during the budget year the City Manager certifies or the Council finds that there are available for appropriation revenues in excess of those estimated in the budget, the Council by ordinance may make supplemental appropriations for the year up to the amount of such excess.

(b)     EMERGENCY APPROPRIATIONS.  To meet a public emergency affecting life, health, property or the public peace the Council may make emergency appropriations.  Such appropriations may be made by emergency ordinance in accordance with the provisions of sub-section (e) of Section 605 of this Charter.

---

(c)    REDUCTION OF APPROPRIATIONS.  If at any time during the budget year it appears probable to the City Manager that the revenues available will be insufficient to meet the amounts appropriated, he or she shall report to the Council without delay, indicating the estimated amount of the deficit, any remedial action taken by him or her, and his or her recommendations as to any other steps to be taken.  The Council shall then take such further action as it deems necessary to prevent or minimize any deficit, and for that purpose it may by ordinance or resolution reduce one or more appropriations.

Also, at any time during the budget year, the Council may repeal or reduce, for any other reason, by ordinance or resolution, any appropriation theretofore made; and, at any time during the budget year, may reappropriate by ordinance all or part of the amount of such reduction for the same or any other class or category of expenditure.

(d)    TRANSFER OF APPROPRIATIONS BY COUNCIL.  At any time during the budget year, the Council may, by ordinance or resolution, transfer part or all of any unencumbered balance of any appropriation from any department, office or agency to another or from any class or category of expenditure to another class or category of expenditure.

Ordinances or resolutions adopted by the Council pursuant to the provisions of this Section shall be effective immediately upon adoption.
*Amended at election June 7, 1994*

## SECTION 1209.  Lapse of Appropriations.

Except as otherwise provided elsewhere in this Charter, every appropriation shall lapse at the close of the fiscal year to the extent that they shall not have been expended or encumbered.

## SECTION 1210.  Control of Expenditures by City Manager.

The several items of expenditure appropriated each fiscal year being based on estimated receipts, income or revenues which may not be fully realized, it shall be incumbent upon the City Manager to establish a schedule of allotments, monthly or quarterly or as he or she may otherwise determine, under which the sums appropriated to the several departments, offices and agencies shall be expended.  The City Manager shall revise revenue estimates from time to time, and may revise allotments at any time.

No officer, department or agency of the City, during any budget year, shall expend or incur any obligation to expend money for any class or category of expenditure not authorized by or in excess of the amounts appropriated by the Council, or in excess of any allotments made by the City Manager.
*Amended at election June 7, 1994*

## SECTION 1211.  Funds; General Fund.

All monies paid into the City Treasury shall be credited to and kept in separate funds in accordance with provisions of this Charter or ordinance.  A fund, to be known as the "General Fund," is hereby created as a medium of control and accounting for all City activities excepting activities for which special funds are established and maintained.  All revenues and receipts which are not required by this Charter, State law or ordinances to be placed in special funds shall be credited to the General Fund.

## SECTION 1212.  Cash Reserve Fund.

A revolving fund, to be known as the "Cash Reserve Fund," is hereby created for the payment of any authorized expenditures of the City for any fiscal year in anticipation of and before the collection of taxes and other revenues of the City for such fiscal year, and for the payment of authorized expenses of the City for any fiscal year which became due and payable and must be paid prior to the receipt of tax payments and other revenues for such fiscal year.  A reserve shall be built up in said fund from any available sources other than restricted sources in an amount which the Council deems sufficient for said purposes.  If necessary, money may be borrowed on tax anticipation notes, subject and pursuant to State law, for the purpose of establishing and maintaining said funds until monies from other available sources are adequate for such purpose.  Transfers may be made by the Council from such fund to any other fund or funds of such sum or sums of money that may be required to place or keep such other fund or funds on a cash basis.  All monies so transferred from the Cash Reserve Fund to any other fund or funds shall be returned to the Cash Reserve Fund before the end of the fiscal year.  The balance in said fund at the end of any fiscal year shall be carried forward in said fund; provided, however, that, to the extent that the amount of money in such fund should exceed such amount as the Council deems desirable for purposes of such fund, the Council may transfer such excess to any other fund or funds for any other purpose or purposes.

## SECTION 1213.  Emergency Reserve Fund.

A fund, to be known as the "Emergency Reserve Fund," is hereby created for the purpose of meeting any public emergency involving or threatening the lives, property or welfare of the people of the City or property of the City.  A reserve shall be built up in said fund from any available sources, other than restricted sources, in an amount which the Council deems desirable.  Except as otherwise hereinafter provided, money in said fund shall be expended pursuant to appropriations made therefrom by ordinance.

In case of a public emergency involving or threatening the lives, property or welfare of the people of the City or the property of the City, the City Manager shall have the power, until the next meeting of the Council, subject to the availability of funds therefor and, subject to such conditions, restrictions and limitations as the Council may impose, to summon, organize and direct the forces of any department of the City in any needed service, to summon, marshal, deputize or otherwise employ other persons, or to do whatever else he or she may deem necessary for the purpose of meeting the emergency; and for such purpose, to the

extent that other monies have not been appropriated or are otherwise unavailable therefor, he or she may expend any unencumbered monies in the Emergency Reserve Fund notwithstanding the fact that such monies may not have been appropriated for such purpose. At the first meeting of the Council following any such action, the City Manager shall present to the Council a full report of what he or she has done to meet the emergency.
*Amended at election June 7, 1994*

### SECTION 1214.  Other Funds.

The Council may provide, by ordinance, for the establishment and maintenance of other special funds.

### SECTION 1215.  Independent Audit.

The Council shall employ at the beginning of each fiscal year a certified public accountant who shall audit the municipal books, records, accounts and fiscal procedures of all officers and employees of the City who receive, administer or disburse public funds on behalf of the City, and such other officers, employees, departments and agencies as the Council may direct.  The Council may order a special audit of any particular department or division of the City government at any time.  Such accountant shall at all times abide by the current and most accepted standards of municipal accounting.  As soon as practicable after completion of a special audit, if such an audit should be ordered by the Council, said independent accountant shall submit a special report to the Council setting forth his or her findings and recommendations with respect to the matters covered by such special audit.  Also, as soon as practicable at the end of the fiscal year, a final report shall be submitted by such independent accountant to the Council setting forth his or her findings and recommendations respecting the records, accounts, and fiscal procedures covered by his or her general audit.  Three (3) copies of each report shall be placed on file in the office of the City Clerk where they shall be available for public inspection.
*Amended at election June 7, 1994*

### SECTION 1216.  Bonded Debt Limit.

The City shall not incur any indebtedness evidenced by general obligation bonds which shall in the aggregate exceed the sum of fifteen percent (15%) of the total assessed valuation of all the real and personal property within the City.

### SECTION 1217.  Public Works Procurement Requirements.

(a)    DEFINITIONS.  For the purposes of this Section, the following words have the following meanings.

(1)    "Public Works Project" means a project for the construction, erection, improvement or demolition of any public building, street, bridge, drain, ditch, canal, dam, tunnel, sewer, water system, fire alarm system, electrical traffic control system, street lighting system, parking

lot, park or playground.  "Public Works Project" shall not mean or include the following: (i) maintenance of any Public Works Project, (ii) any repairs, construction, erection, improvement, or demolition incidental to such maintenance, or (iii) the planting, care or maintenance of trees, shrubbery or flowers.

(2)    "Major Public Works Contract" means a City contract for a Public Works Project that, at the time of award, requires the expenditure of City funds of more than $600,000, excluding the cost of any materials, supplies or equipment the City may have acquired or may separately acquire.

(3)    "Minor Public Works Contract" means a City contract for a Public Works Project that, at the time of award, requires the expenditure of City funds in an amount less than the threshold amount to be a Major Public Works Contract.

(4)    "Design-Build Contract" means a City contract in which both the design and construction of the Public Works Project are procured from a single entity.

(b)    ADJUSTMENT FOR INFLATION. Every July 1st the $600,000 threshold used to define a Major Public Works Contract will be adjusted for inflation in the construction industry as set forth more specifically by ordinance of the City Council.

(c)    PROCUREMENT – MAJOR PUBLIC WORKS CONTRACTS. The primary means of procuring a Major Public Works Contract will be formal public bidding in which, following public notice, the City will award the contract to the lowest responsive bidder that is responsible. Formal public bidding will occur consistent with the requirements in Subsections (e) through (h) of this Section, and as otherwise set forth by ordinance of the City Council.

(1)    As a procurement alternative for Major Public Works Contracts, the City can select a contractor using objective criteria to determine the best combination of price and qualifications. This procurement process will be set forth by ordinance of the City Council consistent with the following requirements.

        (i)    The City will follow the formal bidding requirements in Subsections (e) through (h) except as otherwise provided in Subsections (c)(1)(ii) through (c)(1)(v).

        (ii)    The City will designate a panel to evaluate the qualifications of the bidders and to assign to each bidder a qualification score. The panel will base the qualification score on an evaluation of

objective criteria that may include, but is not limited to, a bidder's safety record, past performance, labor compliance, demonstrated management competence, financial condition and relevant experience.

(iii) The qualification score may be determined as part of a prequalification or as part of the bid solicitation. In either case, the relevant documents will set forth the criteria, methodology and rating system the panel will use to evaluate bidders.

(iv) Bid prices will remain sealed until after the evaluation panel has assigned a qualification score to each bidder.

(v) Based on a formula that uses the assigned qualification score and bid price, the City will award the contract to the lowest responsive bidder that is responsible.

(2) As a procurement alternative for Major Public Works Contracts over $1,000,000, the City may negotiate and award a Design-Build Contract without formal public bidding if the City Council finds that such a contract would save money or result in faster project completion. The process for competitively selecting a design-build contractor, and for negotiating and awarding a Design-Build Contract, will be set forth by ordinance of the City Council.

(d) PROCUREMENT – MINOR PUBLIC WORKS CONTRACTS. The City will procure Minor Public Works Contracts in the manner set forth by ordinance of the City Council.

(e) NOTICE REQUIREMENT AND PROCEDURE.

(1) The notice inviting bids shall set a date for the opening of bids, and shall be published at least once, at least ten (10) days before the date set for opening of bids, in a newspaper of general circulation in the City or electronically so that the notice is publicly available to the general community of potential bidders.

(2) All bids, including such bidder's security as may be required, shall be presented under sealed cover.

(3) If the successful bidder fails to execute the contract within the time specified in the notice inviting bids or in the specifications referred to therein, the amount of the security required, if any, may be declared forfeited to the City and may be collected and paid into its General Fund, and all bonds so forfeited may be prosecuted and the amount thereof collected and paid into such fund.

Updated 2/2021

(4)     All bids shall be publicly opened, and the aggregate bid of each bidder declared at a time and place specified in the notice inviting bids.

(5)     The Council shall have the right to waive any informalities or minor irregularities in bids or bidding.

(f)     APPRENTICESHIP PROGRAM.   Nothing herein shall preclude the City from including in any contract provisions that require contractor participation in an apprenticeship program for at-risk youth.

(g)     OTHER PROGRAMS. Nothing herein precludes the City from implementing otherwise lawful programs supporting the use of small, local or economically disadvantaged businesses.

(h)     SELECTION OF LOWEST RESPONSIBLE BIDDER.   If no bids are received, the Council may re-advertise, or have the "Public Works Project" for which no bids are received done, without further complying with this Section.

(1)     If two or more bids are the same and the lowest, the Council may accept the one it chooses.

(2)     In its discretion, the Council may reject any or all bids presented.  If it rejects all bids, the Council may, in its discretion, re-advertise.

(3)     If, after rejecting all bids for any "Public Works Project" and after re-advertising for bids, the Council finds and declares that the bids were excessive, it may have such "Public Works Project" done by City employees without further complying with this Section.

(i)     SECTION NOT APPLICABLE.  The provisions of this Subsection (c) of this Section shall not apply to any of the following Public Works Projects.

(1)     Any Public Works Project done for the City by any public or governmental body or agency.

(2)     Any Public Works Project done by any public utility which is either publicly owned or is regulated by the Public Utilities Commission of the State of California where such work involves any property of such public utility or is otherwise of direct concern to both the City and such public utility.

(3)     Any Public Works Project done by a subdivider, developer, or owner of real property in connection with the subdivision or development by

Updated 2/2021

him or her of any real property, notwithstanding the fact that such may be subject to entire or partial reimbursement from the City.

(4)    Any Public Works Project involving highly technical or professional skill where the peculiar technical or professional skill or ability of the person selected to do such work is an important factor in his or her selection.

(5)    Expenditures deemed by the Council to be of urgent necessity for the preservation of life, health, or property, provided the same are authorized by resolution of the Council adopted by the affirmative vote of at least eight (8) members of the Council and containing a declaration of the facts constituting the urgency.

(6)    Situations where solicitation of bids would for any reason be an idle act.

(j)    PURCHASE OF SUPPLIES MATERIALS AND EQUIPMENT.   The procedures for the purchase of supplies materials and equipment shall be as prescribed by ordinance.

*Amended at election June 8, 1982*
*Amended at election November 8, 1988*
*Amended at election November 6, 1990*
*Amended at election June 7, 1994*
*Amended at election November 8, 1994*
*Amended at election November 3, 1998*
*Amended at election November 7, 2000*
*Amended at election March 2, 2004*
*Amended at election November 6, 2018*

## SECTION 1218.  Claims Against City.

Except as otherwise required by the provisions of State law applicable to chartered cities, claims against the City shall be presented and audited as prescribed by ordinance.

## SECTION 1219.  Property Tax Limit.

Except as otherwise provided in this Section, the Council shall not levy an ad valorem property tax for any fiscal year in excess of One and 40/100 Dollars ($1.40) on each One Hundred Dollars ($100) of assessed value of taxable property in the City unless authorized by the affirmative votes of a majority of the electors voting on a proposition to increase such levy at any election at which the question of such additional levy is submitted to the electors of the City.  The number of years that such additional levy is to be made shall be specified in any such proposition.  Notwithstanding the foregoing provisions of this Section, there shall be levied and collected at the same time and in the same manner as other ad valorem property taxes of the City are levied and collected, as additional taxes not subject to the foregoing tax

**SER-342**

limit, if no other provision for the payment thereof is made, a tax sufficient to meet all obligations of the City for principal and interest on all bonds or judgments due and unpaid or to become due during the fiscal year which constitute general obligations of the City.

**SECTION 1220.  Revenue Bonds for Off-street Parking or Airport Facilities.**

The Council shall have the power to issue revenue bonds to finance the acquisition, construction, establishment, expansion, improvement, maintenance, operation and administration of off-street vehicular parking facilities within the City (hereinafter in this section referred to as "the project").  The Council shall also have the power to issue revenue bonds to finance the acquisition, construction, establishment, expansion, improvement, maintenance, operation and administration of municipal airport facilities (hereinafter in this Section also referred to as "the project").  Such revenue bonds may be issued in such manner and upon such terms and conditions as may be fixed and established by ordinance of the Council.  In the alternative, the Council may issue such revenue bonds under the general laws of the State of California applicable thereto, provided that no election shall be required for the issuance of such revenue bonds.  The authorization granted to the Council by this section to issue revenue bonds for any of said purposes is complete, and no additional authorization shall be required for their issuance.  Neither such revenue bonds nor the interest accruing thereon shall constitute indebtedness of the City, nor shall be taken into consideration in determining the limit of general obligation bonded indebtedness of the City.  Such revenue bonds, the interest accruing thereon and any reserve, sinking fund or special fund created to secure the payment of such bonds shall be a charge solely upon the revenues, or upon such portion thereof as may be fixed by the Council, of the project on account of which such bonds were issued.  Such revenue bonds shall not be a charge, lien or encumbrance, legal or equitable, on any funds or property of the City, other than the revenues of the project on account of which they were issued, excepting that on-street parking meter revenues may be pledged as additional security for the payment of revenue bonds issued for any automotive parking facilities pursuant to the Constitution of this State.  Neither the credit nor the taxing power of the City shall be deemed to be pledged to or charged with the payment of the principal or interest of any such revenue bonds, nor shall the holders of such revenue bonds have any right to compel the exercise of the taxing power of the City or the forfeiture of any of its properties.  The provisions herein contained for the issuance of revenue bonds shall constitute an alternative method of financing said municipal projects.

Nothing contained in this Charter shall preclude the issuance of general obligation bonds of the City for all or any of the above mentioned purposes pursuant to proceedings taken therefor in accordance with the Constitution and General Laws of the State.

**SECTION 1221.  Revenue Bonds for Public Utilities.**

No revenue bonds shall be issued by the City for the purpose of supplying its inhabitants, or any portion thereof, with water, light, heat, power, railroad or motor vehicle transportation service (other than airport service), or telephone, telegraph or wireless communication service unless authorized by the affirmative vote of a majority of the electors voting on such a proposition in each case.

Nothing herein contained, however, shall be deemed to apply to any of the facilities mentioned in Section 1220. Also, nothing herein contained shall be deemed to deprive the City or its Council of any power which it may have under other Sections of this Charter or under the laws of the State to reimburse, or agree to reimburse, in whole or in part, from any special fund or special revenues, without the affirmative vote of any electors, any subdivider, developer or owner of any real property for any public improvements constructed, installed or furnished by any such person, or for any property dedicated or conveyed to the City by any such person, for or in connection with the subdivision, development or improvement of any real property of any such person.

Also, nothing herein contained shall preclude the issuance of general obligation bonds of the City for any purpose pursuant to proceedings taken therefor in accordance with the Constitution and general laws of the State.

**SECTION 1222.  Revenue Bonds for Other Purposes.**

Revenue bonds may be issued by the City for any purposes other than those specified in Sections 1220 and 1221 only under and pursuant to the laws of the State of California.

Nothing herein contained, however, shall be deemed to deprive the City or its Council of any power which it may have under other Sections of this Charter or under the laws of the State to reimburse, or agree to reimburse, in whole or in part, from any special fund or special revenues, without the affirmative vote of any electors, any subdivider, developer or owner of any real property for any public improvements constructed, installed or furnished by any such person, or for any property dedicated or conveyed to the City by any such person, for or in connection with the subdivision, development or improvement of any real property of any such person.

Also, nothing herein contained shall preclude the issuance of general obligation bonds of the City for any purpose pursuant to proceedings taken therefor in accordance with the Constitution and general laws of the State.

# ARTICLE XIII
# FRANCHISES

**SECTION 1300.  Power to Require Franchises.**

Any person, firm or corporation furnishing or proposing to furnish the City or its inhabitants, or any portion thereof, with water, light, heat, gas, electricity, power, transportation, telephone, telegraph, communication, refrigeration, storage, or any other public utility or service, or traversing or proposing to traverse any part of the City for the transmitting or conveying of any such utility or service elsewhere, or using or proposing to use any public

street, way, alley or place in the City for any of such purposes or for the operation of any plants, works or equipment for the furnishing thereof, or exercising or proposing to exercise any public utility franchise right or privilege in the City, may be required by ordinance to have a valid and existing franchise from the City therefor, excepting insofar as the City is prohibited by the Constitution or other applicable laws of the State of California or of the United States of America from requiring such franchise.

### SECTION 1301.  Authority to Grant Franchises.

The Council is empowered to grant by ordinance a franchise to any person, firm or corporation, whether operating under an existing franchise or not, to furnish the City and its inhabitants, or any portion thereof, with any of the public utilities or services, or to do any of the things, mentioned in Section 1300 of this Charter.

### SECTION 1302.  Franchise Terms, Conditions and Procedures.

Subject to the provisions of this Charter, the Council may grant a franchise pursuant to a procedure prescribed by ordinance or pursuant to a procedure provided by State law.  Any ordinance which prescribes a franchise-granting procedure different from that provided by State law shall make reasonable provision for a public hearing, after public notice, on any requested or proposed grant of a franchise.  The Council may grant a franchise without calling for bids or may, in its discretion, advertise for bids for sale of a franchise upon such basis, not in conflict with the terms of this Article, as in its judgment is in the public interest. The Council may prescribe, in any procedural ordinance adopted pursuant to this Section, the terms and conditions under which any franchise or franchises will be granted.

The Council, in granting any franchise, shall prescribe the terms and conditions of such franchise in accordance with the applicable provisions of this Charter and any ordinance adopted pursuant thereto, and may in such franchise impose such other and additional terms and conditions not in conflict with said Charter or ordinances, whether governmental or contractual in character, as in the judgment of the Council are in the public interest or as the people, by initiative, indicate they desire to have so imposed.

### SECTION 1303.  Term of Franchise.

Every franchise shall be for either a fixed term or for an indeterminate period.  If for a fixed term, the franchise shall state the term for which it is granted; if indeterminate, it shall set forth the terms and conditions under which it may be terminated.

### SECTION 1304.  Purchase or Condemnation by City.

No franchise grant shall in any way or to any extent impair or affect the right of the City now or hereafter conferred upon it by law to acquire property of the grantee thereof either by purchase or through the exercise of the right of eminent domain, and nothing herein contained shall be construed to contract away or to modify or to abridge either for a term or in perpetuity the City's right of eminent domain with respect to any public utility.

**SECTION 1305.  Exercising Right Without Franchise.**

The exercise by any person, firm or corporation of any privilege for which a franchise is required without procuring such franchise shall be a misdemeanor and each day that such continues shall constitute a separate violation.

**SECTION 1306.  Article Not Applicable to City.**

Nothing in this Article shall be construed to apply to the City, or any department thereof, when furnishing any public utility or service.

**SECTION 1307.  Preservation of Rights.**

Nothing contained in this Article shall be construed to affect or impair any rights, powers or privileges vested in, possessed by or available to the City by virtue of previous Charter provisions relating to franchises.

# ARTICLE XIV
# SCHOOL SYSTEM

**SECTION 1400.  Effect of Charter.**

The organization, government and administration of the public school system in the City of San José shall not be affected by the adoption of this Charter, but shall continue in existence as is now or hereafter prescribed by the Education Code of the State of California.

# ARTICLE XV
# RETIREMENT

**SECTION 1500.  Duty to Provide Retirement System.**

Except as hereinafter otherwise provided, the Council shall provide, by ordinance or ordinances, for the creation, establishment and maintenance of a retirement plan or plans for all officers and employees of the City.  Such plan or plans need not be the same for all officers and employees.  Subject to other provisions of this Article, the Council may at any time, or from time to time, amend or otherwise change any retirement plan or plans or adopt or establish a new or different plan or plans for all or any officers or employees; provided, however the Council shall not establish any new or different plan after November 3, 2010 that is not actuarially sound.
*Amended at election November 2, 2010*

**SECTION 1501.  Exclusions.**

(a)　　The Council in its discretion may exclude all or any of the following persons from any or all retirement plans, to wit:  Persons mentioned in sub-paragraphs (1), (2), (4), (5), (6), and (7) of sub-section (a) of Section 1101 of this Charter; all persons employed or whose services are contracted for pursuant to any transfer, consolidation or contract mentioned or referred to in Section 1109 of this Charter; persons employed pursuant to Section 1110 of this Charter; persons in City service primarily for training, study or educational purposes; persons employed or paid on a part-time, per diem, per hour or any basis other than a monthly basis; temporary employees; persons employed pursuant to any relief or anti-poverty program primarily for the purpose of giving relief or aid to such persons.  Also, persons who are members of any other retirement or pension system, other than the federal social security system or any other federal retirement or pension system, and who are receiving credit in such other system for service rendered to the City may be excluded, as to such service, from any such plan or plans.

(b)　　On or after November 3, 2010, the Council, may by ordinance, exclude any officer or employee hired on or after the ordinance's effective date from any retirement plan or benefit of any retirement plan in existence on the effective date of the ordinance.  Any such ordinance shall be subject to the requirements of applicable law.

*Amended at election November 2, 2010*

**SECTION 1502.  Authority to Join Other Systems.**

Subject to other provisions of this Article, the City, by and through its Council, is hereby empowered, but not required, to join or continue as a contracting agency in any retirement or pension system or systems existing or hereafter created under the laws of the State of California or of the United States of America to which municipalities and municipal officers or employees are eligible.

**SECTION 1503.  Continuance of Existing Retirement Systems.**

Any and all retirement system or systems, existing upon adoption of this Charter, for the retirement of officers or employees of the City, adopted under any law or color of any law, including but not limited to those retirement systems established by Parts 1, 2 and 4 of Chapter 9 of Article II of the San José Municipal Code, are hereby confirmed, validated and declared legally effective and shall continue until otherwise provided by ordinance.  The foregoing provisions of this Section shall operate to supply such authorization as may be necessary to validate any such retirement system or systems which could have been supplied in the Charter of the City of San José or by the people of the City at the time of adoption or amendment of any such retirement system or systems.  However, subject to other provisions of this Article, the Council shall at all times have the power and right to repeal or amend any such retirement system or systems, and to adopt or establish a new or different plan or plans

for all or any officers or employees, it being the intent that the foregoing sections of this Article shall prevail over the provisions of this Section.

**SECTION 1504.   Minimum Benefits for Certain Members of Police and Fire Departments.**

The Council, by ordinance, shall provide the following minimum benefits for the following members of the Police and Fire Departments of the City excepting those members who are hereinafter excluded from the application of this Section.

(a)   RETIREMENT.   An officer or employee of the Police Department or Fire Department of the City shall be entitled, upon his or her request, to be retired from City service and to receive during such retirement until his or her death a monthly retirement allowance equal to fifty percent (50%) of his or her "final compensation," hereinafter defined, if he or she:

(1)   Completes twenty (20) years of "service," hereinafter defined, and attains, while holding such office or employment, the age of fifty-five (55) years or more; or

(2)   Completes twenty (20) years of "service," hereinafter defined, is "disabled," as such term is hereinafter defined, while holding such office or employment, and applies for such retirement while holding such office or employment.

(b)   CONTRIBUTIONS.   Contributions required to be made by officers and employees of the Police Department or Fire Department of the City to any retirement fund, plan or system for or because of current service or current service benefits of or for such officers or employees, in relation to and as compared with contributions made by the City for such purpose, shall not exceed the ratio of three (3) for such officers and employees to eight (8) for the City.   The foregoing provision, however, does not apply to any contributions required for or because of any prior service or prior service benefits, nor to any contributions required for or because of membership in the Federal Old Age and Survivorship Insurance Program or any other Federal insurance or retirement program or because of benefits provided by any such program.

(c)   ACTUARIAL SOUNDNESS.   Any retirement plan or system established for officers or employees of the Police or Fire Departments shall be actuarially sound; and an actuarial report thereon shall be obtained at intervals not exceeding five (5) years.

(d)   DEFINITIONS.   As used in this Section, "service" means service as defined on the effective date of this Charter in Topic 5 of Part 3A of Chapter 9 of Article II of the San José Municipal Code; and "final compensation" means

final compensation as defined on the effective date of this Charter in Topic 1 of Part 3A of Chapter 9 of Article II of the San José Municipal Code, except that with respect to officers and employees who on the effective date of this Charter are members of the Police and Fire Department Retirement Plan established by Part 3 of Chapter 9 of Article II of the San José Municipal Code "final compensation" shall be deemed to mean the average monthly pay received by any such officer or employee during the three (3) years immediately preceding his or her request for retirement.  Also, as used in this Section, "disabled" means the incurrence of a disability, short of death, of permanent duration, resulting from injury or disease, which renders the officer or employee incapable of continuing to satisfactorily assume the responsibilities and perform the duties and functions of his or her office or position and of any other office or position in the same classification of offices or positions to which the City may offer to transfer him or her; provided, however, that such a disability shall be deemed to be of permanent duration if the City or any of its authorized agencies finds that such disability will continue at least until the disabled person attains the age of fifty-five (55) years.

(e)    MISCELLANEOUS.  The benefits hereinabove specified are minimum only; and the Council, in its discretion, may grant greater or additional benefits. The City shall not be deemed obligated, by virtue of any of the above provisions, to continue to employ any person or persons until he or she or they qualify for or request any retirement benefits.  Also, anything hereinabove to the contrary notwithstanding, any retirement allowance may be terminated and cancelled if the person otherwise entitled thereto commits treason or is convicted of a felony.

(f)    PERSONS EXCLUDED.  The provisions of this Section shall not apply to any of the following persons, the same being hereby excluded from the application of the above provisions, to wit:  Any and all persons hereinabove mentioned or referred to in Section 1501; officers or employees whose principal duties are those of a telephone operator, clerk, stenographer, secretary, machinist or mechanic; and any and all other officers or employees whose principal duties or functions do not fall clearly within the scope of active law enforcement or active fire fighting and prevention service even though such an officer or employee is subject to occasional call or is occasionally called upon to perform duties or functions within the scope of active law enforcement service or active fire fighting or prevention service, excepting persons employed and qualifying as police patrolmen or in equal or higher rank in the police department irrespective of the duties to which they are assigned, or persons employed and qualifying as firemen, fire fighters, hosemen or in equal or higher rank in the fire department irrespective of the duties to which they are assigned.  Also, the provisions of this Section shall not apply to any person or persons who have been retired from the service of the City prior to the effective date of this Charter.

*Amended at election June 7, 1994*

### SECTION 1505.   Minimum Benefits for Officers and Employees Other Than Members of the Police or Fire Departments.

The Council, by ordinance, shall provide the following minimum benefits for all officers and employees of the City excepting those who are hereinafter excluded from the application of this Section.

(a)     SERVICE RETIREMENT.   An officer or employee of the City, other than those hereinafter excluded, shall be entitled, upon his or her request, to be retired from City service and to receive during such retirement until his or her death an annual retirement allowance equal to two percent (2%) of his or her "final compensation," hereinafter defined, per each year of his or her first twenty-five (25) years of service, hereinafter defined, plus one percent (1%) of such final compensation per each year of his or her service in excess of twenty-five (25) years, subject to a maximum of eighty-five percent (85%) of such final compensation, if he or she:

(1)     Completes twenty-five (25) years or more of "service," hereinafter defined, and attains, while holding such office or employment, the age of fifty-five (55) years or more; or

(2)     Attains, while holding such office or employment, the age of seventy (70) years or more regardless of his or her years of service.

(b)     DISABILITY RETIREMENT.   An officer or employee of the City, other than those hereinafter excluded, who has completed ten (10) years of "service," hereinafter defined, and is "disabled," as such term is hereinafter defined, while holding such office or employment, and applies for a disability retirement while holding such office or employment, shall be entitled, upon his or her request, to be retired from City service because of such disability, and to thereafter receive, during the period of such disability, a monthly disability retirement allowance equal in amount to the monthly disability retirement allowance provided for in Topic 16 of Part 4 of Chapter 9 of Article II of the San José Municipal Code as said Topic and Chapter read on the effective date of this Charter.

(c)     CONTRIBUTIONS.   Contributions required to be made by officers and employees of the City, other than those hereinafter excluded, to any retirement fund, system or plan for or because of current service or current service benefits of or for such officers or employees, in relation to and as compared with contributions made by the City for such purpose, shall not exceed the ratio of three (3) for such officers and employees to eight (8) for the City.  The foregoing provision, however, does not apply to any contributions required for or because of any prior service or prior service benefits, nor to any

contributions required for or because of membership in the Federal Old Age and Survivorship Insurance Program or any other Federal insurance or retirement program or for or because of any benefits provided by any such program.

(d)   DEFINITIONS.   As used in this Section, "service" means all service for which an officer or employee is entitled to credit under the provisions of the retirement system established by Part 4 of Chapter 9 of Article II of the San José Municipal Code as such Part 4 reads on the effective date of this Charter; and "final compensation" means final compensation as defined on the effective date of this Charter in Topic 1 of Part 4 of Chapter 9 of Article II of the San José Municipal Code.  Also, as used in this Section, "disabled" means the incurrence of a disability, short of death, resulting from injury or disease, which renders the officer or employee incapable of continuing to satisfactorily assume the responsibilities and perform the duties and functions of his or her office or position and of any other office or position in the same classification of offices or positions to which the City may offer to transfer him or her.

(e)   MISCELLANEOUS.   The benefits hereinabove specified are minimum only; and the Council in its discretion, may grant greater or additional benefits.  The City shall not be deemed obligated, by virtue of any of the above provisions, to continue to employ any person or persons until he or she or they qualify for or request any retirement benefits.  Also, anything hereinabove to the contrary notwithstanding, any service or disability retirement allowance may be terminated and cancelled if the person otherwise entitled thereto commits treason or is convicted of a felony.

(f)   PERSONS EXCLUDED.   The provisions of this Section shall not apply to any of the following persons, the same being hereby excluded from the application of the above provisions, to wit:  Any and all persons mentioned or referred to in Section 1501; and any and all officers and employees in the Police Department and Fire Department of the City; any person or persons who have been retired from the service of the City prior to the effective date of this Charter; and any and all persons to whom, on the effective date of this Charter, the provisions of Topic 15A of Part 4 of Chapter 9 of Article II of the San José Municipal Code, as it reads on the effective date of this Charter, do not apply.

*Amended at election June 7, 1994*

## SECTION 1506.  Conformance to State and Federal Law.

Notwithstanding any other provisions of this Article, the City Council may, by ordinance, and subject to the provisions of California Government Code Section 3500 et seq., provide for the conformance of any retirement plan or plans established and maintained by the City of San José to Section 415 of the United States Internal Revenue Code or other applicable provisions of the laws of the United States or the State of California.

*Added at election June 5, 1990*

# ARTICLE XV-A
# RETIREMENT

### SECTION 1501-A.  Intent.

The City of San Jose's financial ability to provide basic services is essential to the health, safety, quality of life and well-being of its residents. This Act is intended to strengthen the City's financial ability to ensure the City can provide reasonable and sustainable postemployment benefits while at the same time delivering essential city services to the residents of San Jose. This Act is further designed to ensure that no future defined retirement benefit increases occur without voter approval.
*Amended at election November 8, 2016*

### SECTION 1502-A.  Act Supersedes All Conflicting Provisions.

The Sections of Article XV-A enacted by the voters pursuant to the ballot measure known as Measure B in 2012 are hereby replaced in their entirety by the following provisions. The provisions of this Act shall prevail over all other conflicting or inconsistent wage, pension, or postemployment benefit provisions in the Charter, ordinances, resolutions, or other enactments.

Notwithstanding any other provisions of this Article, the City Council may, by ordinance, and subject to the provisions of California Government Code Section 3500 et seq., provide for the conformance of any retirement plan or plans established and maintained by the City of San José to Section 415 of the United States Internal Revenue Code or other applicable provisions of the laws of the United States or the State of California.
*Amended at election November 8, 2016*

### SECTION 1503-A.  Reservation of Voter Authority.

    (a)    There shall be no enhancements to defined retirement benefits in effect as of January 1, 2017, without voter approval. A defined retirement benefit is any defined post-employment benefit program, including defined benefit pension plans and defined benefit retiree healthcare benefits. An enhancement is any change to defined retirement benefits, including any change to pension or retiree healthcare benefits or retirement formula that increases the total aggregate cost of the benefit in terms of normal cost and unfunded liability as determined by the Retirement Board's actuary. This does not include other changes which do not directly modify specific defined retirement benefits, including but not limited to any medical plan design changes, subsequent compensation increases which may increase an employee's final compensation, or any assumption changes as determined by the Retirement Board.

Updated 2/2021

(b)     If the State Legislature or the voters of the State of California enact a requirement of voter approval for the continuation of defined pension benefits, the voters of the City of San Jose hereby approve the continuation of the pension benefits in existence at the time of passage of the State measure including those established by this measure.

*Amended at election November 8, 2016*

## SECTION 1504-A.  Retirement Benefits – Tier 2.

The Tier 2 retirement plan shall include the following benefits listed below. This retirement program shall be referred to as "Tier 2" and shall be effective for employees hired on or after the following dates except as otherwise provided in this section: (1) Sworn Police Officers: August 4, 2013; (2) Sworn Firefighters: January 2, 2015 and (3) Federated: September 30, 2012. Employees initially hired before the effective date of Tier 2 shall be Tier 1 employees, even if subsequently rehired. Employees who qualify as "classic" lateral employees under the Public Employees' Pension Reform Act and are initially hired by the City of San Jose on or after January 1, 2013, are considered Tier 1 employees.

(a)     COST SHARING. The City's cost for the Tier 2 defined benefit plan shall not exceed 50% of the total cost of the Tier 2 defined benefit plan (both normal cost and unfunded liabilities), except as provided herein. Normal cost shall always be split 50/50.In the event an unfunded liability is determined to exist, employees will contribute toward the unfunded liability in increasing increments of 0.33% per year, with the City paying the balance of the unfunded liability, until such time that the unfunded liability is shared 50/50 between the employer and employee.

(b)     AGE. The age of eligibility for service retirement shall be 57 for employees in the Police and Fire Retirement Plans and 62 for employees in the Federated Retirement System. Earlier Retirement may be permitted with a reduction in pension benefit by a factor of 7% per year for employees in the Police and Fire Retirement Plan and a reduction in pension benefit by a factor of 5% per year for employees in the Federated Retirement System. An employee is not eligible for a service retirement earlier than the age of 50 for employees in the Police and Fire Retirement Plan or age 55 for employees in the Federated Retirement System. Tier 2 employees shall be eligible for a service retirement after earning five years of retirement service credit.

(c)     COLA. Cost of living adjustments, or COLA, shall be equal to the increase in the Consumer Price Index (CPI), defined as San Jose – San Francisco – Oakland U.S. Bureau of Labor Statistics index, CPI-Urban Consumers, December to December, with the following limitations:

1.  For Police and Fire Retirement Plan members, cost of living adjustments applicable to the retirement allowance shall be the lesser of the Consumer Price Index (CPI), or 2.0%.

2.  For Federated Retirement System members, cost of living adjustments applicable to the retirement allowance shall be the lesser of CPI or:
    a) 1-10 total years of City service and hired after the effective date of the implementing ordinances of the revised Tier 2: 1.25%
    b) 1-10 years total years of City service and hired before the effective date of the implementing ordinances of the revised Tier 2: 1.5%
    c) 11-20 total years of City service: 1.5%
    d) 21-25 total years of City service: 1.75%
    e) 26 or more total years of City service: 2.0%

3.  The first COLA adjustment will be prorated based on the number of months retired in the first calendar year of retirement.

(d) FINAL COMPENSATION. "Final compensation" shall mean the average annual earned pay of the highest three consecutive years of service. Final compensation shall be base pay only, excluding premium pays or other additional compensation, except members of the Police and Fire Plan whose pay shall include the same premium pays as Tier 1 members.

(e) MAXIMUM ALLOWANCE AND ACCRUAL RATE. For Police and Fire Plan members, service retirement benefits shall be capped at a maximum of 80% of final compensation for an employee who has 30 or more years of service at the accrual rate contained in the Alternative Pension Reform Settlement Framework approved by City Council on August 25, 2015. For Federated Retirement System members, service retirement benefits shall be capped at a maximum of 70% of final compensation for an employee who has 35 or more years of service at the accrual rate contained in the Alternative Pension Reform Settlement Framework approved by City Council on December 15, 2015, and January 12, 2016.

(f) YEAR OF SERVICE. An employee will be eligible for a full year of service credit upon reaching 2080 hours of regular time worked (including paid leave, but not including overtime).

*Amended at election November 8, 2016*

## SECTION 1505-A.  Disability Retirements.

(a) The definition of "disability" shall be that as contained in the San Jose Municipal Code in Sections 3.36.900 and 3.28.1210 as of the date of this measure.

SER-354

   (b)     Each plan member seeking a disability retirement shall have their disability determined by a panel of medical experts appointed by the Retirement Boards.

   (c)     The independent panel of medical experts will make their determination based upon majority vote, which may be appealed to an administrative law judge.

*Amended at election November 8, 2016*

## SECTION 1506-A.  Supplemental Payments to Retirees.

The Supplemental Retiree Benefit Reserve ("SRBR") has been discontinued, and the assets returned to the appropriate retirement trust fund. In the event assets are required to be retained in the SRBR, no supplemental payments shall be permitted from that fund without voter approval.

The SRBR will be replaced with a Guaranteed Purchasing Power (GPP) benefit for all Tier 1 retirees. The GPP is intended to maintain the monthly allowance for Tier 1 retirees at 75% of purchasing power of their original pension benefit effective with the date of the retiree's retirement. The GPP will apply in limited circumstances (for example, when inflation exceeds the COLA for Tier 1 retirees for an extended period of time). Any calculated benefit will be paid annually in February.

*Amended at election November 8, 2016*

## SECTION 1507-A.  Retiree Healthcare.

The defined benefit retiree healthcare plan will be closed to new employees as defined by the San Jose Municipal Code in Chapter 3.36, Part 1 and Chapter 3.28, Part 1.

*Amended at election November 8, 2016*

## SECTION 1508-A.   Actuarial Soundness (for both pension and retiree healthcare plans).

   (a)     In recognition of the interests of the taxpayers and the responsibilities to the plan beneficiaries, all pension and retiree healthcare plans shall be operated in conformance with Article XVI, Section 17 of the California Constitution. This includes but is not limited to:

       1.    All plans and their trustees shall assure prompt delivery of benefits and related services to participants and their beneficiaries;

       2.    All plans shall be subject to an annual actuarial analysis that is publicly disclosed in order to assure the plan has sufficient assets;

       3.    All plan trustees shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system;

4.   All plan trustees shall diversify the investments of the system so as to minimize the risk of loss and maximize the rate of return, unless under the circumstances it is not prudent to do so;

5.   Determine contribution rates on a stated contribution policy, developed by the retirement system boards and;

6.   When investing the assets of the plans, the objective of all plan trustees shall be to maximize the rate of return without undue risk of loss while having proper regard to the funding objectives of the plans and the volatility of the plans' contributions as a percentage of payroll.

*Amended at election November 8, 2016*

## SECTION 1509-A.  Retirement Contributions.

There shall be no offset to normal cost contribution rates in the event plan funding exceeds 100%. Both the City and employees shall always make the full annual required plan contributions as calculated by the Retirement Board actuaries which will be in compliance with applicable laws and will ensure the qualified status under the Internal Revenue Code.
*Amended at election November 8, 2016*

## SECTION 1510-A.  No Retroactive Defined Retirement Benefit Enhancements.

(a)   Any enhancement to a member's defined retirement benefit adopted on or after January 1, 2017, shall apply only to service performed on or after the operative date of the enhancement and shall not be applied to any service performed prior to the operative date of the enhancement.

(b)   If a change to a member's retirement membership classification or a change in employment results in an enhancement in the retirement formula or defined retirement benefits applicable to that member, except as otherwise provided under the plans as of [effective date of ordinance], that enhancement shall apply only to service performed on or after the effective date of the change and shall not be applied to any service performed prior to the effective date of the change.

(c)   "Operative date" would be the date that any resolution or ordinance implementing the enhancement to a member's defined retirement formula or defined retirement benefit adopted by the City Council becomes effective.

*Amended at election November 8, 2016*

## SECTION 1511-A.  Severability.

This Act shall be interpreted so as to be consistent with all federal and state laws, rules and regulations. The provisions of this Act are severable. If any section, sub-section, sentence or clause ("portion") of this Act is held to be invalid or unconstitutional by a final judgment of a court, such decision shall not affect the validity of the remaining portions of this amendment. The voters hereby declare that this Act, and each portion, would have been adopted

---

irrespective of whether any one or more portions of the Act are found invalid. If any portion of this Act is held invalid as applied to any person or circumstance, such invalidity shall not affect any application of this Act which can be given effect.
*Amended at election November 8, 2016*

# ARTICLE XVI
# ELECTIONS

### SECTION 1600.  Municipal Elections.

All municipal elections shall be held in accordance with the following:

(a)  REGULAR MUNICIPAL ELECTIONS.  A Regular Municipal Election is either a regularly scheduled Primary or Run-off Municipal Election.  Such elections shall be held every two years, with the election for Mayor and for the odd numbered Council Districts being every four (4) years beginning with 1994, and the election for the even numbered Council Districts being every four (4) years beginning in 1996.  Each member's term shall commence on the first day of January next following, and end on the last day of December in the fourth calendar year succeeding, the date of the member's election.  A regularly scheduled Primary Election shall be held on the same date that the State of California holds its Direct Primary Election.  A Run-off Municipal Election shall be held on the same date the State of California holds its Statewide General Election.

(b)  GENERAL ELECTIONS.  Elections which are held simultaneously in all districts of the City, whether municipal, county or state elections are referred to as General Elections.

(c)  SPECIAL MUNICIPAL ELECTIONS.  Special Municipal Elections are elections scheduled pursuant to Section 1601.  The dates of any Special Municipal Election shall be set by resolution.

(d)  RUN-OFF QUALIFICATION.  The two candidates who poll the greatest number of votes for office in the Primary Municipal Election shall be the only candidates whose names shall appear on the ballot as candidates for such office at the following Run-off Municipal Election.

(e)  TIES.  Anything elsewhere to the contrary notwithstanding, all ties in any municipal election shall be decided by lot during open meeting of the Council, under the direction of the Council.

(f)  DEATH OF A CANDIDATE.  If a candidate dies after the filing of nomination papers for the primary election, the deceased candidate is treated as a candidate for all election purposes.  If the deceased candidate is elected,

the office will be declared vacant as of the beginning of the term of office for which the election was held.  The position shall be filled in accordance with Section 410.

(g)    MAJORITY OF VOTES.  No person shall be declared elected to the office of the Mayor or Council member at any municipal election unless the person receives a majority of the votes cast for such office.

*Amended at election June 7, 1966*
*Amended at election June 2, 1970*
*Amended at election June 7, 1972*
*Amended at election November 8, 1994*
*Amended at election March 26, 1996*

## SECTION 1601.  Special Municipal Elections.

All municipal elections, other than Regular Municipal Elections, shall be deemed to be Special Municipal Elections.

No Special Municipal Election shall be held at any time other than at the time of a Regular Municipal Election or a General Election, except in any of the following situations:

(a)    Where such election is held pursuant to Section 410 to fill a vacancy in the Council;

(b)    Where such election is held pursuant to the initiative, referendum and recall provisions of Sections 1603 and 1604;

(c)    Where the Council calls such an election pursuant to any provision of Sections 34450 and following of the California Government Code;

(d)    Where such election is consolidated with a state, county or school district election held in the County of Santa Clara; or

(e)    Where the holding of a Special Municipal Election at another time is authorized by the affirmative vote of ten (10) members of the Council.

Subject to the above provisions, Special Municipal Elections shall be held at such times and for such purposes as the Council may authorize.

*Amended at election June 2, 1970*
*Amended at election November 7, 1978*
*Amended at election November 8, 1994*

## SECTION 1602.  Election Procedure.

Except as otherwise provided by ordinance hereafter enacted, all municipal elections shall be held in accordance with the provisions of the Elections Code of the State of California, as the

same now exist or may hereafter be amended, for the holding of elections in cities, insofar as the same are not in conflict with this Charter.

### SECTION 1603.  Initiative, Referendum and Recall.

The powers of initiative, referendum and the recall of elected municipal officers are hereby reserved to the electors of the City.  The provisions of the Elections Code of the State of California, as the same now exist or may hereafter be amended, governing the initiative and referendum and the recall of municipal officers in cities shall be applicable insofar as the same are not in conflict with this Charter; provided, however, that the number of signatures required shall be as follows:

    (a)    INITIATIVE.   To initiate proceedings for the exercise of the power of initiative, either of the following provisions shall apply as is applicable:

        (1)    If the petition is signed by duly qualified electors of the City equal in number to at least eight percent (8%) of the number of persons eligible to vote according to the last report of registration filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time the notice of intent to circulate the petition is published, and contains a request that the proposed ordinance be submitted immediately to a vote of the people at a Special Municipal Election, the Council shall either pass the proposed ordinance for publication, without alteration, at the regular meeting at which it is presented by the City Clerk and adopt said ordinance within ten (10) days after it is presented, or immediately call a Special Municipal Election at which the ordinance, without alteration, shall be submitted to a vote of the voters of the City.

        (2)    If the petition is signed by duly qualified electors of the City equal in number to at least five percent (5%) of the number of persons eligible to vote according to the last report of registration filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time the notice of intent to circulate the petition is published, and the ordinance petitioned for is not required to be, or for any reason is not, submitted to the voters at a Special Municipal Election, and is not adopted without alteration by the Council, then the proposed ordinance, without alteration, shall be submitted by the Council to the voters at  the next General Election.

        (3)    In the event that a petition is submitted in accordance with the provisions of either subparagraphs (1) or (2) of subsection (a), and the Council submits said proposed ordinance to a vote of the voters of the City, the Council may by a two-thirds vote of the Council submit any alternative ordinance at the same election. If the provisions of two or

more ordinances adopted at the same election conflict, the ordinance receiving the highest number of affirmative votes shall control.

a.  Before the Council may submit any alternative ordinance to a vote of the voters of the City, the Council shall refer the petition submitted in accordance with the provisions of either subparagraphs (1) or (2) of subsection (a) for a report on all of the following:

(i)  The accuracy of the information provided in the petition.

(ii)  The economic impact of the petition on the public, as well as the proponents and major donors to the petition if known.

(iii)  Whether the petition would create a benefit or entitlement that would be difficult or impossible to reverse.

b.  The report must be prepared by a person or entity that is independent from the City, which may be a consultant retained by the City. The report may not include arguments in support or opposition to the petition, rationales for any alternative ordinance, or value judgments from the findings.

c.  The report must be presented to the Council within the time prescribed by the Council, but no later than the deadline to submit the petition to the voters, and must be accepted by a majority vote of the Council.

d.  The report may be in addition to any other report the Council is authorized to request under State law and may be requested during the circulation of the petition.

(b)  REFERENDUM.  To initiate proceedings for the exercise of the power of referendum, the petition shall be signed by duly qualified electors of the City equal in number to at least eight percent (8%) of the number of persons eligible to vote according to the last report of registration filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time of adoption of the ordinance or measure which is the subject of the petition.

(c)  RECALL OF THE MAYOR.  To initiate proceedings for the exercise of the power of recall of the Mayor, the petition shall be signed by duly qualified electors of the City equal in number to at least twelve percent (12%) of the number of persons eligible to vote according to the last report of registration

filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time the notice of intent to circulate the petition is published.

(d)     RECALL OF COUNCIL MEMBER.  To initiate proceedings for the exercise of the power of recall of a Council member elected by a District, the petition shall be signed by duly qualified electors of the District equal in number to at least twelve percent (12%) of the number of persons residing in the District eligible to vote according to the last report of registration filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time the notice of intent to circulate the petition is published.

*Amended at election June 2, 1970*
*Amended at election November 7, 1978*
*Amended at election June 7, 1994*
*Amended at election November 8, 1994*
*Amended at election November 6, 2018*

## SECTION 1604.  Removal of City Manager.

The electors of the City do hereby reserve the power to remove from his or her office the person holding the position of City Manager.  The provisions of the Elections Code of the State of California governing the recall of holders of elective offices of cities, as they now exist or may hereafter be amended, shall be applicable, insofar as the same are not in conflict with this Charter, to the removal from his or her office of the person holding the position of City Manager, the same as if the position of City Manager were an elective office; provided, however, that:

(a)     To initiate proceedings for the exercise of said power, the petition shall be signed by duly qualified electors of the City equal in number to at least the same percentage of the number of persons eligible to vote according to the last report of registration filed by the County Registrar of Voters with the Secretary of State, which is in effect at the time the notice of intent to circulate the petition is published, as is required for recall petitions under the provisions of sub-section (c) of Section 1603 of this Charter.

(b)     If a vacancy occurs in the office of City Manager after a removal petition has been filed, no election need be held;

(c)     There shall be no nomination of candidates to succeed the incumbent in the event the incumbent is removed from office.  If the incumbent is removed from his or her office pursuant to the provisions of this Section, a successor shall be appointed by the Council.

No person who has been removed from the office of City Manager pursuant to the provisions of this Section shall be reappointed thereto within a period of four (4) years from and after date of such removal.

*Amended at election June 7, 1994*

# ARTICLE XVII
# GENERAL PROVISIONS

**SECTION 1700.  Parks.**

Except as otherwise provided elsewhere in this Charter, the public parks of the City shall be inalienable unless otherwise authorized by the affirmative votes of the majority of the electors voting on such a proposition in each case; provided and excepting, however, that the same or any interest therein, or any concessions or privileges therein or in any building or structure situate therein, may be leased by the Council, or the Council may grant permits or licenses for the same, without any vote of any electors, if the term of each such lease or permit does not exceed three (3) years.  As used herein "public parks" means any and all lands of the City which have been or are dedicated, improved and opened to the public for public park purposes.

**SECTION 1700.1.  Council Authority to Enter into Long Term Agreements.**

The City Council may enter into long term leases, concessions, permits or other agreements ("Agreements") with individuals or non-City entities, to allow use of public parks for terms of up to 25 years at a time, without voter approval, if the Council determines that Agreement would benefit the community and that the following conditions have been met:

    (i)     the Agreement would enhance the designated recreational purposes for the public park;

    (ii)    the public park subject to the Agreement is more than 5 acres in size and has at least 1 Community Serving Amenity, as defined below;

    (iii)   the Agreement complies with an adopted City Council policy for Long Term Agreements in Parks, which defines community outreach standards, requirements for affordable access to the public park, periodic performance reviews, and early termination rights among other things; and

    (iv)   any funds received by the City from the Agreement shall be used for recreational purposes.

A "Community Serving Amenity" is defined as one of the following:  Pool, Community Center or Reservable Sports Field or similar recreational improvements in a park and that is described in the City's approved master strategic plan for parks and community facilities. Nothing herein is intended to limit City Council's authority to enter into other long term agreements on parks which have been approved by the voters.
*Added at election November 4, 2008*

**SECTION 1701.  Underground Parking Stations in Parks.**

Whenever the Council finds with respect to any public park, plaza, or square that the construction, when completed, in the sub-surface space thereunder of a public parking station (including all entrance and exit approaches, openings, and ramps, ventilators, elevator shafts and other appurtenances to such parking station) and/or the operation in the subsurface space

thereunder of a public parking station (including services incidental to such operations such as sale of gasoline, oil and accessories and lubrication and oiling of vehicles) will not be in any material respect or degree detrimental to public park, plaza or square purposes or in contravention of any conditions under which such public park, plaza or square was received, the City, without the affirmative vote of any electors, may construct and/or operate such public parking station in the sub-surface space under such public park, plaza or square, or said Council may lease to the highest responsible bidder for a term not to exceed fifty (50) years, and upon such other terms and conditions as it may determine, sub-surface space under such public park, plaza or square for the purpose of constructing and/or operating therein such public automobile parking station.  Nothing contained in this Section shall be deemed to deprive the City or its Council of any powers, nor limit or restrict any powers which the City or its Council may have, with respect to public parks, under or by virtue of other provisions of this Charter.

**SECTION 1702.  Streets in Parks.**

The Council, by ordinance, without the affirmative vote of any electors, may authorize the opening, establishment and/or maintenance of streets or other public ways in or through any of the public parks, public places or other public property of the City.  Nothing contained in this Section shall be deemed to deprive the City or its Council of any powers, nor limit or restrict any powers which the City or the Council may have, with respect to public parks, under or by virtue of other provisions of this Charter.

**SECTION 1703.  Validity of Charter; Severability.**

If any provision of this Charter, or the application thereof to any person or circumstances is held invalid, the remainder of the Charter and the application of such provision to other persons or circumstances shall not be affected thereby.

**SECTION 1704.  Definitions.**

Unless the provisions of the context otherwise require, as used in this Charter:

(a)     "Shall" is mandatory and "may" is permissive;

(b)     "City" is the City of San José and "department," "board," "commission," "agency," "officer," or "employee" is a department, board, commission, agency, officer or employee, as the case may be, of the City of San José;

(c)     "Council" is the Council of the City of San José;

(d)     A "member of the Council" means any one of the members of the Council, including the Mayor;

(e)     "County" is the County of Santa Clara;

(f)     "State" is the State of California;

(g)     "Newspaper of general circulation within the City" is defined by Section 6000 of the Government Code of the State of California;

(h)     The masculine gender includes the feminine and neuter.

(i)     "Council Appointees" are the City Manager, the City Attorney, the City Clerk, the Independent Police Auditor and the City Auditor

*Amended at election November 4, 1980*
*Amended at election November 4, 1986*
*Amended at election November 3, 1992*
*Amended at election November 5, 1996*

### SECTION 1705.  Effective Date.

This Charter shall be effective from the time of its approval by the State legislature.

# ARTICLE XVIII
# TRANSITIONAL PROVISIONS

### SECTION 1800.  Existing Laws, Ordinances, Regulations, Etc.

All City ordinances, resolutions, orders and regulations which are in force when this Charter becomes effective are repealed to the extent that they conflict or are inconsistent with, or interfere with the effective operation of, this Charter or of any ordinances or resolutions adopted pursuant thereto.   To the extent that the Constitution of the State of California permits, all State laws relating to or affecting this City or its agencies, officers or employees which are in force when this Charter becomes effective are superseded to the extent that they conflict or are inconsistent with, or interfere with the operation of, this Charter or of ordinances or resolutions adopted pursuant thereto.

All City ordinances, resolutions, orders and regulations which are in force when this Charter becomes effective, if and to the extent that they are not repealed by the provisions of the immediately preceding paragraph, shall remain in full force and effect until amended or repealed pursuant to the provisions of this Charter.

Without limitation of the general operation of the above provisions of this Section, or of the number or nature of the provisions to which it applies, the Council is hereby empowered to amend or repeal any City ordinance, resolution, rule or regulation which is in force when this Charter becomes effective notwithstanding the fact that such ordinance, rule or regulation may have been adopted or approved by the people of the City prior to the time this Charter becomes effective.

### SECTION 1801.  Pending Matters.

All rights, claims, actions, orders, contracts and legal or administrative proceedings shall continue except as modified, terminated or otherwise disposed of pursuant to the provisions of this Charter, and in each case shall be maintained, carried on or dealt with by the City department, office or agency appropriate under this Charter.

**SECTION 1802.  Continuity of Agencies.**

Any office, department or agency provided for in this Charter with powers and duties the same or substantially the same as those of an office, department, or agency heretofore existing shall be deemed to be a continuation of such office, department or agency and shall exercise such powers and duties as it has under this Charter in continuation of their exercise by the office, department or agency by which the same were heretofore exercised and shall have the power to continue any business, proceedings or other matter within the scope of its powers and duties under this Charter commenced by an office, department or agency by which such powers and duties were heretofore exercised.

**SECTION 1803.  Existing Members of Boards and Commissions.**

Until otherwise provided by the Council, all persons who at the time this Charter takes effect are members of any City boards and commissions, excepting the Planning Commission, the Civil Service Commission and the Board of Library Trustees, shall continue to hold their respective offices and perform the duties thereof, to the extent that such duties as are not in conflict with other provisions of this Charter, until the expiration of their respective terms or until sooner removed therefrom by the Council.  Membership in the Planning Commission and in the Civil Service Commission shall be governed by other applicable provisions of this Charter.  The Board of Library Trustees is hereby abolished, and membership therein vacated, as of the effective date of this Charter; provided, however, that the Council may, in its discretion, establish a new library board and grant it such powers and duties, consistent with other provisions of this Charter, as the Council may deem appropriate.

**SECTION 1804.  Existing Officers and Employees.**

Subject to the provisions of Section 1604, the persons holding the offices of City Manager, City Clerk and City Attorney, respectively, at the time this Charter takes effect shall continue to hold such offices and perform the respective duties thereof, as established by or pursuant to this Charter, until removed by Council.  Subject to such removal, change and control as is required, provided or authorized in or by other provisions of this Charter, all other persons holding other appointive offices or positions in the Civil Service of the City at the time this Charter takes effect, excepting members of boards and commissions, shall continue to perform the duties of their respective offices or positions until persons are appointed, pursuant to this Charter, to succeed to or take over their duties or until relieved pursuant to this Charter, of their duties.

**SECTION 1805.  Transfers, Etc.**

If because of this Charter all or substantially all of the duties or work of any position or employment which was in the Classified Service under the provisions of the immediately preceding Charter are transferred from one department or office to another department or office, then in that event, unless otherwise provided by the Council, such Classified positions or employments shall be deemed transferred to the new department or office and the persons holding such positions or employments on the effective date of this Charter shall continue to hold such positions or employments and perform the duties and work thereof in the new department or office, subject to such removal, supervision and control as is provided for elsewhere in this Charter.  If, upon or after the transfer by this Charter of such duties or work of such Classified positions or employments to another department or office, said positions are discontinued and new or revised Classified positions are created, the persons holding the original positions shall be deemed qualified for transfer or appointment to, and may be transferred or appointed to, the new or revised positions, without examination or further compliance with any Civil Service regulations governing transfers or appointments, if the duties or work thereof are substantially similar to or were substantially included within the duties or work of their prior positions or employments.

If because of this Charter any of the duties or work of any position or employment which was in the Unclassified Service under the provisions of the immediately preceding Charter are transferred from one department or office to another and thereafter assigned in such new department or office to a Classified position in the new department or office, then in that event, unless otherwise provided by the Council, the person holding the original Unclassified position or employment shall be deemed qualified for transfer or appointment to, and may be transferred or appointed to, the new Classified position to which any of his or her former duties or work have been transferred or assigned, without examination or further compliance with any Civil Service regulations governing transfers or appointments, if the duties or work of the new Classified position are substantially similar to or were substantially included within the duties or work of his or her prior position or employment.

Any person who is transferred pursuant to the preceding provisions of this Section from a Classified or Unclassified position or employment in one department or office to a Classified position or employment in another department or office shall acquire a non-probationary status in the classification within which such new position or employment is included pursuant to this Charter if such person has been performing the duties of such position, employment or classification for a period of at least six (6) months immediately prior to the effective date of this Charter; but if such person on the effective date of this Charter has been performing such duties for a period of less than six (6) months, he or she shall have a probationary status in the new classification and will acquire non-probationary status only if and when he or she completes six (6) months of such service in such position, employment or classification.

*Amended at election June 7, 1994*

---

# ARTICLE XIX
# AN ACT TO LIMIT URBAN SPRAWL AND THE FISCAL AND ENVIRONMENTAL EFFECTS OF SPECIFIED DEVELOPMENT IN OUTLYING AREAS

## SECTION 1901.  Findings and Purpose.

The people of the City of San José find and declare as follows:

(a)     San José's experience with rapid growth has provided hard lessons regarding the economic and environmental costs of urban sprawl.  The City's sprawling pattern of residential development has led to excessive dependence upon the automobile, and makes more environmentally friendly alternatives such as transit, walking, and cycling more costly and less efficient.  It results in higher levels of greenhouse gas emissions, and it burdens residents with higher transportation costs and worse health outcomes than in-fill, transit-oriented residential development.

(b)     In the past, residential development at the City's edge has also led to destruction of precious hillside open spaces and adverse impacts on traffic, water quality, water supply, air quality, and wildlife preservation.  Since the mid-1990's, the City has sought to limit these economic costs and adverse environmental impacts through use of an Urban Growth Boundary (UGB) that discourages urban sprawl and establishes the ultimate limit on urbanization within the City.  The City's first UGB was adopted by a unanimous vote of the City Council in 1996.  The City's voters subsequently adopted Measure A in 2000, establishing the UGB with procedures for its future modification.

(c)     The City has found that urban development at its edge, particularly residential development, also does not generate sufficient revenues to cover the costs of providing urban services—such as police and fire response—and infrastructure—such as roads and sewers—at longer distances.

(d)     San José has been described as one of the largest "bedroom communities" in the United States.  San José has a population of over one million residents with a ratio of only 0.8 jobs per employable resident, which means that there are fewer people in San José during the day than at night.  The relatively low number of employers within San José forces thousands of San José residents to commute to jobs in other cities like Santa Clara, Sunnyvale, Mountain View, and Palo Alto.

(e)     The jobs-housing imbalance in the area contributes to congestion on streets and freeways in San José, as well as the regional transportation grid, and adds significant time and distance to commutes because a disproportionate number of San José residents drive to jobs outside of the City of San José.

(f)     The San José General Plan identifies improvement of the City's jobs-housing imbalance, or "Jobs/Employed Residents Ratio," as a critical policy goal. In light of this objective, the General Plan seeks to support the generation of 380,000 new jobs through 2040, focusing employment growth in the Downtown area and on existing employment lands citywide like North San Jose, Edenvale, the Monterey Corridor, Evergreen, North Coyote Valley, urban villages, neighborhood business districts, and major commercial corridors along existing and future transit corridors. The General Plan places a strong emphasis on protecting employment lands, and recognizes that further employment land conversions would have significant negative environmental, fiscal and economic implications, contrary to the General Plan's policies.

(g)     The current General Plan, including the Housing Element of the General Plan, also identifies available land that is designated and zoned for 120,000 new housing units consistent with state law, and the City's Housing Element is certified as adequate by the California Department of Housing and Community Development.

(h)     In order to support the development of all types and income levels of housing, including affordable housing at moderate, low, and very-low income levels pursuant to the City Inclusionary Housing Ordinance (San José Municipal Code Chapter 5.08), while also preserving and enhancing the quality of the City's neighborhoods and strengthening the Urban Growth Boundary, the General Plan focuses residential development primarily in specifically identified Growth Areas in order to avoid urban sprawl and the costs of City infrastructure and services associated with such sprawl. Accordingly, most new housing development will be achieved through higher-density development in existing urbanized areas.

(i)     The policies in the City's current General Plan were adopted unanimously by the City Council in 2011 after significant review and input (which included 51 public meetings for a 37-member task force leading the drafting of the General Plan and approximately 5,000 community stakeholder comments over a four-year period) in order to achieve a balance between the need for housing and the creation of jobs in San José for San José residents and to achieve fiscal sustainability.   Efforts to alter that balance should be subject to extensive community outreach and environmental review.

(j)     The purpose of this Act is to support existing City policies that limit urban sprawl and to ensure that any future conversion of Threatened Employment Lands to non-employment uses meet specified criteria.   These criteria are designed to prevent reduction in City General Fund revenues, City services, and quality of life while assuring that any such conversion provides a substantial public purpose and benefit, including the construction of significant numbers of affordable housing units.   The City would be required to consider the requirements of this Act when it evaluates applications from

developers or other proposals to convert specified lands that are currently designated and/or zoned for employment purposes to residential or other uses.

(k)     The purpose of this Act is also to enhance the ability of the City Council, in considering future land use changes, to determine and designate appropriate uses of land in a manner that encourages more informed public input and involvement while preserving areas of the City for appropriate future growth, discouraging urban sprawl, creating a balance among various types and forms of development, advancing overall community health, and promoting a fiscally strong City.

## SECTION 1902.  Definitions.

For purposes of this Act, the following definitions shall apply:

(a)     "Threatened Employment Lands" shall mean all Qualifying Parcels that are designated in the San José General Plan, as it existed on March 8, 2018, as any of the following: Combined Industrial/Commercial, Commercial Downtown, Heavy Industrial, Industrial Park, Light Industrial, Mixed Use Commercial, Neighborhood/Community Commercial, Regional Commercial, Transit Employment Center, Urban Village, and Urban Village Commercial. Notwithstanding the foregoing, this Act shall not apply to the conversion of Threatened Employment Lands to a designation of San José General Plan Public/Quasi Public or Agriculture, or to proposed conversions of Threatened Employment Lands for public parks, public trails, public open space, or other public uses.

(b)     "Qualifying Parcel" shall mean any parcel or contiguous parcels in common ownership or control that individually or collectively are both:

(1)     five acres or greater in size; and

(2)     partially or wholly located within one mile inside of the City of San José Urban Growth Boundary in any of the following five Planning Areas: Evergreen, Coyote, San Felipe, Almaden, and Calero, as those areas are depicted on the October 2012 map entitled "San Jose Planning Areas." The San Jose Planning Areas Map is attached hereto as Exhibit 1 and incorporated by this reference into the Act.  This map shall be maintained as part of the City Charter.

## SECTION 1903.  City Policy to Support Urban Growth Boundary by Limiting Conversion of Threatened Employment Lands Supersedes All Conflicting Provisions.

Since 1996, the City of San José has had an Urban Growth Boundary (UGB) that discourages urban sprawl and establishes the ultimate limit on urbanization within the City.  It is also the policy of the City of San José that employment lands be protected from conversion to non-

employment uses. In furtherance of these policies, and because sensitive employment lands in certain areas adjacent to the UGB are also threatened by sprawl, land use designations for Threatened Employment Lands and the allowable uses for those lands in the San José General Plan, any master plan or specific plan, any development policy, any Municipal Code provision, any zoning ordinance, or Urban Village Plan shall not be changed in a manner that allows non-employment uses unless all of the requirements set forth in Section 1904 are satisfied.

The provisions of this Act shall prevail over all other conflicting or inconsistent provisions in the City's Charter, ordinances, resolutions, or other enactments, including initiative enactments, existing as of the effective date of this Act. Any ordinance, resolution, or other enactment adopted on or after the effective date of this Act that purports to allow non-employment uses on Threatened Employment Lands in a manner that does not comply with the provisions of this Act shall be of no force or effect.

Any initiative measure adopted at the June 5, 2018 primary election that purports to impose, create, or apply a non-employment use designation or an overlay designation on Threatened Employment Lands to allow residential development on those lands shall be void in its entirety, notwithstanding any contrary provision of that initiative measure.

## SECTION 1904.   Requirements for Conversion of Threatened Employment Lands to Non-Employment Uses.

Before any proposed General Plan amendment, master plan, specific plan, development policy, urban village plan, amendment to the Municipal Code or zoning ordinance, or any other legislative enactment that would allow non-employment uses on Threatened Employment Lands ("proposed legislative change") is considered for approval by the City, the City shall comply with all of the following requirements:

(a)     The City, at the applicant's cost, shall prepare a Fiscal and Jobs/Housing Balance Impact Study ("Impact Study") addressing the potential impacts specified in paragraphs (1) through (3) of this subsection (a), as well as any other fiscal, employment, or jobs/housing balance impacts that may result from non-employment development allowed by the proposed legislative change.  The Impact Study shall be made available for public review.  The City Council shall consider the Impact Study at a duly noticed public hearing.

Upon consideration of the Impact Study, the City Council shall determine whether approval of the proposed legislative change, as compared to buildout of the employment development that otherwise could occur on the site proposed for development pursuant to applicable underlying land use designations, could result in any of the following impacts:

(1)     An annual net loss of revenue to the City in any fiscal year;

(2)     A reduced annual economic benefit in any fiscal year, considering the direct, indirect, and induced effects of employment, labor income, and

economic output, during either construction or operation of the development; or

    (3)    Any measureable reduction in the City's Jobs/Employed Resident ratio in any fiscal year or any reduction in long-term employment.

If the City Council determines that the proposed legislative change could result in any of the impacts described in paragraphs (1) through (3) of this subsection, the City Council shall not approve the application for the proposed legislative change unless it determines that the benefits to the City of the proposal outweigh the specified impacts.  The City Council shall retain the power to deny, approve, modify, or approve with conditions the proposed legislative change.

    (b)    The City shall require any residential development on Threatened Employment Lands allowed by the proposed legislative change to comply with all applicable inclusionary housing requirements, except that notwithstanding any contrary provisions in those requirements, the minimum number of affordable housing units in the residential development shall be as follows and construction of the units shall be concurrent and proportional to the construction of market rate units in the development:

        (1)    For-sale residential development: fifty percent (50%) of the total dwelling units in the residential development shall be made available for purchase at an affordable housing cost to those households earning no more than one hundred ten percent (110%) of the area median income. Such units may be sold to households earning no more than one hundred twenty percent (120%) of the area median income.

        (2)    Rental residential development: thirty-five percent (35%) of the total dwelling units in the residential development shall be made available for rent at an affordable housing cost to moderate income households, and twenty percent (20%) of the total dwelling units in the residential development shall be made available for rent at an affordable housing cost to very low income households.

    (c)    Notwithstanding any provision of the proposed legislative change that purports to limit or could be interpreted as limiting the City's duty or ability to comply with the California Environmental Quality Act, Public Resources Code section 21000, et seq. ("CEQA"), the City shall require compliance with CEQA to the fullest extent permitted by law. Specifically, but not by way of limitation of the foregoing, the City shall retain discretion whether to certify or approve CEQA documents related to any application and to approve, deny, or impose conditions on any proposed development as necessary to avoid, minimize, reduce, rectify, or eliminate any significant environmental impacts of the development, including, without limitation, the payment of appropriate fees for road improvements to address traffic impacts.

(d)    The City shall require that any residential development on Threatened Employment Lands allowed by the proposed legislative change to comply with the City Municipal Code and all laws relating to design and construction including but not limited to building energy efficiency standards, including all applicable Zero Net Energy requirements.

(e)    The City shall require that all landscaping in any non-employment development allowed by the proposed legislative change shall be maintained using recycled/reclaimed water where the site is in an area served by recycled/reclaimed water for those uses.

(f)    To the maximum extent feasible, and subject to all applicable federal and state laws, the City shall require that any residential development on Threatened Employment Lands allowed by the proposed legislative change includes provision of support services, at no cost to the City, as appropriate to serve the intended resident population. Support services may include, but are not necessarily limited to, the following: (1) assisted living; (2) memory care; (3) nursing care; (4) shuttle service to and from transit centers, medical providers, or social service providers; (5) meal delivery; (6) physical therapy; and (7) primary medical care.

## SECTION 1905.  Implementing Legislation.

The City Council is authorized to adopt implementing ordinances or resolutions, as necessary, to further the purposes of this Act.

## SECTION 1906.  No Conflict With State or Federal Housing Laws.

Notwithstanding any other provision of this Act, this Act shall not apply to a proposed legislative change that the City determines is required to implement or comply with state or federal housing law, including laws related to the provision of affordable housing.

## SECTION 1907.  Interpretation and Severability.

This Act shall be interpreted so as to be consistent with all federal and state laws, rules and regulations. The provisions of this Act are severable. If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, part, or portion ("portion") of this Act is held to be invalid or unconstitutional by a final judgment of a court, such decision shall not affect the validity of the remaining portions of this Act. The voters hereby declare that this Act, and each portion thereof, would have been adopted or passed even if one or more portions of the Act were declared invalid or unconstitutional. If any portion of this Act is held invalid as applied to any person or circumstance, such invalidity shall not affect any application of this Act which can be given effect without the invalid application.

**SECTION 1908.  Sunset.**

The provisions of this Act shall be operative for twenty (20) years following the effective date of this Act, and shall thereafter be inoperative unless extended by a duly enacted amendment to this Charter. This date shall be tolled for a period equal to the period during which any litigation or a similar action challenging this Act has been filed and until final judgment or dismissal.
*Added at election June 5, 2018*

# LEGISLATIVE HISTORY
## (CHRONOLOGICAL)

Charter approved at election April 13, 1965
          Assembly Concurrent Resolution No. 104
          Cited:  Resolution Chapter 76, Statutes 1965
              Statutes 1965, Volume 3, page 5122
          Filed with Secretary of State May 4, 1965

Amendments to Sections 407, 800, 1000 and 1600 approved at election June 7, 1966
          Assembly Concurrent Resolution No. 67
          Cited:  Resolution Chapter 107, Statutes 1966
              Statutes 1966, page 885
          Filed with Secretary of State June 23, 1966

Amendment to Section 410 approved at election June 6, 1967
          Assembly Concurrent Resolution 75
          Cited:  Resolution Chapter 99, Statutes 1967
              Statutes 1967, Volume 3, page 4672
          Filed with Secretary of State June 23, 1967

Amendment to Section 1106 approved at election June 3, 1969
          Senate Concurrent Resolution No. 156
          Cited:  Resolution Chapter 276, Statutes 1969
              Statutes 1969, Volume 2, page 3948
          Filed with Secretary of State August 7, 1969

Amendments to Sections 402, 403, 404, 409, 604, 1000, 1217, 1600, 1601, 1603 and repeal
  of Sections 607 and 608 approved at election June 2, 1970
          Senate Concurrent Resolution No. 98
          Cited:  Resolution Chapter 146, Statutes 1970
              Statutes 1970, Volume 2, page 3693
          Filed with Secretary of State July 30, 1970

Amendments to Sections 410, 503 and 1600 approved at election June 6, 1972
          Senate Concurrent Resolution No. 72
          Cited:  Resolutions Chapter 77, Statutes 1972
              Statutes 1972, Volume 2, page 3339
          Filed with Secretary of State July 26, 1972

Amendment to Section 1104 approved at election November 7, 1972
          Senate Concurrent Resolution No. 17
          Cited:  Resolution Chapter 18, Statutes 1973
              Statutes 1973, Volume 9, page 2970
          Filed with Secretary of State February 26, 1973

---

Amendment to Section 407 approved at election June 5, 1973
  Senate Concurrent Resolution No. 69
  Cited:  Resolution Chapter 72, Statutes 1973
   Statutes 1973, Volume 2, page 3140
  Filed with Secretary of State June 26, 1973

Amendments to Sections 401, 402, 403, 410, 500, 601, 605, 805, 901, 1601 and 1603 approved at election November 7, 1978
  Filed with Secretary of State January 19, 1979
  Charter Chapter No. 4

Amendments to Sections 407 and 1704, and addition of Sections 803.1, 805.1, 1001.1 and 1111 approved at election November 4, 1980
  Filed with Secretary of State December 23, 1980
  Charter Chapter No. 31

Amendment to Section 1217 approved at election June 8, 1982
  Filed with Secretary of State July 14, 1982,
  Charter Chapter No. 18

Amendment to Section 1108 approved at election November 2, 1982
  Filed with Secretary of State December 13, 1982
  Charter Chapter No. 31

Amendment to Section 1108 approved at election June 5, 1984
  Filed with Secretary of State July 2, 1984
  Charter Chapter No. 10

Amendment to Section 609 approved at election November 6, 1984
  Filed with Secretary of State December 12, 1984
  Charter Chapter No. 32

Amendments to Sections 407, 411, 502, 700, 701, 800, 805, 805.1, 807, 900, 901, 1101, 1204 and 1704, and addition of Sections 411.1, 805.2, 808 and 809 approved at election November 4, 1986
  Filed with Secretary of State December 30, 1986
  Charter Chapter No. 33.

Amendments to Sections 1000 and 1001 approved at election June 7, 1988
  Filed with Secretary of State June 30, 1988,
  Charter Chapter No. 7

Amendment to Section 1217 approved at election November 8, 1988
  Filed with Secretary of State December 5, 1988
  Charter Chapter No. 22

Amendment to Section 1506 approved at election June 5, 1990
  Filed with Secretary of State July 2, 1990
  Charter Chapter No. 8, Statutes of 1990

Amendments to Sections 402, 403, 1202, 1203 and 1217, and addition of Sections 204, 607 and 809.1 approved at election November 6, 1990
  Filed with Secretary of State December 20, 1990
  Charter Chapter No. 2, Statutes of 1991

Amendments to Sections 411, 800, 900, 901, 1101 and 1704, and deletion of Sections 809 and 809.1 approved at election November 3, 1992
  Filed with Secretary of State December 4, 1992,
  Charter Chapter No. 20, Statutes of 1992

Amendments to Sections 403, 1603, 1604, and the following sections (regarding gender neutrality) 405, 406, 409, 503, 704, 803, 803.1, 804, 904, 1000, 1001, 1001.1, 1101, 1104, 1105, 1108, 1202, 1208, 1210, 1213, 1215, 1217, 1504, 1505, 1604, and 1805 approved at election June 7, 1994
  Filed with Secretary of State July 11, 1994
  Charter Chapter No. 8, Statutes of 1994

Amendments to Sections 401, 402, 404, 410, 500, 503, 1217, 1600, 1601 and 1603 approved at election November 8, 1994
  Filed with Secretary of State December 1, 1994
  Charter Chapter No. 15, Statutes of 1994

Amendment to Section 1600 approved at election March 26, 1996
  Filed with Secretary of State May 2, 1996
  Charter Chapter No. 7, Statutes of 1996

Amendments to Sections 411, 800, 900, 901, 1101 and 1704 and addition of Sections 809 and 809.1 approved at election November 5, 1996
  Filed with Secretary of State December 16, 1996
  Charter Chapter No. 27, Statutes of 1996

Amendments to Sections 1001 and 1217 and repeal of Section 1104 approved at election November 3, 1998
  Filed with Secretary of State December 21, 1998
  Charter Chapter No. 24, Statutes of 1998

Amendments to Sections 1202, 1203 and 1217 approved at election November 7, 2000
  Filed with Secretary of State April 16, 2001
  Charter Chapter No. 13, Statutes of 2001

Amendment to Section 1217 approved at election March 2, 2004
  Filed with Secretary of State May 17, 2004
  Charter Chapter No. 4, Statutes of 2004

Addition of Section 1700.1 approved at election November 4, 2008
        Filed with the Secretary of State December 20, 2010
        Charter Chapter No. 20, Statutes of 2010

Amendment to Section 1111 and approved at election November 2, 2010
        Filed with the Secretary of State December 20, 2010
        Charter Chapter No. 21, Statutes of 2010

Amendment to Sections 1500 and 1501 and approved at election November 2, 2010
        Filed with the Secretary of State December 20, 2010
        Charter Chapter No. 22, Statutes of 2010

Addition of new Article XV-A (Sections 1501-A, 1502-A, 1503-A, 1504-A, 1505-A, 1506-A, 1507-A, 1508-A, 1509-A, 1510-A, 1511-A, 1512-A, 1513-A, 1514-A and 1515-A) approved at election June 5, 2012
        Filed with the Secretary of State January 24, 2013
        Charter Chapter No. 5, Statutes of 2013

Amendment to Sections 1501-A, 1502-A, 1503-A, 1504-A, 1505-A, 1506-A, 1507-A, 1508-A, 1509-A, 1510-A and 1511-A, and deletion of Sections 1512-A, 1513-A, 1514-A and 1515-A approved at election November 8, 2016
        Filed with Secretary of State December 19, 2016
        Charter Chapter No. 19, Statutes of 2016

Addition of new Article XIX (Sections 1901, 1902, 1903, 1904, 1905, 1906, 1907 and 1908) approved at election June 5, 2018
        Filed with Secretary of State October 23, 2018
        Charter Chapter No. 10, Statutes of 2018

Amendment to Section 1217 approved at election November 6, 2018
        Filed with Secretary of State January 30, 2019
        Charter Chapter No. 14, Statutes of 2019

Amendment to Sections 407, 1001.1 and 1603 approved at election November 6, 2018
        Filed with the Secretary of State January 30, 2019
        Charter Chapter No. 13, Statutes of 2019

Amendment to Sections 403,  809, 1000 approved at election November 3, 2020
        Filed with the Secretary of State December 31, 2020
        Charter Chapter No. 23, Statutes of 2020

EXHIBIT "B"

| | | |
|---|---|---|
| | COUNCIL AGENDA: | **1/25/22** |
| | FILE: | **22-045** |
| | ITEM: | **4.1** |



CITY OF
# SAN JOSE
CAPITAL OF SILICON VALLEY

# *Memorandum*

**TO:** HONORABLE MAYOR
AND CITY COUNCIL

**FROM:** Nora Frimann
City Attorney

**SUBJECT:** **GUN HARM REDUCTION
ORDINANCE**

**DATE:** January 14, 2022

---

## RECOMMENDATION

Consider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs.

## BACKGROUND

On June 29, 2021, the City Council directed the City Attorney to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

Council directed that the ordinance include the following provisions:

- Compliance:
  - The gun owner shall sign and complete an insurance attestation, describing the specific policy number and issuer, and sign the attestation under penalty of perjury. Acceptable insurance coverage may include any homeowner's or renter's policy that provides for a minimum coverage amount.
  - The attestation document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
- Exemptions and waivers:
  - A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.
  - An exemption from these requirements for sworn law enforcement.
  - An exemption from these requirements for holders of a concealed carry weapon (CCW) permit.

1889106

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject:  Gun Harm Reduction Ordinance**
Page 2

- Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine.

## ANALYSIS

The proposed ordinance includes provisions that are in accordance with the direction from Council.  The proposed ordinance authorizes an annual gun harm reduction fee to be paid by gun owners to a designated nonprofit organization that will, in turn, use the fees collected to provide certain services, as specified in the ordinance, to residents of the City who own or possess a gun or to members of their household.  The proposed ordinance also authorizes the City Manager to charge and collect any and all City cost recovery fees associated with fulfilling the policies of the ordinance relating to the reduction of gun harm, including any associated third-party costs.

The recitals within the draft ordinance contain the data and other information that supports the proposed ordinance.

The effective date of the proposed ordinance will be six months from the date of adoption.  This is to allow for time for the City Manager's Office to potentially do outreach, develop regulations, and work through any other issues related to the implementation of the proposed ordinance.

## CONCLUSION

If approved, the proposed ordinance will require, with certain exceptions, that San José residents who own firearms: (a) obtain and maintain liability insurance; (b) pay an annual gun harm reduction fee to a designated nonprofit organization that will use the fee proceeds to provide gun harm reduction services to residents of the City who own or possess a gun or to members of their household; and (c) pay any City cost recovery fees associated with program implementation, including any associated third-party costs.

## CLIMATE SMART SAN JOSE

The recommendation in this memo has no effect on Climate Smart San José energy, water, or mobility goals.

## COORDINATION

This memorandum has been coordinated with the City Manager's Office.

1889106

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject:  Gun Harm Reduction Ordinance**
Page 3

## **CEQA**

Not a Project, File No. PP17-008, General Procedure & Policy Making resulting in no changes to the physical environment.

/s/
NORA FRIMANN
City Attorney

For questions please contact Nora Frimann, City Attorney, at (408) 535-1900.

1889106

EXHIBIT "C"



**DAVID A. WARRINGTON**
**DWARRINGTON@DHILLONLAW.COM**

**HARMEET DHILLON**
**HARMEET@DHILLONLAW.COM**

July 14, 2021

**VIA ELECTRONIC AND CERTIFIED MAIL**

San Jose City Council
200 E. Santa Clara St.
San Jose, CA 95113

Mayor Sam Liccardo
mayoremail@sanjoseca.gov

Vice Mayor Charles Jones
District1@sanjoseca.gov

Sergio Jimenez, City Council Dist. 2
District2@sanjoseca.gov

Raul Peralez, City Council Dist. 3
District3@sanjoseca.gov

David Cohen, City Council Dist. 4
District4@sanjoseca.gov

Magdalena Carrasco, City Council Dist. 5
District5@sanjoseca.gov

Devora Davis, City Council Dist. 6
district6@sanjoseca.gov

Maya Esparza, City Council Dist. 7
District7@sanjoseca.gov

Sylvia Arenas, City Council Dist. 8
district8@sanjoseca.gov

Pam Foley, City Council Dist. 9
District9@sanjoseca.gov

Matt Mahan, City Council Dist. 10
District10@sanjoseca.gov

**Re:    Ordinance Shifting the Public Burden of Criminal Behavior to Gun Owners**
**Your File NO - 21-1579**

Dear Mayor and City Council,

This Firm represents the National Foundation for Gun Rights. It has come to our attention that on June 29, 2021, you voted unanimously to have the City Attorney research and draft an ordinance that would impose a mandatory fee on gun owners and require them to buy gun liability insurance.  Given that the city's own press release regarding the proposed ordinance, concedes that "criminals won't obey these mandates," the City of San Jose is seeking to impose a tax on a select group of law abiding citizens simply for exercising their right to keep and bear arms.

**DHILLON LAW GROUP INC.**
**A CALIFORNIA PROFESSIONAL CORPORATION**
**177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)**

July 14, 2021
Page 2 of 4

The right to keep and bear arms of the citizens of the United States, which includes the City of San Jose, is protected by the Second Amendment to the United States Constitution, that states in pertinent part that, "the right of the people to keep and bear Arms shall not be infringed." The proposed ordinance would be an unconstitutional infringement on that right and we are prepared to litigate to protect the Second Amendment rights of the citizens of San Jose should the City Council enact such an ordinance.

The law on this issue is clear.

The City of San Jose is prohibited from enacting laws that infringe upon the Second Amendment rights of its citizens. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790 (2010) (holding that the Second Amendment right is protected against infringement by the individual states through the Fourteenth Amendment); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (holding that the Second Amendment right is "fundamental and is incorporated against state and municipalities" like the City of San Jose).

Further, courts have found that the right to keep and bear arms "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco,* 746 F.3d 953, 967 (9th Cir. 2014). It also protects the right "to acquire and maintain proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The Second Amendment protects the implicit right to train with weapons. *District of Columbia v. Heller*, 665 U.S. 570, 617-618 (2008). It also protects the implicit right to possess ammunition. *United States v. Miller*, 307 U.S. 174, 180 (1939).

What you propose to do strikes at the very core of this fundamental right and seeks to punish (though registration[1] and taxation) citizens of your city who have committed no crime or offense. This type of government overreach was rejected by our Founders and the Bill of Rights was adopted in direct response to then recent examples of such conduct by the British.

First-hand experience with the British Parliament's 1765 enactment of the Stamp Act led to the protections for the freedoms of Speech and Press found in the First Amendment. Like the tax you propose here, the Stamp Act imposed a direct tax on printed material, resulting in a selective tax imposed on those who desired to read the news or communicate with others via printed material.

Indeed, many of the Bill of Rights' protections that citizens of the United States enjoy are a direct result of the abuses by the British Parliament and Crown in the years leading up to the Declaration of Independence, to wit: the 1774 Massachusetts Government Act – First Amendment Right to Assemble; 1774 The Quartering Act – Third Amendment; and 1774 Administration of

---

[1] In order to implement your proposed taxation scheme, there is no doubt that a gun registration scheme will accompany it.

**DHILLON LAW GROUP INC.**
A CALIFORNIA PROFESSIONAL CORPORATION
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

**SER-384**

July 14, 2021
Page 3 of 4

Justice Act – Sixth and Seventh Amendment Right to a Jury Trial.  Americans enjoy the protections of the Second Amendment today because the British attempted to confiscate the guns and ammunition of the colonist on April 19, 1775, in Concord Massachusetts.

Unfortunately, the City Council of the City of San Jose is not the first government entity that has forgotten the lessons of the Founding and attempted to use a selective tax against a fundamental constitutional right.

In 1936, the United States Supreme Court stopped the State of Louisiana from imposing a selective tax on newspapers with circulation of more than 20,000 copies per week. The Court found that this selective tax "might result in destroying both advertising and circulation." *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936).  The Court held that the Louisiana law was "bad because … it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean* at 250. The Louisiana tax penalized certain publishers from being able to fully exercise their constitutional rights.

More recently, in 1983, the Supreme Court dealt with a case where the state tax scheme of Minnesota "singled out the press for special treatment." *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 582 (1983).  The Court held that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star* at 585.

There is no "special characteristic" of the law abiding gun owner that would justify imposition of a special tax, therefore, as in *Minneapolis Star*, it is easily understood that the goal of the proposed ordinance is to suppress and discourage the exercise of the right to keep and bear arms and that goal is "presumptively unconstitutional."  *See id*.

Simply put, a discriminatory tax that singles out citizens exercising their constitutional rights is unconstitutional.

Please be advised that should you pass the proposed ordinance and blatantly violate the constitutional rights of the residents of San Jose, my clients have authorized our firm to file a lawsuit against the City to protect the constitutional rights of their members. This lawsuit will be brought pursuant to 42 U.S.C. §1983 for the deprivation of constitutional rights. As such, once we prevail in protecting the residents of San Jose's constitutional rights, our firm will then seek our reasonable attorney fees under 42 U.S.C. §1988(b).

We thereby strongly encourage you to reconsider moving forward with the proposed ordinance.

**DHILLON LAW GROUP INC.**
A CALIFORNIA PROFESSIONAL CORPORATION
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

July 14, 2021
Page 4 of 4

Regards,

David A. Warrington                Harmeet K. Dhillon

*Counsel for the National Foundation for Gun Rights*

Cc: National Foundation for Gun Rights

**DHILLON LAW GROUP INC.**
**A CALIFORNIA PROFESSIONAL CORPORATION**
**177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)**

**SER-386**



EXHIBIT "D"

# Los Angeles Times

**OPINION**

# Op-Ed: My city's new gun control laws will help more than waiting on Congress to do something



Shown are guns and ammunition that were found in the home of a man who killed nine people in San Jose last May, before killing himself.(Santa Clara County Sheriff's Department)

BY SAM LICCARDO

JAN. 19, 2022 3:05 AM PT

A gunman holding four people hostage at a Colleyville, Texas, synagogue this weekend provides another reminder of the daily threat of gun violence to our local communities. San Jose, where I am mayor, is hardly immune: Our 1 million residents have endured three mass shootings in three years, along with hundreds of gun-inflicted killings, suicides and serious injuries.

Last June our City Council unanimously approved my proposals that will mitigate gun harm in our community — and a final vote on Jan. 25 should turn them into law. The proposals include two requirements for gun owners that no city or state in the U.S. has

ever implemented: the purchase of liability insurance and the payment of annual fees to fund violence-reduction initiatives. We anticipate that a barrage of lawsuits from the firearm industry and gun rights advocates will follow.

Why should any city subject itself to litigation? Because now-common horrific reports of shootings throughout the nation do little more than elicit a performative parade of prayers and platitudes from Congress. Because problem-solving must be elevated over political posturing.

Because, as one grieving mother urged as I hugged her at her son's memorial, "we just need somebody to do something."

My proposals take a page from public health approaches that have reduced auto-related deaths, tobacco use and teen pregnancy in the U.S. They incentivize responsibility, draw on multi-disciplinary learning and invest in proven harm-reduction initiatives with the guidance of experts.

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses. More importantly, insurance can also incentivize safer gun ownership. Risk-adjusted premiums will encourage owners to take gun-safety courses, use gun safes or install child-safe trigger locks to reduce the annual toll of accidental gun harm.

Unintentional shootings — often involving children — annually claim the lives of 500 Americans and injure another 26,000. The new laws coming to San Jose apply lessons from the insurance industry's impact on auto safety. Reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by nearly 80% over the last five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk because approximately 4.6 million children live in a household where a gun is kept unlocked and loaded, and shootings have become the second-leading cause of death among U.S. children and adolescents.

Imposing a modest annual fee on gun owners can support underfunded domestic violence and suicide prevention programs, gun-safety classes, mental health services and addiction intervention. We've invited doctors, public health experts, and yes, gun owners, to help identify how to allocate the money from these fees in ways that will reduce gun violence. Prioritizing those investments to serve residents in gun-owning

households will have the biggest impact because studies suggest that even a properly stored firearm in the home significantly increases occupants' risk of death by homicide and suicide.

Gun rights advocates argue that gun owners should not have to pay a fee to exercise their constitutional right to bear arms. To be sure, the 2nd Amendment protects the rights of citizens to own guns, but it doesn't require the public to subsidize gun ownership. Every day, taxpayers bear the financial burden of police officers, ambulances and trauma surgeons responding to gun violence. These direct costs of gun violence total $40 million annually for San Jose taxpayers, and $1.4 billion for taxpayers statewide.

Critics say that criminals won't obey insurance or fee mandates — and they are right. But these ordinances create a legal mandate that gives police the means for at least the temporary forfeiture of guns from dangerous law-breakers. Particularly given the legally frail status of concealed-carry regulations before the current Supreme Court, law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns. Giving the police the ability to distinguish the scofflaws from the law-abiding among gun owners will have tremendous public safety benefits.

These new laws won't end all gun violence. We're deploying other interventions as well, such as bolstering gun violence restraining orders, banning untraceable "ghost guns" and preventing the illegal purchasing of firearms for people such as felons or minors who are not allowed to buy guns. We need to coordinate early mental health interventions for individuals showing signs of distress as well.

While Congress dallies, communities don't have the luxury of dismissing the devastation of gun violence. We live among grieving family members; we hear echoes of painful eulogies and we work with traumatized friends. These new laws are no panacea, but they can reduce the unnecessary suffering in our community during a crisis that it is long past time to "do something" about.

*Sam Liccardo is the mayor of San Jose, America's 10th largest city.*

**OPINIONOP-ED**


Case 5:22-cv-00501-BLF   Document 19   Filed 02/14/22   Page 140 of 227

EXHIBIT "E"

COUNCIL AGENDA: 01/25/2022
FILE:  22-045
ITEM:  4.1



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:** HONORABLE CITY COUNCIL

**FROM:**  Mayor Liccardo,
Vice Mayor Jones,
Councilmember Cohen
Councilmember Carrasco

**SUBJECT:  SEE BELOW**

**DATE:** 01/21/2022

Approved _____      Date 01/21/2022

**DIRECTION:**

1. Establish that the gun harm reduction fee in the initial year shall amount to $25 per gun-owning household—or an approximate amount close to $25 that assists with the rounding of the final fee—plus that amount strictly reflecting only the administrative cost incurred by:
    a. The Designated Non-profit Organization,
    b. The State of California for its use of the Department of Justice's Automated Firearm System and/or California Firearms Application Reporting System to communicate legal obligations and available services to gun-owning residents in San Jose, and
    c. The City, if any.

2. Determine that until or unless the Council determines otherwise,
    a. The City shall not be engaged in the collection of fees, the transmittal of information through the Department of Justice Database, nor the accounting nor distribution of the funds.
    b. After the initial implementation of the ordinance, the City's role will remain largely limited to setting the fee, engaging in contractual arrangements with the State of California and other entities necessary for the implementation of the ordinance, and enforcement.
    c. All administrative tasks shall be the responsibility of the Designated Nonprofit Organization, and all administrative costs shall be borne by that organization, and recovered by a portion of the fee revenue.

    d.  No fees shall be collected nor required of any gun owner until the City Attorney has determined that there is resolution of pending facial legal challenges to the ordinance for any claim which is not *res judicata,* that is, for any claim that is not precluded by a prior final judgment.


3.  Approve the proposed ordinance, with modifications in the following sections:
    a.  Expenditure of Gun Harm Reduction Fee, Section 10.32.220
- Insert the following italicized language into A. to read, "All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City or to members of their household, *or to those with whom they have a close familial or intimate relationship."*
- Insert within the itemized list under A., "Addiction intervention and substance abuse treatment"
- Revise provisions under C. to read: "*C.   The Designated Nonprofit Organization shall spend every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms.   Otherwise, t*he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended*"*

    b.  Exceptions, Section 10.32.225
- Insert the following italicized language into B. to read, "Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, *for as long as these statutes are legally enforceable."*

    c.  Compliance, Section 10.32.230
- Delete the following stricken language and insert the italicized language into A. to read, "Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported. ~~There is no requirement to submit the attestation form to the City. However, each~~ *Each* person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes.   *Each person shall present the form when lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm."*

    d.  Purpose and Findings, 10.32.200
        Among the findings listed in B., add:

- "Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José.
- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.
- Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries."

## DISCUSSION:

When our current pandemic passes, an epidemic of gun violence will continue to take its grim toll throughout our nation.  In response, we propose that the City of San Jose become the first city—or U.S. jurisdiction—to use liability insurance and a fee-supported non-profit organization to reduce gun violence and harm.   We consider the merits for each of these two elements.

### Insurance

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses.  More importantly, insurance can also incentivize safer gun ownership.  Risk-adjusted premiums can—and in some cases, do—reduce the risk of gun harm, by encouraging firearm owners to take gun-safety courses, use gun safes, install child-safe trigger locks, or utilize chamber-load indicators. Unintentional shootings–often involving children–annually claim the lives of 500 Americans and injure another 26,000.   We should apply the lessons of the insurance industry's impact on auto safety: reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by 80% over the past five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk, because we live in a nation in which 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home, resulting in too many child victims.   As in other contexts, an insurance requirement can help make our community safer.

### Fees and Investment in Evidence-Based Prevention

Second, we propose the payment of a modest fee to support evidence-based community-led initiatives to reduce the harm of gun violence in our community, such as through domestic violence and suicide prevention efforts, gun-safety classes, mental health services, and addiction intervention.

Why should the funding nonprofit focus these services for occupants of gun-owning households?  Because that's where the greatest risk is.  Epidemiological studies show that even a properly stored firearm in the home doubles occupants' risk of becoming a victim of homicide and triples the likelihood of suicide.  A more recent Stanford study concluded that male handgun owners may be eight times more likely to commit suicide by gun than other men, and gun-

owning women are 35 times more likely to do so than their gender peers.  Prioritizing those investments for residents living with guns in the home will provide the most direct path for reducing gun harm.


Some gun owners will express the view that the 2nd Amendment renders any imposition of a gun-related fee unconstitutional.  While the Second Amendment protects the rights of citizens to own guns, it doesn't require the public to subsidize gun ownership.  Every day, our taxpaying residents bear the financial burden for police officers, ambulances, and trauma surgeons to respond to gun violence.  These direct costs of gun violence to San Jose taxpayers-- to say nothing of the human and financial toll to victims' families—exceeds $39 million annually, and $1.4 billion for all Californians.  Using fees to fund initiatives to reduce gun violence reduces the financial burdens of gun use on all of us.

Moreover, courts have long upheld the imposition of taxes on the purchase of guns and ammunition ever since Congress imposed the federal gun tax in 1919.  This history affirms the consistent position of courts to allow the imposition of modest fees on the exercise of constitutional rights, such as IRS filing fees on the formation of nonprofit advocacy organizations (1st Amendment), taxes on newspapers (1st Amendment), and court filing fees (7th Amendment), the cost of counsel for defendants of financial means (6th Amendment), or on filing to become a candidate for elected office (1st and 14th Amendments).   The constitutional question is whether a modest fee substantially burdens the exercise of that right.  Given that we provide an explicit exemption for those unable to pay, it imposes no such burden.

We are grateful for the many community leaders and experts—such as NextDoor Solutions to Domestic Violence CEO Esther Peralez-Dieckman, Health Trust CEO Michele Lew, Gardner Healthcare CEO Reymundo Espinoza, Stanford University Medical Center Epidemiologist Dr. Julie Parsonnet, National Rifle Association San Jose Chapter President Dave Truslow, Community Health Partnership CEO Dolores Alvarado and Deputy Director Cathryn Hyde, and Brady United Director Shikha Hamilton, and Moms Demand Action California Chapter representative Rachel Michelson, and SAFE Legislative Affairs Director Dr. Susie MacLean MD, who have stepped up to advise or participate in the creation of a nonprofit organization that will identify high-impact violence reduction programs for investment.

**Compliance**

The ordinance will impose fines and other administrative sanctions on violators. Of course, criminals won't obey insurance or fee mandates. Yet, given the legally frail status of concealed-carry regulations before the current U.S. Supreme Court, we will likely see many more guns out on the street—and in bars, nightclubs, and other contexts that will increase our peril.  Law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns in America.  Members of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations, with subsequent restoration of ownership as required by constitutional due process. Giving the police the ability to distinguish the scofflaws from law-abiding gun owners could provide a lawful basis for forfeiture of the gun in a context—where an officer responds to a bar brawl or domestic violence allegation—where even temporarily extracting a gun from a combustible situation could dramatically reduce the risk of deadly violence.

**Thanks**

Our gratitude goes to City Attorney Nora Frimann, Terra Chaffee, and the rest of her team for their extensive research and work in fashioning this ordinance, and to Christina Guimera and Paul Pereira in the Mayor's office for their mighty efforts to bring forward this initiative, and to convene partners to help.

In addition to those community leaders mentioned above, we also thank the many supporters, advocates, thought partners, and active partners of this initiative, including Rachel Michelson, Yvonne Murray, Maria Ines Ortega Barrera, and all of the volunteers and staff at Mom's Demand Action, Everytown, Brady United, and many of our Project Hope community leaders. We also thank local leaders who have stepped up to offer critical help, including District Attorney Jeff Rosen, Assemblymember Phil Ting and his lead expert on staff, Mark Chekal-Bain, Senator Josh Becker, California Attorney General Rob Bonta and his team, and Golden State Warriors Coach Steve Kerr.

We are deeply appreciative of the philanthropic support of the policy and research work necessary for the crafting of this initiative by the Heising-Simons Foundation—particularly Deanna Gomby and Holly Kreider—and by SV Angel CEO Ron Conway. We also appreciate the willingness of the Silicon Valley Community Foundation to serve as a fiscal agent for these funds.

Finally, we offer our very deep gratitude to the *pro bono* efforts of our legal team, led by Joe Cotchett and Tamarah Prevost of Cotchett, Pitre & McCarthy, LLP. We have had great support, advice, research, and legal assistance provided by Allison Anderman and Esther Sanchez-Gomez at the Giffords Law Center to Prevent Gun Violence; Tanya Schardt and Steve Lindley at Brady United; UC Berkeley School of Law Dean Erwin Chemerinsky; Stanford Law Professor and Economist John J. Donohue III; Michael Redding, John Marsh, and team at the California Attorney General's office, and Keker, Van Nest & Peters LLP.

*The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*



Case 5:22-cv-00501-BLF   Document 19   Filed 02/14/22   Page 146 of 227

EXHIBIT "F"



# City Council Meeting
# Amended Agenda

## Tuesday, January 25, 2022
### 1:30 PM
### Virtual Meeting - https://sanjoseca.zoom.us/j/99346843938

SAM LICCARDO, MAYOR
CHAPPIE JONES, VICE MAYOR, DISTRICT 1
SERGIO JIMENEZ, DISTRICT 2
RAUL PERALEZ, DISTRICT 3
DAVID COHEN, DISTRICT 4
MAGDALENA CARRASCO, DISTRICT 5
DEV DAVIS, DISTRICT 6
MAYA ESPARZA, DISTRICT 7
SYLVIA ARENAS, DISTRICT 8
PAM FOLEY, DISTRICT 9
MATT MAHAN, DISTRICT 10



*The City of San José is committed to open and honest government and strives to consistently meet the community's expectations by providing excellent service, in a positive and timely manner, and in the full view of the public.*

Welcome to the San José City Council meeting!

This Agenda contains both a Consent Calendar section for routine business items that require Council approval, and general business items arranged to correspond with San José's City Service Areas (CSAs). City Service Areas represent the policy-making level for strategic planning, policy setting, and investment decisions in the critical functions the City provides to the community. They are:

• **Strategic Support** - The internal functions that enable the CSAs to provide direct
  services to the community in an effective and efficient manner.

• **Public Safety** - Commitment to excellence in public safety by investing in neighborhood
  partnerships as well as prevention, enforcement, and emergency preparedness services.

• **Transportation & Aviation Services** - A safe and efficient transportation system that contributes to
  the livability and economic health of the City; and provide for the air transportation needs of the
  community and the region at levels that is acceptable to the community.

• **Environmental and Utility Services** - Manage environmental services and utility systems to ensure
  a sustainable environment for the community.

• **Neighborhood Services** - Serve, foster, and strengthen community by providing access to lifelong
  learning and opportunities to enjoy life.

• **Community & Economic Development** - Manage the growth and change of the community in
  order to create and preserve healthy neighborhoods and ensure a diverse range of employment and
  housing opportunities.

You may speak to the City Council about any discussion item that is on the agenda, and you may also speak during Open Forum on items that are not on the agenda and are within the subject matter jurisdiction of the City Council or Successor Agency to the Redevelopment Agency Board. If you wish to speak to the City Council, please refer to the following guidelines:

o **Fill out a Yellow Speaker's Card and submit it to the City Clerk seated at the front table. Do
  this before the meeting or before the item is heard.** This will ensure that the name on the card is
  called for the item(s) that you wish to address, and it will help ensure the meeting runs smoothly for
  all participants by calling speakers in an orderly manner.
o When the Council reaches your item on the agenda, the Mayor will open the public hearing and call
  your name. Please address the Council from the podium, which is located to the left of the City
  Clerk's table.

o Each speaker generally has two minutes to speak per item. The total amount of time allocated for public testimony for each public speakers or for an agenda item may be limited at the Mayor's discretion, depending on the number of speakers or the length of the agenda. (California Government Code Section 54954.3; Council Policy 0-37)

o To assist you in tracking your speaking time, there is a display on the podium. The green light turns on when you begin speaking; the yellow light turns on when you have 30 seconds left; and the red light turns on when your speaking time is up.

Please be advised that, by law, the City Council is unable to discuss or take action on issues presented during Open Forum. According to State Law (the Brown Act) items must first be noticed on the agenda before any discussion or action.

**The San José City Council meets every Tuesday at 1:30 p.m. and Tuesday at 6 p.m. as needed, unless otherwise noted.  The City Council, or less than a quorum, may adjourn any regular, special or adjourned meeting to a later date, time and place specified in the order of adjournment.  If all members are absent, the City Clerk may declare the meeting adjourned to a stated date, time and place. If you have any questions, please direct them to the City Clerk's staff seated at the tables just below the dais.  Thank you for taking the time to attend today's meeting.  We look forward to seeing you at future meetings.**

**Agendas, Staff Reports and some associated documents for City Council items may be viewed on the Internet at https://www.sanjose.legistar.com/Calendar.aspx.  Council Meetings are televised live and rebroadcast on Channel 26.**

**All public records relating to an open session item on this agenda, which are not exempt from disclosure pursuant to the California Public Records Act, that are distributed to a majority of the legislative body will be available for public inspection at the Office of the City Clerk at San José City Hall, 200 E. Santa Clara Street, Tower 14th Floor, San José, CA 95113 at the same time that the public records are distributed or made available to the legislative body.  Any draft contracts, ordinances and resolutions posted on the Internet site or distributed in advance of the Council meeting may not be the final documents approved by the City Council.  Please go to the Clerk's Records Database https://records.sanjoseca.gov/Pages/Search.aspx for the final document, or you many also contact the Office of the City Clerk at (408) 535-1260 or CityClerk@sanjoseca.gov.**

**American Disability Act: To request an alternative format agenda under the Americans with Disabilities Act for City-sponsored meetings, events or printer materials, please call (408) 535-1260 as soon as possible, but at least three business days before the meeting. Accommodations: Any member of the public who needs accommodations should email the ADA Coordinator at ADA@sanjoseca.gov or by calling (408) 535-8430. The ADA Coordinator will use their best efforts to provide reasonable accommodations to provide as much accessibility as possible while also maintaining public safety in accordance with the City procedure for resolving reasonable accommodation requests.**

**On occasion the City Council may consider agenda items out of order.**

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

## * COVID-19 NOTICE *

Consistent with AB 361 and City of San Jose Resolution Nos. 79485, 80237, 80266, 80290, 80323 and 80343, Councilmembers may be teleconferencing from remote locations.

**How to observe the Meeting (no public comment):**

1) Cable Channel 26,
2) https://www.sanjoseca.gov/news-stories/watch-a-meeting, or
3) https://www.youtube.com/CityofSanJoseCalifornia

**How to submit written Public Comment before the City Council Meeting:**

1) Use the eComment tab located on the City Council Agenda page. eComments are also directly sent to the ilegislate application used by City Council and staff.
2) By email to city.clerk@sanjoseca.gov by 10:00 a.m. the day of the meeting. Those emails will be attached to the Council Item under "Letters from the Public." Please identify the Agenda Item Number in the subject line of your email.

**How to submit written Public Comment during the City Council Meeting:**

1) Email during the meeting to councilmeeting@sanjoseca.gov, identifying the Agenda Item Number in the email subject line. Comments received will be included as a part of the meeting record but will not be read aloud during the meeting.

**How to provide spoken Public Comment during the City Council Meeting:**

1) By Phone: (888) 475 4499. Webinar ID is 993 4684 3938. Click *9 to raise a hand to speak.  Click *6 to unmute when called.
Alternative phone numbers are: US: +1 (213) 338-8477 or +1 (408) 638-0968 or (877) 853-5257 (Toll Free)
2) Online at: https://sanjoseca.zoom.us/j/99346843938
a. Use a current, up-to-date browser: Chrome 30+, Firefox 27+, Microsoft Edge 12+, Safari 7+. Certain functionality may be disabled in older browsers including Internet Explorer. Mute all other audio before speaking.  Using multiple devices can cause an audio feedback.
b. Enter an email address and name. The name will be visible online and will be used to notify you that it is your turn to speak.
c. When the Mayor calls for the item on which you wish to speak, click on "raise hand." Speakers will be notified shortly before they are called to speak.
d. When called, please limit your remarks to the time limit allotted.

• Call to Order and Roll Call

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

9:30 a.m.-  Closed Session

22-007          Closed Session Agenda

**Attachments**    Closed Session Agenda

1:30 p.m.-  Regular Session

6:00 p.m.-  Evening Session - Cancelled (The item for 6pm is on the afternoon agenda, and NOT CANCELLED)

*The previously scheduled Evening Session has been cancelled.

- ## Pledge of Allegiance

- ## Invocation (District 1)

   Brandon Luu, Board Member, San José Poetry Center

- ## Orders of the Day
                         To be heard after Ceremonial Items

   **Items recommended to be added, dropped, or deferred are usually approved under Orders of the Day unless the Council directs otherwise.**

- ## Closed Session Report
                         To be heard after Ceremonial Items

## 1.  CEREMONIAL ITEMS

1.1  Presentation of a proclamation recognizing January 25, 2022 as International Holocaust Remembrance Day. (Jimenez)

1.2  Presentation of a proclamation declaring January 24, 2022 as International Day of Education. (Peralez)

## 2.  CONSENT CALENDAR

**Notice to the public: There will be no separate discussion of Consent Calendar items as they are considered to be routine by the City Council and will be adopted by one motion. If a member of the City Council requests discussion on a particular item, that item may be removed from the Consent Calendar and considered separately.**

City Council                              **Amended Agenda**                              January 25, 2022

---

### 2.1  Approval of City Council Minutes.

22-092          **Approval of City Council Minutes.**

**Recommendation:**   (a) City Council Special Meeting - Climate Smart San José Minutes of
November 8, 2021.
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
and Annual Reports, and Informational Memos that involve no
approvals of any City action.

Attachments    (a) 11/8/2021 CC SM Draft Minutes

### 2.2  Final Adoption of Ordinances.

22-044          **Final Adoption of Ordinances.**

**Recommendation:**   (a) Ordinance No. 30712 - An Ordinance of the City of San José
Rezoning Certain Real Property of Approximately 2.77 Gross Acres
Situated on the South Side of East Santa Clara Street, East of South
26th Street, and North of Shortridge Avenue (1260 East Santa Clara
Street; APNs: 467-33-001, 467-33-002, 467-33-003, 467-33-004,
467-33-006, 467-33-007, and 467-33-008) from the CG Commercial
General Zoning District and LI Light Industrial Zoning District to a
CP(PD) Planned Development Zoning District.
[Passed for Publication on 1/11/2022 - Item 10.2(b) (21-2649)]
(b) Ordinance No. 30713 - An Ordinance of the City of San José
Rezoning Certain Real Property of Approximately 0.69 Gross Acre
Situated on the East Side of South Winchester Boulevard
Approximately 270 Feet South of Fireside Drive (1212-1224 South
Winchester Boulevard) (APNs: 279-17-020 & 279-17-021) from the
R-1-8 Single-Family Residence Zoning District to the CP Commercial
Pedestrian Zoning District.
[Passed for Publication on 1/11/2022 - Item 10.3(b) (21-2650)]

### 2.3  Approval of Council Committee Minutes.

City Council                          **Amended Agenda**                          January 25, 2022

22-093              **Approval of Council Committee Minutes.**

**Recommendation:**     (a) Special Neighborhood Services and Education Committee Meeting
                        Minutes of November 4, 2021.
                        (b) Regular Neighborhood Services and Education Committee Meeting
                        Minutes of December 9, 2021.
                        (c) Regular Neighborhood Services and Education Committee Meeting
                        Minutes of January 13, 2022.
                        (d) Joint County of Santa Clara/Public Safety, Finance and Strategic
                        Support Committee Special Meeting - Gender-Based Violence and Child
                        Sexual Abuse Minutes of November 5, 2021.
                        (e) Regular Public Safety, Finance and Strategic Support Committee
                        Meeting Minutes of November 18, 2021.
                        (f) Regular Public Safety, Finance and Strategic Support Committee
                        Meeting Minutes of December 16, 2021.
                        (g) Regular Joint Meeting for the Rules and Open Government
                        Committee and Committee of the Whole Meeting Minutes of November
                        17, 2021.
                        (h) Regular Joint Meeting for the Rules and Open Government
                        Committee and Committee of the Whole Meeting Minutes of December
                        1, 2021.
                        (i) Regular Joint Meeting for the Rules and Open Government
                        Committee and Committee of the Whole Meeting Minutes of December
                        8, 2021.
                        (j) Regular Joint Meeting for the Rules and Open Government
                        Committee and Committee of the Whole Meeting Minutes of January 5,
                        2022.
                        (k) Regular Joint Meeting for the Rules and Open Government
                        Committee and Committee of the Whole Meeting Minutes of January
                        12, 2022.
                        (l) Regular Community and Economic Development Committee
                        Meeting Minutes of November 22, 2021.
                        (m) Regular Smart Cities and Service Improvements Committee
                        Meeting Minutes of December 2, 2021.
                        (n) Regular Transportation and Environment Committee Meeting
                        Minutes of December 6, 2021.
                        CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
                        Annual Reports, and Informational Memos that involve no approvals of
                        any City action.

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

| | |
|---|---|
| **Attachments** | (a) 11/04/2021 NSE Minutes |
| | (b) 12/09/2021 NSE Minutes |
| | (c) 1/13/2022 NSE Minutes |
| | (d) 11/05/2021 Special Joint SCC/PSFSS |
| | (e) 11/18/2021 PSFSS Minutes |
| | (f) 12/16/2021 PSFSS Minutes |
| | (g) 11/17/2021 ROGC Minutes |
| | (h) 12/01/2021 ROGC Minutes |
| | (i) 12/08/2021 ROGC Minutes |
| | (j) 01/05/2022 ROGC Minutes |
| | (k) 01/12/2022 ROGC Minutes |
| | (l) 11/22/2021 CED Minutes |
| | (m) 12/02/2021 Smart Cities Minutes |
| | (n) 12/06/2021 T&E Minutes |

**2.4  Mayor and Council Excused Absence Requests.**

**2.5  City Council Travel Reports.**

**2.6  Report from the Council Liaison to the Retirement Boards.**

**2.7**   22-022   **Calling for Municipal Elections on June 7, 2022 and November 8, 2022.**

**Recommendation:**   Adopt a resolution calling for a Regular Municipal Election on June 7, 2022 and a Run-Off Municipal Election on November 8, 2022, if necessary, for the purpose of electing a Mayor and Council Members for Districts 1, 3, 5, 7, and 9 and requesting consolidation with the County of Santa Clara.
CEQA: Not a Project, File No. PP17-008, General Procedure and Policy Making resulting in no changes to the physical environment. (City Clerk)

**Attachments**   Memorandum
Resolution

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**2.8**     22-025     **Retroactive Approval of City Hall Tower and Rotunda Lighting Events During January 2022 and February 2022 in Colors Associated with the Celebration of Dr. Martin Luther King Jr. Day, and Tet Vietnamese and Chinese New Year Festivals.**

**Recommendation:**     Retroactively approve City Hall Tower and Rotunda lighting scheduled from January 2, 2022 through February 12, 2022 in colors associated with the celebration of Martin Luther King Jr. Day, and Tết Vietnamese and Chinese New Year festivals as a Ceremonial Item.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (City Manager)

     **Attachments**     Memorandum

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**2.9**   22-026   **Actions Related to California Volunteers for the CaliforniansForAll Youth Workforce Development Program.**

**Recommendation:**   (a) Adopt a resolution authorizing the City Manager to:
 (1) Accept the $13,976,741 grant from California Volunteers for the CaliforniansForAll Youth Workforce Development initiative to continue and expand the Resilience Corps Program; and
 (2) Negotiate and execute any documents necessary to accept the grant.
(b) Adopt the following 2021-2022 Funding Sources Resolution and Appropriation Ordinance Amendments in the General Fund:
 (1) Increase the estimate for Revenue from Federal Government appropriation by $1,911,903; and
 (2) Establish the CaliforniansForAll Youth Workforce Program City-wide appropriation to the Office of Economic Development and Cultural Affairs in the amount of $1,911,903.
(c) Adopt a resolution authorizing the City Manager to negotiate and execute agreements with San Jose Conservation Corps, San Jose Public Library Foundation, and as needed to Keep Coyote Creek Beautiful, Trash Punx, Our City Forest, Veggielution, San Jose Downtown Association, Goodwill of Silicon Valley and Guadalupe River Park Conservancy to implement the program in a combined amount not to exceed the grant award.
CEQA: Not a Project, File No. PP17-010, City Organizational and Administrative Activities resulting in no changes to the physical environment. (Economic Development and Cultural Affairs/City Manager)

**Attachments**   Memorandum
Resolution

City Council                     Amended Agenda                     January 25, 2022

**2.10**   22-027        **Actions Related to the Purchase Orders for Trucking and Debris and Asphalt Hauling Services.**

**Recommendation:**    Adopt a resolution authorizing the City Manager to:
(a) Execute purchase orders with One Stop, Inc. dba San José Transport (Gilroy, CA), 101 Trucking, Inc, (Gilroy, CA), and Alviso Rock, Inc (Alviso, CA) for trucking and debris and asphalt hauling services for an initial twelve-month period, starting on or about January 26, 2022 and ending on or about January 25, 2023, for a total cumulative compensation not-to exceed amount of $593,000; and
(b) Exercise up to four additional one-year options to extend the initial term of the purchase orders with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment.
(Finance)

**Attachments**    Memorandum

TPAC Supplemental Memorandum, 1/14/2022

**2.11**   22-028        **Actions Related to the Purchase Orders for Elgin Crosswing and Broom Bear Street Sweeper Rental Services.**

**Recommendation:**    Adopt a resolution authorizing the City Manager to:
(a) Execute purchase orders with Owen Equipment Sales, Inc. (Fairfield, CA) and Municipal Maintenance Equipment, Inc. (Sacramento, CA) for Elgin Crosswing and Broom Bear street sweeper rental services for an initial twelve-month period, starting on or about January 26, 2022 and ending on or about January 25, 2023 for a combined maximum not-to exceed compensation of $500,000; and
(b) Exercise up to four additional one-year options to extend the initial term of the purchase orders with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended resulting in no physical changes to the environment.
(Finance)

**Attachments**    Memorandum

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**2.12**   22-029   **Actions Related to the Purchase Order with Carahsoft Technology Corp., for a Capital Project Management System.**

**Recommendation:**   Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with Carahsoft Technology Corp. (Reston, VA) to provide a capital project management system for the Department of Public Works, including related professional services such as implementation, training, maintenance, and support, for a maximum compensation not to exceed $139,090 during the initial one-year term beginning on or about January 26, 2022 through January 31, 2023; and
(b) Exercise up to five additional one-year options to extend the term of the purchase order through January 31, 2028, subject to the appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance)

**Attachments**   Memorandum

**2.13**   22-030   **Actions Related to the Purchase Order with Geveko Markings, Inc. for Preformed Thermoplastic Pavements Striping Materials.**

**Recommendation:**   Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with Geveko Markings, Inc. (Gainesville, GA) for preformed thermoplastic pavement striping materials for a twelve-month period, starting on or about January 26, 2022 and ending on January 11, 2023, for an amount not to exceed $935,868; and
(b) Exercise up to four additional one-year options to extend the initial term of the purchase order with the last option year ending on or about January 25, 2027, subject to the appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance)

**Attachments**   Memorandum

City Council | **Amended Agenda** | January 25, 2022

**2.14**   22-031   **Actions Related to the Purchase Order with R.A.C. Services, LLC for Enhanced Maintenance and Ambassador Services at St. James Park.**

**Recommendation:**   Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with R.A.C. Services, LLC (Gilroy, CA) for enhanced maintenance and ambassador services at St. James Park for an initial twelve-month period starting on or about January 26, 2022 and ending on or about January 25, 2023, for an amount not-to exceed $125,000; and
(b) Exercise up to four additional one-year options to extend the initial term of the purchase order with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance)

**Attachments**   Memorandum

**2.15**   22-032   **Amendment to the Turnkey Parkland and Excess Credit Agreement for the Flea Market Project.**

**Recommendation:**   Approve the First Amendment to the "Turnkey Parkland and Excess Credit Agreement" to:
(a) Allow for a one-time payment of $4,072,599.32 to the City to fund and pursue construction of phase one improvements of Bruzzone Park and Mercado Park; and
(b) Confirm excess credits (to be applied toward future development in the Flea Market South).
CEQA: Environmental Impact Report for the Flea Market Planned Development Rezoning and General Plan Amendment and addenda thereto, File No. PDC03-108 and GP06-04-01, City Council Resolution No. 73956 and 73738. Council District 4. (Parks, Recreation and Neighborhood Services)

**Attachments**   Memorandum
Agreement

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**2.16**   22-033   **Master Agreements with IMEG Corp., Salas O'Brien Engineers Inc., and Advance Design Consultants Inc. for Mechanical, Electrical and Plumbing Consultant Services.**

**Recommendation:**   Approve master consultant agreements with IMEG Corp., Salas O'Brien Engineers, Inc., and Advance Design Consultants, Inc for mechanical, electrical, and plumbing consultant services, from the date of execution through December 31, 2024, in a total amount not to exceed $1,000,000 for each agreement, subject to the appropriation of funds.

CEQA: Not a Project, File No. PP17-002, Consultant services for design, study, inspection, or other professional services with no commitment to future action. (Public Works)

**Attachments**   Memorandum

Agreement - IMEG Corp

Agreement - Salas O'Brien Engineers

Agreement - Advance Design Consultants

**2.17**   22-034   **Actions Related to the 9112 - All Inclusive Rotary PlayGarden Project.**

**Recommendation:**   (a) Report on bids and award of construction contract for the 9112 - All Inclusive Rotary PlayGarden Project to the low bidder, Redwood Engineering Construction, Inc., for the base bid in the amount of $1,698,000 and approve a ten percent contingency in the amount of $169,800.

(b) Adopt the following Appropriation Ordinance amendments in the Subdivision Park Trust Fund:

(1) Increase the All Inclusive Rotary PlayGarden Project appropriation to the Parks, Recreation and Neighborhood Services Department in the amount of $816,000; and

(2) Decrease the Matching Grant Reimbursement Reserve by $816,000.

CEQA: Categorically Exempt, File No. PP19-002, CEQA Guidelines Section 15301 Existing Facilities. Council District 3. (Public Works/Parks, Recreation and Neighborhood Services/City Manager)

**Attachments**   Memorandum

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**2.18**  [22-052](#)  **Retroactive Approval of Summerdale Dumpster Day Sponsored by Council District 4 as a City Council Sponsored Special Event to Expend City Funds and Accept Donations of Materials and Services for the Event.**

**Recommendation:** As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Summerdale Dumpster Day scheduled on January 22, 2022 as a City Council sponsored Special Event and approve the expenditure of funds; and
(b) Approve and accept donations from various individuals, businesses, or community groups to support the event.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (Cohen)
[Rules Committee referral 1/12/2022 - Item G.1.a]

**Attachments**  [Memorandum](#)

**2.19**  [22-056](#)  **Retroactive Approval of Fiesta Navideña Sponsored by Council District 5 as a City Council Sponsored Special Event to Expend City Funds and Accept Donations of Materials and Services for the Event.**

**Recommendation:** As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Fiesta Navideña scheduled on December 4, 2021 as a City Council sponsored Special Event and approve the expenditure of funds; and
(b) Approve and accept donations from various individuals, businesses, or community groups to support the event.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (Carrasco)
[Rules Committee referral 1/12/2022 - Item G.1.b]

**Attachments**  [Memorandum](#)

City Council                              **Amended Agenda**                          January 25, 2022

---

**2.20**    22-063          **Retroactive Approval of Multiple Special Events Sponsored by Council District 2 as City Council Sponsored Special Events to Expend City Funds and Accept Donations of Materials and Services for the Events.**

**Recommendation:**          As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Walnut Mobile Home Park Toy Drive held on December 22, 2021 as a City Council sponsored Special Event.
(b) Retroactively approve the Southside Community Center Rotary Senior Luncheon held on December 3, 2021 as a City Council sponsored Special Event.
(c) Retroactively approve the Cottle to Lean Neighborhood Dumpster Day held on November 13, 2021 as a City Council sponsored Special Event.
(d) Approve the expenditure of District 2 office budget funds to purchase gift cards, toys and other materials for the events; and
(e) Approve and accept donations from various individuals, businesses, or community groups to support the event.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (Jimenez)
[Rules Committee referral 1/12/2022 - Item G.1.c]

   **Attachments**      Memorandum

**2.21**    22-079          **Boards and Commissions Appointment.**

**Recommendation:**          Approve the following Boards and Commissions appointment:
(a) Arts Commission:
 (1) Citywide Seat: Jannet Peace to a term ending June 30, 2024.
CEQA: Not a Project, File No. PP17-010, City Organizational and Administrative Activities resulting in no changes to the physical environment. (City Clerk)
[Rules Committee referral 1/19/2022 - Item A.1.a]

   **Attachments**      Memorandum
                        Conflicts of Interest Memorandum
                        Application

# 3.  STRATEGIC SUPPORT

**3.1  Report of the City Manager, Jennifer Maguire (Verbal Report)**

---

City Council                                    **Amended Agenda**                                    January 25, 2022

---

22-035          (a) City Manager's COVID-19 Update (Verbal Report).
                (b) City Manager's Report on Other City Matters (Verbal Report).

**Attachments**   Presentation - est. 20 minutes

**3.2  Labor Negotiations Update.**

                Accept Labor Negotiations Update.
                TO BE HEARD AT 9:30 A.M.

**3.3**   22-036          **Annual Report on City Services 2020-2021**.

**Recommendation:**   Accept the Annual Report on City Services for 2020-2021.
                CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
                Annual Reports, and Informational Memos that involve no approvals of
                any City action. (City Auditor)

**Attachments**   Annual Report

                Presentation - est. 15 minutes

**3.4**   22-013          **Appeals Hearing Board Interview.**

**Recommendation:**   Interview applicant for appointment to the Appeals Hearing Board:
                (a) Appoint applicant to one of the vacant seats on the Appeals Hearing
                Board for a full term from January 1, 2022 to December 31, 2025;
                (b) If any vacancy remains, direct the City Clerk to continue
                recruitment efforts and bring forward additional applicants for
                consideration within 90 days.
                CEQA: Not a Project, File No. PP17-010, City Organizational and
                Administrative Activities resulting in no changes to the physical
                environment. (City Clerk)

**Attachments**   Memorandum

                Conflicts of Interest Memorandum

                Application

---

City Council | Amended Agenda | January 25, 2022
--- | --- | ---

**3.5** [22-037](#)      **Definition of Racial Equity.**

**Recommendation:**      Adopt a resolution accepting the proposed definition of racial equity:
"Both a process and an outcome, racial equity is designed to center
anti-racism, eliminate systemic racial inequities, and rooted in the
acknowledgement of the City of San Jose's historical and existing
practices that have led to discrimination and injustices to Black,
Indigenous, Latino/a/x, Asian, and Pacific Islander communities.
The racial equity process is an explicit, intentional, and continual
practice of prioritizing psychologically safe spaces and a sense of
belonging for racial groups that have been most negatively impacted in
policies and practices. It is action that prioritizes liberation and
measurable change, and centers lived experiences of all impacted racial
groups.
As an outcome, racial equity is achieved when race can no longer be
used to predict life outcomes, and everyone can prosper and thrive."
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
Annual Reports, and Informational Memos that involve no approvals of
any City action. (City Manager)

**Attachments**      [Memorandum](#)

[Resolution](#)

[Presentation - est. 5 minutes](#)

[Letters from the Public](#)

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**3.6**   22-038   **SJC Guadalupe Gardens Fencing Project and Temporary Closure of Spring Street and Asbury Streets. - DEFERRED**

**Recommendation:**   (a) Accept report on Guadalupe Gardens Fencing including security and activation measures and authorize the City Manager to:
 (1) Execute a pilot program to limit trail access to unauthorized vehicles on Guadalupe River Park trail;
 (2) Develop a Request for Proposals for potential programming and stewardship partners for the Guadalupe Gardens area;
 (3) Receive feedback on the Prototype Park Concept Plan; and
 (4) Allocate the SJC Guadalupe Gardens Fencing Project fund in the amount of $1,500,000 for protecting the land and authorized uses.
(b) Adopt a resolution delegating authority to the Director of Public Works to award the construction contract for the 9821 - SJC Guadalupe Gardens Fencing Project, in an amount not greater than $1,500,000.
CEQA: Categorically Exempt, File No. ER21-005, CEQA Guidelines 15303(e). New Construction or Conversion of Small Structures and PP17-007, Preliminary direction to staff and eventual action requires approval from decision-making body. (Airport/Parks, Recreation and Neighborhood Services/Public Works/Transportation/City Manager)
DEFERRED TO 2/8/2022 PER ADMINISTRATION

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**3.7**   22-039   **Report on Procurement of Insurance Products for Continuation of an Owner-Controlled Insurance Program for the San Jose-Santa Clara Regional Wastewater Facility.**

**Recommendation:**   Adopt a resolution authorizing the Director of Finance to:
(a) Purchase insurance policies for the San José-Santa Clara Regional Wastewater Facility Capital Improvement Program with total cost not to exceed $7,221,283 including estimated insurance premiums of $4,661,872 and a total maximum deductible $2,559,411, as well as a cash collateral fund of $1,496,471 with premiums to be paid in four (4) annual installments, and subject to the annual appropriation of funds, as follows:
(1) Federal Insurance Company: Commercial General Liability Insurance and Workers' Compensation Insurance with a Program Agreement Endorsement stipulating terms of the cash collateral fund management;
(2) Allied World Assurance Company, Inc.: Commercial Excess Liability Insurance;
(3) Endurance Risk Solutions Assurance Company: Commercial Excess Liability Insurance;
(4) Liberty Surplus Insurance Corporation: Commercial Excess Liability Insurance;
(5) Great American Assurance Company: Commercial Excess Liability Insurance;
(6) Westchester Surplus Lines Insurance Company: Commercial Excess Liability Insurance;
(7) Ironshore Specialty Insurance Company: Contractors Pollution Liability Insurance;
(8) Berkley Assurance Company: Owners Protective Professional Liability Insurance; and
(b) Either renew an existing, or secure quotes and purchase a new, Master Builder's Risk Insurance policy with special endorsement for Flood to provide builder's risk coverage through 2026 as necessary, with a projected $906,000 in premiums, the cost of which is included in the estimated insurance premiums above.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance/Environmental Services)

**Attachments**   Memorandum
TPAC Supplemental Memorandum, 1/14/2022
Resolution

City Council                                    Amended Agenda                                    January 25, 2022

# 4.  PUBLIC SAFETY SERVICES

**4.1**  22-045                **Gun Harm Reduction Ordinance. - TO BE HEARD AT 6:00 P.M.**

**Recommendation:**    Consider approving an ordinance amending Title 10 of the San José
                       Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by
                       requiring gun owners to obtain and maintain liability insurance and to
                       provide for a fee to apply to gun harm reduction programs.
                       CEQA: Not a Project, File No. PP17-008, General Procedure and
                       Policy Making resulting in no changes to the physical environment.
                       (City Attorney)
                       TO BE HEARD AT 6:00 P.M.

**Attachments**    Memorandum
                   Supplemental Memorandum, 1/19/2022
                   Supplemental Memorandum, 1/21/2022
                   Replacement Supplemental Memorandum, 1/24/2022
                   Memorandum from Davis, 1/21/2022
                   Memorandum from Liccardo, Jones, Cohen & Carrasco, 1/21/2022
                   Memorandum from Peralez, 1/21/2022
                   Memorandum from Arenas, 1/25/2022
                   Ordinance
                   Letters from the Public - 1 of 12
                   Letters from the Public - 2 of 12
                   Letters from the Public - 3 of 12
                   Letters from the Public - 4 of 12
                   Letters from the Public - 5 of 12
                   Letters from the Public - 6 of 12
                   Letters from the Public - 7 of 12
                   Letters from the Public - 8 of 12
                   Letters from the Public - 9 of 12
                   Letters from the Public - 10 of 12
                   Letters from the Public - 11 of 12
                   Letters from the Public - 12 of 12
                   eComments Final

# 5.  TRANSPORTATION & AVIATION SERVICES

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**5.1**  [22-040](#)   **Amendment to the Agreements for On-Call Architectural and Engineering Consultant Services.**

**Recommendation:**   Adopt a resolution authorizing the City Manager to negotiate and execute:

(a) An amendment to the Kimley-Horn and Associates, Inc.'s existing On-Call Architectural and Engineering Consultant Services Master Agreement at Norman Y. Mineta San José International Airport (SJC and Airport) to increase the maximum compensation by $2,300,000; and

(b) An amendment to the Jviation, Inc.'s existing On-Call Architectural and Engineering Consultant Services Master Agreement at Norman Y. Mineta San José International Airport to decrease maximum compensation by $2,300,000.

CEQA: Not a Project, File No. PP17-002, Consultant services for design/study/ inspection, or other professional services with no commitment to future action. (Airport)

**Attachments**   [Memorandum](#)

**5.2**  [22-041](#)   **Community Forest Management Plan.**

**Recommendation:**   Adopt a resolution approving the Community Forest Management Plan. CEQA: Not a Project, File No. PP17-002, Consultant services for design, study, inspection, or other professional services with no commitment to future action. (Transportation)
[Deferred from 12/14/2021 - Item 5.1 (21-2567)]

**Attachments**   [Memorandum](#)
[Attachment A - Community Forest Management Plan](#)
[Attachment B - Strategic Plan](#)
[Memorandum from Liccardo, Carrasco, Davis, Esparza, Cohen, 1](#)
[Memorandum from Mahan, 1/25/2022](#)
[Resolution](#)
[Presentation - est. 15 minutes](#)
[Letters from the Public - 1 of 2](#)
[Letters from the Public - 2 of 2](#)

# 6.  ENVIRONMENTAL & UTILITY SERVICES

# 7.  NEIGHBORHOOD SERVICES

City Council                     **Amended Agenda**                     January 25, 2022

---

# 8.  COMMUNITY & ECONOMIC DEVELOPMENT

**8.1**   <u>22-042</u>      **Approval of a Downtown High-Rise Residential Tax and Fee Waiver for the Carlysle at 51 Notre Dame Street.**

<u>**Recommendation:**</u>    Conduct a public hearing to approve an economic development tax and fee waiver in connection with a reduction in construction taxes and the Affordable Housing Impact Fee for a downtown residential high-rise at 51 Notre Dame Street in the amount of $4,390,599 pursuant to California Government Code Section 53083 and Open Government Resolution No. 77135 Section 2.3.2.6.C.
CEQA: Addendum to the Downtown Strategy 2040 Final Environmental Impact Report and addenda thereto, Planning File No. SP20-020. Council District 3. (Economic Development and Cultural Affairs/Housing)

**Attachments**    <u>Memorandum</u>

<u>Memorandum from Peralez, 1/24/2022</u>

<u>Presentation - est. 5 minutes</u>

<u>Letters from the Public</u>

# 9.  REDEVELOPMENT – SUCCESSOR AGENCY

# 10.  LAND USE

**Notice to the public:  There will be no separate discussion of Land Use Consent Calendar (Item 10.1) as they are considered to be routine by the City Council and will be adopted by one motion. If a member of the City Council requests discussion on a particular item, that item will be removed from the Land Use Consent Calendar (Item 10.1) and considered separately.**

**10.1  Land Use on Consent Calendar**

---

| City Council | Amended Agenda | January 25, 2022 |
|---|---|---|

**(a)**   22-043   **Reorganization/Detachment from the City of San José of Approximately 9.56-Gross Acres Consisting of Two Parcels Located on the Easterly Side of Saratoga Creek Along Lawrence Expressway Between Highway 280 and Bollinger Road (Doyle No. 7). - TO BE HEARD IMMEDIATELY AFTER CONSENT**

**Recommendation:**   Adopt a resolution supporting the reorganization of territory designated as Doyle No. 7 which involves detachment from the City of San José of approximately 9.56 gross acres of land located at the easterly side of Saratoga Creek along Lawrence Expressway between Highway 280 and Bollinger Road, and the detachment of the same from the affected special districts.
CEQA: Categorically Exempt, File No. ER22-004, CEQA Guidelines Section 15305 Minor Alterations in Land Use Limitations. Council District 1. (Planning, Building and Code Enforcement)
TO BE HEARD IMMEDIATELY AFTER CONSENT

**Attachments**   Memorandum
Resolution

**END OF CONSENT CALENDAR**

**10  Land Use - Regular Agenda**

• Open Forum

Members of the Public are invited to speak on any item that does not appear on today's Agenda and that is within the subject matter jurisdiction of the City Council.

• Adjournment

### CITY OF SAN JOSE CODE OF CONDUCT FOR PUBLIC MEETINGS IN
### THE COUNCIL CHAMBERS AND COMMITTEE ROOMS

The Code of Conduct is intended to promote open meetings that welcome debate of public policy issues being discussed by the City Council, their Committees, and City Boards and Commissions in an atmosphere of fairness, courtesy, and respect for differing points of view.

1. Public Meeting Decorum:

a) Persons in the audience will refrain from behavior which will disrupt the public meeting. This will include making loud noises, clapping, shouting, booing, hissing or engaging in any other activity in a manner that disturbs, disrupts or impedes the orderly conduct of the meeting.
b) Persons in the audience will refrain from creating, provoking or participating in any type of disturbance involving unwelcome physical contact.
c) Persons in the audience will refrain from using cellular phones and/or pagers while the meeting is in session.
d) Appropriate attire, including shoes and shirts are required in the Council Chambers and Committee Rooms at all times.
e) Persons in the audience will not place their feet on the seats in front of them.
f) No food, drink (other than bottled water with a cap), or chewing gum will be allowed in the Council Chambers and Committee Rooms, except as otherwise pre-approved by City staff.
g) All persons entering the Council Chambers and Committee Rooms, including their bags, purses, briefcases and similar belongings, may be subject to search for weapons and other dangerous materials.

2. Signs, Objects or Symbolic Material:

a) Objects and symbolic materials, such as signs or banners, will be allowed in the Council Chambers and Committee Rooms, with the following restrictions: § No objects will be larger than 2 feet by 3 feet.
    -No sticks, posts, poles or other such items will be attached to the signs or other symbolic materials.
    -The items cannot create a building maintenance problem or a fire or safety hazard.

b) Persons with objects and symbolic materials such as signs must remain seated when displaying them and must not raise the items above shoulder level, obstruct the view or passage of other attendees, or otherwise disturb the business of the meeting.
c) Objects that are deemed a threat to persons at the meeting or the facility infrastructure are not allowed. City staff is authorized to remove items and/or individuals from the Council Chambers and Committee Rooms if a threat exists or is perceived to exist. Prohibited items include, but are not limited to: firearms (including replicas and antiques), toy guns, explosive material, and ammunition; knives and other edged weapons; illegal drugs and drug paraphernalia; laser pointers, scissors, razors, scalpels, box cutting knives, and other cutting tools; letter openers, corkscrews, can openers with points, knitting needles, and hooks; hairspray, pepper spray, and aerosol containers; tools; glass containers; and large backpacks and suitcases that contain items unrelated to the meeting.

City Council                          **Amended Agenda**                          January 25, 2022

**CITY OF SAN JOSE CODE OF CONDUCT FOR PUBLIC MEETINGS IN**
**THE COUNCIL CHAMBERS AND COMMITTEE ROOMS (CONT'D.)**

3. Addressing the Council, Committee, Board or Commission:

a) Persons wishing to speak on an agenda item or during open forum are requested to
   complete a speaker card and submit the card to the City Clerk or other administrative staff
   at the meeting.
b) Meeting attendees are usually given two (2) minutes to speak on any discussion item
   and/or during open forum; the total amount of time allocated for public testimony for each public
   speaker or for an agenda item is in the discretion of the Chair of the meeting
   and may be limited when appropriate. (California Government Code Section 54954.3; Council Policy
   0-37) Applicants and appellants in land use matters are
   usually given more time to speak. Speakers using a translator will be given twice the time allotted
   to ensure non-English speakers receive the same opportunity to directly address the Council,
   Committee, Board or Commission.
c) Speakers should discuss only the agenda item when called to speak for that item, and only topics
   related to City business when called to speak during open forum on the agenda.
d) Speakers' comments should be addressed to the full body. Requests to engage the Mayor,
   Council Members, Board Members, Commissioners or Staff in conversation will not be
   honored. Abusive language is inappropriate.
e) Speakers will not bring to the podium any items other than a prepared written statement,
   writing materials, or objects that have been inspected by security staff.
f) If an individual wishes to submit written information, he or she may give it to the City
   Clerk or other administrative staff at the meeting.
g) Speakers and any other members of the public will not approach the dais at any time without prior
   consent from the Chair of the meeting.

Failure to comply with this Code of Conduct which will disturb, disrupt or impede the orderly conduct of the
meeting may result in removal from the meeting and/or possible arrest.

EXHIBIT "G"



# City Council Meeting SYNOPSIS

## Tuesday, January 25, 2022

**1:30 PM**
**Virtual Meeting - https://sanjoseca.zoom.us/j/99346843938**

SAM LICCARDO, MAYOR
CHAPPIE JONES, VICE MAYOR, DISTRICT 1
SERGIO JIMENEZ, DISTRICT 2
RAUL PERALEZ, DISTRICT 3
DAVID COHEN, DISTRICT 4
MAGDALENA CARRASCO, DISTRICT 5
DEV DAVIS, DISTRICT 6
MAYA ESPARZA, DISTRICT 7
SYLVIA ARENAS, DISTRICT 8
PAM FOLEY, DISTRICT 9
MATT MAHAN, DISTRICT 10



## * COVID-19 NOTICE *

Consistent with AB 361 and City of San Jose Resolution Nos. 79485, 80237, 80266, 80290, 80323 and 80343, Councilmembers will be teleconferencing from remote locations.

## • Call to Order and Roll Call

9:30 a.m.- Closed Session

**22-007**　　　　Closed Session Agenda

1:30 p.m.- Regular Session:　　　Carrasco, Arenas, Davis, Mahan, Jimenez, Jones, Cohen, Esparza, Peralez, Foley; Liccardo.

　Absent: Councilmembers　-　All Present.

6:00 p.m.- Evening Session - Cancelled

## • Pledge of Allegiance

Mayor Sam Liccardo led the Pledge of Allegiance.

## • Invocation (District 1)

Brandon Luu, Board Member, San José Poetry Center, offered an original poem "Fruit" and spoke to art as an outlet.

## • Orders of the Day

The Orders of the Day and the Amended Agenda were approved with no changes required.

## • Closed Session Report

None provided.

## 1.  CEREMONIAL ITEMS

1.1 Councilmember Sergio Jimenez offered a proclamation recognizing January 25, 2022 as International Holocaust Remembrance Day; he introduced Boris Kaplevich, a survivor of the holocaust, who shared his personal story and was honored for his courage, activism and strength.

# 1. CEREMONIAL ITEMS (Cont'd.)

1.2 Councilmember Raul Peralez declared January 24, 2022 as International Day of Education, honoring all who are passionate advocates for students and presented a proclamation to Patrick Bernhardt, San José teachers' Association.

# 2. CONSENT CALENDAR

The Consent Calendar was approved and the below listed actions were taken as indicated. (11-0.)

**2.1  22-092**          **Approval of City Council Minutes.**

(a) City Council Special Meeting - Climate Smart San José Minutes of November 8, 2021.
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments, and Annual Reports, and Informational Memos that involve no approvals of any City action.

Action: Council Minutes were accepted. (11-0.)

**2.2  22-044**          **Final Adoption of Ordinances.**

(a) Ordinance No. 30712 - An Ordinance of the City of San José Rezoning Certain Real Property of Approximately 2.77 Gross Acres Situated on the South Side of East Santa Clara Street, East of South 26th Street, and North of Shortridge Avenue (1260 East Santa Clara Street; APNs: 467-33-001, 467-33-002, 467-33-003, 467-33-004, 467-33-006, 467-33-007, and 467-33-008) from the CG Commercial General Zoning District and LI Light Industrial Zoning District to a CP(PD) Planned Development Zoning District.
[Passed for Publication on 1/11/2022 - Item 10.2(b) (21-2649)]
(b) Ordinance No. 30713 - An Ordinance of the City of San José Rezoning Certain Real Property of Approximately 0.69 Gross Acre Situated on the East Side of South Winchester Boulevard Approximately 270 Feet South of Fireside Drive (1212-1224 South Winchester Boulevard) (APNs: 279-17-020 & 279-17-021) from the R-1-8 Single-Family Residence Zoning District to the CP Commercial Pedestrian Zoning District.
[Passed for Publication on 1/11/2022 - Item 10.3(b) (21-2650)]

Action: (a) Ordinance No. 30712 and (b) Ordinance No. 30713 were adopted. (11-0.)

**2.3  22-093**          **Approval of Council Committee Minutes.**

(a) Special Neighborhood Services and Education Committee Meeting Minutes of November 4, 2021.
(b) Regular Neighborhood Services and Education Committee Meeting Minutes of December 9, 2021.
(c) Regular Neighborhood Services and Education Committee Meeting Minutes of January 13, 2022.
(d) Joint County of Santa Clara/Public Safety, Finance and Strategic Support Committee Special Meeting - Gender-Based Violence and Child Sexual Abuse Minutes of November 5, 2021.
(e) Regular Public Safety, Finance and Strategic Support Committee Meeting Minutes of November 18, 2021.
(f) Regular Public Safety, Finance and Strategic Support Committee Meeting Minutes of December 16, 2021.
(g) Regular Joint Meeting for the Rules and Open Government Committee and Committee of the Whole Meeting Minutes of November 17, 2021.
(h) Regular Joint Meeting for the Rules and Open Government Committee and Committee of the Whole Meeting Minutes of December 1, 2021.
(i) Regular Joint Meeting for the Rules and Open Government Committee and Committee of the Whole Meeting Minutes of December 8, 2021.
(j) Regular Joint Meeting for the Rules and Open Government Committee and Committee of the Whole Meeting Minutes of January 5, 2022.
(k) Regular Joint Meeting for the Rules and Open Government Committee and Committee of the Whole Meeting Minutes of January 12, 2022.
(l) Regular Community and Economic Development Committee Meeting Minutes of November 22, 2021.
(m) Regular Smart Cities and Service Improvements Committee Meeting Minutes of December 2, 2021.
(n) Regular Transportation and Environment Committee Meeting Minutes of December 6, 2021.
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments, Annual Reports, and Informational Memos that involve no approvals of any City action.

<u>Action</u>: Council Committee Minutes were accepted. (11-0.)

**2.4  Mayor and Council Excused Absence Requests.**

None provided.

**2.5  City Council Travel Reports.**

None provided.

**2.6  Report from the Council Liaison to the Retirement Boards.**

None provided.

2.7   22-022   **Calling for Municipal Elections on June 7, 2022 and November 8, 2022.**

Adopt a resolution calling for a Regular Municipal Election on June 7, 2022 and a Run-Off Municipal Election on November 8, 2022, if necessary, for the purpose of electing a Mayor and Council Members for Districts 1, 3, 5, 7, and 9 and requesting consolidation with the County of Santa Clara.
CEQA: Not a Project, File No. PP17-008, General Procedure and Policy Making resulting in no changes to the physical environment. (City Clerk)

Action: **Resolution No. 80349** regarding a Regular Municipal Election on June 7, 2022 and a Run-Off Municipal Election on November 8, 2022 was adopted. (11-0.)

2.8   22-025   **Retroactive Approval of City Hall Tower and Rotunda Lighting Events During January 2022 and February 2022 in Colors Associated with the Celebration of Dr. Martin Luther King Jr. Day, and Tet Vietnamese and Chinese New Year Festivals.**
Retroactively approve City Hall Tower and Rotunda lighting scheduled from January 2, 2022 through February 12, 2022 in colors associated with the celebration of Martin Luther King Jr. Day, and Tết Vietnamese and Chinese New Year festivals as a Ceremonial Item.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (City Manager)

Action: The City Sponsored Special Events were retroactively approved. (11-0.)

2.9   22-026   **Actions Related to California Volunteers for the CaliforniansForAll Youth Workforce Development Program.**
(a) Adopt a resolution authorizing the City Manager to:
 (1) Accept the $13,976,741 grant from California Volunteers for the CaliforniansForAll Youth Workforce Development initiative to continue and expand the Resilience Corps Program; and
 (2) Negotiate and execute any documents necessary to accept the grant.
(b) Adopt the following 2021-2022 Funding Sources Resolution and Appropriation Ordinance Amendments in the General Fund:
 (1) Increase the estimate for Revenue from Federal Government appropriation by $1,911,903; and
 (2) Establish the CaliforniansForAll Youth Workforce Program City-wide appropriation to the Office of Economic Development and Cultural Affairs in the amount of $1,911,903.
(c) Adopt a resolution authorizing the City Manager to negotiate and execute agreements with San Jose Conservation Corps, San Jose Public Library Foundation, and as needed to Keep Coyote Creek Beautiful, Trash Punx, Our City Forest, Veggielution, San Jose Downtown

*(Item Continued on the Next Page)*

**2.9**    **(Cont'd.)**

Association, Goodwill of Silicon Valley and Guadalupe River Park Conservancy to implement the program in a combined amount not to exceed the grant award.

CEQA: Not a Project, File No. PP17-010, City Organizational and Administrative Activities resulting in no changes to the physical environment. (Economic Development and Cultural Affairs/City Manager)

Action: (a) **Resolution No. 80350** accepting the grant; (b) Funding Source **Resolution No. 80351** and Appropriation **Ordinance No. 30714** in the General Fund, and (c) **Resolution No. 80352** authorizing the City Manager to negotiate and execute were adopted. (11-0.)

**2.10**    **22-027**    **Actions Related to the Purchase Orders for Trucking and Debris and Asphalt Hauling Services.**

Adopt a resolution authorizing the City Manager to:

(a) Execute purchase orders with One Stop, Inc. dba San José Transport (Gilroy, CA), 101 Trucking, Inc, (Gilroy, CA), and Alviso Rock, Inc (Alviso, CA) for trucking and debris and asphalt hauling services for an initial twelve-month period, starting on or about January 26, 2022 and ending on or about January 25, 2023, for a total cumulative compensation not-to exceed amount of $593,000; and

(b) Exercise up to four additional one-year options to extend the initial term of the purchase orders with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.

CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance)

Action: **Resolution No. 80353** regarding Actions Related to the Purchase Orders for Trucking and Debris and Asphalt Hauling Services was adopted. (11-0.)

**2.11**    **22-028**    **Actions Related to the Purchase Orders for Elgin Crosswing and Broom Bear Street Sweeper Rental Services.**

Adopt a resolution authorizing the City Manager to:

(a) Execute purchase orders with Owen Equipment Sales, Inc. (Fairfield, CA) and Municipal Maintenance Equipment, Inc. (Sacramento, CA) for Elgin Crosswing and Broom Bear street sweeper rental services for an initial twelve-month period, starting on or about January 26, 2022 and ending on or about January 25, 2023 for a combined maximum not-to exceed compensation of $500,000; and

(b) Exercise up to four additional one-year options to extend the initial term of the purchase orders with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.

CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended resulting in no physical changes to the environment. (Finance)

Action: **Resolution No. 80354** regarding Actions Related to the Purchase Orders for Elgin Crosswing and Broom Bear Street Sweeper Rental Services was adopted. (11-0.)

**2.12   22-029          Actions Related to the Purchase Order with Carahsoft Technology Corp.,
for a Capital Project Management System.**
Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with Carahsoft Technology Corp. (Reston,
VA) to provide a capital project management system for the
Department of Public Works, including related professional services
such as implementation, training, maintenance, and support, for a
maximum compensation not to exceed $139,090 during the initial
one-year term beginning on or about January 26, 2022 through January
31, 2023; and
(b) Exercise up to five additional one-year options to extend the term of
the purchase order through January 31, 2028, subject to the
appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New
or Amended) resulting in no physical changes to the environment.
(Finance)

Action: **Resolution No. 80355** regarding Actions Related to the Purchase Order with Carahsoft
Technology Corp., for a Capital Project Management System was adopted. (11-0.)


**2.13   22-030          Actions Related to the Purchase Order with Geveko Markings, Inc. for
Preformed Thermoplastic Pavements Striping Materials.**
Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with Geveko Markings, Inc. (Gainesville,
GA) for preformed thermoplastic pavement striping materials for a
twelve-month period, starting on or about January 26, 2022 and ending
on January 11, 2023, for an amount not to exceed $935,868; and
(b) Exercise up to four additional one-year options to extend the initial
term of the purchase order with the last option year ending on or about
January 25, 2027, subject to the appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New
or Amended) resulting in no physical changes to the environment.
(Finance)

Action: **Resolution No. 80356** regarding Actions Related to the Purchase Order with Geveko
Markings, Inc. for Preformed Thermoplastic Pavements Striping Materials was adopted. (11-0.)

2.14   22-031   **Actions Related to the Purchase Order with R.A.C. Services, LLC for Enhanced Maintenance and Ambassador Services at St. James Park.**
Adopt a resolution authorizing the City Manager to:
(a) Execute a purchase order with R.A.C. Services, LLC (Gilroy, CA) for enhanced maintenance and ambassador services at St. James Park for an initial twelve-month period starting on or about January 26, 2022 and ending on or about January 25, 2023, for an amount not-to exceed $125,000; and
(b) Exercise up to four additional one-year options to extend the initial term of the purchase order with the last option year ending on or about January 25, 2027, subject to the annual appropriation of funds.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance)

Action: **Resolution No. 80357** regarding Actions Related to the Purchase Order with R.A.C. Services, LLC for Enhanced Maintenance and Ambassador Services at St. James Park was adopted. (11-0.)

2.15   22-032   **Amendment to the Turnkey Parkland and Excess Credit Agreement for the Flea Market Project.**
Approve the First Amendment to the "Turnkey Parkland and Excess Credit Agreement" to:
(a) Allow for a one-time payment of $4,072,599.32 to the City to fund and pursue construction of phase one improvements of Bruzzone Park and Mercado Park; and
(b) Confirm excess credits (to be applied toward future development in the Flea Market South).
CEQA: Environmental Impact Report for the Flea Market Planned Development Rezoning and General Plan Amendment and addenda thereto, File No. PDC03-108 and GP06-04-01, City Council Resolution No. 73956 and 73738. Council District 4. (Parks, Recreation and Neighborhood Services)

Action: An Amendment to the Turnkey Parkland and Excess Credit Agreement for the Flea Market Project was approved. (11-0.)

2.16   22-033   **Master Agreements with IMEG Corp., Salas O'Brien Engineers Inc., and Advance Design Consultants Inc. for Mechanical, Electrical and Plumbing Consultant Services.**
Approve master consultant agreements with IMEG Corp., Salas O'Brien Engineers, Inc., and Advance Design Consultants, Inc for mechanical, electrical, and plumbing consultant services, from the date of execution through December 31, 2024, in a total amount not to exceed $1,000,000 for each agreement, subject to the appropriation of funds.
CEQA: Not a Project, File No. PP17-002, Consultant services for design, study, inspection, or other professional services with no commitment to future action. (Public Works)

Action: The Master Agreements were approved. (11-0.)

**2.17    22-034        Actions Related to the 9112 - All Inclusive Rotary PlayGarden Project.**

(a) Report on bids and award of construction contract for the 9112 - All Inclusive Rotary PlayGarden Project to the low bidder, Redwood Engineering Construction, Inc., for the base bid in the amount of $1,698,000 and approve a ten percent contingency in the amount of $169,800.
(b) Adopt the following Appropriation Ordinance amendments in the Subdivision Park Trust Fund:
 (1) Increase the All Inclusive Rotary PlayGarden Project appropriation to the Parks, Recreation and Neighborhood Services Department in the amount of $816,000; and
 (2) Decrease the Matching Grant Reimbursement Reserve by $816,000.
CEQA: Categorically Exempt, File No. PP19-002, CEQA Guidelines Section 15301 Existing Facilities. Council District 3. (Public Works/Parks, Recreation and Neighborhood Services/City Manager)

Action: (a) The report on bids and award of construction contract was approved; and (b) Appropriation **Ordinance No. 30715** in the in the Subdivision Park Trust Fund was adopted. (11-0.)

**2.18    22-052        Retroactive Approval of Summerdale Dumpster Day Sponsored by Council District 4 as a City Council Sponsored Special Event to Expend City Funds and Accept Donations of Materials and Services for the Event.**
As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Summerdale Dumpster Day scheduled on January 22, 2022 as a City Council sponsored Special Event and approve the expenditure of funds; and
(b) Approve and accept donations from various individuals, businesses, or community groups to support the event.
[Rules Committee referral 1/12/2022 - Item G.1.a]

Action: The City Sponsored Special Event was retroactively approved. (11-0.)

**2.19    22-056        Retroactive Approval of Fiesta Navideña Sponsored by Council District 5 as a City Council Sponsored Special Event to Expend City Funds and Accept Donations of Materials and Services for the Event.**
As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Fiesta Navideña scheduled on December 4, 2021 as a City Council sponsored Special Event and approve the expenditure of funds; and
(b) Approve and accept donations from various individuals, businesses, or community groups to support the event.
[Rules Committee referral 1/12/2022 - Item G.1.b]

Action: The City Sponsored Special Event was retroactively approved. (11-0.)

**2.20    22-063         Retroactive Approval of Multiple Special Events Sponsored by Council District 2 as City Council Sponsored Special Events to Expend City Funds and Accept Donations of Materials and Services for the Events.**

As recommended by the Rules and Open Government Committee on January 12, 2022:
(a) Retroactively approve the Walnut Mobile Home Park Toy Drive held on December 22, 2021 as a City Council sponsored Special Event.
(b) Retroactively approve the Southside Community Center Rotary Senior Luncheon held on December 3, 2021 as a City Council sponsored Special Event.
(c) Retroactively approve the Cottle to Lean Neighborhood Dumpster Day held on November 13, 2021 as a City Council sponsored Special Event.
(d) Approve the expenditure of District 2 office budget funds to purchase gift cards, toys and other materials for the events; and
(e) Approve and accept donations from various individuals, businesses, or community groups to support the event.
CEQA: Not a Project, File No. PP17-011, Temporary Special Events resulting in no changes to the physical environment. (Jimenez)
[Rules Committee referral 1/12/2022 - Item G.1.c]

Action: The City Sponsored Special Events were retroactively approved. (11-0.)

**2.21    22-079         Boards and Commissions Appointment.**

Approve the following Boards and Commissions appointment:
(a) Arts Commission:
 (1) Citywide Seat: Jannet Peace to a term ending June 30, 2024.
CEQA: Not a Project, File No. PP17-010, City Organizational and Administrative Activities resulting in no changes to the physical environment. (City Clerk)
[Rules Committee referral 1/19/2022 - Item A.1.a]

Action: The Arts Commission appointment was approved. (11-0.)

# 3.  STRATEGIC SUPPORT

## 3.1 Report of the City Manager, Jennifer Maguire (Verbal Report)

City Manager Jennifer Maguire opened the discussion and spoke on Santa Clara Regional Wastewater Facility tracking of the COVID-19 through analysis of samples. Deputy City Manager, City Manager's Office, Kip Harkness and Director of Civic Innovation, Dolan Beckel offered a COVID-19 Update. Alvin Galang, Vaccination Task Force; Director of Communications, Carolina Camarena and Matt Opsal presented on Communications Outreach; Director of Employee Relations/Human Resources, Jennifer Schembri presented on Hybrid Work/Facilities/Resources; Economic Development Director, Nanci Klein discussed Small Business Recovery; Assistant to the City Manager, Sarah Zárate presented on Budget and Advocacy; Deputy Director, Parks, Recreation and Neighborhood Services, Neil Ruffino offered a presentation on Food Distribution & Childcare; Library Director Jill Bourne discussed Digital Equity; and Director of Housing Jacky Morales-Ferrand offered a presentation on Isolation & Quarantine.

**3.2  Labor Negotiations Update.**

None provided.

**3.3      22-036                Annual Report on City Services 2020-2021**.

Accept the Annual Report on City Services for 2020-2021.
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
Annual Reports, and Informational Memos that involve no approvals of
any City action. (City Auditor)

Action: The Annual Report on City Services 2020-2021 was accepted. (11-0.)

**3.4      22-013                Appeals Hearing Board Interview.**

Interview applicant for appointment to the Appeals Hearing Board:
(a) Appoint applicant to one of the vacant seats on the Appeals Hearing
Board for a full term from January 1, 2022 to December 31, 2025;
(b) If any vacancy remains, direct the City Clerk to continue
recruitment efforts and bring forward additional applicants for
consideration within 90 days.
CEQA: Not a Project, File No. PP17-010, City Organizational and
Administrative Activities resulting in no changes to the physical
environment. (City Clerk)

Action: Ronald Cabanayan was appointed to the Appeals Hearing Board for a full term from
January 1, 2022 to December 31, 2025. No interview was conducted. (11-0.)

**3.5      22-037                Definition of Racial Equity.**

Adopt a resolution accepting the proposed definition of racial equity:
"Both a process and an outcome, racial equity is designed to center
anti-racism, eliminate systemic racial inequities, and rooted in the
acknowledgement of the City of San Jose's historical and existing
practices that have led to discrimination and injustices to Black,
Indigenous, Latino/a/x, Asian, and Pacific Islander communities.
The racial equity process is an explicit, intentional, and continual
practice of prioritizing psychologically safe spaces and a sense of
belonging for racial groups that have been most negatively impacted in
policies and practices. It is action that prioritizes liberation and
measurable change, and centers lived experiences of all impacted racial
groups.
As an outcome, racial equity is achieved when race can no longer be
used to predict life outcomes, and everyone can prosper and thrive."
CEQA: Not a Project, File No. PP17-009, Staff Reports, Assessments,
Annual Reports, and Informational Memos that involve no approvals of
any City action. (City Manager)
*Deferred to February 1, 2022 per Council approval.*

3.6   22-038   **SJC Guadalupe Gardens Fencing Project and Temporary Closure of Spring Street and Asbury Streets. - DEFERRED**
(a) Accept report on Guadalupe Gardens Fencing including security and activation measures and authorize the City Manager to:
(1) Execute a pilot program to limit trail access to unauthorized vehicles on Guadalupe River Park trail;
(2) Develop a Request for Proposals for potential programming and stewardship partners for the Guadalupe Gardens area;
(3) Receive feedback on the Prototype Park Concept Plan; and
(4) Allocate the SJC Guadalupe Gardens Fencing Project fund in the amount of $1,500,000 for protecting the land and authorized uses.
(b) Adopt a resolution delegating authority to the Director of Public Works to award the construction contract for the 9821 - SJC Guadalupe Gardens Fencing Project, in an amount not greater than $1,500,000.
CEQA: Categorically Exempt, File No. ER21-005, CEQA Guidelines 15303(e). New Construction or Conversion of Small Structures and PP17-007, Preliminary direction to staff and eventual action requires approval from decision-making body. (Airport/Parks, Recreation and Neighborhood Services/Public Works/Transportation/City Manager)
**DEFERRED TO 2/8/2022 PER ADMINISTRATION**

3.7   22-039   **Report on Procurement of Insurance Products for Continuation of an Owner-Controlled Insurance Program for the San Jose-Santa Clara Regional Wastewater Facility.**
Adopt a resolution authorizing the Director of Finance to:
(a) Purchase insurance policies for the San José-Santa Clara Regional Wastewater Facility Capital Improvement Program with total cost not to exceed $7,221,283 including estimated insurance premiums of $4,661,872 and a total maximum deductible $2,559,411, as well as a cash collateral fund of $1,496,471 with premiums to be paid in four (4) annual installments, and subject to the annual appropriation of funds, as follows:
(1) Federal Insurance Company: Commercial General Liability Insurance and Workers' Compensation Insurance with a Program Agreement Endorsement stipulating terms of the cash collateral fund management;
(2) Allied World Assurance Company, Inc.: Commercial Excess Liability Insurance;
(3) Endurance Risk Solutions Assurance Company: Commercial Excess Liability Insurance;
(4) Liberty Surplus Insurance Corporation: Commercial Excess Liability Insurance;
(5) Great American Assurance Company: Commercial Excess Liability Insurance;
(6) Westchester Surplus Lines Insurance Company: Commercial Excess Liability Insurance;

*(Item Continued on the Next Page)*

**3.7** **(Cont'd.)**

(a) (7) Ironshore Specialty Insurance Company: Contractors Pollution Liability Insurance;
(8) Berkley Assurance Company: Owners Protective Professional Liability Insurance; and
(b) Either renew an existing, or secure quotes and purchase a new, Master Builder's Risk Insurance policy with special endorsement for Flood to provide builder's risk coverage through 2026 as necessary, with a projected $906,000 in premiums, the cost of which is included in the estimated insurance premiums above.
CEQA: Not a Project, File No. PP17-003, Agreements/Contracts (New or Amended) resulting in no physical changes to the environment. (Finance/Environmental Services)

Action: **Resolution No. 80358** regarding the Procurement of Insurance Products for Continuation of an Owner-Controlled Insurance Program for the San Jose-Santa Clara Regional Wastewater Facility was adopted. (11-0.)

# 4.  PUBLIC SAFETY SERVICES

**4.1**    **22-045**    **Gun Harm Reduction Ordinance.**

Consider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by requiring gun owners to obtain and maintain liability insurance and to provide for a fee to apply to gun harm reduction programs.
CEQA: Not a Project, File No. PP17-008, General Procedure and Policy Making resulting in no changes to the physical environment. (City Attorney)
*HEARD AT 6:00 P.M.*

**Note that action regarding Item 4.1 was bifurcated as follows:**

Action #1: **Ordinance No. 30716** amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm was adopted, including the insurance requirements, excluding Sections 10.32.215, 10.32.220, and 10.32.230(b), which was approved with a separate vote.
**(10-1. Noes: Davis.)**

Action #2: **Ordinance No. 30716** amending Title 10 of the San José Municipal Code to add the following Sections 10.32.215, 10.32.220, and 10.32.230(b).
**8-3. (Noes: Davis, Cohen, Foley.)**

The actions include the following:
The joint memorandum from Mayor Sam Liccardo, Vice Mayor Chappie Jones and Councilmembers David Cohen and Magdalena Carrasco, dated 1/21/22, to:

*(Item Continued on the Next Page)*

**4.1      (Cont'd.)**

1. Establish that the gun harm reduction fee in the initial year shall amount to $25 per gun-owning household
   —or an approximate amount close to $25 that assists with the rounding
   of the final fee—plus that amount strictly reflecting only the administrative cost incurred by:
   a. The Designated Non-profit Organization,
   b. The State of California for its use of the Department of Justice's Automated
   Firearm System and/or California Firearms Application Reporting System to
   communicate legal obligations and available services to gun-owning residents in
   San Jose, and
   c. The City, if any.
   2. Determine that until or unless the Council determines otherwise,
   a. The City shall not be engaged in the collection of fees, the transmittal of
   information through the Department of Justice Database, nor the accounting nor
   distribution of the funds.
   b. After the initial implementation of the ordinance, the City's role will remain
   largely limited to setting the fee, engaging in contractual arrangements with the
   State of California and other entities necessary for the implementation of the
   ordinance, and enforcement.
   c. All administrative tasks shall be the responsibility of the Designated Nonprofit
   Organization, and all administrative costs shall be borne by that organization, and
   recovered by a portion of the fee revenue.
   d. No fees shall be collected nor required of any gun owner until the City Attorney
   has determined that there is resolution of pending facial legal challenges to the
   ordinance for any claim which is not res judicata, that is, for any claim that is not
   precluded by a prior final judgment.
   3. Approve the proposed ordinance, with modifications in the following sections:
   a. Expenditure of Gun Harm Reduction Fee, Section 10.32.220
   • Insert the following italicized language into A. to read, "All monies from the Gun Harm Reduction Fee shall be
   expended by the Designated Nonprofit Organization on providing services to residents of the City that own or
   possess a Firearm in the City or to members of their household, or to those with whom
   they have a close familial or intimate relationship."
   • Insert within the itemized list under A., "Addiction intervention and substance abuse treatment"
   • Revise provisions under C. to read: "C. The Designated Nonprofit
   Organization shall spend every dollar generated from the Gun Harm
   Reduction Fee, minus administrative expenses, exclusively for programs and
   initiatives designed to (a) reduce the risk or likelihood of harm from the use of
   firearms in the City of San José, and (b) mitigate the risk of physical harm or
   financial, civil, or criminal liability that a San José firearm owner or her
   family will incur through her possession of firearms. Otherwise, the City
   shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended"
   b. Exceptions, Section 10.32.225
   • Insert the following italicized language into B. to read, "Those persons who
   have a license to carry a concealed weapon issued pursuant to California Penal
   Code § 26150 or § 26155, for as long as these statutes are legally enforceable."
   c. Compliance, Section 10.32.230
   • Delete the following stricken language and insert the italicized language into
   A. to read, "Each person required to obtain and maintain insurance under
   Section 10.32.210 shall demonstrate compliance with the insurance
   requirement by completing and executing a City-designated attestation form.
   Each such person shall state both the name of the insurance company issuing
   the policy and the number of the insurance policy on the attestation form, sign
   the form under penalty of perjury and keep the attestation form with the
   Firearms where they are being stored or transported. ~~There is no requirement
   to submit the attestation form to the City. However, each~~ Each person shall
   complete and sign a new attestation form under penalty of perjury in the event

*(Item Continued on the Next Page)*

**4.1    (Cont'd.)**

any of the information on the form changes. Each person shall present the
form when lawfully requested to do so by a peace officer who knows or has
reason to believe that a person possesses a firearm."
d. Purpose and Findings, 10.32.200
Among the findings listed in B., add:
• "Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the
Pacific for Institute Research and Evaluation (PIRE), on average, 206
people suffer death or serious injury from gunshots each year in the City of San José.
• Conservatively, San José taxpayers annually spend approximately $39.7
million, or approximately $151 per firearm-owning household, to respond
to gun violence with such public services as emergency police and
medical response, victim assistance, incident investigation, acute and
long-term health care, and perpetrator adjudication and judicial sanctioning.
• Including private costs to individuals and families in the calculation, San
José residents incur an annual financial burden of $442 million per year
for gun deaths and injuries."

**Also including the replacement supplemental memorandum from Mayor Sam Liccardo dated 1/24/22:**

Adopt the recommendations and findings contained in the (a) January 21, 2022
Memorandum of Councilmembers Carrasco, Cohen, Peralez, Vice Mayor Jones, and myself, (b)
January 21, 2022 Memorandum of Councilmember Peralez, and (c) the following
recommendations from Councilmember Dev Davis' January 21, 2022 Memorandum, as
modified below:
1. (#2a) Return in the Spring with a presentation to the Council about the extent to
which SJPD and partners at the District Attorney's Office are fully enforcing existing
firearm-related laws, and specifically:
a. Identify what resource, legal, or other constraints inhibit full enforcement, if
any; including the use of the Armed Prohibited Persons (APPS) database for
Penal Code Section 12021 arrests,
b. Identify any proposed solutions to those constraints.
2. (#2b) Return in March a ghost gun ban that closes existing loopholes in the California
Unsafe Handgun Act, as previously directed by Council on June 29, 2021.
3. (#3) Continue the direction from the Council's June 29, 2021 direction to build on
partnerships with law enforcement that better inform our community about Gun
Violence Restraining Orders and how community members can avail themselves of
them. Return to council in the Spring with specific recommendations for public
information and outreach about safe storage laws, GVRO's, and this Gun Harm
Reduction ordinance.
4. (#5) Respond to Council's June 29, 2021 direction to strengthen partnerships to
enable more frequent gun buy-back programs, such as the event scheduled this Spring
at the County Government Center.
5. (#6) Identify and apply for grants to support gun safety education and buyback
programs

**Including the 1/21/22 memorandum from Councilmember Raul Peralez, with this this item to come before the
entire Council, per a friendly amendment by Councilmember Maya Esparza.**

Accept the memorandum authored by Mayor Liccardo, Vice Mayor Jones and
Councilmembers Cohen and Carrasco and direct the City Manager and City Attorney to:
1. Prior to the second reading of the ordinance, report back with a status of the
Community Violence Prevention & Response initiative1
approved by the Rules & Open Government Committee (ROGC) on September 22, 2021 as well as next
steps on any outstanding items.

*(Item Continued on the Next Page)*

**4.1    (Cont'd.)**

2. Prior to the end of the fiscal year, schedule a joint study session with the County Board of Supervisors as directed by ROGC with a focus on gun violence prevention as it relates to mental health, Intimate Partner Violence (IPV) / Intimate Partner Homicide (IPH) and substance abuse with a diverse panel that includes but is not limited to mental health professionals, social service professionals and firearm experts.
a. If the County BOS declines or does not respond, proceed with a Council Study Session and include experts from relevant County departments such as the Behavioral Health Services Department.
3. Provide a timeline and work plan on designating a non-profit before the ordinance takes effect to the Public Safety, Finance and Strategic Services (PSFSS) committee, and include responses to the following questions:
a. Who will be delivering the services outlined in number 1-4 per section 10.32.220 in the draft Gun Harm Reduction Ordinance?
b. Assuming providers are existing local organizations, do they have the bandwidth to effectively carry out these services?
c. How will there be coordination with the County's Behavioral Health Services Department and other relevant county departments?
d. What metrics will be put in place to measure efficacy of the services and whether there is a correlation to reduced gun violence?
e. What is the contingency in the event that the designated non-profit is no longer financially viable?
f. What is the expected rate of registration by gun owners? Compared to other fee-required registration programs such as animal licensing.
g. Per section 10.32.240 of the draft ordinance, elaborate what the enforcement process will be.
4. Amend the ordinance requiring the designated non-profit to provide a bi-annual report to the appropriate committee with a possible cross reference to City Council.

**Also including the 1/25/22 memorandum from Councilmember Sylvia Arenas:**

Direct the City Manager and City Attorney to edit
Section 10.32.220 Expenditure of Gun Harm Reduction Fee
in the draft ordinance to recognize the intersectionality of gender based violence by expanding the violence reduction services or programs, with the following revision in bold: Section 10.32.220 Expenditure of Gun Harm Reduction Fee
*A. All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City or to members of their household. Such expenditures may include, but are not necessarily limited to the following:*
*1. Suicide prevention services or programs;*
*2. Violence reduction or ~~domestic violence~~ **gender based violence** services or programs;*
*3. Mental health services related to gun violence; or*
*4. Firearms safety education or training.*

# 5.  TRANSPORTATION & AVIATION SERVICES

**5.1**   **22-040**   **Amendment to the Agreements for On-Call Architectural and Engineering Consultant Services.**
Adopt a resolution authorizing the City Manager to negotiate and execute:
(a) An amendment to the Kimley-Horn and Associates, Inc.'s existing On-Call Architectural and Engineering Consultant Services Master Agreement at Norman Y. Mineta San José International Airport (SJC and Airport) to increase the maximum compensation by $2,300,000; and
(b) An amendment to the Jviation, Inc.'s existing On-Call Architectural and Engineering Consultant Services Master Agreement at Norman Y. Mineta San José International Airport to decrease maximum compensation by $2,300,000.
CEQA: Not a Project, File No. PP17-002, Consultant services for design/study/ inspection, or other professional services with no commitment to future action. (Airport)

Action: **Resolution No. 80359** regarding Amendment to the Agreements for On-Call Architectural and Engineering Consultant Services was adopted. (10-0-1. Absent: Liccardo.)

**5.2**   **22-041**   **Community Forest Management Plan.**

Adopt a resolution approving the Community Forest Management Plan.
CEQA: Not a Project, File No. PP17-002, Consultant services for design, study, inspection, or other professional services with no commitment to future action. (Transportation)
[Deferred from 12/14/2021 - Item 5.1 (21-2567)]
***Deferred to February 1, 2022 per Council***

# 6.  ENVIRONMENTAL & UTILITY SERVICES

# 7.  NEIGHBORHOOD SERVICES

# 8. COMMUNITY & ECONOMIC DEVELOPMENT

**8.1    22-042        Approval of a Downtown High-Rise Residential Tax and Fee Waiver for the Carlysle at 51 Notre Dame Street.**
Conduct a public hearing to approve an economic development tax and fee waiver in connection with a reduction in construction taxes and the Affordable Housing Impact Fee for a downtown residential high-rise at 51 Notre Dame Street in the amount of $4,390,599 pursuant to California Government Code Section 53083 and Open Government Resolution No. 77135 Section 2.3.2.6.C.
CEQA: Addendum to the Downtown Strategy 2040 Final Environmental Impact Report and addenda thereto, Planning File No. SP20-020. Council District 3. (Economic Development and Cultural Affairs/Housing)
***Deferred to February 1, 2022 per Council***

# 9. REDEVELOPMENT – SUCCESSOR AGENCY

# 10. LAND USE

## 10.1 Land Use on Consent Calendar

**(a)    22-043        Reorganization/Detachment from the City of San José of Approximately 9.56-Gross Acres Consisting of Two Parcels Located on the Easterly Side of Saratoga Creek Along Lawrence Expressway Between Highway 280 and Bollinger Road (Doyle No. 7).**

Adopt a resolution supporting the reorganization of territory designated as Doyle No. 7 which involves detachment from the City of San José of approximately 9.56 gross acres of land located at the easterly side of Saratoga Creek along Lawrence Expressway between Highway 280 and Bollinger Road, and the detachment of the same from the affected special districts.
CEQA: Categorically Exempt, File No. ER22-004, CEQA Guidelines Section 15305 Minor Alterations in Land Use Limitations. Council District 1. (Planning, Building and Code Enforcement)
***ITEM HEARD IMMEDIATELY AFTER CONSENT***

<u>Action</u>: **Resolution No. 80360** supporting the reorganization of territory designated as Doyle No. 7 was adopted. (11-0.)

### END OF CONSENT CALENDAR

## 10 Land Use - Regular Agenda

None provided.

**OPEN FORUM**

1. Raymond Kim spoke to academic research on gun violence.
2. Paul Soto referenced gun violence.
3. Brian Darby expressed concern to a homeless individual living under a 280 overpass.
4. Blair Beekman spoke to open public policy as an inclusive process.
5. Caller #1 offered criticism of the downtown, opining its lack of vibrancy.
6. Tod W asked for more open dialog between elected officials and San Jose residents.
7. Kirk Vartan offered appreciation for Zoom meetings, but asked for more public outreach discussions prior to these issues to allow for community dialog.
8. Jonathon Fleming complained of non-compliance of public records requests (PRA).
9. Chris complained that Council does not listen to the will of the people.

**ADJOURNMENT**

The Council of the City of San José adjourned at 10:34 p.m.



Case 5:22-cv-00501-BLF   Document 19   Filed 02/14/22   Page 193 of 227

EXHIBIT "H"

CONTENT ARCHIVE

## ARCHIVE OF MAYOR LICCARDO'S WRITING

To view a complete archive of Mayor Liccardo's first-person writing and opinion pieces, please visit his medium blog.

## MAYOR LICCARDO PHOTO ARCHIVE

To access this archive of photos featuring Mayor Liccardo -- including updated headshots -- please visit this photostream on Flikr.

## MAYOR LICCARDO VIDEO ARCHIVE

For a complete archive of Mayor Liccardo's videos of special events -- like the annual State of the City events -- please visit the Mayor's Youtube channel.

PRESS ROOM

## SAN JOSÉ MAYOR STATEMENT ON HISTORIC PASSING OF FIRST IN THE NATION GUN VIOLENCE REDUCTION ORDINANCE

**Post Date:**              01/25/2022 10:50 PM

**FOR IMMEDIATE RELEASE**

January 25, 2022

**Media Contact:**

Rachel Davis, Communications Director/Press Secretary, Office of Mayor Sam Liccardo, rachel.davis@sanjoseca.gov

SAN JOSÉ, CA - Today, San José City Council voted to become the first city, state, or jurisdiction in the nation to adopt a law requiring gun owners to have insurance coverage for their firearms, and use fees paid by gun owners to invest in evidence-based initiatives to reduce gun harm.  He released the following statement:

 **"Tonight San José became the first city in the United States to enact an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm.    Thank you to my council colleagues who continue to show their commitment to reducing  gun violence and its devastation in our community.  I am deeply grateful also to our advocacy and legal partners with Cotchett, Pitre & McCarthy, LLP,  EveryTown, Moms Demand Action, SAFE, the Gifford Law Alliance and ma**

SER-445

2/9/22, 11:42 AM     San José Mayor Subpoenaed Historic Casting Pills other Nation Gun License Recoupe Ordinance, Press Room | City of Sa…

Case 5:22-cv-00501-BLF Document 19 Filed 02/14/22 Page 195 of 227

**others who work tirelessly to help us craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community. I look forward to supporting the efforts of others to replicate these initiatives across the nation."**

## <u>Statements of Support:</u>

**Shannon Watts, Founder, Moms Demand Action**

"Following unthinkable tragedies from gun violence, San José has taken action that will save lives. Our grassroots volunteers have been proud to work hand-in-hand with the mayor, city council, and community partners to help get this innovative package of gun safety laws crafted and across the finish line."

**Rachel Michelson, Volunteer Leader with the California Chapter, Moms Demand Action, San José**

"Once again, San José has taken initiative to be a leader in the gun violence prevention movement**.** This ordinance is an innovative approach to address the costs of gun violence and incentivize safer practices that can help prevent firearm deaths and injuries. Other cities should follow San José's lead and prioritize safer cities."

**Ewan Barker Plummer, Volunteer Leader, Students Demand Action, Bay Area**

"This vote is a victory for gun safety. Thanks to the tireless advocacy of volunteers and commitment to gun safety from San José leaders San José is leading the charge against gun violence. We all want a safer San José, a safer California, and a safer nation. With this approach, we can move closer to that goal."

*<u>Return to full list >></u>*



**SER-446**



# EXHIBIT "I"

BAY AREA

# Gun owners in San Jose must buy liability insurance under newly passed first-in-the-nation law

Lauren Hernández
Jan. 25, 2022 Updated: Jan. 26, 2022 6:03 p.m.



This file photograph shows San Jose Mayor Sam Liccardo on Tuesday, March 24, 2015, in San Jose, Calif.
Santiago Mejia/The Chronicle

The San Jose City Council adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability insurance for their firearms, city officials said.

The ordinance — which city officials said marks the first such law for a city, state or other jurisdiction in the country — also calls for gun owners to pay fees that will be invested "into evidence-based initiatives to reduce gun violence and gun harm," San Jose Mayor Sam Liccardo said in a statement on Tuesday night.

According to the ordinance, "A person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or

damages resulting from any negligent or accidental use of the Firearm, including but not limited to death, injury or property damage."

Residents who do not comply could have their firearms confiscated under the new law, which takes effect in six months.

The ordinance notes that each year 23,000 people in the U.S. die by firearm suicide, 14,000 die by firearm homicide and another 500 die from unintentional gun injuries.



Liccardo thanked the council and advocacy groups including Moms Demand Action, SAFE, the Gifford Law Alliance and others for their commitment to "reducing gun violence and devastation in our community."

Liccardo said these groups helped "craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community." He said that he will support other jurisdictions who choose to launch similar ordinances across the United States.

Shannon Watts, the founder of Moms Demand Action, said in a statement that the ordinance will "save lives."

Ewan Barker Plummer, volunteer leader with the Bay Area chapter of Students Demand Action said the vote was "a victory for gun safety."

"We all want a safer San Jose, a safer California, and a safer nation," Barker Plummer said. "With this approach, we can move closer to that goal."

*Lauren Hernández is a San Francisco Chronicle staff writer.*
*Email: lauren.hernandez@sfchronicle.com Twitter: @ByLHernandez*

Written By
Lauren Hernández
Reach Lauren on
Lauren Hernández joined The San Francisco Chronicle in 2018. She covers breaking news, crime and general news. Previously, she was a breaking news reporter for the USA TODAY Network's Statesman Journal in Salem, Oregon. She studied journalism at San Jose State University. She is a member of the National Association of Hispanic Journalists. Hernández has bylines in the Silicon Valley Business Journal and The Desert Sun. Her journalism has received awards in California and Oregon.

# EXHIBIT "J"

# Los Angeles Times

## San Jose approves first law in U.S. requiring gun owners to have insurance



San Jose Mayor Sam Liccardo speaks during a news conference in May 2021 after nine people died in a shooting in his city. (Associated Press)

BY OLGA R. RODRIGUEZ AND JULIET WILLIAMS
ASSOCIATED PRESS

JAN. 25, 2022 **UPDATED** 11:08 PM PT

The city of San Jose voted Tuesday night to require gun owners to carry liability insurance in what's believed to be the first measure of its kind in the United States.

The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights.

The council also voted to require thousands of gun owners in the city to pay a small fee, which would be used for firearm safety education and services such as domestic violence prevention and mental health services.

The proposal seeks to reduce gun violence in the San Francisco Bay Area city.



# EXHIBIT "K"

NVF:TLC:KML                                                    ORD. NO. 30716
2/3/2022

<center>

**ORDINANCE NO. 30716**

**AN ORDINANCE OF THE CITY OF SAN JOSE ADDING
PART 6 TO CHAPTER 10.32 OF TITLE 10 OF THE SAN
JOSE MUNICIPAL CODE TO REDUCE GUN HARM BY
REQUIRING GUN OWNERS TO OBTAIN AND MAINTAIN
LIABILITY INSURANCE AND ESTABLISHMENT OF
ANNUAL GUN HARM REDUCTION FEE**

</center>

**WHEREAS,** the Constitution of the United States of America affords certain protections to the ownership of firearms; and

**WHEREAS,** the United States Supreme Court has recognized that the Constitutional protections related to firearms ownership are not unlimited, and can be subject to certain types of governmental regulations; and

**WHEREAS,** a city's police power includes the power to regulate firearms and many courts throughout the nation have upheld local regulations related to the ownership or possession of firearms; and

**WHEREAS,** firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

**WHEREAS,** each year more than 23,000 United States residents die by firearm suicide, 14,000 die by firearm homicide, and nearly 500 die from unintentional firearm injuries; and

**WHEREAS,** in California, between 2005 and 2015, nearly 4,000 children and teenagers were killed or injured with firearms, and 533 children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

T-887.014.004\1894578                    1
Council Agenda: 1-25-2022
Item Number: 4.1

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** the Santa Clara County Public Health Department issued a report on firearm injuries in April 2018.  In 2016, 11% of injury deaths were due to firearms injuries.  During the period 2007-2016, there were an average of 46 deaths per year due to self-inflicted/suicide from firearms injuries, and an average of 28 deaths per year due to assault/homicide from firearms injuries.  Self-inflicted/suicide accounted for the highest percentage of deaths (59%) from firearms injuries, with assault/homicide accounting for 36% of deaths from firearm injuries; and

**WHEREAS,** the April 2018 Santa Clara County Public Health Department report on firearm injuries reported that during the period from 2010-2014, there were an annual average of 28 emergency department visits and 12 hospitalizations due to unintentional firearms injuries.  During 2010-2014, 31% of emergency department visits and 16% of hospitalizations from firearms injuries were due to unintentional shootings; and

**WHEREAS,** research published in the American Journal of Epidemiology in 2004 found that regardless of storage practice, type of gun, or number of firearms in the home, having a gun in the home was associated with an increased risk of firearm homicide and firearm suicide in the home; and

**WHEREAS,** a 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

**WHEREAS,** a study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight times greater likelihood for firearm suicide among men, and 35 times greater likelihood of firearm suicide among women; and

**WHEREAS,** according to the American Academy of Pediatrics, in homes with guns, suicide rates in children and adolescents and the likelihood of accidental death by shooting are each four times higher than in homes without guns; and

T-887.014.004\1894578
Council Agenda: 1-25-2022
Item Number: 4.1

2

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** in the past decade, 40% of the suicides committed by children and teens involved guns, and 90% of these suicides were with guns that the victims accessed at their own homes or from a relative's home; and

**WHEREAS,** 58% of shooting deaths in children and teens are homicides, and the risk of homicide is three times higher when there are guns in the home; and

**WHEREAS,** a June 2014 report published by Everytown for Gun Safety and Moms Demand Action which analyzed publicly reported gun deaths nation-wide over a one-year period from December 15, 2012 to December 12, 2013, showed that at least 100 children were killed in unintentional shootings, amounting to nearly two each week; and

**WHEREAS,** according to research published in Social Science and Medicine in 2007 based on data over a three-year study period from 2001 to 2003, states with higher rates of household firearm ownership had higher rates of firearm homicide but not of non-firearm homicide, and this relationship held across gender, age, income and multiple other variables; and

**WHEREAS,** a study in the Journal of Urban Health conducted in 2015 estimated there are as many as 4.6 million children in the United States living in homes with loaded unsecured guns; and

**WHEREAS,** injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

**WHEREAS,** in some instances, gun owners have been successfully sued for harm resulting from the use of the owner's firearm by themselves or a third party; and

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly 80% from 1967 to 2017; and

**WHEREAS,** similarly, insurance-based mechanisms can encourage firearm owners to take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators, and according to 2018 research published in The Actuary there is evidence that some actuaries and insurance companies are recognizing firearm-related risk through their product offerings, pricing and underwriting decisions; and

**WHEREAS**, pursuant to the provisions and requirements of the California Environmental Quality Act of 1970, together with related State CEQA Guidelines and Title 21 of the San José Municipal Code (collectively, "CEQA"), the Director of Planning, Building and Code Enforcement has determined that the provisions of this Ordinance do not constitute a project, under File No. PP17-008 (General Procedure & Policy Making resulting in no changes to the physical environment); and

**WHEREAS**, the City Council of the City of San José is the decision-making body for this Ordinance; and

**WHEREAS**, this Council has reviewed and considered the "not a project" determination under CEQA prior to taking any approval actions on this Ordinance;

**NOW, THEREFORE,** BE IT ORDAINED BY THE COUNCIL OF THE CITY OF SAN JOSE:

<u>**SECTION 1.**</u>  Chapter 10.32 of Title 10 of the San José Municipal Code is hereby amended by adding a Part to be numbered, entitled and to read as follows:

T-887.014.004\1894578
Council Agenda: 1-25-2022
Item Number: 4.1

4

NVF:TLC:KML                                                              ORD. NO. 30716
2/3/2022

## Part 6

## REDUCTION OF GUN HARM – LIABILITY INSURANCE REQUIREMENT AND GUN HARM REDUCTION FEE

**10.32.200  Purpose and Findings**

A.      This Part is passed and adopted in the exercise of the police power of the City, and for the protection of the welfare, peace and comfort of the residents of the City of San José.  Specifically, it is the intent of this Ordinance to reduce gun harm.

B.      Findings:

1.      Firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

2.      Each year more than twenty-three thousand (23,000) United States residents die by firearm suicide, fourteen thousand (14,000) die by firearm homicide, and nearly five hundred (500) die from unintentional firearm injuries; and

3.      In California, between 2005 and 2015, nearly four thousand (4,000) children and teenagers were killed or injured with firearms, and five hundred thirty-three (533) children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

4.      During 2010-2014 in Santa Clara County, thirty-one percent (31%) of emergency department visits and sixteen percent (16%) of

NVF:TLC:KML                                                              ORD. NO. 30716
2/3/2022

hospitalizations from firearms injuries were due to unintentional shootings; and

5.    A 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

6.    A study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight (8) times greater likelihood for firearm suicide among men, and thirty-five (35) times greater likelihood of firearm suicide among women; and

7.    Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José; and

8.    Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning; and

9.    Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries; and

10.   Injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

NVF:TLC:KML                                                    ORD. NO. 30716
2/3/2022

11.     Auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly eighty percent (80%) from 1967 to 2017; and

12.     Liability insurance can reduce the number of gun incidents by encouraging safer behavior and it can also provide coverage for losses and damages related to gun incidents; and

13.     Programs and services to gun owners and their households can also encourage safer behavior, and provide education and resources to those residents.

## 10.32.205  <u>Definitions</u>

As used in this Part, the following terms have the following meaning:

A.      "Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion.  Firearm does not include antique firearms as defined by 18 U.S.C. Section 921(a).

B.      "Designated Nonprofit Organization" means an entity that qualifies as a nonprofit corporation under the federal internal revenue code and is designated pursuant to the City Manager's authority under Section 10.32.235. No City official or employee shall sit on the board of directors of the Designated Nonprofit Organization.

## 10.32.210  <u>Liability Insurance Required</u>

NVF:TLC:KML
2/3/2022                                    ORD. NO. 30716

A.   Insurance required.  A person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury or property damage.

B.   For purposes of this Section, a person shall be deemed to be the owner of a Firearm if such Firearm is lost or stolen until such loss or theft is reported to the police department or sheriff which has jurisdiction in which such Firearm owner resides.

C.   Any person who owns a Firearm on the effective date of this Section shall obtain the insurance required by this Section within thirty (30) days of the effective date of this Ordinance, or by a later date certain established in the regulations promulgated by City Manager pursuant to Section 10.32.235.

**10.32.215  Annual Gun Harm Reduction Fee**

A person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year.  The date by which payment shall be made annually shall be established in the regulations promulgated by City Manager pursuant to Section 10.32.235. The annual fee will be set forth in the schedule of fees and charges established by resolution of the City Council.

NVF:TLC:KML                                                    ORD. NO. 30716
2/3/2022

## 10.32.220  <u>Expenditure of Gun Harm Reduction Fee</u>

A.    All monies from the Gun Harm Reduction Fee shall be expended by the
      Designated Nonprofit Organization on providing services to residents of the City
      that own or possess a Firearm in the City, to members of their household, or to
      those with whom they have a close familial or intimate relationship.  Such
      expenditures may include, but are not necessarily limited to the following:

      1.    Suicide prevention services or programs;

      2.    Violence reduction or gender based violence services or programs;

      3.    Addiction intervention and substance abuse treatment;

      4.    Mental health services related to gun violence; or

      5.    Firearms safety education or training.

B.    No portion of the monies from the Gun Harm Reduction Fee shall be used for
      litigation, political advocacy, or lobbying activities.

C.    The Designated Nonprofit Organization shall spend every dollar generated from
      the Gun Harm Reduction Fee, minus administrative expenses, exclusively for
      programs and initiatives designed to (a) reduce the risk or likelihood of harm
      from the use of firearms in the City of San José, and (b) mitigate the risk of
      physical harm or financial, civil, or criminal liability that a San José firearm
      owner or her family will incur through her possession of firearms. Otherwise, the
      City shall not specifically direct how the monies from the Gun Harm Reduction
      Fee are expended.

NVF:TLC:KML                                                          ORD. NO. 30716
2/3/2022

D.      The designated non-profit shall provide a biannual report to an appropriate
        council committee and the report may also be provided to the City Council, as
        directed by the council committee.

## 10.32.225  Exceptions

The provisions of this Part shall not apply to any of the following:

A.      Those persons designated as peace officers pursuant to Chapter 4.5 of Title 3 of
        Part 2 of the California Penal Code (§830 et seq.), including sworn peace
        officers, active reserve peace officers and retired peace officers.

B.      Those persons who have a license to carry a concealed weapon issued pursuant
        to California Penal Code § 26150 or § 26155, for as long as these statutes are
        legally enforceable.

C.      Those persons for which compliance with this Part would create a financial
        hardship.

## 10.32.230  Compliance

A.      Insurance requirement.  Each person required to obtain and maintain insurance
        under Section 10.32.210 shall demonstrate compliance with the insurance
        requirement by completing and executing a City-designated attestation form.
        Each such person shall state both the name of the insurance company issuing
        the policy and the number of the insurance policy on the attestation form, sign
        the form under penalty of perjury and keep the attestation form with the Firearms
        where they are being stored or transported.  Each person shall complete and
        sign a new attestation form under penalty of perjury in the event any of the
        information on the form changes.  Each person shall present the form when

NVF:TLC:KML                                                          ORD. NO. 30716
2/3/2022

lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm.

B.      Fee provisions.  Each person shall affix proof of payment of the annual Gun Harm Reduction Fee to the attestation form and keep it with the Firearm or Firearms where they are being stored or transported.

### 10.32.235  <u>Authority of the City Manager</u>

A.      The City Manager is authorized to promulgate all regulations necessary to implement the requirements and fulfill the policies of this Part relating to the reduction of gun harm, including, but not limited, to the following subjects:

   1.      Processes and procedures related to the implementation of the liability insurance requirement, and forms necessary thereto.

   2.      Designation of the nonprofit organization that will receive the Gun Harm Reduction Fee, any processes and procedures related to the payment of the fee, and any additional guidelines or auditing of the use of the monies from the fee.

   3.      Designation of any third-party agency and/or organization that will aid in the implementation of the noticing of the requirements of this Part or any other administrative tasks related to the requirements of this Part.

   4.      The criteria by which a person can claim a financial hardship exemption from this Part pursuant to Section 10.32.225.C.

B.      Regulations shall be published on the City's website.

NVF:TLC:KML
2/3/2022                                                    ORD. NO. 30716

C.      Regulations promulgated by the City Manager shall have the same force and
        effect of law.  Unless a later date is specified in a regulation, a regulation shall
        become effective upon date of publication.

**10.32.240  <u>Enforcement</u>**

A.      Any violation of this Part shall be punishable by an administrative citation in
        accordance with the procedures set forth in Chapter 1.15 of Title 1 of this Code
        relating to the issuance of administrative citations, imposing of administrative
        fines, right to appeal, and the right to an administrative hearing.

B.      The amounts of the fines for violations imposed pursuant to this Part shall be
        set forth in the schedule of fines established by resolution of the City Council.

C.      A violation of this Part is also enforceable through all other civil and
        administrative remedies available to the City.

**10.32.245  <u>Impoundment</u>**

To the extent allowed by law, the Firearm or Firearms of a person that is not in
compliance with this Part may be impounded subject to a due process hearing.

**10.32.250  <u>Fees and Charges</u>**

The City Manager is hereby authorized to charge and collect any and all cost recovery
fees associated with fulfilling the policies of this Part relating to the reduction of gun
harm, including any associated third-party costs.  All fees shall be as set forth in the
schedule of fees and charges established by resolution of the City Council.

NVF:TLC:KML                                                              ORD. NO. 30716
2/3/2022

**SECTION 2.**  This Ordinance shall become effective at the expiration of one hundred eighty (180) days after its adoption.

**SECTION 3.**  Consistent with Section 1.04.160 of the San José Municipal Code, should any provision of this Ordinance or its application to any person or circumstance be determined by a court of competent jurisdiction to be unlawful, unenforceable or otherwise void, that determination shall have no effect on any other provision of this Ordinance or the application of this Ordinance to any other person or circumstance and, to that end, the provisions hereof are severable.

**SECTION 4.**  The City Council of the City of San José takes action on this Ordinance based upon the totality of the administrative record including the facts stated above, the facts stated in the memorandums to the City Council for the January 25, 2022 City Council Meeting, as well as any oral or written testimony at the January 25, 2022 City Council meeting.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**PASSED FOR PUBLICATION of title this 25th day of January, 2022, by the following bifurcated vote:**

**Including Insurance Requirements; Excluding Sections 10.32.215, 10.32.220, and 10.32.230(b)**

| | |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, FOLEY, JONES, JIMENEZ, MAHAN, PERALEZ, LICCARDO. |
| NOES: | DAVIS. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

**PASSED FOR PUBLICATION of title this 25th day of January, 2022, by the following bifurcated vote:**

**Excluding Insurance Requirements; Sections 10.32.215, 10.32.220, and 10.32.230(b) only:**

| | |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, JONES, JIMENEZ, PERALEZ, LICCARDO. |
| NOES: | DAVIS, FOLEY, MAHAN. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

SAM LICCARDO
Mayor

ATTEST:

TONI J. TABER, CMC
City Clerk

T-887.014.004\1894578
Council Agenda: 1-25-2022
Item Number: 4.1

14

EXHIBIT "L"

COUNCIL AGENDA: 1/25/22

FILE: 22-045



CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:  HONORABLE CITY COUNCIL**          **FROM:  MAYOR LICCARDO**

**SUBJECT:  GUN HARM REDUCTION ORDINANCE   DATE:  JANUARY 19, 2022**

Approved                                           Date 1/19/22

---

## DISCUSSION

A more substantive memorandum—with specific recommendations—will follow, but it is important for the entire City Council to have access to all of the data available to us in evaluating this proposed ordinance. When we initially proposed the imposition of a fee paid by gun owners in San Jose, it became apparent that under Proposition 26, it would be helpful to establish the legal baseline and ceiling for that fee, by identifying the cost burden to San Jose taxpayers of gun-inflicted injuries and death in San Jose. Doing so requires rigorous study of demographics and cost data from healthcare and other service providers, public agencies, and other sources.

Accordingly, we sought to identify a qualified consultant, and multiple references recommended the Pacific Institute on Research and Evaluation (PIRE), an independent, nonprofit organization, headed by health economist Dr. Ted Miller, Ph.D. Dr. Miller and his team–consisting of David Swedler, Ph.D  and Bruce Lawrence, Ph.D, gathered data, conducted research, and prepared the attached document, reflecting their calculations. Dr. Miller summarized their preliminary findings in a June report, and the attached provides a fuller description of PIRE's assumptions, methods, and findings. Among those findings:

- On average, 206 people suffered death or serious injury from gunshots each year in the City of San José between 2012 and 2018.

- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with publicly-funded services such as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.

1

**SER-470**

- When private financial costs to individuals and families are included in the calculation, San José residents incur an annual burden of $442 million per year.

This report was peer-reviewed by economist Dr. John J Donohue III, JD, PhD, a law professor at Stanford Law School, and epidemiologist Julie Parsonnet, MD, a health policy expert at Stanford University School of Medicine.  My thanks for their commitment of time.

This work was funded by a grant from the Silicon Valley Community Foundation using philanthropic funds that originated from two donors. My deep gratitude to Director Holly Kreider and CEO Deanna Gomby at the Heising-Simons Foundation, and to SV Angel founder Ron Conway for their generous support. I also thank Gina Dalma and Nicole Taylor of the SVCF for their support of our efforts. None of these funders or supporters have reviewed the report, so it may or may not reflect their views.

2

**PIRE**

PACIFIC INSTITUTE FOR RESEARCH AND EVALUATION

# Incidence and Cost of Firearm Injuries in San Jose, CA

January 19, 2022

**Pacific Institute for Research and Evaluation**
4061 Powder Mill Road, Suite 350
Beltsville, MD 20705-3113
www.pire.org

**Prepared by:**
Ted R Miller, PhD
David I Swedler, PhD
Bruce A Lawrence, PhD

The City of San José is considering legislation that would reduce the public cost of firearm injury. This report examines how many firearm injuries occur annually in the city and how much the city spends responding to them. It then analyzes the number of guns in the city and uses that information to calculate the city's annual firearm injury spending per gun. A report appendix provides the costs of firearm injuries in San José from the perspectives of society and of Federal, state, county, and city governments combined.

## Gunfire Annually Kills or Injures More Than 200 People in San José

Annually, more than 200 people are killed or injured by gunfire in San José. Assaults and homicides are the most common. Almost 30% of those injured die. Suicide deaths by firearm also are frequent. Unintentional gunshot wounds tend to be less serious. Notably, those incidents virtually all involve a single bullet. Table 1 summarizes official statistics on the average annual number of firearm deaths and injuries in San José over the most recent 6 years of data. The table uses 6-year averages to protect confidentiality.

Table 1. Average Annual Number of People Killed or Injured by Gunfire in San José

|  | Deaths | Nonfatal Hospital Inpatient Admissions | Emergency Department Treated & Discharged Without Admission | Total |
|---|---|---|---|---|
| Assault/Homicide/Legal Intervention | 28 | 32 | 29 | 89 |
| Self-Inflicted/Suicide | 28 | 3 | * | 31 |
| Unintentional/Undetermined | 2 | 25 | 59 | 86 |
| Total | 58 | 60 | 88 | 206 |

* Included with unintentional/undetermined to meet minimum count requirements that protect confidentiality.
Source: Tabulations of 2013-2019 Vital Statistics Multiple Cause of Death data and 2013-2018 California Hospital Discharge and Emergency Department Discharge Data censuses.

Many people are assaulted or robbed at gunpoint but not injured. Annually between 2017 and 2019, San José police responded to an average of 869 firearm robberies and assaults without physical injury.

## Annually, San José Spends at Least $7,937,000 Responding to Shootings

The primary costs that the City of San José incurs in responding to a shooting are for fire department and police response including police investigation and participation in the criminal justice process. Table 2 summarizes those costs. The San José Fire Department delivered emergency medical services to 48 shooting victims in 2018, 57 in 2019, and 82 in 2020, with an average annual cost of $137,000. The fire department response volume for gunshot injuries in this calculation comes from the department's call database that includes a variable indicating if calls responded to a shooting. The $2,199 cost per call in 2020 is a performance measure reported in the 2021 department budget.

1

The annual police response costs totaled  $7,800,000 annually. Of that amount, 72% involved homicides. The police cost estimates come from US average police response costs by crime from Hunt et al.[1] as refined by Miller et al.[2] The Hunt simulation model builds police costs per crime from the average police spending per capita in California in 2010 ($235.29 from Table A1). To adapt its estimates to San José, we therefore multiplied its mean costs by type of incident times the ratio of per capita costs in San José in 2020 versus the state in 2010. The San José per capita cost of $434.49 was computed as the average police cost per sworn officer hour of $144.34 according to the police budget office multiplied times 2080 hours per year times 1,151 sworn officers in 2020 times the ratio of 1.274 (sworn and nonsworn police labor payments) per sworn officer labor payment in the San José Police Department in 2016.[3] Hunt gave police costs for homicide, aggravated assault, motor vehicle crash, and a few other offenses. We did not vary police costs of an aggravated assault depending on whether the victim was injured, meaning our assault costs for cases with injury may be an underestimate. More likely than not, the police time required for a suicide or unintentional shooting death is comparable to the time required by an aggravated assault, whereas other nonfatal shootings involve modest costs comparable to a motor vehicle crash. Conservatively, we do not attribute any costs to robberies and assaults involving firearms but no injuries as these crimes might have happened even if the perpetrator lacked firearm access. The cost is even more conservative because it omits police costs of weapons violations and gun thefts. No data are available on the frequency of those crimes.

Table 2. Costs the City of San José Incurs Annually Responding to Firearm Injuries

|  | Unintentional/ Undetermined | Suicide Act | Homicide/ Assault | Total |
|---|---|---|---|---|
| Fire Department EMS | $69,403 | $10,136 | $57,531 | $137,071 |
| Police Fatal Injury Response | $29,224 | $624,663 | $5,680,080 | $6,333,967 |
| Police Nonfatal Injury Response | $135,072 | $4,556 | $1,329,692 | $1,469,320 |
| Total | $233,699 | $639,355 | $7,067,303 | $7,940,358 |

## 50,000-55,000 Households in San José Own Guns

We estimate that between 50,000 and 55,000 households in San Jose own guns.  This count was calculated using two approaches that have different limitations. Both approaches yielded counts for Santa Clara County in 2013-2015 (the most recent data available) that were used to calculate San José's share, then adjusted to account for firearms acquired in 2016-2020.

The first approach uses State of California background check data that show 363,725 guns were sold in Santa Clara County (SCC) between 2002 and 2015.[4] The County treats that count as the number of guns in SCC. The resulting count, however, has wide uncertainty because (a) people in SCC bought some of their guns before 2002, (b) some SCC residents purchased guns elsewhere and brought them to SCC, (c)

---

[1] Hunt PE, Saunders J, Kilmer B. Estimates of law enforcement costs by crime type for benefit-cost analyses. *Journal of Benefit-Cost Analysis, 10*(1), 95-123, 2019.

[2] Miller TR, Cohen M, Swedler D, Ali B, Hendrie D. Incidence and costs of personal and property crimes in the United States, 2017. *Journal of Benefit Cost Analysis. 12*(1), 24-54, 2021.

[3] Hyland S. Justice expenditure and employment extracts, 2016 – Preliminary. NCJ Number 254126, Bureau of Justice Statistics. 2019. https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/jeee16p.zip

[4] Santa Clara County Public Health. Guns in Santa Clara County. April 2018. The State requires that all gun sales in California go through its system.

some purchasers in SCC did not live in SCC and brought the guns they purchased elsewhere, (d) some SCC residents who purchased guns in SCC moved out of the County or stored their guns out of county, e.g., at a vacation home, (e) some people moved to SCC and brought guns with them, (f) some guns were sold in transactions outside SCC or were stolen and transported into or out of SCC, and (g) some guns were decommissioned (i.e., they became inoperative, were destroyed, or were otherwise removed from the stock of guns in San Jose). The count also excludes "ghost guns" that owners built themselves from parts they bought or printed on a 3-D printer.

The second approach uses 2013-14 Behavioral Risk Factor Surveillance System survey data that found 11% of households in Santa Clara County owned guns[5] (70,424 households when 11% is multiplied by the Census Bureau count of 640,215 households in SCC in 2015[6]). A national survey calculates that the average gun owner owns 4.8 guns, while Federal gun excise tax data adjusted for some guns being decommissioned arrived at an average of 5.16.[7] Multiplying the number of households with guns in SCC times the number of guns per household with guns yields a range of 338,034 to 363,545 guns in SCC in 2015.

These two approaches using different methods and data yield virtually identical counts when one uses the 5.16 average count of guns per household with guns. The similarity of results strengthens confidence in the accuracy of the calculated count.

The figures calculated above for Santa Clara County can be used to estimate the number of gun-owning households in San José . This calculation also can be approached in two ways. If we apply the 11% ownership rate to the 2014 household count of 325,114 for San José.[8] It yields a range of 164,856 to 177,298 guns in San José in 2014. Alternatively, we can build on published findings that the number of guns in a jurisdiction tracks the number of suicide deaths by firearm in the jurisdiction.[9,10] That alternative can be used with either the survey-based or sales-based SCC counts. It indicates that San José had 154,530 to 166,274 guns in 2015. Across the 5 calculated counts, the mean number of guns in San José in 2014-15 is 165,830, with a range from 154,530 to 177,298.

From 2015 to 2020, the number of guns in California rose by 55.3%. With that growth rate, people in San José owned 257,500 guns in 2020, with a range from 240,000 to 287,000. Dividing by the number of guns per household, 50,000 to 55,500 household owned guns.

---

[5] Idem.

[6] https://www.census.gov/quickfacts/fact/table/santaclaracountycalifornia,sanjosecitycalifornia/INC110219? , accessed June 2021.

[7] Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of US firearms: results from the 2015 National Firearms Survey. RSF: The Russell Sage Foundation Journal of the Social Sciences. 2017;3(5):38–57. The 5.16 average was computed by extending Table A1 in the article from 2013 to 2015, then multiplying the 4.8 average for 2015 from the survey by the 285-million-gun count from Table A1 divided by  the 265 million survey count.

[8] https://www.sanjoseca.gov/home/showpublisheddocument/23765/636689378693570000 , accessed August 2021. A 2015 count is not readily available.

[9] Miller M, Barber C, White RA, Azrael D. Firearms and suicide in the United States: is risk independent of underlying suicidal behavior? Am J Epidemiol. 15;178(6):946-955, 2013.

[10]

## San José Incurs an Annual Average Costs of $151 per Gun-owning Household Providing Services to Fatal and Nonfatal Firearm Injury Shooters and Victims

Dividing the total annual costs by the number of gun-owning household reveals that San José spends an average of $151 per gun-owning household providing injury-related services to firearm injury shooters and those they shoot. Given the range around the number of guns in the city, the cost per gun-owning household has an uncertainty range of $143 to $159. These figures incorporate a conservative estimate of total city expenditures on shooting response. The cost per gun averages $31, with a range from $28 to $33.

## ACKNOWLEDGEMENT

For insightful peer reviews of our draft report that improved its clarity and quality, we thank economist John J Donohue III, JD, PhD, who is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School, and Julie Parsonnet, MD, who is the George deForest Barnett Professor of Medicine and Professor of Health Research and Policy at Stanford University. Dr. Parsonnet also is the President and Chair of the Board of Directors of Scrubs Addressing the Firearm Epidemic (SAFE). We also thank The City of San José and The County of Santa Clara government personnel for promptly providing us with data we requested, as well as helpful guidance and insights. This work was funded by a grant from the Silicon Valley Community Foundation using funds that originated from Ron Conway and the Heising-Simons Foundation. The funders have not reviewed the report so it may not reflect their views.

## APPENDIX: COSTS OF FIREARM INJURIES IN SAN JOSÉ TO SOCIETY AND GOVERNMENT

### Annually Firearm Injuries in San José Cost $442 Million

We assessed the cost to society of gunfire in San José. Firearm deaths and injuries in San José annually impose losses valued at $442 million (Table 3). That's $432 per San José resident. Societal costs are comprehensive. The total includes costs paid by victims and their families, perpetrators, employers, insurers, and taxpayers. The value of pain, suffering, and lost quality of life accounts for the largest share of societal costs, with work losses of victims and perpetrators also large. Direct out-of-pocket costs total $35 million annually. These costs encompass medical and mental health care, police and emergency services, victim services, criminal justice, and employer spending because workers are absent temporarily or need to be replaced due to death or permanent disability.

Table 3. Annual Cost of Firearm Injury by Cost Category in San José, CA, 2013-2019

| Cost Category | Annual Cost | % of Total |
|---|---|---|
| Direct | $35,068,500 | 8% |
| Lost Work | $78,275,000 | 18% |
| Quality of Life | $328,355,500 | 74% |
| Total | $441,699,000 | 100% |

Source: Computations by Ted Miller, Pacific Institute for Research and Evaluation, 2021.

The societal costs here are tied to specific shootings. They exclude prevention costs and the impact on residents and businesses when gunfire harms neighborhoods.

4

Homicide and assault cause most (57%) of the firearm costs, followed by suicide acts (37%) and unintentional shootings (6%), per Table 4. The cost per shooting is highest for suicides, since so many of those incidents are fatal.

Table 4. Annual Incidence and Societal Cost of Firearm Injury by Intent in San José, CA, 2013-2019

| | People Shot | Cost/Person Shot | Total Cost | Cost to Federal, State & Local Government |
|---|---|---|---|---|
| Homicide/Assault/ Legal Intervention | 89 | $2,851,000 | $253,828,000 | $34,180,000 |
| Suicide | 31 | $5,238,000 | $164,122,000 | $4,298,000 |
| Unintentional/Undetermined | 86 | $290,000 | $24,749,000 | $1,260,000 |
| Total | 206 | $2,151,000 | $441,699,000 | $39,738,000 |

Source: Computations by Ted Miller, Pacific Institute for Research and Evaluation, 2021.

Governments across all levels pay almost $40 million annually due to firearm injuries in San José (Table 4). The taxpayer bill includes contributions to the costs of acute and long-term health care; public services including emergency response, victim assistance, incident investigation, and perpetrator adjudication and sanctioning; as well as tax revenue lost when someone is killed or unable to work.

The societal cost assessment used a peer-reviewed framework for costing gun violence that PIRE developed more than 20 years ago and periodically updates.[11] This framework consists of an economic analysis of direct out-of-pocket costs across the continuum of public services and employer responses associated with injury and death, as well as indirect cost data following an event. Direct costs include police, emergency response, hospital-related expenses, healthcare claims, family mental health services, court, criminal justice, and employer costs. Indirect costs include victim loss of wages and the estimated value of lost quality of life. For most of these cost elements, we use injury cost models and methods that we developed and have widely published to price injuries from all causes. That model is documented in considerable detail.[12] Other costs were adapted from our well-known crime cost model.[13] The indirect costs of fatalities were computed for each victim in San José, taking account of the victim's age and sex, then summed.

As explained above, we incorporated police and fire department EMS costs that are specific to San José. For other cost categories, the current estimates use national average costs per firearm incident by intent and severity adjusted to San José prices. We are working with Santa Clara County public health staff to

---

[11] Miller TR, Cohen MA**.** Costs of gunshot and cut/stab wounds in the United States, with some Canadian comparisons. *Accident Analysis and Prevention. 29*(3):329-341, 1997. Follman M, Lurie J, Lee J, West J. The True Cost of Gun Violence in America: The data the NRA doesn't want you to see. Mother Jones. 2015.

[12] Zonfrillo MR, Spicer RS, Lawrence BA, Miller TR. Incidence and costs of injuries to children and adults in the United States. *Injury Epidemiology. 5*(1), article 37, 2018. Miller TR, Pindus NM, Douglass JB, Rossman SB. Databook on nonfatal injury: Incidence, costs, and consequences. Washington, DC: The Urban Institute Press, 1993. Lawrence BA, Miller TR. Medical and work loss cost estimation methods for the WISQARS cost of injury module. Calverton, MD: PIRE, 2014. https://www.researchgate.net/publication/265162679_Medical_and_Work_Loss_Cost_Estimation_Methods_for_the_WISQARS_Cost_of_Injury_Module .

[13] Miller TR, Cohen MA, Wiersema B. Victim costs and consequences—A new look. Washington, DC: National Institute of Justice, 1996. Miller TR, Cohen M, Swedler D, Ali B, Hendrie D. Incidence and costs of personal and property crimes in the United States, 2017. *Journal of Benefit Cost Analysis. 12*(1), 24-54, 2021.

update the medical costs by applying our models to local hospital data, as well as to replace selected other direct costs with local data.

## About PIRE and Dr. Miller

The Pacific Institute for Research and Evaluation (PIRE) is an independent, nonprofit organization merging scientific knowledge and proven practice to create solutions that improve the health, safety, and well-being of individuals, communities, and nations around the world. PIRE's mission is to promote, undertake, and evaluate activities, studies, and programs that improve individual and public health, welfare, and safety.

Founded in 1974, PIRE has a longstanding reputation for research integrity. Its work is funded with a balance of National Institutes of Health (NIH) grants, other federal grants and contracts, and foundation awards. PIRE has held a NIH/National Institute on Alcohol Abuse and Alcoholism Center Grant -- Berkeley's Prevention Research Center -- since 1980.

Ted R Miller, PhD, is a widely cited health economist who has more than 30 years of experience studying the costs of injury and violence. He has published more than 350 books and journal articles on the costs of societal ills and savings from prevention. Dr. Miller received the Excellence in Science and Distinguished Career Awards from the Injury Control and Emergency Health Services Section of the American Public Health Association and the Vision Award from the State and Territorial Injury Prevention Director's Association. He is a Principal Research Scientist at PIRE and an Adjunct Professor at the Curtin University School of Public Health.

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE*
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admission *Pro Hac Vice* forthcoming

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a non-profit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case Number: _____<br><br>COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND NOMINAL DAMAGES |



Complaint                                                              No: _____

1        *"That the power to tax involves the power to destroy; that the power to destroy may defeat and*
2  *render useless the power to create ..."* Justice John Marshall, *M'Culloch v. Maryland*, 17 U.S. 316,
3  431 (1819). *"A tax that burdens rights protected by the [Constitution] cannot stand unless the burden*
4  *is necessary to achieve an overriding governmental interest."* Justice Sandra Day O'Connor,
5  *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 582 (1983).
6
7        Plaintiffs National Assocation for Gun Rights, Inc. ("NAGR"), and Mark Sikes ("Sikes"), by
8  and through the undersigned counsel, hereby bring this action for injunctive relief, a declaratory
9  judgment, and nominal damages as a result of the City of San Jose's unconstitutional and unlawful
10 ordinance, specifically Chapter 10 of Title 10 of the San Jose Municipal Code (the "Ordinance"). In
11 support of these requests, Plaintiffs state as follows:
12                                    **INTRODUCTION**
13       1.     The Second Amendment "guarantee[s] the individual right to possess and carry
14 weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and the
15 government "may not impose a charge for the enjoyment of a right granted by the federal
16 constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). And yet, the City of San Jose has
17 taken the unprecedented step of requiring virtually all gun owners within its city limits to pay
18 unspecified sums of money to private insurance companies and an unspecified fee to an unidentified
19 government-chosen non-profit simply to exercise their constitutional right to own a gun, as well as an
20 unspecified fee to the City for the costs of administering the unlawful Ordinance. Just as a tax on the
21 fundamental right for the press to circulate its content "suggests that the goal of the regulation is not
22 unrelated to suppression of expression," *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936),
23 San Jose's imposition of a tax, fee, or other arbitrary cost on gun ownership is intended to suppress
24 gun ownership without furthering any government interest. In fact, the penalties for nonpayment of
25 the insurance and fees include seizure of the citizen's gun. The Ordinance is, therefore, patently
26 unconstitutional.
27       2.     Moreover, it is at home "where the need for defense of self, family, and property is
28 most acute." *Heller*, 554 U.S. at 628. Because California and the City of San Jose have already made

1

Complaint

1   it exceedingly difficult to lawfully carry a weapon outside the home, and the Ordinance only affects

2   owners of lawfully owned guns, the Ordinance's true impact is solely on guns kept in the home by

3   law-abiding citizens. It does *nothing* to deter the scourge of unlawful ownership and use of guns by

4   criminals or to recoup from them compensation for the injuries and damage they cause. If left intact,

5   the City of San Jose's Ordinance would strike at the very core of the fundamental constitutional right

6   to keep and bear arms and defend one's home.

7        3.      By compelling gun owners to subsidize the advocacy of an unnamed government-

8   chosen and anti-gun ownership non-profit, as appears to be the intent and function of the Ordinance,

9   the Ordinance also violates the First Amendment rights of gun owners.

10       4.      Additionally, the Ordinance violates Article XXIII of the California Constitution

11  because it imposes taxes that were not approved by the voters, or in the alternative, imposes a fee that

12  is unrelated to the costs borne by the City of San Jose. Finally, the Ordinance violates the San Jose

13  City Charter because, by commanding gun owners to directly pay one non-profit for unspecified

14  programs not controlled by the City Council, it unlawfully deprives the City Council of its budget

15  and appropriations powers, and violates a requirement that City receipts be deposited into City

16  accounts.

17       5.      To preserve the safety and core rights under the Constitution of the law-abiding

18  citizens of the City of San Jose, as well as their rights under the California Constitution and the City

19  Charter, this Court must prevent Defendants from enforcing the unconstitutional and unlawful

20  Ordinance.

21                              **JURISDICTION AND VENUE**

22       6.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331

23  because it arises under the First, Second, Fifth, and Fourteenth Amendments to the U.S. Constitution

24  and 42 U.S.C § 1983. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant

25  declaratory relief and other relief, including preliminary and permanent injunctive relief, pursuant to

26  Rule 65 of the Federal Rules of Civil Procedure.

27       7.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the state

28  law claims regarding (the City of) San Jose's lack of authority to pass the Ordinance because the

2

Complaint

1   federal claims and this state claim are so related that they form part of the same case or controversy.

2   8.   Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1)

3   because Defendants are officials of the City of San Jose, which is within the geographical boundaries

4   of the Northern District of California. Defendants are also residents of this State within the meaning

5   of 28 U.S.C. § 1391(c).

6   9.   The Court has personal jurisdiction over the Defendants because Defendant, an official

7   with the City of San Jose, is within the State of California.

8   **INTRADISTRICT ASSIGNMENT**

9   10.   This action is properly assigned to the San Jose Division, pursuant to Civil L.R. 3-2(e).

10   A substantial part of the events giving rise to the claims occurred in Santa Clara County, California.

11   **PARTIES**

12   11.   Plaintiff NAGR is a non-stock, non-profit corporation incorporated under the laws of

13   the Commonwealth of Virginia and has its principal place of business in Windsor, Colorado. NAGR is

14   a grassroots organization whose mission is to defend the right to keep and bear arms under the Second

15   Amendment and advance the constitutional right by educating the American people and urging them

16   to action in public policy.  NAGR has members who would be subject to the Ordinance within the

17   City of San Jose.

18   12.   Plaintiff Mark Sikes resides in San Jose, California. Sikes legally owns a gun, is not a

19   peace officer, does not have a concealed carry permit, and does not meet the qualifications of CAL.

20   GOV. CODE § 68632 (a) and (b) and, therefore, would be subject to the Ordinance if it were to go into

21   effect on July 23, 2022.

22   13.   Defendant City of San Jose is a municipal corporation within the County of Santa

23   Clara, California. A true and correct copy of the City of San Jose's City Charter is attached as Exhibit

24   "A."

25   14.   Defendant Jennifer Maguire ("Maguire") is the current and active City Manager for the

26   City of San Jose. San Jose's Charter states that "The City Manager shall be responsible for the faithful

27   execution of all laws, provisions of this Charter, and acts of the Council which are subject to

28   enforcement by the City Manager or by the officers who are under the City Manager's direction and

3

Complaint

1  supervision." San Jose City Charter, § 701(d) (Exhibit "A"). Additionally, the City Manager is

2  directly identified with enforcement authority throughout the Ordinance. Ordinance §§ 10.32.205,

3  210, 215, 235, & 250.

4       15.    Defendant San Jose City Council (the "City Council") is vested with authority under

5  Article IV of the City of San Jose's City Charter (see Exhibit "A"). The Ordinance vests the City

6  Council with authority to "set forth the schedule of fees and charges established by resolution of the

7  City Council." *Id.,* § 10.32.215; 10.32.250.

8  <center>**STATEMENT OF FACTS**</center>

9  <center>**The Ordinance**</center>

10       16.    On January 25, 2022, the City Council adopted bill number 22-045, which will become

11  law on July 25, 2022, one hundred eighty (180) days from the date of its passing.  This law is to be

12  codified as Chapter 10.32 of Title 10 of the San Jose Municipal Code (collectively referred to as the

13  "Ordinance"). A true and correct copy of bill number 22-045 is attached as Exhibit "B." A copy of a

14  January 21, 2022 memo with passed amendments is attached as "Exhibit C."

15       17.    According to a memorandum from Mayor Sam Liccardo, the Ordinance will require an

16  estimated 50,000-55,000 gun-owning San Jose Citizens, minus a few exceptions, to obtain an

17  insurance policy and pay annual fees simply to exercise the same constitutional right to own a gun that

18  existed prior to this ordinance. Liccardo Mem. re Gun Harm Reduction Ord., Jan., 19, 2022 (attached

19  as Exhibit "D").

20       18.    The City of San Jose's City Attorney's summary of the law states

21  that:

22          If approved, the proposed ordinance will require, with certain
        exceptions, that San José residents who own firearms: (a) obtain

23          and maintain liability insurance; (b) pay an annual gun harm
        reduction fee to a designated nonprofit organization that will use

24          the fee proceeds to provide gun harm reduction services to
        residents of the City who own or possess a gun or to members of

25          their household; and (c) pay any City cost recovery fees associated

26          with program implementation, including any associated third-party costs.

27  Frimann Mem. re Gun Harm Reduction Ord., Jan. 14, 2022, (attached hereto as Exhibit "E").

28

<center>4</center>

Complaint

19.     "Failure to comply [with the Ordinance] shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine." *Id.* at 2; *see also* Ordinance § 10.32.245 (seizure of guns for noncompliance); § 10.32.240 (fines).

20.     The Ordinance targets guns in the home. It does not apply to people who have a license to carry a concealed weapon. *Id.*, § 10.32.225. Additionally, absent a concealed carry permit, there is no other way to carry a firearm in San Jose. CAL. PENAL CODE §§ 25850, 26150, 26155, 26350, 26400. The Ordinance thus would charge all law-abiding owners of guns for home and self-defense to pay for the harms caused by criminals who use unregistered guns to commit acts of violence. Ordinance § 10.32.200 (identifying costs the Ordinance seeks to recoup to include those arising from homicides and all firearm-related injuries).

### *Insurance Requirement*

21.     The Ordinance conditions the constitutional right to own a gun on the payment of an unstated amount for insurance.  It states that "A person who resides in the City of San Jose and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy…specifically covering losses or damages resulting from any negligent or accidental use of the Firearm, including but not limited to death, injury, or property damage." Ordinance § 10.32.210.A; *see also* § 10.32.200.B.9.

22.     This requirement does not contain any information about minimum insurance coverage thresholds or premiums. Thus, the City of San Jose has conditioned the constitutional right of its law-abiding citizens to own a gun on an unstated, unregulated price to be set by an industry of for-profit private sector corporations.

### *Fee Requirement*

23.     The second primary component of the Ordinance is the creation of a "fee" for owning a gun. The Ordinance states that "A person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year." Ordinance § 10.32.215. No fee amount is specified, nor is there a criteria on how to calculate the fee. *Id.* Rather, Defendant City Council reserved the right for itself to determine the fee amount at

5

Complaint

a later date. *Id*.

24.     The destination of the money is to an undetermined non-profit. That determination is delegated to Defendant Maguire. *Id.*, § 10.32.220.

25.     The non-profit fee in the Ordinance is not to defray the City's administrative costs. Rather, "all monies…shall be expended by the Designated Nonprofit Organization…." *Id.*, § 10.32.220.A.

26.     The only criteria for said non-profit is that it "provid[e] services to residents of the City that own or possess a Firearm in the City or to members of their household, or to those with whom they have a close familial or intimate relationship." These services "include, *but are not necessarily limited to*" suicide prevention services or programs, violence reduction or domestic violence services or programs, mental health services related to gun violence, firearms safety education or training, or addiction intervention and substance abuse treatment. *Id.*, § 10.32.220.A (emphasis added).

27.     "The City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended" by the non-profit. *Id.*, § 10.32.220.C

28.     The fee thus functions to compel gun owners to give their money to government-approved non-profits to spend on either wholly unspecified programs at the non-profit's discretion, the non-profit staff's salaries and benefits, or a handful of specified services that the City is not obligated to perform. This redistribution of wealth from gun owners to one City-favored non-profit and its staff is not only obnoxious to the Constitution, it is an invitation to corruption and waste.

29.     By its plain terms, this fee and insurance requirement do not compensate the City to cover reasonable costs of governmental activity, because they are not for government activity. Further, the manner in which those costs are allocated to gun owners do not bear a fair or reasonable relationship to the gun owner's burdens on, or benefits received from, the City's governmental activity.

30.     Indeed, the Ordinance also authorizes a separate fee just to recoup the costs associated in enforcing the Ordinance. *Id.*, § 10.32.250.

31.     Accordingly, as discussed further below, the "Annual Gun Harm Reduction Fee" — unconnected to the cost of City services and for unspecified programs outside of the City's control—is

6

Complaint

1   nothing more than a *tax* the City is imposing on the exercise of a constitutional right.

2   **The Second Amendment**

3   32.   The Second Amendment to the United States Constitution states that "A well regulated

4   Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms,

5   shall not be infringed." U.S. Const., amend. II.

6   33.   "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the

7   right to keep and bear arms among those fundamental rights necessary to our system of ordered

8   liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).

9   34.   Even in the face of "the problem of handgun violence in this country,…the

10   enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*,

11   554 U.S. at 636.

12   35.   "The upshot of [*Heller* and *McDonald*] is that there now exists a clearly-defined

13   fundamental right to possess firearms for self-defense within the home." *United States v.*

14   *Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011).

15   36.   Local governments, including the City of San Jose, are bound by the Second

16   Amendment. *McDonald*, 561 U.S. at 790; *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

17   37.   Imposing an insurance mandate and fees (or taxes) on gun owners in the City of San

18   Jose burdens Plaintiff NAGR's members and Plaintiff Sikes by creating an indefinite cost on their

19   ability to exercise their basic and fundamental right to possess a gun. "A tax that burdens rights

20   protected by the [Constitution] cannot stand unless the burden is necessary to achieve an overriding

21   governmental interest." *Minneapolis Star and Tribune*, 460 U.S. at 582.

22   38.   Specific to insurance, in theory, when crime increases in a community, insurance

23   premiums will increase, just as premiums for car insurance increase in geographical locations that

24   have more car accidents.

25   39.   Thus, in times of increased need for self-protection and defense, which is one of the

26   very purposes of the Second Amendment, exercising that right will become increasingly expensive

27   and burdensome.

28   40.   Specific to both the insurance mandate and the fees created by the Ordinance, these

---

7

Complaint

costs are subject to the whims of the City Council and private insurance companies and, thus, bear a significant risk of making gun ownership cost prohibitive.

41.     The Ordinance cites a number of statistics about gun violence, but provides no studies or statistics that liability insurance will reduce the stated aim of reducing gun violence. Rather, it in conclusory fashion states that "Liability insurance can reduce the number of gun incidents by encouraging safer behavior…." Ordinance § 10.32.200.B.9.

42.     The Ordinance cites a number of statistics about gun violence, but provides no studies or statistics that the yet-to-be-determined non-profit will accomplish the stated aim of reducing gun violence. Rather, in conclusory fashion, it states that "Programs and services to gun owners and their households can also encourage safer behavior, and provide education and resources to those residents." *Id.*, § 10.32.200.B.10.

43.     Neither the insurance mandate nor the non-profit fee "fit" any stated government objective.

44.     Additionally, governments "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113.

45.     The only exception is to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Applied to the Second Amendment, "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2nd Cir. 2013).

46.     Neither the insurance premium nor the fee to be paid to the City's chosen non-profit are designed to defray the City's administrative costs.

**The Ordinance's Uncertainties**

47.     The Ordinance's insurance mandate does not specify any standards for insurance, including a minimum coverage threshold, and requires coverage for certain liabilities "*including but not limited to*" death, injury or property damage. Ordinance § 10.32.210. Thus, the scope of coverage is not sufficiently defined so as to determine what liabilities must be covered.

48.     The Ordinance does not specify how much either fee will cost gun owners. *Id*. §§

8

Complaint

10.32.215; 10.32.250. Rather, "The annual fee will be set forth in the schedule of fees and charges established by resolution of the City Council." *Id.*, § 10.32.215. And, "The City Manager is hereby authorized to charge and collect any and all cost recovery fees…established by resolution of the City Council." *Id.*, § 10.32.250.

49.     The non-profit fee schedule is also undetermined. The Ordinance delegates that responsibility to Defendant Maguire. "The date by which payment shall be made annually shall be established in the regulations promulgated by City Manager." *Id.*, § 10.32.215.

50.     The Ordinance does not create any criteria for the fee amount to be distributed to the non-profit. *Id.*, § 10.32.215.

51.     No assurances are made that the non-profit will use the money for any of the stated purposes. To the contrary, "The City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended." *Id.*, § 10.32.220.C.

52.     The Ordinance does not identify the recipient of the non-profit fee money. Rather, it only sets out criteria that "include, but are not necessarily limited to" suicide prevention or programs, violence reduction, mental health services, firearms safety education or training, or addiction intervention and substance abuse treatment. *Id.*, § 10.32.220. Thus, the criteria for who receives the proceeds of the fee described in section 10.32.220 is open ended.

**The First Amendment**

53.     The First Amendment, applied to the states through the Fourteenth Amendment, protects the freedom of speech, including both the right to speak freely and the right to refrain from speaking at all, and to avoid associating with others for expressive purposes. The First Amendment thus prohibits government officials from forcing individuals to support views that they find objectionable.

54.     Thomas Jefferson famously said that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical." *Janus v. AFSCME*, 138 S.Ct. 2448 (2018) quoting *A Bill for Establishing Religious Freedom*, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950).

55.     The Ordinance directs gun owners to subsidize one unidentified non-profit by paying

9

Complaint

1    the city's fee directly to that organization.  The Ordinance even prohibits the city from directing how

2    the non-profit would use the funds.  The one thing that is clear is that the organization will likely be

3    dedicated to exclusively preaching the negative risks of gun ownership.

4        56.    The Defendants may not require Plaintiffs to pay fees to non-profits when those fees

5    are going to be used to fund activities of ideological or political nature with which Plaintiffs disagree.

6    *See Keller v. State Bar of California*, 496 U.S. 1, 13 (1990).

7        57.    The Ordinance therefore compels Plaintiffs' speech and this Court should preliminarily

8    and permanently enjoin Defendant from enforcing the Ordinance and award Plaintiffs' nominal

9    damages.

10                          **California Constitution-Preemption**

11       58.    Article XI, section 7 of the California Constitution states that "A county or city may

12   make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not

13   in conflict with general laws."

14       59.    Article XI, section 7 of the California Constitution preempts any local law that

15   "duplicates, contradicts, or *enters an area fully occupied by general law*, either expressly or by

16   legislative implication." *Fiscal v. City and County of San Francisco* 158 Cal.App.4th 895, 903 (Cal.

17   Ct. App. 2008)(quotation omitted)(emphasis added).

18       60.    "[T]he Legislature intended to occupy the field of residential handgun possession to the

19   exclusion of local government entities." *Fiscal*, 158 Cal.App.4th at 909.

20       61.    Gun regulation is already fully occupied by the state of California. Indeed, California

21   already comprehensively regulates firearms, including firearm safety, CAL. PENAL CODE §§ 23500-

22   23520, the appearance of firearms, *id*., §§ 23800-24790, storage of firearms, *id*., §§ 25000-25225,

23   how to handle lost or stolen firearms, *id*., §§ 25250-25225, carrying firearms, *id*., §§ 25300-26406, the

24   sale, lease, or transfer of firearms, *id*., §§ 26500-28490, the registration and assignment of firearms,

25   *id*., §§ 28010-28024, how to transfer firearms between private persons, *id*., §§ 28050-28070,

26   recordkeeping, background checks, and fees related to transfer, *id*., §§ 28100-28490, the manufacture

27   of firearms, *id*., §§ 29010-29184, who may not possess a firearm, *id*., §§ 29610-30165, rules

28   pertaining to "firearm equipment," *id*., §§ 30150-30165, and, in some cases, firearm registration, *id*.,

                                        10
Complaint

1  §§ 30900-30965. This is but a sample of all of the separate statutes regulating firearms in California.

2  *See generally* CAL. PENAL CODE §§ 23500-34370.

3     62.    Thus, firearm regulation is not within the purview of the City of San Jose pursuant to

4  the California Constitution because the Ordinance is preempted by California law.

5                         **California's Local Tax Requirements**

6     63.    All taxes imposed by local governments in California must be approved by voters of

7  the local government. CAL. CONST. art. XIII C. A "tax" in California, with exceptions that do not

8  apply here, is defined as "any levy, charge, or exaction of any kind imposed by a local government."

9  Article XIII C, § 1.

10    64.    The Ordinance, which contains three separate "taxes" (that is, the insurance mandate,

11 the non-profit fee, and the administrative fee), was not submitted to the electorate for approval and,

12 therefore, violates the California Constitution.

13                         **The San Jose City Charter**

14    65.    The San Jose City Charter vests in the City Council "[a]ll powers of the City and the

15 determination of all matters of policy." San Jose City Charter § 400. These powers include the

16 exclusive authority to impose taxes. *Id.*, § 602(c). With regard to the expenditure of City funds, only

17 the City Council has the power to establish a budget. *Id.* §§ 1204, 1206. The Council also has the sole

18 power to appropriate the expenditure of City funds. *Id.*, § 1207.

19    66.    The City Manager is the "Chief Administrative Officer and head of the administrative

20 branch of the City government." *Id.*, § 502; *see also id.*, § 701.

21    67.    "All revenues and receipts which are not required by [the] Charter, State law or

22 ordinances to be placed in special funds shall be credited to the [City's] General Fund." *Id.*, § 1211.

23 The General Fund is "a medium of control and accounting for all City activities excepting activities

24 for which special funds are established and maintained." *Id.*

25    68.    The Ordinance, by prohibiting the City from directing how "monies from the Gun

26 Harm Reduction fee are expended" by the chosen non-profit, Ordinance § 10.32.220.C, violates the

27 San Jose City Charter's reservation of budgeting and appropriation power to the City Council.

28    69.    The Ordinance, to the extent it empowers the City Manager to determine how the

                                        11
Complaint

1   Ordinance's cost recovery fee is spent, violates the separation of powers within the City Charter,

2   which reserve budgeting and the appropriation of funds to the City Council.

3        70.    The Ordinance, by requiring gun owners to pay the City-required, City-determined fee

4   directly to a non-profit organization, *id.*, § 10.32.215, thereby diverts a City fee to a non-profit rather

5   than the City's General Fund, and thus violates the City Charter's requirement that all City revenues

6   and receipts be deposited into City accounts as an essential means of City "control and accounting."

7   This too is an invitation to corruption, waste, and fraud.

8        71.    The Ordinance also violates California Government Code § 43400 which requires that

9   all "money received from licenses, street poll taxes, fines, penalties, and forfeitures shall be paid into

10   the general fund."

11                           *      *      *      *

12        72.    In sum, the Ordinance violates the Second Amendment by infringing upon the right to

13   bear arms, violates the First Amendment by forcing gun owners to subsidize a non-governmental non-

14   profit organization's advocacy against gun ownership, violates the Fifth and Fourteenth Amendment

15   rights to due process by being unconstitutionally vague, violates article XI, §7 of the California

16   Constitution by preempting a field thoroughly occupied by state law, violates article XIII C of the

17   California Constitution by failing to submit a local tax to the voters for approval, violates the San Jose

18   City Charter's budget and appropriations provisions, and violates controls on the handling of city

19   receipts under the City Charter and the California Government Code. Accordingly, Plaintiffs request

20   this court to issue preliminary and permanent injunctions preventing Defendants from enforcing the

21   Ordinance in its entirety pursuant to 42 U.S.C. § 1983, declare the Ordinance unconstitutional in its

22   entirety under both the United States and California Constitutions, declare that the Ordinance violates

23   the San Jose City Charter and the California Government Code, issue nominal damages, and order any

24   other relief this Court deems necessary and proper.

**FIRST CLAIM FOR RELIEF**
**Violation of the Second and Fourteenth Amendments (42 U.S.C. § 1983)**
***The Ordinance requiring owners of guns to purchase insurance and pay an annual fee***
***violates the Second and Fourteenth Amendments to the United States Constitution.***

28        73.    Plaintiffs incorporate by reference and re-allege each of the Paragraphs set forth above.

---

Complaint

74.     The Second Amendment of the United States Constitution guarantees "the right of the people to keep and bear arms" and that right "shall not be infringed." U.S. CONST., amend. II.

75.     In a Second Amendment inquiry, a Court asks "whether the challenged law burdens conduct protected by the Second Amendment[.]" *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).

76.     Government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113. For example, in 1973 the Minnesota legislature passed a use tax on paper and ink. The Supreme Court struck down this special use tax because it singled out the press for special treatment and the Court found that a "tax that burdens rights protected by the [Constitution] cannot stand unless the burden is necessary to achieve an overriding governmental interest." *Minneapolis Star and Tribune Co.*, 460 U.S. at 581.

77.     This is particularly true because the exercise of a constitutional right cannot be conditioned upon a fee unless it is to defray an administrative expense. *Cox*, 312 U.S. at 577; *Kwong*, 723 F.3d at 165.

78.     The Ninth Circuit has adopted the *Murdock/Cox* standards for Second Amendment fee cases. *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017).

*The Ordinance Violates the Second Amendment*

79.     Both the insurance mandate and the two fee requirements in the Ordinance impose costs on gun owners in the City of San Jose for the enjoyment of their Second Amendment rights.

80.     If the City has the power to impose such taxes and fees on gun ownership, there would be little to prevent the city from extinguishing the Second Amendment within its borders.

81.     Though it threatens the confiscation of guns for noncompliance with its insurance and fee mandates when it takes effect in just 180 days, the Ordinance does not specify a sum certain or articulate standards that will determine the cost of the insurance requirement or either fee that the Ordinance creates. Therefore, the as yet unknown financial burden of the Ordinance's insurance requirement will be left to the whims of for-profit insurance companies without a clear standard for what their policies must cover.  The City's fees, too, are left unstated and deferred to future, unscheduled determinations of the City Council in an exercise of unfettered discretion.

Complaint

82.     The City's dictate that the right to gun ownership will depend on citizens having an unspecified insurance policy and payment of as-yet undetermined fees to the City and a third party who has yet to be chosen will chill and infringe upon on those citizens' Second Amendment rights.

83.     It is plausible, if not probable, that the City would make gun ownership cost prohibitive for at least some San Jose residents, particularly in light of the view of gun ownership reflected in the Ordinance's findings.

84.     Where, as here, taxes and fees are not anchored to value or income, they are also inherently regressive; their burden on citizens' rights will be inversely proportional to those citizens' ability to pay the taxes and fees.

85.     At the very least, any such a cost "infringe[s]" upon the constitutional right to bear arms.

### The Ordinance Does Not Serve Its Claimed Purpose or Any Other Valid Purpose

86.     The Ordinance's "Purpose and Findings" recites facts about homicide, suicide, accidental injury and death, hospitalizations, probabilities of incidents as they correlate to gun ownership, and statistics from automobile insurance. Ordinance § 10.32.200.B. Accordingly, the City of San Jose appears to claim a stated objective of reducing gun violence. *Id.*, § 10.32.200.

87.     However, requiring gun owners to purchase an insurance policy and pay an annual fee to an unnamed non-profit are not a "reasonable fit" to the asserted objective of reducing gun violence insofar as the violence to be reduced is committed by persons who do not register their guns and use their guns to commit crimes, or the injuries are inflicted by persons other than the guns' owners.

88.     The City makes no findings, other than conclusory statements, that insurance or funding non-profits will impact gun violence, particularly gun violence by those who lawfully possess and register their firearms to be kept in the home as opposed to others who possess guns either unlawfully or outside the home. *See generally id.*, § 10.32.200. That the Ordinance does not in fact control how the chosen non-profit would spend the City's fees, and specifically forbids the City from directing the spending of its own funds, further undermines the contention that payment of the fee would achieve the Ordinance's aims.

89.     To the extent that Defendants will assert a separate government interest, said

14

Complaint

government interest would not be significant, substantial, or important.

90.     To the extent that Defendant will assert a separate government interest, requiring gun owners to pay insurance and an annual fee to an unnamed non-profit does not constitute a "reasonable fit" for any other government interest.

91.     Neither the insurance requirement nor the fee requirement is historically or presumptively lawful, in that, the Ordinance is a first-of-its-kind regulation of firearms.

*          *          *          *

92.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Ordinance.

93.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Ordinance.

94.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### SECOND CLAIM FOR RELIEF

**Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)**
***The payment of a fee to a non-profit violates the free speech rights of gun owners by compelling them to subsidize private speech on matters of substantial public concern.***

95.     Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth above.

96.     The First Amendment protects Plaintiffs' freedom of speech which includes both the right to speak freely and the right to refrain from speaking at all.

97.     The First Amendment protects the right of Plaintiffs to eschew association for expressive purposes.

98.     The First Amendment prohibits government officials from forcing individuals to support views that they find objectionable.

99.     Thomas Jefferson famously said that "to compel a man to furnish contributions of

15

Complaint

1  money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical."

2  *Janus*, 138 S.Ct. at 2464 (quoting *A Bill for Establishing Religious Freedom*, in 2 Papers of Thomas

3  Jefferson 545 (J. Boyd ed. 1950)).

4      100.    In *Janus v. AFSCME*, the Supreme Court examined the case of compelled

5  subsidization of private speech. The Court never determined if the courts are to use strict scrutiny or

6  exacting scrutiny because in *Janus* the Court concluded that the "Illinois scheme cannot survive

7  under even the more permissive standard." *Id.* at 2465.

8      101.    Furthermore, the Defendants may not require Plaintiffs to pay fees to non-profits when

9  those fees are going to be used to fund activities of ideological or political nature, such as endorsing

10  gun control. *See Keller*, 496 U.S. at 13.

11      102.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

12  to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

13  Ordinance.

14      103.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and

15  temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of

16  the Ordinance.

17      104.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

18  rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

19  U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**
**Violation of the Fifth and Fourteenth Amendments (42 U.S.C. § 1983)**
***The insurance requirements and annual fee are unconstitutionally vague,***
***in violation of the Fifth and Fourteenth Amendments.***

23      105.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

24  above.

25      106.    A law is unconstitutionally vague when "obedience to a rule or standard was so vague

26  and indefinite as really to be no rule or standard at all."  *Boutilier v. INS*, 387 U.S. 118, 123 (1967).

27      107.    The Ordinance is vague, in that, it does not specify any standards for insurance,

28  including a minimum coverage threshold, and requires coverage for certain liabilities "*including but*

Complaint

1   *not limited to*" death, injury or property damage. Ordinance § 10.32.210.

2       108.    The Ordinance is vague, in that, it does not identify any particular standards by which

3   the non-profit fee is calculated, or a specific fee amount, and leaves open the possibility of prohibitive

4   fees and future fee increases. *Id.*, § 10.32.220.

5       109.    The Ordinance is vague, in that, it does not identify the recipient of the fee that must be

6   paid to a non-profit in order to avoid gun confiscation and fines.

7       110.    Further, the Ordinance does not specify how the chosen non-profits must spend the

8   City's fee revenues, but rather only sets out a criterion that "include, but are not necessarily limited

9   to" suicide prevention or programs, violence reduction, mental health services, firearms safety

10  education or training, or addiction intervention and substance abuse treatment. *Id.*, § 10.32.220.

11      111.    No assurances are made that these non-profits will use the money for any of the stated

12  purposes. To the contrary, "The City shall not specifically direct how the monies from the Gun Harm

13  Reduction Fee are expended." *Id.*, § 10.32.220.C.

14      112.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

15  to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

16  Ordinance.

17      113.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and

18  temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of

19  the Ordinance.

20      114.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

21  rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42

22  U.S.C. § 1988.

23                          **FOURTH CLAIM FOR RELIEF**
                **Violation of article XI, §7 of the California Constitution-Field Preemption**
24               ***The Ordinance occupies a field already occupied by California law.***

25

26      115.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

    above.

27

28      116.    Article XI, section 7 of the California Constitution states that "A county or city may

    make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not

---

                                17

Complaint

1   in conflict with general laws."

2       117.   The State of California has voluminous statutes comprehensively regulating firearm

3   ownership in California. *See generally* CAL. PENAL CODE §§ 23500-34370. California courts have

4   already determined that "the Legislature intended to occupy the field of residential handgun

5   possession to the exclusion of local government entities." *Fiscal*, 158 Cal.App.4th at 909 (citing Cal.

6   Penal Code § 12026).[1]

7       118.   Accordingly, because the state legislature has already occupied the field of regulating

8   residential handgun possession, as well as all conceivable fields of gun possession, local governments

9   are excluded from further regulation of guns, particularly guns in the home.

10      119.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

11   to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

12   Ordinance.

13      120.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate

14   their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs

15   pursuant to California Code of Civil Procedure Section 1021.5.

16
                            **FIFTH CLAIM FOR RELIEF**

17      **Violation of article XXIII C, §1 of the California Constitution-Local Tax Elections**
         *The Ordinance imposes new taxes, but was not submitted to the electorate for vote.*

18
19       121.   Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

   above.

20       122.   The California Constitution requires that "No local government may impose, extend, or

21   increase any general tax unless and until that tax is submitted to the electorate and approved by a

22   majority vote." Article XIII C, §2(b).

23      123.   It also requires that "No local government may impose, extend, or increase any special

24   tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." Article

25   XIII C, §2(d).

26      124.   A "tax" is "any levy, charge, or exaction of any kind imposed by a local government,"

27

28

---

[1] The state laws cited in *Fiscal* have since been repealed.  However, they have been continued into other statutes with no substantive change.

Complaint

with exceptions that do not apply here. Article XIII C, §1(e).

125.    Thus, both of the fees in the Ordinance and the insurance requirement constitute a "tax."

126.    The Ordinance, whether it is a general or a special tax, was never submitted to the electorate for a vote.

127.    We note that, if the City disputes that the Ordinance is a tax, "the [City] bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." Article XIII C, §1.

128.    The City cannot meet this burden because the fees imposed are a levy, charge, or exaction imposed by the city that does not meet any exception, and the amount of the fees are "more than necessary to cover the reasonable costs of the governmental activity" because they are not for government activity, and "the manner in which those costs are allocated to" gun owners do not "bear a fair or reasonable relationship to the payor's burdens on, or benefits received from" the City's "governmental activity." Article XIII C, §1.

129.    As stated previously, the insurance requirement and the fee allocated to a non-profit do not cover "costs of a governmental activity" as the insurance is allocated to for-profit corporations and the fee is allocated to an unnamed non-profit rather than the City.

130.    Neither the insurance requirement nor the non-profit fees bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, a governmental activity.

131.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Ordinance.

132.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

19
Complaint

1   //

2   //

3   //

**SIXTH CLAIM FOR RELIEF**
**San Jose City Charter, Art. IV, §§ 400, 502, 602, 701, 1204, 1206, 1207, 1211**
***The Ordinance Violates the Separation of Powers Within the City of San Jose's Government, its***
***Budget and Appropriations Procedures, and Controls on the City's Receipts***

7   133.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

8   above.

9   134.    The San Jose City Charter ("Charter") establishes the powers of the City of Sam Jose's

10  government.  San Jose City Charter § 200.

11  135.    The Charter divides the legislative power of the City's government from its executive

12  power.  "All powers of the City and the determination of all matters of policy shall be vested in the

13  Council, subject to the provisions of this Charter and the Constitution of the State of California." *Id.*, §

14  400.

15  136.    The Charter grants the City Council the power to impose taxes by ordinance.  *Id.*, §

16  602(c).

17  137.    Only the City Council has the power to establish a budget. *Id.* §§ 1204, 1206.  The

18  Council also has the sole power to appropriate the expenditure of City funds. *Id.*, § 1207.

19  138.    Finally, "[a]ll revenues and receipts which are not required by [the] Charter, State law

20  or ordinances to be placed in special funds shall be credited to the [City's] General Fund." *Id.*, § 1211.

21  The General Fund is "a medium of control and accounting for all City activities excepting activities

22  for which special funds are established and maintained." *Id.* CAL. GOV'T. CODE § 43400 also requires

23  monies received "from licenses, street poll taxes, fines, penalties, and forfeitures" to be put into the

24  general fund.

25  139.    Here, the Ordinance states that "[t]he City shall not specifically direct how the monies

26  from the Gun Harm Reduction fee are expended" by its chosen non-profit.  Ordinance, § 10.32.220.C.

27  140.    The Ordinance, by prohibiting the City from directing how "monies from the Gun

28  Harm Reduction fee are expended" violates the San Jose City Charter's reservation of budgeting and

20

Complaint

1    appropriation power to the City Council.

2         141.    The Ordinance, to the extent it empowers the City Manager to determine how the

3    Ordinance's cost recovery fee is spent, violates the separation of powers within the City Charter,

4    which reserves budgeting and the appropriation of funds to the City Council.

5         142.    The Ordinance states that gun owners must pay the City-required, City-determined fee

6    directly to a non-profit organization. *Id.*, § 10.32.215.

7         143.    By diverting a City fee to a non-profit rather than the City's General Fund, the

8    Ordinance violates the City Charter's requirement that all City revenues and receipts be deposited into

9    City accounts as an essential means of City "control and accounting."

10        144.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm

11   to their constitutional rights unless Defendants are enjoined from implementing and enforcing the

12   Ordinance.

13        145.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate

14   their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs

15   pursuant to California Code of Civil Procedure Section 1021.5.

**SEVENTH CLAIM FOR RELIEF**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202**
*Plaintiffs are entitled to declaratory relief.*

18        146.    Plaintiffs incorporate by reference and re-allege herein each of the Paragraphs set forth

19   above.

20        147.    To the extent that each of the claims above have not already established a remedy,

21   Plaintiffs are entitled to declaratory relief holding that the Ordinance violates Plaintiffs' individual

22   rights under the United States and California constitutions and San Jose's City Charter, and is

23   otherwise invalid, are entitled to preliminary and permanent injunctions preventing the enforcement of

24   the Ordinance, nominal damages, and further relief that this Court deems necessary or proper.

**PRAYER FOR RELIEF**

26        WHEREFORE, Plaintiffs pray, on behalf of themselves and all of NAGR's members, for the

27   following:

28        A.      Preliminary and permanent injunctions enjoining Defendants and all successors in

21

Complaint

1    office from enforcing the Ordinance, including those authorized by 42 U.S.C. § 1983

2    and Cal. Civil Code §52.1;

3    B.    A declaratory judgment that the Ordinance violates the First, Second, Fifth, and

4    Fourteenth Amendments of the United States Constitution and article XI, section 7 and

5    article XIII C of the California Constitution, San Jose's City Charter, and granting the

6    necessary and proper relief this Court deems appropriate, including relief authorized by

7    28 U.S.C. §§ 2201, 2202;

8    C.    Nominal damages;

9    D.    Costs and attorney fees, including those authorized by 42 U.S.C. § 1988 and California

10    Code of Civil Procedure Section 1021.5; and

11    E.    Any other relief as this Court, in its discretion, deems just and appropriate.

12

13    Dated: January 25, 2022                    DHILLON LAW GROUP INC.

14

15                                              By:  /s/ Harmeet K. Dhillon
                                                Harmeet K. Dhillon
16                                              Michael A. Columbo
                                                Mark P. Meuser
17                                              DHILLON LAW GROUP INC.
18                                              177 Post Street, Suite 700
                                                San Francisco, California 94108
19                                              (415) 433-1700

20
                                                David A. Warrington*
21                                              Curtis M. Schube*
                                                DHILLON LAW GROUP INC.
22                                              2121 Eisenhower Avenue, Suite 402
23                                              Alexandria, VA 22314
                                                (571) 400-2121
24
                                                *Admission *pro hac vice* forthcoming
25
26                                              *Attorneys for Plaintiffs*

27

28

---

22

Complaint