No. 23-16091

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

HOWARD JARVIS TAXPAYERS ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

v.

CITY OF SAN JOSE, *et al.*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of California
Consolidated Case Nos. 5:22-cv-00501-BLF and 5:22-cv-02365-BLF
Hon. Beth Labson Freeman

---

**APPELLANTS' REPLY BRIEF**

---

Jonathan M. Coupal, SBN 107815
Timothy A. Bittle, SBN 112300
Laura E. Dougherty, SBN 255855
Howard Jarvis Taxpayers Foundation
1201 K Street, Ste. 1030
Sacramento, CA 95814
Telephone: (916) 444-9950

*Attorneys for Appellants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CORRECTIONS TO THE RECORD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    THIS CASE UNAVOIDABLY CALLS FOR AN INTERPRETATION
      OF THE FIRST AMENDMENT: CAN THE GOVERNMENT COMPEL
      PEOPLE TO FINANCIALLY SUPPORT A PRIVATE ORGANIZATION
      THAT NEITHER REPRESENTS THEM NOR WAS CHOSEN BY
      THEM?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.   HJTA'S UNVOTED TAX CLAIM PASSES THE THREE TESTS
      THAT, ACCORDING TO THE CITY, THE CLAIM MUST PASS.. . . . . 18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## CASES

*Abood v. Detroit Bd. of Ed.*
431 U.S. 209, 97 S.Ct. 1782 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ashcroft v. Iqbal*
556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bay Area Cellular Telephone Co. v. Union City*
162 Cal.App.4th 686 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Cumberland Farms v. Tax Assessor*
116 F.3d 943 (1st Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Harris v. Quinn*
573 U.S. 616 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 17

*Howard Jarvis Taxpayers Association v. Fresno Metropolitan*
*Projects Authority*
40 Cal.App.4th 1359 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25, 26

*Jacks v. City of Santa Barbara*
3 Cal.5th 248 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Janus v. AFSCME Council 31*
138 S.Ct. 2448 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lehnert v. Ferris Faculty Assn.*
500 U.S. 507, 111 S.Ct. 1950 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*Schmeer v. County of Los Angeles*
213 Cal.App.4th 1310 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Baxter Int'l, Inc.*
345 F.3d 866 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## CONSTITUTIONS

**California Constitution**
Art. XIII C, § 1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Art. XIII C, § 1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24
Art. XIII C, § 1(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Art. XIII C, § 2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 25

## STATUTES

**San Jose Municipal Code**
§ 10.32.200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21
§ 10.32.200-250. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

## RULES

**Federal Rules of Civil Procedure**
§ 8(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## MISCELLANEOUS

https://www.sjpd.org/about-us/organization/bureau-of-investigations/
      investi-gations-division-ii/accident-reconstruction-auto-theft/
      auto-pedestrian-collisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## CORRECTIONS OF THE RECORD

On page 15 of its Answering Brief, the City describes its gun fee ordinance as responding to "findings that *more than a third* of gun injuries are from accidental shootings."[1]  It cites the self-serving "Purpose and Findings" section of its own ordinance (SJ Muni Code § 10.32.200), but even that does not support the Brief's outrageous statement.  Finding No. 2 of the ordinance states that, of 37,500 firearm-related deaths per year *in the United States*, 500 are due to accidental shootings.  That's barely over one percent.

In San Jose, according to the City's own Pacific Institute study, there are, at most, one or two accidental gun deaths per year.  That's 0.004% of the 50,000 households required to pay the City's new fee.  For comparison, according to the San Jose Police Department, in 2022 there were 65 fatal vehicle accidents in San Jose. (https://www.sjpd.org/about-us/organization/bureau-of-investigations/investi-gations-division-ii/accident-reconstruction-auto-theft/auto-pedestrian-collisions.) Yet the City doesn't require vehicle owners to make annual donations to a nonprofit that provides driver training and services to victims of car accidents.  Plaintiffs' Opening Brief raised this point to illustrate that the City has not shown "a compelling state interest."  The City's Answering Brief never even addresses it.

---

[1]  Unless noted otherwise, all emphasis is added.

5

On page 16, the Answering Brief states, "[t]he fee is to fund voluntary services for gun owners and those living in a house with a gun." That is incomplete. One needn't live in a house with a gun to be eligible for services. Services are expressly available to persons living elsewhere "with whom [gun owners] have a close familiar or intimate relationship." And plaintiffs' complaint (which must be deemed true for a motion to dismiss) alleges that, while the nonprofit is *required* to make services available to gun owners, their households, family, and intimate friends, it "is *nowhere precluded* from making those services available to the general public." (2-ER-131.)

On page 19, the Answering Brief states, "Contrary to HJTA's assertions ... the City *never has* and *is not currently* enforcing the Fee requirement." Plaintiffs never contended that the City has in the past, or currently is, enforcing the fee requirement. That too is a false statement. We alleged in our complaint (which must be accepted as true) and we cited public records and the City's own Status Reports filed herein to show that the City enacted the fee, set it at $25 for FY 2022-23, renewed it at $25 for FY 2023-24, included it in the Police Department's budget and, contrary to waiving the fee, has stated publicly and in this litigation that it will begin enforcing collection of the fee once a nonprofit is designated. (Opening Brief at 27, 37 and fn. 4.)

On page 20, the Answering Brief states that, "[a]lthough the Ordinance permits the impoundment of any non-compliant person's firearm ... that provision is inoperable because 'there is currently no lawful basis to impound firearms under state or

federal law.' *... HJTA also alleges this same lack of authority to impound.*"  That too is a false statement.  One of the injustices resulting from the District Court consolidating HJTA's case with the case filed by the National Association of Gun Rights is that HJTA and NAGR disagreed on this very point.  While NAGR believed it served its members' interests to embrace the City's "admission" that it had no authority to impound noncompliant firearms, HJTA believed the "admission" was legally inaccurate and made only for the purpose of downplaying the constitutional overreach of its ordinance.  This disagreement was handled in the court-mandated "joint" amended complaint by setting out a separate section containing HJTA's distinct allegations.  In falsely claiming that "HJTA also alleges this same lack of authority to impound," the City cites one of NAGR's allegations.  In the HJTA section of the complaint it alleged the exact opposite, that "City police are authorized by law to, and often do, confiscate firearms when carried or used in violation of the law."  (2-ER-139.)

## ARGUMENT

### I

### THIS CASE UNAVOIDABLY CALLS FOR AN INTERPRETATION OF THE FIRST AMENDMENT: CAN THE GOVERNMENT COMPEL PEOPLE TO FINANCIALLY SUPPORT A PRIVATE ORGANIZATION THAT NEITHER REPRESENTS THEM NOR WAS CHOSEN BY THEM?

The problem with federal compelled speech and association jurisprudence is that it developed mostly around three types of cases: (1) cases brought by public

employees who didn't want to pay compulsory union dues; (2) cases brought by lawyers who didn't want to pay compulsory bar dues; and (3) cases brought by taxpayers who didn't want to pay taxes. In all three situations the receiving entity actually served or regulated the payer.

The City in its Answering Brief dismisses each case relied on by plaintiffs as distinguishable because it involved facts unlike the case at bar. To that plaintiffs respond, of course the facts are different – no public agency has ever before attempted what San Jose has done here. Plaintiffs have unearthed no other case where a public agency has required its citizens, or a subset of its citizens, to annually pay a compelled donation to a private nonprofit organization neither chosen by nor serving the citizen, or else be guilty of a misdemeanor. And by the way, nowhere does the City cite a case with similar facts. This Court does not have the luxury of an on-point precedent. It will need to determine what protection Americans have under their First Amendment in a case like this.

To support its assertion that HJTA's First Amendment claim is "impossible to evaluate on the current factual record," the City argues that "HJTA ... fails to identify the Nonprofit or specify any expressive speech or activity by the Nonprofit with which HJTA disagrees." Until "these critical facts [are] known," the City argues, HJTA's First Amendment claim is "prudentially unripe." (City's Brief at 24.)

The City's ordinance is short. This Court can read the whole thing in just

minutes. (SJ Muni. Code Title 10, chap. 32, §§ 10.32.200-250.) The ordinance nowhere contains an "objector" exemption. In other words, if the first designated nonprofit, or a subsequent nonprofit, engages in "expressive speech or activity … with which [a payer] disagrees," there is no administrative mechanism for enforcing even the City's cramped concept of First Amendment protection. The City's motion to dismiss explains the only mechanism available. When a particular nonprofit engages in a particular pattern of expression to which a particular payer objects, then that payer can invest years of his life and many thousands of dollars in litigation to obtain a refund of $25.

Obviously, no prudent person would make that investment. If the City's scheme is not invalidated as facially unconstitutional, then this Court should expect that every as-applied violation of an individual's rights will go unremedied.

Contrary to the City's position, however, the law does not require courts to spoon out remedies for First Amendment infringements one plaintiff at a time. Consider, for example, *Janus v. AFSCME, Council 31*, 138 S.Ct. 2448 (2018). According to the City, *Janus* ruled that a plaintiff must first prove his money is funding some speech or expressive conduct with which *he personally* disagrees before there is a justiciable dispute for a court to resolve. (E.g., City's Brief at 39 ["[*Janus*] held requiring *individuals* to endorse ideas *they* find objectionable is counter to First Amendment principles"]; and at 50 ["*Janus* supports the District

9

Court's decision to dismiss HJTA's First Amendment claim on ripeness grounds [because a] threshold issue in *Janus* was that *the plaintiff* non-union members objected to the speech *they* alleged *they* were compelled to support"]; and at 14 ["HJTA [cannot] specify any expressive speech or activity by the Nonprofit with which *HJTA* disagrees"]; and at 24 ["[Plaintiffs] cannot plausibly allege that *they* will disagree with the unknown 'message' of an unknown Nonprofit"].)

*Janus*, however, does not support the City's view that courts may only spoon out remedies for First Amendment infringements one offended plaintiff at a time. The holding in *Janus* was not limited to Mark Janus. The Court did not order a refund to just Mr. Janus. Rather the Court invalidated the entire nationwide practice of charging agency fees to non-union members. The Court ruled:

> *States and public-sector unions may no longer extract agency fees from nonconsenting employees.* Under Illinois law, if a public-sector collective-bargaining agreement includes an agency-fee provision ... that amount is automatically deducted from the nonmember's wages. No form of employee consent is required. *This procedure* violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." (*Janus*, 138 S.Ct. at 2486.)

10

The complaint filed by Mark Janus did not identify any specific message or activity to which he objected.  As an intervenor in the Governor's lawsuit, Mr. Janus said he opposed the union's efforts to negotiate higher employee compensation when the State of Illinois was facing a budget deficit.  (138 S.Ct. at 2461.)  But in his own complaint, he simply alleged "that *all* 'nonmember fee deductions are coerced political speech' and that 'the First Amendment forbids coercing *any* money from the nonmembers.'" (*Id.* at 2462.)

The bare bones allegations in the *Janus* complaint are similar to the allegations at bar.  HJTA's complaint here alleges: "The Ordinance will require an estimated 50,000-55,000 gun-owning San Jose Citizens, minus a few exceptions, to ... pay annual fees simply to exercise the same constitutional right to own a gun that existed prior to this ordinance." (2-ER-128-129.)  "The Ordinance ... requires San Jose gun owners to pay an 'Annual Gun Harm Reduction Fee' to a 'Designated Nonprofit Organization' that the City Manager will designate from time to time. ... 'Designated Nonprofit Organization' is defined in the Ordinance as 'an entity that qualifies as a nonprofit corporation under the federal internal revenue code." (2-ER-125.) "'[T]he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended' by the nonprofit. ... The fee thus functions to compel gun owners to give their money to a government approved nonprofit to spend on vaguely specified and/or unspecified programs at the nonprofit's discretion." (2-ER-131.)  "Freedom

11

of speech includes the right to not speak and the right to not be forced by the government to support someone else's speech .... The right to peaceably assemble includes ... the right to not be forced by the government to associate with or support someone else's organization .... By requiring San Jose gun owners to pay an Annual Gun Harm Reduction Fee to a private nonprofit organization that the City Manager will designate, the Ordinance forces San Jose gun owners to associate with or support that private group and to fund their message, in violation of the gun owners' rights of free speech and association under the United States Constitution." (2-ER-136.)

Equivalent allegations were sufficient in *Janus*. Therefore, they should be sufficient here. HJTA's complaint is not missing "critical facts" by not alleging a particular message "with which HJTA disagrees." (City's Brief at 24.)

Although *Janus* did not involve identical facts, it articulated helpful principles that shed light on the path as this Court moves beyond the battlefield of public-sector agency fees, bar dues, and taxes, where most of the compelled speech and association skirmishes were fought in the past. *Janus* reversed forty-one years of precedent when it overruled *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782 (1977). *Abood* was the seminal case which found no First Amendment violation when state employees who declined to join a public-sector union were nonetheless compelled to pay an agency fee to support the union's work related to collective bargaining. *Abood* reasoned that nonmembers were being charged only for work that benefitted them,

12

and not for political or ideological activities with which they might disagree.  (*Id.*, 431 U.S. at 235-236.)

Here, when the City argues that, until the first nonprofit is designated and its messages and activities come into focus, it is impossible to know whether HJTA will object to them, the City is trying to lead this Court down the *Abood* path.  But the Supreme Court not only abandoned that path, it reversed course when it overruled *Abood*.  Now even agency fees – which do *not* pay for contentious expressive activities, but pay only for services that benefit the payer – cannot lawfully be compelled.  As *Janus* held, even when private speech "'furthers the interests of nonspeakers' ... 'that does not alone empower the state to compel the speech to be paid for.'  In simple terms, the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." (*Janus*, 138 S.Ct. at 2466-2467 [quoting *Lehnert v. Ferris Faculty Assn.*, 500 U.S. 507, 556, 111 S.Ct. 1950 (1991) Scalia, J., concurring and dissenting].)

Thus, even though *Janus* involved different facts, its holding and principles are extremely relevant.  Moreover, compared to the facts in *Janus*, the facts here are even more convincing.  In *Janus*, the public employee union represented employees only, and was required by law to represent all employees equally, whether or not they were members of the union.  (*Janus*, 138 S.Ct. at 2460.)  Also, at least over the course of

13

time, the higher pay and benefits negotiated by the union produced a net gain for nonmembers, compared to the relatively small agency fee exacted from them.

Here, however, the City admits that the nonprofit's services are voluntary. (City's Brief at 17.) Because they are voluntary, plaintiffs allege that "gun owners are not required to, and may not choose to, utilize" them. (2-ER-128.) The City also admits the nonprofit's services will be available to others, not just fee payers. (City's Brief at 17.) Finally, since many gun owners will receive nothing in return for their annual fee, the exaction will be a net loss to them. Thus, although the facts of *Janus* are not identical, the Supreme Court's decision (that nonmembers, despite receiving and benefitting from the union's services, could not be compelled to pay a fee to the union) applies with even greater force here (where gun owners who will *not* receive or benefit from the nonprofit's services *are* compelled to pay a fee to the nonprofit).

While no existing case involves facts identical to the case at bar, one comes close. That case is *Harris v. Quinn*, 573 U.S. 616 (2014). The facts are as follows. Under federal law, incapacitated Medicaid patients have the choice of institutional care or in-home care by a "personal assistant" ("PA"). In-home care recipients (designated "customers") are, by law, the PA's employer, and control most aspects of their employment. They hire, fire, supervise, validate records, and define the duties of the PA. The PA's compensation is fixed by federal statute. The State's only role is to pay PAs with funds it receives from the federal government. (*Harris v.*

14

*Quinn*, 573 U.S. at 621-22.)

The lawsuit arose in Illinois when the Governor issued an executive order (later codified) designating PAs as "state employees" for the sole purpose of including them in a public employee labor union, thereby requiring them to pay an agency fee. The SEIU Healthcare union charged PAs the same agency fee as state employee objectors even though, in collective bargaining, it had no power to negotiate any of the PAs' employment conditions. A group of PAs brought suit. They contended that, by requiring them to pay a fee to a union that provided them almost no representation, the State was violating their First Amendment rights. (573 U.S. at 625-626.)

Because the case pre-dated *Janus*, the District Court dismissed the case, and the Seventh Circuit affirmed, concluding the case was controlled by *Abood v. Detroit Bd. of Ed.* (supra), the case later overruled by *Janus*. Even though the case arose during the era of *Abood* and its progeny, the Supreme Court had no trouble reversing the Court of Appeals because the agency fee exacted from the PAs did not pass muster even under *Abood*.

Under *Abood*, the Court noted, "'The primary purpose' of permitting unions to collect fees from nonmembers ... is 'to prevent nonmembers from free-riding on the union's efforts, sharing the employment benefits obtained by the union's collective bargaining without sharing the costs incurred.'" (*Harris*, 573 U.S. at 627.) "[B]ecause [PAs] are quite different from full-fledged public employees," the *Harris*

Court wrote, "we refuse to extend *Abood* to the new situation now before us. *Abood* itself has clear boundaries; it applies to public employees. Extending those boundaries to encompass partial-public employees, quasi-public employees, or simply private employees would invite problems." (*Harris*, 573 U.S. at 645- 647.)

"Because *Abood* is not controlling," the Court went on to say, "we must analyze the constitutionality of the payments compelled by Illinois law under generally applicable First Amendment standards." Chief among those standards, the Court stated, are the bright line rules that "[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves," and "compelled funding of the speech of other private speakers or groups presents the same dangers as compelled speech." (*Harris*, 573 U.S. at 647 (citations and internal quotation marks omitted).) Even in the agency fee context, "[t]he mere fact that nonunion members benefit from union speech is not enough to justify an agency fee because 'private speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for.'" (*Harris*, 573 U.S. at 643 (quoting *Lehnert v. Ferris Faculty Assn.*, 500 U.S. 507, 556 (1991).)

Applying these general standards, the Supreme Court concluded: "we refuse to extend *Abood* in the manner that Illinois seeks. If we accepted Illinois' argument, we would approve an unprecedented violation of the bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled

16

to subsidize speech by a third party that he or she does not wish to support. The First Amendment prohibits the collection of an agency fee from personal assistants in the Rehabilitation Program who do not want to join or support the union." (*Harris*, 573 U.S. at 656.)

This Court, in the case at bar, need not even wrestle with whether *Abood* should be extended to allow the San Jose gun fee. Now, under *Janus*, *Abood* and its progeny are no longer good law.

The City's Answering Brief never vigorously defends the constitutionality of its ordinance, arguing mainly that the facts critical to an *Abood* era analysis are missing from plaintiffs' complaint because a first nonprofit has not yet been designated. Until a first nonprofit is designated, the City argues, it is unknown whether nonprofits will engage in expressive speech or activities like the political or ideological union activities that *Abood* held were not chargeable to objecting nonmembers. In a mere footnote, the City suggests that the constitutionality of its ordinance is not at issue: "The merits of HJTA's First Amendment claim – i.e., whether the Fee requirement passes constitutional muster ... was not reached by the lower court, and is not at issue in this appeal." (City's Brief at 44, fn. 10.)

The City can avoid defending the constitutionality of its ordinance only if this Court agrees that an *Abood* era analysis still applies so as to require the plaintiff to show that his mandated payment will fund political or ideological messaging with

which he or she personally disagrees. If *Abood* is still good law, then the City is correct that "until these critical facts [are] known," HJTA's First Amendment claim is "prudentially unripe." (City's Brief at 24.) However, if this Court agrees that *Janus* overruled *Abood*, then the City is mistaken and the District Court erred in dismissing HJTA's First Amendment claim as unripe.

## II

### HJTA'S UNVOTED TAX CLAIM PASSES THE THREE TESTS THAT, ACCORDING TO THE CITY, THE CLAIM MUST PASS

In what is apparently a drafting error, the Answering Brief initially states, "To achieve reversal, HJTA must prevail on four separate issues," but thereafter lists only three issues. (City's Brief at 53-54.) According to the City, then, this Court must order reversal if it finds: (1) that the complaint adequately pleads a violation of article XIII C, section 2(d) of the California Constitution; (2) that the City's fee constitutes a "tax" under, or in spite of, *Schmeer v. County of Los Angeles*, 213 Cal.App.4th 1310 (2013); and (3) that the fee, if a tax, is a "special tax," not a "general tax." (City's Brief at 53-54.)

As explained in HJTA's Opening Brief, a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." (FRCP § 8(a)(2).) "[D]etailed factual allegations" are unnecessary. (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).) It need

only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." (*Twombly*, 550 U.S. at 555.)  This threshold "is 'exceedingly low.'" (*United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003).)

Here, HJTA claims a violation of article XIII C, section 2(d) of the California Constitution.  Section 2(d), then, provides the elements of the claim.  It states simply, "No local government may [1] impose, extend, or increase [2] any special tax [3] unless and until that tax is submitted to the electorate and approved by a two-thirds vote."  The City's first test for "achieving reversal" is that HJTA "must convince this Court that the claim is adequately pleaded."  (City's Brief at 53.)

Regarding imposition, the complaint expressly alleges, "The Annual Gun Harm Reduction Fee is imposed by the City of San Jose."  (2-ER-139.)  The City freely admits that the fee is imposed by the City:  "*The Ordinance imposes* ... an annual Fee (currently set at $25) to the City-designated Nonprofit to fund voluntary services." (2-ER-90.)  "*[I]mposition* of the Fee and the Fee amount are both *controlled entirely by the City Council*."  (2-ER-113.)

Regarding voter approval, the complaint alleges that the fee "was not submitted to the electorate or approved by a two-thirds vote."  (2-ER-140:13-18.)  The City freely admits that the fee was never presented to the voters for approval.  (2-ER-293:10-22.)  Accordingly, the City does not list voter non-approval as one of the three tests that HJTA must pass "to achieve reversal."

19

The only remaining element to be pled is that the City's gun fee is really a "special tax." The complaint alleges, "Although labeled a 'fee' by the City, the Annual Gun Harm Reduction Fee does not qualify for any exception from the definition of a 'tax' enumerated in article XIII C, section 1(e). Therefore it is a tax. Taxes are either 'general taxes' or 'special taxes.' A 'special tax' is "any tax imposed for specific purposes. (Cal. Const., art. XIII C, § 1(d).) The Annual Gun Harm Reduction Fee is imposed ostensibly for the purpose of reducing gun harm. Therefore, it is a special tax." (2-ER-140.) The City criticizes these allegations as "conclusions of law" devoid of facts. (City's Brief at 53.) But "[w]hether a charge is a tax or a fee 'is a question of law for the appellate courts to decide on independent review.'" (*Jacks v. City of Santa Barbara*, 3 Cal.5th 248, 267 (2017); *Cumberland Farms v. Tax Assessor*, 116 F.3d 943, 946 (1st Cir. 1997) ["The classification of an impost [as a] 'tax' versus 'fee' presents a question of law"].)

The City's own first test to "achieve reversal" is therefore passed because the complaint adequately pleads a violation of article XIII C, section 2(d) of the California Constitution.

Its second test is that the gun fee constitutes a "tax" under, or in spite of, *Schmeer v. County of Los Angeles*. As just explained, the "tax" versus "fee" dilemma presents a question of law. The City argues that it is a binary question which turns solely on whether the fee is paid or remitted to the government, citing *Schmeer v.*

20

*County of Los Angeles*, 213 Cal.App.4th 1310 (2013). But California law considers many factors in classifying an exaction as a fee or a tax, and *Schmeer* itself acknowledges this as it traces California's taxpayer revolution from Proposition 13 in 1978 through Proposition 26 in 2010. (*Schmeer*, 213 Cal.App.4th at 1317-1326.) In fact, in the very sentences that the City often repeats, *Schmeer* itself is clearly not binary. If it were, then words like "*ordinarily*," "although," and "or" would be unnecessary. This shows that payment to a private entity does not automatically resolve the inquiry. (*Schmeer*, 213 Cal.App.4 th at 1327 ["Taxes ordinarily are imposed to raise revenue for the government ... *although taxes may be imposed for nonrevenue purposes as well*."]; 1328-1329 ["we conclude that the language ... "levy, charge or exaction" ... is limited to charges payable to, *or for the benefit of*, a local government."].)

San Jose Municipal Code section 10.32.200 explains how the fee is "*for the benefit of*" the "local government" and the people of San Jose. "This Part is passed ... for the protection of the welfare, peace and comfort of the residents of the City of San Jose. Specifically, it is the intent of this Ordinance to reduce gun harm." Reducing gun harm, it says, will save the local government money, as it spends "approximately $39.7 million ... to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning."

Due to the limited space allowed, plaintiffs cannot reiterate the many ways in which the facts at bar differ from *Schmeer*, or how each of those different facts is tied to a relevant factor in determining where, on the "tax" versus "fee" continuum, San Jose's gun fee lands. Plaintiffs instead implore this Court to reread pages 43-49 of plaintiffs' Opening Brief, where plaintiffs explain with citations to authority that the gun fee is: (1) imposed by the City; (2) compulsory; (3) not to mitigate a problem caused by the payer; (4) not to cover the cost of a benefit received by the payer; and (5) to support a public purpose (gun harm reduction) advanced by the government. Weighing these five factors against the one factor that the gun fee shares with *Schmeer* (writing the check to a private entity), the balance tilts far to the "tax" side of the scale. Even *Schmeer* shares this conclusion when it classifies taxes as "charges payable to, *or for the benefit of*, a local government." (213 Cal.App.4th at 1328-1329.)

Finally, *Schmeer* is not alone in sharing this conclusion that a government-imposed, compulsory payment to a private entity for a public purpose can be a "tax" requiring voter approval. In *Howard Jarvis Taxpayers Association v. Fresno Metro-politan Projects Authority*, 40 Cal.App.4th 1359 (1995), the California Legislature declared that promoting science, culture and the arts is essential to the quality of life and economic well-being of the Fresno area and the State. The Legislature sought to achieve these goals by creating a private entity called the Fresno Metropolitan

22

Projects Authority. (40 Cal.App.4th at 1363-64.) The Legislature authorized a new 0.1% local sales tax, if approved by Fresno area voters. The Authority would "levy and collect the tax" and spend it according to loose guidelines in the Act. No tax revenue would be paid or remitted to the City or County of Fresno. (*Id.* at 1364.) Even though the voters approved the proposal, the Court invalidated the tax because it was levied and collected by a private, non-governmental entity.

*Fresno* predated Propositions 218 and 26. Moreover, the Legislature gave the electorate the opportunity to vote on the proposal. The principal issue in the case, then, was not whether this was a "tax" requiring voter approval, but rather whether the government could impose a tax to be collected and appropriated by a private entity. The Court was concerned that the Authority's "members were neither elected by the voters nor appointed by government officials who were themselves elected by voters." The state constitution, it said, stands as "a safeguard against just such a situation." (40 Cal.App.4th at 1383.)

While it is *not* an invalid tax when a private entity charges ten cents for a ten cent bag voluntarily requested by a shopper, as *Schmeer* found, *Fresno* illustrates that it *is* an invalid tax when a charge must be involuntarily paid to an unelected private entity in return for nothing, under government compulsion. The fact that a private entity is the recipient of the revenue is not the determining factor.

The City's own second test to "achieve reversal," then, is passed. The gun fee,

on balance, constitutes a "tax" under, or in spite of, *Schmeer v. County of Los Angeles*. One last test remains.

The City's Answering Brief states, "[t]he third issue, although not reached by the District Court below, provides yet another ground for affirming dismissal of this claim because the Fee is not deposited into the City's 'general fund,' and thus likely is not a 'special tax.'" This argument is easily laid to rest.

Under California law, the test for whether a tax is a "special tax" or a "general tax" is not the name on the account. The test, rather, is whether the revenue is directed to "specific purposes." "'General tax' means any tax imposed for general governmental purposes." (Cal. Const., art. XIII C, § 1(a).) "'Special tax' means any tax imposed for specific purposes, *including* a tax imposed for specific purposes which is *placed into a general fund*." (art. XIII C, § 1(d).) Ordinarily, then, *not* depositing the revenue into a general fund would indicate a "special tax," contrary to the City's suggestion. But California's constitution provides that, *even if* the revenue is deposited into a general fund, the tax is still a "special tax" if it is "imposed for specific purposes."

*Bay Area Cellular Telephone Co. v. Union City*, 162 Cal.App.4th 686 (2008) held that a "911 Fee" imposed on telephone subscribers was a "tax" not a "fee" because, just like gun harm reduction, "[t]he 911 system benefits every inhabitant of the City ... whether or not subject to the Fee." (*Id.* at 696.) It also held that the tax

24

was a "special tax" because "[t]he essence of a special tax 'is that its proceeds are earmarked or dedicated in some manner to a specific project or projects.'" (*Id.* (citations omitted).) In that case, funding the 911 system was the specific purpose of the 911 "fee." Here, funding gun harm reduction counseling, treatment and training is the specific purpose of the City's gun harm reduction fee. It is therefore a special tax.

Applying the three tests that the City argues plaintiffs must pass to "achieve reversal" on their unvoted tax claim, then: (1) plaintiffs' complaint adequately pled a violation of article XIII C, section 2(d) of the California Constitution; (2) the City's gun fee constitutes a "tax" under, or in spite of, *Schmeer v. County of Los Angeles*; and (3) the tax is a "special tax," not a "general tax." (City's Brief at 53-54.) And because it lacks voter approval, the gun fee is an invalid special tax.

## **CONCLUSION**

Under *Janus*, which overruled the *Abood* line of cases upon which the City's "until we know" defense is built, and *Harris*, which found a First Amendment violation on similar facts even during the *Abood* era, plaintiffs have the right to not associate with any group they have not voluntarily selected, and the right to not support their work or message. Forcing them to pay an annual donation to a private nonprofit designated by the City is unconstitutional.

Weighing the one factor that does not support finding a "tax" (revenue

25

received by a private entity) against the five factors that weigh in favor of finding a "tax" ((1) imposed by the City; (2) compulsory; (3) not for a problem caused by the payer; (4) not for a benefit received by the payer; (5) to support a public purpose advanced by the government), tips the balance far to the "tax" side of the scale. *Schmeer* supports this conclusion ("'tax' refers to charges payable to, *or for the benefit of*, a local government") and so does *Fresno*, which invalidated a tax even though it was received by a private entity.

For all of the reasons herein, the District Court's dismissal of plaintiffs' complaint should be reversed.

DATED:   April 9, 2024.                    Respectfully submitted,

JONATHAN M. COUPAL
TIMOTHY A. BITTLE
LAURA E. DOUGHERTY


  */s/ Timothy A. Bittle*
Timothy A. Bittle
*Attorneys for HJTA Plaintiffs-Appellants*

26

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-16091

I am the attorney or self-represented party.

**This brief contains** 5,410 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Timothy A. Bittle | **Date** | April 9, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED:   April 9, 2024.

JONATHAN M. COUPAL
TIMOTHY A. BITTLE
LAURA E. DOUGHERTY

 */s/ Timothy A. Bittle*
Timothy A. Bittle
*Attorneys for HJTA Plaintiffs-Appellants*